UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
    :
CHESAPEAKE ENERGY CORPORATION,    :
    :
           Plaintiff,    :   Civil Action No. 13 CIV 1582 (PAE)
    :
      v.    :
    :
THE BANK OF NEW YORK MELLON    :   ECF Case
TRUST COMPANY, N.A.,    :
    :
          Defendant.    :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## THE INTERVENOR AD HOC NOTEHOLDER GROUP'S [PROPOSED] MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300

*Counsel for Intervenor Ad Hoc Noteholder Group*

## TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

FACTUAL BACKGROUND.....................................................................................................3

     A.     The Relevant Indentures ....................................................................................3

     B.     Chesapeake's Potential Notice of Redemption.....................................................5

ARGUMENT ...........................................................................................................................6

     A.     There is No Justiciable Dispute Ripe For Adjudication. .........................................6

     B.     Chesapeake Has No Right to the Extraordinary Remedy of an Injunction. .............7

           1.     Chesapeake Has Only Hypothetical Money Damages and Cannot Show Irreparable and Overwhelming or Extreme Harm. ...........................8

           2.     Chesapeake Cannot Show a Substantial Likelihood of Success on the Merits. ..............................................................................................10

           3.     The Balance of the Harms Weighs Decidedly Against Chesapeake. ........17

           4.     If the Court Issues an Injunction, It Should Require Chesapeake to Post an Injunction Bond......................................................................19

CONCLUSION.......................................................................................................................21

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alcatel Space, S.A. v. Loral Space & Comms. Ltd.*,
   154 F. Supp. 2d 570 (S.D.N.Y. 2001)..................................................................9

*Argonaut P'shp., L.P. v. Bankers Trustee Co.*,
   1997 U.S. Dist. LEXIS 1092 (S.D.N.Y. Feb. 4, 1997)..........................................6

*Babbitt v. United Farm Workers Nat'l Union*,
   442 U.S. 289 (1979)...........................................................................................6

*Blom ASA v. Pictometry Int'l Corp.*,
   757 F. Supp. 2d 238 (W.D.N.Y. 2010)...............................................................18

*Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*,
   934 F.2d 30 (2d Cir. 1991).................................................................................7

*Continental Bank & Trust Co. v. Garfinkle*,
   1969 U.S. Dist. LEXIS 12945 (S.D.N.Y. June 11, 1969) ....................................16

*Doninger v. Niehoff*,
   527 F.3d 41 (2d Cir. 2008)............................................................................6, 16

*Eastin-Phelan Corp. v. Hal Roach Studios, Inc.*,
   350 F. Supp. 1328 (S.D.N.Y. 1972)...................................................................15

*Edgar v. Mite Corp.*,
   457 U.S. 624 (1982).........................................................................................17

*Emmet & Co. v. Catholic Health East*,
   2011 U.S. Dist. LEXIS 54935 (S.D.N.Y. May 18, 2011) ............................8, 9, 17

*First African Trust Bank v. Bankers Trust Co.*,
   1992 U.S. Dist. LEXIS 14762 (S.D.N.Y. Sept. 28, 1992)......................................7

*First Montauk Sec. Corp. v. Menter*,
   26 F. Supp. 2d 688 (S.D.N.Y. 1998)..................................................................14

*Gold Fields Ltd. v. Harmony Gold Mining Co.*,
   2004 U.S. Dist. LEXIS 23874 (S.D.N.Y. Nov. 23, 2004)................................8, 17

*In re South Side House, LLC*,
   470 B.R. 659 (Bankr. E.D.N.Y. 2012).................................................................11

*Joneil Fifth Ave., Ltd. v. Ebeling & Reuss Co.*,
   458 F. Supp. 1197 (S.D.N.Y. 1978)...................................................................16

*Kaiser Alum. Corp. v. Matheson*,
   681 A.2d 392 (Del. Sup. 1996) ................................................................15

*Laurus Master Fund, Ltd. v. Valcom, Inc.*,
   2002 U.S. Dist. LEXIS 4631 (S.D.N.Y. Mar. 18, 2002) .....................8, 15

*Law Debenture Trust Co. of New York v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010) ...................................................................11

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997) ...................................................................................7

*Metropolitan Life Sin. Co. v. RJR Nabisco, Inc.*,
   906 F.2d 884 (2d Cir. 1990) .............................................................10, 16

*Munaf v. Geren*,
   128 S. Ct. 2207 (2008) ...............................................................................6

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) .....................................................18

*Nokia Corp. v. InterDigital, Inc.*,
   645 F.3d 553 (2d Cir. 2011) ....................................................................17

*North Carolina v. Rice*,
   404 U.S. 244 (1971) ...................................................................................6

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Company I LLC*,
   582 F. Supp. 2d 616 (S.D.N.Y. 2008) .......................................................9

*Qualitative Reasoning Sys. v. Computer Scis. Corp.*,
   2000 U.S. Dist. LEXIS 17283 (D. Conn. Mar. 30, 2000) ....................6, 15

*Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*,
   754 F. Supp. 2d 616 (S.D.N.Y. 2010) .....................................................18

*RJE Corp. v. Northville Industries Corp.*,
   329 F.3d 310 (2d Cir. 2003) ....................................................................14

*Ryan v. VHA Enters.*,
   1990 U.S. Dist. LEXIS 5040 (S.D.N.Y. May 1, 1990) ..............................8

