919 THIRD AVENUE  NEW YORK  NEW YORK  10022-3908

# JENNER&BLOCK LLP

March 31, 2013

Richard F. Ziegler
Partner
Tel  212 891-1680
Fax 212 909-0854
rziegler@jenner.com

**VIA EMAIL**

Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY 10007

**Re:     *Chesapeake Energy Corporation v. The Bank of N.Y. Mellon Tr. Co., N.A. et ano*, 13-CV-1582**

Dear Judge Engelmayer:

Plaintiff Chesapeake Energy Corporation ("Chesapeake") and Defendant The Bank of New York Mellon Trust Company, N.A. ("BNY") submit this letter jointly to update the Court on the parties' efforts to resolve their disagreement concerning BNY's request for production of documents by Chesapeake concerning and reflecting "custom, practices, usage and terminology", in accordance with the Court's March 28, 2013 Order, ECF No. 57 (the "Order") and in anticipation of tomorrow's conference at 8:30 a.m.[1]

The parties met and conferred on this issue and have exchanged proposals. Unfortunately, the parties have been unable to agree on a resolution of their disagreement.

To aid the Court in its resolution of this matter, the parties' individual perspectives on this issue are set forth below.

---

[1] On Thursday evening, March 28, the Court advised the parties that it expects to order Chesapeake's production of "written discovery relating to custom, practices, usage, and terminology with regard to the redemption of bonds covered by the Base or Supplemental Indentures…."  Order at 2.  The Court directed Chesapeake "(1) to expeditiously develop a concrete and productive proposal with regard to this category of discovery, (2) to confer with opposing counsel about this proposal, and (3) to put in place personnel and other relevant resources to commence review and production of such materials promptly upon a Court order with respect to such discovery on April 1."  *Id*.  The Court further directed "BNY Mellon in turn to work in good faith with Chesapeake to attempt to narrow the parties' differences with regard to this category of discovery."  *Id*.

Honorable Paul A. Engelmayer
March 31, 2013
Page 2

## I.  BNY's Perspective

As the Court previously explained, custom and usage evidence is relevant and discoverable. *See generally* 3/14/13 Tr. at 15-16 (In order to assess whether "reasonably intelligent persons" would find language to be ambiguous, the "reasonably intelligent person is deemed to be cognizant of the customs, practices, usages and terminology as generally understood in the particular trade and business."). Chesapeake should produce such evidence without further delay.

Toward this end, the Court directed Chesapeake "to expeditiously develop a concrete and productive proposal with regard to custom, practices, usage and terminology," to confer in good faith with BNY Mellon, and to put in place personnel and relevant resources to commence review and production upon a court order with the accompanying direction for BNY Mellon to try to narrow the parties' differences. (3/28/13 Order, p. 2.) On Friday afternoon, rather than proposing a document production, Chesapeake instead proposed a response to an interrogatory that it crafted concerning Chesapeake's purported understanding of one word -- redemption. BNY Mellon asked for document discovery on custom, practices, usage and terminology in the bond and note industry generally (Request No. 10) -- not to obtain Chesapeake's purported corporate understanding of a single word.

To be sure, Chesapeake has benefitted from the issuance of billions of dollars of bonds to investors, and is a sophisticated player with deep ties to Wall Street. *E.g., Special Report: Chesapeake's Deepest Well: Wall Street*, REUTERS.COM, May 10, 2012 ("All told, the financiers have helped Chesapeake raise approximately $40 billion in financing since 2000.") (Exh. A hereto, p. 2.) Chesapeake no doubt has discussed internally and with its investment bankers and others the process and concept of early redemptions in the issuance of bonds along with customs, practices, usages and terminology related to such redemptions. The discovery sought is not about a single word. Nor is it limited to discrete instances where Chesapeake opted to redeem notes before maturity. Rather, the document discovery is designed to capture the discussions and references to customs, practices, usages, and terminology related to the redemption of notes.

Thus, on Friday afternoon, in the absence of any proposal for document production by Chesapeake, BNY Mellon proposed both a "search term" and a focused traditional search for documents. (See Exh. B hereto.) The key components are as follows:

**Search Term Search**

("note" OR "notes" OR "bond" OR "bonds" OR "paper" OR "indenture") AND ("redeem*" OR "redemption" OR "call*" OR "par" OR "matur*" OR notice)

The search should be conducted of emails sent or received by the individuals whom Chesapeake has listed in its Initial Disclosures and Interrogatory Responses as persons with knowledge.

**Non-Search Term Search**

BNY Mellon also proposed that Chesapeake conduct a targeted search in hard-copy and share drive (or other centrally or locally stored) locations for custom, practice, usage and

Honorable Paul A. Engelmayer
March 31, 2013
Page 3

terminology documents, including, by way of example, documents and communications concerning the potential or actual redemption of notes pursuant to the Base and/or Supplemental Indenture and documents and communications concerning any processes, procedures or plans for the potential or actual redemption of notes such as time lines, slide decks (presented internally, by investment banks, or otherwise), memoranda, planning documents, and minutes.  This search also should collect any financial industry materials or sources concerning or reflecting custom, practice, usage and terminology (whether from professional or trade organizations, regulators, investment banks, or other sources).  The search should be conducted of any central or other files where such documents might be maintained.  It could be the CFO's office, the Corporate Finance Office, or the like.  That there is no file labeled "Redemptions" doesn't end the inquiry.

The "search term" and non-search term efforts described above should be run for the period from August 2, 2010 (the date of the Base Indenture), through March 8, 2013, the date of the lawsuit.  The proposal by Chesapeake, made in part by phone Friday evening, and by email Saturday evening (including belatedly with a search term component) (Exh. C hereto), is unfair and unworkable because it would be limited in time and scope to two actual redemptions and would not capture discussions of redemptions considered but rejected by Chesapeake or redemptions more generally.  BNY Mellon's scope of collection is designed to capture potential evidence reflecting custom and usage and would more faithfully adhere to the Court's interest in "thoroughness" in discovery in light of the difficulties presented by the expedited timetable that Chesapeake demanded.  *See* 3/19/13 Tr. at 47 ("Inasmuch as the timetable is an enemy of accuracy, at least I would rather make the thoroughness a friend.  So it seems to me that as you are having your discussions, hear my voice, which says, all else being equal, I'd rather include scope.").  Under the circumstances, BNY Mellon respectfully requests that the Court order Chesapeake to collect and produce documents on customs, practices, usages and terminology as outlined above.[2]

## II.    Chesapeake's Perspective

Chesapeake submits the following to aid the Court's assessment of the two recent proposals Chesapeake has made to resolve the pending dispute, and of the burdens BNY's proposals would entail:

First, as we have reported to BNY, Chesapeake does not maintain any central or other readily-identifiable files on redemption processes; instead, any references to "redemption" are most likely to be found scattered among Chesapeake documents generated in the course of actual redemptions and not otherwise, making searches for such documents inherently challenging.  Moreover, because Chesapeake has not issued any notices to redeem under the Base Indenture

---

[2] Separately, for the Court's information, we have notified Plaintiff's counsel that BNY Mellon has instructed that, with respect to Claim II in the Complaint, BNY Mellon will not treat the March 15, 2013 notice from Plaintiff as requiring a make whole redemption in the event that the Court determines the March 15, 2013 notice to be untimely for a par redemption.  BNY Mellon otherwise reserves all rights and defenses.

