919 THIRD AVENUE   NEW YORK   NEW YORK   10022-3908

JENNER&BLOCK LLP

**SUBMITTED UNDER SEAL PURSUANT TO
STIPULATED PROTECTIVE ORDER**

April 10, 2013

Stephen L. Ascher
Tel  212 891-1670
Fax 212 909-0803
sascher@jenner.com

**VIA EMAIL**

Honorable Paul A. Engelmayer
United States District Judge
United States District Court
Southern District of New York
40 Foley Square
New York, NY  10007

Re:   *Chesapeake Energy Corporation v. The Bank of New York Mellon Trust Company, N.A.,
No. 13-CV-1582 (PAE)*

Dear Judge Engelmayer:

This letter on behalf of Chesapeake responds to this morning's letter from The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") seeking (a) a change in the cut-off date of the privilege waiver order, and (b) a change in the pre-trial and trial schedule. Chesapeake opposes both requests for the following reasons:

I.   **The Privilege Waiver Cut-Off Date**

BNY Mellon argues that the cut-off date of February 21, 2013, is unfair and enables Chesapeake to use certain privileged information as a "sword" while shielding other such information that BNY Mellon speculates would support its position. Chesapeake takes no exception to the legal principles that BNY Mellon recites but rejects BNY Mellon's speculation, not rooted in any fact, that Chesapeake selected an "arbitrary" end-date for its privilege waiver (BNY Mellon Letter at p. 4) for the purpose of concealing "discussions and advice that contradict or undermine Chesapeake's legal position in this case...." BNY Mellon Letter at p. 3.

There is nothing arbitrary about the end-date of February 21, 2013, for Chesapeake's waiver, as Chesapeake's letter to the Court of March 25 in support of its proposed privilege waiver already explained: As of the next day, February 22, the pending dispute with BNY Mellon had emerged and Chesapeake began considering its options, including litigation options.

Aligning Chesapeake's privilege waiver with the initiation of work product protection makes perfect sense. This case concerns the meaning of a specific contractual provision, which will be determined by an analysis of the four corners of the document in question and, if necessary, the extrinsic

Honorable Paul A. Engelmayer
April 10, 2013
Page 2

evidence of the drafters' intent. The purpose of Chesapeake's subject matter waiver was to ensure a full evidentiary record of contemporaneous information bearing on that question. The most meaningful such information was generated during the nine-day period when the contract was negotiated and drafted in February 2012. To give BNY Mellon a complete record, Chesapeake has also waived the privilege for more than a year after that.

But privileged information that was generated after the dispute arose and Chesapeake began considering and then preparing for litigation is highly unlikely to bear on the drafters' intent; to the contrary, materials generated during that later period naturally reflect Chesapeake's internal assessment of its litigation options. This distinction is reflected in the cases cited at pp. 3-4 of Chesapeake's March 25 letter, which confirm that work product protection continues to apply notwithstanding a privilege waiver. In sum, the February 21, 2013, end-date of the privilege waiver order reasonably ensures that Chesapeake will produce all communications concerning the Special Early Redemption provision, even ordinarily protected privileged communications, up to the date that Chesapeake anticipated litigation. This end date cannot be fairly characterized as "selective."

BNY Mellon's argument appears to be based on surprise that Chesapeake generated privileged documents after the end-date of its waiver (BNY Mellon Letter at p. 3-5), but that obviously does not support its request; Chesapeake has never suggested that it did not generate privileged information after February 21. BNY Mellon's other support for its challenge is simply innuendo and speculation that Chesapeake must have selected the February 21 end-date because it wishes to hide documents generated thereafter "that contradict or undermine Chesapeake's legal position in this case...." BNY Mellon Letter at p. 3. But BNY Mellon has no foundation for that speculation.

Ironically, as BNY Mellon mentions towards the end of its letter, Chesapeake inadvertently produced a handful of privileged documents that were generated after the February 21, 2013, end-date in the privilege waiver order, so BNY Mellon now has some direct information concerning such documents. Even if BNY Mellon were entitled to rely on such inadvertently produced privileged information in this proceeding, which it is not,[1] none of the documents includes any information that is inconsistent with Chesapeake's legal position in this case.

