UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

CHESAPEAKE ENERGY CORPORATION,

                    Plaintiff,

      -v-

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

                    Defendant.

------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 4/15/13

13 Civ. 1582 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This memorandum opinion addresses the Court's *ex parte* review of certain materials withheld from production in this expedited litigation by plaintiff Chesapeake Energy Corporation ("Chesapeake"), on grounds of attorney-client privilege, attorney work product, or both.

I. **Background**

The Court assumes familiarity with the claims in and procedural history of this lawsuit. The issue at hand involves an application by defendant Bank of New York Mellon Trust Company, N.A. ("BNY"), to compel Chesapeake to produce privileged documents outside the scope of Chesapeake's voluntary privilege waiver. That privilege waiver, embodied in the Court's March 27, 2013 protective order, applies to all documents and communications concerning the "drafting, meaning, interpretation, and/or application of section 1.7 of the Ninth Supplemental Indenture" governing the 2019 Notes at issue in this action (the "Subject Matter"). By its terms, Chesapeake's privilege waiver governs documents and communications through and including February 21, 2013, a date more than a year after the Ninth Supplemental Indenture was executed. Chesapeake represents that it selected February 21, 2013, as the end date for its

privilege waiver, on the grounds that on that date Chesapeake began to contemplate litigation of the controversy relating to the Ninth Supplemental Indenture, and that its privileged communications with counsel from that point forward were likely to be separately protected by the attorney work-product doctrine. By its terms, Chesapeake's waiver did not extend to attorney work product. BNY agreed to the terms of the waiver, but reserved the right to object to the end date of the waiver.

In a letter submitted to the Court on April 10, 2013, BNY exercised that right. It argued that the February 21, 2013 end date that Chesapeake had chosen for its waiver of privileged materials relating to the Subject Matter was improperly selective; that using that date served to deny BNY access to probative materials relating to that Subject Matter; and that that end date permitted Chesapeake to use its privileged materials as both a sword and a shield. Dkt. 73, at 2–5 (citing *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie, S.C.A.*, 258 F.R.D. 95, 110 (S.D.N.Y. 2009)). In a letter response submitted to the Court on April 10, 2013, Chesapeake disputed these points. Dkt. 74, at 2–3.

At a conference convened on Thursday, April 11, 2013, to discuss discovery issues that had arisen, the Court heard argument on these points. In light of the telescoped time period of this litigation and the need for prompt resolution, the Court agreed to review, *ex parte*, materials reflecting communications as to which Chesapeake has claimed privilege, covering the period between February 22, 2013, *i.e.*, the first date after the privilege waiver, and March 8, 2013, the date when this litigation commenced. The Court, however, limited the scope of its review to communications to which one or more of the three attorneys at Bracewell & Giuliani LLP ("Bracewell"), who had advised Chesapeake with regard to the Ninth Supplemental Indenture, were party: Michael Telle, Esq., Erica Hogan, Esq., and Clay Brett, Esq. (collectively, the

"Bracewell Fact Witnesses"). The Court's judgment was that communications involving Chesapeake's litigation counsel but not the Bracewell Fact Witnesses were likely instead to consist of attorney work product, including relating to litigation strategy and assessments, to which BNY has no claim of fair entitlement.

Late Friday, April 12, 2013, counsel for Chesapeake supplied the Court with two binders of material, for its *in camera* review. "Making an *in camera* submission of materials that counsel contends are privileged is a practice both long-standing and routine in cases involving claims of privilege." *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180, 184 (2d Cir. 2007) (citation omitted). The first binder ("Binder One") contains 119 sets of emails and attachments relating to the Subject Matter in which one or more of the Bracewell Fact Witnesses appears in the "to," "from," or "cc" fields. The second binder ("Binder Two") contains an additional 67 such emails and attachments (all dated March 6 or 7, 2013); the materials in this binder differ in that one or more lawyers from Jenner & Block, which commenced work for Chesapeake on this matter on March 6, 2013, are party to each of these emails. Chesapeake also supplied the Court with indexes to the two binders; the Court understands that these indexes were also furnished to counsel for BNY. Finally, on April 12, 2013, at the Court's invitation, counsel for both Chesapeake and BNY submitted letters setting forth their views as to the applicable principles governing the Court's *in camera* review. Dkt. 75–76.

