UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                                              :
CHESAPEAKE ENERGY CORPORATION,                :
                                              :
                    Plaintiff,                :
                                              :
           v.                                 :      Civil Action No. 13-cv-1582(PAE)
                                              :
THE BANK OF NEW YORK MELLON                   :
TRUST COMPANY, N.A.,                          :
                                              :
                                              :
                    Defendant.                :
———————————————————————x


## PLAINTIFF CHESAPEAKE ENERGY CORPORATION'S
## PRETRIAL BRIEF

RICHARD F. ZIEGLER (RZ0872)
STEPHEN L. ASCHER (SA7820)
MICHAEL W. ROSS (MR4490)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................... 1

PLAINTIFF'S CASE IN CHIEF ................................................................................... 7

    A.   Background to the Offering ........................................................... 7

    B.   The Negotiation and Drafting of the Supplemental Prospectus .................................. 9

    C.   The Negotiation and Drafting of the Supplemental Indenture ................................... 16

    D.   Notice of Redemption of the 2019 Notes ............................................. 19

LEGAL ARGUMENT .................................................................................................. 19

   I.   The Supplemental Indenture Unambiguously Prescribes
     a Notice Period for Special Early Redemption. ............................................ 19

    A.   Principles of Contract Interpretation ................................................. 19

    B.   Chesapeake's Interpretation is Reasonable ........................................... 22

    C.   BNY Mellon's Interpretation is Unreasonable. ....................................... 26

   II.  All Relevant Extrinsic Evidence Supports Chesapeake's Interpretation. ........................ 29

    A.   Only Evidence of the Drafters' Intent Is Relevant ..................................... 29

    B.   All Relevant Extrinsic Evidence of the Drafters' Intent Corroborates that
       Chesapeake Could Provide Notice Until March 15, 2013. .............................. 31

   III. Extrinsic Evidence Not Probative of the Drafters' Intent Should Be Disregarded ........... 33

    A.   BNY Mellon's Expert Reports ...................................................... 34

    B.   Any Confusion Within Chesapeake or in the Market Is Not Relevant. .................... 36

   IV. Any Ambiguity Should Not Be Construed Against Chesapeake. ............................ 39

BNY MELLON'S AFFIRMATIVE DEFENSES ....................................................... 42

    A.   Conditionality of Notice ........................................................... 42

    B.   Laches ........................................................................... 43

CONCLUSION ........................................................................................................... 45

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Acme Analgesics, Ltd. v. Lemmon Co.*,
 602 F. Supp. 306 (S.D.N.Y. 1985)......................................................................31

*Adasar Grp., Inc. v. NetCom Solutions Int'l, Inc*,
 No. 01 Civ. 0279 (WHP), 2003 WL 1107670 (S.D.N.Y. Mar. 13, 2003)...............36

*Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*,
 853 F. Supp. 791 (S.D.N.Y. 1994)......................................................................38

*APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc.*,
 890 F. Supp. 2d 360 (S.D.N.Y. 2012)..................................................................37

*Aramony v. United Way of Am.*,
 254 F.3d 403 (2d Cir. 2001)....................................................................20, 21, 24

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
 No. 04 Civ. 10014, 2005 WL 751914 (S.D.N.Y Mar. 31, 2005)............................33

*Bank of N.Y. v. First Millennium, Inc.*,
 598 F. Supp. 2d 550 (S.D.N.Y. 2009)..................................................................21

*Bank of N.Y. v. First Millennium, Inc.*,
 607 F.3d 905 (2d Cir. 2010).................................................................................20

*BKCAP, LLC v. Captec Franchise Trust*,
 No. 3:07-cv-637, 2011 WL 3022441, (N.D. Ind. July 21, 2011) .....................31, 43

*Carolina First Bank v. Banque Paribas*,
 No. 99-cv-9002(NRB), 2000 WL 1597845 (S.D.N.Y. Oct. 26, 2000)...................20

*Cherry River Music Co. v. Simitar Ent., Inc.*,
 38 F. Supp. 2d 310 (S.D.N.Y. 1999)....................................................................37

*Evans v. Famous Music Corp.*,
 1 N.Y.3d 452 (2004) ............................................................................................30

*Feifer v. Prudential Ins. Co. of Am.*,
 306 F.3d 1202 (2d Cir. 2002).........................................................................19, 20

*Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.*,
 948 F. Supp. 1227 (S.D.N.Y. 1996).....................................................................30

*Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.*,
 88 F. Supp. 2d 188 (S.D.N.Y. 2000)....................................................................44

*Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*,
    84 F.3d 91 (2d Cir. 1996) ............................................................................22

*Ginett v. Computer Task Group, Inc.*,
    962 F.2d 1085 (2d Cir. 1992)......................................................................43

*Great Am. Ins. Co. v. USF Holland Inc.*,
    --- F. Supp. 2d ---, 2013 WL 1313841 (S.D.N.Y. March 27, 2013).........................34

*Hart v. Hart*,
    544 S.E.2d 366 (Va. Ct. App. 2001) ...........................................................26

*HSH Nordbank AG v. Street*,
    421 F. App'x 70 (2d Cir. 2011) ..................................................................24

*In re 5300 Memorial Investors, Ltd.*,
    973 F.2d 1160 (5th Cir. 1992) ....................................................................44

*In re Coudert Bros.*,
    487 B.R. 375 (Bankr. S.D.N.Y. 2013) ..................................................21, 28

*In re Dep't of Energy Stripper Well Exemption Litig.*,
    855 F.2d 865 (Temp. Emer. Ct. App. 1988) ...............................................30

*In re Lehman Brothers Inc.*,
    478 B.R. 570 (S.D.N.Y. 2012)...................................................................30

*In re Northwest Airlines*,
    393 B.R. 337 (Bankr. S.D.N.Y. 2008) .......................................................31

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002).........................................................................21

*InterDigital Commc'ns Corp. v. Nokia Corp.*,
    407 F. Supp. 2d 522 (S.D.N.Y. 2005)........................................................22

*JA Apparel Corp. v. Abboud*,
    568 F.3d 390 (2d Cir. 2000)...........................................................20, 23, 25

*JA Apparel Corp. v. Abboud*,
    682 F. Supp. 2d 294 (S.D.N.Y. 2010)...................................................29, 30

*John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*,
    717 F.2d 664 (2d Cir. 1983)...............................................................21, 23

*Kass v. Kass*,
    91 N.Y.2d 554 (1998) ...............................................................................20

*LaSalle Bank Nat'l Assoc. v. CIBC, Inc.,*
   No. 08 Civ. 8426, 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012) .............................................34

*Law Debenture Trust Co. v. Maverick Tube Corp.,*
   595 F.3d 458 (2d Cir. 2010) ............................................................................ passim

*Luitpold Pharms., Inc. v. Ed. Geistlich A.G. Fur Chemische Industrie,*
   No. 11 Civ. 681 (KBF), 2013 WL 208908 (S.D.N.Y. Jan. 15, 2013) ....................................37

*M. Fortunoff v. Peerless Ins. Co.,*
   432 F.3d 127 (2d Cir. 2005) .........................................................................................40

*Makofsky v. Cunningham,*
   576 F.2d 1223 (5th Cir. 1978) ......................................................................................30

*McMillan, Ltd. v. Warrior Drilling & Eng'g Co.,*
   512 So.2d 14 (Ala. 1987) .............................................................................................26

*Morgan Stanley & Co. v. Archer Daniels Midland Co.,*
   570 F. Supp. 1529 (S.D.N.Y. 1983) .........................................................................40, 41

*New Moon Shipping Co. v. Man B & W Diesel,*
   121 F.3d 24 (2d Cir. 1997) ...........................................................................................37

*Novel Commodities S.A. v. QBE Ins. Corp.,*
   No. 11 Civ. 6339, 2013 WL 1294618 (S.D.N.Y. Mar. 30, 2013) .........................................40

*Olin Corp. v. Am. Home Assur. Co.,*
   704 F.3d 89 (2d Cir. 2012) .....................................................................................21, 27

*Paretti v. Cavalier Label Co., Inc.,*
   722 F. Supp. 985 (S.D.N.Y. 1989) .................................................................................31

*Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.,*
   557 F. Supp. 2d 427 (S.D.N.Y. 2008) .......................................................................37, 39

*Roberts v. Consol. Rail Corp.,*
   893 F.2d 21 (2d Cir. 1989) ...........................................................................................30

*Rossman & Co. v. Donaldson,*
   No. 94APE03-388, 1994 WL 694985 (Ohio Ct. App. 1994) ................................................26

*Rotuba Extruders, Inc. v. Ceppos,*
   46 N.Y.2d 223 (1979) .................................................................................................37

*Rus, Inc. v. Bay Industries, Inc.,*
   322 F. Supp. 2d 302 (S.D.N.Y. 2003) ............................................................................30

*Samba Enters., LLC v. iMesh, Inc.*,
   No. 06 Civ. 7660(DC), 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009) ...............................22, 29

*Schering Corp. v. Home Ins. Co.*,
   712 F.2d 4 (2d Cir. 1983) ..........................................................................................................40

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
   959 F.2d 425 (2d Cir. 1992)........................................................................................................21

*Serdarevic v. Centrex Homes, LLC*,
   760 F. Supp. 2d 322 (S.D.N.Y. 2010)...............................................................................21, 22, 29

*Sharon Steel Corp. v. Chase Manhattan Bank*,
   691 F.2d 1039 (2d Cir. 1982)................................................................................................19, 28

*Siders v. Odak*,
   513 N.Y.S.2d 549 (3d Dep't 1987).............................................................................................26

*SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
   467 F.3d 107 (2d Cir. 2006)........................................................................................................34

*Sunbury Textile Mills v. Comm'r*,
   585 F.2d 1190 (3d Cir. 1978) .....................................................................................................32

*Terwilliger v. Terwilliger*,
   206 F.3d 240 (2d Cir. 2000).........................................................................................................20

*U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*,
   949 F.2d 569 (2d Cir. 1991)...................................................................................................40, 41

*Wayland Investment Fund, LLC v. Millenium Seacarriers, Inc.*,
   111 F. Supp. 2d 450 (S.D.N.Y. 2000) ........................................................................................33

*Will of Bartoli*,
   521 N.Y.S. 2d 392 (Sup. Ct. 1987)............................................................................................31

