UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X
                                                                       :
CHESAPEAKE ENERGY CORPORATION,                                         :
                                                                       :
                                    Plaintiff,                         :    Civil Action No. 13-cv-1582 (PAE)
                                                                       :
                         v.                                            :
                                                                       :
THE BANK OF NEW YORK MELLON                                            :    ECF Case
TRUST COMPANY, N.A.,                                                   :
                                                                       :
                                    Defendant.                         :
                                                                       :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -   X


**MEMORANDUM OF LAW OF DEFENDANT
THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.
IN SUPPORT OF ITS MOTION *IN LIMINE* TO EXCLUDE
<u>EXTRINSIC EVIDENCE OF UNCOMMUNICATED SUBJECTIVE INTENT</u>**

## <u>TABLE OF CONTENTS</u>

**<u>Page</u>**

Preliminary Statement.................................................................................................1

Summary of Facts for Motion.....................................................................................3

Argument ...................................................................................................................5

       A.     Extrinsic Evidence of Uncommunicated, Subjective Intent Is
Inadmissible, Irrelevant, and Not Probative to Construe the Meaning of
the Supplemental Indenture ...............................................................5

       B.     Chesapeake Should Be Precluded From Introducing Extrinsic Evidence
of Subjective Intent For Any Other Purposes ......................................11

Conclusion ...............................................................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bank of New York Mellon v. Commerzbank Cap. Funding Trust II,*
    No. 372, 2012, 2013 WL 1136821 (Del. Mar. 19, 2013) .......................................................12

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929 (5th Cir. 1981) ...................................................................................................14

*Capital Ventures Int'l v. Verenium Corp.,*
    No. 09 Civ. 4261 (GBD), 2011 WL 70227 (S.D.N.Y. Jan. 4, 2011)................................6, 7, 9

*Chateaugay Corp. v. Aetna Cas. & Sur. Co.,*
    116 B.R. 887 (Bankr. S.D.N.Y. 1990)......................................................................................8

*Faulkner v. Nat'l Geographic Soc'y,*
    452 F. Supp. 2d 369 (S.D.N.Y. 2006).......................................................................................6

*First Montauk Securities Corp. v. Menter,*
    26 F. Supp. 2d 688 (S.D.N.Y. 1998).....................................................................................2, 6

*Hudson-Port Ewen Assocs., L.P. v. Chien Kuo,*
    165 A.D.2d 301, 566 N.Y.S.2d 774 (3d Dep't 1991) ...............................................................7

*Invista B.V. v. E.I. Du Pont De Nemours & Co.,*
    No. 07 Civ. 713 (WHP), 2008 WL 4865044 (S.D.N.Y. Nov. 5, 2008)....................................7

*JA Apparel Corp. v. Abboud,*
    682 F. Supp. 2d 294 (S.D.N.Y. 2010).......................................................................................7

*Kaiser Aluminum Corp. v. Matheson,*
    681 A.2d 392 (Del. 1996) ..................................................................................................13, 15

*Klos v. Polskie Linie Lotnicze,*
    133 F.3d 164 (2d Cir. 1997)...................................................................................................5, 6

*Law Deb. Trust Co. v. Maverick Tube Co.,*
    595 F.3d 458 (2d Cir. 2010).......................................................................................................5

*Morgan Stanley & Co. v. Archer Daniels Midland Co.,*
    570 F. Supp. 1529 (S.D.N.Y. 1983)........................................................................................14

*Murray Walter, Inc. v. Sarkisian Bros., Inc.*
    183 A.D.2d 140, 589 N.Y.S.2d 613 (3d Dep't 1992) ...............................................................8

*Mut. Life Ins. Co. v. Oglesby*,
    695 A.2d 11146 (Del. 1997) ........................................................................13

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1988) .........................5, 6, 7

*Padovano v. Vivian*,
    217 A.D.2d 868, 629 N.Y.S.2d 844 (3d Dep't 1995) ................................................7

*Prescott, Ball & Turben v. LTV Corp.*,
    531 F. Supp. 213 (S.D.N.Y. 1981) ................................................................13

*Prop. Asset Mgmt., Inc. v. Chicago Title Ins. Co*,
    173 F.3d 84 (2d Cir. 1999) ........................................................................7

*RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*,
    No. 10 Civ. 0025(PGG), 2013 WL 1294515 (S.D.N.Y. Mar. 30, 2013) ..................................5

*Ross Univ. School of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*,
    No 09-cv-1410 (KAM) (RLM), 2013 WL 1334271 (E.D.N.Y. Mar. 28, 2013) .............................6, 7, 8

*S.I. Mgmt. L.P. v. Wininger*,
    C.A. Nos. 4227-VCS, 4427-VCS, 2009 WL 2096213 (Del. Ch. July 14, 2009) ...................14

