Exh. C - REDACTED

Exh. D

**From:** Casey McDonald [cmcdonald@cravath.com]
**Sent:** Monday, February 13, 2012 6:55 PM
**To:** scott.vanbergh@baml.com; scott.warrender@baml.com; kurt.ramsauer@baml.com; william.hundley@baml.com; lauren.buchman@baml.com; sumon.chaudhuri@baml.com; lex.maultsby@baml.com; john.pantalena@baml.com; chima.a.joseph@baml.com; jrote@baml.com; thomas.kruse@baml.com; tyler.s.harris@baml.com; reza.watts@baml.com; marina.varshavskaya@baml.com; jeffrey.a.fritsche@baml.com; jami.friedman@bankofamerica.com; michael.v.johnson@morganstanley.com; eric.w.swanson@morganstanley.com; alex.popp@morganstanley.com; taylor.mason@morganstanley.com; w.graham@morganstanley.com; james.r.pearson@morganstanley.com; thomas.graham@morganstanley.com; chris.sevrens@morganstanley.com; jason.terrana@morganstanley.com; michael.telle@bgllp.com; connie.stamets@bgllp.com; troy.harder@bgllp.com; ian.brown@bgllp.com; eric.mccord@bgllp.com; emily.leitch@bgllp.com; harrison.bolling@bgllp.com; erica.hogan@bgllp.com; clay.brett@bgllp.com; Nick Dell'Osso; Jennifer Grigsby; Elliot Chambers; Bryan Lemmerman; Susan Seymore; Marc Rome; Paul Ingram; Mike Johnson; Traci Cook; Erik Fares; Mary Ann Sanders
**Cc:** Stephen Burns; Daniel O'Shea; Brandon DeFrehn; Christopher Moore
**Subject:** CHK - Executed UA

**Attachments:** UA Execution.pdf
All,

Attached please find an execution copy of the Underwriting Agreement.

Best,
Casey


Casey L. McDonald
Cravath, Swaine & Moore LLP
825 Eighth Avenue, 3638D
New York, NY  10019
(212) 474-1504

This e-mail is confidential and may be privileged. Use or disclosure of it by anyone other than a designated addressee is unauthorized. If you are not

CONFIDENTIAL

CHK00005887

## CHESAPEAKE ENERGY CORPORATION

**$1,300,000,000 6.775% Senior Notes due 2019**

**UNDERWRITING AGREEMENT**

February 13, 2012

Merrill Lynch, Pierce, Fenner & Smith
       Incorporated
One Bryant Park
New York, New York 10036

Morgan Stanley & Co. LLC
1585 Broadway, 4th Floor
New York, New York 10036

As Representatives (the "**Representatives**") of the Several Underwriters (as defined below)

Dear Sirs:

     1. *Introductory.* Chesapeake Energy Corporation, an Oklahoma corporation (the "**Company**"), proposes to issue and sell to the several underwriters named in Schedule A hereto (the "**Underwriters**") $1,300,000,000 principal amount of its 6.775% Senior Notes due 2019 (the "**Offered Securities**"). The Offered Securities will be unconditionally guaranteed (the "**Guarantees**") on a senior basis by each existing subsidiary of the Company, other than the subsidiaries named in Schedule D hereto and certain de minimis subsidiaries, and, subject to certain exceptions, by subsequently acquired domestic subsidiaries of the Company in accordance with the terms of the Indenture referred to below (collectively, the "**Subsidiary Guarantors**"). The Offered Securities are to be issued under an indenture dated as of August 2, 2010, among the Company, the Subsidiary Guarantors and The Bank of New York Mellon Trust Company, N.A., as trustee (the "**Trustee**"), as supplemented by the ninth supplemental indenture to be dated February 16, 2012, among the Company, the Subsidiary Guarantors and the Trustee (the "**Indenture**"). The Company hereby agrees with the Underwriters as follows:

     2. *Representations and Warranties of the Company and the Subsidiary Guarantors.* The Company and each Subsidiary Guarantor represents and warrants to, and agrees with, the several Underwriters that:

     (a) A registration statement (No. 333-168509) including all materials incorporated by reference therein and a base prospectus, relating to the Offered Securities, has been filed with the Securities and Exchange Commission (the "**Commission**") and has become effective. Such registration statement as amended to the date of this Agreement, including all materials incorporated by reference therein and any prospectus or prospectus supplement deemed or retroactively deemed to be part thereof that has not been superseded or modified, is hereinafter referred to as the "**Registration Statement**". "**Registration Statement**" without reference to a time means the Registration Statement as of the date and time of its filing and effectiveness which time shall be considered the "effective date" of the Registration Statement. For purposes of the previous sentence, information contained in a form of prospectus or prospectus supplement that is deemed retroactively to be a part of the Registration Statement pursuant to Rule 430B ("**Rule**

[[3330356]]

**430B**") under the Securities Act of 1933 (the "**Act**") shall be considered to be included in the Registration Statement as of the time specified in Rule 430B. "**Statutory Prospectus**" as of any time means the prospectus included in the Registration Statement immediately prior to that time, including any document incorporated by reference therein and any base prospectus or prospectus supplement deemed to be a part thereof that has not been superseded or modified.  For purposes of the preceding sentence, information contained in a form of prospectus (including a prospectus supplement) that is deemed retroactively to be a part of the Registration Statement pursuant to Rule 430B shall be considered to be included in the Statutory Prospectus as of the actual time that form of prospectus (including a prospectus supplement) is filed with the Commission pursuant to Rule 424(b) ("**Rule 424(b)**") under the Act. "**Prospectus**" means the Statutory Prospectus that discloses the public offering price and other final terms of the Offered Securities and otherwise satisfies Section 10(a) of the Act.  "**Issuer Free Writing Prospectus**" means any "issuer free writing prospectus," as defined in Rule 433, relating to the Offered Securities in the form filed or required to be filed with the Commission or, if not required to be filed, in the form retained in the Company's records pursuant to Rule 433(g). "**General Use Issuer Free Writing Prospectus**" means any Issuer Free Writing Prospectus that is intended for general distribution to prospective investors, as evidenced by its form being specified in Schedule B to this Agreement.  "**Limited Use Issuer Free Writing Prospectus**" means any Issuer Free Writing Prospectus that is not a General Use Issuer Free Writing Prospectus. "**Applicable Time**" means 4:35 p.m. (Eastern time) on the date of this Agreement.  Any reference herein to the terms "**amend,**" "**amendment,**" or "**supplement**" with respect to the Registration Statement, the Prospectus or any Issuer Free Writing Prospectus shall be deemed to refer to and include the filing of any document under the Securities Exchange Act of 1934 (the "**Exchange Act**") and the rules and regulations of the Commission (the "**Rules and Regulations**") on or after the initial effective date of the Registration Statement, or the date of such Prospectus or Issuer Free Writing Prospectus, as the case may be, and deemed to be incorporated by reference therein.

(b)  On its effective date, the Registration Statement conformed in all respects to the requirements of the Act and the Rules and Regulations and did not include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, and on the date of this Agreement and on the Closing Date (as defined herein), the Registration Statement and the Prospectus conform or will conform in all respects to the requirements of the Act and the Rules and Regulations, and neither of such documents include or will include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, except that the foregoing does not apply to statements in or omissions from any of such documents based upon written information furnished to the Company by an Underwriter , if any, specifically for use therein, it being understood and agreed that the only such information furnished by an Underwriter consists of the information described as such in Section 8(b) hereof. The documents incorporated by reference in the Prospectus (the "**Company Filed Documents**"), when they became effective or were filed with the Commission, as the case may be, conformed in all material respects with the requirements of the Act or the Exchange Act, as applicable, and the Rules and Regulations and did not include any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statement therein not misleading.

(c)  The Registration Statement is an "automatic shelf registration statement," as defined in Rule 405 under the Act, that initially became effective within three years of the date of this Agreement, and as of the determination date applicable to the Registration Statement (and any amendment thereof) and the offering contemplated hereby, the Company is a "well-known seasoned issuer" (as defined in Rule 405 under the Act).  If immediately prior to the third anniversary (the "**Renewal Deadline**") of the initial effective date of the Registration Statement, any of the Offered Securities remain unsold by the Underwriters, the Company will, prior to the Renewal Deadline, if it has not already done so and is eligible to do so, file a new automatic shelf registration statement relating to the Offered Securities, in a form satisfactory to the Representatives.  If the Company is no longer eligible to file an automatic shelf registration

CONFIDENTIAL

statement, the Company will, prior to the Renewal Deadline, file, if it has not already done so, a new shelf registration statement relating to the Offered Securities, in a form satisfactory to the Representatives, and will use its best efforts to cause such registration statement to be declared effective within 180 days after the Renewal Deadline. The Company will take all other action necessary or appropriate to permit the public offering and sale of the Offered Securities to continue as contemplated in the expired registration statement relating to the Offered Securities. References herein to the Registration Statement shall include such new automatic shelf registration statement or such new shelf registration statement, as the case may be.

(d) The Company has not received from the Commission any notice pursuant to Rule 401(g)(2) objecting to use of the automatic shelf registration statement form. If at any time when Offered Securities remain unsold by the Underwriters the Company receives from the Commission a notice pursuant to Rule 401(g)(2) or otherwise ceases to be eligible to use the automatic shelf registration statement form, the Company will (i) promptly notify the Representatives, (ii) promptly file a new registration statement or post-effective amendment on the proper form relating to the Offered Securities in a form satisfactory to the Representatives, (iii) use its best efforts to cause such registration statement or post-effective amendment to be declared effective as soon as practicable, and (iv) promptly notify the Representatives of such effectiveness. The Company will take all other action necessary or appropriate to permit the public offering and sale of the Offered Securities to continue as contemplated in the registration statement that was the subject of the Rule 401(g)(2) notice or for which the Company has otherwise become ineligible. References herein to the registration statement relating to the Offered Securities shall include such new registration statement or post-effective amendment, as the case may be.

(e) The Company has paid or shall pay the required Commission filing fees relating to the Offered Securities within the time required by Rule 456(b)(1) without regard to the proviso therein and otherwise in accordance with Rules 456(b) and 457(r).

(f) (i) At the time of filing the Registration Statement and (ii) at the date of this Agreement, the Company was not and is not an "ineligible issuer," as defined in Rule 405, including (x) the Company or any subsidiary in the preceding three years not having been convicted of a felony or misdemeanor or having been made the subject of a judicial or administrative decree or order as described in Rule 405 and (y) the Company in the preceding three years not having been the subject of a bankruptcy petition or insolvency or similar proceeding, not having had a registration statement be the subject of a proceeding under Section 8 of the Act and not being the subject of a proceeding under Section 8A of the Act in connection with the offering of the Offered Securities, all as described in Rule 405.

(g) As of the Applicable Time and at all subsequent times through the completion of the public offer and sale of the Offered Securities, neither (i) the General Use Issuer Free Writing Prospectus(es) issued at or prior to the Applicable Time, the Statutory Prospectus and the information set out in Schedule B hereto all considered together (collectively, the "**General Disclosure Package**"), nor (ii) any individual Limited Use Issuer Free Writing Prospectus, when considered together with the General Disclosure Package, nor (iii) any "road show" (as defined in Rule 433 under the Act) not constituting an Issuer Free Writing Prospectus (a "**Non-Prospectus Road Show**"), when taken together with the General Disclosure Package, included any untrue statement of a material fact or omitted to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. The preceding sentence does not apply to statements in or omissions from any prospectus included in the Registration Statement or any Issuer Free Writing Prospectus in reliance upon and in conformity with written information furnished to the Company by an Underwriter specifically for use therein, it being understood and agreed that the only such information furnished by an Underwriter consists of the information described as such in Section 8(b) hereof.

(h) Each Issuer Free Writing Prospectus and Non-Prospectus Road Show, as of its issue date and at all subsequent times through the completion of the public offer and sale of the Offered

CONFIDENTIAL                                                                 CHK00005890

Securities or until any earlier date that the Company notified or notifies the Representatives as described in the next sentence, did not, does not and will not include any information that conflicted, conflicts or will conflict with the information then contained in the Registration Statement. If at any time following issuance of an Issuer Free Writing Prospectus or a Non-Prospectus Road Show there occurred or occurs an event or development as a result of which such Issuer Free Writing Prospectus or Non-Prospectus Road Show conflicted or would conflict with the information then contained in the Registration Statement or included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances prevailing at that subsequent time, not misleading, (i) the Company has promptly notified or will promptly notify the Representatives and (ii) the Company has promptly amended or will promptly amend or supplement such Issuer Free Writing Prospectus or Non-Prospectus Road Show to eliminate or correct such conflict, untrue statement or omission. The foregoing two sentences do not apply to statements in or omissions from any Issuer Free Writing Prospectus or Non-Prospectus Road Show in reliance upon and in conformity with written information furnished to the Company by an Underwriter specifically for use therein, it being understood and agreed that the only such information furnished by an Underwriter consists of the information described as such in Section 8(b) hereof.

(i) The Company has been duly incorporated and is an existing corporation in good standing under the laws of the State of Oklahoma, with power and authority (corporate and other) to own its properties and conduct its business as described in the General Disclosure Package; and the Company is duly qualified to do business as a foreign corporation in good standing in all other jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified would not reasonably be expected to, individually or in the aggregate, have a material adverse effect on the condition (financial or other), business, prospects, properties or results of operations of the Company and its subsidiaries taken as a whole ("**Material Adverse Effect**").

(j) Each subsidiary of the Company has been duly organized and is in good standing under the laws of the jurisdiction of its organization, with power and authority (corporate and other) to own its properties and conduct its business as described in the General Disclosure Package; and each subsidiary of the Company is duly qualified to do business and is in good standing in all other jurisdictions in which its ownership or lease of property or the conduct of its business requires such qualification; except where the failure to be so qualified would not reasonably be expected to individually or in the aggregate have a Material Adverse Effect; all of the issued and outstanding capital stock or similar equity interests of each subsidiary of the Company has been duly authorized and validly issued and is fully paid and nonassessable; and the capital stock or similar equity interests of each subsidiary owned by the Company, directly or through subsidiaries, is owned free from liens, encumbrances and defects.

(k) The Indenture has been duly authorized by the Company and each Subsidiary Guarantor; the Guarantees have been duly authorized by each Subsidiary Guarantor; the Offered Securities have been duly authorized; when the Offered Securities are delivered and paid for in accordance with this Agreement on the Closing Date, the Indenture will have been duly executed and delivered, such Offered Securities will have been duly executed, authenticated, issued and delivered and will conform to the description thereof contained in the General Disclosure Package and the Indenture and, in the case of the Company, such Offered Securities, and in the case of the Subsidiary Guarantors, such Guarantees, will constitute valid and legally binding obligations of the Company and each Subsidiary Guarantor, as applicable, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(l) Except as disclosed in the General Disclosure Package, there are no contracts, agreements or understandings between the Company and any person that would give rise to a valid

CONFIDENTIAL

claim against the Company or an Underwriter for a brokerage commission, finder's fee or other like payment in connection with this offering.

(m) No consent, approval, authorization, filing with or order of any court or governmental agency or body is required for the consummation of the transactions contemplated by this Agreement in connection with the issuance and sale of the Offered Securities by the Company, except such as have been obtained and made under the Act and such as may be required under state securities laws in connection with the resale of the Offered Securities by the Underwriters.

(n) None of the execution, delivery and performance of this Agreement and the Indenture, the issuance and sale of the Offered Securities and compliance with the terms and provisions hereof and thereof, will result in a breach or violation of any of the terms and provisions of, or constitute a default under, any statute, rule, regulation or order of any governmental agency or body or any court, domestic or foreign, having jurisdiction over the Company or any subsidiary of the Company or any of their properties, or any agreement or instrument to which the Company or any such subsidiary is a party or by which the Company or any such subsidiary is bound or to which any of the properties of the Company or any such subsidiary is subject, or the charter or by-laws (or similar organizational documents) of the Company or any such subsidiary and the Company has full power and authority to authorize, issue and sell the Offered Securities as contemplated by this Agreement.

(o) This Agreement has been duly authorized, executed and delivered by the Company and each Subsidiary Guarantor.

(p) Except as disclosed in the General Disclosure Package, each of the Company and its subsidiaries has (i) good and defensible title to its oil and gas properties, (ii) good and marketable title to all other real property owned by it to the extent necessary to carry on its business, (iii) good and marketable title to all personal property owned by it, and (iv) good and defensible title to the easements, leases and subleases material to the business of the Company and its subsidiaries, in each case free and clear of all liens, encumbrances and defects that materially affect the value of the properties of the Company and its subsidiaries, considered as one enterprise, and do not interfere in any material respect with the use made and proposed to be made of such properties, by the Company and its subsidiaries, considered as one enterprise.

(q) The Company and its subsidiaries possess adequate certificates, authorities or permits issued by appropriate governmental agencies or bodies necessary to conduct the business now operated by them and have not received any notice of proceedings relating to the revocation or modification of any such certificate, authority or permit that, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to individually or in the aggregate have a Material Adverse Effect.

(r) No labor dispute with the employees of the Company or any subsidiary exists or, to the knowledge of the Company, is imminent that would reasonably be expected to have a Material Adverse Effect.

