Case
Chesapeake Energy Corp.,
v.
Bank of New York Mellon, N.A.
13-cv-1582 (PAE)

Exhibit

PLAINTIFF'S EXHIBIT
101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
———————————————————————x
: 
CHESAPEAKE ENERGY CORPORATION, :
:
Plaintiff, :
:
v. : Civil Action No. 13-Cv-1582 (PAE)
:
THE BANK OF NEW YORK MELLON : **DECLARATION OF**
TRUST COMPANY, N.A., : **DOMENIC J. DELL'OSSO**
:
Defendant. :
———————————————————————x

DOMENIC J. DELL'OSSO hereby declares the following:

1. I make this Declaration on behalf of Plaintiff Chesapeake Energy Corporation ("Chesapeake" or the "Company"). I understand that Chesapeake will offer my Declaration in evidence at the trial of its claim against The Bank of New York Mellon Trust Company, N.A. ("BNY"), and that I will be subject to cross-examination by counsel for BNY.

I. **CAREER HISTORY AND ROLE AT CHESAPEAKE**

2. I am the Chief Financial Officer and Executive Vice President of Chesapeake Energy Corporation ("Chesapeake") and have served in that position since November, 2010. As of April 1 of this year I became part of the Office of the Chairman at Chesapeake, along with Steve Dixon, Chesapeake's acting Chief Executive Officer and Archie Dunham, the Company's non-executive chairman of the board. I have worked in the finance organization at Chesapeake for nearly five years, having joined the Company in August 2008 as Vice President of Finance of Chesapeake and Chief Financial Officer of Chesapeake Midstream Partners, L.P., which was then a Chesapeake subsidiary.

3. I received a Bachelor of Arts in economics from Boston College in 1998 and a Master of Business Administration from the University of Texas in 2003. After completing my MBA, I worked briefly for Ernst & Young Corporate Finance in Houston and then became an investment banking associate in the Corporate Finance group of Bank of America Securities. I joined Jefferies & Company in 2006 and remained there until I joined Chesapeake. At both Bank of America and Jefferies, I advised companies in conjunction with public and private debt offerings.

4. As Chesapeake's Chief Financial Officer at the time of the offering of the 2019 Notes at issue in this lawsuit, I reported directly to the Chief Executive Officer, who at that time was Aubrey McClendon. I oversee four departments at Chesapeake – Accounting, Information Technology, Tax, and Treasury – and also have a small Finance staff. The Treasury department oversees functions pertinent to this case, including the issuance of debt securities. Within Treasury, I primarily work with Jennifer Grigsby, Senior Vice President, Treasurer and Corporate Secretary, and Elliot Chambers, Vice President–Finance and Assistant Treasurer, although I periodically interact with more junior employees.

5. Chesapeake is the nation's second largest producer of natural gas. We also explore for and produce oil and natural gas liquids. Our business is located exclusively in the continental United States and our oil and natural gas production involves solely on-shore wells. We currently employ approximately 12,000 people. Our annual sales in 2012 totaled about $12.3 billion.

6. We have grown our assets and production dramatically over the past several years and have been frequent participants in public and private debt markets to partially fund that growth. We have been committed to making significant capital expenditures each year to

increase our holdings and production of oil and natural gas properties in the United States; those acquisitions have led to our current status as a very significant producer of oil, natural gas, and natural gas liquids. Because our cash flow from current operations has been insufficient to fund this period of rapid growth, we frequently borrow funds necessary to support our desired capital investments. As of January, 2012, the month before we issued the 2012 Notes, we had a total of $8.9 billion in outstanding public debt. As a result of our relatively high level of borrowing, Chesapeake's debt is typically rated non-investment grade by the ratings agencies and Chesapeake is referred to as "high yield" issuer.