*Scholastic, Inc. v. Harris*,
   259 F.3d 73 (2d Cir. 2001) ......................................................................14

*TGS-NOPEC Geophysical Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   2009 WL 185995 (S.D.N.Y. Jan. 26, 2009) ...............................................9

*U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*,
   839 F. Supp. 2d 639 (S.D.N.Y. 2011)...................................................................................11

*United States v. New York*,
   708 F.2d 92 (2d Cir. 1983)..............................................................................................9

*Wisdom Import Sales Co. v. Labbatt Brewing Co.*,
   339 F.3d 101 (2d Cir. 2003).............................................................................................7

Certain holders of 6.775% Senior Notes ("Notes") of Chesapeake Energy Corporation Due 2019 (the "Intervenor Ad Hoc Noteholder Group" or "Intervenor Noteholders"),[1] by and through their undersigned counsel, respectfully submit this memorandum of law in opposition to the motion of plaintiff Chesapeake Energy Corporation ("Plaintiff" or "Chesapeake") for a preliminary injunction.  Together, the Ad Hoc Noteholder Group holds approximately $250 million of the outstanding Notes.

## PRELIMINARY STATEMENT

Chesapeake filed this lawsuit on March 8, 2013, impermissibly seeking an advisory opinion regarding a proposed notice of redemption that it has not, even now, actually issued.  In the guise of a simultaneously-filed preliminary injunction motion, Chesapeake seeks to rewrite the redemption provisions of the subject indenture.  The Court should deny Chesapeake's motion in its entirety.

As a threshold matter, there is no justiciable controversy.  Chesapeake seeks an advisory ruling that it may issue a redemption notice to effect a par redemption but that if the Court later determines that the time to do so has elapsed under the governing indenture documents (and it has), then the redemption notice that Chesapeake seeks to issue will be treated as "null and void" rather than a redemption at the Make-Whole Price.  Having failed to provide a timely notice for a par redemption it now seeks a free option by asking the Court for an advisory opinion before it even issues a notice of redemption to defendant The Bank of New York Mellon Trust Company,

---

[1] The individual members of the Intervenor Ad Hoc Noteholder Group are Archer Capital Management, L.P.; Ares Management LLC; Aurelius Capital Management, LP; Carlson Capital, L.P.; Cetus Capital, LLC; Latigo Partners LLC; Monarch Alternative Capital LP; P. Schoenfeld Asset Management LP; River Birch Capital, LLC; and Taconic Capital Advisors LP, together with such other noteholders that hereafter join the Ad Hoc Noteholder Group.  The Ad Hoc Noteholder Group has simultaneously moved to intervene pursuant to Fed. R. Civ. P. 24.

N.A. ("Trustee").  Until Chesapeake actually issues a notice of redemption, and the Trustee acts or refuses to act in some way, there is no dispute or issue to resolve.

Nor could Chesapeake ever establish the irreparable harm required for the drastic remedy of an injunction.  Indeed, it has acknowledged that this action and motion are designed for one reason and one reason only – to avoid the $400 million dollar delta between the no-longer applicable at par redemption and a redemption at the Make-Whole Price.  *See* Memorandum of Law in Support of Plaintiff's Order to Show Cause for Preliminary Injunction ("Chp. Mem.") at 2.  There is no business to save, no reputation to protect, no unique contractual right to enforce.  This case indisputably is about money and money only.  And, as such, there is no irreparable harm.

Chesapeake fares no better in showing a substantial likelihood of success or even sufficiently serious question on the merits to make them a fair ground for litigation.  The text of the Base Indenture and Ninth Supplemental Indenture are plain and unequivocal.  Chesapeake may redeem the Notes at par during the Special Early Redemption Period of November 15, 2012 through March 15, 2013, provided it gives the 30-day advance notice in accordance with Section 3.04 of the Base Indenture within the Special Early Redemption Period.  *See* Supplemental Indenture § 1.7(b).  If it redeems the Notes after March 15, 2013, the redemption must be at the Make-Whole Price.  *See id.*, § 1.7(c).  According to its proposed Notice of Early Redemption, Chesapeake intends "to redeem at par on May 13, 2013 . . . ."  (Compl. Exh. D.)  Such a redemption, under the plain and unambiguous terms of Section 1.7(c), must be at the Make-Whole Price rather than at par.

Finally, the equities decidedly do not tip in Chesapeake's favor.  On the contrary, it would be inequitable in the extreme to the noteholders if the Trustee were precluded from

treating any actual notice of redemption in accordance with the plain language of the Indentures on which the noteholders relied on in making their investments. Moreover, Chesapeake should not be permitted to issue a so-called conditional notice of redemption that would be rendered null and void by Court order if the Court disagreed with Chesapeake's unilateral interpretation of the Indentures. If Chesapeake chooses to issue a notice of redemption, it must live with the consequences of the terms in the Indenture, and the Court should not create a right that does not exist.

Plaintiff has demonstrated none of the prerequisites for preliminary injunctive relief, and its motion for such extraordinary relief should be denied.