Honorable Paul A. Engelmayer
March 31, 2013
Page 4

apart from the 2019 Notes,[3] any such custom and usage information must at best be derived indirectly from redemptions of notes issued under other indentures; because the precise wording found in the second sentence of Sec. 1.7(b) of the Supplemental Indenture is unique among all of Chesapeake's indentures, the relevance of such other redemption documents is attenuated.

Second, Chesapeake believes that there is very little, if any, actual disagreement between the parties on the customary or typical meaning in the industry of the term "redemption" and its variants. Although BNY has been reluctant to explain what it hopes to prove with document disclosure on the custom/usage issue, Chesapeake believed that BNY has been eager to establish that the term customarily encompasses the actual payment of the redemption price and does not typically refer merely to the issuance of the notice of redemption. Significantly, Chesapeake is not contesting that point; indeed, as noted in its March 28 letter to the Court, Chesapeake offered to stipulate with BNY that under the terms of Section 1.7(b) of the Supplemental Indenture, any redemption would need to have been noticed by February 13 and completed by March 15 but for the second sentence of that Section (the one that includes the phrase "so long as it gives the notice of redemption during the Special Early Redemption Period"). Chesapeake's willingness to agree that the first sentence of 1.7(b) on its own would ordinarily require payment of the redemption price by March 15 suggests that the parties do not have a material disagreement on the subject about which BNY is seeking burdensome document discovery.

On Friday Chesapeake went further and proffered as another alternative an express interrogatory answer on its view of the customary meaning of the word. BNY rejected Chesapeake's proposed interrogatory response on the ground that Chesapeake had misunderstood what BNY is trying to prove. Notably, however, BNY also stated unequivocally that even if Chesapeake admitted precisely what BNY believes, BNY would still insist on burdensome document discovery concerning custom and usage. BNY claimed that it needs documents to cross-examine Chesapeake witnesses, but that overlooks the effect of Chesapeake's proposed admission.

Once BNY made clear that an agreement required additional document disclosure, Chesapeake proposed to produce documents concerning two notices that Chesapeake issued in mid-2010 for the redemption of $1.934 billion of four series of outstanding notes. Chesapeake explained that it selected those two notices because they are the only redemptions in which Chesapeake engaged under any indenture in the nearly five years preceding the contested notice in this action, apart from a *sui generis* "mop-up" redemption of small quantities of various notes that remained outstanding in September, 2010 after a tender offer had repurchased a large quantity of such notes (which is wholly inapposite to the matter at hand). Chesapeake proposed

---

[3] Chesapeake's litigation counsel only recently learned this fact; BNY has necessarily known it all along in its role as trustee. In view of the lack of any prior redemptions under the Base Indenture, BNY's document requests 11 and 19, which seek documents about redemptions under the Base Indenture and are among the handful of the requests it flagged to the Court in its March 27 letter, are moot.

Honorable Paul A. Engelmayer
March 31, 2013
Page 5

to produce all documents that reasonable diligence can find that relate to the planning and implementation of those mid-2010 redemptions, even though they were not governed by the Base Indenture.  Chesapeake's specific proposal is enclosed as Exhibit D.

BNY rejected Chesapeake's proposal because the proposal focused on actual redemptions by Chesapeake and is not designed to search for general information that would show industry standards of the meaning of "redemption."  BNY is apparently driven by a misapprehension that Chesapeake is a repository of such financial industry information divorced from any actual redemption activity by the Company.  BNY may well be able to produce that type of information without undue burden since it is a leading participant in the indenture trustee business, but Chesapeake cannot; searching for random industry presentations or other materials in Chesapeake's files that might touch generally on this subject appears to be the Platonic form of "fishing expedition."  Indeed, BNY's proposal to us of last Friday (Ex. B to this letter) employs search terms of such breadth that our e-discovery experts have estimated they would result in Chesapeake collecting and reviewing more than 1,000,000 additional documents (and many millions of additional pages), on top of the hundreds of thousands of documents that Chesapeake's contingent of nearly 100 lawyers has already been reviewing to respond to BNY's requests to which we have not objected.

Moreover, BNY's proposed time period is not only lengthy – nearly three years from August 2, 2010 through March 8, 2013 – but is not logically grounded in relevant facts; the starting date is the date of the Base Indenture, but that date and the ensuing three years have no meaning since aside from the notice at issue in this case (for which ample documents are being produced), Chesapeake did not issue any redemption notices under any indenture in that period, apart from the inapposite post-tender offer "mop-up" redemption that was completed shortly after BNY's proposed time period begins.  Significantly, and independent of the pending dispute, Chesapeake has been searching broadly for documents relating to "redemption" for the key 13-month time period in this case – from the initial notes offering in mid-February, 2012 through the filing of the complaint; notably, that search is not limited to documents relating to the 2019 Notes and is therefore likely to retrieve generalized industry information, if any exists, in that period.  Chesapeake's enclosed proposal was intended to supplement that document production with another focused on Chesapeake's only prior significant redemption activity in the last several years.

For these reasons Chesapeake respectfully requests that the Court either approve Chesapeake's enclosed document production proposal, or, preferably, direct BNY to work with Chesapeake to identify a stipulation on the customary meaning and usage of the word "redemption" and its variants that would moot the need for any additional document discovery.

* * * * * * * * * * * * * *

Honorable Paul A. Engelmayer
March 31, 2013
Page 6

Respectfully submitted,

*Richard Ziegler/*AMA

Richard F. Ziegler

cc: Steven M. Bierman, Esq.
  Counsel for Intervenor-Defendants and Defendant BNY Mellon

  Paul T. Weinstein, Esq.
  Counsel for Defendant BNY Mellon

# EXHIBIT A

» **Print**

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Special Report: Chesapeake's deepest well: Wall Street

Thu, May 10 2012

By Carrick Mollenkamp



NEW YORK (Reuters) - Far from the drilling rigs of Oklahoma, America's second-largest natural gas producer is having to dig ever deeper into the well that really fueled its growth: Wall Street.

In a Times Square office building, a team tapped by Chesapeake Energy Corp deployed more than 40 bankers, lawyers and other experts to plot another chapter in that strategy.

Dubbed Glenn Pool, it was more financial engineering than petroleum engineering. In essence, Chesapeake sold future rights to the gas in its wells. The deal took in approximately $850 million last year.

Glenn Pool proved so innovative that a trade magazine honored it this March. In an especially creative twist, the borrowings were chopped into two slices and sold to investors - akin to the way subprime housing loans were turned into securities and sold last decade.

Deals like Glenn Pool are known as volumetric production payments, or VPPs. These and other sophisticated financings are central to the business model of a company that in some ways resembles a hedge fund, using borrowed money to make big financial bets.

The financial-engineering strategy began as a way for CEO Aubrey McClendon to expand the company. Now, Chesapeake has become so reliant on deals like Glenn Pool that more such transactions may be necessary just to tread water.