---

[1] Chesapeake alerted BNY Mellon in two e-mails on April 8, 2013, and April 9, 2013, that it had inadvertently produced 11 privileged documents. Under the Stipulated Protective Order and applicable rules, BNY Mellon is free to contest the invocation of privilege with respect to such documents (though only after a meet-and-confer process that has not yet occurred, rendering the discussion at pages 4-5 of this morning's letter from BNY Mellon premature). But until such time, if ever, that such documents are determined not to be privileged, receiving counsel is at risk of sanctions and potential disqualification if it relies on the content of such documents for any other purpose. See New York Rules of Professional Conduct, Rule 4.4(b), Comment 2 ("Although this Rule does not require that the lawyer refrain from reading or continuing to read the document, a lawyer who reads or continues to read a document that contains privileged or confidential information may be subject to court-imposed sanctions, including

Honorable Paul A. Engelmayer
April 10, 2013
Page 3

Despite this ethical constraint, BNY Mellon's letter tries to exploit the contents of one of the inadvertently produced privileged documents, an indisputably privileged e-mail exchange between in-house counsel and their in-house clients on February 24, 2013, that reveals that Chesapeake was about to receive a draft opinion on the dispute with BNY Mellon from Bracewell & Guiliani LLP, its outside counsel on the 2019 Notes transaction. See BNY Mellon Letter at p. 3-4 (referring to that opinion). Nothing in the inadvertently produced e-mail exchange suggests that the Bracewell draft opinion, which had not yet been supplied to Chesapeake, is inconsistent with Chesapeake's position in this action.

In fact, the key attorney-client documents for which Chesapeake has waived privilege flatly negate BNY Mellon's speculation. In January 2013, Chesapeake first began to seriously consider planning to redeem the 2019 Notes and accordingly first focused on the precise deadline for giving notice. The company determined at that time that its notice deadline was March 15, and at Chesapeake's request the Bracewell firm promptly re-reviewed the indenture and confirmed that fact. Thus, there is no reason to believe either that Bracewell's advice has been inconsistent with Chesapeake's position in this lawsuit or that or that Chesapeake brought this case because it "forgot" to give notice on February 13.[2]

It is also important to emphasize that Chesapeake does not propose to use documents disclosed pursuant to the waiver protective order affirmatively as a "sword" to prove its case. The principal purpose of these privileged documents will be to rebut BNY Mellon's speculation that Chesapeake's position on the March 15 notice deadline was crafted only after it had missed the February 13 deadline BNY Mellon urges. To the contrary, as noted above, more than a month before the supposed February 13 deadline, Chesapeake believed and confirmed with counsel that it had until March 15 to send notice.

Considerations of burden also support the February 21 end-date. As our March 25 letter noted, once the dispute with BNY Mellon materialized, much of the ensuing privileged communications are also subject to protection under the work product doctrine. Extending the subject matter waiver into this litigation planning period would require assessments of numerous documents to distinguish between work product and privilege. For all these reasons, BNY Mellon has not shown that the February 21 end-date of the privilege waiver is either arbitrary or unfair.

---

disqualification and evidence-preclusion."); New York City Bar Association Formal Opinion 2012-1, http://www.nycbar.org/ethics/ethics-opinions-local/2012opinions/1441-formal-opinion-2012-01 ("Counsel would do well, however, to remember the New York State Bar Association comment that 'a lawyer who reads or continues to read a document that contains privileged or confidential information may be subject to court-imposed sanctions, including disqualification and evidence preclusion.'").

[2] BNY Mellon's letter to the Court dated April 9 gratuitously attached as Exhibit 1 an email from January 2013 in which a Chesapeake manager stated that he was previously under the impression that Chesapeake had to give notice by February 15. That a single individual had a mistaken understanding of a contractual provision does not illuminate, let alone change, the meaning of that provision – even if there were proof that the individual had ever read the provision in question.

Honorable Paul A. Engelmayer
April 10, 2013
Page 4

Finally, the Court should also reject BNY Mellon's request that the Court conduct an *in camera* review of all documents that Chesapeake withholds as work product. BNY Mellon Letter at p. 5. BNY Mellon offers no support for this sweeping request, which would impose a tremendous burden on the Court. And BNY Mellon should not be permitted to refocus this case on Chesapeake's and its lawyers' after-the-fact assessments of the dispute, rather than the contemporaneous intentions and understandings of the parties who negotiated and drafted the Supplemental Indenture.

II.     **The Trial and Interim Pre-Trial Dates**

BNY Mellon next requests that the Court re-set the trial and interim pre-trial dates. Chesapeake opposes any scheduling change that would jeopardize the Court's ability to decide the dispute on a timetable that would permit Chesapeake to proceed with a Special Early Redemption if its notice is determined to have been timely.