## II. Discussion

### A. Binder One

The Court has closely examined the contents of Binder One. Without disclosing the substance of these communications, the Court summarizes the emails in this binder as falling into the following categories:

3

- (1) transmittal emails—*i.e.*, emails that transmit to counsel documents from in or around February 2012 relating to the Note offering, or that forward to counsel embedded email chains from in or around February 2012;
- (2) scheduling emails—emails that arrange calls to discuss legal strategy with regard to the developing dispute with BNY relating to the Ninth Supplemental Indenture;
- (3) emails soliciting or seeking updates on the status of a memorandum containing analysis of potential litigation options which Chesapeake commissioned from a Bracewell & Giuliani litigation partner (not one of the Bracewell Fact Witnesses);
- (4) an email attaching two memoranda from the Bracewell & Giuliani litigation partner, one discussing Chesapeake's options with regard to declaratory relief and another assessing whether Chesapeake had the right to redeem the 2019 Notes pursuant to the special early redemption process so long as notice of such redemption was given on or before March 15, 2013 (both are contained at Tab 35);
- (5) emails discussing strategy for anticipated phone call(s) with BNY's counsel relating to the dispute, and emails reporting communications with BNY;
- (6) emails discussing potential means of resolving, out of court, Chesapeake's dispute with BNY;
- (7) emails commenting on the strategic merits, and mechanics, of potential applications for injunctive or other emergency relief from a court;

- (8) an email from a Bracewell & Giuliani litigation partner discussing a potential litigation option (Tabs 76 and 86) and emails from counsel commenting on this option;

- (9) emails discussing the need to retain lead litigation counsel from a firm other than Bracewell & Giuliani and arranging the process for doing so; and

- (10) emails discussing the option of issuing a notice of special early redemption that would be ineffective if held untimely for that purpose.

In reviewing these emails, the Court has considered, as to each email: (1) whether it is privileged; (2) whether it falls within the scope of the attorney work-product doctrine; (3) whether it reveals facts or evidentiary material relevant to the issues before the Court, as opposed to *post hoc* legal judgments on those issues; and (4) whether anything in the emails could fairly be used as impeachment material with respect to the potential testimony of any of the Bracewell Fact Witnesses.

The Court's conclusions are as follows.

1. Each email is a privileged communication between attorney and client.

2. The vast majority of the emails in the binder squarely qualify as attorney work product. There are none which the Court is prepared to hold are not attorney work product. The emails as to which more information or briefing would be needed to enable the Court to make such a determination are those that deal with potential non-litigation resolutions to the controversy between Chesapeake and BNY, or non-substantive emails scheduling calls that appear likely to have been intended to address Chesapeake's litigation options, but of which the intended subject matter is not always transparent on the face of the email. However, in the

Court's judgment, none of these emails has any conceivable bearing on the issues before the Court.

3. A number of emails, as noted, attach documents from 2012 relating to the loan offering or embed email chains from 2012. In particular, a number of emails early in the binder are of this nature (*e.g.*, Tabs 2, 3, 8, 9, 10, 11, 13). The Court expects that Chesapeake has already produced to BNY the attached 2012 documents and embedded email strings from 2012: The loan offering documents from 2012 appear to be discoverable and potentially relevant and the embedded email strings from 2012 all appear to fall within the subject-matter and temporal scope of Chesapeake's privilege waiver. The Court directs Chesapeake to confirm, by letter to the Court and counsel due by noon on Tuesday, April 16, 2013, that all attached documents from 2012 relating to the loan offering and all embedded email strings from 2012 that appear in this binder have been produced to BNY. To the extent that any have not been produced, the Court directs that Chesapeake either produce them forthwith or explain, by letter to the Court, why each is properly withheld. (For avoidance of doubt, the Court is not requiring Chesapeake to produce the 2013 emails transmitting these 2012 documents or communications. Chesapeake is required only to confirm that the documents and communications from 2012 themselves have been produced.)

The Court has closely reviewed the materials in the binder for the purpose of determining whether they draw upon or reveal documents, facts, or other evidentiary material that may not have been disclosed to BNY. Most relevant here is the litigation assessment by the Bracewell & Giuliani litigation partner. The documents referenced in the litigation assessment are the text of the indentures and the prospectus supplement; the assessment also refers generally to preliminary drafts of the supplemental indenture. The Court expects that Chesapeake has produced such

preliminary drafts to BNY. (For avoidance of doubt, the Court directs Chesapeake to confirm in its April 16, 2013 letter that it has done so.) If so, all documents referred to in the litigation assessment are equally available to the parties to this lawsuit. The litigation assessment also references the fact that other participants in the underlying transaction—a partner at Cravath, Swaine & Moore ("CSM") and representatives of Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill")—had been consulted as to their views whether a notice of special early redemption would be timely if given by March 15, 2013. The Court expects that BNY is aware of the names of the CSM and Merrill personnel referenced in the litigation assessment and that these persons participated in the underlying transaction. (For avoidance of doubt, the Court directs Chesapeake to confirm in its April 16, 2013 letter that this is so.) If so, the potential fact witnesses revealed in the litigation assessment are also equally available to the parties to this lawsuit to be deposed. As to the other materials in the binder, they do not identify relevant evidence bearing on the parties' dispute.