## TABLE OF DEFINITIONS

| Term | Definition |
| --- | --- |
| "2019 Notes" | Chesapeake's 6.775% Senior Notes due 2019 |
| "Base Indenture" | Indenture dated as of August 2, 2010 (Compl. Ex. A) |
| "BAML" | Merrill Lynch, Pierce, Fenner & Smith, Inc. |
| "BNY Mellon" or "Defendant" | Bank of New York Mellon Trust Company, N.A. |
| "Bracewell" | Bracewell & Giuliani LLP |
| "Burns Decl." | Declaration of Cravath Partner Stephen Burns dated April 21, 2013 |
| "Chesapeake" or "Company" | Chesapeake Energy Corporation |
| "Cravath" | Cravath, Swaine & Moore LLP |
| "Dell'Osso Decl." | Declaration of Chesapeake Chief Financial Officer Domenic J. Dell'Osso Jr. dated April 21, 2013 |
| "Finnerty Report" | Exhibit A to the Declaration of Dr. John D. Finnerty dated April 21, 2013 |
| "Landau Tr." | Transcript of the Deposition of Robert Landau dated April 20, 2013 |
| "Make-Whole Redemption Provision" | Section 1.7(c) of the Supplemental Indenture |
| "Maultsby Decl." | Declaration of BAML Managing Director James Alexander Maultsby dated April 21, 2013 |
| "Mullin Tr." | Transcript of the Deposition of James Mullin dated April 17, 2013 |
| "Notice" | Chesapeake's Notice of Special Early Redemption dated March 15, 2013 (Dkt. No. 30 Ex. A) |
| "Special Early Redemption Option" | Chesapeake's right as defined in the Special Early Redemption Provision |
| "Special Early Redemption Provision" | Section 1.7(b) of the Supplemental Indenture |

| "Supplemental Indenture" | Ninth Supplemental Indenture dated February 16, 2012 (Compl. Ex. B) |
|---|---|
| "Supplemental Prospectus" | Prospectus Supplement for Chesapeake's 2019 Notes dated February 13, 2012 |
| "Telle Decl." | Declaration of Bracewell Partner Michael S. Telle dated April 21, 2013 |
| "Tuckman Tr." | Transcript of the Deposition of Bruce Tuckman dated April 19, 2013 |
| "Underwriting Agreement" | Underwriting Agreement dated February 13, 2012 |

## PRELIMINARY STATEMENT

This is not a typical contract case in which the parties who negotiated and drafted a contract disagree on their original intentions.  In this case, a party who played no part in negotiating or drafting a provision argues it means the opposite of what the drafters intended.

As the Court will hear at trial, the negotiators and drafters of the Supplemental Indenture intended for Chesapeake to be able to exercise its option to redeem the notes at par so long as it sent notice by March 15, 2013, not thirty days before March 15, 2013, as BNY Mellon now contends.  Chesapeake will call four fact witnesses at trial:  Chesapeake's Chief Financial Officer, the senior banker from the lead underwriter (BAML), a partner from Bracewell (representing Chesapeake), and a partner from Cravath (representing BAML).  All four will testify that the Special Early Redemption Provision includes an unusual sentence designed to give Chesapeake the right to send notice until March 15, 2013.  Conversely, none of the drafters or negotiators – not one – will testify that he intended Chesapeake's option to expire if Chesapeake did not give notice by February 13.

The written evidence corroborates the drafters' testimony.  In deciding Chesapeake's request for a preliminary injunction, the Court heard incomplete evidence about a proposed revision to the Special Early Redemption Provision, which was rejected by counsel for BAML. The full story of that incident will make it clear that the proposed revision showed exactly what the drafters intended the provision to mean.  As the Court may recall, in a draft Supplemental Indenture, Chesapeake's counsel proposed adding seventeen words that would have made the provision crystal clear by stating expressly that a Special Early Redemption could be completed after March 15, so long as Chesapeake sent notice by March 15.  Crucially, however, this edit was not – and could not have been – intended to change the terms of the transaction.  Because

1

the Supplemental Prospectus had already been distributed to investors when the drafting of the Supplemental Indenture began, varying the terms of the deal was inconceivable. Rather, this language was intended to make the import of this unusual provision even more obvious. By the same token, underwriters' counsel at Cravath rejected the seventeen words not because of any disagreement with the substance of the revision, but only because it was Cravath's policy not to diverge from language in the Supplemental Prospectus. Thus, the drafting history of the Supplemental Indenture conclusively demonstrates the negotiators' intentions to permit a Special Early Redemption to occur after March 15 so long as it was noticed by that date.

Lacking any contemporaneous evidence to support its interpretation of the provision, BNY Mellon relies instead on after-the-fact documents that shed little or no light on the drafters' intentions, but that purportedly reflect confusion within Chesapeake and within the market generally. For example, Chesapeake's website and periodic securities filings provide summary information which, BNY Mellon argues, stated that March 15, 2013 was the last possible date for the Special Early Redemption to be completed, not noticed. But the website provides only short-hand information in pre-existing categories, and neither it nor the summary description in the securities filings purports to describe the precise terms of the Supplemental Indenture. In sum, this information says nothing about Chesapeake's original understanding of the provision, and surely could not have been relied upon by any investor of even the slightest sophistication.

BNY Mellon also intends to call as a witness an executive in Chesapeake's Treasury function who had been involved in the offering and many months later wrote a handful of emails that reflected an erroneous understanding of Chesapeake's time period to exercise the Special Early Redemption Option. That executive will testify at trial that he had not reviewed any deal

documents when he wrote those emails, and that after he reviewed the relevant language, he came to the same conclusion as the original negotiators and drafters.

The remainder of BNY Mellon's witness list underscores its strategy of misdirection, to avoid rather than prove the drafters' intent.  BNY Mellon intends to call a BNY Mellon employee and one of its outside lawyers, neither of whom participated in the negotiation of the business terms reflected in the 2019 Notes or the drafting of the Supplemental Indenture.  BNY Mellon's witness list also includes a 23-year-old employee of Bloomberg, L.P., for reasons that are not apparent.  Evidence from these individuals who did not negotiate or draft the Special Early Redemption Provision should be disregarded.

BNY Mellon also intends to call three expert witnesses, largely to testify that because the customary usage of the verb "redeem" is to pay for a redemption of notes, the first sentence of Section 1.7(b) is customarily understood to refer to a deadline for redemption to be completed. But as BNY Mellon knows from Chesapeake's weeks-old, proposed stipulation to obviate some burdensome discovery, there is no dispute about the typical meaning of that sentence – the dispute is over BNY Mellon's refusal to acknowledge that the issuer and the underwriters explicitly contracted out of customary terms by drafting a unique contract provision that reflected the highly unusual business term reflected in the early par redemption feature.  BNY Mellon's own experts admit that the issuer and underwriters had every right to draft a contract that departed from industry custom, and that is precisely what they did.

BNY Mellon's experts will also note that some market participants believed that Chesapeake had to give notice by February 13, not March 15.  But any confusion within the market is readily explained by BNY Mellon's expert's remarkable admission that bond investors

often read only the cover of the prospectus, not the detailed disclosures within – let alone the terms of the indenture itself.

Although Chesapeake acknowledges the Court's decision to hear the extrinsic evidence described above, Chesapeake continues to submit that after fuller consideration, the Court should conclude that the Special Early Redemption Provision is clear and unambiguous. "Clear and unambiguous" does not mean that the meaning of the provision must be immediately obvious on first read or not remotely susceptible to competing interpretations. A contract is "clear and unambiguous" as a legal matter as long as there is only one reasonable reading of it after the Court has applied ordinary canons of contractual construction. BNY Mellon's interpretation does not survive application of those canons, whose purpose is to enable the Court to resolve gaps, conflicts, and potential inconsistencies in contracts without extrinsic evidence. Here, application of those rules of construction readily resolves any claimed inconsistencies and leads to only one reasonable meaning of the Special Early Redemption Provision.

This provision contains two key sentences, a first sentence that defines a Special Early Redemption Period in which Chesapeake "may redeem" the 2019 Notes, and a second sentence that provides that Chesapeake "shall be permitted to exercise its option . . . so long as it gives notice" during the Special Early Redemption Period.

BNY Mellon's primary argument is that the words "redeem" and "redemption" customarily refer to the act of paying holders for the notes, and therefore the first sentence would ordinarily be understood to require Chesapeake to complete the redemption by March 15, 2013, and notice it at least 30 days before that redemption date. But as noted above, Chesapeake does not dispute that if the first sentence were the only relevant sentence, that interpretation would be correct.

4

Crucially, however, the second sentence of that provision is not customary language, and the Special Early Redemption Provision must be read as a whole to make sense of that unusual addition. Reading the provision as a whole to require Chesapeake to complete a Special Early Redemption by March 15, 2013, and to have sent notice by February 13, 2013, would make the second sentence superfluous, in violation of a bedrock rule of contractual construction.

The only way to make sense of this unusual sentence is to recognize that it specifies exactly what must happen during the Special Early Redemption period – Chesapeake must give notice. This reading of the provision gives meaning to both sentences while also recognizing that the second sentence is more specific than the first because the second sentence expressly refers to when notice must be given, not just when Chesapeake "may redeem" the 2019 Notes.

Acknowledging the imperative to give meaning to the second sentence, BNY Mellon contends that its effect was to prevent Chesapeake from giving notice before November 15, 2012, and thereby restrict Chesapeake's exercise of the option to the period November 15, 2012 through February 13, 2013. This interpretation of the provision is inconsistent, illogical, and unreasonable. If the purpose of the second sentence were to restrict Chesapeake's right to exercise the option to the period November 15, 2012 through February 13, 2013, then the first sentence of the provision should provide that Chesapeake "may redeem the Notes" starting only on December 15, 2012 – 30 days after the first notice date – not starting on November 15, 2012.

Indeed, BNY Mellon's interpretation of the Special Early Redemption Provision is predicated on the assumption that the first sentence describes a four-month period for the redemption to be completed, and the second sentence describes the same four-month period for the redemption to be noticed, even though those two events are necessarily separated by at least 30 days. In other words, BNY Mellon asks the Court to conclude that in the first sentence the

two boundary dates refer to entirely different actions: "November 15" refers to the first date Chesapeake could issue its notice, but "March 15" refers to the last date on which payment could be made. Equally important, one of BNY Mellon's experts has admitted that he could think of no business reason why the parties would have agreed to restrict the period in which Chesapeake could issue its notice to the three months starting November 15, though that is the only meaning BNY Mellon and its experts attribute to the second sentence of Section 1.7(b).

BNY Mellon also tries to alter the meaning of Section 1.7(b) by relying on Section 1.7(c), which provides that "[a]t any time after March 15, 2013," Chesapeake "may redeem" the notes "for an amount equal to the Make-Whole Price." BNY Mellon argues that this provision compels the conclusion that any redemption completed after March 15, 2013 can only be at the Make-Whole Price. This argument requires the Court to read Section 1.7(c) in isolation, without taking into account the impact of the important sentence that appears two sentences earlier. Giving effect to Section 1.7 as a whole, that section clearly and unambiguously provides that Chesapeake can exercise the Special Early Redemption Option by giving notice until March 15, 2013.

For these reasons, Chesapeake believes the evidence at trial will support a ruling that the Special Early Redemption Provision permitted Chesapeake to give notice of a Special Early Redemption until March 15, 2013, even if the Special Early Redemption is completed thereafter. This is the result unanimously intended by the drafters of the provision, and compelled by applying fundamental rules of contractual interpretation to the provision's text.

## PLAINTIFF'S CASE IN CHIEF

Chesapeake is a publicly traded independent oil and natural gas producer.  On February 16, 2012, Chesapeake completed its public offering of its 2019 Notes.  The offering was governed by a pre-existing Base Indenture that covered other securities offerings as well, and a Supplemental Indenture entered into for the specific purpose of offering the 2019 Notes.  BNY Mellon is the trustee under both indentures.