*S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*,
    467 F.3d 107 (2d Cir. 2006)..............................................................6, 7, 11, 12

*Sally v. Sally*,
    225 A.D.2d 816, 638 N.Y.S.2d 832 (3d Dep't 1996) ...............................................7

*Sass v. N.Y. Towers Ltd.*,
    23 A.D.2d 105 (1st Dep't 1965) ..................................................................13

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
    691 F.2d 1039 (2d Cir. 1982)......................................................................14

*Wells v. Shearson Lehman/Am. Express*,
    72 N.Y.2d 11, 530 N.Y.S.2d 517 (1988) ...........................................................7

*Westfield Family Physicians v. Healthnow N.Y., Inc.*,
    59 A.D.3d 1014, 873 N.Y.S.2d 793 (4th Dep't 2009).............................................8

Defendant The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon") respectfully submits this memorandum of law in support of its motion *in limine* to preclude plaintiff Chesapeake Energy Corporation ("Chesapeake") from introducing extrinsic evidence at trial of any purported subjective intent concerning the meaning of the Supplemental Indenture that was not communicated to BNY Mellon or the initial purchasers of the 2019 Notes before the execution of the Supplemental Indenture.

## **Preliminary Statement**

As BNY Mellon will demonstrate in its trial brief and establish at trial, the Base Indenture and Supplemental Indenture unambiguously provide that Chesapeake may redeem the 2019 Notes at par during the Special Early Redemption Period so long as it provides at least 30-days' prior notice during that period. Otherwise, the 2019 Notes remain outstanding to maturity unless Chesapeake exercises its option to redeem the Notes after March 15, 2013, which redemption shall be at the Make-Whole Price as required by Section 1.7(c). Because the Base Indenture as supplemented by the Supplemental Indenture is clear and unambiguous on its face, the Court need not consider extrinsic evidence to determine, from the four corners of the agreement, that Chesapeake's claim for a declaratory judgment fails as a matter of law. BNY Mellon's interpretation of Section 1.7(b), Section 1.7(c), and the other relevant terms provides the only consistent, reasonable construction of the redemption provisions and the indenture documents as a whole. Even if the Court determines that the Supplemental Indenture is ambiguous, the relevant extrinsic evidence introduced at trial will confirm BNY Mellon's interpretation of the redemption provisions and establish that Chesapeake is not entitled to any declaratory relief.

Whether or not the Court looks to extrinsic evidence to determine the expressed intent of the parties, however, BNY Mellon respectfully requests that the Court issue an order

precluding Chesapeake from introducing any extrinsic evidence at trial of its subjective intentions as to the meaning of the Supplemental Indenture that was not communicated, expressed, or made manifest to BNY Mellon during the process leading up to the execution of the Supplemental Indenture.  As a matter of New York law, evidence of a party's subjective but uncommunicated intentions about what it intended contract language to mean is inadmissible and irrelevant for purposes of construing the terms of the contract, whether or not that contract is ambiguous or unambiguous.  *See First Montauk Securities Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998) ("[I]t is hornbook law that the uncommunicated subjective intent of a party is irrelevant in interpreting a contract.").

BNY Mellon as indenture trustee is the counterparty to the Supplemental Indenture.  As set forth below, plaintiff should be precluded from introducing any subjective evidence of what Chesapeake or its attorneys at Bracewell & Giuliani LLP ("Bracewell") purport to have believed about the meaning of the redemption provisions in the Supplemental Indenture, but failed to communicate to BNY Mellon as counterparty at the time that the Supplemental Indenture was negotiated, drafted, and executed.  Plaintiff should also be precluded from introducing any subjective evidence as to what any or all of Chesapeake, the underwriters, or their respective lawyers purportedly thought or communicated with each other concerning the meaning of the Supplemental Indenture, because none of that purported subjective intent evidence was communicated to BNY Mellon as indenture counterparty.  Any evidence of such subjective and unexpressed intent is inadmissible and irrelevant for purposes of interpreting the expressed, objective manifestation of the parties' intent.

## Summary of Facts for Motion[1]

The signatories to the Supplemental Indenture at issue here are Chesapeake as issuer, BNY Mellon as trustee, and various subsidiary guarantors.  The underwriters of the transaction are not parties to the Supplemental Indenture.  (Bierman Decl. Ex. A.)

In accordance with the terms of the Supplemental Indenture, BNY Mellon as trustee is obligated to perform certain duties, including upon the issuer's proper exercise of redemption rights under Section 1.7 of the Supplemental Indenture.  (*Id.* Ex. A § 1.7; *id.* Ex. B § 7.01.)  As trustee, BNY Mellon has an economic interest in the Supplemental Indenture and the 2019 Notes transaction because it earns a fee for performing its contractual duties and maintaining various obligations as indenture trustee.  (*Id.* Ex. B. § 7.07.)  It is therefore essential that BNY Mellon's understanding of the terms of the Supplemental Indenture is governed by the four corners of that agreement rather than the undisclosed subjective intentions of the issuer and underwriters.