(s) The Company and its subsidiaries own, possess or can acquire on reasonable terms, adequate trademarks, trade names and other rights to inventions, know-how, patents, copyrights, confidential information and other intellectual property (collectively, "**intellectual property rights**") necessary to conduct the business now operated by them, or presently employed by them, and have not received any notice of infringement of, or conflict with, asserted rights of others with respect to any intellectual property rights that, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect.

[[3330356]]

(t)  Except as disclosed in the General Disclosure Package, neither the Company nor any of its subsidiaries is in violation of any statute, rule, regulation, decision or order of any governmental agency or body or any court, domestic or foreign, relating to the use, disposal or release of hazardous or toxic substances or relating to the protection or restoration of the environment or human exposure to hazardous or toxic substances  (collectively, "**environmental laws**"), owns or operates any real property contaminated with any substance that is subject to any environmental laws, is liable for any off-site disposal or contamination pursuant to any environmental laws, or is subject to any claim relating to any environmental laws which violation, contamination, liability or claim would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect; and the Company is not aware of any pending investigation which might lead to such a claim.

(u)  Except as disclosed in the General Disclosure Package, there are no pending actions, suits or proceedings against or affecting the Company, any of its subsidiaries or any of their respective properties that, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect, or would materially and adversely affect the ability of the Company or any Subsidiary Guarantor to perform its obligations under this Agreement or the Indenture, or which are otherwise material in the context of the sale of the Offered Securities; and no such actions, suits or proceedings are threatened or, to the Company's knowledge, contemplated.

(v)  The financial statements included or incorporated by reference in the Registration Statement and the General Disclosure Package present fairly the financial position of the Company and its consolidated subsidiaries as of the dates shown and their results of operations and cash flows for the periods shown, and such financial statements have been prepared in conformity with the generally accepted accounting principles in the United States applied on a consistent basis.

(w)  Except as disclosed in the General Disclosure Package, since the date of the latest audited financial statements incorporated by reference in the General Disclosure Package, there has been no material adverse change, nor any development or event involving a prospective material adverse change, in the condition (financial or other), business, properties or results of operations of the Company and its subsidiaries taken as a whole, and, except as disclosed in the General Disclosure Package, there has been no dividend or distribution of any kind declared, paid or made by the Company on any class of its capital stock.

(x)  The Company is not, and at no time during which a prospectus is required by the Act to be delivered (whether physically or through compliance with Rule 172 under the Act or any similar rule) in connection with the sales will it be, an open-end investment company, unit investment trust or face amount certificate company that is, or is required to be, registered under Section 8 of the United States Investment Company Act of 1940 (the "Investment Company Act"); and the Company is not, and, after giving effect to the offering and sale of the Offered Securities and the application of the proceeds thereof as described in the General Disclosure Package, will not be, an "investment company" as defined in the Investment Company Act.

(y)  The Company is subject to the reporting requirements of either Section 13 or 15(d) of the Exchange Act and files reports with the Commission on the Electronic Data Gathering, Analysis, and Retrieval (EDGAR) System.

(z)  The statistical and market related data and forward looking statements included in the General Disclosure Package and any Limited Use Issuer Free Writing Prospectus, are based on or derived from sources that the Company believes to be reliable and accurate in all material respects and represents its good faith estimates that are made on the basis of data derived from such sources.

[[3330356]]

(aa)  Neither the Company nor any of its subsidiaries has any liability for any prohibited transaction or accumulated funding deficiency (within the meaning of Section 412 of the Internal Revenue Code) or any complete or partial withdrawal liability (within the meaning of Sections 4203 and 4205 of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), respectively), with respect to any pension, profit sharing or other plan which is subject to ERISA, to which the Company or any of its subsidiaries makes or ever has made a contribution and in which any employee of the Company or any subsidiary is or has ever been a participant.  With respect to such plans, the Company and each of its subsidiaries is in compliance in all material respects with all applicable provisions of ERISA.

(bb)  The Company has established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any subsidiary, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system; the Company's auditors and the audit committee of the board of directors of the Company have been advised of: (A) any significant deficiencies in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (B) any fraud, whether or not material, that involves management or other employees who have a role in the Company's internal controls; any material weaknesses in internal controls have been identified for the Company's auditors; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.  The Company made available to the Underwriters or their counsel for review true and complete copies of all minutes or draft minutes of meetings, or resolutions adopted by written consent, of the board of directors of the Company and each subsidiary and each committee of each such board in the past three years, and all agendas for each such meeting for which minutes or draft minutes do not exist.

(cc)  Except as disclosed in the General Disclosure Package and the Registration Statement (i) all stock options granted under any stock option plan of the Company (the "**Stock Plans**") have been granted in compliance with the terms of applicable law and the applicable Stock Plans and (ii) the Company has properly accounted for all stock options granted under the Stock Plans in conformity with generally accepted accounting principles in the United States applied on a consistent basis.

(dd)  All information on (or hyperlinked from) the Company's website at www.chk.com either (i) qualifies for the exemption for regularly released factual business information or forward-looking information in Rule 168 of the Act or (ii) qualifies for the safe-harbor related to historical information in Rule 433(e)(2) under the Act, and the Company does not maintain or support any website other than www.chk.com.

(ee)  The Company has not received any written comments from the Commission staff in connection with the Company's reports under the Exchange Act that remain unresolved.

(ff)  The Company has been informed of the existence of the United Kingdom Financial Services Authority stabilizing guidance contained in Section MAR 2, Ann 2G of the Handbook of rules and guidance issued by the Financial Services Authority; and none of the Company or any Subsidiary Guarantor has taken any action or omitted to take any action (such as issuing any press release relating to any Notes without an appropriate legend) which may result in the loss by any of the Underwriters of the ability to rely on any stabilization safe harbor provided under the Financial Services and Markets Act 2000 ("**FSMA**").

[[3330356]]

(gg) Neither the Company nor any of the Subsidiary Guarantors has distributed and, prior to the later to occur of (i) the Closing Date and (ii) the completion of the distribution of the Offered Securities, will not distribute any material in connection with the offering and sale of the Offered Securities other than the General Disclosure Package, the Prospectus or other materials, if any, permitted by the Act and FSMA (or regulations promulgated pursuant to the Act or FSMA) and approved by the parties to this Agreement.

(hh) The interactive data in eXtensible Business Reporting Language included in the Registration Statement, the General Disclosure Package and the Prospectus fairly presents the information called for in all material respects and is prepared in accordance with the Commission's rules and guidelines applicable thereto.

In addition, any certificate signed by any officer of the Company or any of its Subsidiaries and delivered to the Underwriters or counsel for the Underwriters in connection with the offering of the Offered Securities shall be deemed to be a representation and warranty by the Company, as to matters covered thereby, to each Underwriter.

3. *Purchase, Sale and Delivery of Offered Securities.* On the basis of the representations, warranties and agreements herein contained, but subject to the terms and conditions herein set forth, the Company agrees to sell to the Underwriters, and the Underwriters agree, severally and not jointly, to purchase from the Company, at a purchase price of 97.125% of the principal amount thereof plus accrued interest from February 16, 2012 to the Closing Date, the respective principal amounts of Offered Securities set forth opposite the names of the Underwriters in Schedule A hereto.

The Company will deliver against payment of the purchase price the Offered Securities in the form of one or more permanent global securities in definitive form (the "**Global Securities**") deposited with the Trustee as custodian for The Depository Trust Company ("**DTC**") and registered in the name of Cede & Co., as nominee for DTC. Interests in any permanent Global Securities will be held only in book-entry form through DTC, except in the limited circumstances described in the General Disclosure Package. Payment for the Offered Securities shall be made by the Underwriters in Federal (same day) funds by wire transfer to an account at a bank acceptable to the Representatives drawn to the order of Chesapeake Energy Corporation at the office of Cravath, Swaine & Moore LLP at 10:00 A.M. (New York time), on February 16, 2012 or at such other time not later than seven full business days thereafter as the Representatives and the Company determine, such time being herein referred to as the "**Closing Date**," against delivery to the Trustee as custodian for DTC of the Global Securities representing all of the Offered Securities. The Global Securities will be made available for checking at the above office at least 24 hours prior to the Closing Date.

4. *Offering by Underwriters.* It is understood that the Underwriters propose to offer the Offered Securities for sale to the public as set forth in the Prospectus.

5. *Certain Agreements of the Company.* The Company agrees with the Underwriters that:

(a) The Company will file each Statutory Prospectus with the Commission pursuant to and in accordance with Rule 424(b)(2) (or, if applicable and if consented to by the Representatives, subparagraph (5), such consent not to be unreasonably withheld or delayed) not later than the second business day following the execution and delivery of this Agreement. The Company will also prepare a final term sheet, containing solely the terms of the Offered Securities, substantially in the form set out in Schedule C, and file such term sheet pursuant to Rule 433(d) under the Act within the time required by such Rule and file promptly all other material required to be filed by the Company with the Commission pursuant to Rule 433(d) under the Act.

(b) The Company will advise the Underwriters promptly of any proposal to amend or supplement the Registration Statement or any Statutory Prospectus and will not undertake any such amendment or supplement if the Underwriters reasonably object in writing thereto; and the

CONFIDENTIAL

Company will also advise the Underwriters promptly of the filing of any such amendment or supplement and of the institution by the Commission of any stop order proceedings in respect of the Registration Statement or of any part thereof and will use its best efforts to prevent the issuance of any such stop order and to obtain as soon as possible its lifting, if issued.

(c)  If, at any time when a prospectus relating to the Offered Securities is required to be delivered (whether physically or through compliance with Rule 172 under the Act) in connection with sales by the Underwriters or any dealer, any event occurs as a result of which the Prospectus, as then amended or supplemented would include an untrue statement of a material fact or omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, or if it is necessary at any time to amend the Registration Statement or the Prospectus to comply with the Act, the Company promptly will notify the Underwriters of such event and will promptly prepare and file with the Commission, at its own expense, an amendment or supplement which will correct such statement or omission or an amendment which will effect such compliance.  Neither the Underwriters' consent to, nor the Underwriters' delivery of, any such amendment or supplement shall constitute a waiver of any of the conditions set forth in Section 6 hereof.

(d)  As soon as practicable, but not later than 16 months, after the date of this Agreement, the Company will make generally available to its security holders an earnings statement covering a period of at least 12 months beginning after the later of (i) the effective date of the registration statement relating to the Offered Securities, (ii) the effective date of the most recent post-effective amendment to the Registration Statement to become effective prior to the date of this Agreement and (iii) the date of the Company's most recent Annual Report on Form 10-K filed with the Commission prior to the date of this Agreement, which will satisfy the provisions of Section 11(a) of the Act.

(e)  The Company will furnish to the Underwriters copies of the Registration Statement in the form it became effective (including all exhibits) and of all amendments thereto, any related preliminary prospectus, any related preliminary prospectus supplement, and, so long as a prospectus relating to the Offered Securities is (or but for the exemption in Rule 172 would be required to be) delivered under the Act in connection with sales by the Underwriters or any dealer, the Prospectus and all amendments and supplements to such documents, in each case in such quantities as the Underwriters request.  The Prospectus shall be so furnished on or prior to 3:00 p.m., New York time, on the business day following the execution and delivery of this Agreement.  All other documents shall be so furnished as soon as available.  The Company will pay the expenses of printing and distributing to the Underwriters all such documents.

(f)  The Company will arrange for the qualification of the Offered Securities for sale under the laws of such jurisdictions as the Underwriters designate and will continue such qualifications in effect so long as required for the distribution.

(g)  The Company will pay all expenses incidental to the performance of its obligations under this Agreement, for any filing fees and other expenses (including fees and disbursements of counsel) incurred in connection with qualification of the Offered Securities for sale under the laws of such jurisdictions as the Underwriters designate and the printing of memoranda relating thereto, and for expenses incurred in distributing preliminary prospectuses, preliminary prospectus supplements and the Prospectus (including any amendments and supplements thereto) to the Underwriters and for expenses incurred for preparing, printing and distributing any Issuer Free Writing Prospectuses to investors or prospective investors; provided, however, that the Underwriters (acting collectively) will reimburse the Company for up to $150,000 of expenses incurred by the Company in the performance of its obligations under this Agreement.

(h)  For a period of 60 days after the date of this Agreement, the Company will not offer, sell, contract to sell, pledge or otherwise dispose of, directly or indirectly, any U.S. dollar-denominated debt securities registered under the Act or eligible for trading pursuant to Rule 144A,

CONFIDENTIAL

issued or guaranteed by the Company or its subsidiaries and having a maturity of more than one year from the date of issue, without the prior written consent of the Representatives; provided that the Company may offer and sell one or more series of senior notes, the proceeds of which are used to repurchase or redeem outstanding senior notes of the Company.

(i) Before using, authorizing, approving or referring to any written communication that constitutes an offer to sell or a solicitation to buy the Offered Securities (other than the General Disclosure Package), the Company will furnish to the Underwriters and counsel for the Underwriters a copy of such written communication for review and will not use, authorize, approve or refer to any such written communication to which the Representatives reasonably object.

(j) The Company will apply the net proceeds of the offering and the sale of the Offered Securities in a manner consistent with the description contained in the General Disclosure Package under the caption "Use of Proceeds".

6. *Free Writing Prospectuses.* The Company represents and agrees that (other than the final term sheet prepared and filed pursuant to Section 5(a) hereto), unless it obtains the prior consent of the Representatives, and each Underwriter represents and agrees that (other than one or more term sheets relating to the Offered Securities containing customary information and conveyed to purchasers of Offered Securities), unless it obtains the prior consent of the Company and the Representatives, it has not made and will not make any offer relating to the Offered Securities that would constitute an Issuer Free Writing Prospectus, or that would otherwise constitute a "free writing prospectus," as defined in Rule 405, required to be filed with the Commission. Any such free writing prospectus consented to by the Company and the Representatives is hereinafter referred to as a "**Permitted Free Writing Prospectus.**" The Company represents that it has treated and agrees that it will treat each Permitted Free Writing Prospectus as an "issuer free writing prospectus," as defined in Rule 433, and has complied and will comply with the requirements of Rule 433 applicable to any Permitted Free Writing Prospectus, including timely Commission filing where required, legending and record keeping.

7. *Conditions of the Obligations of the Underwriters.* The obligations of the several Underwriters to purchase and pay for the Offered Securities will be subject to the accuracy of the representations and warranties on the part of the Company and each Subsidiary Guarantor herein, to the accuracy of the statements of officers of the Company and each Subsidiary Guarantor made pursuant to the provisions hereof, to the performance by the Company and each Subsidiary Guarantor of its obligations hereunder and to the following additional conditions precedent:

(a) The Underwriters shall have received a letter (the "**Initial Comfort Letter**"), dated on or prior to the date of this Agreement, of PricewaterhouseCoopers LLP, independent public accountants for the Company, in form and substance satisfactory to the Representatives and PricewaterhouseCoopers LLP, which comfort letter shall address, without limitation, the various financial disclosures, if any, set forth in the Registration Statement and the General Disclosure Package.

(b) The Prospectus shall have been filed with the Commission in accordance with the Act and Section 5(a) of this Agreement. No stop order suspending the effectiveness of the Registration Statement or of any part thereof shall have been issued and no proceedings for that purpose shall have been instituted or, to the knowledge of the Company or any Underwriter, shall be contemplated by the Commission.

(c) Subsequent to the execution and delivery of this Agreement, there shall not have occurred (i) any change, or any development or event involving a prospective change, in the condition (financial or other), business, properties or results of operations of the Company and its subsidiaries taken as one enterprise which, in the judgment of the Representatives, is material and adverse and makes it impractical or inadvisable to proceed with completion of the public offering or the sale of and payment for the Offered Securities; (ii) any downgrading in the rating of any

[[3330356]]

CHK00005897

debt securities of the Company by any "nationally recognized statistical rating organization" (as defined for purposes of Rule 436(g) under the Act), or any public announcement that any such organization has under surveillance or review its rating of any debt securities of the Company (other than an announcement with positive implications of a possible upgrading, and no implication of a possible downgrading, of such rating) or any announcement that the Company has been placed on negative outlook; (iii) any change in U.S. or international financial, political or economic conditions or currency exchange rates or exchange controls as would, in the judgment of the Representatives, be likely to prejudice materially the success of the proposed issue, sale or distribution of the Offered Securities, whether in the primary market or in respect of dealings in the secondary market; (iv) any material suspension or material limitation of trading in securities generally on the New York Stock Exchange, or any setting of minimum prices for trading on such exchange, or any suspension of trading of any securities of the Company on any exchange or in the over-the-counter market; (v) any banking moratorium declared by U.S. Federal or New York authorities; (vi) any major disruption of settlements of securities or clearance services in the United States; or (vii) any attack on, outbreak or escalation of hostilities or acts of terrorism involving the United States, any declaration of war by Congress or any other national or international calamity or emergency if, in the judgment of the Representatives, the effect of any such attack, outbreak, escalation, act, declaration, calamity or emergency makes it impractical or inadvisable to proceed with completion of the public offering or the sale of and payment for the Offered Securities.

(d) The Underwriters shall have received an opinion, dated such Closing Date, of Bracewell & Giuliani LLP, counsel for the Company, that:

(i) The Company has been duly incorporated and is an existing corporation in good standing under the laws of the State of Oklahoma, with corporate power and authority to own its properties and conduct its business as described in the General Disclosure Package.