7. I have worked on several public and private debt offerings in my career. Since Chesapeake is well known as a frequent issuer of public debt in the "high yield" market, underwriters often approach us with information about current market conditions and appetite to acquire additional Chesapeake debt securities. They also frequently propose terms that they are prepared to pursue for a new public debt offering. If we are interested in the proposal, which will include an "indicative" interest rate at which the underwriter believes it can sell the notes to the market, I will lead discussions with the underwriter in which we negotiate the key business terms of the offering, which typically include the maturity (or "tenor"), interest rate, and amount of the offering.

8. In my current role at Chesapeake, I am primarily involved in the initial planning stages and negotiation of the key terms of our debt offerings. I serve as the primary contact for Chesapeake, though I work with the Chief Executive Officer and members of the Treasury staff. Once the business terms of an agreement have been negotiated, I rely on both Chesapeake's outside counsel and the professional staff within Chesapeake's Treasury department to document and execute the agreement. For many of our debt offerings, we have relied upon our outside

3

counsel at the Houston-based law firm Bracewell & Giuliani ("Bracewell"). In particular, we turn to Michael Telle, an experienced transactional partner at the Bracewell firm. I have personally worked with Mr. Telle on several of our capital markets transactions. I and the rest of the Treasury team continue to perform an oversight function through the offering period and during the life of the instrument.

## II. BACKGROUND TO THE 2019 NOTE OFFERING

9. The winter of 2011-12 was unusually warm in many parts of the United States and the price of natural gas declined significantly as a result. For Chesapeake, that meant that our cash flow generated by operations would be less than planned in 2012 and we would need to find additional sources of liquidity to fund our planned capital investments. By that time we had embarked on a strategy of shifting the focus of our investments from natural gas, whose prices were trending downward, to oil and natural gas liquids. To assist that shift we had decided to sell some of our oil and natural gas properties and use the proceeds of those asset sales to fund our 2012 capital investment program. We had also planned, and publicly disclosed at the beginning of 2011, that we would seek to reduce our overall indebtedness even while we increased our production revenues. As 2012 began, the quite precipitous decline in natural gas prices led us to focus on raising short-term liquidity to "bridge" our need for cash until the asset sales we were planning could come to fruition later in the year.

## III. THE OFFERING OF THE 2019 NOTES

10. On or around February 8, 2012, Lex Maultsby and Scott Van Bergh of Bank of America Merrill Lynch ("BAML") approached me with a public debt proposal that would assist Chesapeake's immediate liquidity objectives without permanently increasing the amount of Chesapeake's long-term debt. BAML had done an excellent job of reading Chesapeake's

4

financial situation, and suggested that the public debt markets would be interested in a new Chesapeake offering that would include an unusual feature enabling Chesapeake to have the option to repay the notes early, and without any prepayment penalty, after the time we anticipated obtaining the proceeds of some of our planned asset sales.

11. Typically high-yield bonds either do not permit repayment in advance of the maturity date of the notes, or if they do – in which case they are "callable" or "redeemable" notes – they will not permit any redemption for the first several years after the notes are issued and then the price at which the redemption is permitted often includes a premium for the noteholders above "par" (the face amount of the notes). Other notes permit redemption earlier in the life of the notes but only at a "make whole" amount that provides a sufficiently high premium to noteholders that issuers will not have any economic incentive to exercise that right, and such notes are referred to as essentially "non-callable." Several of the notes we had issued prior to the 2019 Notes did not permit any redemption at all in the first few years after the notes were issued, but then set a schedule of redemption prices thereafter that started well above par and stepped down annually thereafter with reducing premiums (for example, the Company's 6.875% Senior Notes due in 2018 are redeemable at 105.156% of par beginning August 15, 2013; 103.438% of par beginning August 15, 2014; 101.719% of par beginning August 15, 2015; and at par from August 15, 2016 through the notes' August 15, 2018 maturity).