## FACTUAL BACKGROUND

### A. The Relevant Indentures

On February 16, 2012, Chesapeake, a publicly traded oil and natural gas producer, completed a public offering of $1.3 billion of 6.775% Senior Notes Due 2019. (*See* Plaintiff's Complaint for Declaratory Judgment (the "Complaint" or "Compl.") ¶¶ 6, 10.) Chesapeake offered 6.775% Senior Notes due in 2019 (the "Notes") pursuant to a prospectus supplement dated February 13, 2012, and issued the Notes pursuant to the Ninth Supplemental Indenture, dated February 16, 2012 (the "Supplemental Indenture"), which supplemented an Indenture dated as of August 2, 2010 (the "Base Indenture").[2] (*Id.*) Both the Base Indenture and the Supplemental Indenture are governed by New York law. (*See* Base Indenture § 13.08; Supplemental Indenture § 2.2.)

Central to this action is Section 1.7 of the Supplemental Indenture, which provides:

---

[2] Chesapeake submitted copies of the Base Indenture and the Supplemental Indenture, which were attached as Exhibits A and B, respectively, to the both the Complaint and Declaration of Anne Cortina Perry ("Perry Decl.").

(a) The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

(b)  At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; …. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

(c)  At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

(Supplemental Indenture § 1.7 (emphasis added).)

Section 1.7(a) provides that Chesapeake has no obligation to redeem the Notes.  The first sentence of Section 1.7(b) permits Chesapeake the limited option to exercise a redemption at par value at any time during the Special Early Redemption Period (*i.e.*, from and including November 15, 2012 to and including March 15, 2013).  The second sentence of Section 1.7(b) provides how Chesapeake can effect such a redemption at par value by giving a notice of redemption pursuant to Section 3.04 of the Base Indenture (*i.e.*, no less than 30 days and no more than 60 days notice).  (*See* Base Indenture § 3.04(a) (providing that Chesapeake shall mail to the noteholders a notice of redemption "at least 30 days but nor more than 60 days before a redemption date"); *see also* Compl. ¶ 14.)  Section 1.7(c) of the Supplemental Indenture provides that any redemption of the Notes after March 15, 2013 must be at the Make-Whole Price[3] plus

---

[3] The "Make-Whole Price" is defined in the form of Note attached to the Supplemental Indenture (the "Form of Note") as "the sum of the outstanding principal amount of the Notes to be redeemed plus the Make-Whole Amount of such Notes."  (Form of Note ¶ 5.)  The "'Make-

accrued and unpaid interest to the redemption date (the "Make-Whole Redemption"), meaning that Chesapeake would purportedly be obligated to pay approximately $400 million to the noteholders on the redemption date.

### B. Chesapeake's Potential Notice of Redemption.

Chesapeake has not alleged, nor could it, that it took any steps to redeem the Notes prior to February 20, 2013, nor does Chesapeake allege that it was precluded from taking such steps. According to Chesapeake, beginning on February 20, 2013, it held several phone calls with the Trustee in which the Trustee declined to confirm that it would treat a "proposed" notice of redemption in accordance with Chesapeake's interpretation of the Indenture in the event that such proposed notice were actually issued.  (Compl. ¶¶ 17-19; *see also* Chp. Mem. at 2.) (explaining "*if* Chesapeake issues" a notice on March 15, BNY Mellon has stated that it "reserves the right" to treat it as untimely for purposes of a Special Early Redemption) (emphasis added).  Moreover, Chesapeake never actually issued a notice of redemption.  Instead, having failed to take any timely action between November 15, 2012 to 30 days prior to the end of the Special Early Redemption Period, Chesapeake attempts to test whether it can get away with a par redemption by contorting the plain terms of the Indenture.  If it really believes that it has the right to issue a par redemption, it should do so.  Again, no one is precluding Chesapeake from issuing a notice of redemption.

Despite learning no later than February 22, 2013, that the Trustee may not accept its unilateral interpretation of the Indenture or consent to a conditional notice of redemption,

---

Whole Amount' with respect to a Note means an amount equal to the excess, if any, of (i) the present value of the remaining principal, premium, if any, and interest payments due on such Note (excluding any portion of such payments of interest accrued as of the redemption date) as if such Note were redeemed on the Maturity Date, computed using a discount rate equal to the Treasury Rate plus 50 basis points, over (ii) the outstanding principal amount of such Note." (Form of Note ¶ 5.)

Chesapeake waited until Friday, March 8, 2013, and then made the instant motion for an emergency preliminary injunction to be decided within a matter of days.

## ARGUMENT

### A.  There is No Justiciable Dispute Ripe For Adjudication.

As a dispositive threshold matter, there is no case or controversy for this Court's review, and the Court accordingly must deny Chesapeake's motion without needing even to consider whether it satisfies the requirements for injunctive relief.  Even now, Chesapeake has not issued a notice of redemption.  According to Chesapeake, it held several phone calls with the Trustee in which the Trustee declined to confirm that it will treat a "proposed" notice of redemption in accordance with Chesapeake's interpretation of the Indenture in the event that such proposed notice were actually issued.  (Compl. ¶¶ 17-19; s*ee also* Chp. Mem. at 2.)  Chesapeake has now come to this Court to ask for an advisory opinion that *if* it were to issue a *proposed* notice of redemption, that such redemption should be treated by BNY as a redemption at par rather than at the Make-Whole Price.