Today, the Oklahoma City company is taking in more money from bankers, other investors and its own financial bets than it is from its oil and gas. Most big energy companies, such as Exxon Mobil Corp, typically earn more selling oil and gas than they spend on investments, financing and other costs, making them cash rich. Chesapeake is expanding so fast that it takes in much less revenue from its oil and gas than it spends, leaving it stretched.

Hence its business depends on deal-making: raise money from investors to acquire land and drill wells; sell the rights to the gas and oil in those wells; plow that money into new land and wells; repeat the cycle all over again.

FUNDING SHORTFALLS

Now, some analysts question whether Chesapeake can keep striking enough deals to sate its cash needs, which are growing acute as natural gas prices languish. The gap between cash coming in and cash going out shows "massive internal funding shortfalls," according to an April report by Standard & Poor's.

On Wednesday, Moody's Investors Service changed its outlook for Chesapeake's debt to negative from stable, citing "an even-larger capital spending funding gap for 2012," due both to lower energy prices and higher spending.

Between now and the end of 2013, Chesapeake expects as much as $23.1 billion in costs for outlays such as wells and property, according to the company and analysts. Yet funds from operations over the same period are expected to total as much as $8.3 billion. To cover the gap, Chesapeake plans to raise as much as $20.5 billion from new ventures, including selling future production rights.

"There seems to be little acknowledgement by management or the board that the company faces a major financial crisis," analysts at International Strategy & Investment Group in New York said in a report May 1.

Chesapeake says it has no trouble keeping itself well-financed.

"Chesapeake has superb assets and a track record of successfully completing large transactions to monetize assets in varying market conditions," said spokesman Michael Kehs. "We'll let our record speak for itself."

A Reuters examination of Chesapeake's books, VPP deals by the company and its CEO, and other novel transactions shows the financing is growing increasingly complex and costly - and in some cases is intertwined with the personal finances of the chief executive.

Last week, Reuters reported that McClendon had co-owned and actively traded in a $200 million hedge fund that bought and sold the same commodities produced by Chesapeake.

On Tuesday, Reuters reported that one of Chesapeake's chief financiers, EIG Global Energy Partners, arranged $450 million in personal financing for McClendon in March. That brought to $1.55 billion the total amount of financing McClendon has taken out against his stakes in wells drilled by Chesapeake. Of that amount, $1.33 billion came from EIG - which has also helped line up $2.5 billion for Chesapeake itself since November.

GOVERNANCE CRISIS

The disclosures have embroiled the company in a corporate-governance crisis, prompting the board to strip McClendon of his chairmanship and U.S. regulators to open informal inquiries.

EIG is drawing attention for its central role in financing McClendon's personal borrowings, which he took on to fund a lucrative perk giving him the right to receive stakes in company wells so long as he shoulders his share of the costs.

The coterie of financial engineers is much wider. It includes executives at Jefferies & Co, chiefly Ralph Eads III, a Houston oil banker and McClendon's fraternity brother at Duke University.

The deals are so big that they require major trading partners and financiers, like Barclays PLC, which handled Glenn Pool. Wall Street's biggest banks, including Deutsche Bank AG, Morgan Stanley, and Wells Fargo & Co, stepped in as both trading partners and lenders, according to court documents and company statements.

All told, the financiers have helped Chesapeake raise approximately $40 billion in financing since 2000. They've used their trading desks to hedge bets on gas prices and interest rates, and advised on a host of deals, records show.

Some of the same financiers that have bankrolled Chesapeake's deals also have made personal loans to McClendon, including Goldman Sachs Group Inc. and Wells Fargo, according to filings in Oklahoma. For collateral with Goldman, McClendon put up part of his wine collection. Wells Fargo and Goldman declined to comment.

Chesapeake has strengths that could enable it to ride out the storm. Low interest rates have made its junk bonds popular with investors. What's more, Chesapeake is "asset rich," S&P said, noting how the company "has been adept at structuring varied and innovative transactions to generate funds."

With its aggressive financial management, some analysts say, Chesapeake could be making a correct bet that it can reinvest the cash it's raising in higher-yielding assets, such as new wells.

"They know what they are doing," said John Rittenhouse, chief executive of EDF Trading, a London firm that is one of Chesapeake's largest trading partners. "It is a question of redeploying capital."

15 MILLION ACRES

Chesapeake's remarkable rise dates to 1989, when McClendon co-founded the company. He dispatched "land men" across America to scout out energy plays, eventually building an empire on 15 million acres of land in 16 states. It's one of the biggest property-buying sprees ever by a public company in the United States, a combined area nearly the size of West Virginia.

As Chesapeake sped its expansion, it needed to raise ever-larger sums to lease land and drill on it. An important tool is the volumetric production payment, or VPP, which it first used in 2007.

The deals allow Chesapeake to sell to trading partners future natural gas and oil production in exchange for upfront cash. Rivals have used VPPs, but Chesapeake has tapped them much more.

Reuters tallied 10 VPP deals by Chesapeake and two by McClendon. Chesapeake's use of VPPs has grown as rivals have moved away from them. The problem, analysts say, is that a company gives up future cash from a well. They also are a relatively expensive source of capital.

"It is rare for (exploration and production companies) to use VPPs as financing vehicles, especially in recent years," said Joseph Allman, a J.P. Morgan Chase & Co analyst who follows Chesapeake.

Technically, VPP deals don't increase a company's debt, because they are deemed to be asset sales. But some analysts say VPPs are controversial because they effectively move future obligations to opaque off-balance sheet structures. Once a well is moved off the books, it can be difficult for investors to track production.

Broadly, investors frown on off-balance-sheet activity because it is much more difficult to monitor the use of money. Murky vehicles were a major factor in the accounting scandals involving Enron and others a decade ago.

Among McClendon's advisers on these deals are Jefferies & Co. and its vice chairman, Ralph Eads III. Both were members of the Sigma Alpha Epsilon fraternity at Duke, are big donors to the North Carolina university, and share a love of expensive French wine. Jefferies' connections extend into Chesapeake's corporate suite. McClendon has credited his CFO, Domenic Dell'Oso, a former Jefferies banker, for forming the "industry-leading VPP program."

A Jefferies spokesman declined comment. Dell'Osso didn't reply to a request for comment. Chesapeake has disclosed some but not all of the details of its VPP structures in company statements. In 2008, for example, Chesapeake told investors that it had raised $1.1 billion in a VPP deal with affiliates of Deutsche Bank and UBS.

GOLDMAN HELPS

Details on some VPP deals emerged in a lawsuit wending its way through federal court in New York. Mary Linda McCall of Harris County, Texas, claims she has stakes in four wells that improperly were used to back unspecified Chesapeake VPP deals.

The lawsuit alleges Chesapeake didn't disclose that in 2008, two VPPs paid $132 million to an entity called Chesapeake Investments. Reuters reported last month that McClendon used Chesapeake Investments to hold personal stakes in company-drilled wells, and pledged those wells as collateral to his lenders.