Moreover, BNY Mellon's request is predicated on several misstatements and distortions. First, BNY Mellon states that "it is now clear that Chesapeake doubted the certainty of its current interpretation of the redemption provisions at issue, long before a 'dispute' with BNY Mellon emerged in late February 2013...." BNY Mellon Letter at p. 5. To the contrary, the otherwise privileged documents described above reflect the fact that as soon as Chesapeake began to consider the mechanics of exercising its Special Early Redemption option, it reviewed the Supplemental Indenture, determined that it had until March 15 to give notice, and confirmed that interpretation of the Supplemental Indenture with the lawyer who drafted it. Chesapeake had no reason at that time to seek judicial relief.

BNY Mellon next claims that Chesapeake "has largely failed to produce its documents pursuant to the CMO"'s April 2 deadline. In particular, BNY Mellon claims that Chesapeake has made 75% of its total production after the deadline. In reality, by March 28, Chesapeake had produced 24,000 pages of documents from the files of the five key custodians at Chesapeake and at Bracewell who negotiated and drafted the Supplemental Indenture. Chesapeake produced another 12,000 pages on April 2, substantially completing its original production. BNY Mellon had the key documents in the case by that date, and much of what Chesapeake has produced thereafter has been either duplicative or unrelated to the negotiation and drafting of the Supplemental Indenture.

More specifically, the 29,000 pages of documents Chesapeake has produced since that date have largely consisted of:

(1) "custom and usage" documents that Chesapeake was ordered to produce on April 1, and which the Court has already recognized are "unusually unlikely to be relevant";

(2) documents Chesapeake has located in response to a barrage of follow-up requests by counsel for BNY Mellon. Virtually all of these follow-up requests have been for documents generated long after the parties negotiated and drafted the Supplemental Indenture, for example, summary

documents that recited the date range in the prospectus but did not address the precise significance of that date range or the mechanics of notice; and

(3) documents originally marked as privileged.

Third, BNY Mellon's accusation that Chesapeake "hindered" its attempts to obtain documents from Chesapeake's counsel at Bracewell is simply false. BNY Mellon claims that it was not until March 29 that we informed it that we would not be producing Bracewell's internal documents. To the contrary, on March 22, in our response to BNY Mellon's document requests, we noted in an objection that we would be producing documents from Bracewell only to the extent that they were in Chesapeake's "possession, custody or control." Counsel for BNY Mellon did not indicate that it did not appreciate the significance of this objection, which should have been apparent to New York lawyers in light of the *Sage Realty* doctrine. *See Sage Realty Corp. v. Proskauer Rose Goetz & Mendelsohn L.L.P.*, 689 N.E.2d 879, 883 (N.Y. 1997) (holding "firm documents intended for internal law office review and use" are not part of a client's file). On March 26, to avoid any confusion on this point, we sent BNY Mellon a detailed description of our electronic search protocol which noted that for the Bracewell custodians, "Bracewell provided Jenner & Block with emails and other documents reflecting communications with Chesapeake or with third parties that Bracewell collected in accordance with the following protocol...." Plaintiff's Document Collection Protocol for Bracewell Custodians at p. 1. If BNY Mellon did not appreciate the significance of these two statements until March 29, it was certainly not because Chesapeake "hindered" its understanding. In any event, the vast majority of relevant documents produced to date from Bracewell's files were in fact produced by Chesapeake by March 28; Chesapeake has produced from Bracewell's files within its possession, custody, or control 1,091 documents totaling 8,643 pages, while Bracewell's additional production has yielded just 110 documents totaling 2,286 pages.[3]

Finally, Chesapeake notes that BNY Mellon's request for a change to the schedule appears possibly to be part of a strategy either to delay decision in this action beyond May 10 or to make it impossible for us to take and defend the depositions scheduled for this case. In the last few days, BNY Mellon has insisted on rescheduling several depositions for next week, so that the parties will now have to triple-track depositions (at least) for the first three days next week. Since BNY Mellon has three law firms representing it (Sidley, Emmet Marvin, and conflict counsel handling the depositions of the underwriters), while Chesapeake has only one, these postponements appear to be strategic.

Chesapeake has moved heaven and earth to produce documents to BNY Mellon in time to facilitate depositions during the schedule that the Court generously provided for decision on this action. There is no reason why BNY Mellon needs every possible document before it begins every significant deposition. This case should proceed as scheduled.

---

[3] The discrepancy between the number of documents and the number of pages reflects the fact that many of the documents include drafts of the lengthy prospectus.

Honorable Paul A. Engelmayer
April 10, 2013
Page 6


Respectfully submitted,

Stephen L. Ascher

Cc: Steven M. Bierman, Esq. (Counsel for Defendant BNY Mellon)
    Paul T. Weinstein, Esq. (Counsel for Defendant BNY Mellon)