    4. The Court has closely examined the communications in the binder, post-dating February 21, 2013, involving Mr. Telle and Ms. Hogan. (There do not appear to be any involving Mr. Brett.) The Court has done so on the understanding that Mr. Telle, Ms. Hogan, and Mr. Brett may be fact witnesses in this litigation. The Court is satisfied that none of these communications bears substantively on the issues before the Court. To the limited extent these parties are participants in (as opposed to passive recipients of) these emails, their emails address non-substantive organizational or logistical topics (*e.g.*, transmitting documents, arranging calls, and/or confirming the timetable for the litigation assessment by the Bracewell & Giuliani litigation partner) or attach drafts of Chesapeake's special early redemption notice. The Court wishes to assure counsel for BNY that it has scrutinized these documents closely. The Court is

satisfied that these documents do not contain, explicitly or implicitly, any representations by any of the Bracewell Fact Witnesses as to any of the facts at issue. Nor do they supply any basis not already readily apparent to the Court and counsel (*e.g.*, Bracewell's interest in retaining a role as Chesapeake's outside counsel; and/or the reputational or other potential adverse consequences to Bracewell if the deal documents that it prepared were held deficient) for attempting to impeach the testimony of these witnesses.

In light of this review, the Court denies BNY's request that it order the production of any of the privileged communications in Binder One to the extent that they postdate February 21, 2013. The Court has broad authority to issue rulings relating to the scope and parameters of a privilege waiver. *See John Doe Co. v. United States*, 350 F.3d 299, 306 (2d Cir. 2003); *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir. 1995). The Court declines to disturb the time parameters of the existing privilege waiver, for several independent reasons.

First, the Court's review of the Binder One materials has confirmed Chesapeake's representation to the Court and counsel that Chesapeake's privileged attorney-client communications after February 21, 2013, are overwhelmingly, if not entirely, protected by the work-product doctrine. These documents are overwhelmingly addressed to the prospect of litigation (or a pre-litigation settlement) with BNY. The parties' written privilege waiver explicitly did not waive attorney work-product communications. That agreement warrants deference, as does a party's interest in protecting its work product. Moreover, the Second Circuit has instructed that a court should engage in a separate waiver analysis as to work product, addressing fairness concerns and making particularized findings. *In re Grand Jury Proceedings*, 219 F.3d 175, 190–91 (2d Cir. 2000). Unless fairness requires it, the Court will not modify the agreed-upon scope of the waiver. *See Alpex Computer Corp. v. Nintendo Co., Ltd.*, No. 86 Civ.

1749 (KMW), 1994 WL 330381, at *2 (S.D.N.Y. July 11, 1994) ("The scope of the subject matter waiver is of particular concern in cases involving opinion work product. . . . Courts should simply take care to extend the scope of the waiver only so far as necessary to ensure fairness to the litigants."); *see also Resolution Trust Corp. v. Mass. Mut. Life Ins. Co.*, 200 F.R.D. 183, 194 (W.D.N.Y. 2001) ("[W]aiver of one privilege will not necessarily mean waiver of the other." (citing *In re Pfohl Bros. Landfill Litig.*, 175 F.R.D. 13, 21 (W.D.N.Y.1997)); *Bowne of N.Y.C., Inc. v. AmBase Corp.*, 150 F.R.D. 465, 479 (S.D.N.Y. 1993) ("The protection of the work-product rule is less readily waived [than attorney-client privilege]."). Here, Chesapeake has not voluntarily waived its work-product materials, and fairness does not require that these materials be produced to BNY.