### A.      Background to the Offering

The offering originated with a proposal by Lex Maultsby of BAML to Domenic ("Nick") J. Dell'Osso Jr., Chesapeake's Chief Financial Officer.  Dell'Osso Decl. ¶ 10; Pl. Ex. 10. BAML proposed an approximately $1 billion debt offering that gave Chesapeake the option to redeem the notes at par early in the life of the notes.  Maultsby Decl. ¶ 5; Dell'Osso Decl. ¶¶ 12, 16; Pl. Exs. 8, 10.  The parties viewed this early redemption option as "unprecedented" in high-yield bond offerings because typically early redemption is conditioned on the issuer paying note holders a substantial premium above par.  Maultsby Decl. ¶¶ 4-5; Dell'Osso Decl. ¶ 11. Sometimes the premium takes the form of a make-whole price that is tied to the present value of the future interest that would otherwise have been payable under the notes, and in other instances the premium is a stipulated price above par.  Finnerty Report ¶¶ 13, 17.[1]

This early par redemption option perfectly suited Chesapeake's financial needs at the time.  After an unseasonably warm winter and consequently low natural gas prices, Chesapeake

---

[1] Chesapeake's expert, Dr. John Finnerty, will offer two separate opinions based on an empirical investigation of all publicly available bond indentures for bonds issued in the U.S. bond market since January 1, 2002, market research, and his years of personal experience in the securities industry.  He will opine not only that the Special Early Redemption option in the 2019 Notes is unusual from an economic perspective (by giving Chesapeake the right to call the bonds at par early in the life of the bonds), but also that the language of Section 1.7 is almost unprecedented (by setting a defined time period for the issuer to give notice of a Special Early Redemption, rather than specifying when the redemption date must occur).

needed additional liquidity.  Dell'Osso Decl. ¶ 10.  Since Chesapeake expected to generate cash by selling certain assets over the course of the year, Chesapeake was looking for a short-term transaction to provide a bridge until after those sales were completed.  Maultsby Decl. ¶ 12; Dell'Osso Decl. ¶¶ 10, 13.

On Thursday, February 9, Mr. Maultsby emailed BAML's first written proposal to Mr. Dell'Osso.  Dell'Osso Decl. ¶ 12; Ex. 8.  That proposal contemplated an "Optional Redemption" period in which the proposed bonds would be "Callable at Par" from November 15, 2012 through December 31, 2012, followed by periods in which the bonds could be called at premiums above par.  *Id.*  Later that day, following a call, Mr. Maultsby emailed a presentation showing variants of BAML's early-call proposal.  Maultsby Decl. ¶ 5; Dell'Osso Decl. ¶ 12; Pl. Exs. 9, 10.  These preliminary proposals did not spell out all the particulars of an expected early redemption option.  They did make it clear, however, that Chesapeake would have to pay for this early redemption feature through a higher interest rate for the period the notes were outstanding and by selling the notes to the initial purchasers at an "original issue discount."  Dell'Osso Decl. ¶ 14.

Although Mr. Dell'Osso was very interested in the option to redeem at par, he preferred a much longer early redemption period than the last six weeks of the year that BAML originally proposed.  Mr. Dell'Osso wanted Chesapeake to have greater flexibility to raise the funds and make a decision about exercising the option without having "a gun to its head" at the end of the year.  *Id.* ¶ 9; Pl. Ex. 10.  He originally proposed a twelve-month call period with no specified starting or ending dates; the parties settled on a call period that would begin in late 2012 and extend for some time into 2013.  Dell'Osso Decl. ¶ 17; Burns Decl. ¶ 8; Pl. Ex. 11.

Chesapeake and BAML quickly agreed to the outline of a proposed offering, but the timeframe the parties had to finalize the details of the deal and to document them was short. Dell'Osso Decl. ¶ 15. With a Form 10-K expected to be filed in a few weeks, the company could not issue any debt within a so-called "blackout" period of two weeks prior to its release. *Id.*; Telle Decl. ¶ 12. The deal went to market on February 13, just five days after BAML's original proposal, and closed on February 16. Maultsby Decl. ¶ 6; Dell'Osso Decl. ¶ 12; Burns Decl. ¶¶ 21, 29; Telle Decl. ¶ 11. In addition, because the company was in the process of revising its financial strategy – a major focus of Chesapeake's and the lawyers' efforts was conducting due diligence and drafting disclosures in the offering documents. Burns Decl. ¶ 9.

### B.     The Negotiation and Drafting of the Supplemental Prospectus

#### 1.     The Initial Drafts and Negotiations

Between February 9 and 13, the parties finalized the specifics of the deal, and drafted the "Supplemental Prospectus" that would be used to sell the 2019 Notes to prospective investors. Maultsby Decl. ¶¶ 6-8; Dell'Osso Decl. ¶¶ 18-21; Burns Decl. ¶¶ 8-23; Telle Decl. ¶¶ 11-27. Chesapeake's lead lawyer at Bracewell, Michael Telle, was responsible for drafting the Supplemental Prospectus in the first instance, and BAML's lawyers at Cravath, led by Stephen Burns, represented the underwriters. Burns Decl. ¶ 8-9 & Pl. Ex. 11; Telle Decl. ¶ 19.

Notably, BNY Mellon was not involved in negotiating the business terms of the deal or in drafting the Supplemental Prospectus. Trustees are not typically involved in such negotiations, and in this instance, BNY Mellon had not yet even been confirmed as trustee.

Late on Friday, February 10, Bracewell circulated to Cravath and the underwriters the company's initial draft of the Supplemental Prospectus. Burns Decl. ¶ 11; Telle Decl. ¶ 15; Pl. Ex. 13. This first draft proposed an early redemption window "[b]etween November 15, 2012

and March 31, 2013."   Specifically, in the "Description of Notes," Bracewell inserted the following:

> *Special Redemption.*   Between November 15, 2012 and March 31, 2013, the Notes will be redeemable at our option at any time in whole, or from time to time in part, at a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption.

Burns Decl. ¶ 11; Telle Decl. ¶ 19; Pl. Ex. 13.[2]   This preexisting language used only the customary formulation for describing a redemption period.   Telle Decl. ¶ 15.   That prior draft had included – and the circulated draft retained – description of a standard make-whole redemption provision permitting the company to redeem the notes at a premium above par, in addition to this "Special Redemption" provision.   Burns Decl. ¶ 13; Pl. Ex. 13.

In response to this proposed four-and-a-half month early redemption at par window, the underwriters proposed to shorten the window for redemption by shortening the end date from March 31 to March 15.[3]   Burns Decl. ¶ 14; Telle Decl. ¶ 16-17; Pl. Ex. 16.   This change was not made to shorten the period for Chesapeake to exercise its option but, as explained by Mr. Burns, to conform the redemption date to the dates for interest payments and maturity, which are typically on the first and fifteenth of the month.   Burns Decl. ¶ 14.

## 2.   Mr. Telle's Suggestion to Redefine the Redemption Period

Mr. Telle of Bracewell was concerned that if March 15 was the deadline for Chesapeake to consummate a "special" redemption at par, the company would have not have enough time to

---

[2] The draft included similar references to the early "Special Redemption" period in the description of "The Offering," as well as on the front page of the draft Supplemental Prospectus that directed the reader to the "Description of Notes" section of the prospectus.

[3] Separately, the negotiations on redemption also included adding a provision, requested by the underwriters, that would require any partial redemption of the notes to leave $250 million in notes outstanding following the partial redemption.

decide whether to exercise its right.  The company wanted to make sure it had ample time to sell the assets and decide whether to exercise the option.

To accomplish this goal, Mr. Telle proposed that March 15, 2013 be stated as a deadline for Chesapeake to give notice, rather than a deadline for it to complete the redemption by repurchasing the notes.  Because the Base Indenture required any notice of redemption to be sent between 30 and 60 days prior to the redemption date, making March 15 a deadline for notice rather than completion would give the company at least 30 more days to decide whether to exercise the right, and up to 60 more days to fund a redemption.  Telle Decl. ¶ 19; Dell'Osso Decl. ¶ 20.

Mr. Telle was proposing an unusual change to the redemption provision in the Supplemental Prospectus then being drafted.  There is no dispute that redemption periods ordinarily refer to the time to complete the redemption.  Finnerty Report ¶¶ 15, 35; Burns Decl. ¶¶ 16, 29; Telle Decl. ¶ 21.  But Mr. Dell'Osso had emphasized that he wanted the longest possible period in which Chesapeake could decide whether to take advantage of the early redemption option it was paying for, and Mr. Telle thought it made sense to define the period by the time the Company would need to act by giving its notice to exercise its option.  Telle Decl. ¶¶ 19-21; Dell'Osso Decl. ¶ 17.

The lawyers who memorialized the agreement in the Supplemental Prospectus understood that they were drafting novel language for a novel business feature, and Chesapeake's expert, John D. Finnerty, has found only one precedent, a bond issued by AEP Industries, Inc. ("AEP").  Finnerty Report ¶¶ 33-34, 45-48.  Notably, the AEP indenture was economically very similar to the one at issue here – it permitted AEP to redeem the notes for a price just above par early in the life of the bonds – and it similarly specified the deadline for the

issuer to give notice rather than to pay the redemption price. *Id.* Mr. Telle is not the first person to think that an option to redeem early at par can reasonably be defined in terms of when notice is given.

### 3. Chesapeake and BAML Agreed to and Implemented Mr. Telle's Proposal.

The evidence demonstrates without contradiction that representatives of the issuer and the lead underwriter agreed to this proposal and that both sets of lawyers purposefully implemented it.

Most important, on Saturday, February 11, Chesapeake and BAML agreed to the concept in a telephone conversation that included Mr. Dell'Osso of Chesapeake and at least one banker from BAML. *See* Burns Decl. ¶ 16. As Cravath's Steve Burns recalls, "the unusual subject matter" of the call "stuck in my mind." *Id*. "I recall that Mr. Dell'Osso expressed concern about having sufficient time for Chesapeake to complete a redemption under the special early redemption provision, and that he raised the concept of being able to redeem the notes so long as notice was given by March 15." *Id*. Mr. Burns has further explained that "[w]hen I got off the call, it was my understanding that the Company and the underwriters had agreed as a business matter that the Company would be permitted to give notice of an early redemption at par until March 15, 2013 and, as long as they gave such notice by such date, redeem the bonds on a redemption date thereafter." *Id*.

Although Mr. Dell'Osso and Mr. Maultsby do not recall this specific conversation, they both share the same contemporaneous understanding of the provision conveyed in that conversation, namely, that the March 15 date was a deadline for notice. Maultsby Decl. ¶ 8; Dell'Osso Decl. ¶ 20. For his part, Mr. Maultsby did not focus on the time period in which a redemption payment could occur after notice was issued. Maultsby Decl. ¶ 8. This lack of focus

on the "mechanics" of the settlement date does not alter BAML's concurrence in the notice provision.