BNY Mellon was represented by legal counsel in connection with the 2019 Note transaction—Bayard Chapin of Emmet, Marvin & Martin, LLP—as Chesapeake and its counsel, Bracewell & Giuliani ("Bracewell"), were well aware.  (*Id.* Ex. G, Chapin Dep. 13:5-14:12, Apr. 18, 2013.)  It is undisputed that BNY Mellon was not involved in negotiating or drafting of the Supplemental Indenture and, in fact, Chesapeake excluded BNY Mellon from that process, except for inconsistently and intermittently copying BNY Mellon's counsel on drafts of the Supplemental Indenture.  (*See* Telle Decl. ¶ 3 (Mar. 8, 2013) Dkt. 6; Bierman Decl. Ex. J,

---

[1] The documents and deposition transcripts referenced in this memorandum of law are attached as exhibits to the accompanying Declaration of Steven M. Bierman, sworn to on April 22, 2013 ("Bierman Decl.").  Citations to deposition transcripts attached to the Bierman Declaration and referenced herein shall be use the last name of the witness, in the following form:  "McClendon Dep. ___."

Dell'Osso Dep. 172:4-13, Apr. 16, 2013; *id*. Ex. H, Grigsby Dep. 18:20-19:16, Apr. 12, 2013; *id*.

Ex. H, Seymore Dep. 143:4-145:3, 145:16-147:12, Apr. 19, 2013; *id*. Ex. G, Chapin Dep. 35:16-

25.)  It is also undisputed that neither Chesapeake's counsel, Bracewell, nor counsel for the

underwriters, Cravath, Swaine & Moore LLP ("Cravath"), communicated at all with BNY

Mellon or its counsel in February 2012 (when the Supplemental Indenture was drafted and

negotiated), regarding Chesapeake's intent with respect to Section 1.7 or the meaning or

application of any of its redemption provisions, other than emails transmitting the drafts of the

document.  (*See* Telle Decl. ¶ 3; Bierman Decl. Ex. J, Dell'Osso Dep. 172:4-13; *id*. Ex. H,

Grigsby Dep. 18:20-19:8; *id*. Ex. N, Seymore Dep. 140:13-141:20, 170:5-14; *id*. Ex. G, Chapin

Dep. 35:16-25; Chapin Decl. ¶¶ 3-4 (Mar. 11, 2013) Dkt. 11.)  In particular, not one of the

responsible executives—the CEO, CFO, Treasurer, and the Vice-President Finance/Assistant

Treasurer—or any operational people at Chesapeake spoke or otherwise communicated with

BNY Mellon or its counsel, Mr. Chapin.  (*See* Bierman Ex. K, McClendon Dep. 49:20-23, 95:2-

18, Apr. 12, 2013; *id*. Ex. J, Dell'Osso Dep. 71:20-72:12, 95:15-97:12, 172:4-17; *id*. Ex. H,

Grigsby Dep. 18:24-19:16, 101:7-17; *id*. Ex. I, Chambers Dep. 186:4-15, Apr. 15, 2013; *id*. Ex.

N, Seymore Dep. 146:15-147:12; *id*. Ex. G, Chapin Dep. at 35:22-25.)  Similarly, neither

Chesapeake's transactional counsel, Bracewell, nor the underwriters or the underwriters'

counsel, spoke or otherwise communicated with BNY Mellon or its counsel, Mr. Chapin.  (*See*

*id.* Ex. M, Telle Dep. 97:17-24, Apr. 17, 2013; *id.* Ex. L, Burns Dep. 86:13-87:20, Apr. 17,

2013.)

On the morning of Monday, February 13, 2012, Chesapeake issued a press release

announcing that it was commencing a public offering of $1.0 billion of Senior Notes due 2019,

and Bank of America Merrill Lynch, as the lead bookrunner, began to market the 2019 Notes to

investors and accept purchase orders of the 2019 Notes. Chesapeake's "drive-by" offering was very successful: by 1:41 p.m. the very same day the issuance had been announced, the 2019 Notes had been over-subscribed, and therefore, the transaction was upsized from $1 billion to $1.3 billion. (*Id.* Ex. N, Seymore Dep. 109:22-110:2.) Only after these commitment orders to purchase the 2019 Notes were received from the initial purchasers of the 2019 Notes did the underwriters enter into the underwriting agreement on the afternoon of February 13, 2012, one day before BNY Mellon received the first draft of the Supplemental Indenture from Chesapeake's counsel on February 14, 2013, and three days before execution of the final Supplemental Indenture by Chesapeake and BNY Mellon on February 16, 2012. (*Id.* Exs. A, D & E; *id.* Ex. N, Seymore Dep. 145:16-147:12; 169:7-170:17; *see also* Chapin Decl. ¶¶ 3-4.)