(ii) Each subsidiary of the Company has been duly organized and is in good standing under the laws of the jurisdiction of its organization, with power and authority (corporate and other) to own its property and conduct its business as described in the General Disclosure Package; except where the failure to be so qualified would not reasonably be expected to individually or in the aggregate have a Material Adverse Effect; and, to the best of such counsel's knowledge after reasonable investigation, the capital stock or similar equity interests of each subsidiary owned by the Company, directly or through subsidiaries, is owned free from liens, encumbrances and defects.

(iii) The Indenture has been duly authorized, executed and delivered by the Company and each Subsidiary Guarantor; the Guarantees have been duly authorized by each Subsidiary Guarantor; the Offered Securities have been duly authorized; when the Offered Securities are delivered and paid for pursuant to this Agreement on the Closing Date, such Offered Securities will have been duly executed, authenticated, issued and delivered and will conform to the description thereof contained in the General Disclosure Package and the Indenture; and such Offered Securities will constitute valid and legally binding obligations of the Company and each Subsidiary Guarantor, enforceable in accordance with their terms, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles;

(iv) The Company is not and, after giving effect to the offering and sale of the Offered Securities and the application of the proceeds thereof as described in the General Disclosure Package, will not be an "investment company" as defined in the Investment Company Act.

[[3330356]]

CHK00005898

(v) No consent, approval, authorization or order of, or filing with, any governmental agency or body or any court is required for the consummation of the transactions contemplated by this Agreement in connection with the issuance or sale of the Offered Securities by the Company, except such as may be required under applicable securities laws in connection with the purchase and resale of the Offered Securities by the Underwriters.

(vi) None of the execution, delivery and performance of this Agreement and the Indenture, the issuance and sale of the Offered Securities and compliance with the terms and provisions hereof will result in a breach or violation of any of the terms and provisions of, or constitute a default under, (1) any statute, rule, regulation or order of any governmental agency or body or any court having jurisdiction over the Company or any subsidiary of the Company or any of their properties which is, in the experience of such counsel, customarily applicable to securities offerings or (2) any agreement or instrument filed or referenced as an exhibit to the Company's Annual Report on Form 10-K for the year ended December 31, 2010, or to any report on Form 8-K or Form 10-Q filed since December 31, 2010, to which the Company or any such subsidiary is party or by which the Company or any such subsidiary is bound or to which any of the properties of the Company or any such subsidiary is subject, or (3) the charter or by-laws (or similar organizational documents) of the Company or any such subsidiary and the Company has full power and authority to authorize, issue and sell the Offered Securities contemplated by this Agreement, except in the case of clause (2) for such breaches or violations that would not have a Material Adverse Effect.

(vii) The statements under the captions "Description of Notes" and "Certain Material United States Federal Income Tax Considerations" in the Prospectus, insofar as such statements purport to describe or summarize the legal matters and documents therein, fairly present in all material respects such legal matters and documents.

(viii) Except as disclosed in the General Disclosure Package, there are no pending actions, suits or proceedings against or affecting the Company, any of its subsidiaries or any of their respective properties that, if determined adversely to the Company or any of its subsidiaries, would individually or in the aggregate have a Material Adverse Effect, or would materially and adversely affect the ability of the Company or any Subsidiary Guarantor to perform its obligations under this Agreement or the Indenture, or which are otherwise material in the context of the sale of the Offered Securities; and no such actions, suits or proceedings are threatened or, to such counsel's knowledge, contemplated.

(ix) This Agreement has been duly authorized, executed and delivered by the Company and each Subsidiary Guarantor.

(x) The Registration Statement has become effective under the Act, the Prospectus was filed with the Commission pursuant to the subparagraph of Rule 424(b) specified in such opinion on the date specified therein in the manner and within the time period required by Rule 424 and in compliance with Rule 430B, and, to the best of the knowledge of such counsel, no stop order suspending the effectiveness of the Registration Statement or any part thereof has been issued and no proceedings for that purpose have been instituted or are pending or contemplated under the Act, and the Registration Statement, as of its effective date and as of the date of this Agreement, the Statutory Prospectus as of the Applicable Time, and the Prospectus, as of its date and the Closing, and any amendment or supplement thereto, as of its date, complied as to form in all material respects with the requirements of the Act and the Rules and Regulations; the descriptions in the Registration Statement and the Prospectus of statutes, legal and governmental proceedings and contracts and other documents are accurate and fairly present the information required to be shown; and such counsel do not know of any legal

[[3330356]]

CHK00005899

or governmental proceedings required to be described in the Prospectus which are not described as required or of any contracts or documents of a character required to be described in the Registration Statement or Prospectus or to be filed as exhibits to the Registration Statement which are not described and filed as required.

It is understood and agreed that certain of the opinions set forth in paragraphs (i), (ii), (iii), (vi) (with respect to conflicts with charters, by-laws or similar organizational documents and with respect to certain of the documents filed as exhibits to the filings described in such paragraph) and (ix) (with respect to due authorization) may be given by the Commercial Law Group, P.C., and certain opinions in paragraphs (viii) and (ix) may be given by Henry Hood, Esq.

In addition, Bracewell & Giuliani LLP shall state that they have participated in conferences with officers and other representatives of the Company, representatives of the independent public accountants of the Company, general counsel of the Company, representatives of the Underwriters and counsel for the Underwriters, at which conferences the Registration Statement and the Prospectus were discussed. Such counsel shall further state that, although they have made certain additional inquiries and investigations in connection with the preparation of the Registration Statement and the Prospectus, they have not verified, are not passing on and do not assume any responsibility for the accuracy, completeness or fairness of the statements contained in the Registration Statement or the Prospectus or any documents incorporated by reference therein, based on the participation described above in the course of acting as counsel to the Company in this transaction, no information has come to their attention that has caused such counsel to believe that (i) any part of the Registration Statement, at the time such part became effective (other than the financial statements and schedules and other financial and accounting data (including the notes thereto and auditor's report thereon) and the oil and gas reserve data and related future net revenue data and exhibits, in each case contained or incorporated by reference therein, as to which such counsel need not express any comment or belief) contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, (ii) the General Disclosure Package (other than the financial statements and schedules and other financial and accounting data (including the notes thereto and auditor's report thereon) and the oil and gas reserve data and related future net revenue data and exhibits, in each case contained or incorporated by reference therein, as to which such counsel need not express any comment or belief), as of the Applicable Time and as of the date of this Agreement, contained any untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, (iii) the Prospectus (other than the financial statements and schedules and other financial and accounting data (including the notes thereto and auditor's report thereon) and the oil and gas reserve data and related future net revenue data and exhibits, in each case contained or incorporated by reference therein, as to which such counsel need not express any comment or belief), as of its date and as of the Closing Date, contained an untrue statement of a material fact or omitted to state a material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading, or (iv) any of the documents incorporated by reference in the Registration Statement (other than the financial statements and schedules and other financial and accounting data (including the notes thereto and auditor's report thereon) and the oil and gas reserve data and related future net revenue data and exhibits, in each case contained or incorporated by reference therein, as to which such counsel need not express any comment or belief), at the time such Registration Statement became effective or was filed with the Commission (or the time of filing of an amendment, if so amended or deemed amended), as the case may be, did not comply as to form in all material respects with the requirements of the Act or Exchange Act, as the case may be, and the Rules and Regulations.

(e) The Underwriters shall have received from Cravath, Swaine & Moore LLP, counsel for the Underwriters, such opinion or opinions, dated the Closing Date, with respect to the incorporation of the Company, the validity of the Offered Securities delivered on the Closing Date, the Registration Statement, the Prospectus and other related matters as the Underwriters may require, and the Company shall have furnished to such counsel such documents as they request for the purpose of enabling them to pass upon such matters. In rendering such opinion, Cravath, Swaine & Moore LLP may rely as to the incorporation of the Company and all other matters governed by Oklahoma law upon the opinion of Commercial Law Group, P.C. referred to above.

[[3330356]]

CHK00005900

(f) The Underwriters shall have received a certificate, dated the Closing Date, of the President or any Vice President and a principal financial or accounting officer of the Company in which such officers, on behalf of the Company, shall state that the representations and warranties of the Company in this Agreement are true and correct, that the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date, that no stop order suspending the effectiveness of the Registration Statement or of any part thereof has been issued and no proceedings for that purpose have been instituted or are contemplated by the Commission and that, subsequent to the date of the most recent financial statements included or incorporated by reference into the Registration Statement and the General Disclosure Package, there has been no material adverse change, nor any development or event involving a prospective material adverse change, in the condition (financial or other), business, properties or results of operations of the Company and its subsidiaries taken as a whole except as set forth in or contemplated by the Registration Statement and the General Disclosure Package or as described in such certificate.

(g) The Underwriters shall have received a letter (the "**Bring-Down Comfort Letter**"), dated the Closing Date, of PricewaterhouseCoopers LLP (i) confirming that they are independent public accountants with respect to the Company and its subsidiaries within the meaning of the Act and the applicable Rules and Regulations thereunder, (ii) stating, as of the date of the Bring-Down Comfort Letter (or, with respect to matters involving changes or developments since the respective dates as of which specified financial information is given in the Registration Statement and the General Disclosure Package, as of a date not more than three business days prior to the date of the Bring-Down Comfort Letter), that the conclusions and findings of such accountants with respect to the financial information and other matters covered by the Initial Comfort Letter are accurate, (iii) confirming in all material respects the conclusions and findings set forth in the Initial Comfort Letter and (iv) otherwise in form and substance satisfactory in all respects to the Representatives and PricewaterhouseCoopers LLP.

(h) The Underwriters shall have received (i) a copy of the certificate or articles of incorporation, including all amendments thereto, of the Company, certified as of a recent date by the Secretary of State of the State of Oklahoma, (ii) a certificate of good standing for the Company, dated as of a recent date, from such Secretary of State and (iii) a certificate, dated as of a recent date, of the Secretary of State of each state in which the Company is qualified to do business as a foreign corporation under the laws of such state.

(i) The Underwriters shall have received (i) a copy of the certificate or articles of incorporation (or similar organizational document), including all amendments thereto, of the Subsidiary Guarantors and the Company's subsidiaries named in Schedule D hereto, certified as of a recent date by the Secretary of State of the state in which such subsidiary is organized, (ii) a certificate of good standing for each such subsidiary of the Company, certified as of a recent date by the Secretary of State of the state in which such subsidiary is organized, and (iii) a certificate, dated as of a recent date, of the Secretary of State of each state in which each such subsidiary is qualified to do business as a foreign corporation (or similar entity) under the laws of each such state.

The Company will furnish the Underwriters with such conformed copies of such opinions, certificates, letters and documents as the Underwriters reasonably request. The Representatives may in their sole discretion waive compliance with any conditions to the obligations of any Underwriter hereunder.

8. *Indemnification and Contribution.* (a) Each of the Company and the Subsidiary Guarantors, jointly and severally, will indemnify and hold harmless each Underwriter, its partners, members, directors and officers and each person, if any, who controls such Underwriter within the meaning of Section 15 of the Act, against any losses, claims, damages or liabilities, joint or several, to which such Underwriter may become subject, under the Act or the Exchange Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any Statutory Prospectus,

CONFIDENTIAL

the Prospectus, any Issuer Free Writing Prospectus or any amendment or supplement thereto, any related preliminary prospectus or preliminary prospectus supplement, any "issuer information" filed or required to be filed pursuant to Rule 433(d) under the Act, or any Non-Prospectus Road Show, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, and will reimburse each Underwriter for any legal or other expenses reasonably incurred by such Underwriter in connection with investigating or defending any such loss, claim, damage, liability or action as such expenses are incurred; <u>provided</u>, <u>however</u>, that the Company will not be liable in any such case to the extent that any such loss, claim, damage or liability arises out of or is based upon an untrue statement or alleged untrue statement in or omission or alleged omission from any of such documents in reliance upon and in conformity with written information furnished to the Company by an Underwriter specifically for use therein, it being understood and agreed that the only such information furnished by the Underwriters consists of the information described as such in subsection (b) below.

(b) Each Underwriter will severally and not jointly indemnify and hold harmless the Company, its directors and officers and each person, if any, who controls the Company within the meaning of Section 15 of the Act, against any losses, claims, damages or liabilities to which the Company may become subject, under the Act or the Exchange Act or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the Registration Statement, any Statutory Prospectus, the Prospectus, any Issuer Free Writing Prospectus or any Non-Prospectus Road Show or any amendment or supplement thereto, or any related preliminary prospectus or preliminary prospectus supplement, or arise out of or are based upon the omission or the alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, in each case to the extent, but only to the extent, that such untrue statement or alleged untrue statement or omission or alleged omission was made in reliance upon and in conformity with written information furnished to the Company by such Underwriter specifically for use therein, and will reimburse any legal or other expenses reasonably incurred by the Company in connection with investigating or defending any such loss, claim, damage, liability or action as such expenses are incurred, it being understood and agreed that the only such information furnished by the Underwriters consists of the following information in the Prospectus: paragraphs 5, 6 and 7 under the caption "Underwriting". The Company and the Underwriters acknowledge that no information has been furnished to the Company by an Underwriter for use in any Non-Prospectus Road Show.

(c) Promptly after receipt by an indemnified party under this Section of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under subsection (a) or (b) above, notify the indemnifying party in writing of the commencement thereof; but the failure to notify the indemnifying party will not relieve it from any liability which it may have under subsection (a) or (b) above except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; <u>provided</u> that the failure to notify the indemnifying party shall not relieve it from any liability that it may have to any indemnified party otherwise than under subsection (a) or (b) above. In case any such action is brought against any indemnified party and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled to participate therein and, to the extent that it may wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and after notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party will not be liable to such indemnified party under this Section for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; <u>provided</u>, <u>however</u>, if such indemnified party shall have been advised by counsel that there are one or more defenses available to it that are in conflict with those available to the indemnifying party (in which case the indemnifying party shall not have the right to direct the defense of such action on behalf of the indemnified party), the reasonable fees and expenses of such indemnified party's counsel shall be borne by the indemnifying party. In no event shall the indemnifying party be liable for the fees and expenses of more than one counsel (together with appropriate local counsel) at any time for any indemnified party in connection with any one action or separate but substantially similar or related actions arising in the same jurisdiction out of the same general

[[3330356]]

CHK00005902

allegations or circumstances. No indemnifying party shall, without the prior written consent of the indemnified party, effect any settlement of any pending or threatened action in respect of which any indemnified party is or could have been a party and indemnity could have been sought hereunder by such indemnified party unless such settlement includes an unconditional release of such indemnified party from all liability on any claims that are the subject matter of such action and does not include a statement as to or an admission of fault, culpability or failure to act by or on behalf of any indemnified party.

(d) If the indemnification provided for in this Section is unavailable or insufficient to hold harmless an indemnified party under subsection (a) or (b) above, then each indemnifying party shall contribute to the amount paid or payable by such indemnified party as a result of the losses, claims, damages or liabilities referred to in subsection (a) or (b) above (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one hand, and the Underwriters, on the other from the offering of the Offered Securities or (ii) if the allocation provided by clause (i) above is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) above but also the relative fault of the Company, on the one hand, and the Underwriters, on the other, in connection with the statements or omissions which resulted in such losses, claims, damages or liabilities as well as any other relevant equitable considerations. The relative benefits received by the Company, on the one hand, and the Underwriters, on the other shall be deemed to be in the same proportion as the total net proceeds from the offering (before deducting expenses) received by the Company bear to the total underwriting discounts and commissions received by the Underwriters from the Company under this Agreement. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such untrue statement or omission. The amount paid by an indemnified party as a result of the losses, claims, damages or liabilities referred to in the first sentence of this subsection (d) shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any action or claim which is the subject of this subsection (d). Notwithstanding the provisions of this subsection (d), no Underwriter shall be required to contribute any amount in excess of the amount by which the total price at which the Offered Securities underwritten by it and distributed to the public were offered to the public exceeds the amount of any damages which such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations in this subsection (d) to contribute are several in proportion to their respective underwriting obligations and not joint.

(e) The obligations of the Company under this Section shall be in addition to any liability which the Company may otherwise have and shall extend, upon the same terms and conditions, to each person, if any, who controls an Underwriter within the meaning of the Act or the Exchange Act; and the obligations of the Underwriters under this Section shall be in addition to any liability which the Underwriters may otherwise have and shall extend, upon the same terms and conditions, to each director of the Company, to each officer of the Company who has signed the Registration Statement and to each person, if any, who controls the Company within the meaning of the Act or the Exchange Act.

9. *Default of Underwriters*. If one of the Underwriters defaults in its obligations to purchase Offered Securities hereunder and the aggregate principal amount of Offered Securities that such defaulting Underwriter agreed but failed to purchase does not exceed 10% of the total principal amount of Offered Securities, the non-defaulting Underwriters may make arrangements satisfactory to the Company for the purchase of such Offered Securities by other persons, including the non-defaulting Underwriters, but if no such arrangements are made by the Closing Date, the non-defaulting Underwriters shall be obligated to purchase the Offered Securities that such defaulting Underwriter agreed but failed to purchase. If one of the Underwriters so defaults and the aggregate principal amount of Offered Securities with respect to which such default or defaults occur exceeds 10% of the total principal amount of Offered Securities and arrangements satisfactory to the non-defaulting Underwriters and the Company for the purchase of such Offered Securities by other persons are not made within 36 hours after such default, this Agreement will

[[3330356]]

CHK00005903

terminate without liability on the part of the non-defaulting Underwriters or the Company, except as provided in Section 11. As used in this Agreement, the term "Underwriter" includes any person substituted for an Underwriter under this Section. Nothing herein will relieve a defaulting Underwriter from liability for its default.