12. The proposal Mr. Maultsby and Mr. Van Bergh told me about in February, 2012 would be very different from any notes we had previously issued because they were proposing that the new notes could be called at par early in the life of the notes, after which the notes could only be redeemed at premiums above par. On February 9, 2012, Mr. Maultsby emailed me a written proposal entitled "Short-Term Callable Bond Opportunity." That proposal contemplated

5

a five-year note with an "Optional Redemption" period in which the bonds would be "Callable at Par" for a six-week period that would end at year-end 2012. That proposal appears as Chesapeake Ex. 8. After December 31, 2012 the bonds would be callable but only at premiums above par, though in contrast to the redemption features of our existing notes, the proposed premiums started relatively low (101.5), then went higher (103) and then stepped-down to par as the five-year maturity approached. The sequence of e-mails indicates that I had a call with Mr. Maultsby in which we discussed that initial proposal. Following that conversation, which I do not specifically recall, BAML sent me that same day another presentation showing several variants of its early-call proposal with maturities ranging from five to ten years. This next presentation is Chesapeake Ex. 9.

13. BAML's suggestion that we could issue notes in the public capital markets with a feature that would give us the flexibility to repay the notes at par early in the life of the notes struck me as very innovative and particularly well-suited to our needs at the time. I was not aware of any precedent for their proposal, and until they suggested it, I was not aware that the market would be receptive to a Chesapeake note issuance with such a feature. The flexibility offered by the proposed early redemption at par also was appealing to us. By offering us the ability if we wished to repay the notes early, we obtained the advantages of a relatively short-dated loan that addressed our immediate cash objectives that could be repaid with the proceeds of our planned asset sales, and that would not permanently add new long-term debt to our balance sheet; alternatively, we also obtained the opportunity potentially to refinance the notes if market conditions and our situation made such a refinancing attractive to the company. At the same time, the longer maturity date of the notes would mean we would not be compelled to

6

repay the notes early if the pace of our asset sales did not meet our expectations or if other financial circumstances made it preferable to keep the notes in place for their full maturity.

14. I recognized that the flexibility provided by the notes BAML was proposing would not be free – Chesapeake would need to pay the noteholders for the unusual early par redemption feature. The second presentation BAML sent to us on February 9, Chesapeake Ex. 9, illustrates the cost we would be required to pay to include that provision in the notes. In that presentation, BAML provided us indicative pricing information for various different notes offerings both with and without the early par redemption feature. The difference reflects the fact that with an early redemption feature the coupon interest rate would need to be higher by about .375% annually, and there would need to be an original issue discount of about 1%. That meant that Chesapeake would receive lower proceeds from the underwriters on the day the offering closed by about 1% of the face amount of the notes, and would be obligated to pay a higher annual interest rate for the entire period the notes were outstanding. In the final pricing of the 2019 Notes the actual original issue discount was set at 1.25%. As applied to the $1.3 billion face amount of the notes, the underwriters received $16,250,000 less from the original purchasers of the notes as a consequence of the inclusion of the Special Early Redemption provision, and in turn the underwriters remitted that much less to Chesapeake. In addition, Chesapeake's interest obligation of 6.775% annually is higher than it would have been without the early par redemption feature.

15. Later on February 9 Chesapeake decided to work with BAML to issue notes with a seven-year maturity that included the key option that would enable us to repay the notes early at par. Chesapeake typically acted swiftly when issuing debt and the 2019 Notes were negotiated and documented on a quick timeframe. With the Company working at that time on closing its

7

books on its 2011 fiscal year and fourth quarter, and planning an earnings release towards the end of February, the company's opportunity to issue public securities was closing soon, as there is effectively a "blackout" period in advance of the public release of earnings and the Company's filing of its annual report on the SEC's Form 10-K that follows. Therefore, although BAML had first sent us a written proposal for the offering on Thursday, February 9, we acted very quickly to negotiate and document its terms so we could bring it to market on Monday, February 13.

16. The tenor, amount, and coupon of the note were uncontroversial. I was interested in a 7 year life because the 2019 maturity fit well in the maturity schedule of our existing debt. BAML had included a 2019 maturity among the variants it had presented to us in writing that day, and I selected that. Similarly, an issuance between $1 and 1.5 billion, which BAML had proposed, was sufficient to meet our immediate cash needs.