The Indenture does not provide that Chesapeake may undertake conditional redemptions such that if the Court interprets the notice of redemption differently than Chesapeake, then the redemption will be treated as "null and void."  This contemplated chain of events does not present a ripe controversy and seeks nothing other than an advisory opinion.  The Complaint and accompanying motion for a preliminary injunction should be dismissed and denied on this basis alone.  *See generally Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *North Carolina v. Rice*, 404 U.S. 244, 246 (1971); *Argonaut P'shp., L.P. v. Bankers Trustee Co.*, 1997 U.S. Dist. LEXIS 1092, *12-13 (S.D.N.Y. Feb. 4, 1997).

Accordingly, the purported "controversy" posed by Chesapeake is hypothetical, and not actual, and no injunction may issue.

### B. Chesapeake Has No Right to the Extraordinary Remedy of an Injunction.

A preliminary injunction is an "extraordinary and drastic remedy." *Munaf v. Geren*, 128 S. Ct. 2207, 2219 (2008). Accordingly, the movant generally must show: "(1) a likelihood of irreparable harm in the absence of the injunction; and (2) either a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the movant's favor." *Doninger v. Niehoff*, 527 F.3d 41, 47 (2d Cir. 2008). Here, Chesapeake does not seek to maintain the status quo. Rather, Chesapeake asks this Court to direct the Trustee to treat a proposed notice of redemption in a manner than the governing indenture nowhere provides. Chesapeake thus seeks mandatory injunctive relief and its motion fails because it is unable to establish that "extreme or very serious damage will result from a denial of preliminary relief" and "a clear or substantial likelihood of success on the merits." *Qualitative Reasoning Sys. v. Computer Scis. Corp.*, 2000 U.S. Dist. LEXIS 17283, *24-25 (D. Conn. Mar. 30, 2000).

The party seeking the injunction carries the burden of persuasion to demonstrate, "by a clear showing," that the necessary elements are satisfied. *See Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997). Furthermore, because the issuance of the preliminary injunction would provide Chesapeake with the ultimate relief sought—requiring BNY Mellon to allow Chesapeake to redeem the Notes at par or not at all, the exact relief sought through the Complaint—Chesapeake must show that the harm to it would be "overwhelming." *First African Trust Bank v. Bankers Trust Co.*, 1992 U.S. Dist. LEXIS 14762, at *11 (S.D.N.Y. Sept. 28, 1992).

Chesapeake cannot come close to meeting its burden.

1.      **Chesapeake Has Only Hypothetical Money Damages and Cannot Show Irreparable and Overwhelming or Extreme Harm.**

Chesapeake's hypothetical future harm, if that should ever occur, indisputably would be monetary in nature.  This alone precludes a finding of irreparable harm.  *See Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 934 F.2d 30, 34 (2d Cir. 1991).  *See also generally Wisdom Import Sales Co. v. Labbatt Brewing Co.*, 339 F.3d 101, 114 (2d Cir. 2003) (observing that not "all bargained-for contractual provisions provide a basis for injunctive relief upon breach or threatened breach; such a broad holding would eviscerate the essential distinction between compensable and non-compensable harm.").

Chesapeake openly acknowledges that the purported harm that it seeks to prevent is the payment of $400 million under the Indentures.  (Compl. ¶ 5.)  But that is not a harm if the Court determines that Chesapeake must pay the Make-Whole premium.  Such a result would simply be performance of the contract in accordance with its terms.  Chesapeake attempts to create a harm by arguing that it will be difficult to recover the Make-Whole amount in the event that its unilateral interpretation of the Supplemental Indenture turns out to be correct.  But if it is correct, Chesapeake will never be required to pay the Make-Whole amount; it would only be required to pay a par redemption.  In all events, Chesapeake alleges that it "will not *likely* be able to recover damages" from the Trustee (Compl. ¶ 4 (emphasis added); *see also* Chp. Mem. 9 (conceding that it would be possible but not "practical" for the Company to recover damages because "the 2019 Notes are held by over 100 institutions….").)

However, case after case makes clear that potential difficulty in recovering damages does not convert a claim regarding money into irreparable harm.  For example, in *Gold Fields Ltd. v. Harmony Gold Mining Co.*, 2004 U.S. Dist. LEXIS 23874, *15 (S.D.N.Y. Nov. 23, 2004), a

plaintiff sought an injunction to stop a tender offer based on allegedly false information, claiming that "once the tender offer has been consummated, it becomes difficult, and sometimes virtually impossible for a court to unscramble the eggs."  The court found no irreparable harm, reasoning that, although it would be a difficult process, "those persons who allegedly sold at an unfairly depressed price have an adequate remedy by way of an action for damages."  *Id*. at *17-18; *see also Emmet & Co. v. Catholic Health East*, 2011 U.S. Dist. LEXIS 54935, *14 (S.D.N.Y. May 18, 2011) (denying injunction stopping bond redemption and finding no irreparable harm because "injury stemming from investments in a market for bonds or stocks is fully remediable in an action for monetary damages"); *Laurus Master Fund, Ltd. v. Valcom, Inc.*, 2002 U.S. Dist. LEXIS 4631, *7 (S.D.N.Y. Mar. 18, 2002) (denying injunction ordering defendant to comply with terms of note subscription agreement because fact that damages would be "difficult" to calculate and non-movant's potential lack of "sufficient resources to satisfy any potential judgment" did not constitute irreparable harm); *Ryan v. VHA Enters.*, 1990 U.S. Dist. LEXIS 5040, *6 (S.D.N.Y. May 1, 1990) (denying injunction stopping proxy vote for merger because, although plaintiff would lose ability to seek rescission post-merger, plaintiff could with difficulty seek damages award through other avenues of relief).