In this case, the VPPs, called Blue Devil and TW Investors, were constructed by Wells Fargo, the lawsuit says.

Chesapeake won a court order to dismiss the case last September. A federal judge ruled that Chesapeake in fact had only sold future oil and gas carved out of the company's "working interest" in the wells. McCall's attorneys filed an appeal at the U.S. Court of Appeals for the Second Circuit in New York.

Records unearthed by McCall's lawyers also show that a bank owned by George Kaiser, a billionaire Oklahoma investor, is a lender to McClendon. In 2008, a $21 million investment from a Kaiser foundation, and financing from an affiliate of Goldman Sachs, enabled an enterprise called Argonaut VPP LLC to provide Chesapeake $412 million. In exchange, Argonaut received well production in Oklahoma and Arkansas.

A year later, McClendon turned to Kaiser for a personal loan. Documents filed in Oklahoma show that McClendon pledged distributions from two of his personal companies as collateral to Kaiser. The size of the loans is not known.

A spokesman for Kaiser declined comment.

In the past 12 months, Chesapeake's VPPs and other deals have gotten more complex. One example is Glenn Pool Oil & Gas Trust I and II, which was executed by the Barclays Capital unit of Barclays PLC.

This one stood out as cutting edge, earning the British bank a "deals of the year" honor from a commodities and risk trade

publication called Energy Risk.

This time, dozens of people worked on Glenn Pool, including employees from Barclays Capital's structuring, syndication, and ratings teams, according to the award description.

CREATIVE TOUCH

In a typical VPP, an energy producer gets cash by exchanging future production rights with a trading partner, such as a bank. In the Glenn Pool deal, the trading partners—the two trusts—raised money by selling debt to investors. The investors then would recoup their investment from the revenue raised by the sale of natural gas from wells in seven counties in northern Oklahoma.

The sale of debt to investors meant the buyers needed to be assured of a return. That meant the deal needed a credit rating.

By spring 2011, the Glenn Pool deal was almost ready to be graded by the ratings firms. To verify that natural gas was in the ground, engineers from a Houston firm conducted a review, confirming there was plenty.

There was another risk for the debt investors: the fluctuation of gas prices and cash flows. To comfort investors, Barclays served as a middleman, providing hedges - financial contracts that effectively provide more stable prices or cash flow. The bank then reduced its risk exposure by taking hedges against its own positions in the deal.

Next, it was time for Barclays to get the blessing of a ratings agency. In May 2011, Moody's Rating Service gave it a thumbs-up, granting the deal - two layers of debt, one maturing in 5 years and the other in 10 years - investment-grade ratings of Baa2 and Baa3.

Glenn Pool was innovative because prior VPP deals had remained on bank balance sheets. "Barclays Capital has pioneered a new approach in its recent transactions with Chesapeake," Energy Risk magazine wrote in bestowing an honor on the deal, "allowing a broad array of investors to take part in the investment while giving the gas producer a lower cost of capital."

The debt then was sold in two buckets. The first — five-year debt sold to investors such as hedge funds — fetched $397.4 million. The second — 10-year debt sold to longer-term investors such as insurance companies — raised $482.2 million.

The return paid by Chesapeake on the Glenn Pool deal wasn't disclosed. Chesapeake's borrowing costs on other recent deals have been divulged, however. Some analysts say those borrowings are coming at a high price as the company's financing gap widens and it makes a dash for cash.

MORE IN THE PIPELINE

In the first quarter, Chesapeake spent more than $2.5 billion drilling and completing wells, resulting in a cash shortfall. To cover it, Chesapeake relied on a series of conventional loans and creative deals to raise cash totaling $3.4 billion.

Between December 31 and February 9, for example, Chesapeake tapped three loan commitments from banks to raise $2.35 billion, according to a regulatory filing and analysis by J.P. Morgan Chase's Allman.

Chesapeake is going beyond VPP deals to other novel structures. Consider the two-stage deal it pulled off in November and December, when it traded 700,000 acres in eastern Ohio for $1.25 billion.

A Chesapeake subsidiary, CHK Utica LLC, owns the leaseholds on the land. It issued $750 million in preferred shares to an investment consortium led by EIG, the Washington, D.C., investment-management firm that also has loaned heavily to McClendon.

The consortium also includes an affiliate of private-equity firm Blackstone Group and Magnetar Capital - an Illinois hedge fund that profited handsomely with bets on subprime housing.

The consortium not only will receive a juicy dividend of 7 percent. It also will get royalty interests from gas produced from wells on the land.

The deal spree continues: In April, Chesapeake raised a total of $2.6 billion.

A Chesapeake unit issued preferred shares to EIG and Magnetar in return for gas production in Oklahoma, this time netting $1.25 billion.

Chesapeake also raised $745 million in a VPP with Morgan Stanley. And the company agreed to sell a leasehold on 58,400 acres to raise $590 million in a deal with an Exxon Mobil subsidiary.

This month, McClendon told investors in a conference call that more deals are afoot.

"We'll have to work a bit harder on the asset monetization front to counteract currently soft U.S. natural gas prices to hit our year-end target," McClendon said. "The good news is, the positives for our company are enduring, and the negatives we believe, are short-term."

(Additional reporting by Anna Driver in Houston; Editing by Michael Williams and Blake Morrison)

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# EXHIBIT B

**Nagin, Benjamin**

| | |
|---|---|
| **From:** | Nagin, Benjamin |
| **Sent:** | Friday, March 29, 2013 1:25 PM |
| **To:** | 'Ziegler, Richard F.' |
| **Cc:** | Bierman, Steven; Rovira, Alex R.; Arden, James D.; Greaney, Isaac; tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne Cortina; Ascher, Stephen L.; Yerramalli, Prashant |
| **Subject:** | CHK Litigation -- Further Meet and Confer Efforts |

Dear Richard:

Thank you again for your email and for the time spent on the call that we just concluded.

As you know, the Order from yesterday requires Chesapeake to develop a concrete and productive proposal for the production of documents concerning custom, practice, usage and terminology regarding the redemption of bonds covered by the Base and Supplemental Indentures. We asked for this and related information in the individual document requests that are referenced in our meet and confer correspondence with you to try to achieve a negotiated resolution. We also cited those requests in our application to the Court that led to yesterday's order.

Despite the Court's order, we have not yet received a concrete proposal from you with regard to this document discovery. However, in an effort to avoid further delay in collection and production, we suggest the following resolution. It addresses both the custom, practice, usage and terminology documents as well as the search term parameters that we have discussed and are the subject of Prashant Yerramalli's email of 9:06 p.m. Thursday (the "Yerramalli Email").

To avoid further delay and to permit us to receive documents on the schedule requested by you and set by the Court, we will accede to your proposal on search terms in paragraphs 1 through 4 of the Yerramalli Email.

We propose a variation of the connector search in paragraph 5 of the Yerramalli Email for purposes of the "search term" search for custom, practice, usage and terminology documents. The search below should be run on all of the designated Chesapeake custodians for the period August 2, 2010, through March 8, 2013.