Second, the Court's review of Binder One—and the directives it has given Chesapeake to confirm that certain 2012 materials are contained within its existing production—serve to assure that BNY has access to all relevant evidence (*e.g.*, documents) and notice of the names of potential witnesses referenced in the materials in Binder One. The vast majority of communications in the binder involve either non-substantive communications, which have no bearing on the issues before the Court, or communications regarding litigation strategy, which are irrelevant to the issues before the Court and are core work product. *See Adlman*, 68 F.3d at 1501 (discussing extent and purposes of work-product doctrine). They do not shed light on the intent of the drafters or negotiators or on the meaning of the special early redemption provision. To the very limited extent that the materials in Binder One do comment upon the merits of that issue, these materials (the litigation assessment by the Bracewell litigation partner and emails relating to it) are core opinion work product to which BNY has no claim of entitlement. This core opinion work product merits greater protection than attorney-client privilege or fact work

9

product. *See In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d at 183 ("[O]pinion work product . . . is entitled to greater protection than fact work product."); *The Shinnecock Indian Nation v. Kempthorne*, 652 F. Supp. 2d 345, 367 (E.D.N.Y. 2009) ("[E]ven in those cases in which courts have held that selective or partial disclosure has impliedly waived the privilege, courts have been reluctant to hold that implied waiver of non-opinion work product extends to opinion work product. In fact, the Court's research has yielded no case in this Circuit reaching such a conclusion."); *In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 473 (S.D.N.Y.1996) (limiting work-product waiver to purely factual materials, leaving protected "core attorney mental processes"). Extending the end date of Chesapeake's privilege waiver would thus breach Chesapeake's privilege as to core opinion work product without conferring any benefit upon BNY to which it may legitimately lay claim.

Third, BNY's speculative fear that limiting Chesapeake's privilege waiver to communications before February 22, 2013, would allow Chesapeake to use privileged materials as both a sword and a shield does not have a basis in fact. Chesapeake has represented that it does not intend to offer into evidence any privileged documents created following the closing of the offering. Dkt. 76, at 4; Transcript of April 11, 2013 Conference ("Tr."), at 41. And, based on the Court's review, none of those documents would appear to be probative and admissible to advance Chesapeake's cause. Thus, BNY has failed to demonstrate that it would suffer prejudice unless these materials were produced, a showing necessary to justify invading Chesapeake's work-product privilege. *See In re von Bulow*, 828 F.2d 94, 101 (2d Cir. 1987) (aim of "the fairness doctrine" is "to prevent prejudice to a party and distortion of the judicial process"); *Newmarkets Partners*, 258 F.R.D. at 106–07 (work-product protection only waived where, "given the particular circumstances of a case, 'it would be unfair for a party asserting

contentions . . . to then rely on its privileges to deprive its adversary of access to material that might disprove or undermine the party's contentions'" (quoting *John Doe Co.*, 350 F.3d at 302)); *Granite Partners v. Bear, Stearns & Co., Inc.*, 184 F.R.D. 49, 54 (S.D.N.Y. 1999) ("The work product privilege is waived when a party to a lawsuit uses it in an unfair way that is inconsistent with the principles underlying the doctrine of privilege."); *Alpex Computer Corp.*, 1994 WL 330381, at *2 ("Subject matter waiver is found only in the event that the initial disclosure is made during the course of litigation and results in prejudice to the opposing party."). Because BNY has not demonstrated prejudice, the Court will not broaden the scope of Chesapeake's voluntary privilege waiver.

### B. Binder Two

The Court has also closely reviewed the materials in Binder Two—which consist of privileged communications to which its newly retained litigation counsel Jenner & Block was a party. These materials are all dated March 6 and 7, 2013. These materials do not have any bearing on the merits of the dispute before the Court. They are core work product: They address the strategy and mechanics of the lawsuit that Chesapeake filed, and the request for emergency relief that Chesapeake made, on Friday, March 8, 2013. There is no basis for granting BNY's request for access to these materials. *See In re Grand Jury Proceedings*, 219 F.3d at 190–91 ("As for work-product that shows 'mental impressions, conclusions, opinions, or legal theories of an attorney,' we have held that, 'at a minimum such material is to be protected unless a highly persuasive showing [of need] is made.'" (alteration in original) (quoting Fed. R. Civ. P 26(b)(3); *Adlman*, 134 F.3d at 1204)).

## CONCLUSION

For the reasons stated, BNY's request that the end date of Chesapeake's privilege waiver be extended beyond February 21, 2013, is denied. Chesapeake is directed to submit a letter to the Court, by noon on April 16, 2013, confirming that the materials about which the Court has inquired in this opinion have in fact been produced to BNY.

SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge

Dated: April 15, 2013
      New York, New York