After the issuer and the lead underwriter agreed to this term as a business matter, the lawyers affirmed and memorialized that agreement in multiple conversations and the exchange of several drafts that included the term in question. Bracewell's next draft of the "Special Early Redemption" provision of the Supplemental Prospectus included a new sentence, drafted by Mike Telle, and inserted into the detailed "Description of the Notes" section:

> We may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption [is] given during the Early Redemption Period.

Burns Decl. ¶¶ 17-18; Telle Decl. ¶ 21; Pl. Ex. 20.  This draft contained the key language that was carried through to the final prospectus.

When he saw Mr. Telle's suggested language the next morning, Steve Burns was not surprised because he expected to see language to this effect as a result of the conversation with Mr. Dell'Osso and Mr. Maultsby the previous evening.  Burns Decl. ¶ 18.  In a draft returned by Cravath midday on Sunday, February 12, Cravath accepted Mr. Telle's addition of this crucial sentence, and, equally important, copied that sentence into "The Box" describing the terms of "The Offering" that addressed "Special Early Redemption."  Telle Decl. ¶ 23; Burns Decl. ¶ 19; Pl. Ex. 23.  This addition was transmitted by means of a handwritten "rider" that tracked the language proposed by Mr. Telle:

> We may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption [is] given during the Early Redemption Period.

Burns Decl. ¶ 19; Telle Decl. ¶ 23; Pl. Ex. 23.  In other words, Cravath responded to Mr. Telle's proposal by adding this same language earlier in the Supplemental Prospectus where it would be even more prominently disclosed to prospective investors.  Telle Decl. ¶ 23.

At least six drafts of the Supplemental Prospectus were subsequently transmitted between the parties, each containing this language and in one instance correcting a typo within that language. Burns Decl. ¶¶ 19-21; Telle Decl. ¶¶ 23-27. No further material changes were made to the redemption terms of the deal.

On Sunday night, for several hours while Mr. Telle was at the printer finalizing the prospectus, there was essentially an open line between Mr. Telle, Cravath, and various client representatives. During that call, the parties intermittently discussed various edits to the prospectus as part of a process to finalize it. Telle Decl. ¶ 24. Mr. Telle recalls that during this conversation, Mr. Dell'Osso asked whether the key notice provision meant that he had until March 15, 2013 to decide whether to exercise the Special Early Redemption Option, and an unnamed representative of the underwriters replied affirmatively. Telle Decl. ¶ 24.

While this conversation recalled by Mr. Telle occurred on Sunday, and the conversation between Mr. Dell'Osso and BAML recalled by Mr. Burns occurred on Saturday, the two conversations are, of course, entirely consistent in substance. Mr. Dell'Osso does not recall either conversation but recalls that he clearly understood that Chesapeake would have until March 15 to decide whether to issue a notice to redeem its new 2019 Notes at par. Dell'Osso Decl. ¶ 20.

BNY Mellon will doubtless question why no Chesapeake representative other than the Chief Financial Officer and outside counsel recalls any of these conversations or knows about this crucial notice provision. As noted above, however, this deal was negotiated in a very short time frame almost entirely over a weekend, and the Treasury personnel were primarily focused on the company's disclosures in the Supplemental Prospectus about the Company's financial

performance.  Under these circumstances, it should come as no surprise that the outside counsel who conceived of and drafted the notice provision has the clearest recollection of it.

On February 13, 2012, after the deal terms had been finalized, the prospectus was used during a "Road Show" to sell the 2019 Notes to potential investors.  Maultsby Decl. ¶ 10; Telle Decl. ¶ 26; Pl. Ex. 35.  On February 14, 2012, the parties finalized the Supplemental Prospectus without further changes to the key language.  Telle Decl. ¶¶ 26-27; Pl. Exs. 1, 38.

### 4.    Other Documents Reflecting the Notice Concept

On February 13, 2012, the issuer and the lead underwriters also executed an Underwriting Agreement governing the underwriting relationship regarding the 2019 Notes. Burns Decl. ¶ 22; Telle Decl. ¶¶ 31-32; Maultsby Decl. ¶ 7; Pl. Ex. 37.  Included as Schedule C to the Underwriting Agreement, and incorporated into its terms, was a Rule 433 Pricing Term Sheet, which included a provision for early redemption.  Telle Decl. ¶ 31; Burns Decl. ¶ 22; Pl. Exs. 3, 37.  That section, memorialized in the execution version of the Underwriting Agreement, also contained a disclosure of the notice-based approach:

> The issuer may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period.

Telle Decl. ¶ 32; Burns Decl. ¶ 22; Pl. Ex. 37.  This Pricing Term Sheet was made available to the investors who purchased the note offering directly from the underwriters on February 13; at the time they decided to purchase the notes, the final prospectus supplement, which included the pricing information, was not yet available.  Maultsby Decl. ¶ 10.

Mr. Telle also drafted, and Chesapeake executed, board of directors' materials reflecting and approving the material terms of the deal.   Among these materials was the "Pricing Committee Resolutions," dated February 13, 2012, which conformed to the same language included in the Supplemental Prospectus and reflected in the Supplemental Indenture:

> The Corporation may redeem the Senior Notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period.

Telle Decl. ¶¶ 29-31; Pl. Ex. 40.

### C.   The Negotiation and Drafting of the Supplemental Indenture

By the time Chesapeake and BAML turned to draft a supplemental indenture, the deal terms were final, the underwriters had sold the 2019 Notes to the original purchasers, and no additional changes could be made in the terms of the transaction.  Because the underwriters had already marketed and sold the notes to investors based on the draft Supplemental Prospectus and the Pricing Term Sheet, the task of drafting the Supplemental Indenture was simply to document the deal that was already struck.  Burns Decl. ¶¶ 23; Telle Decl. ¶ 33.

Just as they had with the Supplemental Prospectus, the lawyers worked from an existing supplemental indenture from a prior offering.  Telle Decl ¶ 34; Burns Decl. ¶ 24; Pl. Ex. 41.  Although the prior indenture included a standard make-whole provision, it obviously contained no provision for the "Special Early Redemption" that was nearly unique.  To add a provision for Special Early Redemption, Bracewell amended the standard redemption language by inserting the following language into the existing make-whole language:

~~Section 1.7~~ <u>Section 1.7</u>  **Redemption.**

(a) The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

(b) ~~At any time prior~~ <u>At any time from and including November 15, 2012 to and including March 15, 2013 (the "Early Redemption Period"), the Company at its option may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes must remain outstanding.  The Company shall be permitted to exercise its option to redeem the Notes pursuant to</u>

> this Section 1.7 so long as it gives notice of redemption pursuant to Section 3.04 of the Base Indenture prior to 5:00p.m. (Central Time) on March 15, 2013, even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period.
>
> (c) At any time after March 15 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

Telle Decl ¶ 35; Burns Decl. ¶ 24; Pl. Ex. 41 (showing additions to prior draft in underlined text and deletions in strikethrough text).

The language in this draft differed from the language in the Supplemental Prospectus in two notable ways.  First, it included some additional information concerning the timing of any notice ("prior to 5:00pm (Central Time)").  Mr. Telle added that language to "provide 'belt and suspenders' clarity by inserting objective language" to guide the Company's decision to exercise this important option.  Telle Decl. ¶ 36.

Second, this draft included the phrase, "even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period."  Mr. Telle added these seventeen words because he recognized that the sentence was unusual, and he wanted to make it even "more clear."  Telle Decl. ¶ 36.  He also believed it was sensible in drafting the contract not to be bound solely by the language of the Supplemental Prospectus, a securities disclosure document.  *Id.*

The proposed addition of these seventeen words was not intended to alter the terms of the deal.  *Id.*  Nor could it have.  Because Chesapeake and the underwriters had already agreed to the terms of the deal and disclosed those terms in the Supplemental Prospectus, substantively revising the terms was inconceivable.  Burns Decl. ¶¶ 23, 26; Telle Decl. ¶¶ 33, 36.  And since the proposed new language was not – and could not have been – intended to alter the terms of the deal, the proposed language is the best contemporaneous written corroboration for the drafters'

intention that the four-month period in the Special Early Redemption was for notice, and consequently that, pursuant to the Base Indenture, a redemption date could occur up to 60 days after March 15.

Cravath removed the additional language Mr. Telle had added.  Burns Decl. ¶ 25; Telle Decl. ¶ 39; Pl. Ex. 42.  Mr. Telle called a lawyer at Cravath to find out why.  Telle Decl. ¶ 38. Mr. Telle was told that Cravath wanted to ensure that the final language in the Supplemental Indenture was consistent with the language used in the Supplemental Prospectus that had already been used to sell the securities.  Telle Decl. ¶ 38; Burns Decl. ¶ 26.  As the Cravath lawyer explained to Mr. Telle, it was preferable under the securities laws not to stray from the specific language already agreed to, and signed off on, by the parties to the deal.  Mr. Telle was not surprised to hear this rationale, and accepted it.  Telle Decl. ¶ 38.

None of the Cravath lawyers recalls this interchange about the seventeen words, but Mr. Burns has affirmed that it is Cravath's policy to conform the language of an indenture to the language of the offering materials, and that the edit he has reviewed properly executed Cravath's policy.  Burns Decl. ¶ 26.

An execution copy of the Supplemental Indenture was circulated later that day, and the final version was executed on February 16.  Burns Decl. ¶ 27; Pl. Exs. 4, 43.  The Supplemental Indenture provides as follows:

Section 1.7 **Redemption.**

> (a) The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

> (b) At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued

and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes remains outstanding. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

(c) At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

**D.     Notice of Redemption of the 2019 Notes**

On March 15, 2013, Chesapeake provided holders of the 2019 Notes a notice of redemption entitled "NOTICE OF SPECIAL EARLY REDEMPTION AT PAR," which states, in relevant part:

> **THE NOTES ARE BEING CALLED FOR REDEMPTION SOLELY AT A PRICE EQUAL TO 100% OF THE PRINCIPAL AMOUNT OF THE NOTES PLUS ACCRUED AND UNPAID INTEREST ON THE NOTES TO BE REDEEMED TO THE REDEMPTION DATE (THE "SPECIAL EARLY REDEMPTION PAYMENT") PURSUANT TO SECTION 1.7(b) OF THE SUPPLEMENTAL INDENTURE, PARAGRAPH 4 OF THE NOTES AND ARTICLE THREE OF THE BASE INDENTURE.**

*See* Dkt. No. 30, Ex. A.

## LEGAL ARGUMENT

**I.     The Supplemental Indenture Unambiguously Prescribes a Notice Period for Special Early Redemption.**

**A.     Principles of Contract Interpretation**

"Interpretation of indenture provisions is a matter of basic contract law." *Sharon Steel Corp. v. Chase Manhattan Bank*, 691 F.2d 1039, 1049 (2d Cir. 1982). "It is axiomatic that where the language of a contract is unambiguous, the parties' intent is determined within the four corners of the contract, without reference to external evidence." *Feifer v. Prudential Ins. Co. of*

*Am.*, 306 F.3d 1202, 1210 (2d Cir. 2002).  Thus, "[u]nder New York law, a written contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language they have employed."  *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000).