## <u>Argument</u>

### THE COURT SHOULD PRECLUDE CHESAPEAKE FROM INTRODUCING ANY EVIDENCE OF SUBJECTIVE INTENT AS TO THE MEANING OF THE SUPPLEMENTAL INDENTURE THAT WAS NOT COMMUNICATED TO BNY MELLON AT THE TIME THE AGREEMENT WAS EXECUTED

**A.    Extrinsic Evidence of Uncommunicated, Subjective Intent Is Inadmissible, Irrelevant, and Not Probative to Construe the Meaning of the Supplemental Indenture**

The interpretation of indenture provisions is a matter of basic contract law. *RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*, No. 10 Civ. 0025(PGG), 2013 WL 1294515, at *8 (S.D.N.Y. Mar. 30, 2013). The court's role in interpreting a contract "'is to ascertain the intention of the parties at the time they entered into the contract.'" *Id.* (citation omitted).

The fundamental "'objective of contract interpretation is to give effect to the *expressed* intentions of the parties'" at the time the contract was formed. *Law Deb. Trust Co. v. Maverick Tube Co.*, 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted); *Klos v. Polskie Linie Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997) (same). Under New York law, "this is accomplished

5

by examining the objective manifestations of the parties' intentions." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1988); *see Klos,* 133 F.3d at 168 ("[I]t is the objective intent of the parties that controls.").  "The best evidence of the parties' expressed intention is the words of the contract itself." *Capital Ventures Int'l v. Verenium Corp.*, No. 09 Civ. 4261 (GBD), 2011 WL 70227, at *4 (S.D.N.Y. Jan. 4, 2011).  "The parties' communicated expressions are interpreted objectively to give effect to the reasonable expectations of the parties, not necessarily their actual expectations." *S.R. Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 125 (2d Cir. 2006) (internal quotation marks and citations omitted).

While a court may consider statements of purported intent that were exchanged between the parties to a contract at the time of negotiations and drafting, it is black letter law that "statements of subjective intention uncommunicated *to the other contracting party* are immaterial in construing the terms of the contract." *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006) (emphasis added).  "The secret or subjective intent of the parties is irrelevant." *Klos,* 133 F.3d at 168; *see also First Montauk*, 26 F. Supp. 2d at 689.  New York law is clear that a contracting party's "'unexpressed subjective views have no proper bearing' on the court's determination of the parties' intent" with respect to an ambiguous contract.  *Ross Univ. School of Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No 09-cv-1410 (KAM) (RLM), 2013 WL 1334271, at *11 (E.D.N.Y. Mar. 28, 2013) (quoting *Nycal*, 988 F. Supp. at 302); *see World Trade Ctr.*, 467 F.3d at 126 (affirming jury instruction precluding consideration of unmanifested subjective intent to supply meaning of ambiguous contract term: "'A party's intent that is not communicated *to the other party* has no bearing; only the intent indicated by words and acts that are made known to the other party may be considered.'")

6

(emphasis added) (quoting jury instruction); *Nycal*, 988 F. Supp. at 302-03 (precluding testimonial evidence reflecting "subjective intent or understanding only," because "the only germane testimonial evidence is that of objective manifestations of the parties' intent").[2]

      The Second Circuit has thus held that "a party's uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract." *World Trade Ctr.*, 467 F.3d at 125. It is well settled that parol evidence "of a party's uncommunicated, subjective intent with respect to an ambiguous contractual provision" is "inadmissible," and "may not be considered by the court" to interpret the meaning of such a provision. *Ross*, 2013 WL 1334271, at *12. "In reviewing such extrinsic evidence, this Court only considers the parties' objective manifestations of intent." *Capital Ventures*, 2011 WL 70227, at *4. "This exclusive reliance upon evidence of objective manifestations of intent renders evidence of uncommunicated subjective intent irrelevant. . . ." *Nycal*, 988 F. Supp. at 301 (citing *Wells v. Shearson Lehman/Am. Express*, 72 N.Y.2d 11, 24, 530 N.Y.S.2d 517, 524 (1988).)