10. *Qualified Independent Underwriter*.   The Company hereby confirms that at its request Morgan Stanley & Co. LLC has, without compensation, acted as "qualified independent underwriter" (in such capacity, the "**QIU**") within the meaning of Rule 5121 of the Conduct Rules of the Financial Industry Regulatory Authority, Inc. in connection with the offering of the Offered Securities.  The Company and each Subsidiary Guarantor jointly and severally will indemnify and hold harmless the QIU, its directors, officers, employees and agents and each person, if any, who controls the QIU within the meaning of Section 15 of the Act or Section 20 of the Exchange Act against any and all losses, claims, damages or liabilities, joint or several, to which the QIU may become subject, under the Act, the Exchange Act, other federal or state statutory law or regulation or otherwise, insofar as such losses, claims, damages or liabilities (or actions in respect thereof) arise out of or are based upon the QIU's acting (or alleged failing to act) as such "qualified independent underwriter" and will reimburse the QIU for any legal or other expenses reasonably incurred by the QIU in connection with investigating or defending any such loss, claim, damage, liability or action as such expenses are incurred.

11. *Survival of Certain Representations and Obligations*.   The respective indemnities, agreements, representations, warranties and other statements of the Company or its officers and of the several Underwriters set forth in or made pursuant to this Agreement will remain in full force and effect, regardless of any investigation, or statement as to the results thereof, made by or on behalf of an Underwriter, the Company or any of their respective representatives, officers or directors or any controlling person, and will survive delivery of and payment for the Offered Securities. If this Agreement is terminated pursuant to Section 9 or for any reason the purchase of the Offered Securities by the Underwriters is not consummated, the Company shall remain responsible for the expenses to be paid or reimbursed by it pursuant to Section 5 and the respective obligations of the Company and the Underwriters pursuant to Section 8 shall remain in effect, and if any Offered Securities have been purchased hereunder the representations and warranties in Section 2 and all obligations under Section 5 shall also remain in effect. If the purchase of the Offered Securities by the Underwriters is not consummated for any reason other than solely because of the termination of this Agreement pursuant to Section 9 or the occurrence of any event specified in clause (iii), (iv) (other than any suspension of trading of any securities of the Company on any exchange or in the over-the-counter market), (v), (vi) or (vii) of Section 7(c), the Company will reimburse the Underwriters for all out-of-pocket expenses (including fees and disbursements of counsel) reasonably incurred by them in connection with the offering of the Offered Securities.

12. *Research Independence*.   In addition, the Company acknowledges that the Underwriters' research analysts and research departments are required to be independent from their respective investment banking divisions and are subject to certain regulations and internal policies, and that the Underwriters' research analysts may hold and make statements or investment recommendations and/or publish research reports with respect to the Company and/or the offering that differ from the views of their investment bankers. The Company hereby waives and releases, to the fullest extent permitted by law, any claims that the Company may have against the Underwriters with respect to any conflict of interest that may arise from the fact that the views expressed by the Underwriters' independent research analysts and research departments may be different from or inconsistent with the views or advice communicated to the Company by the Underwriters' investment banking divisions.  The Company acknowledges that the Underwriters are full service securities firms and as such from time to time, subject to applicable securities laws, may effect transactions for their own accounts or the accounts of their customers and hold long or short positions in debt or equity securities of the companies that may be the subject of the transactions contemplated by this Agreement.

13. *No Fiduciary Duty*.  The Company acknowledges and agrees that in connection with this offering, the sale of the Offered Securities or any other services the Underwriters may be deemed to be providing hereunder, notwithstanding any preexisting relationship, advisory or otherwise, between the

[[3330356]]

parties or any oral representations or assurances previously or subsequently made by the Underwriters: (i) no fiduciary or agency relationship between the Company and any other person, on the one hand, and the Underwriters, on the other, exists; (ii) the Underwriters are not acting as advisors, experts or otherwise, to the Company, including, without limitation, with respect to the determination of the public offering price of the Offered Securities, and such relationship between the Company, on the one hand, and the Underwriters, on the other, is entirely and solely commercial, based on arm's-length negotiations; (iii) any duties and obligations that the Underwriters may have to the Company shall be limited to those duties and obligations specifically stated herein; and (iv) the Underwriters and their respective affiliates may have interests that differ from those of the Company.   The Company hereby waives any claims that the Company may have against the Underwriters with respect to any breach of fiduciary duty in connection with the offering.

14. *Notices*. All communications hereunder will be in writing and, if sent to the Underwriters, will be mailed, delivered or telegraphed and confirmed to the Underwriters, at Merrill Lynch, Pierce, Fenner & Smith Incorporated, One Bryant Park, New York, New York 10036, Attention: Legal Department (fax: (212) 901-7897) and at Morgan Stanley & Co. LLC, 1585 Broadway, 4th Floor, New York, New York 10036, Attention: High Yield Syndicate Desk (with a copy to the Legal Department) with a copy to Cravath, Swaine & Moore LLP, 825 Eighth Avenue, New York, New York 10019 (fax: (212) 474-3700), Attention: Stephen Burns, Esq. or, if sent to the Company, will be mailed, delivered or telegraphed and confirmed to it at Chesapeake Energy Corporation, 6100 North Western Avenue, Oklahoma City, Oklahoma 73118, Attention: Corporate Secretary.

15. *Successors*.   This Agreement will inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and controlling persons referred to in Section 8, and no other person will have any right or obligation hereunder.

16. *Counterparts*.   This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all such counterparts shall together constitute one and the same Agreement.

17. *Applicable Law*.   This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to principles of conflicts of laws.   The Company hereby submits to the non-exclusive jurisdiction of the Federal and state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby.

Each of the Underwriters and the Company (on its behalf and, to the extent permitted by applicable law, on behalf of its stockholders and affiliates) waives all right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) in any way arising out of or relating to this Agreement.

[[3330356]]

CONFIDENTIAL

If the foregoing is in accordance with the Underwriters' understanding of our agreement, kindly sign and return to us one of the counterparts hereof, whereupon it will become a binding agreement between the Company and each Subsidiary Guarantor and the Underwriters in accordance with its terms.

Very truly yours,

CHESAPEAKE ENERGY CORPORATION

By: _____

Name: Jennifer M. Grigsby

Title: Senior Vice President, Treasurer and Corporate Secretary

CONFIDENTIAL

SUBSIDIARY GUARANTORS:

CHESAPEAKE ENERGY LOUISIANA CORPORATION,
CHESAPEAKE ENERGY MARKETING, INC.,
CHESAPEAKE E&P HOLDING CORPORATION,
CHESAPEAKE OPERATING, INC.,
CHK HOLDINGS CORPORATION,
CHESAPEAKE NG VENTURES CORPORATION,
WINTER MOON ENERGY CORPORATION,
CHESAPEAKE AEZ EXPLORATION, L.L.C.,
CHESAPEAKE APPALACHIA, L.L.C.,
CHESAPEAKE-CLEMENTS ACQUISITION, L.L.C.,
CHESAPEAKE EXPLORATION, L.L.C.,
CHESAPEAKE LAND DEVELOPMENT COMPANY, L.L.C.,
CHESAPEAKE PLAZA, L.L.C.,
CHESAPEAKE ROYALTY, L.L.C.,
CHESAPEAKE VRT, L.L.C.,
EMLP, L.L.C.,
EMPRESS, L.L.C.,
GOTHIC PRODUCTION, L.L.C.,
MC LOUISIANA MINERALS, L.L.C.,
MC MINERAL COMPANY, L.L.C.,
MIDCON COMPRESSION, L.L.C.,
MKR HOLDINGS, L.L.C.,
NORTHERN MICHIGAN EXPLORATION COMPANY,
L.L.C.,
VENTURA, LLC,
CHESAPEAKE LOUISIANA, L.P.,
    By:  Chesapeake Operating, Inc., its General Partner
EMPRESS LOUISIANA PROPERTIES, L.P.,
    By:  EMLP, L.L.C., its General Partner

By: _____

    Name:  Jennifer M. Grigsby
    Title:   Senior Vice President, Treasurer and
           Corporate Secretary

CONFIDENTIAL

The foregoing Underwriting Agreement is hereby confirmed and accepted
as of the date first above written.

MERRILL LYNCH, PIERCE, FENNER & SMITH
              INCORPORATED
MORGAN STANLEY & CO. LLC

Acting on behalf of themselves
and as the Representatives of
the several Underwriters.


MERRILL LYNCH, PIERCE, FENNER & SMITH
             INCORPORATED,

By:

  Name: Scott Worcester
  Title: Managing Director


MORGAN STANLEY & CO. LLC,

By:

  Name:
  Title:

[[3330356]]

CONFIDENTIAL

CHK00005908

The foregoing Underwriting Agreement is hereby confirmed and accepted as of the date first above written.

MERRILL LYNCH, PIERCE, FENNER & SMITH
                    INCORPORATED
MORGAN STANLEY & CO. LLC

Acting on behalf of themselves
and as the Representatives of
the several Underwriters.

MERRILL LYNCH, PIERCE, FENNER & SMITH
                    INCORPORATED,

By:
     _____
     Name:
     Title:

MORGAN STANLEY & CO. LLC,

By:  _Michael Monk_____
     Name:  Michael Monk
     Title:  Authorized Signatory

[[3330356]]

                                              CHK00005909

**SCHEDULE A**

| Underwriter | Principal Amount of Offered Securities |
|---|---|
| Merrill Lynch, Pierce, Fenner & Smith Incorporated | $292,499,987 |
| Morgan Stanley & Co. LLC | $130,000,000 |
| Goldman, Sachs & Co. | $130,000,000 |
| Deutsche Bank Securities Inc. | $130,000,000 |
| RBS Securities Inc. | $130,000,000 |
| Barclays Capital Inc. | $33,999,966 |
| Citigroup Global Markets Inc. | $33,999,966 |
| Comerica Securities, Inc. | $33,999,966 |
| Credit Agricole Securities (USA) Inc. | $33,999,966 |
| Credit Suisse Securities (USA) LLC | $33,999,966 |
| DNB Markets, Inc. | $33,999,966 |
| Mitsubishi UFJ Securities (USA), Inc. | $33,999,966 |
| Mizuho Securities USA Inc. | $33,999,966 |
| Natixis Securities Americas LLC | $33,999,966 |
| Scotia Capital (USA) Inc. | $33,999,966 |
| UBS Securities LLC | $33,999,966 |
| Wells Fargo Securities, LLC | $33,999,966 |
| Lloyds Securities, Inc. | $11,357,203 |
| Macquarie Capital (USA) Inc. | $11,357,203 |
| Nomura Securities International, Inc. | $11,357,203 |
| PNC Capital Markets LLC | $11,357,203 |
| SMBC Nikko Capital Markets Limited | $11,357,203 |
| SunTrust Robinson Humphrey, Inc. | $11,357,203 |
| TD Securities (USA) LLC | $11,357,203 |
| Total | $1,300,000,000 |

[[3330356]]

CONFIDENTIAL

CHK00005910

## SCHEDULE B

1.   The Pricing Term Sheet attached as Schedule C hereto.

[[3330356]]

CONFIDENTIAL                                                                CHK00005911

**SCHEDULE C**

Filed Pursuant to Rule 433
Registration No. 333-168509

Pricing Term Sheet
February 13, 2012

**Chesapeake Energy Corporation**

**$1,300,000,000 aggregate principal amount of 6.775% Senior Notes due 2019**

*The following information supplements the Preliminary Prospectus Supplement, dated February 13, 2012, filed pursuant to Rule 424, Registration Statement No. 333-168509.*

| | |
|---|---|
| **Issuer:** | Chesapeake Energy Corporation |
| **Aggregate principal amount offered:** | $1,300,000,000 principal amount 6.775% Senior Notes due 2019 |
| **Ranking:** | Senior unsecured |
| **Coupon:** | 6.775% |
| **Maturity:** | March 15, 2019 |
| **Price to public:** | 98.750% of principal amount |
| **Gross Proceeds to Issuer:** | $1,283,750,000 |
| **Yield to Maturity:** | 7.000% |
| **Spread to Benchmark Treasury:** | +562 basis points |
| **Benchmark Treasury:** | UST 1.25% due January 31, 2019 |
| **Gross Spread:** | 1.625% |
| **Use of proceeds:** | The issuer intends to use the net proceeds from this offering for general corporate purposes. Pending such use, it plans to use the net proceeds of this offering to repay amounts outstanding under its corporate revolving bank credit facility. |
| **Interest payment dates:** | March 15 and September 15 of each year, commencing September 15, 2012 |
| **Record dates:** | March 1 and September 1 |
| **Special early redemption:** | At any time from and including November 15, 2012 to and including March 15, 2013 (the "Early Redemption Period"), the notes will be redeemable at the issuer's option in whole, or from time to time in part, at a price equal to 100% of the principal amount of the notes to be redeemed, plus accrued and unpaid interest on the notes to be redeemed to the date of redemption; provided that after any redemption of the notes in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal amount of the notes must remain outstanding. The issuer may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period. |

[[3330356]]

CHK00005912

| | |
|---|---|
| **Make-whole redemption:** | At any time after March 15, 2013 to the maturity date at Treasury Rate plus 50 basis points. |
| **Certain pro forma debt information:** | On a pro forma as adjusted basis, as of September 30, 2011, after giving effect to the transactions described in the preliminary prospectus supplement under the heading "Capitalization," including the completion of the offering and the application of the net proceeds therefrom, the amount set forth on pages S-7, S-23 and S-32 of the preliminary prospectus supplement of long-term indebtedness outstanding consisting of senior notes issued by Chesapeake Energy Corporation and the amount set forth on pages S-7, S-23, S-27 and S-32 consisting of secured borrowings outstanding under Chesapeake's corporate revolving bank credit facility would have been $10.005 billion and $78 million, respectively, after giving effect to the actual aggregate principal amount of the notes offered hereby. |
| **Conflicts of Interest:** | Because affiliates of Merrill Lynch, Pierce, Fenner & Smith Incorporated, RBS Securities Inc. and certain of the other underwriters will receive 5% or more of the net proceeds of this offering, this offering is being made in compliance with Rule 5121 of the rules of the Financial Industry Regulatory Authority, Inc. ("FINRA"). Accordingly, Morgan Stanley & Co. LLC is assuming the responsibilities of acting as the qualified independent underwriter in pricing the offering and conducting due diligence. No underwriter having a conflict of interest under FINRA Rule 5121 will confirm sales to any account over which the underwriter exercises discretionary authority without the specific written approval of the accountholder. |
| **Joint Book-Running Managers:** | Merrill Lynch, Pierce, Fenner & Smith Incorporated<br>Deutsche Bank Securities Inc.<br>Goldman, Sachs & Co.<br>Morgan Stanley & Co. LLC<br>RBS Securities Inc. |
| **Senior Co-Managers:** | Barclays Capital Inc.<br>Citigroup Global Markets Inc.<br>Comerica Securities, Inc.<br>Credit Agricole Securities (USA) Inc.<br>Credit Suisse Securities (USA) LLC<br>DNB Markets, Inc.<br>Mitsubishi UFJ Securities (USA), Inc.<br>Mizuho Securities USA Inc.<br>Natixis Securities Americas LLC<br>Scotia Capital (USA) Inc.<br>UBS Securities LLC<br>Wells Fargo Securities, LLC |

[[3330356]]

CHK00005913

| Co-Managers: | Lloyds Securities, Inc.<br>Macquarie Capital (USA) Inc.<br>Nomura Securities International, Inc.<br>PNC Capital Markets LLC<br>SMBC Nikko Capital Markets Limited<br>SunTrust Robinson Humphrey, Inc.<br>TD Securities (USA) LLC |
|---|---|
| Trade date: | February 13, 2012 |
| Settlement date: | February 16, 2012 (T+3) |
| CUSIP: | 165167 CH8 |
| ISIN: | US165167CH82 |

**The Issuer has filed a registration statement (including a prospectus) with the SEC for the offering to which this communication relates. Before you invest, you should read the prospectus in that registration statement and other documents the Issuer has filed with the SEC for more complete information about the Issuer and this offering. You may get these documents for free by visiting EDGAR on the SEC Web site at www.sec.gov. Alternatively, the Issuer, underwriters or any dealer participating in the offering will arrange to send you the prospectus if you request it by calling toll free (866) 718-1649.**

[[3330356]]

**CONFIDENTIAL**

**SCHEDULE D**

<u>Chesapeake Midstream Companies</u>

AMGS, L.L.C.
Arkansas Midstream Gas Services Corp.
Chesapeake Midstream Development, L.P.
Chesapeake Midstream Holdings, L.L.C.
Chesapeake Midstream Management L.L.C.
Chesapeake Midstream Operating L.L.C.
Chesapeake West Texas Processing, L.L.C.
Louisiana Midstream Gas Services, L.L.C.
Mid-America Midstream Gas Services, L.L.C.
Mid-Atlantic Gas Services, L.L.C.
Mockingbird Midstream Gas Services, L.L.C.
Utica Gas Services, L.L.C.