17. I focused on the terms of what was labeled on BAML's presentation the "Optional Redemption" for Chesapeake's option to redeem the notes early at par. BAML had initially proposed a period of only six weeks – November 15–December 31, 2012. I wanted the longest possible period in which Chesapeake could decide whether to exercise its option. In an e-mail I sent to Mr. Van Bergh, Mr. Maultsby and others at BAML on that Friday evening, February 9, I asked if we could obtain a period of a year. That e-mail is Chesapeake Ex. 10. When I discussed the terms of the early par redemption feature with BAML, we were planning several significant sales of assets in the course of 2012, but at that time in February none of them was close to completion. BAML told us that a year-long period was too long. Because the likelihood of completing sufficient asset sales was greater by sometime in 2013 than in late 2012, I pushed for a window that would extend well into 2013. After BAML had rejected our request for a year-long par redemption window, I recall having telephone call at some point over the

weekend in which I told Mr. Maultsby of BAML that the Company wanted to obtain the longest and latest period we could for us to act on the early par redemption option. I believe other BAML representatives were also on that call, but I do not recall who. What was important to me was the time period in which Chesapeake could act to exercise its option. I do not recall a specific conversation about the "notice" concept, but I know that I was focused on the time the Company had to act, not on the date the payment would need to be made to the noteholders. I knew at that time that as a practical matter we would need to have lined up our source of funds to make the redemption payment before we actually exercised our option and committed ourselves to make that payment and the discussions I had with Mr. Maultsby and other representatives from BAML were around the potential sensitivities to the timing of sales.

18. We engaged Mike Telle of Bracewell to assist in negotiating the documents necessary for the offering. *See* Chesapeake Ex. 12. We relied on Bracewell to negotiate the details of the documents, which I and my colleagues in the Treasury function at Chesapeake reviewed as successive drafts were prepared. Bracewell worked with counsel for BAML, as lead underwriter, which had retained Cravath, Swaine & Moore, LLP ("Cravath"). I understood that the Cravath team, which was led by partner Stephen Burns, also represented the additional underwriters, including Morgan Stanley, which served as a second "joint book-running" manager that signed the underwriting agreement on behalf of the remaining underwriters. William Graham was the lead banker for Morgan Stanley. I believe that I participated in one or more telephone calls over the course of the February 9–13 period in which Mr. Burns participated but I do not recall any details of any such calls.

19. Mr. Telle and his team at Bracewell were responsible for drafting the Supplemental Prospectus in the first instance, and for negotiating it with Cravath. Although I

9

relied on others in Chesapeake's Treasury function (Ms. Grigsby, our Treasurer, Mr. Chambers, our Assistant Treasurer, and their staff) to work directly with Bracewell, I personally reviewed the drafts of the Prospectus Supplement that were exchanged between Bracewell and Cravath, and made comments on at least one of those drafts, as shown in Chesapeake Ex. 15. In my role as Chief Financial Officer my comments focused on the disclosures that the Prospectus Supplement necessarily included about Chesapeake's current financial condition and performance. I did not make comments on the description of the terms of the offering that appeared in the Prospectus Supplement.

20. After several drafts were exchanged that changed both the time period for the Special Early Redemption Provision and its precise wording, I ultimately agreed to a four-month window providing Chesapeake could issue its notice of redemption up to the last day of that window, March 15, 2013. *See* Chesapeake Ex. 20. I reviewed at the time the final form of the Prospectus Supplement and believed at the time of the notes offering, as well as today, that it accurately reflected the business deal I negotiated with BAML that afforded Chesapeake a four-month option period. That option period ended on March 15, 2013, and I understood that Chesapeake was permitted to exercise its option to retire the notes at par by issuing its notice to redeem on any day during the four-month period, including on March 15, the last day of the period. At no time did I ever consider or discuss the possibility of a three-month period for our option, or a final date for us to act of mid-February, 2013.