Because Chesapeake alleges only that it "will not likely be able to recover damages" in the event of a breach, the circumstances potentially presented here are easily distinguished from the cases it cites involving the Eleventh Amendment, where the Constitution definitively barred any award of damages.  *See, e.g.*, *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983). Nor do the other decisions cited by Chesapeake granting injunctive relief to protect unique contractual rights support a finding of irreparable harm here.  *See Oracle Real Estate Holdings I LLC v. Adrian Holdings Company I LLC*, 582 F. Supp. 2d 616 (S.D.N.Y. 2008) (issuing

injunction to protect party's right to control management of company because right "has intrinsic value that cannot easily be quantified"); *Alcatel Space, S.A. v. Loral Space & Comms. Ltd.*, 154 F. Supp. 2d 570, 584-85 (S.D.N.Y. 2001) (enforcing right to obtain information and other related rights that would not be compensated with money damages).  By sharp contrast, "there is no 'intrinsic value' in the proper distribution of funds," and the value of redemptions under a contract are "quite easily quantified."  *TGS-NOPEC Geophysical Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 2009 WL 185995, at *3 n.21 (S.D.N.Y. Jan. 26, 2009).[4]

> **2.  Chesapeake Cannot Show a Substantial Likelihood of Success on the Merits.**

Chesapeake cannot demonstrate a likelihood of success on the merits, let alone a "substantial showing of likelihood of success" that its "proposed" notice for a par redemption would be timely if noticed by March 15, 2013, rather than redeemed by March 15, 2013 and, if not, then that such notice is "null or void."

As a threshold matter, Chesapeake does not have any likelihood of success of obtaining a "judicial blessing" to serve a conditional notice of redemption.  Chesapeake has asked the Court (i) to enjoin BNY Mellon from treating its proposed Notice of Redemption as one for redemption at the Make-Whole Price but that, if the Court disagrees, then (ii) to deem the Notice of Redemption as "null and void."  Under Section 1.7(b), if the redemption occurs during the

---

[4] Chesapeake's delay also militates against issuance of an injunction.  Subject to the 30-day advance notice requirement, Chesapeake was permitted to redeem the Notes during the period November 15, 2012 through March 15, 2013.  At entirely its own choosing, Chesapeake determined to wait until one week was left in the period and then ask for emergency relief from the Court.  This delay, including its delay since February 22, 2013, when it allegedly first learned that BNY Mellon may not accept its strained interpretation of the Indenture, confirms the absence of irreparable harm.  *See Emmet & Co.*, 2011 U.S. Dist. LEXIS 54935, *4 (refusing to find irreparable harm because "if Plaintiff truly believed that the closing of this municipal bond transaction would cause it irreparable harm, it is difficult to understand why it waited 45 days, *i.e.,* to the '11th hour,' to request injunctive relief").

Special Early Redemption Period (on and including November 15, 2012 to and including March 15, 2013), then the redemption shall occur at the par price.  Under Section 1.7(c), if the redemption occurs after March 15, 2013, then the redemption shall occur at the Make-Whole Price.  There is no provision in the Indenture that allows a redemption to be deemed "null and void" if the Court before notice is even issued determines that any redemption after March 15 must be a Make-Whole redemption.  The Court should not create this free option where it is not provided for in the Indenture.  Under similar circumstances, courts properly reject efforts to rewrite contracts to accommodate a party's concerns regarding its conduct under a contract.  *See, e.g.*, *Metropolitan Life Sin. Co. v. RJR Nabisco, Inc.*, 906 F.2d 884 (2d Cir. 1990) (vacating injunction because courts cannot extend the length of bargained-for contractual periods to allow for adjudication of the sufficiency of a party's notice; "[w]e concede without apology that we believe contract provisions specifying 60-day periods mean 60 days rather than 60 days plus an additional period calculated by the length of the chancellor's foot").[5]  Accordingly, just as in *Metropolitan Life*, this Court should not lengthen any periods and uphold the bargained-for period of November 15, 2012 through March 15, 2013 and the requisite 30-days advance notice.

Separate and apart from an inability to issue a conditional notice of redemption, Chesapeake cannot establish any likelihood of success for its strained contractual interpretation. The interpretation of an indenture is a matter of basic contract law.  *See U.S. Bank N.A. v. Black Diamond CLO 2005-1 Adviser, L.L.C.*, 839 F. Supp. 2d 639, 641 (S.D.N.Y. 2011).  "Perhaps the

---

[5] A conditional notice of redemption also would create uncertainty in the market and a slew of practical problems.  What would happen if the underlying action, including any appeal, is not resolved by the targeted redemption date?  Will Chesapeake remit funds to the Trustee?  Do noteholders surrender their bonds?  Would the Notes trade without definitive knowledge as to whether the bonds have been redeemed or not?  Chesapeake should not receive a judicial dispensation not found in the Indenture and that would wreak havoc in the marketplace.  *See generally* Seery Decl. ¶¶ 3, 11-15, 26.

most fundamental principle of contract construction is that when parties set down their

agreement in a clear, complete document, their writing should as a rule be enforced according to

its terms," *In re South Side House, LLC*, 470 B.R. 659, 671-72 (Bankr. E.D.N.Y. 2012), (*citing*

*Signature Realty, Inc. v. Tallman*, 2 N.Y.3d 810, 811 (2004)), and without resort to extrinsic

evidence. *Law Debenture Trust Co. of New York v. Maverick Tube Corp.*, 595 F.3d 458, 467-68

(2d Cir. 2010).