("note" OR "notes" OR "bond" OR "bonds" OR "paper" OR "indenture") AND ("redeem*" OR "redemption" OR "call*" OR "par" OR "matur*" OR notice)

Chesapeake also must conduct a targeted search in hard-copy and share drive (or other centrally or locally stored) locations for custom, practice, usage and terminology documents, including, by way of example, documents and communications concerning the redemption of notes pursuant to the Base and/or Supplemental Indenture and documents and communications concerning any processes, procedures or plans for the redemption of notes such as time lines, slide decks, memoranda, planning documents, and minutes. This search also should collect any financial industry materials or sources concerning or reflecting custom, practice, usage and terminology (whether from professional or trade organizations, regulators, investment banks, or other sources).

With respect to the remainder of the searches in the Yerramalli Email (some of which Chesapeake previously agreed to conduct and some of which it did not), we propose the following:

("note" OR "notes" OR "bond" OR "bonds" OR "paper" OR "holder*" or "call*" or indenture) AND (MW OR "11/15" OR "November 15" OR "Nov 15" OR Nov. 15" OR "3/15" OR "March 15" OR "Mar. 15" OR Mar 15" OR "Feb 13" OR "Feb. 13" OR "2/13" OR "May 14" or "5/14" OR Bracewell OR Telle OR Cravath OR Maultsby OR "@baml" OR "@bgllp")


We look forward to discussing this with you at 2 p.m.

Regards,

Ben


Benjamin R. Nagin
Sidley Austin LLP
787 Seventh Avenue
New York, NY  10019
212-839-5911 (office)
212-839-5599 (fax)



-----Original Message-----
From: Ziegler, Richard F. [mailto:RZiegler@jenner.com]
Sent: Thursday, March 28, 2013 10:50 PM
To: Nagin, Benjamin
Cc: Bierman, Steven; Rovira, Alex R.; Arden, James D.; Greaney, Isaac; tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne Cortina; Ascher, Stephen L.; Yerramalli, Prashant
Subject: Re: Meet/Confer Friday a.m. on Judge's Order?

OK -- if you don't mind, we'd prefer 12:45 pm.

Please use the following info (we'll assume 12:45 works for you unless you advise us it doesn't):

866-319-3661
code: 212 891 1680

Thanks for the quick response.

--Richard

On 3/28/13 10:15 PM, "Nagin, Benjamin" <BNagin@Sidley.com> wrote:

>Dear Richard:
>
>Thank you for your email.
>
>9 a.m. does not work here, unfortunately.  (Our schedules filled up
>quickly!)
>
>Let's talk at 12:30 p.m.
>
>We will give serious thought to your requests though we tried very hard
>to resolve this before seeking assistance from the Court.  If you have a

2

>concrete proposal before then, please let us know.  Thank you.
>
>Regards,
>
>Ben
>
>
>Benjamin R. Nagin
>Sidley Austin LLP
>787 Seventh Avenue
>New York, NY  10019
>212-839-5911 (office)
>212-839-5599 (fax)
>
>
>
>
-----------------------------
Richard F. Ziegler

Jenner & Block LLP
919 Third Avenue
New York
NY 10022-3908
Tel (212) 891-1680
Fax (212) 909-0854
RZiegler@jenner.com
www.jenner.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is
for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this
communication is prohibited. If you believe that you have received this email in error,
please notify the sender immediately and delete it from your system.


-----------------------------

-----Original Message-----
>From: Ziegler, Richard F. [mailto:RZiegler@jenner.com]
>Sent: Thursday, March 28, 2013 8:54 PM
>To: Nagin, Benjamin
>Cc: tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne
>Cortina; Ascher, Stephen L.; Yerramalli, Prashant; Bierman, Steven;
>Rovira, Alex R.; Arden, James D.; Greaney, Isaac
>Subject: Meet/Confer Friday a.m. on Judge's Order?
>
>Dear Ben (and colleagues)--
>
>I appreciate your voicemail and your follow-up e-mail to assure that we'd
>learned quickly of the change in the Court conference (as it happens, Mr.
>Beaty's voicemail arrived shortly before yours). Thanks very much for
>your courtesy.
>
>We'd like to get going in responding to the Judge's order of this evening
>on the custom and usage discovery, and to that end suggest that we have a
>meet-and-confer on that topic with you tomorrow morning at 9 am, when we
>were otherwise going to be on the phone with the Court.  We hope you

>haven't made conflicting plans already, but if you have please suggest an
>alternative time for a call tomorrow.
>
>To make tomorrow's call as productive as possible, we'd appreciate it if
>you would give thought in advance to what you're looking for so that you
>can describe it with as much precision as possible, such as categories of
>information you wish to see and the types of documents you think would
>have such information.  That information from you will be very important
>in enabling us to reach agreement on an appropriate scope for searching
>and identifying responsive documents.  One possibility that has occurred
>to us that could streamline the process for both sides would be for
>Chesapeake to agree to respond to reasonable interrogatories from you on
>the subjects that you're interested in, in lieu of additional document
>production; that approach would presumably be less burdensome for
>Chesapeake and would also spare you the burden that you would otherwise
>have to incur in piecing together information from various documents.
>
>--Richard
>
>From: <Nagin>, Benjamin Nagin
><bnagin@sidley.com<mailto:bnagin@sidley.com>>
>Date: Thursday, March 28, 2013 6:02 PM
>To: Richard Ziegler User <rziegler@jenner.com<mailto:rziegler@jenner.com>>
>Cc: Steven Bierman <sbierman@sidley.com<mailto:sbierman@sidley.com>>
>Subject: <no subject>
>
>Just left you a voicemail.  Judge is going to reschedule conference to
>8:30 am Monday.  Chambers will fax order.
>
>
>
>
>Benjamin R. Nagin
>Sidley Austin LLP
>787 Seventh Avenue
>New York, NY  10019
>212-839-5911 (office)
>212-671-0373 (mobile)
>212-839-5599 (fax)
>
>
>
>
>------------------------------------------------------------------------
>----------------------------
>IRS Circular 230 Disclosure: To comply with certain U.S. Treasury
>regulations, we inform you
>that, unless expressly stated otherwise, any U.S. federal tax advice
>contained in this
>communication, including attachments, was not intended or written to be
>used, and cannot be
>used, by any taxpayer for the purpose of avoiding any penalties that may
>be imposed on such
>taxpayer by the Internal Revenue Service.  In addition, if any such tax
>advice is used or referred
>to by other parties in promoting, marketing or recommending any
>partnership or other entity,

>investment plan or arrangement, then (i) the advice should be construed
>as written in connection
>with the promotion or marketing by others of the transaction(s) or
>matter(s) addressed in this
>communication and (ii) the taxpayer should seek advice based on the
>taxpayer's particular
>circumstances from an independent tax advisor.
>***********************************************************************
>***************************
>This e-mail is sent by a law firm and may contain information that is
>privileged or confidential.
>If you are not the intended recipient, please delete the e-mail and any
>attachments and notify us
>immediately.
>
>***********************************************************************
>***************************
>
>
>
>_____
>
>Richard F. Ziegler
>
>Jenner & Block LLP
>
>919 Third Avenue
>New York, NY 10022-3908
>Tel (212) 891-1680
>Fax (212) 909-0854
>RZiegler@jenner.com
>www.jenner.com<http://www.jenner.com/>
>
>
>CONFIDENTIALITY WARNING: This email may contain privileged or
>confidential information and is for the sole use of the intended
>recipient(s). Any unauthorized use or disclosure of this communication is
>prohibited. If you believe that you have received this email in error,
>please notify the sender immediately and delete it from your system.
>
>_____
>
>