That the meaning of a contractual provision is not immediately obvious does not make it "ambiguous" under New York law.  *See, e.g.*, *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) (holding that seemingly unclear provisions were unambiguous because New York contract interpretation principles provided "clear direction on the proper way to resolve the inconsistency"); *Carolina First Bank v. Banque Paribas*, No. 99-cv-9002(NRB), 2000 WL 1597845, at *6 (S.D.N.Y. Oct. 26, 2000) (holding that agreement that was "not a portrait of clarity" was unambiguous after applying rules of contract construction).

If "unambiguous" meant that a contract's meaning must be immediately obvious, there would be no need for the canons of contract interpretation.  Instead, determining the plain meaning of a contract can often require a rigorous application of those rules.  New York law recognizes several principles of contract interpretation relevant here.

Interpret the agreement as a whole.  A court must consider an agreement's "particular words not in isolation but in light of the obligation as a whole and the intention of the parties as manifested thereby."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2000) (internal quotation marks omitted).  "Where the document makes clear the parties' overall intention, courts examining isolated provisions should then choose the construction which will carry out the plain purpose and object of the agreement."  *Kass v. Kass*, 91 N.Y.2d 554, 567 (1998) (internal quotations and alterations omitted)).

Specific language controls general language.  When parties use both general language, but also more specific language, the specific language will control.  *See Aramony v. United Way*

*of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001) ("Even when there is no 'true conflict' between two provisions, 'specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate."). "Thus, where the parties have particularized the terms of a contract, an apparently inconsistent general statement to a different effect must yield." *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983).

Afford language its reasonable and ordinary meaning. An interpretation that "strains contractual language beyond its reasonable or ordinary meaning" should be avoided. *In re Coudert Bros.*, 487 B.R. 375, 389-90 (Bankr. S.D.N.Y. 2013); *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992) ("Nor does ambiguity exist where one party's view 'strains the contract language beyond its reasonable and ordinary meaning.'") (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).

Do not render language superfluous. "Any interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless is not preferred and will be avoided if possible." *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (internal quotations omitted); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002); *Serdarevic v. Centrex Homes, LLC*, 760 F. Supp. 2d 322, 332 (S.D.N.Y. 2010).

Do not create internal inconsistencies. A court should disfavor an interpretation that creates irreconcilable inconsistencies between provisions. Instead, "[i]n interpreting contract terms, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Bank of N.Y. v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 557 (S.D.N.Y. 2009) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992) (internal quotation omitted)).

<u>Do not create absurd results</u>.  "A court should not interpret a contract such that the result would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'"  *Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660(DC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009) (quoting *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003)); *see also Fulton Cogeneration Assocs. v. Niagara Mohawk Power Corp.*, 84 F.3d 91, 98 (2d Cir. 1996) (rejecting a party's interpretation of a contract that was counter to commercially reasonable expectations); *InterDigital Commc'ns Corp. v. Nokia Corp.*, 407 F. Supp. 2d 522, 530 (S.D.N.Y. 2005) ("It is hornbook law that a contract should be interpreted so as not to render its terms nonsensical.").

In applying these rules, the court should conclude that "[a]n ambiguity exists [only] where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business."  *Law Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotations omitted).  It is not enough to create ambiguity that sophisticated parties vehemently and genuinely disagree about the interpretation of the contract.  *See Serdarevic*, 760 F. Supp. 2d at 328.

### B.      Chesapeake's Interpretation is Reasonable.

Read in its entirety, so as to give meaning to all its provisions – and to minimize any contradictions between its provisions, while giving full effect to specific provisions over general provisions – Section 1.7(b) unambiguously provides that Chesapeake had until March 15, 2013 to give notice of a Special Early Redemption at par.

The second sentence of Section 1.7(b), by its plain terms, gives Chesapeake the right to redeem at par "so long as it gives the notice of redemption . . . during the Special Early

Redemption Period."  The most natural reading of this sentence is that it allows Chesapeake to do what it says:  exercise its option by giving notice of redemption during the Special Early Redemption Period, which is defined to last up to and include March 15, 2013.  Only that reading gives meaning to all the words the parties chose for this sentence.

This reading accords with the structure of Section 1.7(b) when viewed as a whole.  *See JA Apparel Corp.*, 568 F.3d at 397.  The first sentence of Section 1.7(b) sets the price of the Special Early Redemption – par – and establishes the four-month period in which Chesapeake can exercise its option to redeem (a four-month period from November 15, 2012 to March 15, 2013).  The second sentence describes how Chesapeake may exercise its option, including how and when Chesapeake is required to give notice:  by sending notice during that four-month period, and by complying with Section 3.04 of the Base Indenture, which sets out the various criteria for giving notice, including the requirement of specifying the redemption date and the redemption price.  Section 1.7(b) as a whole supports the conclusion that the Special Early Redemption period is a period for giving notice.

Chesapeake's reading of this provision is compelled by the additional principle that general terms of a contract "must yield" to specific terms.  *John Hancock Mut. Life Ins. Co.*, 717 F.2d at 669 n.8.  Section 1.7(b) begins by stating that Chesapeake "may redeem the Notes" during the Special Early Redemption Period, but does not specify what specifically must occur during that period.  Although there is no dispute that this language would customarily mean that the redemption must be completed within the specified time period, the first sentence of Section 1.7(b) does not require that.  In fact, the first sentence does not use the term "redemption," let alone the term "redemption date."  That latter term is used a total of eighteen times within the Base and Supplemental Indentures to refer to the day on which the issuer pays holders in order to

retire the securities.   Because the first sentence of Section 1.7(b) does not state that the "redemption date" must occur by the end of the Special Early Redemption Period, it simply does not specify what must occur during the period.  *See Law Debenture Trust Co.*, 595 F.3d at 469 (holding that use of an undefined term elsewhere in an agreement, but not in connection with the disputed provision, supported exclusion of that term from meaning of provision).

These general references in the first sentence of Section 1.7(b) are clarified and informed by the "notice" language in the second sentence, which could not be more specific or more express.  As a result, its terms must control.  *See HSH Nordbank AG v. Street*, 421 F. App'x 70, 74-75 (2d Cir. 2011) (summary order) (holding that provision specifically mandating how particular funds would be disbursed controlled over provision providing only general definition of funds).[4]

For all the same reasons, the Court should reject BNY Mellon's argument that Section 1.7(c) limits the notice period in the second sentence of Section 1.7(b).  Sections 1.7(b) and 1.7(c) must be read together, and not in isolation.  Section 1.7(c) employs the same "at its option, may redeem" language found in the first sentence of Section 1.7(b).  Just as the first sentence of Section 1.7(b) does not specifically state that a redemption must actually be completed by March 15, 2013 to occur at par, the first sentence of Section 1.7(c) does not specifically state that any redemption that is completed after March 15, 2013 must be at the Make-Whole Price.  Thus, while Section 1.7(c) would ordinarily be read to refer to redemption rather than notice, any tension between Section 1.7(c) and Section 1.7(b) does not amount to a true conflict.  *See Aramony*, 254 F. 3d at 413-14.

---

[4] For this same reason, the language of Section 1.7(b) prevails over the general notice provisions in the Base Indenture.

For this reason, just as the specific language of the second sentence of Section 1.7(b) informs the meaning of the general "may redeem" language in the first sentence of Section 1.7(b), the specific language of the second sentence also informs the meaning of the very same language in Section 1.7(c).  Read in conjunction with Section 1.7(b), Section 1.7(c) clearly and unambiguously provides that only a redemption that is noticed after March 15, 2013 must occur at the Make-Whole Price.  *See JA Apparel*, 568 F.3d at 397 (court should not consider agreement's particular words in isolation, "but in light of the obligation as a whole and the intention of the parties as manifested thereby").

Chesapeake's reading is further supported by the "customs, practices, usages and terminology as generally understood in the particular trade or business."  *Law Debenture Trust Co.*, 595 F.3d at 466 (internal quotations omitted).  Here, a "reasonably intelligent person" familiar with such custom and usage will be keenly aware that high-yield bond indentures rarely permit an early redemption at par, and rarely, if ever, define the period in which a company has to redeem its notes in terms of the notice period in which to do so.  Viewing Section 1.7 of the Supplemental Indenture as a whole, therefore, the reasonable person, aware of industry custom, would pay particular attention to the highly unusual second sentence of Section 1.7(b), which is stated in the expansive language of an option that does not customarily appear in indenture notice provisions.  The reader would afford the sentence especial significance in determining the parties' intentions.  Custom and usage, therefore, highlights that the second sentence defining a notice period for redemption should control over any contrary suggestions elsewhere in the contract.

Moreover, while BNY Mellon points to the custom and usage of redemption provisions, this unusual provision is more similar to an option than a typical redemption provision, because

it gives Chesapeake a valuable right that expires, whereas typical redemption provisions do not expire, but continue indefinitely at a progressively reduced price.  For option agreements, if the agreement specifies a time period for the option – but does not specifically require the optionee to tender performance during that time period – the agreement granting the option is generally construed to require only notice, but not payment, during that period.  *See Hart v. Hart*, 544 S.E.2d 366, 373-74 (Va. Ct. App. 2001) ("sixty days in which to purchase" property required only notice to exercise option, not tender of payment); *McMillan, Ltd. v. Warrior Drilling & Eng'g Co.*, 512 So.2d 14, 24 (Ala. 1987) (right "to purchase up to ten percent of the outstanding voting common stock" for one year under agreement required only notice to exercise option, not tender of payment); *Rossman & Co. v. Donaldson*, No. 94APE03-388, 1994 WL 694985, at *8 (Ohio Ct. App. 1994) (right to purchase stock within 90 days required only notice to exercise option, not tender of payment).

If the parties intend for both notice and repayment to be accomplished during the option period, the agreement must expressly provide as much.  *See Siders v. Odak*, 513 N.Y.S.2d 549, 551-52 (3d Dep't 1987) (contractual right to purchase property within three years, on thirty days notice, required only notice within three years, "in the absence of a specific provision providing otherwise").  This presumption for option contracts underscores the limits of the custom and usage for redemption provisions, and vividly illustrates the logic of the unusual provision in the Supplemental Indenture.

### C.    BNY Mellon's Interpretation is Unreasonable.

BNY Mellon's contrary interpretation of Section 1.7 "would strain the contract language beyond its reasonable and ordinary meaning."  *Law Debenture Trust Co.*, 595 F.3d at 467.

BNY Mellon relies heavily on "custom and usage in the industry," namely, that the language used in the first sentence of Section 1.7(b) would ordinarily mean that Chesapeake

must complete any Special Early Redemption during the period from November 15, 2012 through March 15, 2013.  Because the general notice provision in the Base Indenture requires notice to be given at least thirty days before any redemption, this first sentence alone would customarily require Chesapeake to give notice of a Special Early Redemption by February 13, 2013, without consideration of the second sentence.