      It is similarly well settled that the "'unilateral expression of one party's postcontractual subjective understanding of the terms of the agreement'" is "'not probative as an

---

[2] *See also, e.g., Prop. Asset Mgmt., Inc. v. Chicago Title Ins. Co*, 173 F.3d 84, 87 (2d Cir. 1999) (affirming that affidavits testifying to officer's intent to assign loan "express[ed] only the uncommunicated subjective understandings of the officers" and did not create fact issue as to interpretation of contract); *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 303 (S.D.N.Y. 2010) ("A court is prohibited, however, from considering the parties' '[u]ncommunicated subjective intent.'") (citation omitted); *Sally v. Sally*, 225 A.D.2d 816, 834 N.Y.S.2d 832, 834 (3d Dep't 1996) (holding that parties' interpretations of stipulation were "nothing more than expressions of uncommunicated subjective intent, which are insufficient to create a question of fact"); *Padovano v. Vivian*, 217 A.D.2d 868, 629 N.Y.S.2d 844, 846 (3d Dep't 1995) (even if phrase in contract was ambiguous, "extrinsic evidence of the plaintiffs' uncommunicated subjective intent would be irrelevant"); *Hudson-Port Ewen Assocs., L.P. v. Chien Kuo*, 165 A.D.2d 301, 566 N.Y.S.2d 774 (3d Dep't 1991) (finding that vendors' "attestations of their understanding of what the contract language means" were insufficient to raise fact issue as to interpretation of agreement where defendants failed to establish "that their understanding of the meaning of the contract was communicated to the buyer prior to or contemporaneous with execution of the contract").

aid to the interpretation of the contract." *Invista B.V. v. E.I. Du Pont De Nemours & Co.*, No. 07 Civ. 713 (WHP), 2008 WL 4865044, at *45 (S.D.N.Y. Nov. 5, 2008) (holding extrinsic statements in affidavits and deposition testimony from in-house and outside counsel contending "that their side's current interpretation of the Agreement is the correct one" were inadmissible "'unilateral expression[s]'" of post-contractual subjective understanding with "no probative value") (citation omitted); *see Chateaugay Corp. v. Aetna Cas. & Sur. Co.*, 116 B.R. 887, 905 (Bankr. S.D.N.Y. 1990) (finding affidavits containing "post hoc, self-serving statements about affiant's view of the intent of the parties involved in the transaction" were "either inadmissible" or "not entitled to any weight, to the extent that they merely show the affiant's subjective intent"); *Murray Walter, Inc. v. Sarkisian Bros., Inc.* 183 A.D.2d 140, 589 N.Y.S.2d 613 (3d Dep't 1992) (affirming ruling that "letter was not admissible extrinsic evidence of the parties' mutual intent in entering into their agreement, but merely a unilateral expression of one party's postcontractual subjective understanding" of agreement); *Westfield Family Physicians v. Healthnow N.Y., Inc.*, 59 A.D.3d 1014, 1017, 873 N.Y.S.2d 793, 796 (4th Dep't 2009) (granting summary judgment enforcing defendant's interpretation of cap provision in agreement where plaintiffs "merely offered evidence of uncommunicated subjective intent, and subsequent interpretations of the [agreement]," and thus "failed to raise an issue of fact to defeat the motion").

In *Ross*, for example, the district court recently affirmed that "only objective, communicated statements of subjective intent are relevant to construing the terms of a contract." 2013 WL 1334271, at *9.  In adopting the magistrate judge's report and recommendation granting the plaintiff's motion for summary judgment finding the defendant liable for breach of contract, Judge Matsumoto found that several categories of the defendants' evidence of

8

subjective intent in opposition to the motion were "inadmissible," because the evidence was never communicated to the plaintiff. *Id.* at *12. The inadmissible evidence included: (i) deposition testimony from the defendant's chief operating officer regarding his "subjective concerns" about potential liability that were "never communicated" to the plaintiff, (ii) declarations from certain of the defendant's board members regarding their "purported 'lack of consent'" to assuming liability under the contract that was "never communicated to" the plaintiff, and (iii) a separate agreement involving the same defendant with contrasting terms that "was never communicated to" the plaintiff. *Id.* at *9 to *12. The court concluded that the proffered evidence of the defendant's "uncommunicated, subjective intent with respect to an ambiguous contractual provision" was "inadmissible and will not be considered by the court in resolving" the defendant's objections to the report and recommendation. *Id.* at *12; *see also Capital Ventures*, 2011 WL 70227, at *1, *5 to *7 (granting summary judgment in favor of defendant in contract dispute concerning two interpretations of the applicable closing date and price at which a corporate note could be converted to common stock, where the definition of "closing date" was not ambiguous, and where the "overwhelming evidence" of the parties' course of performance indicated that all parties to the contract intended a closing date that permitted the defendant to obtain the higher of the two proposed conversion prices).