<u>Chesapeake Oilfield Services Companies</u>

Chesapeake Oilfield Services, L.L.C.
Chesapeake Oilfield Operating, L.L.C.
Chesapeake Oilfield Finance, Inc.
Compass Manufacturing, L.L.C.
Great Plains Oilfield Rental, L.L.C.
Hodges Trucking Company, L.L.C.
Keystone Rock & Excavation, L.L.C.
Mid-States Oilfield Machine LLC
Nomac Drilling, L.L.C.
Nomac Services, L.L.C.
Oilfield Trucking Solutions, L.L.C.
Performance Technologies, L.L.C.
PTL Prop Solutions, L.L.C.
Thunder Oilfield Services, L.L.C.

<u>Other</u>

CHK Utica, L.L.C.

[[3330356]]

Exh. E

**From:** Maultsby, Lex - GCM [lex.maultsby@baml.com]
**Sent:** Monday, February 13, 2012 10:21 PM
**To:** Nick Dell'Osso; Jennifer Grigsby; Jeff Mobley; Elliot Chambers
**Cc:** Van Bergh, Scott - GCIB NY; Warrender, Scott - GCIB HOU; Rote, John M - GCM; Pantalena, John - GCM; Ramsauer, Kurt - GCIB HOU
**Subject:** FW: NEW CHK 6.775 '19: 99-99¼ FREE TO TRADE -- Allocations attached -- and Thank You from BofA Merrill

**Attachments:** CHK 6.775% Callable Note Allocations from BofA Merrill 2.13.2012.pdf

Nick, Jennifer, Jeff & Elliot -
Attached please find the allocations for the new CHK 6.775% callable notes.  We allocated bonds to a remarkably broad group of 166 investors.  The notes were free to trade at 5:40pm eastern, but we still managed to trade the new notes actively for a half hour.  The notes remain marked at a bid/ask of 99.00 - 99.25 on our desk, up a touch from pricing.

We are proud of this unique par callable bond - it's one for the record books, as we have yet to find a similar structure that has cleared in the high yield market.

I know we still have some final documents to clear and put to bed in advance of a closing in a few days, but let's find a time soon to congratulate ourselves on our good work.

Thank you for the opportunity.

Lex


--- Original Sender: LAWRENCE WOLFSON, MERRILL LYNCH ---

NEW CHK 6.775 '19:   99-99¼

---

This message w/attachments (message) is intended solely for the use of the intended recipient(s) and may contain information that is privileged, confidential or proprietary. If you are not an intended recipient, please notify the sender, and then please delete and destroy all copies and attachments, and be advised that any review or dissemination of, or the taking of any action in reliance on, the information contained in or attached to this message is prohibited.
Unless specifically indicated, this message is not an offer to sell or a solicitation of any investment products or other financial product or service, an official confirmation of any transaction, or an official statement of Sender. Subject to applicable law, Sender may intercept, monitor, review and retain e-communications (EC) traveling through its networks/systems and may produce any such EC to regulators, law enforcement, in litigation and as required by law.
The laws of the country of each sender/recipient may impact the handling of EC, and EC may be archived, supervised and produced in countries other than the country in which you are located. This message cannot be guaranteed to be secure or free of errors or viruses.

References to "Sender" are references to any subsidiary of Bank of America Corporation. Securities and Insurance Products: * Are Not FDIC Insured * Are Not Bank Guaranteed * May Lose Value * Are Not a Bank Deposit * Are Not a Condition to Any Banking Service or Activity * Are Not Insured by Any Federal Government Agency. Attachments that are part of this EC may have additional important disclosures and

disclaimers, which you should read. This message is subject to terms available at the following link: http://www.bankofamerica.com/emaildisclaimer. By messaging with Sender you consent to the foregoing.

CONFIDENTIAL

CHK00003875

Exh. F

**From:** bradley.hutchinson@barclays.com
**Sent:** Tuesday, February 05, 2013 9:03 AM
**To:** Nick Dell'Osso; Elliot Chambers
**Cc:** paul.cugno@barclays.com; david.a.brown@barclays.com; syed.imteaz@barclays.com

**Attachments:** 2013.02.04_CHK Refinancing Analysis_vF.pdf
Attached are pages for the call at 9:15

Brad Hutchinson
Managing Director
Barclays
1301 McKinney St., Suite 400
Houston, TX 77010
(713) 236 2426
(646) 758 1393 - fax

_____

This message may contain information that is confidential or privileged. If you are not an intended recipient of this message, please delete it and any attachments, and notify the sender that you have received it in error. Unless specifically stated in the message or otherwise indicated, you may not duplicate, redistribute or forward this message or any portion thereof, including any attachments, by any means to any other person, including any retail investor or customer. This message is not a recommendation, advice, offer or solicitation, to buy/sell any product or service, and is not an official confirmation of any transaction. Any opinions presented are solely those of the author and do not necessarily represent those of Barclays. This message is subject to terms available at: www.barclays.com/emaildisclaimer and, if received from Barclays' Sales or Trading desk, the terms available at: www.barclays.com/salesandtradingdisclaimer/. By messaging with Barclays you consent to the foregoing. Barclays Bank PLC is a company registered in England (number 1026167) with its registered office at 1 Churchill Place, London, E14 5HP. This email may relate to or be sent from other members of the Barclays group.

_____

CONFIDENTIAL





# Refinancing Update

February 4, 2013

Confidential Presentation

CONFIDENTIAL

# Summary Trading Update

## Overview

- The broader new issue market has strengthened over the past few weeks, with **all major indices sitting at or near their all time lows**
- Chesapeake benchmark 6.125% 2021s have surged recently, and are now bid at 107.25, which represents a 5.02% YTW; accordingly, Barclays believes Chesapeake has access to the high yield markets at **5.25% for a new 10 Non-Call Life new issue**, and can **add on to its 2021 Senior Notes at 106.25, which represents a 5.16% YTW**
- Chesapeake can use the proceeds from a new notes offering to redeem its 6.775% 2019 Senior Notes at par and / or tender for (or redeem) its 2013 notes at the MW price, as that series is currently trading at or near the MW price today
  - Given the end of the special redemption period for the 2019 Notes is **fast approaching (ends March 15, 2013)**[1], we believe a refinancing of that issue is particularly compelling against the robust market backdrop
- **Barclays has also received reverse inquiry from Franklin around a mandatory convertible** – the account has suggested that if taken out of its 25 – 30% hold in the 6.775% 2019 Notes, it would act as an anchor order in any new mandatory convertible issuance
  - CHK has access to the mandatory convert market at levels of **5.00% – 5.50% up 17.5% up 22.5%** in an overall deleveraging transaction
- A refi today (funded with high yield, mandatory convertible, or a combination of the two) would allow Chesapeake to replace one of its higher coupon and one of its nearest-dated issues with comparatively low cost paper at a historic time in the new issue markets, locking in attractive rates and achieving compelling economics, while **taking market risk off the table**

## Historical Notes and Benchmark Indices Trading Summary[2]



| Notes / Index | 6/5/2012 | Current | Delta (bps) |
|---|---|---|---|
| CHK 6.125% 2/15/2021 | 7.08% | 5.02% | (206) |
| HY Index | 8.15% | 5.69% | (216) |
| HY Energy Index | 7.93% | 5.55% | (238) |
| E&P Index | 7.96% | 5.42% | (254) |
| BB Index | 6.44% | 4.40% | (204) |

Legend: HY Index — HY Energy Index — HY E&P Index — BB Index — Chesapeake 6.125% Senior Notes due 2021

1. *CHK will need to issue a call notice by February 13, 2013, in order for the redemption to settle within the special call period.*
2. *Source: Barclays, Advantage Data.*



1

CHK00006114

# Refinancing Analysis

**A refinancing of CHK's 7.625% 2013s and 6.775% 2019s has become very attractive as the broader market and the Company's benchmark Notes have tightened**

## Economics

| | 2013 MW | 2019 Call | Total |
|---|---|---|---|
| **Security Details** | | | |
| Coupon | 7.625% | 6.775% | |
| Maturity | 7/15/2013 | 3/15/2019 | |
| Amount Outstanding ($mm) | $464.1 | $1,300.0 | $1,764.1 |
| **Repurchase Details** | | | |
| Repurchase Price (at Settlement) | 102.82 | 100.00 | |
| **Transaction Details** | | | |
| Settlement Date | 2/19/2013 | 3/6/2013 | |
| Participation Rate | 100% | 100% | 100% |
| Participation ($mm) | $464.1 | $1,300.0 | $1,764.1 |
| **Funding Details** | | | |
| Source of Funding | New Issue | New Issue | |
| New Funding Used ($mm) | $477.2 | $1,300.0 | $1,777.2 |
| Funding Term | 10 yrs | 10 yrs | 10 yrs |
| New Coupon (Today) | 5.25% | 5.25% | 5.25% |
| **Transaction Economics** | | | |
| After-Tax NPV (%) | -0.7% | 6.7% | 4.7% |
| **After-Tax NPV ($mm)** | **-$3.2** | **$86.5** | **$83.3** |
| **Pre-Tax Accounting Impact** | | | |
| Income Adjustment (%) | -3.1% | -2.5% | -2.7% |
| **Income Adjustment ($mm)** | **-$14.5** | **-$32.8** | **-$47.3** |
| Annual Interest Savings (%) | 2.5% | 1.7% | 1.9% |
| **Annual Interest Savings ($mm)** | **$11.6** | **$22.1** | **$33.7** |

## Assumptions

- Any and all tender offer for CHK's 7.625% Senior Notes due 2013 and full redemption of CHK's 6.775% Notes

- Tender offer and redemption funded with new 10 NC L Senior Unsecured Notes at 5.25%[1]

- Analysis assumes a repurchase of the 2013 Notes at the make whole ("MW") price (~102.8) and a full redemption of the 2019 Notes at par

  ‣ The 2019 Notes offer a unique opportunity to capitalize on the par call price associated with the special redemption period of the bonds (November 15, 2012 – March 15, 2013)

- MW tender and call assumed to be launched concurrently on 2/4, with the tender settling on 2/19 pursuant to an tender offer early settlement feature, with call settlement 30 days after launch on 3/6

- 100% participation assumed for the tender offer for illustrative purposes – we would expect that the majority of holders would tender their bonds at the MW price; 100% participation assumed for the 2019 call

## Analysis

- Taken together, the 2013 MW tender and 2019 call transactions are NPV positive with significant annual interest savings, driven by the attractive coupon on the CHK new issue

- CHK takes a $47mm upfront hit to repurchase the Notes at a premium to their book value

  ‣ Street analysts typically look past these one time charges; focusing instead on the ongoing benefit to the company

- If rates rise by 12 bps between 2/19 and the July maturity date for the 2013 Notes, CHK would be better off undertaking the 2013 tender transaction in February

*Note: NPV to maturity versus CHK zero coupon new issue curve. Annual interest savings versus new 10 NC L new issue at 5.25%. Analysis excludes fees and expenses.*
*1.    Analysis assumes transaction is funded with the more conservative 10-year new issue rate versus an add-on to the Senior Notes due 2021.*





CHK00006115

# Indicative Terms for Senior Notes

| Summary Terms | | |
|---|---|---|
| | **New Issue** | **Add-On to the 6.125% Senior Notes due 2021** |
| **Issuer:** | Chesapeake Energy Corp. (the "Issuer") | Chesapeake Energy Corp. (the "Issuer") |
| **Issue:** | Senior Unsecured Notes (the "Notes") | Add-On to the 6.125% Senior Notes (the "Notes due 2021") |
| **Maturity:** | 10 years | February 15, 2021 |
| **Principal Amount:** [1] | $1,300 million | $500 million add-on |
| **Indicative All-In Yield:** | 5.250% | 6.125% Coupon (add-on to price at 106.25 or 5.16% YTW) [2] |
| **Assumed Ratings:** | Ba3 / BB- | Ba3 / BB- |
| **Use of Proceeds:** | To refinance existing indebtedness, for general corporate purposes, and to pay related fees and expenses | To refinance existing indebtedness, for general corporate purposes, and to pay related fees and expenses |
| **Ranking:** | *Pari passu* with all existing and future senior indebtedness and senior to all subordinated indebtedness | Same as existing Notes due 2021 |
| **Security:** | None | None |
| **Guarantors:** | Similar to the existing 6.125% Senior Notes due 2021 | Same as existing Notes due 2021 |
| **Change of Control:** | 101% Change of Control put | Same as existing Notes due 2021 |
| **Covenants:** | Similar to the existing 6.125% Senior Notes due 2021 | Same as existing Notes due 2021 |

1. We have shown $1,300mm and $500mm sizing respectively for the 10-yr new issue and 2021 add-on, assuming CHK would fund the 2019 redemption with a 10-yr new issue and the 2013 tender / call with a 2021 add-on for illustrative purposes. CHK can size the new issue / add-on according to its preferences.
2. The 6.125% Senior Notes due 2021 are currently bid at 107.25 or 5.02% YTW.



3

Chesapeake ENERGY

CHK00006116

# Mandatory Convertible Rationale

**Chesapeake can fund the redemption of its 6.775% notes with a high equity content mandatory convertible and bolster its balance sheet**

| Chesapeake Rationale | Investor Rationale |
|---|---|
| ■ Delever the balance sheet by replacing a debt security with an equity content security | ■ Replace existing investment with comparable yield |
|   ▸ Receive high equity credit from the agencies |   ▸ Potential equity upside |
|   ▸ Less dilution / equity exposure than common stock | ■ Receive a preferred / material allocation in the new offering |
| ■ Fixed charge similar to a new high yield security | ■ Pro forma capitalization is a better credit than as currently structured |
| ■ Take advantage of the strong convertible market | |
| ■ Anchor order can de-risk transaction execution | |



4



CHK00006117

# Mandatory Convertible Indicative Pricing

| Mandatory Convertible | |
|---|---|
| | 3-Year |
| Gross Proceeds ($mm): | $1,300.0 |
| Coupon: | **5.00% - 5.50%** |
| Mandatory Issue Price: | $20.00 |
| Conversion Feature: | |
| Illustrative Par Amount: | $20.00 |
| Conversion Premium: | **17.5% - 22.5%** |
| Conversion Price: | $24.50 |
| Shares per Security: | Depends on the Stock Price: Stock < $20.00 then 1.000 shares; $20.00 < or = Stock < or = $24.50 then the holder receives $20.00 worth of stock; Stock > $24.50 then .816 shares; |
| Conversion Shares: | 65,000,000 (maximum) 53,061,224 (minimum) |
| Call Feature: | NC-Life |

**Commentary**

- A mandatory convertible allows Chesapeake to sell its stock at a premium to the current price while locking-in today's price
  - ‣ If stock price is above $24.50 in 3 years, shares will be sold at $24.50
  - ‣ If stock price is below $20.00, shares will be sold at $20.00
  - ‣ For any stock price below $24.50 and above $20.00, stock price will be sold at that price
- Mandatory securities are deeply subordinated and receive high equity credit from the agencies
  - ‣ 100% equity credit from both Moody's and S&P, although S&P may give credit only for the last 2 years based on its stated policy
  - ‣ Can be structured as "tangible equity units" to immediately receive ~85% equity credit from both agencies

*Note: Assumes $20.00 stock price.*

 

5

CHK00006118

# Disclaimer

This document has been prepared by Barclays Capital Inc. ("Barclays") for information purposes only. This document is an indicative summary of the terms and conditions of the securities, financial instrument or transaction described herein and may be amended, superseded or replaced by subsequent summaries. The final terms and conditions of the securities/transaction will be set out in full in the applicable offering document(s) or binding transaction document(s).

This document shall not constitute an underwriting commitment, an offer of financing, an offer to sell, or the solicitation of an offer to buy any securities or other financial instruments described herein, which shall be subject to Barclays' internal approvals. No transaction or services related thereto is contemplated without Barclays' subsequent formal agreement. Barclays is not acting as a fiduciary. Accordingly you must independently determine, with your own advisors, the appropriateness for you of the securities, financial instrument or transaction before investing or transacting. Barclays accepts no liability whatsoever for any consequential losses arising from the use of this document or reliance on the information contained herein.

Barclays does not guarantee the accuracy or completeness of information which is contained in this document and which is stated to have been obtained from or is based upon trade and statistical services or other third party sources. Any data on past performance, modeling or back-testing contained herein is no indication as to future performance. No representation is made as to the reasonableness of the assumptions made within or the accuracy or completeness of any modeling or back testing or any other information contained herein. All opinions and estimates are given as of the date hereof and are subject to change and Barclays assumes no obligation to update this document to reflect any such changes. The value of any investment may fluctuate as a result of market changes. The information herein is not intended to predict actual results and no assurances are given with respect thereto. Nothing herein shall be deemed to constitute investment, legal, tax, financial, accounting or other advice.

Barclays, its affiliates and the individuals associated therewith may (in various capacities) have positions or deal in transactions, securities or other financial instruments (or related derivatives) identical or similar to those described herein.