21. The notes were sold on Monday, February 13, 2012 on the basis of a preliminary Prospectus Supplement that contained the same description of the Special Early Redemption provision that appears in the final form of the Prospectus Supplement that was issued later that day. I understand that the initial purchases of the notes on February 13, directly from the

10

underwriters, settled three days later, on Thursday, February 16, 2012. The supplemental indenture that was required to govern the 2019 Notes was drafted between February 13 and the February 16 closing of the initial purchases of notes. I believe I reviewed the final form of the supplemental indenture, which I recognize as Chesapeake Ex. 4, but I do not believe I reviewed any drafts of it. The business terms of the transaction were memorialized in the Prospectus Supplement. The documentation of the supplemental indenture was a less significant event from my standpoint because it merely needed to reflect the business terms that had already been agreed upon.

22. I viewed the 2019 Notes' Special Early Redemption provision as a significant departure from customary high yield note offerings. Mr. Maultsby told me that BAML was "proud of the unique structure" in an email he sent to me on February 11, 2012, which appears as Chesapeake Ex. 19.

## IV. REDEMPTION OF THE 2019 NOTES

23. On November 15, 2012, the first day of the four-month period in which we could exercise our option to retire the 2019 Notes at par, it did not make business sense for Chesapeake to exercise its option. Although we had successfully completed some significant asset sales as planned, other planned sales were still in the pipeline to be negotiated. Moreover, continued low natural gas prices in 2012 had reduced our cash flow from operations and it would not have made sense to devote our cash and credit resources to the redemption of the 2019 Notes at that time. By January, 2013, however, Chesapeake had substantially improved its liquidity situation. It had closed additional asset sales, was expecting to be able to announce another significant asset sales transaction in February, and had increased its available cash and credit resources. At the same time, the prevailing interest rates in the high yield market had continued to improve

from an issuer's standpoint and Chesapeake had the opportunity to save perhaps $100 million in on-going interest expense for the 2019 Notes if it redeemed them at par and sourced the cost of the redemption by issuing new debt securities at current interest rates.

24. By the second week of January it was clear to me that Chesapeake would exercise its option to redeem the 2019 Notes at par towards the end of our four-month option period. I planned to do a new financing to fund the redemption to take advantage of the attractive rates in the public capital markets. Since we were anticipating filing our annual Form 10-K on March 1, and expected to be announcing in February another significant asset sale agreement that I thought would improve the market's interest in our new financing (which we did, on February 25), it made business sense for us to plan to bring our new financing to the market shortly after March 1. I wanted to have a clear source of funds before we committed to exercise our redemption option. I asked my colleagues in our Treasury function in January to focus on the calendar and the process we would need to follow to pursue the early redemption of the 2019 Notes. In an e-mail that I received from Mr. Chambers on January 13, he confirmed that we had until March 15 to issue our notice to redeem the 2019 Notes. This e-mail appears as Chesapeake Ex. 47.

25. On February 20, 2012, Mr. Chambers told me that he had spoken to a representative of BNY Mellon, the trustee for the 2019 Notes. I learned that in the course of more than one telephone call that day between my colleagues and BNY Mellon that BNY Mellon had at one point agreed with Chesapeake's understanding, but had ultimately taken the position that the last day for Chesapeake to exercise its option to redeem the notes early at par had already passed. With that in mind, I personally spoke with a senior representative of BNY Mellon on this subject on February 28, and BNY Mellon reiterated its new position. We spent

the next two weeks considering ways to deal with this very unfortunate development, and decided to bring this action against BNY Mellon to obtain an authoritative declaration of our right to redeem the 2019 Notes so long as we issue the notice to redeem not later than March 15, 2012.

I declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that the foregoing is true and correct. Executed at Oklahoma City, Oklahoma on April 21, 2013.

/s/ *[signature]*
Domenic J. Dell'Osso