The governing indenture documents in the present case are unambiguous and crystal clear

that any redemption at par must be made in the period ending March 15, 2013.  Those

unambiguous provisions do not provide for mere notice by March 15, 2013.  Rather, the notes

must be redeemed by March 15, 2013.  Section 1.7(b) of the Supplemental Indenture provides

"[a]t any time from and including November 15, 2012 to and including March 15, 2013 (the

'Special Early Redemption Period') the Company, at its option, may redeem the Notes in whole

or from time to time in part for a price equal to 100% of the principal amount of the Notes to be

redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of

redemption."  Thus, Chesapeake may "redeem the Notes" but only during the period November

15, 2012 through March 15, 2013.[6]

Section 1.7(b) further provides that the "Company shall be permitted to exercise its

option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of

redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption

Period."  In turn, Section 3.04 requires at least 30-days' advance notice before a redemption date.

---

[6] The Indenture does not define the term "redeem" or "redemption".  However, BLACK'S LAW
DICTIONARY defines redemption and redeem, with respect to securities, as the "reacquisition of a
security by the issuer."  BLACK'S LAW DICTIONARY (7th ed.).  Notably, redeem is not defined as
merely providing notice of redemption.  Moreover, the securities market participants, including
Chesapeake, know the difference between redemption and notice of redemption. *See* Seery
Decl., ¶¶ 23-25.

Lastly, Section 1.7(b) provides that "[a]ny redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture."  Taken together, the provisions of the Base Indenture and Supplemental Indenture thus provide that the Company may redeem the Notes during the Special Early Redemption Period so long as it provides at least 30-days' prior notice during that period.  Under Section 1.7(c), any redemption made after March 15, 2013, shall be at the Make-Whole Price.

Having delayed providing notice of redemption to this very day, Chesapeake can no longer provide the requisite 30-days' notice to redeem the Notes during the Special Early Redemption Period that ends on March 15, 2013.  Faced with a problem caused by its own delay, Chesapeake now suggests that it may redeem the Notes at the par price after the March 15, 2013 Special Early Redemption Period so long as it provides notice of redemption within that time period – *i.e.*, by March 15, 2013.  But this interpretation would allow the Company "to redeem" the Notes at the par price *after* the Special Early Redemption Period and cannot be squared with the plain language of §§ 1.7(b) and 1.7(c).

Chesapeake's interpretation would turn Section 1.7(b) on its head and render meaningless the limited right "to redeem" the Notes only within the Special Early Redemption Period that ends on March 15, 2013.   Indeed, according to its proposed Notice of Early Redemption, Chesapeake intends "to redeem at par on May 13, 2013 . . . ."  (Compl. Exh. D.)  Section 1.7(b) allows Chesapeake if it has complied with the notice requirements of Section 3.04, to "redeem the Notes" at the par price during the period November 15, 2012 through March 15, 2013 – and not "to redeem the Notes" at the par price on May 13, 2013 as contemplated by Chesapeake, or at the par price on any other date after March 15, 2013.  The fact that Chesapeake admits in its

draft notice that it intends to redeem on May 13, 2013, should be dispositive that such redemption is a Make-Whole redemption pursuant to the terms of Section 1.7(c).

Chesapeake suggests that requiring it to redeem at the par price within the Special Early Redemption Period with at least 30-days' notice during such period would require rewriting Section 1.7(b) "to substitute February 13, 2013 for March 15" for a final notice date.  (Chp. Mem. 14.)  Section 1.7(b) allows the Company to redeem Notes at the par price within the Special Early Redemption Period so long as it gives notice within the Special Early Redemption period and such notice complies with the 30-day period written notice requirement.  Reading Section 3.04 and 1.7(b) together, along with the remainder of the Indenture, and giving effect to each term, reasonably requires notice of an at par redemption no later than February 13, 2013 so that the Company may redeem Notes by March 15, 2013.  February 13, 2013 is not a new date – it is simply the last day on which Chesapeake could have tendered the requisite 30-days' notice as required by §§ 1.7(b) and 3.04.

Moreover, if Chesapeake could exercise its option to redeem at par simply by giving notice of redemption within the Special Early Redemption Period, then contrary to the express terms of the first sentence of Section 1.7(b) and Section 1.7(c) of the Supplemental Indenture, the Special Early Redemption Period could be extended by 60 days (to May 14, 2013), to the detriment of the noteholders, and contrary to their reasonable expectations as set forth in the express terms of the first sentence of Section 1.7(b) and Section 1.7(c).  Moreover, the limited window for a par redemption is intended to be an exception to a Make-Whole redemption and therefore it is reasonable that a narrow window was intended rather than a non-explicit larger window.  *See* Seery Decl., ¶¶ 5-6.