# EXHIBIT C

**Nagin, Benjamin**

| | |
|---|---|
| **From:** | Ziegler, Richard F. [RZiegler@jenner.com] |
| **Sent:** | Saturday, March 30, 2013 5:27 PM |
| **To:** | Nagin, Benjamin |
| **Cc:** | Bierman, Steven; Rovira, Alex R.; Arden, James D.; Greaney, Isaac; tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne Cortina; Ascher, Stephen L.; Yerramalli, Prashant; Arain, Ali M. |
| **Subject:** | Re: Update and weekend planning |

Dear Ben et al.:

I'm pleased to report that the proposal we described to you yesterday evening in
concept has been shown to be sufficiently workable from a burden and timing standpoint that
we are able to describe the specifics of the proposal below for your review.

To place the proposal in context, it may be helpful to address the six specific document requests that your letter to the Court of March 27 identified as most pertinent to the pending dispute (Requests 10-11, 15, 17, 19 and 21).
We believe that the area of disagreement has already been narrowed by virtue of the fact
(which we focused on only very recently, and mentioned to you in one of our
meet-and-confers yesterday) that until the notice to redeem the 2019 Notes, Chesapeake had not ever redeemed any of the notes it had issued in connection with the Base Indenture.  That fact disposes of any disagreement with respect to Request No. 11 (which calls for documents regarding redemptions under the Base Indenture other than the 2019 Notes) and Request No. 19 (which calls for documents regarding redemptions under either the Base and Supplemental Indentures, and we are producing responsive documents with respect to the latter).  As to Request No. 15 (calling for documents concerning the March 15 notice), we will be producing such documents since they are responsive to Request No. 1.  As to Request No. 21 (calling for documents providing yield to maturity and/or yield to call calculations for the 2019 Notes), we have been advised that no such documents were created but we will not withhold such documents if they exist. That leaves only Requests 10 (calling for documents relating to custom/usage on redemption by the Company or more generally) and No. 17 (calling for documents about Chesapeake's standard redemption process). The proposal below is our attempt to satisfy those requests.  In assessing this proposal you should take into account that we have already reported to you that the Company does not have documents that identify redemption "procedures," that there is no central, easily-identifiable repository of information at the Company on redemptions, and that the
Company has not redeemed any of the notes it issued pursuant to the Base Indenture until it issued its notice for the 2019 Notes.

In an effort to search for documents responsive to Requests 10 and 17 we propose the following:

Concept:

This proposal is designed to identify documents concerning the
only Chesapeake  redemptions of notes since mid-2008 (apart from one other
redemption notice that effected a "mop up" of a small number of notes
following a successful tender offer). The first redemption transaction to
be searched was initiated by a notice issued May 18, 2010 for the
aggregate redemption in whole of approximately $1.334 billion, plus
accrued interest, in outstanding notes, approximately $364 million of
which was comprised of outstanding 7.50% Senior Notes due 2013; $300
million of which was comprised of 7.50% Senior Notes due 2014; and
approximately $670 million of which was comprised of 6.875% Senior Notes
due 2016 completed on June 21, 2010. See
http://www.chk.com/News/Articles/Pages/1428570.aspx.   The second such
transaction was initiated by a notice issued on June 21, 2010 for the
redemption of $600 million, plus accrued interest, of 6.375% Senior Notes
due 2015 completed on July 22, 2010.  See
http://www.chk.com/News/Articles/Pages/1440026.aspx.  Note that none of
these redemptions was governed by the Base Indenture in this case; the
only notice of redemption that Chesapeake has issued in connection with
the Base Indenture is the pending notice for the 2019 Notes.


The proposed search terms are designed to mirror the searches
that uncovered responsive documents concerning the planning and execution
of the pending redemption  at issue in this case.


Custodians:

These 7 custodians have been identified by knowledgeable
Chesapeake finance personnel as those who are the most likely to have
either participated in the redemption planning/decision-making, or to have
received or sent communications relating to that subject:


- Elliot Chambers
- Domenic Dell'Osso
- Jennifer Grigsby
- Aubrey McClendon
- Marc Rome
- Marcus Rowland (Mr. Rowland was CFO of the Company during part
of the search period)
- Susan Seymore


Search Terms:

("redeem" OR "redeemed" OR "redemption" OR "notice" OR "call*" Or
"indenture") AND ("7.50% Senior Notes" OR "6.875% Senior Notes" OR "6.375%
Senior Notes" OR "2013 Senior Notes" OR "2014 Senior Notes" OR "2015
Senior Notes" OR "2016 Senior Notes" OR "7.50% Notes" OR "6.875% Notes"
OR "6.375% Notes"  OR "2013 Notes" OR "2014 Notes" OR "2015 Notes" OR
"2016 Notes" OR "1334 billion" OR "1,334 billion" OR "364 million" OR "300
million" OR "670 million" OR "600 million").

Date Ranges:

March 29, 2010 (when these redemption transactions were first
contemplated) - July 22, 2010 (when the final transaction was closed).

We would appreciate your comments -- and, ideally, approval of this
proposal to resolve our pending disagreement -- as promptly as possible.

--Richard

On 3/29/13 6:11 PM, "Ziegler, Richard F." <RZiegler@jenner.com> wrote:

>Dear Ben,
>
>We are considering with Chesapeake a possible search term proposal to
>address your insistence on additional document disclosure on the "custom
>and usage" issue.  We are making this effort in light of your rejection
>of our proposal of earlier today to attempt to moot our disagreement by
>having Chesapeake respond to an interrogatory about its understanding of
>the customary industry meaning of "redemption" in a manner that would
>admit precisely what we had understood BNY hopes to establish through the
>additional documents.   We hope to learn sometime tomorrow whether the
>new search-term effort we are contemplating is workable from a burden and
>timeframe standpoint, and if it is, we will describe it to you in detail
>promptly after we've obtained that information.
>
>In concept, we are contemplating producing documents that relate to the
>planning and execution of the only two redemption notices Chesapeake has
>issued since mid-2008 before its notice for the 2019 Notes (and apart
>from one other notice that constituted merely a "mop-up" redemption
>following a successful tender offer for some notes).  Those two notices
>occurred in mid-2010 and were collectively applicable to four outstanding
>series of notes.  As I noted in an e-mail earlier today, until the notice
>to redeem the 2019 Notes, Chesapeake had not redeemed any notes that are
>governed by the Base Indenture that underlies the 2019 Notes and so by
>definition any prior redemptions are governed by different indentures.
>
>We hope that we will learn tomorrow that the proposal we are devising
>will be workable from a time and burden standpoint, and if so, that
>(after we have provided a more detailed description of the proposal to
>you) BNY will accept it as an appropriate resolution of our pending
>dispute.
>
>If that proves not to be the case, however, we will need to prepare a
>joint letter for the Court for Sunday submission that describes our
>respective client's perspectives on our unresolved dispute.  To that end,
>we will send you a draft of such a letter by Sunday morning, but in the
>meantime it probably makes sense for you to be drafting the section of
>that letter that will be inserted under the heading "BNY's Perspective."
>
>Separately, I am pleased to confirm that we have begun the process of
>implementing the first four search-term proposals in Prashant's e-mail of
>last night, with which you agreed today, notwithstanding our apparent
>continued disagreement on the fifth aspect of last night's e-mail.
>
>--Richard