To make sense of the notice language in the second sentence of Section 1.7(b) – *i.e.*, to avoid rendering it superfluous, *Olin Corp.*, 704 F.3d at 99 – BNY Mellon therefore must take the position that the second sentence was intended solely to prevent Chesapeake from providing notice <u>before</u> November 15, 2012 (the beginning of the notice date range).  This is precisely what BNY Mellon's expert witnesses claim.  *See, e.g.*, Report of Bruce Tuckman 13; Tuckman Tr. at 96-97; Mullin Tr. at 66-68.  Put differently, BNY Mellon contends that the purpose of the second sentence was to shorten the front end of the Special Early Redemption Period by precluding Chesapeake from completing a redemption during the first 30 days of that period, until December 15, 2012.  This reading violates numerous fundamental rules of contract construction.

*First*, BNY Mellon reads the same defined date range (the Early Redemption Period) to cover both repayment (in the first sentence) and notice (in the second sentence), even though under Section 3.04 of the Base Indenture those events must be separated by at least 30 and not more than 60 days.  It strains ordinary usage of language to prescribe the identical, defined four-month time period for taking actions that necessarily must be separated by at least one month in time.  *See Law Debenture Trust Co.*, 595 F.3d at 467.

*Second*, as a result of that peculiarity, under BNY's interpretation, the four-month Special Early Redemption Period would actually consist of two overlapping three-month windows – November 15, 2012 to February 13, 2013 for notice, and December 15, 2012 to March 15, 2013

for repayment.[5]  But the agreement repeatedly and clearly refers to the Special Early Redemption Period as a four-month window of time.  Thus, this reading fails to give the words of Section 1.7(b) their ordinary meaning.  *See In re Coudert Bros.*, 487 B.R. at 389-90.

*Third*, BNY Mellon's reading is also internally inconsistent with its insistence that the word "redeem" can only mean "to repay."   The first sentence of Section 1.7(b) reads that Chesapeake "may redeem" the notes "[a]t any time" from November 15, 2012 through March 15, 2013.  If "redeem" in the first sentence of Section 1.7(b) could *only* mean "repay," as BNY Mellon contends, and BNY Mellon were also correct that the second sentence establishes November 15, 2012 as the first day Chesapeake could give notice, then the first sentence should actually state that Chesapeake "may redeem" – meaning repay – from *December* 15, 2012 to March 15, 2013.  The agreement does not say that because the first sentence is not intended to define a period for consummating redemption; the first sentence does not specify what has to happen during that time.  It is the second sentence that makes clear that the Special Early Redemption period referenced in the first sentence is a period for giving notice.

*Fourth*, whatever evidence BNY Mellon might present concerning typical redemption provisions in bonds – whether through expert testimony or otherwise – is irrelevant to the unusual if not unique language in the second sentence of Section 1.7(b).  "Because context is of obvious and critical importance to the use of particular language," evidence on "custom and usage" is only relevant when it illuminates the language chosen by the parties.  *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048-49 (2d Cir. 1982) (affirming exclusion of expert testimony on "custom and usage" when transaction at issue was "unique" so

---

[5] Indeed, as noted, the only way Section 1.7(b) could allow for a four-month repayment period – and also be a period for repayment – would be if the contract permitted notice of redemption beginning in October 15, 2012.  But, as noted above, that interpretation would read the second sentence of Section 1.7(b) out of the contract, as that sentence permits notice only after November 15, 2012.

that expert testimony "was thus limited to use of such clauses and such language in very different context"). Here, the juxtaposition of customary language with clearly non-traditional language evidences an unambiguous intent to depart from the customary high-yield bond provision by establishing a notice period for redemption.

*Finally*, BNY Mellon's interpretation leads to a commercially unreasonable result. The second sentence uses the expansive phrases "shall be permitted" and "so long as" – not the restrictive phrase "only if" – to expand, not restrict, Chesapeake's rights. It would be unreasonable to interpret the benefit-conferring language of that sentence as intending solely to *restrict* Chesapeake's right to redeem early. Moreover, as a business matter, the drafters would naturally have been much more concerned with the last possible date for Chesapeake to exercise its option, rather than the first possible exercise date. Nor could BNY Mellon's expert articulate any business rationale for imposing a term simply to restrict the company's notice period on the front end. *See* Tuckman Tr. at 105-07. The Court may consider this custom and usage evidence in concluding that BNY Mellon's interpretation of the provision simply makes "no sense." *Samba Enters.*, 2009 WL 705537, at *11; *see Serdarevic*, 760 F. Supp. 2d at 328.

## II.     All Relevant Extrinsic Evidence Supports Chesapeake's Interpretation.

Even were the Court to conclude that the Supplemental Indenture is ambiguous, all the competent extrinsic evidence makes abundantly clear the drafters' intent to allow for notice of redemption until March 15, 2013.

### A.     Only Evidence of the Drafters' Intent Is Relevant.

"If an ambiguity requires consideration of extrinsic evidence, a court must look to all 'surrounding facts and circumstances' in order to ascertain the parties' intended meaning of the contract." *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010) (citing *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989)). This inquiry is

guided solely by the objective of determining the "intention of the parties *at the time they entered into the contract*." *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004) (emphasis added).

In determining what the drafters intended, the Court must limit its inquiry to the personal knowledge of individuals who were actually involved in the negotiating and drafting of the agreement. *See Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989); *JA Apparel*, 682 F. Supp. 2d at 303-08.

Here, for instance, the Court must consider testimony of attorneys who were directly involved in the negotiations and drafting of the agreement. *See In re Lehman Brothers Inc.*, 478 B.R. 570, 598 (S.D.N.Y. 2012) (upholding bankruptcy court's evaluation of testimony of "lawyers and negotiators" as to the drafters' intent); *Rus, Inc. v. Bay Indus., Inc.*, 322 F. Supp. 2d 302, 314 n.7 (S.D.N.Y. 2003) (observing that testimony of lawyer involved in drafting agreement was admissible to prove drafters' intent); *Fireman's Fund Ins. Cos. v. Siemens Energy & Automation, Inc.*, 948 F. Supp. 1227, 1235 (S.D.N.Y. 1996) (evaluating testimony of "key participants" in negotiation meeting, including both in-house and outside counsel). This is because "[t]he intent of the parties' often is the intention of their attorneys." *Makofsky v. Cunningham*, 576 F.2d 1223, 1229 n.8 (5th Cir. 1978) ("noting that "[t]he variance between the acts of the attorneys and the goals of the client is not so great as to preclude us from equating the intent of both"); *In re Dep't of Energy Stripper Well Exemption Litig.*, 855 F.2d 865, 870-71 (Temp. Emer. Ct. App. 1988) (crediting testimony of appellant's chief negotiator over objection that negotiator acted independently because the negotiator was in "daily communication" with appellant on the status of negotiations, and because both parties' negotiators testified as to their shared intent).

The significance of lawyers' intentions in the drafting context is sufficiently significant under New York law that a lawyer can be disqualified as a necessary witness if he or she is the only individual able to speak to the drafters' intent. *See Acme Analgesics, Ltd. v. Lemmon Co.*, 602 F. Supp. 306, 306 (S.D.N.Y. 1985) (disqualifying attorney who "negotiated, executed, and administered the contract" upon which action was based); *Will of Bartoli*, 521 N.Y.S.2d 392, 394 (Sup. Ct. 1987) (disqualifying law firm due to counsel's role as draftsman of will). Indeed, "when a lawyer drafts an ambiguous document for a layperson, the lawyer may be the *only* witness capable of explaining what a clause means or why it appears." *Paretti v. Cavalier Label Co., Inc.*, 722 F. Supp. 985, 986 (S.D.N.Y. 1989) (emphasis supplied).

Even if someone who was not originally a party to a contract becomes a party, it is still the intention of the drafters that controls because it is the drafters who have personal knowledge of the meaning of the disputed terms. *See, e.g.*, *BKCAP, LLC v. Captec Franchise Trust*, No. 3:07-cv-637, 2011 WL 3022441, at *3-8 (N.D. Ind. July 21, 2011) (excluding the interpretation of assignee of contract as not probative because he "arrived on the scene well after the negotiation"); *see also In re Northwest Airlines*, 393 B.R. 337, 346-47 (Bankr. S.D.N.Y. 2008) (relying on testimony of financial advisor who drafted the term sheet in a prior, separate deal that served as the template for the disputed contractual language in the deal at issue because that individual had personal knowledge).

### B.   All Relevant Extrinsic Evidence of the Drafters' Intent Corroborates that Chesapeake Could Provide Notice Until March 15, 2013.

The only competent extrinsic evidence of the parties' intent makes plain that the Special Early Redemption Period is a period for providing notice of redemption.

Critically, representatives of the issuer and the lead underwriters of the 2019 Notes offering have all testified that they understood that the business deal was intended to provide

Chesapeake a period in which to exercise its option by providing notice within the Special Early Redemption Period.  The inclusion of the second sentence of Section 1.7(b) was intended to reflect that agreement in the Supplemental Indenture.  As thoroughly detailed above, this point is confirmed by testimony from Chesapeake, BAML, and the lawyers who were actually involved in the negotiation and drafting in February 2012.  Chesapeake's Chief Financial Officer, Mr. Dell'Osso, and Bank of America's lead banker on the deal, Mr. Maultsby, understood this provision as operating this way.  *See supra*.  Mr. Burns of Cravath, counsel to the underwriters, has sworn to a conversation in which "the Company and the underwriters had agreed as a business matter that the Company would be permitted to give notice of an early redemption at par until March 15, 2013 and, as long as they gave such notice by such date, redeem the bonds on a redemption date thereafter."  Burns Decl. ¶ 14.  The testimony of Mr. Telle and Mr. Burns is unequivocal that each understood the deal to prescribe a notice period.

By contrast, no one involved in the actual negotiation could or will testify that the drafters intended otherwise.  The unanimity in the drafters' understanding of the intended meaning of Section 1.7(b) is dispositive.  *See Sunbury Textile Mills v. Comm'r*, 585 F.2d 1190, 1196 (3d Cir. 1978) (when "there is no dispute between the contracting parties over the meaning of the terms, extrinsic evidence should [be considered] . . . as providing an explanation of the parties' contractual understanding.  Their harmonious recital of what these words mean is conclusive.").

The contemporaneous documents such as the Prospectus Supplement and the Pricing Term Sheet attached to the Underwriting Agreement confirm that this provision of the Supplemental Indenture was amply disclosed to investors and amply considered by the underwriters, notwithstanding the short time frame of the deal.  These documents are all

admissible extrinsic evidence of the drafters' intent.  *See Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04 Civ. 10014, 2005 WL 751914, at *4 (S.D.N.Y Mar. 31, 2005) ("[T]he Offering Memorandum constitutes parole evidence as to the meaning of the Indenture[.]"); *Wayland Investment Fund, LLC v. Millenium Seacarriers, Inc.*, 111 F. Supp. 2d 450, 456 (S.D.N.Y. 2000) (noting that the prospectus is admissible extrinsic evidence in the case of ambiguity).