Applying these principles, the Court should exclude Chesapeake from submitting any evidence at trial of uncommunicated subjective intent in the following categories:

1.      Any evidence concerning the subjective intent of any Chesapeake or Bracewell witness, whether offered through live witness testimony or set forth in any document, as to the meaning of the redemption provisions in the Supplemental Indenture that was not communicated to BNY Mellon. This impermissible evidence of undisclosed subjective intent

would include, among other items:  (i) any evidence concerning what anyone at Chesapeake or

Bracewell "thought" the Supplemental Indenture meant, to the extent they considered it at all;

(ii) any intent evidence about the Supplemental Indenture that Chesapeake personnel

communicated with each other; (iii) any intent evidence about the Supplemental Indenture that

Bracewell lawyers communicated with each other, (iv) any intent evidence about the meaning of

the Supplemental Indenture that Chesapeake and/or Bracewell communicated to the underwriters

and/or their counsel at Cravath.  All evidence of any such subjective intent is inadmissible and

irrelevant to construe the meaning of the Supplemental Indenture because it was not disclosed to

BNY Mellon as the counterparty to the Supplemental Indenture.

   Indeed, the record is clear the four primary executives at Chesapeake involved in

the Supplemental Indenture—the CEO, CFO, Treasurer, and Vice President-Finance/Assistant

Treasurer—have all admitted that they did not negotiate or even speak to anyone at BNY Mellon

about the Supplemental Indenture generally, or the about the meaning of Section 1.7 specifically,

and BNY Mellon received no communications from Chesapeake or its agents other than emails

transmitting copies of the drafts of the Supplemental Indenture.  (*See* Bierman Decl. Ex. K,

McClendon Dep. 49:20-23, 95:2-18; *id*. Ex. J, Dell'Osso Dep. 71:20-72:12,  95:15-97:12, 172:4-

17; *id*. Ex. H, Grigsby Dep. 18:24-19:3, 101:7-17; *id*. Ex. I, Chambers Dep. 27:2-28:3, 29:3-21;

*id*. Ex. N, Seymore Dep. 140:13-141:20, 170:5-14; Chapin Decl. ¶¶ 3-4.)  Ms. Grigsby further

stated that Chesapeake never engages in negotiations with any trustee regarding the terms of an

indenture.  (Bierman Decl. Ex. H, Grigsby Dep. 19:4-16.)

   Likewise, Chesapeake's outside lawyer at Bracewell, Mr. Telle, previously

testified that "neither BNY Mellon nor its counsel was involved in the negotiation of the terms of

the 2019 Notes."  (Telle Decl. ¶ 3.)  BNY Mellon's counsel on the transaction, Mr. Chapin, also

testified that he did not participate in the drafting or negotiation of the Supplemental Indenture in February 2012. (Bierman Decl. Ex. G, Chapin Dep. 13:17-14:6, 25:13-26:11.) Under these circumstances, Chesapeake cannot introduce any evidence of subjective intent as to the meaning of the redemption provisions from or among Chesapeake, Bracewell, the underwriters, and/or Cravath, because none of this subjective intent evidence was shared with BNY Mellon in connection with the negotiation and drafting of the Supplemental Indenture.

        2.      Any evidence concerning the subjective intent of any underwriter or Cravath witness as to the meaning of the redemption provisions in the Supplemental Indenture that was not communicated to BNY Mellon at the time of the drafting and negotiation of Supplemental Indenture.  Any evidence of what the underwriters or their lawyers at Cravath thought about the meaning of the redemption provisions in the Supplemental Indenture, or anything the underwriters or Cravath communicated between themselves concerning the Supplemental Indenture, is irrelevant because the underwriters are not parties to the Supplemental Indenture, and is inadmissible because it was not shared with BNY Mellon in the negotiation and drafting process.

    **B.**    **Chesapeake Should Be Precluded From Introducing Extrinsic Evidence of Subjective Intent For Any Other Purposes**

        Although the law is clear that "a party's uncommunicated subjective intent cannot supply the ultimate meaning of an ambiguous contract," the Second Circuit has on one occasion recognized a narrow exception, inapplicable in this case, where subjective intent evidence may be relevant for "other purposes" to explain the objective actions of parties involved in bilateral contract negotiations.  *World Trade Ctr.*, 467 F.3d at 125-26.  "At least with respect to a negotiated agreement, a parties' subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions."  *Id.* (finding

the district court did not abuse discretion in admitting subjective intent evidence, where "jury was not misled into treating this testimony, in its context, as something more than evidence bearing on the behavior and the perceptions *of the parties to the negotiation*," and the trial court gave appropriate limiting instruction that "a party's intent that is not communicated to the other party has no bearing; only the intent indicated by words and acts that are made known to the other party may be considered") (emphasis added).