IRS Circular 230 Disclosure: Barclays and its affiliates do not provide tax advice. Please note that (i) any discussion of U.S. tax matters contained in this communication (including any attachments) cannot be used by you for the purpose of avoiding tax penalties; (ii) this communication was written to support the promotion or marketing of the matters addressed herein; and (iii) you should seek advice based on your particular circumstances from an independent tax advisor. Notwithstanding anything herein to the contrary, each recipient hereof (and their employees, representatives, and other agents) may disclose to any and all persons, without limitation of any kind from the commencement of discussions, the U.S. federal and state income tax treatment and tax structure of the proposed transaction described herein and all materials of any kind (including opinions or other tax analyses) that are provided relating to such tax treatment and tax structure. For this purpose, "tax structure" is limited to facts relevant to the U.S. federal and state income tax treatment of the proposed transaction described herein and does not include information relating to the identity of the parties, their affiliates, agents or advisors.

BARCLAYS CAPITAL INC., THE UNITED STATES INVESTMENT BANKING AFFILIATE OF BARCLAYS BANK PLC, ACCEPTS RESPONSIBILITY FOR THE DISTRIBUTION OF THIS DOCUMENT IN THE UNITED STATES. ANY TRANSACTIONS BY U.S. PERSONS IN ANY SECURITY DISCUSSED HEREIN MUST ONLY BE CARRIED OUT THROUGH BARCLAYS CAPITAL INC., 745 SEVENTH AVENUE, NEW YORK, NY 10019.

NO ACTION HAS BEEN MADE OR WILL BE TAKEN THAT WOULD PERMIT A PUBLIC OFFERING OF THE SECURITIES DESCRIBED HEREIN, OR AN OFFERING OF ANY FINANCIAL INSTRUMENT, IN ANY JURISDICTION IN WHICH ACTION FOR THAT PURPOSE IS REQUIRED. NO OFFERS, SALES, RESALES OR DELIVERY OF THE SECURITIES OR OTHER FINANCIAL INSTRUMENTS DESCRIBED HEREIN OR DISTRIBUTION OF ANY OFFERING MATERIAL RELATING TO SUCH SECURITIES OR OTHER FINANCIAL INSTRUMENTS MAY BE MADE IN OR FROM ANY JURISDICTION EXCEPT IN CIRCUMSTANCES WHICH WILL RESULT IN COMPLIANCE WITH ANY APPLICABLE LAWS AND REGULATIONS AND WHICH WILL NOT IMPOSE ANY OBLIGATION ON BARCLAYS OR ANY OF ITS AFFILIATES.

THIS DOCUMENT DOES NOT DISCLOSE ALL THE RISKS AND OTHER SIGNIFICANT ISSUES RELATED TO AN INVESTMENT IN THE SECURITIES, FINANCIAL INSTRUMENTS OR TRANSACTION DESCRIBED HEREIN. PRIOR TO TRANSACTING, POTENTIAL INVESTORS SHOULD ENSURE THAT THEY FULLY UNDERSTAND THE TERMS OF THE SECURITIES, FINANCIAL INSTRUMENT OR TRANSACTION AND ANY APPLICABLE RISKS.

Barclays Bank PLC is registered in England No. 1026167. Registered Office: 1 Churchill Place, London E14 5HP. Copyright Barclays Bank PLC, 2013 (all rights reserved). This document is confidential, and no part of it may be reproduced, distributed or transmitted without the prior written permission of Barclays.



6



CHK00006119

Exh. G

1

2  UNITED STATES DISRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  ----------------------------------------

5  CHESAPEAKE ENERGY CORPORATION,

6                    Plaintiff,

7

        vs.        Civil Action Number

8                   1:13-cv-01582-PAE

9  THE BANK OF NEW YORK MELLON TRUST

   COMPANY, N.A.

10

                  Defendant.

11 ----------------------------------------

12

13      VIDEOTAPED DEPOSITION OF

14          BAYARD CHAPIN

15      THURSDAY, APRIL 18, 2013

16           9:37 a.m.

17

18

19

20

21

22

23

24 Job 60420

25 Reported by:  Adrienne M. Mignano, RPR

1                       Chapin

2       Q     Do you know what proportion of

3   your firm's business they constitute?

4       A     Not exactly, no.

5       Q     So how did you come to be

6   involved as trustee counsel in connection

7   with the 2019 notes?

8       A     I was engaged in September 2012

9   to represent the bank.

10      Q     How did that come about?

11      A     I was notified by the company of

12  an upcoming bond offering.

13      Q     By Chesapeake?

14      A     Yes.

15      Q     By whom?

16      A     Susan Seymore.

17      Q     And did you have any involvement

18  at all in the drafting of the instruments

19  governing the issuance of the 2019 notes?

20      A     I did not.

21      Q     Did you have any input at all

22  into the substance of those, the 2019

23  supplemental indenture?

24          MR. GREANEY:  Objection.  Vague.

25      A     I don't recall any involvement

1                    Chapin

2     in drafting, no.

3          Q     Did you provide any input at all

4     into its substance?

5               MR. GREANEY:  Objection.  Vague.

6          A     Not that I remember.

7          Q     You said that your first

8     involvement in -- with this particular

9     transaction was September 2012?

10         A     Yes.

11         Q     Are you sure about that?

12         A     I'm sorry, February 2012.

13         Q     Okay.

14               (Whereupon, E-mail Chain with

15          Attachments, Initial Bates Stamp

16          BG00006670, was marked as Chapin

17          Exhibit 1 for identification, as of

18          this date.)

19               MR. BARKOW:  So we're just going

20          to ask him about the front page of

21          this.  We may not have enough copies

22          to give you right now, so he is going

23          to work on that.

24     BY MR. BARKOW:

25          Q     I'm showing you what has been

1                         Chapin

2    supplemental indenture that governs the

3    2019 notes, right?

4         A     Yes.

5         Q     Now, when you received this on

6    February 14 of 2012, had you provided any

7    input at all into its content before that?

8         A     Not that I remember, no.

9         Q     Had you had any conversations

10   with anyone about its content before you

11   received it on February 14th?

12        A     No.

13        Q     Could you turn to the page that

14   is Bates stamped BG00002328, which is also

15   page 3 in the ninth supplemental

16   indenture?

17        A     Uh-huh.

18        Q     Do you see that?

19        A     I do.

20        Q     And directing your attention to

21   what's marked Section 1.7 entitled

22   "Redemption", Subsection (B), can you read

23   that to yourself?

24              (Witness reviewing document)

25        A     Okay.

1                    Chapin

2     Q     Did you read this provision at

3  the time that you received it on February

4  14 of 2012?

5     A     I don't recall reading this

6  provision.

7     Q     Did you have any input at all

8  into the substance of this provision as of

9  that date, February 14, 2012?

10          MR. GREANEY:  Objection.  Vague.

11    A     Not that I recall.

12    Q     When was the first time -- I'm

13  sorry.

14          Did you ever review the ninth

15  supplemental indenture?

16    A     Not that I remember, no.

17          (Whereupon, E-mail with Trustee

18     Certificate, Initial Bates Stamp

19     CHK00018595, was marked as Chapin

20     Exhibit 4 for identification, as of

21     this date.)

22  BY MR. BARKOW:

23    Q     So we've put before you what's

24  marked for identification as Chapin

25  Exhibit 4.

1                     Chapin

2    officer's certificate, a supplemental

3    indenture.  That would be the principal

4    documents I would have looked at.

5        Q     In this instance, do you

6    remember reviewing any of those?

7             MR. GREANEY:  Objection.  Asked

8        and answered.

9        A     I don't remember specifically

10   reviewing those, no.

11       Q     Or providing any input into

12   their substance?

13            MR. GREANEY:  Objection.  Vague.

14       A     Other than the officer's

15   certificate, no.

16       Q     Did you engage in any

17   negotiations over the text of the

18   supplemental indenture?

19            MR. GREANEY:  Objection.  Vague.

20       A     I do not recall any negotiation

21   on the supplemental.

22       Q     Did you engage in any

23   discussions with anyone about the text of

24   the ninth supplemental indenture?

25       A     I do not recall any discussion.

Exh. H

Page 1

1

2          UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF NEW YORK

4    - - - - - - - - - - - - - - - - -x

5    CHESAPEAKE ENERGY CORPORATION,          Civil Action No.

                    Plaintiff,            1:13-cv-01582-PAE

6

            -against-

7

     THE BANK OF NEW YORK MELLON

8    TRUST COMPANY, N.A.,

9                    Defendant.

     - - - - - - - - - - - - - - - - -x

10

11

12    VIDEOTAPED DEPOSITION OF JENNIFER M. GRIGSBY

13

14              New York, New York

15            Friday, April 12, 2013

16

17

18

19

20

21

22   Reported by:

23   JEFFREY BENZ, CRR, RMR

24   JOB NO. 60146

25

Grigsby

2  responsible for analyzing -- for the -- the

3  analysis of credit party -- or counterparty

4  credit risk, both -- all way risks with any

5  counterparties we might do business with or that

6  might do business with us throughout the company

7  and through our subsidiaries.

8      Q.   When you were assistant treasurer,

9  were you responsible for any public debt

10  offerings?

11      A.   I was -- I participated in the

12  process.

13      Q.   What was your participation in the

14  process?

15      A.   I would have worked with bankers to

16  discuss terms.  I would have coordinated the

17  process of document flow and preparation with

18  our external counsel.  I would have reviewed

19  documentation.

20      Q.   When you were assistant treasurer, did

21  you ever participate in negotiations over and --

22  in a trust indenture?

23      A.   Yes.

24      Q.   Did you ever participate in

25  negotiations about a trust indenture with the

1                          Grigsby

2    indenture trustee?

3         A.    No, not that I recall.

4         Q.    Have you ever participated in

5    negotiations with an indenture trustee about a

6    trust indenture?

7         A.    No.  I don't believe that we actually

8    negotiate an indenture with a trustee.

9         Q.    So you're saying no one else would at

10   Chesapeake either?

11        A.    We -- when a trustee is needed to

12   serve in that function for our indentures, we

13   obviously, typically, provide the indenture to

14   the trustee, they review it.  I am not aware of

15   any negotiations that have taken place with the

16   trustee about an indenture.

17        Q.    When you said you participated in

18   negotiations about an indenture trustee, what

19   did you have in mind?

20        A.    I didn't say I participated in

21   negotiations about an indenture trustee.

22        Q.    I'm sorry, you're correct.  I believe

23   you said you participated in negotiations about

24   a trust indenture?

25        A.    Correct.

1                     Grigsby

2   redemption if given during the early redemption

3   period."

4       A.   In addition the -- the -- the

5   parenthetical defining the early redemption

6   period after the date March 15, 2013.

7       Q.   Did you have any discussion about that

8   additional sentence in the special early

9   redemption description on page 8305 of the draft

10  supplemental prospectus?

11      A.   I don't recall.  As I stated earlier,

12  I don't recall reviewing this document.

13      Q.   And that means you don't recall any

14  discussion with anyone about that language,

15  right?

16      A.   I do not recall a discussion with

17  anyone about any provision of this document.

18          MR. ARDEN:  Let's mark this document

19      Grigsby 13, this document that begins on

20      CHK 60579 to CHK 60588.

21          (Document bearing Bates numbers CHK

22      60579 to 60588 was marked Grigsby Exhibit 13

23      for identification, as of this date.)

24      Q.   This document, again, is heavily

25  redacted.  Does it remind you that -- withdrawn.

Exh. I

Page 1

1

2                  UNITED STATES DISTRICT COURT

3                SOUTHERN DISTRICT OF NEW YORK

4

5    CHESAPEAKE ENERGY CORPORATION,   )
                                      )
6                                     )
                                      )
              Plaintiff,              )   CIVIL ACTION
7                                     )
              v.                      )   No. 13-CIV-158
8                                     )
     THE BANK OF NEW YORK MELLON       )
9    TRUST COMPANY, N.A.,             )
                                      )
10                                    )
                                      )
11            Defendant.              )
     --------------------------------

12

              * C O N F I D E N T I A L *
13

14    *  U N D E R   P R O T E C T I V E   O R D E R  *

15              VIDEOTAPED DEPOSITION

16                      OF

17              ELLIOT CHAMBERS

18              New York, New York

19              Monday, April 15, 2013

20

21

22

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 60148

Chambers - Certified - Under Protective Order

1

2    Q.    Did you ever -- prior to the issuance

3    of the 2019 bonds, did you ever speak to anyone

4    from Bank of New York regarding the bonds?

5    A.    Prior to the issuance?

6    Q.    Correct.

7    A.    I did not speak to anybody directly,

8    no.

9    Q.    Did you speak -- again, prior to the

10   issuance of the 2019 bonds, did you speak with

11   any counsel from Bank of New York regarding the

12   bonds?

13   A.    No, not personally.

14   Q.    Do you know if anyone else from

15   Chesapeake spoke to anyone from Bank of New York

16   or acting on behalf of Bank of New York

17   regarding the 2019 notes?  Again, this is before

18   issuance.

19   A.    I'm not aware of anyone speaking to

20   Bank of New York prior to issuance.

21   Q.    Are you aware of anyone from

22   Chesapeake communicating in any other way with

23   anyone from Bank of New York or acting on behalf

24   of Bank of New York regarding any potential

25   redemption provisions associated with the 2019

1    Chambers - Certified - Under Protective Order

2   notes?  Again, this is before issuance.

3        A.    I'm not aware of that.

4        Q.    Are you aware of anyone acting on

5   behalf of Chesapeake communicating in any way

6   with anyone from Bank of New York or acting on

7   behalf of Bank of New York regarding any

8   potential redemption provisions associated with

9   the 2019 notes?

10            MR. ZIEGLER:  Objection to form.

11        Q.    Again, before issuance.

12        A.    I'm a little confused, because it

13   sounds like just -- the same question you just

14   asked me that I already answered.

15            MR. ZIEGLER:  I think it was

16        different in that he was -- the earlier

17        question was Chesapeake people, and this

18        one question was anybody acting on

19        Chesapeake's behalf.

20            MR. NAGIN:  Correct.  Thanks,

21        Richard.

22        A.    Maybe if --

23            MR. ZIEGLER:  I thought it was a long

24        and complicated question, which is why I

25        originally objected.

1    Chambers - Certified - Under Protective Order

2   BY MR. NAGIN:

3        Q.    Let me ask it again.  And Richard was

4   exactly right in distinguishing the two

5   questions.  I'm asking now about any counsel for

6   Chesapeake or any investment banker acting on

7   behalf of Chesapeake.

8            And so my question is:  Did, you

9   know, any lawyer or other person acting on

10   behalf of Chesapeake, to your knowledge, speak

11   with anyone from Bank of New York regarding

12   potential redemption provisions associated with

13   the 2019 notes?

14       A.    I'm not aware of that.

15            (Mr. Weinstein entered the room.)

16       Q.    Would your answer be the same if I

17   modified the question to say whether any of

18   those people spoke to any person acting on

19   behalf of the Bank of New York such as a lawyer?

20            MR. ZIEGLER:  Objection to form.

21       A.    I don't recall.

22            (Discussion off the record.)

23            MR. NAGIN:  Mr. Weinstein has come

24       in.

25            Good morning, Paul.

1    Chambers - Certified - Under Protective Order

2        you.

3    BY MR. NAGIN:

4        Q.    Mr. Chambers, you said you had a few

5    conversations with BNY Mellon, correct?

6        A.    Yes.

7        Q.    Could you tell us what you recall

8    about the first conversation you had?

9        A.    The first conversation was initiated

10   by Chesapeake that I recall, to discuss our

11   intent to call the 2019 bonds and to ask Bank of

12   New York to provide us, if they would be

13   flexible to waive some of the 15-day period for

14   notice to the trustee before we actually issued

15   notice to the bondholders.

16       Q.    How much advance notice was provided

17   to Bank of New York regarding the first call?

18       A.    I don't remember --

19           MR. ZIEGLER:  You mean notice of the

20       call itself?

21           MR. NAGIN:  Yes.

22       Q.    Reach out to them the same day?

23       A.    I don't recall.

24       Q.    Other than the flexibility with

25   respect to the 15-day period that you've

Exh. J

Page 1

1

2             UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4

5    CHESAPEAKE ENERGY CORPORATION,   )
                                      )
6                                     )
                                      )
             Plaintiff,               )   CIVIL ACTION
7                                     )
           v.                         )   No. 13-CIV-158
8                                     )
     THE BANK OF NEW YORK MELLON      )
9    TRUST COMPANY, N.A.,             )
                                      )
10                                    )
                                      )
11           Defendant.               )
     --------------------------------

12

          * C O N F I D E N T I A L *

13

14   * U N D E R   P R O T E C T I V E   O R D E R *

15             VIDEOTAPED DEPOSITION

16                   OF

17          DOMENIC J. DELL'OSSO, JR.

18            New York, New York

19          Tuesday, April 16, 2013

20

21

22

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 60150

1   Dell'Osso - Confidential - Under Protective Order

2     looks like it, but I can't say.

3         Q.    Did you tell Mr. Telle that what the

4     company was to achieve was a 12-month callable

5     at par period in the indenture and note?

6             MR. ZIEGLER:  I'll just object to the

7         form.