Any such interpretation would also be inconsistent with numerous other clauses and terms in the Supplemental Indenture.  For example, such an interpretation renders the definition "Special Early Redemption Period" meaningless because it no longer describes a "redemption period" but rather a "notice period."  The terms of the first sentence of Section 1.7(b) setting forth November 15, 2012 to March 15, 2013 as the narrow period during which Chesapeake can exercise a special right to redeem at par would be rendered superfluous because the second sentence of Section 1.7(b) would effectively replace the four-month par redemption period with a longer period (the dates of which – April and May 2013 – are not set forth in the Supplemental Indenture, prospectus or other marketing materials.  In addition, the terms of Section 1.7(c), setting forth March 15, 2013 to the Maturity Date as the period in which Chesapeake can exercise a redemption at the Make-Whole Price would be partially and improperly rendered superfluous and meaningless because it creates overlapping redemption periods where, as a practical matter, Chesapeake would not exercise a redemption at the Make-Whole Price between March 16, 2013 and May 14, 2013.  *See RJE Corp. v. Northville Industries Corp.*, 329 F.3d 310, 314 (2d Cir. 2003).

Because the indenture documents are clear and unambiguous on their face, the Court should look no further than the four corners of the agreement to reject Chesapeake's effort to rewrite the redemption provisions.  Even if the Court were to conclude otherwise and examine extrinsic evidence, the objective, extrinsic evidence here – most importantly the prospectuses – only confirms that Chesapeake does not have a substantial likelihood of success on the merits.  "When the terms of a contract are ambiguous, reasonably subject to differing interpretations, a court may turn to evidence extrinsic to the agreement's four corners to ascertain the intent of the parties."  *See Scholastic, Inc. v. Harris*, 259 F.3d 73, 82 (2d Cir. 2001).  The cover page of the

prospectuses (Perry Decl., Exhs. C & D) highlight Chesapeake's two redemption options, and

describes only the first sentence of Section 1.7(b) and Section 1.7(c) of the Supplemental

Indenture.  As the redemption right is a material term to the noteholders that would affect their

return, the notable absence of the terms of the second sentence on the face of the prospectus

strongly suggests that the parties only intended the second sentence to be procedural by

providing the notice requirements for a redemption at par, rather than a material extension of the

Special Early Redemption Period.

By contrast, Chesapeake offers after-the-fact assertions regarding the subjective intent of

the parties to the Indentures.  For example, Michael S. Telle, Esq., counsel for Chesapeake now

conveniently claims that his subjective intent in drafting Section 1.7(b) was to allow Chesapeake

to provide notice as late as March 15, 2013.  *Id*. at ¶ 6.  Such "evidence" is self-serving and

irrelevant.  *See generally First Montauk Sec. Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y.

1998) ("[I]t is hornbook law that the uncommunicated subjective intent of a party is irrelevant in

interpreting a contract.").  Moreover, contemporaneous statements by an employee of the

underwriters substantially undercuts Mr. Teller's recollection set forth solely for the litigation.

*See* Seery Decl., ¶ 22.

Moreover, and critically, courts have generally held that "when faced with an ambiguous

provision in [an indenture] . . ., the Court must construe the document to adhere to the reasonable

expectations of the investors who purchased the security and thereby subjected themselves to the

terms of the contract."  *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 399 (Del. Sup. 1996)

("The issuer is better able to clarify unclear bond contract terms in advance so as to avoid future

disputes and therefore should bear the drafting burden that the *contra proferentem* principle

would impose upon it.").  Therefore, to the extent that Section 1.7(b) of the Supplemental

Indenture is deemed ambiguous, the Court should construe that ambiguity in favor of the noteholders, who had no role in drafting the Supplemental Indenture.

As described above, the Ad Hoc Noteholder Group's (and the Trustee's) interpretation of Section 1.7(b) of the Supplemental Indenture is supported by a plain reading of the agreement's plain and unambiguous terms.  At best, Chesapeake's argument suggests that the Supplemental Indenture may be ambiguous, and that the Company's reading of the Supplemental Indenture is one alternate interpretation.  Where such a dispute exists, the party seeking a preliminary injunction clearly cannot meet its burden to demonstrate likelihood of success.  Injunctions may not be issued under such circumstances.  *See, e.g.*, *Laurus*, 2002 U.S. Dist. LEXIS 4631, *9 (denying injunction because notice provision in subscription agreement was ambiguous, meaning that plaintiff "has not met the 'clear' or 'substantial' showing required to issue a mandatory injunction"); *Qualitative Reasoning Sys.*, 2000 U.S. Dist. LEXIS 17283, *24-25 (denying injunction because relevant contract provision was ambiguous and plaintiff therefore could not show substantial likelihood of success on the merits); *Eastin-Phelan Corp. v. Hal Roach Studios, Inc.*, 350 F. Supp. 1328, 1332 (S.D.N.Y. 1972) (denying preliminary injunction because "ambiguity and conflicting nature of the language" in the contract created issues of fact that should not be resolved on a preliminary injunction).

### 3.    The Balance of the Harms Weighs Decidedly Against Chesapeake.

As set forth above, Chesapeake cannot show a substantial likelihood of success or sufficiently serious questions going to the merits to make them a fair ground for litigation.  Even if Chesapeake could make such a showing, the Court should still deny injunctive relief because Chesapeake cannot show that the balance of the hardships tips "decidedly" in its favor. *Doninger*, 527 F.3d at 47.  Here, the balance of hardships tips decidedly in favor of the

noteholders.  The noteholders, in contrast to the Company, will be deprived of the very benefit of their bargain if a preliminary injunction issues.  Seery Decl., ¶¶ 3, 10-15, 26.