>
>
>
>-----Original Message-----
>From: Nagin, Benjamin [mailto:BNagin@Sidley.com]
>Sent: Friday, March 29, 2013 1:25 PM
>To: Ziegler, Richard F.
>Cc: Bierman, Steven; Rovira, Alex R.; Arden, James D.; Greaney, Isaac;
>tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne Cortina;
>Ascher, Stephen L.; Yerramalli, Prashant
>Subject: CHK Litigation -- Further Meet and Confer Efforts
>
>Dear Richard:
>
>Thank you again for your email and for the time spent on the call that
>we just concluded.
>
>As you know, the Order from yesterday requires Chesapeake to develop a
>concrete and productive proposal for the production of documents
>concerning custom, practice, usage and terminology regarding the
>redemption of bonds covered by the Base and Supplemental Indentures.  We
>asked for this and related information in the individual document
>requests that are referenced in our meet and confer correspondence with
>you to try to achieve a negotiated resolution.  We also cited those
>requests in our application to the Court that led to yesterday's order.
>
>
>Despite the Court's order, we have not yet received a concrete proposal
>from you with regard to this document discovery.  However, in an effort
>to avoid further delay in collection and production, we suggest the
>following resolution.  It addresses both the custom, practice, usage and
>terminology documents as well as the search term parameters that we have
>discussed and are the subject of Prashant Yerramalli's email of 9:06
>p.m. Thursday (the "Yerramalli Email").
>
>To avoid further delay and to permit us to receive documents on the
>schedule requested by you and set by the Court, we will accede to your
>proposal on search terms in paragraphs 1 through 4 of the Yerramalli
>Email.
>
>We propose a variation of the connector search in paragraph 5 of the
>Yerramalli Email for purposes of the "search term" search for custom,
>practice, usage and terminology documents.  The search below should be
>run on all of the designated Chesapeake custodians for the period August
>2, 2010, through March 8, 2013.
>
>("note" OR "notes" OR "bond" OR "bonds" OR "paper" OR "indenture") AND
>("redeem*" OR "redemption" OR "call*" OR "par" OR "matur*" OR notice)
>
>Chesapeake also must conduct a targeted search in hard-copy and share
>drive (or other centrally or locally stored) locations for custom,
>practice, usage and terminology documents, including, by way of example,
>documents and communications concerning the redemption of notes pursuant
>to the Base and/or Supplemental Indenture and documents and
>communications concerning any processes, procedures or plans for the
>redemption of notes such as time lines, slide decks, memoranda, planning
>documents, and minutes.  This search also should collect any financial

4

>industry materials or sources concerning or reflecting custom, practice,
>usage and terminology (whether from professional or trade organizations,
>regulators, investment banks, or other sources).
>
>With respect to the remainder of the searches in the Yerramalli Email
>(some of which Chesapeake previously agreed to conduct and some of which
>it did not), we propose the following:
>
>("note" OR "notes" OR "bond" OR "bonds" OR "paper" OR "holder*" or
>"call*" or indenture) AND (MW OR "11/15" OR "November 15" OR "Nov 15" OR
>Nov. 15" OR "3/15" OR "March 15" OR "Mar. 15" OR Mar 15" OR "Feb 13" OR
>"Feb. 13" OR "2/13" OR "May 14" or "5/14" OR Bracewell OR Telle OR
>Cravath OR Maultsby OR "@baml" OR "@bgllp")
>
>
>We look forward to discussing this with you at 2 p.m.
>
>Regards,
>
>Ben
>
>
>Benjamin R. Nagin
>Sidley Austin LLP
>787 Seventh Avenue
>New York, NY  10019
>212-839-5911 (office)
>212-839-5599 (fax)
>
>
>
>
>-----Original Message-----
>From: Ziegler, Richard F. [mailto:RZiegler@jenner.com]
>Sent: Thursday, March 28, 2013 10:50 PM
>To: Nagin, Benjamin
>Cc: Bierman, Steven; Rovira, Alex R.; Arden, James D.; Greaney, Isaac;
>tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne
>Cortina; Ascher, Stephen L.; Yerramalli, Prashant
>Subject: Re: Meet/Confer Friday a.m. on Judge's Order?
>
>OK -- if you don't mind, we'd prefer 12:45 pm.
>
>Please use the following info (we'll assume 12:45 works for you unless
>you
>advise us it doesn't):
>
>866-319-3661
>code: 212 891 1680
>
>Thanks for the quick response.
>
>--Richard
>
>On 3/28/13 10:15 PM, "Nagin, Benjamin" <BNagin@Sidley.com> wrote:
>
>>Dear Richard:

>>
>>Thank you for your email.
>>
>>9 a.m. does not work here, unfortunately.  (Our schedules filled up
>>quickly!)
>>
>>Let's talk at 12:30 p.m.
>>
>>We will give serious thought to your requests though we tried very hard
>>to resolve this before seeking assistance from the Court.  If you have
>a
>>concrete proposal before then, please let us know.  Thank you.
>>
>>Regards,
>>
>>Ben
>>
>>
>>Benjamin R. Nagin
>>Sidley Austin LLP
>>787 Seventh Avenue
>>New York, NY  10019
>>212-839-5911 (office)
>>212-839-5599 (fax)
>>
>>
>>
>>
>----------------------------
>Richard F. Ziegler
>
>Jenner & Block LLP
>919 Third Avenue
>New York
>NY 10022-3908
>Tel (212) 891-1680
>Fax (212) 909-0854
>RZiegler@jenner.com
>www.jenner.com
>
>CONFIDENTIALITY WARNING: This email may contain privileged or
>confidential information and is for the sole use of the intended
>recipient(s). Any unauthorized use or disclosure of this communication
>is prohibited. If you believe that you have received this email in
>error, please notify the sender immediately and delete it from your
>system.
>
>
>----------------------------
>
>-----Original Message-----
>>From: Ziegler, Richard F. [mailto:RZiegler@jenner.com]
>>Sent: Thursday, March 28, 2013 8:54 PM
>>To: Nagin, Benjamin
>>Cc: tkandel@emmetmarvin.com; PWEINSTEIN@EMMETMARVIN.COM; Perry, Anne
>>Cortina; Ascher, Stephen L.; Yerramalli, Prashant; Bierman, Steven;
>>Rovira, Alex R.; Arden, James D.; Greaney, Isaac