Any room for doubt is extinguished by the "seventeen words" that Bracewell included in a draft of the Supplemental Indenture.  These seventeen words clearly memorialize Chesapeake's contemporaneous understanding that it could redeem at par even after the expiration of the Special Early Redemption period, so long as it had provided notice by the end of the period. And the reason for Cravath's rejection of those seventeen words, as explained by Steve Burns, confirms that the underwriters agreed with Chesapeake's understanding of the agreement; the words were not included in the Supplemental Indenture solely because Cravath persuaded Bracewell that they were wholly unnecessary and that the Supplemental Indenture should track the Prospectus Supplement as closely as possible.  *See supra.*

In short, all the relevant evidence of the drafters' contemporaneous intentions and understandings corroborates Chesapeake's current understanding of the provision.

## III.    Extrinsic Evidence Not Probative of the Drafters' Intent Should Be Disregarded.

Perhaps because the intent of the drafters is so clear, BNY Mellon's defense strategy appears to be built on a contention that a reasonable investor would have understood March 15 to be the last possible redemption date at par, not the last possible date for Chesapeake to notice a redemption at par.  In support of this contention, BNY Mellon has introduced snippets of material that can be divided into two categories:  (1) expert opinions on the typical meaning of

"redeem"; (2) evidence of purported confusion within Chesapeake or in the market about the deadline to provide notice of redemption.

None of these categories of evidence is relevant to determining the meaning of Section 1.7 of the Supplemental Indenture, as none illuminates the intent of the negotiators and drafters at the time that intention was formed. Nor does BNY Mellon establish any real confusion in Chesapeake or in the market.

### A.    BNY Mellon's Expert Reports

The starting point of BNY Mellon's case is expert testimony that it is the "custom and usage" in the industry to disclose a period when a redemption may be completed at a given price, not the period when notice must be given for the redemption to conclude at that price.

But that issue is undisputed. Chesapeake agrees that the general custom or usage in the securities industry is that the terms "redeem" or "redemption" typically refer to the repayment itself. The proffered expert testimony, therefore, is not necessary to resolve any issue before the Court.

Aside from their "custom and usage" opinions, these experts mostly offer legal conclusions that should be disregarded. While experts may testify as to the industry custom and usage of a particular term, or as to a particular industry meaning of that term, *see, e.g.*, *SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 135 (2d Cir. 2006), they "may not . . . render[] legal opinions interpreting contract terms at issue." *LaSalle Bank Nat'l Assoc. v. CIBC, Inc.*, No. 08 Civ. 8426, 2012 WL 466785, at *7 (S.D.N.Y. Feb. 14, 2012) (citing *Marx & Co., Inc. v. Diners' Club Inc.*, 550 F.2d 505, 509-10 (2d Cir. 1977)); *see Great Am. Ins. Co. v. USF Holland Inc.*, --- F. Supp. 2d ---, 2013 WL 1313841, at *5 (S.D.N.Y. March 27, 2013) (excluding an expert's report because it "essentially set forth his view as to the ultimate legal conclusions this Court should reach").

For example, James Mullin, a longtime banker at the now-defunct Kidder, Peabody firm, will opine at BNY Mellon's behest that reasonable investors would have thought Chesapeake needed to complete the redemption by March 15, 2013. But Mr. Mullin also conceded that investors would not have reviewed the Supplemental Indenture and perhaps would not even have read the Supplemental Prospectus, beyond the cover page. *See* Mullin Tr. at 57-58; 112-13. His opinion plainly says nothing about the intent of the drafters or even the customary usage of any term in the indenture. Mr. Mullin also will testify that the Supplemental Indenture must mean that redemption had to be completed by March 15, 2013, but the basis for his opinion is simply that every other indenture with which he is familiar has worked that way. Mr. Mullin admittedly made no effort to consider the language of this particular indenture, so his opinions are simply not relevant. *See id.* at 120.

Robert Landau, a retired long-time trust company executive who has authored a book on corporate trust administration, will provide his interpretation of the words "may redeem" and the relationship among the provisions in Supplemental Indenture Section 1.7. However, Mr. Landau concedes that his opinions are based solely on his understanding of the custom and practice of the corporate trust industry, that parties to bond indentures can deviate from custom and practice, and that – in over 50 years in the industry – he has never seen the precise language at issue in Section 1.7(b). *See* Landau Tr. at 47-48, 56, 80. Mr. Landau will also testify that the March 15, 2013 Notice was defective, but his opinion is based solely on custom and practice, and he notably admits the Notice contained all the information required by the Indenture. *Id.* at 84-86; 89. His opinions are thus irrelevant.

Bruce Tuckman, a Ph.D. in economics from M.I.T. who has authored a textbook on fixed income securities and is a "Clinical Professor" of Finance at the NYU Stern School of Business,

will opine that the custom and practice in the corporate bond industry is for the redemption date, rather than the notice date, to set the redemption price. Chesapeake's own expert, John Finnerty, notes the same view in his report, so there is no disagreement between the parties on this point. *See* Finnerty Report ¶¶ 35-36. Dr. Tuckman will further opine that industry custom and practice requires that Section 1.7 be interpreted to mean that Chesapeake could not effect a Special Early Redemption at par by giving notice after February 13, 2013. However, Dr. Tuckman conceded that there is no reason why a bond indenture could not be drafted so that the notice date sets the redemption price; indeed, he admitted that an issuer and an underwriter could agree to include such a provision in the indenture and that he could even draft such a provision if necessary. *See* Tuckman Tr. at 108-10.

More importantly, Dr. Tuckman admitted that he could not identify any business purpose served by BNY Mellon's interpretation of Section 1.7(b), under which the unusual second sentence "serves only to disallow notice of a par redemption before . . . November 15, 2012." Report of Bruce Tuckman 13; Tuckman Tr. at 99, 105-07. Because Dr. Tuckman's reading of Section 1.7 is not rooted in any economic principle or financial theory, his interpretation is no more than a legal conclusion and is therefore irrelevant.

In short, BNY Mellon's expert witnesses will not offer any testimony that is probative of the disputed issues in the case, and the Court should afford them no weight.

### B. Any Confusion Within Chesapeake or in the Market Is Not Relevant.

BNY Mellon will also attempt to introduce evidence that some Chesapeake personnel were confused about the notice period under the Supplemental Indenture.

The evidence will show that some of those employees were either not involved in the negotiation of the 2019 Notes offering or were not even employed by Chesapeake at that time. The law is clear that the understanding of individuals uninvolved in the negotiation or drafting of

an agreement is not relevant extrinsic evidence. *See Adasar Grp., Inc. v. NetCom Solutions Int'l, Inc*, No. 01 Civ. 0279 (WHP), 2003 WL 1107670, at *7 (S.D.N.Y. Mar. 13, 2003) (disregarding testimony from "officers and employees who did not participate in the negotiation . . . and had no first-hand knowledge of either"); *Luitpold Pharms., Inc. v. Ed. Geistlich A.G. Fur Chemische Industrie*, No. 11 Civ. 681 (KBF), 2013 WL 208908, at *7 (S.D.N.Y. Jan. 15, 2013) (rejecting reliance on high-ranking executive of party to contract who did not have personal knowledge of negotiation).   Only individuals with "personal knowledge of the drafting and negotiating processes" can provide testimony that is "probative of the parties' intent." *Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp. 2d 427, 431 n.16 (S.D.N.Y. 2008).

Nor is evidence of any internal misunderstanding within the company relevant to prove the intent of the drafters under the guise of a purported "course of dealing," as BNY Mellon has claimed.   The application of the "course of dealing" concept requires the showing of a "well-established custom" established over numerous transactions between the same parties over a period of time. *New Moon Shipping Co. v. Man B & W Diesel*, 121 F.3d 24, 31 (2d Cir. 1997). This principle is not relevant here since BNY Mellon cannot establish any prior dealings with Chesapeake that are governed by the terms of Section 1.7(b), a unique provision. *See, e.g.*, *Cherry River Music Co. v. Simitar Ent., Inc.*, 38 F. Supp. 2d 310, 318 n.54 (S.D.N.Y. 1999) ("[T]hree unrelated transactions over a three year period are insufficient to establish a course of dealing in the sense the term is used in the law."); *APL Co. Pte. Ltd. v. Kemira Water Solutions, Inc.*, 890 F. Supp. 2d 360, 367 (S.D.N.Y. 2012) (rejecting course of dealing argument where parties had only transacted once before); *Rotuba Extruders, Inc. v. Ceppos*, 46 N.Y.2d 223, 230-31 (1979) (rejecting prior course of dealing argument because the "isolated and remote event,"

could not "constitute the sequence of previous conduct that it would take to comprise a trade practice or course of dealing") (internal quotations and citations omitted).

Nevertheless, BNY Mellon will likely attempt to introduce evidence of internal Chesapeake Treasury Department documents that display the range "November 15, 2012 through March 15, 2013" as the "redemption date" for the 2019 Notes in a table of Chesapeake's outstanding bonds. Similar information appeared on Chesapeake's website in a listing summarizing all of Chesapeake's outstanding bonds, and in similar phrasing in Chesapeake's quarterly and annual securities filings. There will be no evidence, however, that any of these tables or phrasings conveyed, or were intended to convey, that Chesapeake did not have until March 15, 2013 to give notice of redemption under the unusual Special Early Redemption Provision. Moreover, there will be no evidence that any of these documents reflect the intent of anyone involved in the negotiation or drafting of the Supplemental Indenture. *See Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*, 853 F. Supp. 791, 798 (S.D.N.Y. 1994) (requiring "personal knowledge of the contracts negotiations" to determine intent).

Along these lines, BNY Mellon has chosen to call as a witness in its defense case Elliot Chambers, Chesapeake's Vice President-Finance, presumably because he wrote some emails in Fall of 2012 in which he mistakenly described the deadlines for notice to be sent under the Special Early Redemption provision. Mr. Chambers participated in the preparation of the offering and received drafts of the deal documents and the Supplemental Indenture, but testified at his deposition that he has little recollection of his understanding of the details of the documents at that time, and no recollection at all of having reviewed the Supplemental Indenture. And when Mr. Chambers wrote the emails in question, Mr. Chambers had not actually reviewed

the language in the deal documents or the indenture.  Later, in January 2013, when he did review the language, he understood it to allow Chesapeake until March 15, 2013 to give notice.

BNY Mellon will similarly attempt to rely on evidence of confusion in the market concerning the time period for early redemption at par.  For example, BNY Mellon has included on its witness list a customer-service level employee at Bloomberg who was responsible in February 2013 for inputting information about Chesapeake's 2019 Notes into Bloomberg's terminal system.  At some point in late February 2013 certain information concerning the atypical notice-period for redeeming Chesapeake's 2019 Notes was clarified on that system.  This tangential issue will not assist the Court in resolving any issue before it.  Testimony from strangers to the drafting of the Supplemental Indenture do not bear at all on the drafters' intentions.  *See Portside Growth & Opportunity Fund*, 557 F. Supp. 2d at 431 n.16 (refusing to consider affidavit of individual with "no personal knowledge of the drafting and negotiating processes").