In this case, the narrow exception addressed in *World Trade Ctr.* to the rule precluding uncommunicated subjective intent evidence does not apply, because it is undisputed that the Supplemental Indenture was not negotiated between the parties to the Supplemental Indenture.  BNY Mellon as trustee and counterparty did not participate in any negotiation with respect to the Supplemental Indenture.  As set forth above, the relevant Chesapeake executives on this transaction have admitted that they did not negotiate or even speak to anyone at BNY Mellon about the indenture or the meaning of Section 1.7.  (*See* Bierman Decl. Ex. K, McClendon Dep. 49:20-23, 95:2-18; *id*. Ex. J, Dell'Osso Dep. 71:20-72:12,  95:15-97:12, 172:4-17; *id*. Ex. H, Grigsby Dep. 18:24-19:16, 101:7-17; *id*. Ex. I, Chambers Dep. 27:2-28:3, 29:321.) In fact, Chesapeake never engaged in negotiations with any trustee regarding the terms of an indenture.  (*Id*. Ex. H, Grigsby Dep. 18:24-19:16; *see also* Telle Decl. ¶ 3).)

Accordingly, as the Delaware Supreme Court recently held in a similar situation: "Here, an inquiry into what the parties intended would serve no useful purpose, because it would yield information about the views and positions of only one side of the dispute . . . ."  *Bank of New York Mellon v. Commerzbank Cap. Funding Trust II,* No. 372, 2012, 2013 WL 1136821, at *9 (Del. Mar. 19, 2013).  The court in *Commerzbank* cited its earlier decision in *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 297 (Del. 1996), which likewise did not consider

extrinsic evidence because "such an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter."  In *Kaiser*, the court reviewed the *Commentaries on Model Debenture Indenture Provisions* and other models showing that the security "could have clearly stated the intent for which [the issuer] now argues," and that the issuer could have used such language to avoid disputes over bond contracts and bears the burden for failing to use clear language.  Such a result was also necessary to protect the reasonable expectations of investors:  "Where, as here, the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines her rights, the reasonable expectations of the purchaser of the securities must be given effect."  *Kaiser*, 681 A.2d at 395; *see Mut. Life Ins. Co. v. Oglesby*, 695 A.2d 11146, 1149 (Del. 1997) ("it is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document").

 None of the subjective intent evidence that Chesapeake apparently intends to offer was ever expressed or communicated to BNY Mellon at or before the time the Supplemental Indenture was executed.  Under these circumstances, New York law provides that issuers bear the risk of any ambiguity in the relevant agreements.  *See Sass v. N.Y. Towers Ltd.*, 23 A.D.2d 105 (1st Dep't 1965) (ambiguity "will be construed against the issuing corporation which created or bears the responsibility for such ambiguity") (citing *Rothschild v. Rio Grande W. Ry. Co.,* 84 Hun 103, 65 N.Y. St. Rep. 193 (N.Y. Gen. Term 1895)).  Thus, "the only way in which [issuers] may prevail" under such an indenture is if the indenture is unambiguous:  "Anything less, even some level of ambiguity, will result in a construction of the Trust Indenture favoring plaintiffs [investors]."  *Prescott, Ball & Turben v. LTV Corp.,* 531 F. Supp. 213, 217 (S.D.N.Y. 1981).

The Court should reach the same result here:  the Supplemental Indenture should be interpreted against Chesapeake as issuer with respect to any ambiguity in the redemption provisions.

Indeed, there are powerful policy reasons forbidding issuers and underwriters from re-defining fundamental terms such as "redeem" to mean something other than its industry meaning:

> Whereas participants in the capital markets can adjust their affairs according to a uniform interpretation, whether it be correct or not as an initial proposition, the creation of enduring uncertainties as to the meaning of boilerplate provisions would decrease the value of all debenture issues and greatly impair the efficient working of capital markets. Such uncertainties would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital market or in the administration of justice.

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,* 691 F.2d 1039, 1048 (2d Cir. 1982); s*ee S.I. Mgmt. L.P. v. Wininger*, C.A. Nos. 4227-VCS, 4427-VCS, 2009 WL 2096213, at *5 (Del. Ch. July 14, 2009) ("To introduce the consideration of parol evidence when issues regarding subjects like indemnification come up would create unpredictable results, reduce the incentives for clear drafting, and undermine the ability of investors, officers, and other relevant constituencies to rely on the written text of governing instruments in deciding whether to invest in, work for, or supply debt capital to entities.").

It is also undisputed here that the noteholders themselves were not involved in negotiating the Supplemental Indenture, either individually or through the underwriter in some way, as counsel for Chesapeake suggested early in the case.  In two older cases,[3] there is *dicta* suggesting that holders of debentures or notes may in some circumstances "stand[] in the shoes of the underwriter who originally purchased those Debentures," *Broad,* 642 F.2d at 947 n.20, but that *dicta* has been rebutted by courts more recently, which have recognized that issuers should

---

[3] *See Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947 n.20 (5th Cir. 1981); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983).

bear the burden of any ambiguity because "they are in a much better position to clarify the meaning of . . . contract terms in advance of disputes than are investors generally." *Kaiser*, 681 A.2d at 398 (quoting Dale B. Tauke, *Should Bonds Have More Fun?  A Reexamination of the Debate over Corporate Bondholder Rights*, 1989 COLUM. BUS. L. REV. 1, 88 (1989)).