8         A.    I don't remember what I told him

9     specifically.

10        Q.    Did you tell Mr. Telle that what the

11    company wanted was a 13-month or 14-month or

12    15-month call period?

13        A.    I don't recall.

14            MR. ZIEGLER:  Objection to form.

15        Sorry.

16            THE WITNESS:  I thought I paused long

17        enough that time.

18            MR. ZIEGLER:  I was a little slow.

19    BY MR. BIERMAN:

20        Q.    Did you discuss with anyone at Bank

21    of New York Mellon or its counsel in connection

22    with the indenture and the 2019 notes that you

23    wanted to have a 12-month callable par period as

24    a feature in this debt issuance?

25            MR. ZIEGLER:  Objection to form.

1   Dell'Osso - Confidential - Under Protective Order

2        A.    No, I did not talk to anyone at Bank

3   of New York.

4        Q.    Did you instruct Mr. Telle that you

5   wanted Bracewell to draft a indenture with a

6   12-month callable par period feature?

7        A.    I don't recall directly instructing

8   Mr. Telle about this myself.

9        Q.    Do you know if anyone else did?

10       A.    They must have at some point, but I

11  don't recall whether I was part of that

12  conversation or not.

13             (Defendant's Dell'Osso Exhibit 5,

14        Email dated 2/10/12 from Hogan to Dell'Osso

15        and distribution list with attachment,

16        Bates stamped CHK7745 through 7947, marked

17        for identification, as of this date.)

18  BY MR. BIERMAN:

19       Q.    I show you Dell'Osso Exhibit 5 for

20  identification, production numbers CHK7745

21  through 7947.  And, sir, this is an email on the

22  front from Erica Hogan to a number of people,

23  including you, dated February 10, 2012,

24  attaching, as it's referred to here, a draft of

25  the prospectus supplement in connection with

1    Dell'Osso - Confidential - Under Protective Order

2         A.    Um-hmm.

3         Q.    Is that yes?

4         A.    Yes.

5         Q.    And is it your understanding that

6    what Erica Hogan was sending you was a markup,

7    essentially, of a prospectus from another debt

8    offering involving Chesapeake?

9         A.    That's correct.

10        Q.    Now, if you look at the front page,

11   the first page of the prospectus, the draft

12   prospectus, you see some underlined language

13   that begins -- the third paragraph, "Between

14   November 15th."

15             Do you see that?

16        A.    I do.

17        Q.    And the underlining means that

18   this -- this is a black-line, and this is

19   language that was added to whatever the previous

20   template was?

21        A.    That's right.

22        Q.    The language reads, "Between

23   November 15, 2012, and March 31, 2013, we may

24   redeem some or all of the notes at a redemption

25   price equal to 100 percent of the principal

1   Dell'Osso - Confidential - Under Protective Order

2    amount of the notes, plus accrued and unpaid

3    interest, if any, to the redemption date."

4            And then there is a reference to see

5    a description.  The language I read you, is that

6    the language that you intended Bracewell to

7    include in the supplemental prospectus regarding

8    redemption at par?

9            MR. ZIEGLER:  Objection to form.

10    A.    So again I didn't -- I don't recall

11   having discussions directly with Bracewell on

12   what to write.

13            What I did was negotiate an option

14   period with BofA and then made sure that my team

15   was focused on getting it documented.

16    Q.    And what you wanted to get documented

17   was this language here that I read to you?

18            MR. ZIEGLER:  Objection to form.

19    Q.    Is that right?

20            MR. ZIEGLER:  Misstates the

21   testimony.  No foundation.

22    A.    You know, I wanted to get documented

23   the option as had been negotiated.

24    Q.    And this is the option as set forth

25   here, right?

Dell'Osso - Confidential - Under Protective Order

2      A.    Yes.

3      Q.    And then the first sentence,

4  including the proviso referring to the $250

5  million aggregate principal amount, that's again

6  essentially the same as what we saw in the term

7  sheet as revised and the front page of the

8  prospectus as revised, right?

9      A.    Correct.

10     Q.    Then we have another new sentence

11 here, because it's underlined and therefore I

12 assume this is in addition, right?  Is that your

13 understanding?

14     A.    That's my understanding.

15     Q.    And it reads as follows:  "We may

16 redeem the notes pursuant to the special early

17 redemption provisions so long as the notice of

18 redemption, if given, during the early

19 redemption period."

20           Do you see that?

21     A.    I do.

22     Q.    What was the source of that new

23 language?

24     A.    I don't recall the source.

25     Q.    What was the reason for that new

1    Dell'Osso - Confidential - Under Protective Order

2      language at the time?

3          A.    In reading this now, it appears to be

4      to clarify.

5          Q.    I'm not asking you in reading this

6      now.  My question is -- and if I was inept in

7      asking the question, let me ask it another way.

8                At the time, February 2012, did you

9      have any understanding concerning the reason for

10     this language being added to the draft

11     supplemental prospectus?

12         A.    I don't recall.  I can't say.  It's

13     very possible, but I don't recall the specifics

14     of those discussions.

15         Q.    And in this additional sentence on

16     page S33, do you know what the reference to

17     "redeem the notes" means?  Or perhaps you don't

18     know what it means, but do you know what it

19     means?

20         A.    To me, it means we may repurchase the

21     notes.

22         Q.    Okay.  Did you discuss with anyone at

23     Bank of New York Mellon or their counsel at

24     Emmet Marvin the changes in language reflected

25     in this draft supplemental prospectus?

1    Dell'Osso - Confidential - Under Protective Order

2              MR. ZIEGLER:  Pardon me.  Objection

3         to form.

4         A.    I had no discussions with Bank of New

5    York through this process.

6         Q.    Or Emmet Marvin?

7         A.    Or Emmet Marvin myself.

8         Q.    Okay.  Did you direct anyone to speak

9    with Bank of New York Mellon or their counsel

10   Emmet Marvin concerning these changes in the

11   draft prospectus supplement?

12        A.    No.

13        Q.    You testified earlier that there was

14   an aspect in which the 2019 notes issuance was

15   unique.  I think you used the word "unique."

16              In what respect was it unique, in

17   your experience?

18        A.    As I described the last time I told

19   you that, it's because of this special

20   redemption provision.

21        Q.    What about the special early

22   redemption provision is unique?  Or is it just

23   the idea of a special early redemption

24   provision?

25              MR. ZIEGLER:  Objection to form.

1   Dell'Osso - Confidential - Under Protective Order

2       BG2323 through 2372, marked for

3       identification, as of this date.)

4   BY MR. BIERMAN:

5       Q.    I show you Dell'Osso Exhibit 14 for

6   identification bearing production numbers BG2323

7   through 2372.

8           The first page of this exhibit is an

9   email from Clay Brett to a number of people

10  dated February 14, 2012, 5:44 p.m., indicating:

11  "Attached is Bracewell's draft of the Ninth

12  Supplemental Indenture and a black-line against

13  the Fifth Supplemental Indenture from the

14  February 2011 offering.  Please let us any

15  comments you have."

16          And then behind it is, are the

17  documents that are referred to in the email.

18          Looking at the recipients, I just

19  want you to help me here, I don't see your name

20  here.  Did you receive this?

21      A.    It doesn't appear that I did.

22      Q.    Do you recall receiving this?

23      A.    No, I do not.

24      Q.    Did you discuss with any lawyers at

25  Bracewell in February 2012, the drafting of the

1  Dell'Osso - Confidential - Under Protective Order

2  supplemental indenture that would relate to the

3  issuance of the 2019 notes?

4        A.    I don't believe that I did.

5        Q.    Did you discuss with anyone at

6  Bracewell during February 2012, the drafting of

7  the form of note which would be associated with

8  the indenture and the issuance of the 2019

9  notes?

10             MR. ZIEGLER:  Objection to form.

11        A.    I don't believe that I did.

12        Q.    I want you to turn to page production

13  numbers BG2328 within this exhibit.

14        A.    (Witness complies.)

15        Q.    Actually, I want to refer you back

16  first to the beginning of the exhibit.  Why

17  don't you flip back to the first page.

18        A.    (Witness complies.)

19        Q.    So again, we have the email

20  transmitting a draft and a black-line.  Turn to

21  the second page.

22        A.    (Witness complies.)

23        Q.    And you see that it is a black-line

24  over what had been the Fifth Supplemental

25  Indenture, to now make it the new draft

1   Dell'Osso - Confidential - Under Protective Order

2   Mellon or -- withdrawn.  Let me ask it more

3   clearly.

4                You didn't have any conversation

5   concerning the meaning or application of Section

6   1.7 regarding redemption of the Ninth

7   Supplemental Indenture with anyone at Bank of

8   New York Mellon or their counsel at Emmet,

9   Marvin, right?

10                MR. ZIEGLER:  Back in February 2012?

11                MR. BIERMAN:  Back in February 2012,

12       correct.

13       A.    I did not.

14       Q.    You didn't have any such conversation

15   with Bank of New York Mellon or its counsel

16   until February 2013, correct?

17       A.    That's correct.

18       Q.    Please have in front of you again

19   Exhibit 15, which is the final execution version

20   of the Ninth Supplemental Indenture.

21                (Witness complies.)

22       Q.    I want to turn your attention to page

23   BG2847 again, and that contains Section 1.7

24   Redemption.

25                Are you there?

1  Dell'Osso - Confidential - Under Protective Order

2   which the redemption provisions or operation of

3   the 2019 notes was discussed?

4       A.    Not in any substance.  Meaning it

5   could have come up in discussion around our

6   capital structure that these bonds were

7   callable, but not in any detail that you're

8   asking about here.

9              (Defendant's Dell'Osso Exhibit 24,

10       Email dated 2/5/13 from Hutchinson to

11       Dell'Osso with attachments, Bates stamped

12       CHK6112 through 6119, marked for

13       identification, as of this date.)

14  BY MR. BIERMAN:

15      Q.    I show you Dell'Osso Exhibit 24 for

16   identification, which bears production numbers

17   CHK6112 through 6119.

18              The first page of this exhibit is an

19   email from Bradley Hutchinson at Barclays, to

20   you and Elliot Chambers.

21              Do you see that?

22      A.    I do.

23      Q.    Do you recall receiving this?

24      A.    Not specifically.  Obviously, I did

25   but I don't recall paying too much attention to

1   Dell'Osso - Confidential - Under Protective Order

2   it.

3           Q.    Then attached to the email and

4   referred to in the email is a refinancing update

5   dated February 4, 2013.

6                 Do you see that behind the email?

7           A.    I do.

8           Q.    Did you review it at the time?

9           A.    I really don't know.

10          Q.    Do you know why Barclays prepared

11  this report for Chesapeake?

12          A.    Trying to get our business to

13  refinance the bonds.

14          Q.    Had you worked with Barclays before

15  on such matters?

16          A.    Never as lead underwriter in my

17  involvement at Chesapeake, but I know the

18  Barclays team well.  They've done plenty of

19  stuff for us over time.

20          Q.    And there is a reference in

21  Mr. Hutchinson's email to a call, a call at

22  9:15.

23          A.    Um-hmm.

24          Q.    That's not a call of bonds, that's a

25  telephone call, right?

1   Dell'Osso - Confidential - Under Protective Order

2       A.    That's a telephone call.

3       Q.    Okay.  We can agree on that?

4       A.    Yes.  We have gotten down to the time

5   of the day.  Okay.

6       Q.    So the call at 9:15, what was that

7   about?

8       A.    According to his email here, it was

9   to discuss the attached pages.

10      Q.    And do you recall that phone call?

11      A.    I don't.  I'm wondering whether I had

12  Elliot just do this without me or if I was on.

13  It's possible I was multi-tasking, so to speak.

14      Q.     In the report that Barclays prepared

15  for Chesapeake, if you turn to, it has the cover

16  page to the first numbered page.  It says,

17  "Summary trading update" and then underneath

18  that, "Overview."

19           Do you see that?

20      A.    Pardon me.  I do.

21      Q.    And partway down, there is an

22  indented bullet -- withdrawn.

23           And this is about refinancing the

24  2019 notes, right?

25      A.    Well, the summary trading update

1   Dell'Osso - Confidential - Under Protective Order

2    talks about the market generally and then talks

3    about the discussion they had with Franklin

4    around how they were interested in some new

5    paper, it says.

6           I definitely don't recall this

7    discussion, because I don't remember talking

8    about Franklin or anything like that.

9        Q.    Partway down under the summary

10   trading update overview, there is an indented

11   bullet that reads as follows:  "Given the end of

12   the special redemption period for the 2019

13   notice is fast approaching (ends March 15,

14   2013), we believe a refinancing of that issue is

15   particularly compelling against the robust

16   market backdrop."

17          Do you see that?

18       A.    I do.

19       Q.    Did you agree that the end of the

20   special redemption period for the 2019 notes was

21   fast approaching, ending March 15, 2013?

22       A.    Well, again, I don't remember having

23   this discussion with them.  I do agree that the

24   special early redemption period, as defined in

25   1.7(b), ends on March 15th, 2013.

1   Dell'Osso - Confidential - Under Protective Order

2        Q.     You notice there is a footnote

3   referenced there in the language I just read to

4   you from the bullet.

5             Do you see that?

6        A.     I do.

7        Q.     As you go down to the footnote,

8   Barclays is telling you:  "Chesapeake will need

9   to issue a call notice by February 13th, 2013,

10  in order for the redemption to settle within the

11  special call period."

12            Do you see that?

13       A.     I do see that.

14       Q.     Did you tell anyone at Barclays, you

15  got it wrong, that's not what it provides?

16       A.     Again, I don't remember.

17            MR. ZIEGLER:  Let me just note an

18       objection.  Foundation.  Go ahead.

19       A.     I don't remember having this

20  discussion, so I don't think I did.

21       Q.     When you saw this, did it raise a

22  concern on your part that maybe the notice is

23  due by February 13, 2013, in order for the

24  redemption to settle within the special call

25  period, as Barclays notes?

Exh. K

Page 1

1

2                 UNITED STATES DISTRICT COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4

5    CHESAPEAKE ENERGY CORPORATION,    )
                                       )
6                                      )
                  Plaintiff,           )    CIVIL ACTION
7                                      )
                     v.                )    No. 13-CIV-158
8                                      )
     THE BANK OF NEW YORK MELLON       )
9    TRUST COMPANY, N.A.,              )
                                       )
10                                     )
                                       )
11                Defendant.           )
     --------------------------------

12

                 * C O N F I D E N T I A L *
13

14   *  U N D E R   P R O T E C T I V E   O R D E R  *

15               VIDEOTAPED DEPOSITION

16                       OF

17              AUBREY K. McCLENDON

18               New York, New York

19             Friday, April 12, 2013

20

21

22

23

24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 60145

1  A. McCLENDON - CONFIDENTIAL - UNDER PROTECTION ORDER

2    reference to November 15th to March 15th.

3        Q.    November 15th, 2012, to March 15th,

4    2013, is that the four-month period you're

5    referring to?

6        A.    That's what I saw yesterday, yes.

7        Q.    And was that the period of time in

8    which the 2019 notes were callable at par under

9    the indenture that's at issue?

10       MR. ZIEGLER:  Objection to form.

11       A.    I don't know how the mechanism

12   worked.

13       Q.    Did you understand that the notes, if

14   they were to be called at par, needed to be

15   called in that four-month period, November 15,

16   2012 through March 15, 2013?

17       MR. ZIEGLER:  Objection to form.

18       A.    As I've testified, I don't know how

19   the process was to have worked.

20       Q.    Did you ever speak with anyone from

21   Bank of New York Mellon or its counsel regarding

22   the 2019 notes issued in February of 2012?

23       A.    I did not.

24       Q.    Did you ever speak with anyone at the

25   Cravath law firm in connection with the 2019

A. McCLENDON - CONFIDENTIAL - UNDER PROTECTION ORDER

1

2            Have you ever had any conversation,

3      by which I mean orally, whether in person or by

4      telephone, with anyone inside Chesapeake Energy

5      regarding the Ninth Supplemental Indenture,

6      Exhibit 7?

7            A.    I do not believe so.

8            Q.    Have you ever had any conversation

9      regarding the Ninth Supplemental Indenture with

10     anyone at the Bracewell law firm?

11           A.    I have not.

12           Q.    Or with anyone Cravath law firm?

13           A.    I have not.

14           Q.    Or with anyone at any underwriter of

15     the debt issue?

16           A.    I have not.

17           Q.    Or with anyone else?

18           A.    I don't recall.

19           Q.    I want to turn your attention within

20     this exhibit to page BG2847.  It's page 3 of the

21     -- numbered at the bottom of the document.  And

22     I want to direct your attention in particular to

23     the Section 1.7 entitled "Redemption."

24            Do you see that?

25           A.    I do.

Exh. L

Confidential - Pursuant to Protective Order

Page 1

1

2                 UNITED STATES DISTRICT COURT

3                 SOUTHERN DISTRICT OF NEW YORK

4           (CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER)

    ------------------------------)

5   CHESAPEAKE ENERGY CORPORATION, )

                                   )Civil Action No.