As demonstrated above, the relief Chesapeake has requested requires this Court to intervene in order to rewrite the clear terms of the Supplemental Indenture.  This will cause not only a disruption to the many noteholders who have undoubtedly relied upon Section 1.7(b) to assess and value their investment in the Notes, but also to market participants generally.  If investors understand that issuers can have courts simply rewrite unambiguous contract terms, or delay their enforcement, investments like the Notes will become more uncertain and, therefore, less valuable.  The Court should not use invoke its equitable powers to permit such a result.  *See Metropolitan Life*, 906 F.2d at 884 (vacating injunction that extended contractually-mandated cure periods pending adjudication of default notices); *Joneil Fifth Ave., Ltd. v. Ebeling & Reuss Co.*, 458 F. Supp. 1197, 1199 (S.D.N.Y. 1978) (when balancing the harms, the Court "must weigh the harm to plaintiff if the preliminary injunction is not granted against the harm that will accrue to defendant and third parties if it is"); *Continental Bank & Trust Co. v. Garfinkle*, 1969 U.S. Dist. LEXIS 12945, *10-11 (S.D.N.Y. June 11, 1969) (denying preliminary injunction because "[w]here great harm would result to innocent shareholders, that consideration alone will justify a denial").

In addition, Chesapeake ignores the reality that the noteholders stand to suffer significant losses, and that this case is, at its heart, about deciding how to apportion money.  Rather than rush to rewrite the Supplemental Indenture, the Court should take note of the fact that Chesapeake long had the opportunity to protect itself, but failed to do so.  Chesapeake could have drafted a contract provision that more clearly provided it additional time to notice its early redemption; or simply provided notice any time after November 15, 2012 through 30 days prior

to March 15, 2013 as required by Section 1.7(b) and Section 3.04 *Emmet & Co.*, 2011 U.S. Dist. LEXIS 54935 (denying injunction because "Plaintiff's lengthy delay in requesting injunctive relief—*i.e.*, waiting 45 days to file its complaint such that only 3 work days remained before the scheduled closing—imposes unnecessary hardship on Defendants and precludes a grant of equitable relief"); *Gold Fields Ltd.*, 2004 U.S. Dist. LEXIS 23874 (denying injunction stopping tender offer because plaintiff "waited two weeks after [defendant] filed its Prospectus and Registration Statement before filing this suit").

In sum, the balance of the hardships tip decidedly in favor of the noteholders, and the Court should deny the injunction.

### 4.    If the Court Issues an Injunction, It Should Require Chesapeake to Post an Injunction Bond.

Chesapeake concedes that absent an injunction, the Trustee may well interpret an untimely notice to require a Make-Whole redemption.  (Chp. Mem. at 11.)  Any injunction would therefore fundamentally alter the status quo — potentially depriving the noteholders of their right to enforce the payment of the Make-Whole.  Accordingly, in the event the Court grants an injunction, Chesapeake should be required to post a bond sufficient to assure the noteholders that they "may readily collect damages from the funds posted in the event that it was wrongfully enjoined[.]"  *Nokia Corp. v. InterDigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).  *See also Edgar v. Mite Corp.*, 457 U.S. 624, 649 (1982) ("[G]enerally the moving party must demonstrate confidence in his legal position by posting bond in an amount sufficient to protect his adversary from loss in the event that future proceedings prove that the injunction issued wrongfully.") (Stevens, J., concurring).  The loss of these contract rights through an injunction would severely impair the market value of the Notes, resulting in financial harm to the

noteholders if they need to sell the Notes at a reduced price or cannot sell them at all.  (Seery Decl., ¶¶ 3, 10-15, 26.)

Plaintiffs' cited authorities are wholly inapposite.  (Chp. Mem. at 3 n.1.)  In those cases, defendants failed to demonstrate any harm absent the posting of a bond, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 345 (S.D.N.Y. 2010), or that the plaintiff's interpretation of the contact was unequivocally correct, *Rex Med. L.P. v. Angiotech Pharms. (US), Inc.*, 754 F. Supp. 2d 616, 627 (S.D.N.Y. 2010) (requiring bond of only $100,000 because defendant was "highly unlikely to prevail in arbitration").[7]  In contrast, here, the noteholders stand to lose their clear contractual rights to an additional $400 million payment from Chesapeake and otherwise face substantial uncertainty.

---

[7] In *Blom ASA v. Pictometry Int'l Corp.*, 757 F. Supp. 2d 238, 247 (W.D.N.Y. 2010), the court declined to require a bond when it had enjoined both parties from taking an action that would disrupt the status quo pending arbitration.  This case, cited by Chesapeake (Chp. Mem. at 3 n.1), is completely inapplicable.

## <u>CONCLUSION</u>

For all the foregoing reasons, the Ad Hoc Intervenor Noteholder Group respectfully

request that the Court issue an order denying plaintiff's motion for a preliminary injunction in its

entirety.

Dated:  New York, New York
   March 12, 2013

          Respectfully Submitted,

          SIDLEY AUSTIN LLP

          By:  /s/ Steven M. Bierman
            Steven M. Bierman
            sbierman@sidley.com
            Benjamin R. Nagin
            bnagin@sidley.com
            Alex R. Rovira
            arovira@sidley.com
            787 Seventh Avenue
            New York, New York 10019
            Telephone:  (212) 839-5300

          *Attorneys for the Intervenor Ad Hoc Noteholder Group*