6

>>Subject: Meet/Confer Friday a.m. on Judge's Order?
>>
>>Dear Ben (and colleagues)--
>>
>>I appreciate your voicemail and your follow-up e-mail to assure that
>we'd
>>learned quickly of the change in the Court conference (as it happens,
>Mr.
>>Beaty's voicemail arrived shortly before yours). Thanks very much for
>>your courtesy.
>>
>>We'd like to get going in responding to the Judge's order of this
>evening
>>on the custom and usage discovery, and to that end suggest that we have
>a
>>meet-and-confer on that topic with you tomorrow morning at 9 am, when
>we
>>were otherwise going to be on the phone with the Court.  We hope you
>>haven't made conflicting plans already, but if you have please suggest
>an
>>alternative time for a call tomorrow.
>>
>>To make tomorrow's call as productive as possible, we'd appreciate it
>if
>>you would give thought in advance to what you're looking for so that
>you
>>can describe it with as much precision as possible, such as categories
>of
>>information you wish to see and the types of documents you think would
>>have such information.  That information from you will be very
>important
>>in enabling us to reach agreement on an appropriate scope for searching
>>and identifying responsive documents.   One possibility that has
>occurred
>>to us that could streamline the process for both sides would be for
>>Chesapeake to agree to respond to reasonable interrogatories from you
>on
>>the subjects that you're interested in, in lieu of additional document
>>production; that approach would presumably be less burdensome for
>>Chesapeake and would also spare you the burden that you would otherwise
>>have to incur in piecing together information from various documents.
>>
>>--Richard
>>
>>From: <Nagin>, Benjamin Nagin
>><bnagin@sidley.com<mailto:bnagin@sidley.com>>
>>Date: Thursday, March 28, 2013 6:02 PM
>>To: Richard Ziegler User
><rziegler@jenner.com<mailto:rziegler@jenner.com>>
>>Cc: Steven Bierman <sbierman@sidley.com<mailto:sbierman@sidley.com>>
>>Subject: <no subject>
>>
>>Just left you a voicemail.  Judge is going to reschedule conference to
>>8:30 am Monday.  Chambers will fax order.
>>
>>
>>

```
>>
>>Benjamin R. Nagin
>>Sidley Austin LLP
>>787 Seventh Avenue
>>New York, NY  10019
>>212-839-5911 (office)
>>212-671-0373 (mobile)
>>212-839-5599 (fax)
>>
>>
>>
>>
>>----------------------------------------------------------------------
>---
>>--------------------------
>>IRS Circular 230 Disclosure: To comply with certain U.S. Treasury
>>regulations, we inform you
>>that, unless expressly stated otherwise, any U.S. federal tax advice
>>contained in this
>>communication, including attachments, was not intended or written to be
>>used, and cannot be
>>used, by any taxpayer for the purpose of avoiding any penalties that
>may
>>be imposed on such
>>taxpayer by the Internal Revenue Service.  In addition, if any such tax
>>advice is used or referred
>>to by other parties in promoting, marketing or recommending any
>>partnership or other entity,
>>investment plan or arrangement, then (i) the advice should be construed
>>as written in connection
>>with the promotion or marketing by others of the transaction(s) or
>>matter(s) addressed in this
>>communication and (ii) the taxpayer should seek advice based on the
>>taxpayer's particular
>>circumstances from an independent tax advisor.
>>********************************************************************
>***
>>**************************
>>This e-mail is sent by a law firm and may contain information that is
>>privileged or confidential.
>>If you are not the intended recipient, please delete the e-mail and any
>>attachments and notify us
>>immediately.
>>
>>********************************************************************
>***
>>**************************
>>
>>
>>
>>_____
>>
>>Richard F. Ziegler
>>
>>Jenner & Block LLP
>>
>>919 Third Avenue
```

8

```
>>New York, NY 10022-3908
>>Tel (212) 891-1680
>>Fax (212) 909-0854
>>RZiegler@jenner.com
>>www.jenner.com<http://www.jenner.com/>
>>
>>
>>CONFIDENTIALITY WARNING: This email may contain privileged or
>>confidential information and is for the sole use of the intended
>>recipient(s). Any unauthorized use or disclosure of this communication
>is
>>prohibited. If you believe that you have received this email in error,
>>please notify the sender immediately and delete it from your system.
>>
>>_____
>>
>>
>
>
```

# EXHIBIT D

*Chesapeake v. BNY Mellon, et ano*
Case No. 1:13-cv-1582-PAE

## PLAINTIFF'S PROPOSED SEARCH TERM PROTOCOL
## FOR "CUSTOM AND USAGE" DOCUMENTS

**Concept:**

This proposal is designed to identify documents concerning the only Chesapeake redemptions of notes since mid-2008 (apart from one other redemption notice that effected a "mop up" of a small number of notes following a successful tender offer). The first redemption transaction to be searched was initiated by a notice issued May 18, 2010 for the aggregate redemption in whole of approximately $1.334 billion, plus accrued interest, in outstanding notes, approximately $364 million of which was comprised of outstanding 7.50% Senior Notes due 2013; $300 million of which was comprised of 7.50% Senior Notes due 2014; and approximately $670 million of which was comprised of 6.875% Senior Notes due 2016 completed on June 21, 2010. *See* http://www.chk.com/News/Articles/Pages/1428570.aspx. The second such transaction was initiated by a notice issued on June 21, 2010 for the redemption of $600 million, plus accrued interest, of 6.375% Senior Notes due 2015 completed on July 22, 2010. *See* http://www.chk.com/News/Articles/Pages/1440026.aspx. Note that none of these redemptions was governed by the Base Indenture in this case; the only notice of redemption that Chesapeake has issued in connection with the Base Indenture is the pending notice for the 2019 Notes.

The proposed search terms are designed to mirror the searches that uncovered responsive documents concerning the planning and execution of the pending redemption at issue in this case.

**Custodians:**

These 7 custodians have been identified by knowledgeable Chesapeake finance personnel as those who are the most likely to have either participated in the redemption planning/decision-making, or to have received or sent communications relating to that subject:

- Elliot Chambers
- Domenic Dell¹Osso
- Jennifer Grigsby
- Aubrey McClendon
- Marc Rome
- Marcus Rowland (Mr. Rowland was CFO of the Company during part of the search period)
- Susan Seymore

*Chesapeake v. BNY Mellon, et al.*
Case No. 1:13-cv-1582-PAE

**Search Terms:**

("redeem" OR "redeemed" OR "redemption" OR "notice" OR "call*" Or "indenture") **AND** ("7.50% Senior Notes" OR "6.875% Senior Notes" OR "6.375% Senior Notes" OR "2013 Senior Notes" OR "2014 Senior Notes" OR "2015 Senior Notes" OR "2016 Senior Notes" OR "7.50% Notes" OR "6.875% Notes" OR "6.375% Notes" OR "2013 Notes" OR "2014 Notes" OR "2015 Notes" OR "2016 Notes" OR "1334 billion" OR "1,334 billion" OR "364 million" OR "300 million" OR "670 million" OR "600 million")

**Date Ranges:**

March 29, 2010 (when these redemption transactions were first contemplated) to July 22, 2010 (when the final transaction was closed).