The irrelevance of this evidence is underscored by the opinion of BNY Mellon's expert, Mr. Mullin, that investors typically do not even look past the first page of a prospectus, let alone review the particular provisions of indentures.  *See* Report of Dr. James A. Mullin ¶ 36 (opining that "it is likely the investor only looked at the cover page of the Prospectus"); *see also* Mullin Tr. at 58, 112-13.  Particularly following this concession, BNY Mellon cannot present any plausible basis to offer the views of market participants about the Supplemental Indenture or the meaning of the language in Section 1.7(b).

## IV.    Any Ambiguity Should Not Be Construed Against Chesapeake.

Finally, we expect BNY Mellon to argue that any ambiguity in Section 1.7(b) should be construed against Chesapeake under the principle of *contra proferentem*, which requires an ambiguous provision to be construed against the drafter.  Any such argument is misguided.

First, this doctrine applies only "as a matter of last resort, after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 n.2 (2d Cir. 1983); *see also M. Fortunoff v. Peerless Ins. Co.*, 432 F.3d 127, 142 (2d Cir. 2005) ("[C]ourts should not resort to *contra proferentem* until after consideration of extrinsic evidence to determine the parties' intent.") (internal quotations and citation omitted).

Second, even when extrinsic evidence does not fully resolve an ambiguity, courts apply the doctrine in limited circumstances, for instance where the parties lack equal bargaining power. *See Novel Commodities S.A. v. QBE Ins. Corp.*, No. 11 Civ. 6339, 2013 WL 1294618, at *7 (S.D.N.Y. Mar. 30, 2013) (declining to apply principle, finding that Second Circuit "indicated that the *contra proferentem* rule must be applied with caution"). This is because where "both parties are sophisticated business entities, familiar with the market in which they deal and armed with relatively equivalent bargaining power," the principle "serves little purpose." *U.S. Fire Ins. Co. v. Gen. Reins. Corp.*, 949 F.2d 569, 574 (2d Cir. 1991) (citing *Schering Corp.*, 712 F.2d at 10 n.2 (noting that "a number of courts have recognized that in cases involving bargained-for contracts, negotiated by sophisticated parties, the underlying adhesion contract for the doctrine rationale is inapposite")).

In the context of an indenture, the contract is not construed against the issuer because the issuer negotiates the agreement with the underwriter, a sophisticated party. In its negotiations with the issuer over the terms of the deal, the underwriter stands in the place of the note holders who ultimately purchase the notes. *See Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983) ("[P]urchaser of Debentures may stand in the shoes of the underwriters that originally negotiated and drafted the debentures.") (citing *Broad v.*

*Rockwell Int'l Corp.*, 642 F.2d 929, 947 n.20 (5th Cir. 1981)).  In other words, the issuer is not viewed as the sole "drafter," against whom it would be appropriate to construe the contract.  *See id.*[6]

Here, because the Court will be able to discern the intent of the drafters from the evidence at trial, and because note holders' interests were well represented by a sophisticated underwriter, the doctrine of *contra proferentem* would not serve any of its underlying purposes. *See U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 574 (2d Cir. 1991) ("Where, as here, the justifications for applying the rule seem to be lacking, and there exists ample extrinsic evidence, which, properly considered, clarifies the policy's 'per claim'/'applicable limit' ambiguity, we find that the district court erred in applying the doctrine of *contra proferentem*."); *Archer Daniels Midland Co.*, 570 F. Supp. at 1541 (declining to construe indenture against issuer where sophisticated underwriter stood in for note holders' interests and negotiated the deal).

BNY Mellon previously argued that the doctrine should apply because Section 9.01 of the Base Indenture permits the Trustee "to cure any ambiguity, omission, defect or inconsistency; provided that such modification shall not adversely affect the Holders of any series in any material respect."  As the Court previously recognized, however, this provision by its terms governs "the entirely separate subject of the way or ways in which ambiguities or unaddressed issues in the Base Indenture can be cured, for example, by supplements, such as the Supplemental Indenture."  Mar. 14 Hearing Tr. at 23.  That provision does "not address at all how ambiguities are to be construed by a Court," and "is silent as to in whose favor ambiguity is

---

[6] Judge Sand explained in that case:  "[W]e view this as a most inappropriate case to construe ambiguous contract language against the drafter.  The Indenture was negotiated by sophisticated bond counsel on both sides of the bargaining table.  There is no suggestion of disparate bargaining power in the drafting of the Indenture, nor could there be.  Moreover, even if we were to adopt this rule, it is not at all clear that [the issuer] would be considered the drafter of the Indenture, given the active participation of the managing underwriter.  Indeed, it is arguable that the ambiguous language should be construed in favor of [the issuer]."  *Id.*

to be construed." *Id.* The ability of BNY Mellon to resolve an ambiguity in Section 9.01 has no bearing on the rules of construction to be applied by the Court.

## BNY MELLON'S AFFIRMATIVE DEFENSES

BNY Mellon asserted nine "Affirmative and Other Defenses" as part of its Answer.[7] None of these is meaningfully pleaded. This memorandum focuses on the two defenses that BNY Mellon has appeared to focus on in pretrial proceedings: the "conditional" nature of Chesapeake's March 15 Notice; and Chesapeake's purported laches in initiating this suit. Chesapeake reserves for its post-trial submission its response to any of the defenses that BNY Mellon seeks to prove at trial.

### A.    Conditionality of Notice

BNY Mellon's third defense is that Chesapeake's Notice is "conditional" and therefore defective. This defense suffers from several fatal flaws.

First, the Notice is not "conditional" or "contingent." As we have argued to the Court with respect to Claim Two of the Complaint, if the Notice is too late to trigger a Special Early Redemption, then it should be null and void according to ordinary practice and law with respect to untimely notice. If BNY Mellon's argument were correct, then any notice that must be delivered by a specified date is "conditional" on being timely provided. The only reason the Notice states expressly that it does not take effect unless the Court rules that it is timely is to assure that BNY Mellon would not apply it as a notice for a Make-Whole Redemption, as it had previously reserved the ability to do. BNY Mellon cannot now argue that Chesapeake's attempt

---

[7] These defenses are: (1) failure to state a claim; (2) the failure to timely provide notice; (3) the issuance of a purportedly conditional notice; (4) estoppel; (5) unclean hands; (6) waiver; (7) violation of the implied covenant of good faith and fair dealing; (8) violation of Section 8-202(a) of the Uniform Commercial Code; and (9) laches.

to protect itself from BNY Mellon's misapplication of the indenture eliminates Chesapeake's option.

Second, even if the Notice were "conditional," BNY Mellon can point to no provision in the Base or Supplemental Indenture that makes such a Notice ineffective if otherwise timely. BNY Mellon's expert on indentures, Mr. Landau, was unable to identify any such provision. *See* Landau Tr. at 85-86, 89.  In fact, in *BKCAP, LLC v. Captec Franchise Trust 2000-1*, the court rejected BNY Mellon's argument that a "conditional" notice was defective because, in that case, like here, the indenture was "completely silent on the form the notice must take and certainly cannot be read as precluding a conditional pre-payment notice."  No. 07-cv-637, 2011 WL 3022441, at *12 (N.D. Ind. July 21, 2011).  New York law similarly disfavors imposing conditions without express language in the contract.  *See Ginett v. Computer Task Group, Inc.*, 962 F.2d 1085, 1099-1100 (2d Cir. 1992).

In sum, Chesapeake drafted the Notice to inform note holders clearly and emphatically that notwithstanding the baseless position BNY Mellon was then taking – that it could misconstrue a Notice of Special Early Redemption as a Notice of Make-Whole Redemption – Chesapeake was not noticing a Make-Whole Redemption.  BNY Mellon should not be permitted to threaten a punitive misinterpretation of Chesapeake's Notice and then prejudice Chesapeake because of its effort to protect itself from that misinterpretation.

### B.    Laches

In its ninth defense, BNY Mellon claims that Chesapeake has long known that the redemption terms of the 2019 Notes were unclear and has failed to act in a timely manner.  BNY Mellon will not be able to establish the factual predicate for this defense.

To succeed on a laches defense, BNY Mellon will need to prove that Chesapeake (1) had knowledge of its claim against BNY Mellon; (2) inexcusably delayed in taking action; and (3)

BNY Mellon will be prejudiced such delay.  *See Fourth Toro Family Ltd. P'ship v. PV Bakery, Inc.,* 88 F. Supp. 2d 188, 196 (S.D.N.Y. 2000).

Chesapeake initiated this litigation promptly after learning that BNY Mellon would decline to treat a notice issued after mid-February as timely for a redemption at par.  Moreover, when BNY Mellon initially considered Chesapeake's position with its outside counsel at Emmet, Marvin & Martin LLP on February 20, BNY Mellon told Chesapeake that Chesapeake's position was correct.  Plaintiff Ex. No. 49.  Had Chesapeake alerted BNY Mellon any earlier of its plan to send its notice in March, there is no reason to think that BNY Mellon would have reached a different conclusion than its initial conclusion on February 20.  It was only after a hedge fund, River Birch Capital, advanced a contrary view that BNY Mellon changed its position.  That hedge fund presumably waited purposefully until after February 13 to assert its position to BNY Mellon.  Accordingly, there is no basis for BNY Mellon's defense.

If necessary to rebut this defense, Chesapeake will introduce evidence that, in early January 2013, the Bracewell firm confirmed to Chesapeake that the company had until March 15, 2013 to give notice of a Special Early Redemption.[8]  And until February 20, 2013, Chesapeake had no reason to believe that BNY Mellon would take the position that Chesapeake had only until February 13, 2013 to give notice of Special Early Redemption.  *See, e.g.*, *In re 5300 Memorial Investors, Ltd.*, 973 F.2d 1160, 1174 (5th Cir. 1992) (denying laches defense when first indication of disagreement over contract interpretation was nine months before claim).  Chesapeake filed suit promptly after becoming aware that BNY Mellon was taking a contrary position.

---

[8] As Chesapeake has previously reported to the Court, Chesapeake will rely on this previously privileged evidence, which post-dates the offering period but otherwise falls within the time period of Chesapeake's subject matter privilege waiver, solely as rebuttal to the BNY Mellon's defense arguments.  *See* Chesapeake's Letter of April 12, 2013 at 4.

In short, BNY Mellon's defenses do not prevent the Court from entering judgment in Chesapeake's favor on Claim One of the Complaint.

## **CONCLUSION**

As shown above, the governing agreements unambiguously permit Chesapeake to provide notice of Special Early Redemption on March 15, 2013.  As will be shown at trial, all the pertinent extrinsic evidence corroborates that this was precisely the intent of the drafters.  None of BNY Mellon's defenses will undermine this conclusion.  Following trial, Chesapeake will be entitled to entry of judgment on Claim One in the Complaint, and to such other relief that the Court deems just and proper.

**Dated:** April 21, 2013
New York, New York

CHESAPEAKE ENERGY CORPORATION

_____/s/ Richard F. Ziegler_____

Richard F. Ziegler (RZ0872)
Stephen L. Ascher (SA7820)
Michael W. Ross (MR4490)

JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908

*Counsel for Plaintiff*