    In any event, even if that *dicta* were relevant, the noteholders would not stand in the shoes of the underwriters for purposes of the indenture negotiations under the circumstances of this transaction.  The 2019 Notes were sold on a "best efforts" basis by the lead underwriter.[4] Indeed, the underwriters did not even enter into an underwriting agreement until *after* the Notes already had been sold to the original investors in a "drive-by offering" on February 13, 2013—and until after the 2019 Notes were being traded on the market.[5]  Thus, the underwriters never assumed economic risk through purchase of the Notes either before or during the negotiation and drafting of the Supplemental Indenture.

    Finally, to argue in this case that the noteholders should stand in the shoes of the underwriters who sold the 2019 Notes would lead to chaotic results, as there were approximately 25 underwriters that allocated Notes listed in the underwriting agreement, including underwriters who understood the documents as written—*i.e.*, that the last redemption date at par was March 15, 2013, and therefore the notice requirement imposed by the second sentence of 1.7(b) meant

---

[4] (*See* Bierman Decl. Ex. C.)  Best-efforts selling is defined as "a method of underwriting whereby a syndicate takes a new issue without any guarantees of sale to the issuer." http://dictionary.reference.com/browse/best-efforts+selling.  (*See also* Expert Report of James A. Mullin ¶¶ 15-16.)

[5] (*See* Bierman Decl. Ex. D (email transmitting execution copy to underwriters at 6:55 p.m. February 13, 2012); *id*. Ex. E (underwriter stating that notes were sold and publicly traded on February 13, 2012); *see also id*. Ex. O, Maultsby Dep. 114:9-114:20.)

that notice needed to be given by February 13, 2013.  (Bierman Decl. Ex. D.)[6]  The rights of the noteholders and the indenture trustee under the indentures cannot be determined by underwriters.

      For these reasons, Chesapeake should be precluded from introducing any uncommunicated subjective intent either to supply the meaning of the ambiguous redemption terms in the Supplemental Indenture (should the Court find that the terms are, in fact, ambiguous), or for any other purposes, such as to explain the irrelevant behavior or perceptions of Chesapeake or other parties that never negotiated or communicated with BNY Mellon concerning the intent or meaning of the redemption provisions at issue here.

<u>Conclusion</u>

      For all the foregoing reasons, BNY Mellon respectfully requests that the Court grant its motion *in limine* and issue an order precluding Chesapeake from introducing any evidence of subjective intent to interpret the meaning of the Supplemental Indenture that was not communicated or made manifest to BNY Mellon at the time of contracting.

Dated:  New York, New York
      April 22, 2013

                    Respectfully Submitted,

                    SIDLEY AUSTIN LLP

                    By:   /s/ Steven M. Bierman
                        Steven M. Bierman
                        sbierman@sidley.com
                        Benjamin R. Nagin
                        bnagin@sidley.com

---

[6] One of the underwriters, Barclays, made presentation slides for Chesapeake entitled "Refinancing Update February 4, 2013."  (*Id.* Ex. F.)  In the first slide, Barclays stated that "the end of the special redemption period for the 2019 Notes is fast approaching (ends March 15, 2013)."  (*Id.* at CHK00006114.)  It emphasized to Chesapeake in a footnote:  "*CHK will need to issue a call notice by February 13, 2013, in order for the redemption to settle within the special call period.*" (*Id.* (italics in original); *see also id.* Ex. J, Dell'Osso Dep. at 243:15-247:13.)

16

Alex R. Rovira
arovira@sidley.com
787 Seventh Avenue
New York, New York 10019
Telephone:  (212) 839-5300
Facsimile: (212) 839-5999

EMMET, MARVIN & MARTIN, LLP


By:   /s/ Paul T. Weinstein
       Paul T. Weinstein
       pweinstein@emmetmarvin.com
       Tyler J. Kandel
       Mordecai Geisler
       120 Broadway, 32nd Floor
       New York, New York 10271
       Telephone: (212) 238-3000
       Facsimile: (212) 238-3100

DUVAL & STACHENFELD LLP


By:   /s/ Allan N. Taffet
       Allan N. Taffet
       ataffet@dsllp.com
       555 Madison Avenue, 6th Floor
       New York, New York 10022
       Telephone: (212) 883-1700
       Facsimile: (212) 883-8883


*Attorneys for the Defendant The Bank of New York
Mellon Trust Company, N.A.*

17