6                  Plaintiff,      )1:13-cv-01582-PAE

                                   )

7        -against-                 )

                                   )

8   THE BANK OF NEW YORK MELLON    )

    TRUST COMPANY, N.A.,           )

9                                  )

                   Defendants.     )

10  ------------------------------)

11

12

13

14

15        VIDEOTAPED DEPOSITION OF STEPHEN BURNS

16                New York, New York

17             Wednesday, April 17, 2013

18

19

20

21

22

23

24  Reported by:

    JOMANNA DeROSA, CSR

25  JOB NO. 60501

Confidential - Pursuant to Protective Order

1                   BURNS - DIRECT

2          A.    Yes.

3          Q.    The language we just discussed

4    doesn't appear there.  It's not yet included on

5    this draft, correct, or included on this draft, on

6    this page?

7          A.    That is correct.

8          Q.    Any reason why not, to your

9    knowledge?

10              MR. BARRON:  Object to the form.

11         A.    I wouldn't know.  I didn't return

12   the draft, so I wouldn't know at that time.

13         Q.    You didn't have any particular

14   discussion in this time frame before seeing this

15   draft with anyone at BNY Mellon.  Correct?

16         A.    Correct.

17         Q.    Is it fair to say that, so I don't

18   have to continually ask this, in this period of

19   time, Thursday night you're brought in, we're

20   discussing at least now the back and forth

21   comments, revisions to the pro sup, which

22   culminate with a pro sup that goes out to

23   investors on Monday, February 13th.  BNY Mellon is

24   not involved in these discussions.  Correct?

25         A.    They're not involved in any

Confidential - Pursuant to Protective Order

Page 87

1                    BURNS - DIRECT

2    discussions I'm involved in.  I don't know whether

3    they were -- I don't know what communications you

4    had.

5            Q.    I'm only asking to your knowledge?

6    To your knowledge, are they involved at all?

7            A.    To my knowledge, no.

8            Q.    To your knowledge, is any counsel

9    for BNY Mellon involved in any discussions

10   regarding the pro sup process, the comments back

11   and forth that in the various drafts culminating

12   with the draft that went in on the launch on

13   Monday, February 13th?

14           A.    Not that I'm aware.

15           Q.    And you're here today on behalf of

16   Cravath?

17           A.    That's correct.

18           Q.    So not that Cravath is aware?

19           A.    That's correct, not that Cravath is

20   aware.

21           Q.    Do you recall whether you had a

22   specific discussion with Mr. Telle at Bracewell

23   regarding this?

24                 MR. BARRON:  And time period,

25       again, is before Mr. Burns saw this draft?  Is

Exh. M

1          VOLUME I - MICHAEL TELLE

2          UNITED STATES DISTRICT COURT

3         SOUTHERN DISTRICT OF NEW YORK

4    -------------------------------X
     CHESAPEAKE ENERGY CORPORATION,
5
                    Plaintiff,
6                   Civil Action No. 1:13-cv-01582-PAE
               VS.
7
     THE BANK OF NEW YORK MELLON
8    TRUST COMPANY, N.A.,

9                   Defendant.
     -------------------------------X
10

11

12              VOLUME I

13          VIDEOTAPED DEPOSITION

14                  OF

15             MICHAEL TELLE

16        Wednesday, April 17, 2013

17           787 Seventh Avenue

18            New York, New York

19

20

21   Reported by:
     AYLETTE GONZALEZ, CLR
22   JOB NO. 60149

23

24

25

```
 1              VOLUME I - MICHAEL TELLE

 2         A.    I think it was my doing.  If she

 3   did, it was following my instructions to put

 4   this rider in the document.

 5         Q.    Okay.  In connection with

 6   circulating this draft that we've been looking

 7   at, did you have any conversation with anyone

 8   at Chesapeake regarding the special redemption

 9   provision language that we've been looking at?

10         A.    You know, other than the -- the

11   conversations I referred to earlier that I

12   can't -- the details of which I can't clearly

13   recall, I had those conversations, but I -- I

14   don't -- sort of a circular question.  I -- I

15   believe I had those conversations, and those

16   are the ones we've talked about having had.

17         Q.    Did you have any conversations with

18   anyone from Bank of New York Mellon or their

19   counsel at the Emmet Marvin firm concerning

20   this draft or the language in it relating to

21   the special redemption?

22         A.    Not at this point in time.

23         Q.    Not in February 2012, correct?

24         A.    Correct.

25         Q.    I show you Telle Exhibit 7 for
```

Exh. N

1            SUSAN SEYMORE – CONFIDENTIAL

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    ---------------------------------------X

     CHESAPEAKE ENERGY CORPORATION

4

5                    Plaintiff,

6         -against-          Civil Action No.
                             1:13-cv-01582-PAE

7

8    THE BANK OF NEW YORK MELLON

9    TRUST COMPANY, N.A.

10                   Defendant.

     ---------------------------------------X

11

12         VIDEOTAPED DEPOSITION OF SUSAN SEYMORE

13                New York, New York

14              Friday, April 19, 2013

15

16   REPORTED BY:  BOBBIE ZELTMAN

                   Professional Stenographic Reporter

17

18   Job Number:60421

19

20

21

22

23

24

25

1        SUSAN SEYMORE - CONFIDENTIAL

2        Q      What are you sure you understood?

3        A      I'm sure I understood what he

4    meant.

5        Q      Which was what?

6        A      That we could change the size of

7    the offering later if we so desired.

8        Q      And by "up size, make it larger?

9        A      That's right.

10       Q      Were there any discussions that you

11   can recall at the time about up sizing the

12   offering?

13       A      I don't remember specific

14   conversations, but seeing this e-mail, you

15   know, says to me that we did have

16   conversations as it's customary to do to go

17   through the what ifs scenarios when you go

18   out with an offering.  If there is extra

19   demand, is that something we would be

20   interested in.  That would be a standard

21   conversation to have.

22       Q      Do you recall whether this deal

23   was, in fact, up sized?

24       A      You know, I didn't remember at the

25   time, but it looks like we went out with 1

1    SUSAN SEYMORE - CONFIDENTIAL

2    and then we ended at 1.3.

3         MR. GREANEY:  Mark this,

4     please, as Seymore Exhibit 5.

5         (Seymore Exhibit 5, E-mail

6     chain top e-mail dated Friday,

7     February 10, 2012, 10:46 p.m.,

8     CHK-7745 through CHK-7947, was

9     marked for Identification.)

10   BY MR. GREANEY:

11        Q     Seymore Exhibit 5 is an e-mail with

12   an attachment Bates labeled CHK-7745 through

13   CHK-7901 -- excuse me -- through 7947.

14        A     Okay.

15        Q     Do you recall this e-mail from

16   Ms. Hogan on February 10, 2012?

17        A     I see that I was on it.  I recall

18   she distributed it because --

19        Q     I'm sorry.  I didn't hear the last

20   part.

21        A     I recall that she was to distribute

22   it, yeah.

23        Q     Do you recall the attachment?

24   Actually I apologize.  There are several

25   attachments.

1        SUSAN SEYMORE - CONFIDENTIAL

2     Q     Do you know which party or their

3   attorneys proposed the addition of that

4   sentence?

5          Do you know which party or their

6   attorneys proposed the addition of that

7   sentence?

8     A     I don't know that I would have

9   focused on who put it in there because

10   that's just what the business deal was.  So,

11   I don't remember that it would have been

12   something I would have been focused on.

13     Q     Ms. Seymore, do you recall having

14   any discussions with Bank of New York Mellon

15   personnel in connection with this

16   transaction?

17     A     I recall that I couldn't get a hold

18   of them over the weekend when I wanted to.

19          I recall that they were

20   out-of-pocket during the weekend, and I

21   don't think we spoke until Monday,

22   potentially after we launched.  That's

23   probably the way it worked out.

24     Q     Do you remember anything that you

25   said to Bank of New York Mellon or its

1       SUSAN SEYMORE - CONFIDENTIAL

2    attorneys?

3    A      My typical practice would have been

4    to contact them to let them know about the

5    issuance, ask if they'd perform as trustee

6    and provide whatever information they

7    required or requested in order for them to

8    perform that duty.  They were the trustee

9    on, I believe, all of our other issuances.

10   Q      But you don't recall any particular

11   conversations with Bank of New York or its

12   attorneys in connection with this

13   transaction?

14   A      Like I said, I know that I had

15   e-mailed to them several times over the

16   weekend trying to get in touch.  I believe I

17   may have left messages as well, because I

18   was anxious to get in touch with them as one

19   of the parties here.  And performing my

20   normal course responsibilities.

21       MR. GREANEY:  Can you mark that

22    as Seymore Exhibit 12.

23       (Seymore Exhibit 12, E-mail

24    chain top e-mail dated Sunday,

25    February 12, 2012, 2:47 p.m.,

<sup>1</sup>     SUSAN SEYMORE - CONFIDENTIAL

<sup>2</sup> did, in fact, touch base on Monday morning.

<sup>3</sup> Or me and Bank of New York did certainly.

<sup>4</sup>    Q    Was it typical for the trustee to

<sup>5</sup> get looped in after the prospectus

<sup>6</sup> supplement was significantly on its way?

<sup>7</sup>    A    Well, we attempted to loop them in

<sup>8</sup> on early drafts the pro supp, so that part

<sup>9</sup> would have been typical when we started

<sup>10</sup> looping them in.

<sup>11</sup>         I think the rest of the deal team

<sup>12</sup> was working around the clock over the

<sup>13</sup> weekend.  That's not the way the trustee

<sup>14</sup> works.  So, by the time we were making those

<sup>15</sup> decisions, they weren't available.  So, we

<sup>16</sup> did our best to do that.  So, we kind of

<sup>17</sup> followed normal course in that way.

<sup>18</sup>         I suppose it's normal for the

<sup>19</sup> trustee not to be available on the weekend,

<sup>20</sup> but it's not normal for a deal to stop on

<sup>21</sup> the weekend.

<sup>22</sup>    Q    Right.  So when did that deal

<sup>23</sup> launch; do you recall?

<sup>24</sup>         MR. BARKOW:  Objection.  Vague.

<sup>25</sup>    Q    Do you know what I mean by

1      SUSAN SEYMORE - CONFIDENTIAL

2    "launch"?

3      A      Yes.  I think it was Monday

4    morning.

5      Q      Premarket?

6      A      Yeah.  I think to the best of my

7    recollection it was premarket Monday.

8      Q      So, is it a fair assumption that

9    neither Bank of New York nor its counsel was

10   involved in any of the telephone calls that

11   took place over the weekend?

12          MR. BARKOW:  Objection.

13   Compound and calls for speculation.

14     A      I'm sorry, can you repeat the

15   question?

16     Q      Yeah, I'll just ask another one.

17          Do you recall Bank of New York or

18   its counsel being involved in any of the

19   telephone calls or discussions that took

20   place over the weekend?

21     A      No, but that's not abnormal.

22          So, even if it had been a Thursday

23   and we had sent this to them, they typically

24   wouldn't dial into a drafting call.  Their

25   normal course would be to e-mail back their

1          SUSAN SEYMORE - CONFIDENTIAL

2       written comments.

3          Q     Okay.

4             MR. GREANEY:  Would you mark

5          that as Seymore Exhibit 13, please.

6             MR. GREANEY:  Actually let me

7           pull that back.

8               Sorry about that.

9              THE WITNESS:  That's all right.

10             (Seymore Exhibit 13, E-mail

11        chain, top e-mail dated Sunday,

12        February 12, 2012, 3:40 p.m.,

13        BG-6670 through BG-6766, was marked

14        for Identification.)

15    BY MR. GREANEY:

16        Q     So Seymore Exhibit 13 is an e-mail

17       chain and attachment Bates stamped BG-6670

18       to BG-6766.

19             Do you remember this e-mail from

20       you to Mr. Chapin?

21        A     I recognize it now that I'm seeing

22       it again.

23        Q     Who is Mr. Chapin?

24        A     Bank of New York's counsel that

25       they would typically use on these matters.

1      SUSAN SEYMORE - CONFIDENTIAL

2      Q      In your e-mail to Mr. Chapin you

3  write, "I haven't been able to reach Linda

4  yet," and then it continues.

5           And then at the end you write,

6  "Note that we plan to launch premarket

7  tomorrow."

8           Do you see that?

9      A      I do.

10      Q      And this is consistent with what

11  you testified to earlier that you believed

12  that you launched to the market before the

13  market opened on Monday morning?

14      A      Right.

15      Q      Do you remember having any

16  conversations with Mr. Chapin regarding the

17  prospectus supplement drafts?

18      A      I don't.

19           Communication on the telephone is

20  what you are asking?

21      Q      Telephone -- any communication.

22      A      I don't recall if they commented on

23  this draft or not.

24      Q      And you don't recall any

25  discussions with Mr. Chapin regarding any of

1          SUSAN SEYMORE - CONFIDENTIAL

2      the language in the prospectus supplement?

3          A     No.

4          Q     Do you recall any conversations

5      with Ms. Garcia regarding the language in

6      the prospectus supplement?

7          A     I don't remember any specifics of

8      any conversation on language.

9          Q     In substance, do you remember any

10     conversations with Mr. Chapin or Ms. Garcia

11     regarding the language?

12         A     I don't think so.

13             MR. GREANEY:  We need to take a

14         break.

15             THE VIDEOGRAPHER:  This ends

16         tape Number 4.  We are going off the

17         record at 2:43 p.m.

18             THE VIDEOGRAPHER:  This marks

19         the start of Tape Number 5.  We're

20         back on record at 2:55 p.m.

21 BY MR. GREANEY:

22         Q     Ms. Seymore, you understand you are

23     still under oath?

24         A     Yes.

25             (Seymore Exhibit 14, E-mail

1          SUSAN SEYMORE - CONFIDENTIAL

2       discussed?

3          A    I don't remember these specific

4       conversations, but I feel comfortable saying

5       that it was discussed.  Or reviewed and

6       discussed.

7               (Seymore Exhibit 22, E-mail

8          chain, top e-mail dated Wednesday,

9          February 15, 2012, 5:01 p.m., with

10         attachments, was marked for

11         Identification.)

12      BY MR. GREANEY:

13         Q    So do you recall receiving from

14      Erica Hogan a version of a Supplemental

15      Indenture and Execution form?

16         A    I recognize this.

17         Q    If you flip ahead to Page 3 of the

18      first attachment.

19              If you look at Section 1.7,

20      Redemption again, do you see the sentence we

21      looked at earlier, which included the "5:00

22      Central Time language" has been changed?

23         A    Uh-huh.

24         Q    Is it your understanding that the

25      language set forth here in this exhibit was

1        SUSAN SEYMORE - CONFIDENTIAL

2   the final language used in the Ninth

3   Supplemental Indenture?

4       A     I think so.

5       Q     Did you have any discussion with

6   Linda Garcia or anyone else at Bank of New

7   York about what this Section 1.7 meant?

8            MR. BARKOW:  Objection.

9       Compound.

10      A     I don't recall that.

11      Q     Did you have any discussion with

12  Mr. Chapin or anyone representing Bank of

13  New York Mellon in this transaction about

14  what Section 1.7 meant?

15           MR. BARKOW:  Objection.

16      Compound and vague.

17      A     I don't recall one.

18      Q     When was the first time that you

19  learned that there was a disagreement

20  regarding the meaning of Section 1.7 in the

21  Ninth Supplemental Indenture?

22           MR. BARKOW:  Objection.

23      Foundation.  And vague.  And

24      actually, depending on the timing

25      potentially privileged.

Exh. O

Confidential - Pursuant to Protective Order

Page 1

1

2                      UNITED STATES DISTRICT COURT

3                     SOUTHERN DISTRICT OF NEW YORK

4              (CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER)

5        ---------------------------------------x

6      CHESAPEAKE ENERGY CORPORATION,

7                             Plaintiff,

8          -against-                    Civil Action No.

9      THE BANK OF NEW YORK MELLON       1:13-cv-01582-PAE

10     TRUST COMPANY, N.A.,

11                             Defendants.

12       ---------------------------------------x

13

14

15

16

17                   VIDEOTAPED DEPOSITION OF:

                     JAMES ALEXANDER MAULTSBY

18                 Wednesday, April 17, 2013

                      New York, New York

19                  2:20 p.m. - 6:26 p.m.

20

21

22

23                   Reported in stenotype by:

            ---- Rich Germosen, CCR, CRCR, CRR, RMR ----

24            NCRA & NJ Certified Realtime Reporter

              NCRA Realtime Systems Administrator

25                   JOB NO. 60500

Confidential - Pursuant to Protective Order

1          JAMES ALEXANDER MAULTSBY - 04.17.13

2     often evidenced by commitment letters, so that is

3     a fully underwritten transaction, or a best

4     efforts transaction, which we will launch a

5     transaction without having any contractual

6     minimums in terms of coupon, principle, et cetera,

7     and this transaction is being launched under that

8     basis.

9          Q.     In a best efforts transaction, are

10    you with B of A committing to the company to

11    purchase the bonds?

12          A.     No.

13          Q.     And is that the significant

14    difference?

15          A.     That's right.

16          Q.     And so here the underwriting

17    agreement that we looked at earlier, Exhibit 1,

18    was that signed after the bonds were sold to the

19    market?

20          A.     That's right.

21          Q.     And if I could direct your

22    attention back to a few pages earlier, BAML2128.

23    There's a listing of a whole host of people from

24    B of A?

25          A.     Yep.