UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x
                    :

CHESAPEAKE ENERGY CORPORATION,   :
                    :

          Plaintiff,       :
                    :

         v.          :      Civil Action No. 13-cv-1582(PAE)
                    :

THE BANK OF NEW YORK MELLON    :
TRUST COMPANY, N.A.,          :
                    :

         Defendant.      :
———————————————————————x

**PLAINTIFF CHESAPEAKE ENERGY CORPORATION'S
POST-TRIAL MEMORANDUM**

RICHARD F. ZIEGLER (RZ0872)
STEPHEN L. ASCHER (SA7820)
MICHAEL W. ROSS (MR4490)
ALI M. ARAIN (AA2008)
PRASHANT YERRAMALLI (PY7225)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, NY 10022-3908

*Counsel for Plaintiff*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

PROOF AT TRIAL .............................................................................................................. 5

   I.   Plaintiff's Case in Chief .......................................................................................... 5

      A.   BAML's Proposal to Chesapeake .................................................................... 5

      B.   The Negotiation and Drafting of the Prospectus Supplement ...................... 7

          1.   Chesapeake and BAML Negotiate the Dates of the Special Redemption Right .... 7

          2.   Mr. Telle's Suggestion to Redefine the Redemption Period ............... 10

          3.   Chesapeake and BAML Agree to and Implement Mr. Telle's Proposal ............. 11

          4.   The Marketing and Underwriting Process ........................................... 14

      C.   The Negotiation and Drafting of the Supplemental Indenture .................... 17

      D.   Expert Evidence Presented by Chesapeake Concerning this Provision ..................... 21

   II.   Defendant's Case ................................................................................................... 22

LEGAL ARGUMENT ............................................................................................................ 25

   I.   The Supplemental Indenture Is Clear and Unambiguous in Chesapeake's Favor ............ 25

      A.   The Role of Custom and Usage (Court's Question #1). ............................... 25

      B.   Chesapeake's Interpretation Is Reasonable While
          BNY Mellon's Interpretation Is Unreasonable. ......................................... 27

   II.   The Relevant Extrinsic Evidence Resolves Any Ambiguity in Chesapeake's Favor ....... 34

      A.   To Determine the Drafters' Intent, the Court Should Consider Extrinsic Evidence
          of Chesapeake's and BAML's Intentions (Court's Question #2). ............................. 34

      B.   Statements Made by Chesapeake Are Not
          Probative Extrinsic Evidence (Court's Question #3). ................................. 42

      C.   The Views of Market Participants Are Not Probative
          Extrinsic Evidence (Court's Question #4). ................................................. 46

   III.   BNY Mellon Has Not Proven Its Affirmative Defenses. ................................... 48

      A.   Conditional Notice ....................................................................................... 48

      B.   Laches .......................................................................................................... 49

CONCLUSION ................................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

<span style="font-variant: small-caps">Cases</span>

*A.G. Cap. Funding Partners, L.P. v. State St. Bank and Trust Co.*,
    10 A.D. 3d 293 (1st Dep't. 2004) ...........................................................................27

*Adasar Grp., Inc. v. NetCom Solutions Int'l, Inc*,
    No. 01 Civ. 0279 (WHP), 2003 WL 1107670 (S.D.N.Y. Mar. 13, 2003) ..............47

*Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*,
    853 F. Supp. 791 (S.D.N.Y. 1994) ...............................................................43, 47

*Aramony v. United Way of Am.*,
    254 F.3d 403 (2d Cir. 2001) ...........................................................................28

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*,
    No. 04CIV10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005) ......................29, 30, 49

*Baladevon v. Abbott Laboratories*,
    871 F. Supp. 89 (D. Mass. 1994) ...................................................................39

*Bank of N.Y. v. First Millennium, Inc.*,
    598 F. Supp. 2d 550 (S.D.N.Y. 2009) .............................................................29

*Bank of New York Mellon v. Commerzbank Capital Funding Trust*,
    – A.3d – 2013 WL 1136821 (Del. Ch. 2013) ..................................................35, 42

*Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*,
    757 F.2d 523 (2d Cir. 1985) ...........................................................................27

*BKCAP, LLC v. Captec Franchise Trust 2000-1*,
    No. 07-cv-637, 2011 WL 3022441 (N.D. Ind. July 21, 2011) ............................49

*Broad v. Rockwell Int'l Corp.*,
    642 F.2d 929 (5th Cir. 1981) (en banc) ...........................................................41

*Brown v. E.F. Hutton Group, Inc.*,
    991 F.2d 1020 (2d Cir. 1993) .........................................................................46

*Chris-Craft Indus. v. Piper Aircraft Corp.*,
    480 F.2d 341 (2d Cir. 1973) ...........................................................................36

*Cruden v. Bank of N.Y.*,
    957 F.2d 961 (2d Cir. 1992) ...........................................................................29

*EBC I, Inc. v Goldman Sachs & Co.*,
    91 A.D.3d 211 (1st Dep't 2011) .....................................................................36

*Escott v. BarChris Constr. Corp.*,
   283 F. Supp. 643 (S.D.N.Y. 1968)........................................................................36

*FCCD Ltd. v. State St. Bank and Trust Co.*,
   No.10-cv-1632(DLC), 2011 WL 519228 (S.D.N.Y. Feb. 15, 2011)......................................26

*Feit v. Leasco Data Processing Equip. Corp.*,
   332 F. Supp. 544 (E.D.N.Y. 1971) ........................................................................36

*Geren v. Quantum Chemical Corp.*,
   832 F. Supp. 728 (S.D.N.Y. 1993)........................................................................41

*Green v. Wachs,*
   254 N.Y 437 (1930) (Cardozo, J.) ........................................................................27

*In re Bank of New England Corp.*,
   404 B.R. 17 (Bankr. D. Mass. 2009) ........................................................................36

*In re Prudential Lines, Inc.,*
   170 B.R. 222 (Bankr. S.D.N.Y. 1994) ........................................................................40

*In re W. Union Tel. Co.,*
   299 N.Y. 177 (1949) ........................................................................27

*In re WICAT Sec. Litig.,*
   600 F. Supp. 1236 (D. Utah 1984)........................................................................36

*John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*,
   717 F.2d 664 (2d Cir. 1983)........................................................................29

*Kaiser Aluminum Corp. v. Matheson*,
   681 A.2d 392 (Del. 1996) ........................................................................41-42

*Kolb v. Suffolk Cty.*,
   109 F.R.D. 125 (E.D.N.Y. 1985) ........................................................................6

*Law Debenture Trust Co. v. Maverick Tube Corp.*,
   595 F.3d 458 (2d Cir. 2010)........................................................................26, 46

*Manley v. AmBase,*
   337 F.3d 237 (2d Cir. 2003)........................................................................6

*MBL Contr. Corp. v. King World Prods., Inc.*,
   98 F. Supp. 2d 492 (S.D.N.Y. 2000)........................................................................39

*Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*,
   No. 02 Civ. 6005 (HBP), 2007 WL 2197830 (S.D.N.Y. July 31, 2007)........................................41

*Metro Funding Corp. v. WestLB AG*,
No. 10 Civ. 1382 (CM), 2010 WL 1050315 (S.D.N.Y. Mar, 19, 2010)................................40

*Metro. Life Ins. Co. v. RJR Nabisco, Inc.*,
716 F. Supp. 1504 (S.D.N.Y. 1989)................................................................35, 41

*Michael J. Torpey, Inc. v. Consol. Edison Co.*,
99 A.D. 2d 484 (2d Dep't 1984).................................................................27

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*,
570 F. Supp. 1529 (S.D.N.Y. 1983)................................................... *passim*

*Napier v. Bossard*,
102 F.2d 467 (2d Cir. 1939) (Hand, J.)...........................................................6

*New Moon Shipping Co. v. Man B & W Diesel*,
121 F.3d 24 (2d Cir. 1997)..................................................................45

*Prescott, Ball & Turben v. LTV Corp.*,
531 F. Supp. 213 (S.D.N.Y. 1981)..............................................................40

*Randolph Equities, LLC v. Carbon Capital, Inc.*,
648 F. Supp. 2d 507 (S.D.N.Y. 2009).............................................................45

*Record Club of Am. v. United Artists Records, Inc.*,
72 Civ. 5234(WCC), 1991 WL 73838 (S.D.N.Y. Apr. 29, 1991) ............................................41

*Redd v. N.Y. State Div. of Parole*,
No. 07 Civ. 120, 2013 WL 588233 (E.D.N.Y. Jan. 24, 2013)...........................................6

*Richie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*,
280 F.R.D. 147 (S.D.N.Y. 2012) ................................................................45

*Rothschild v. Rio Grande W. Ry. Co.*,
84 Hun 103, 65 N.Y. St. Rep 193 (N.Y. Gen. Term 1895) ..............................................35, 40

*Sass v. New Yorker Towers, Ltd.*,
23 A.D.2d 105 (1st Dep't 1965) ................................................................35, 40

*Schering Corp. v. Home Ins. Co.*,
712 F.2d 4 (2d Cir. 1983) ......................................................................40

*Seiden Assoc., Inc. v. ANC Holdings, Inc.*,
959 F.2d 425 (2d Cir. 1992).....................................................................30

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
691 F.2d 1039 (2d Cir. 1982)...................................................................27, 29

iv

*Sotheby's Int'l Realty, Inc. v. Black*,
 472 F.Supp.2d 481 (S.D.N.Y. 2006)...................................................................27

*Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*,
 412 F.3d 103 (2d Cir. 2005)..............................................................................45

*Stockman v. Heartland Indus. Partners, L.P.*,
 Nos. 4227-VCS, 4427-VCS, 2009 WL 2096213 (Del. Ch. July 14, 2009)............................40

*United Rentals, Inc. v. RAM Holdings, Inc.*,
 937 A.2d 810 (Del. Ch. 2007).............................................................................39

*United States Fire Ins. Co. v. General Reinsurance Corp.*,
 949 F.2d 569 (2d Cir. 1991)..........................................................................39, 40

*United States Trust Co. v. Alpert*,
 10 F. Supp. 2d 290 (S.D.N.Y. 1997)......................................................................38

*United States v. IBM*,
 90 F.R.D. 377 (S.D.N.Y. 1981) ............................................................................6

*United States v. Stuart*,
 489 U.S. 353 (1989).......................................................................................38

**OTHER AUTHORITIES**

12 Williston on Contracts § 34:11 ........................................................................27

Efrat Lev, *The Indenture Trustee: Does It Really Protect Bondholders?*, 8 U. Miami Bus.
 L. Rev. 47, 71 (1999)....................................................................................37

Restatement (Second) of Contracts § 201(1) ..............................................................39

Robert I. Landau & Romano I. Peluso, *Corporate Trust Administration and Management*
 117 (6th ed. 2008)...........................................................................36, 37, 38, 42

Steven L. Schwarcz & Gregory M. Sergi, *Bond Defaults and the Dilemma of the
 Indenture Trustee*, 59 Ala. L. Rev. 1037, 1067 (2007) ..................................................36

Smith, Case & Morison, *The Trust Indenture Act of 1939 Needs No Conflict of Interest
 Revision*, 35 Bus. Law. 161, 170 (1979) .................................................................37

**TABLE OF DEFINITIONS**

| Term | Definition |
|---|---|
| "2019 Notes" | Chesapeake's 6.775% Senior Notes due 2019 |
| "Base Indenture" | Indenture dated as of August 2, 2010 (Pl. Ex. 6) |
| "BAML" | Merrill Lynch, Pierce, Fenner & Smith, Inc. |
| "BNY Mellon" or "Defendant" | The Bank of New York Mellon Trust Company, N.A. |
| "Bracewell" | Bracewell & Giuliani LLP |
| "Chesapeake" or "Company" | Chesapeake Energy Corporation |
| "Cravath" | Cravath, Swaine & Moore LLP |
| "Ct. Ex. 1" | Court Exhibit 1 (Declaration of Chesapeake Chief Financial Officer Domenic J. Dell'Osso Jr. dated April 21, 2013) |
| "Ct. Ex. 2" | Court Exhibit 2 (Declaration of Bracewell Partner Michael S. Telle dated April 21, 2013) |
| "Ct. Ex. 3" | Court Exhibit 3 (Declaration of Cravath Partner Stephen L. Burns dated April 21, 2013) |
| "Ct. Ex. 4" | Court Exhibit 4 (Declaration of Dr. John D. Finnerty dated April 21, 2013) |
| "Ct. Ex. 5 " | Court Exhibit 5 (Declaration of BAML Managing Director James Alexander Maultsby dated April 21, 2013) |
| "Finnerty Report" | Pl. Ex. 105A (Expert Report of Dr. John D. Finnerty) |
| "Make-Whole Redemption Provision" | Section 1.7(c) of the Supplemental Indenture |
| "Notice" | Chesapeake's Notice of Special Early Redemption at Par dated March 15, 2013 (Dkt. No. 30 Ex. A) |
| "Special Early Redemption Option" | Chesapeake's right as defined in the Special Early Redemption Provision |
| "Special Early Redemption Provision" | Section 1.7(b) of the Supplemental Indenture |

| "Supplemental Indenture" | Ninth Supplemental Indenture dated February 16, 2012 (Pl. Ex. 4) |
|---|---|
| "Prospectus Supplement" | Prospectus Supplement for Chesapeake's 2019 Notes dated February 13, 2012 (Pl. Ex. 1) |
| "Tr." | Transcript of Trial Proceedings before Hon. Paul A. Engelmayer dated April 23-25, 2013 |
| "Underwriting Agreement" | Underwriting Agreement dated February 13, 2012 (Pl. Ex. 3) |

## PRELIMINARY STATEMENT

The trial of this matter revealed no genuine factual dispute: The negotiators and drafters of the Special Early Redemption Provision unanimously intended Chesapeake to have until March 15, 2013 to exercise its option. BNY Mellon's contrary reading of the provision disregards that uniform contemporaneous intent.

BNY Mellon's proposed interpretation to the contrary – that the "notice" provision of Section 1.7(b) operates to restrict Chesapeake from exercising its option during the first thirty days of the Special Early Redemption Period – should also be rejected as a matter of law, even without consideration of the extrinsic evidence. In contending that the Special Early Redemption Provision unambiguously establishes a notice period of November 15, 2012 through February 13, 2013, and a redemption period from December 15, 2012 through March 15, 2013, BNY Mellon argues that the customary meaning of an industry term (the word "redeem") must prevail in the face of prominent contractual language indicating that the parties were choosing an unusual procedure in lieu of the customary one. Thus, BNY Mellon would have the Court use evidence of "custom and usage" not to aid its interpretation of the contract but instead to rewrite it, in violation of well-established law.

BNY Mellon's insistence that the customary meaning of the word "redeem" trumps the contractual usage would override the second sentence of Section 1.7(b) or reduce it to an incoherent triviality, making a mockery of the process of contract interpretation. Among other things, BNY Mellon asks the Court to interpret a contract that says "Chesapeake may redeem at par from November 15, 2012 through March 15, 2013" to mean instead: "Chesapeake may redeem at par from *December* 15, 2012 through March 15, 2013." And BNY Mellon offers no

business reason why the parties would restrict the front end of the redemption period, or why they would do it using an unusual notice provision.

If the Court finds the provision ambiguous, the Court should also find for Chesapeake. To avoid the intent of the drafters, BNY Mellon proposes to overhaul contract law in at least three radical ways:

First, BNY Mellon argues that the Court should disregard the unanimous intent of the negotiators and drafters because that intent was not disclosed to BNY Mellon. But courts have disregarded evidence of drafters' intentions only in unusual circumstances, such as where there were no negotiations because the drafter was able to act unilaterally. Nothing of the sort occurred here; Chesapeake was required to negotiate the provision with BAML, and did so.

Courts have also occasionally disregarded a drafter's intentions pursuant to the "unexpressed intent" rule, where a negotiator keeps its subjective intention to itself until after a dispute arose. But that doctrine has no application here, where Chesapeake and BAML repeatedly expressed their intentions to each other, and the only party who claims to have been unaware of them, BNY Mellon, had no role in negotiating the business terms of the transaction – but could have objected to the text of the early redemption provision had it chosen to review it.

The second way that BNY Mellon tries to overturn settled contract law is by contending that instead of looking to the drafters' intentions, the Court should automatically enforce the Supplemental Indenture in a way that is contrary to Chesapeake's interests, and purportedly consistent with note holders' "reasonable expectations." This attempt to invoke the doctrine of *contra proferentem* is unwarranted. That doctrine is a "last resort" to be applied only in narrow circumstances to resolve "hopeless" ambiguity. Moreover, issuers and underwriters have an arms' length relationship, such that an issuer cannot be considered the sole drafter of a

prospectus and indenture. As Judge Sand put it in *Morgan Stanley & Co., Inc. v. Archer Daniels Midland Co.* in rejecting a note holder's invitation to construe ambiguous indenture language against the issuer:

> The Indenture was negotiated by sophisticated bond counsel on both sides of the bargaining table . . . . [E]ven if we were to adopt this rule, it is not at all clear that [the issuer] would be considered the drafter of the Indenture, given the active participation of the managing underwriter. Indeed, it is arguable that the ambiguous language should be construed in favor of [the issuer].

570 F. Supp. 1529, 1541 (S.D.N.Y. 1983). It would be the height of irony to apply such a rule against Chesapeake on the facts of this case, where it is undisputed that Chesapeake's counsel tried to make the provision at issue "more clear" by inserting additional language and was persuaded not to in the interest of minimizing differences in phrasing between the prospectus and the indenture.

In fact, BNY Mellon should be the last party permitted to invoke the *contra proferentem* rule since it was expressly asked to provide comments on the text of the Supplemental Indenture and chose to remain silent rather than seek additional clarity for the benefit of note holders. Having been given a seat at the table, BNY Mellon is disabled from invoking a rule of construction against Chesapeake as if it were the sole drafter.

Third, BNY Mellon asks the Court to construe the Supplemental Indenture in accordance with whatever note holders "reasonably expected" – or even actually expected. At trial, BNY Mellon presented no meaningful evidence of what any note holder actually or reasonably believed. And tellingly, the note holders who originally intervened in this matter withdrew and successfully opposed discovery into their understanding of the provision. If anything, these circumstances support an inference that many note holders actually and reasonably understood that Chesapeake had until March 15 to issue notice, and this litigation was triggered by a hedge

fund that sought to earn a risk-free arbitrage by suggesting there was a claimed ambiguity in the Supplemental Indenture.

The only evidence BNY Mellon presented with respect to note holders' expectations was an opinion of its expert James Mullin, who did not purport to marshal any evidence of what any investor or any other market participant actually believed. And since Mr. Mullin readily admitted that investors and others in the bond industry typically act after reviewing only the cover of the prospectus, which he acknowledged was not "good judgment," BNY Mellon did not prove that investors reasonably believed that Chesapeake's option expired on February 13.

In any event, the reasonable expectations of investors are simply not the concerns of contract law; protecting those expectations is the fundamental purpose of the securities laws. The highly sophisticated purchasers of the 2019 Notes plainly cannot prove that they reasonably relied on any misleading statement in the prospectus or in Chesapeake's securities filings, much less a material one. New York contract law does not permit BNY Mellon to do an end run around the challenging elements of a securities law claim by requiring an indenture to be interpreted in accordance with investors' expectations, let alone unreasonable and unsubstantiated expectations. Pursuant to the only applicable law – contract law – the terms of the Supplemental Indenture should be enforced consistent with their reasonable meaning and with the unanimous intent of the drafters.

## <u>PROOF AT TRIAL</u>[1]

1.        Chesapeake is a publicly traded independent oil and natural gas producer and a regular issuer of debt and equity securities.  On February 16, 2012, Chesapeake completed its public offering of its 2019 Notes.  Pl. Ex. 1.  The offering was governed by a pre-existing Base Indenture that also covered other securities offerings, and a Supplemental Indenture entered into for the specific purpose of offering the 2019 Notes.  Pl. Exs. 4, 6.  BNY Mellon is the trustee under both indentures.  *Id.*

## I.        Plaintiff's Case in Chief

### A.        BAML's Proposal to Chesapeake

2.        Because Chesapeake is a well known issuer of public debt in the "high yield" market, underwriters regularly approach Chesapeake with proposals for possible new corporate debt offerings.  Ct. Ex. 1 ¶ 7.  It is standard practice for Chesapeake and its counsel to negotiate with underwriters and their counsel over the key business terms of such offerings, including the maturity, interest rate, and amount of the offering.  *Id*.

3.        BAML is an underwriter of securities for corporate issuers such as Chesapeake.  As an underwriter of high-yield debt securities, BAML's role is to propose note offerings that it considers attractive to issuers but that it can also market to sophisticated institutional investors.  And because BAML had ongoing dialogues with numerous institutional investors, BAML is well aware of the financial terms that will and will not be sufficient to attract private capital.

---

[1] The numbered paragraphs summarize the proof at trial.  Because Chesapeake's Pretrial Brief cited some of the declarations that were being submitted simultaneously, portions of this section track that brief.  Chesapeake has supplemented that presentation with additional evidence that was developed at trial and that is pertinent to issues raised by the Court.

4.     The 2019 Notes offering originated with a proposal by Lex Maultsby of BAML to Domenic ("Nick") J. Dell'Osso Jr., Chesapeake's Chief Financial Officer. *Id.* ¶ 10; Pl. Ex. 8.[2] BAML proposed an approximately $1 billion debt offering that would give Chesapeake the option to redeem the notes at par early in the life of the notes. Ct. Ex. 1 ¶¶ 12, 16; Ct. Ex. 5 ¶ 5; Pl. Exs. 8, 10. This early redemption option "was unprecedented in similar high-yield bond offerings," according to Mr. Maultsby, because early redemption is typically conditioned on the issuer paying note holders a substantial premium above par. Ct. Ex. 5 ¶ 4. Sometimes the premium takes the form of a make-whole price that is tied to the present value of the future interest that would otherwise have been payable for the remaining life of the notes, and in other instances the premium is a stipulated price above par. Finnerty Report ¶ 13.

5.     Chesapeake believed that this early par redemption option perfectly suited its financial needs at the time. After an unseasonably warm winter and consequently low natural gas prices, Chesapeake needed additional liquidity. Ct. Ex. 1 ¶ 10. Since Chesapeake expected to generate cash by selling certain assets over the course of the year, Chesapeake was interested in a short-term transaction to provide a bridge until after those sales were completed. Tr. 112-13; Ct. Ex. 5 ¶ 12. According to Mr. Dell'Osso, "BAML's suggestion that we could issue notes in the public capital markets with a feature that would give us flexibility to repay the notes at par

---

[2] In spite of the Court's repeated statements, *see* Tr. 8-10, 242, 351, 442, BNY Mellon seeks to admit deposition testimony of three witnesses who testified live at trial. This Court generally does not permit that procedure. *See, e.g.*, *Manley v. AmBase*, 337 F.3d 237, 248 (2d Cir. 2003); *United States v. IBM*, 90 F.R.D. 377, 382 (S.D.N.Y. 1981); *Kolb v. Suffolk Cty.*, 109 F.R.D. 125, 127 (E.D.N.Y. 1985); *see also Napier v. Bossard*, 102 F.2d 467, 469 (2d Cir. 1939) (Hand, J.) ("The deposition has always been, and still is, treated as a substitute, a second-best, not to be used when the original is at hand."). The only in-circuit case law cited by BNY Mellon, *Redd v. N.Y. State Div. of Parole*, No. 07 Civ. 120, 2013 WL 588233 (E.D.N.Y. Jan. 24, 2013), is inapposite since it is a pretrial ruling concerning available witnesses. Chesapeake is prejudiced by BNY Mellon's tactic because, for example, its cross examination of Mr. Dell'Osso spans less than ten pages of trial transcript, *see* Tr. 63-72, but it seeks to introduce over a hundred pages of deposition testimony. Had BNY Mellon chosen to cross-examine Mr. Dell'Osso on such subjects at trial, Chesapeake would have elicited clarifying testimony.

early in the life of the notes struck me as very innovative and particularly well suited to our needs at the time." Ct. Ex. 1 ¶ 13.

6.    On Thursday, February 9, Mr. Maultsby emailed BAML's first written proposal to Mr. Dell'Osso.  Ct. Ex. 1 ¶ 12; Pl. Ex. 8.  That proposal contemplated an "Optional Redemption" period in which the proposed bonds would be "Callable at Par" from November 15, 2012 through December 31, 2012, followed by periods in which the bonds could be called at premiums above par.  Pl. Ex. 8.  Later that day, following a call, Mr. Maultsby emailed a presentation showing variants of BAML's early-call proposal.  Ct. Ex. 1 ¶ 12; Ct. Ex. 5 ¶ 5; Pl. Exs. 9, 10.  These preliminary proposals did not spell out all the particulars of an expected early redemption option.  Pl. Exs. 9, 10.  They did make clear, however, that Chesapeake would have to pay for this early redemption feature through a higher interest rate and by selling the notes to the initial purchasers at an "original issue discount."  Ct. Ex. 1 ¶ 14.

**B.    The Negotiation and Drafting of the Prospectus Supplement**

**1.    Chesapeake and BAML Negotiate the Dates of the Special Redemption Right**

7.    Although Mr. Dell'Osso was very interested in the option to redeem at par, he preferred a much longer early redemption period than the last six weeks of 2012 that BAML originally proposed.  Ct. Ex. 1 ¶ 17.  Mr. Dell'Osso wanted Chesapeake to have greater flexibility to raise the funds and make a decision about exercising the option without having "a gun to its head" at the end of the year.  Ct. Ex. 1 ¶ 9; Pl. Ex. 10.  Mr. Dell'Osso "wanted the longest possible period in which Chesapeake could decide whether to exercise its option."  Ct. Ex. 1 ¶ 17.  He originally proposed a twelve-month call period with no specified starting or ending dates.  *Id.*; Pl. Ex. 10.

8.     The underwriters were not willing to give Chesapeake a year-long option to redeem at par, however, because they did not believe that investors would buy bonds that gave the issuer such a lengthy option; as is typical during this process, a key concern of an underwriter like BAML and its counsel is to ensure that the business terms of the offering are attractive to potential investors and that the deal is marketable.  Tr. 152-54; 235-36.  As Mr. Burns put it:

> [The underwriter] is trying to find a balance of serving the issuer and helping them craft the transaction that's going to have what they view as market terms, given what the market conditions are and what the investor expectations are at the time.  That's a negotiation in the balance and it involves recommendations from the underwriters and sometimes push back from the company.  And they find a set of terms that they think they can take to the market that will clear the market, and the market will be comfortable buying at a price or rate that is acceptable to the company, so it is a give and take.

Tr. 155-56.

9.     The underwriters rejected Mr. Dell'Osso's proposal because they did not believe that a 12-month call period was marketable to prospective investors.  Ct. Ex. 1 ¶ 17.  The parties soon settled on a call period that would begin in late 2012 and extend for some time into 2013. *Id.*; Pl. Exs. 10, 16.

10.    The parties quickly moved to conclude a deal.  Chesapeake's lead lawyer at Bracewell, Michael Telle, was responsible for drafting the Prospectus Supplement in the first instance, and BAML's lawyers at Cravath, led by Mr. Burns, represented the underwriters.  Tr. 116-17; Ct. Ex. 2 ¶ 15; Ct. Ex. 3 ¶¶ 8-9; Pl. Ex. 11.

11.    The timeframe the parties had to finalize and document the details of the deal was short.  Ct. Ex. 1 ¶ 15.  With a Form 10-K expected to be filed in a few weeks, the company could not issue any debt within a so-called "blackout" period of two weeks prior to its release.  *Id.*; Ct. Ex. 2 ¶ 11.  As a result, the parties decided to try to sell the notes on Monday, February 13, 2012, meaning they would finalize the deal between Thursday, February 9 and Monday, February 13.

12.     During this period, in addition to finalizing the business terms of the deal to ensure it was marketable to investors, BAML also performed its due diligence on Chesapeake to ensure that the disclosure to investors was fairly reflective of Chesapeake's financial condition. Tr. 235-36; Ct. Ex. 3 ¶¶ 9-10.   Because the Company was in the process of clarifying its financial strategy for the coming year in light of depressed natural gas prices, the due diligence and disclosure was a major focus of Chesapeake's and the lawyers' efforts.

13.     Notably, BNY Mellon was not involved in negotiating the business terms of the deal or in drafting the Prospectus Supplement.  Tr. 84-85, 92; Ct. Ex. 2 ¶ 13; Pl. Exs. 20, 22, 25. Because the trustee's role is largely administrative and ministerial, trustees are not typically involved in the negotiations of the business terms.  Tr. 151-52.

14.     Late on Friday, February 10, Bracewell circulated to Cravath and the underwriters the Company's initial draft of the Prospectus Supplement.  Ct. Ex. 2 ¶ 15; Ct. Ex. 3 ¶ 11; Pl. Ex. 13.  This first draft proposed on behalf of Chesapeake an early redemption window "[b]etween November 15, 2012 and March 31, 2013."   Pl. Ex. 13.   Specifically, in the "Description of Notes," Bracewell inserted the following:

> *Special Redemption*.  Between November 15, 2012 and March 31, 2013, the Notes will be redeemable at our option at any time in whole, or from time to time in part, at a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption.

*Id.*; *see also* Ct. Ex. 3 ¶ 11.

15.     This language used only the customary formulation for describing a redemption period.  Ct. Ex. 2 ¶ 15 ("At this stage, we simply 'dropped in' a common formulation of a redemption disclosure.").  That prior draft had also included – and the circulated draft retained – a description of a standard make-whole redemption provision permitting the company to redeem the notes at a premium above par, in addition to this "Special Redemption" provision.  Pl. Ex. 13.

16. In response to this proposed four-and-a-half month early redemption at par window, the underwriters proposed to shorten the end date from March 31 to March 15. Ct. Ex. 2 ¶¶ 16-17; Ct. Ex. 3 ¶ 14; Pl. Ex. 16. This change was not made to reduce Chesapeake's flexibility but, as explained by Mr. Burns, to conform the redemption date to the dates for interest payments and maturity, which are typically on the first and fifteenth of the month. Ct. Ex. 3 ¶ 14.

## 2. Mr. Telle's Suggestion to Redefine the Redemption Period

17. Mr. Telle of Bracewell was concerned that if March 15 was the deadline for Chesapeake to consummate a "special" redemption at par, and Chesapeake had to give notice of a special early redemption at least 30 days prior to the redemption date, the Company would not have enough time to decide whether to exercise its right. The company wanted to make sure it had ample time to sell the assets and decide whether to exercise the option. Ct. Ex. 2 ¶ 18 ("I understood that my client wanted as much time as possible following the close of calendar year 2012 to make a decision as to whether to exercise its redemption option, and accordingly that February 13 was not a desirable deadline.").

18. To accomplish this goal, Mr. Telle "identified that one way to provide Chesapeake with more time to decide whether to exercise its par redemption option would be to specify in the Special Early Redemption Provision that Chesapeake need only give notice of its election to exercise the option." *Id.* ¶ 19. Because the Base Indenture required any notice of redemption to be sent between 30 and 60 days prior to the redemption date, making March 15 a deadline for notice rather than completion would give the company at least 30 more days to decide whether to exercise the right, and up to 60 more days to fund a redemption. Ct. Ex. 2 ¶¶ 19-20; Pl. Ex. 6.

19.     Mr. Telle was proposing an unusual change to the redemption provision in the Prospectus Supplement then being drafted.   There is no dispute that redemption periods ordinarily refer to the time to complete redemption, with notice required to be given 30 to 60 days in advance of the "redemption date."  Ct. Ex. 2 ¶ 21; Ct. Ex. 3 ¶¶ 16, 29; Finnerty Report ¶ 35.

20.     But Mr. Dell'Osso had emphasized that he wanted the longest possible period in which Chesapeake could decide whether to take advantage of the early redemption option it was paying for, and Mr. Telle thought it made sense to define the period by the time the Company would need to act by giving its notice to exercise its option.  Ct. Ex. 1 ¶ 17; Ct. Ex. 2 ¶¶ 19-21.

### 3.     Chesapeake and BAML Agree to and Implement Mr. Telle's Proposal

21.     The uncontroverted record evidence demonstrates that the senior-most representatives of the issuer and the lead underwriter agreed to Mr. Telle's proposal and that both sets of lawyers purposefully implemented it.  Tr. 139-42, 146-48; Ct. Ex. 1 ¶¶ 17, 20; Ct. Ex. 2 ¶¶ 16-17, 19-21; Pl. Exs. 20, 23, 25.

22.     Most important, according to the recollection of Mr. Burns of Cravath, on Saturday, February 11, Chesapeake and BAML agreed to the concept in a telephone conversation that included Mr. Dell'Osso of Chesapeake and at least one banker from BAML.  Tr. 139-42; Ct. Ex. 3 ¶ 16.  As Cravath's Mr. Burns testified, "the unusual subject matter" of the call "stuck in my mind."  Ct. Ex. 3 ¶ 16.  "I recall that Mr. Dell'Osso expressed concern about having sufficient time for Chesapeake to complete a redemption under the special early redemption provision, and that he raised the concept of being able to redeem the notes so long as notice was given by March 15."  *Id.*  Mr. Burns has further explained that "[w]hen I got off the call, it was my understanding that the Company and the underwriters had agreed as a business matter that the Company would be permitted to give notice of an early redemption at par until

March 15, 2013 and, as long as they gave such notice by such date, redeem the bonds on a redemption date thereafter." *Id.*

23.     Although Mr. Dell'Osso and Mr. Maultsby do not recall this specific conversation, they both share the same contemporaneous understanding of the provision conveyed in that conversation, namely, that the March 15 date was a deadline for notice. Tr. 230-31; Ct. Ex. 1 ¶ 20; Ct. Ex. 5 ¶ 8 ("I understood that sentence to mean that Chesapeake could issue a notice to redeem the 2019 Notes at par as late as March 15, 2013."). For his part, Mr. Maultsby did not focus on the time period in which a redemption payment could occur after notice was issued. Ct. Ex. 5 ¶ 8. He testified, however, that BAML relied on counsel at Cravath to "ensure that the language in the Prospectus Supplement effectuated the terms of the business arrangement between Chesapeake and the underwriters." Ct. Ex. 5 ¶ 11.

24.     After the issuer and the lead underwriter agreed to this term as a business matter, the lawyers affirmed and memorialized that agreement. Bracewell's next draft of the "Special Early Redemption" provision of the Prospectus Supplement included a new sentence, drafted by Mr. Telle, and inserted into the detailed "Description of the Notes" section:

> We may redeem the notes pursuant to the special early redemption provisions so
> long as the notice of redemption [is] given during the Early Redemption Period.

Pl. Ex. 20; *see also* Ct. Ex. 2 ¶ 21; Ct. Ex. 3 ¶¶ 17-18. This draft, containing the key language that was carried through to the final prospectus, was distributed to Linda Garcia of BNY Mellon and to Bayard Chapin, an attorney for BNY Mellon at Emmet, Marvin & Martin, LLP on February 12, 2012. Pl. Ex. 22.

25.     When Mr. Burns saw Mr. Telle's suggested language the next morning, he was "not surprised" because he expected to see language to this effect "[i]n light of the telephone discussion that I had heard the night before." Ct. Ex. 3 ¶ 18. Indeed, Mr. Burns confirmed that

the addition of this language "was consistent with the conversation the previous evening" when Mr. Dell'Osso expressed his desire for the agreement to allow Chesapeake to issue notice for par redemption as late as March 15.  Tr. 141-42; *see* Ct. Ex. 3 ¶ 16.

26.     In a draft returned by Cravath midday on Sunday, February 12, Cravath accepted Mr. Telle's drafting of this crucial sentence, and, equally important, copied that sentence into "The Box" describing the most important terms of "The Offering."   Ct. Ex. 2 ¶ 23; Ct. Ex. 3 ¶ 19; Pl. Ex. 23.  This addition was transmitted by means of a handwritten "rider" that tracked the language proposed by Mr. Telle:

> We may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption [is] given during the Early Redemption Period.

Pl. Ex. 23.  In other words, Cravath responded to Mr. Telle's proposal by adding this same language earlier in the Prospectus Supplement where it would be even more prominently disclosed to prospective investors.  Ct. Ex. 2 ¶ 22 ("I received drafts from Cravath that plainly signified the Underwriters' agreement to the change.").

27.     At least five drafts of the Prospectus Supplement were subsequently transmitted between the parties, each containing this language and in one instance correcting a typo within that language.  Ct. Ex. 2 ¶¶ 23-27; Ct. Ex. 3 ¶¶ 19-21; Pl. Exs. 23, 25, 28, 30, 32.  At least of one of these drafts was copied to BNY Mellon's Ms. Garcia, Pl. Exs. 25, and one was separately forwarded to her and Mr. Chapin, Pl. Ex. 22.  No further material changes were made to the redemption terms of the deal.  Pl. Ex. 38.

28.     On Sunday night, for several hours while Mr. Telle was at the printer finalizing the prospectus, there was essentially an open line between Mr. Telle, Cravath, and various client representatives.  Ct. Ex. 2 ¶ 24.  During that call, the parties intermittently discussed various edits to the prospectus as part of a process to finalize it.  *Id.*; Pl. Exs. 26, 27.  Mr. Telle recalls

that during this conversation, Mr. Dell'Osso asked whether the key notice provision meant that he had until March 15, 2013 to decide whether to exercise the Special Early Redemption Option, and an unnamed representative of the underwriters replied affirmatively. Ct. Ex. 2 ¶ 24.

29.     While this conversation recalled by Mr. Telle occurred on Sunday, and the conversation between Mr. Dell'Osso and BAML recalled by Mr. Burns occurred on Saturday, the two conversations are, of course, entirely consistent in substance. Mr. Dell'Osso does not specifically recall either conversation but recalls that he clearly understood that Chesapeake would have until March 15 to decide whether to issue a notice to redeem its new 2019 Notes at par. Ct. Ex. 1 ¶ 20.

30.     As noted above, however, this deal was negotiated in a very short time frame almost entirely over a weekend, and the personnel in Chesapeake's Treasury function were primarily focused on the disclosures in the Prospectus Supplement about the Company's financial condition and performance, which are of the utmost importance under the securities laws. Pl. Ex. 12. Under these circumstances, it should come as no surprise that the outside counsel, who were most likely to appreciate the unique nature of the revision, have the clearest recollection of it.

### 4.     The Marketing and Underwriting Process

31.     In an offering for an issuer that is well known to the bond market, like Chesapeake, deal launch and pricing often occur on the same day. Ct. Ex. 3 ¶ 5. As lead book runner, an underwriter like BAML sells only to qualified institutional investors, who are the market's most sophisticated purchasers and who carefully analyze their purchases (often with the assistance of counsel). Tr. 154-56, 212. Investors sometimes even provide comments on the offering terms before they are final. Tr. 154-56.

32.     On Monday, February 13, after the redemption terms had been finalized but before the pricing terms (coupon and original issue discount) had been determined, a draft of the Prospectus Supplement was provided to prospective investors and used during a "Road Show" to sell the 2019 Notes to potential investors. Ct. Ex. 2 ¶ 26; Ct. Ex. 5 ¶ 10; Pl. Exs. 31, 35 (Road Show presentations); *see also* Def. Ex. 49 (recording of Road Show presentation). There is no evidence that investors were concerned as to whether the end date of the Special Early Redemption Provision was March 15, 2013 or 60 days thereafter; to the contrary, the Road Show presentation reflects only that there was some "confusion" about whether Chesapeake's right to redeem began immediately after the offering or later in 2012. Def. Ex. 49; Tr. 224-25.

33.     After the roadshow the pricing terms were finalized between the Company and the underwriters and reflected in a final Rule 433 Pricing Term Sheet. Pl. Ex. 2; Ct. Ex. 2 ¶¶ 31-32; Ct. Ex. 3 ¶ 22; Pl. Exs. 3, 37. The Pricing Term Sheet contained a disclosure of the notice-based redemption provision:

> The issuer may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period.

Pl. Ex. 37; *see also* Ct. Ex. 2 ¶ 32; Ct. Ex. 3 ¶ 22. This Pricing Term Sheet was made available to investors who purchased the notes directly from the underwriters on February 13; it was also formatted to file on EDGAR, the SEC's online document system. Tr. 225-26; 227-29; Ct. Ex. 5 ¶ 10; Pl. Ex. 36. At the time they decided to purchase the notes, the final Prospectus Supplement, which included the pricing information, was not yet available. Tr. 225-26; 227-28; Ct. Ex. 5 ¶ 10.

34.     By the end of the day, BAML was able to sell the 2019 Notes to 166 institutional investors. Pl. Ex. 39. The investors included mutual funds, hedge funds, and other institutional investors; not one of the initial investors was a natural person. *Id.* The largest single investor

purchased $100,000,000 of the 2019 Notes. *Id.* The average investor purchased approximately $7.8 million in notes and no investor purchased less than $100,000 in notes. *Id.*

35. On February 14, 2012, the parties finalized the Prospectus Supplement without further changes to the key language on the Special Early Redemption provision. Ct. Ex. 2 ¶¶ 26-27; Pl. Exs. 1, 38.

36. On February 13, the issuer and the underwriters had executed an Underwriting Agreement, which set forth the underwriters' commitment to buy, and the issuer's commitment to sell, the 2019 Notes. Ct. Ex. 2 ¶¶ 31-32; Ct. Ex. 3 ¶ 22; Ct. Ex. 5 ¶ 7; Pl. Exs. 29, 33, 37. Included as Schedule C to the Underwriting Agreement, and incorporated into its terms, was the Pricing Term Sheet, which, as described above, prominently included the notice-based special early redemption provision. *See* Pl. Ex. 37; Ct. Ex. 2 ¶ 31-32; Ct. Ex. 3 ¶ 22.

37. BNY Mellon has attempted to draw a stark distinction between a "firm commitment" underwriting, in which an underwriter buys the notes from the issuer and then takes the risk of whether it will be able to re-sell them to initial investors, and a "best efforts" underwriting, in which an underwriter promises only to make its "best efforts" to sell the notes, and thus takes no financial risk. This distinction is not nearly as black-and-white as BNY Mellon contends, however, particularly in the specific circumstances of this underwriting.

38. By its terms, the underwriting agreement for the 2019 Notes Offering does not state that the underwriters are merely undertaking their "best efforts" to sell the notes. Tr. 225; Pl. Ex. 3 (Underwriting Agreement) ¶ 3. Rather, the Underwriting Agreement provided for the underwriter's "firm commitment" to purchase the notes. This offering can be characterized as a "best efforts" underwriting to the extent that the underwriting agreement was executed after BAML had received commitments from the initial investors. Tr. 225-26. Although this

sequencing mitigated BAML's risk of being unable to sell the notes in the first instance, it did not eliminate BAML's "economic risk" of being unable to consummate those sales; as Mr. Maultsby put it, BAML remained "long" the entire offering between the trade date on Monday, February 13 and the settlement date on Thursday, February 16. Tr. 205, 225-27. As a result, BAML still took the credit risk that individual note holders might be unable or unwilling to consummate their purchases, Tr. 226-27, a risk that was not insignificant with respect to individual hedge fund purchasers and that could have been substantial if a major macroeconomic or political event, such as the Lehman Brothers bankruptcy or a large terrorist attack, were to occur during that interval.

39. Underwriters also have a keen reputational interest in assuring that their offerings are and remain sound investments for investors. Tr. 154-56, 227. For a high-yield offering like the 2019 Notes offering where the investors were composed of the most sophisticated mutual funds, hedge funds, and other institutional investors, BAML's incentives were particularly strong.

40. Bracewell also drafted, and Chesapeake executed, board of directors' materials reflecting and approving the material terms of the deal. Pl. Ex. 40. Among these materials were the "Pricing Committee Resolutions," dated February 13, 2012, which conformed to the same language included in the Prospectus Supplement and reflected in the Supplemental Indenture:

> The Corporation may redeem the Senior Notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period.

Pl. Ex. 40. Ct. Ex. 2 ¶¶ 29-31.

### C. The Negotiation and Drafting of the Supplemental Indenture

41. By the time Chesapeake and their counsel turned to draft the Supplemental Indenture, the deal terms were final, the underwriters had sold (though not yet settled) the 2019

Notes to the original purchasers, and no additional changes could be made in the business terms of the transaction. Pl. Ex. 39 (final investor list sent a day before first draft of Supplemental Indenture). Because the underwriters had already marketed and sold the notes to investors based on the Prospectus Supplement and the Pricing Term Sheet, the task of drafting the Supplemental Indenture was simply to document the deal that was already struck. Tr. 123-24; Ct. Ex. 2 ¶ 33; Ct. Ex. 3 ¶ 23 ("[A]ny potential for further revision of the contractual terms had past and the deal terms were set.").

42.     As is typical, Chesapeake's counsel drafted the Supplemental Indenture, which it viewed as a mechanical task, since the substantive terms of the offering could not be altered. Ct. Ex. 2 ¶¶ 33-36, 38; Pl. Exs. 41, 43. Likewise, BAML relied upon its outside counsel at Cravath to ensure the terms of the Supplemental Indenture conformed to the Prospectus Supplement. Ct. Ex. 3 ¶ 6; Ct. Ex. 5 ¶ 11. Cravath's role with respect to the Supplemental Indenture was also largely ministerial and consisted of simply reviewing the Prospectus Supplement and conforming the language contained in the Supplemental Indenture. Tr. 123, 136; Ct. Ex. 3 ¶¶ 6, 26; Pl. Ex. 42. As is customary, Cravath also rendered an opinion that, among other things, the terms in the supplemental indenture conformed to the offering materials. Tr. 154; Ct. Ex. 3 ¶¶ 6, 26.

43.     Just as they had with the Prospectus Supplement, the lawyers worked from an existing supplemental indenture from a prior offering. Tr. 129-30; Ct. Ex. 2 ¶ 34; Ct. Ex. 3 ¶ 24; Pl. Ex. 41. Although the prior supplemental indenture included a standard make-whole provision, it necessarily contained no provision for the "Special Early Redemption" that was nearly unique. To add a provision for Special Early Redemption, Bracewell amended the standard redemption language by inserting the following language into the existing make-whole language:

Section 1.7 ~~Section 1.7~~ **Redemption.**

(a) The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

(b) ~~At any time prior~~ At any time from and including November 15, 2012 to and including March 15, 2013 (the "Early Redemption Period"), the Company at its option may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes must remain outstanding. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives notice of redemption pursuant to Section 3.04 of the Base Indenture prior to 5:00p.m. (Central Time) on March 15, 2013, even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period.

(c) At any time after March 15 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

Pl. Ex. 41 (showing additions to prior draft in underlined text and deletions in strikethrough text); Ct. Ex. 2 ¶ 35; Ct. Ex. 3 ¶ 24.

44.     The language in this draft differed from the language in the Prospectus Supplement in two notable ways. First, it included some additional information concerning the timing of any notice ("prior to 5:00pm (Central Time)"). *Compare* Pl. Ex. 1 *with* Pl. Ex. 41. Mr. Telle added that language to "provide 'belt and suspenders' clarity by inserting objective language" to guide the Company's decision to exercise this important option. Ct. Ex. 2 ¶ 36; *see also* Tr. 100-01.

45.     Second, this draft included the phrase, "even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period." Pl. Ex. 41. Mr. Telle added these seventeen words because he recognized that the notice concept was unusual, and he

wanted to provide additional clarity. Ct. Ex. 2 ¶ 36; *see also* Tr. 101-02. He also believed it was sensible in drafting the contract not to be bound solely by the language of the Prospectus Supplement, a securities disclosure document. Ct. Ex. 2 ¶ 36.

46.     As Mr. Telle testified, by adding this language, "[b]y no means was I trying to change the terms of the deal at that point; it would not have been possible to do so." *Id.* Because Chesapeake and the underwriters had already agreed to the terms of the deal and disclosed those terms in the Prospectus Supplement, substantively revising the terms was inconceivable. Ct. Ex. 2 ¶¶ 33, 36; Ct. Ex. 3 ¶¶ 24, 26. And since the proposed new language was not – and could not have been – intended to alter the terms of the deal, the proposed language is the best contemporaneous written corroboration for the drafters' intention that the four-month period in the Special Early Redemption was for notice, and consequently that, pursuant to the Base Indenture, a redemption date could occur up to 60 days after March 15.

47.     Cravath removed the additional language Mr. Telle had added. Ct. Ex. 2 ¶ 39; Ct. Ex. 3 ¶ 25; Pl. Ex. 42. Mr. Telle called a lawyer at Cravath to find out why. Ct. Ex. 2 ¶ 38. Mr. Telle was told that Cravath wanted to ensure that the final language in the Supplemental Indenture was consistent with the language used in the Prospectus Supplement that had already been used to sell the securities. *Id.*; Ct. Ex. 3 ¶ 26. As the Cravath lawyer explained to Mr. Telle, the language in the Prospectus Supplement was clear and it was preferable under the securities laws not to stray from the specific language already agreed to, and signed off on, by the parties to the deal. Tr. 106. Mr. Telle was not surprised to hear this rationale and accepted it. Ct. Ex. 2 ¶ 38.

48.     None of the Cravath lawyers recalls this interchange about the seventeen words, but Mr. Burns has affirmed that it is Cravath's policy to conform the language of an indenture to

the language of the offering materials, and that the edit he has reviewed properly executed Cravath's policy. Tr. 136; Ct. Ex. 3 ¶ 26 ("Associates who work for me are under standing instructions in such situations to conform, closely if not exactly, the draft indenture to . . . the Prospectus Supplement."). Such edits are "ministerial" and "common practice" when preparing an indenture after a business deal has been reached through drafting a prospectus. Tr. 136.

49.     An execution copy of the Supplemental Indenture was circulated later that day, and the final version was executed on February 16. Ct. Ex. 3 ¶ 27; Pl. Exs. 4, 43. Both the version of the Supplemental Indenture with Mr. Telle's changes, and the execution copy of the Supplemental Indenture including a blackline reflecting Cravath's strike-out of those changes, were circulated to both Ms. Garcia and Mr. Chapin. Pl. Exs. 41, 43. No one at either BNY Mellon or Emmet Marvin commented on the suggested 17 words or their deletion. Tr. 85-86, 88, 108-11.

**D.     Expert Evidence Presented by Chesapeake Concerning this Provision**

50.     At trial, Chesapeake presented evidence from Dr. John Finnerty, a fixed income expert, concerning the nearly unique quality of the Special Early Redemption Option. When issued, the 2019 Notes were unusual from an economic perspective because they gave Chesapeake the right to call the bonds at par early in the life of the bonds. Finnerty Report ¶ 13; Pl. Exs. 39 (email from Mr. Maultsby calling the deal "unique" and "one for the record books, as we have yet to find a similar structure that has cleared in the high yield market"), 105B (Covenant Review analysis calling the early par call option "unique"); Seery Decl. (Dkt. No. 15) ¶¶ 4, 5 (calling the early par call feature "unusual" three times); Def. Exs. 62 (BAML email calling the deal "truly unique"), 190 (noting BAML's John Rote said the 2019 Notes were first to include early par call window); *see also* Tr. 398. This feature was different from typical forms

of redemption because it gave Chesapeake a valuable economic right that expired at a particular point in time. Finnerty Report ¶¶ 13, 27-29.

51. The 2019 Notes were also unusual because the notes set a defined time period for the issuer to give notice of a Special Early Redemption, rather than specifying when the redemption date must occur. *Compare* Finnerty Report ¶ 14 *with* Tr. 394.

52. Dr. Finnerty was able to find only one other bond issuance since 2002 in which an issuer disclosed a specific date range in which to notice a redemption, rather than a specific date range to complete the redemption. That bond was issued by AEP Industries, Inc. ("AEP"). Finnerty Report ¶¶ 33-34, 45-48; Pl. Ex. 105D. Notably, the AEP indenture was economically very similar to the one at issue here – it permitted AEP to redeem the notes for a price just above par early in the life of the bonds, meaning that the issuer had a valuable economic right that expired on a particular date. Finnerty Report ¶ 48. Thus, Mr. Telle was not the first person to think that an option to redeem early at par can reasonably be defined in terms of when notice is given.

## II. Defendant's Case

53. In its case, BNY Mellon did not introduce any evidence that any drafter or negotiator of the Supplemental Indenture intended March 15, 2013 to be the last possible redemption date or February 13, 2013 to be the last possible notice date for a Special Early Redemption at par. Instead of presenting evidence of the drafters' intentions, BNY Mellon offered evidence of non-drafters' after-the-fact understandings.

54. For example, Elliot Chambers, an Assistant Treasurer and Vice President-Finance at Chesapeake, is a mid-level Chesapeake executive who was involved in the 2019 Notes Offering. In late 2012, Mr. Chambers wrote some emails indicating that he believed that Chesapeake was required to complete the redemption process for the 2019 Notes by March 15,

2013 to redeem them at par.  Tr. 308; Tr. 311-12; Def. Exs. 101, 108.  Mr. Chambers explained at trial that although he likely understood how the Special Early Redemption Provision worked in February 2012, Tr. 254, he was no longer focused on those mechanics when he wrote his mistaken e-mails in late 2012 and early 2013, and he had not reviewed the Supplemental Indenture before writing the emails in question.  Tr. 326.  Mr. Chambers also did not recall participating in the drafting of the Supplemental Indenture.  Tr. 257-58.

55.     BNY Mellon also established that Chesapeake distributed information to the public regarding the Special Early Redemption provision in the form of summaries on the company's website and in the company's SEC filings.  Def. Exs. 74, 75, 79 (website summaries), 83 (Form 10-Q for quarter ending March 31, 2012), 152 (Form 10-K for fiscal year ending December 31, 2012).  Although these summaries did not discuss the notice concept set forth in the Prospectus Supplement and the Supplemental Indenture, BNY Mellon offered no proof that these summaries were intended to convey Chesapeake's complete understanding of the mechanics of the Special Early Redemption Provision.

56.     Additionally, BNY Mellon introduced evidence that Chesapeake listed March 15, 2013 as the end of the Special Early Redemption period in certain internal documents.  Def. Exs. 84, 90, 102.

57.     This evidence does not demonstrate that the drafters of the Special Early Redemption Provision understood March 15 to be a deadline for completing a redemption at par. The documents in question summarize the terms of the company's outstanding issued notes without addressing the timing of notice and payment in the redemption process.  For example, the chart in Chesapeake's Treasury Manual and on its website used pre-existing boxes that were not designed to accommodate the unique terms of this particular offering.  Def. Exs. 74, 75, 79,

82, 84, 90, 102. Moreover, there is no record evidence that these documents reflect the contemporaneous knowledge of drafters of the Supplemental Indenture, or even the understanding of individuals who had read it. Tr. 326.

58. BNY Mellon has also submitted deposition testimony of Chesapeake employees who at times did not understand how the provision worked, *see* Deps. of Ross McLaughlin, Conrad Holub, and Aubrey McClendon, or did not have a detailed recollection of it, *see* Deps. of Jennifer Grigsby and Susan Seymore, or were not even employed by Chesapeake when the 2019 Notes were issued, *see* Dep. of Caleb Morgret.

59. BNY Mellon also called Kyle Bork, an analyst at Bloomberg LP, to testify that Bloomberg had received a term sheet from BAML for publishing on Bloomberg terminals that the 2019 notes were "callable" between November 15, 2012 and March 15, 2013. Tr. 363-65; Def. Ex. 47. Further, BNY Mellon introduced a smattering of documents that BNY Mellon claims show that the market believed that Chesapeake had to complete a redemption at par by March 15, 2013. Def. Exs. 119, 129, 190.

60. However, BNY Mellon did not offer any evidence that any allegedly "confused" party reviewed – let alone attempted to understand – the key language of the Supplemental Indenture.[3] Since one of BNY Mellon's experts has admitted that many bond investors review only the cover of the prospectus before investing, Tr. 375-76, any such market confusion is readily explained by the lack of diligence in the bond market.

61. BNY Mellon also presented an expert analysis claiming that the 2019 Notes were structured to provide a minimum 8% internal rate of return even if they were redeemed early at par, and that the 8% figure was calculated by BAML based on an assumed early redemption date

---

[3] BNY introduced a document that showed that as of February 4, 2013, Barclays believed that Chesapeake had to provide notice by February 13, 2013 in order to redeem at par, Def. Ex. 119, but another document shows that Barclays later reversed its position – presumably after reading the Supplemental Indenture. Pl. Ex. 50.

of not later than March 15, 2013.  Def. Ex. 166 ¶ 29.  However, BNY Mellon did not present any

fact evidence demonstrating how the 8% figure was calculated, whether it was intended to yield

precisely the 8% figure assumed by BNY Mellon's expert (or instead an approximate figure), or

whether any person who conducted or reviewed the calculation had reviewed the Supplemental

Indenture or claimed to understand its terms.  Tr. 381-83.

## LEGAL ARGUMENT

### I.    The Supplemental Indenture Is Clear and Unambiguous in Chesapeake's Favor.

Chesapeake's interpretation of the Special Early Redemption Provision is the only

reasonable one, for the reasons set forth in Chesapeake's Pretrial Brief, *see* Pl. Pretrial Br. 19-29

(Dkt. No. 91)), and for the additional reasons set forth below.

### A.    The Role of Custom and Usage (Court's Question #1).

Question Number 1:  "The Court has received evidence as to the customary meaning in the industry of words, including 'redeem' and 'redemption.'  The Court has also received evidence that language regarding notice along the lines of that contained in the second sentence of Section 1.7(b) is unusual in bond indentures.  In considering the plain text of Section 1.7(b), may the Court consider such evidence or is such evidence to be considered only if the text of Section 1.7(b) is held to be ambiguous and there is then occasion to consider extrinsic evidence?"  Tr. 481.

Chesapeake Answer:  Evidence concerning the customary meaning of industry terms can be received by the Court to help it decide whether contractual language is "clear and unambiguous."  In making that determination, however, the Court should recognize that parties can implicitly or explicitly contract out of customary meanings.  Thus, in deciding whether language is clear and unambiguous, the Court should employ the ordinary rules of contract construction to make sense of all the language of the contract, including terms that typically have a customary meaning and any unusual language that may modify that meaning.

A court may consider custom and usage in making the threshold determination of

whether a contractual provision is unambiguous.  *See* Pl. Pretrial Br. 22, 25-26, 28-29.  In *Law*

*Debenture Trust Co. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010), for instance, the

Second Circuit explained that evidence of customary usage may be considered "by the court

where necessary to understand the context in which the parties have used terms that are specialized." *Id.* at 466;[4] *see also FCCD Ltd. v. State St. Bank and Trust Co.*, No.10-cv-1632(DLC), 2011 WL 519228, at *6-8 (S.D.N.Y. Feb. 15, 2011) (considering custom of term "allocate" in intercreditor agreements to determine meaning of clear and unambiguous contract).

Evidence of customary meaning is of limited usefulness in this case, however. The parties do not dispute that the term "redeem" would mean "to repay" if standing alone, without modification by the second sentence of Section 1.7(b) of the Supplemental Indenture.

The question in this case is whether the parties have contracted around the customary meaning of "redeem" by including a non-customary term concerning "notice." Whatever the customary definition of a word may be, contracting parties are free to depart from that meaning, just as they are free to depart from the fixed meaning of an everyday word. BNY Mellon's own expert witness at trial agreed. Tr. 354 (Landau).

By insisting that the ordinary and customary meaning of "redeem" overrides the express "notice" provision of Section 1.7(b), however, BNY Mellon contends that parties cannot depart from custom and usage, even when their contract signals that intention by its terms. BNY Mellon's contention is contrary to New York law. "[E]vidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1985); *see, e.g.*, *In re W. Union Tel. Co.*, 299 N.Y. 177, 185 (1949) ("Usage is sometimes admissible to add to or explain, but never to vary or contradict, either expressly or by implication, the terms of a written

---

[4] In *Law Debenture* itself, the Court of Appeals upheld the district court's refusal to rely on custom and usage evidence because, in that case, the meaning of the term "common stock" was not invariably used to encompass American Depositary Shares ("ADS"), and an indenture's reference to common stock could not be presumed to have included ADS. *See id.* at 469-71. The dispute here is not over the meaning of a term of art in the industry, and the Court need not review evidence of custom and usage to determine if the term has a sufficiently "uniform and not varying" meaning for the customary usage "to become a part of [the] contract." *Id.* at 466.

instrument, or the fair and legal import of a contract."). Importantly, the parties need not expressly state that they intend to diverge from customary meaning. 12 Williston on Contracts § 34 ("It is not necessary that the parties state in terms that the usage is not adopted as part of the contract if they otherwise make their intention manifest.").[5]

BNY Mellon's insistence that "custom and usage" evidence necessarily determines the meaning of Section 1.7(b) is at odds with these hornbook principles. *See id.*; *Sotheby's Int'l Realty, Inc. v. Black*, 472 F. Supp. 2d 481, 485-86 (S.D.N.Y. 2006) (declining to permit customary usage in real estate industry regarding typical source of payment for commissions to be read into contract to alter plain terms that required commission regardless of source of payment).

### B. Chesapeake's Interpretation Is Reasonable While BNY Mellon's Interpretation Is Unreasonable.

The parties agree that the second sentence of Section 1.7(b) modifies the meaning of the first sentence. *See* BNY Mellon's Pretrial Br. 16 & n.3. As the Court well knows, in Chesapeake's view, the specific and explicit notice language of the second sentence modifies the customary meaning of the first sentence so that the November 15, 2012 through March 15, 2013 window is a period for providing notice of redemption. *See* Chesapeake's Pretrial Br. 22-26. By contrast, in BNY Mellon's view the second sentence affects the first sentence by altering the date

---

[5] *See also Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048-49 (2d Cir. 1982) (affirming exclusion of expert testimony on "custom and usage" when transaction at issue was "unique" so that expert testimony "was thus limited to use of such clauses and such language in very different context"); *A.G. Cap. Funding Partners, L.P. v. State St. Bank and Trust Co.*, 10 A.D. 3d 293, 295 (1st Dep't. 2004) (a party "may not introduce evidence of custom or industry practice to subvert the agreement's plain meaning"); *Michael J. Torpey, Inc. v. Consol. Edison Co.*, 99 A.D. 2d 484, 484 (2d Dep't 1984) ("it is the law that evidence of custom and usage cannot be used to contradict, alter or vary the express terms of an unambiguous contract"); *Green v. Wachs*, 254 N.Y 437, 442 (1930) (Cardozo, J.) (finding that custom is not available to override an agreement's "plain significance.").12 Williston on Contracts § 34:11 ("Although a usage may show that the effect of a written contract is different from an apparently clear meaning the writing would otherwise bear, it is obvious that if the parties choose to exclude the application of usage by contracting on different terms from those customary in the locality or trade, they may do so. This is because a trade usage or custom, no matter how well established, cannot be permitted to nullify the express terms of a contract.").

on which redemption can first occur to December 15, 2012 rather than November 15. *See* BNY Mellon's Pretrial Br. 16 & n.3.

There are at least six reasons why Chesapeake's harmonization of these two sentences is entirely reasonable and consistent with the legal principles articulated above and in Chesapeake's pretrial memo, and BNY Mellon's is not.

1. <u>Chesapeake's Harmonization Of The Two Sentences Does Not Suffer From An Irreconcilable Contradiction.</u> Consistent with the law set forth above, although the phrase "may redeem" customarily means "complete the redemption," there is no reason why the phrase "may redeem" cannot refer to the act of beginning the redemption process by noticing the redemption.

The phrase "may redeem" does not create a "true conflict" with the second sentence because it is not a defined or unyielding contractual term. *See Aramony v. United Way of Am.*, 254 F.3d 403, 413-14 (2d Cir. 2001). If the first sentence said, "any *redemption date* shall occur between November 15, 2012 and March 15, 2013," then the conflict between the first and second sentences might be irreconcilable without extrinsic evidence, because "redemption date" is a contractual term with a meaning fixed by the contract itself, and under the Base Indenture notice and redemption date must be separated by between 30 and 60 days.

But, of course, the first sentence does not use the term "redemption date," even though that term is used repeatedly – eighteen times – in the Base and Supplemental Indentures. Instead, the first sentence uses an undefined phrase ("may redeem") that has a typical meaning *only* through custom and usage. Since "may redeem" is not a contractual term but is merely a phrase with a customary meaning, the parties can contract out of that customary meaning and specify a different meaning. *See Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1048-49 (2d Cir. 1982) ("Because context is of obvious and critical importance to the use

of particular language," evidence on "custom and usage" is only relevant when it illuminates the language chosen by the parties).

Thus, the second sentence of Section 1.7(b) should be seen as merely specifying a meaning for the first sentence that is entirely plausible both linguistically and within the context of the contract itself. This interpretation of the interplay between these two sentences also accords with the principles that general contractual provisions should yield to specific provisions, *John Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("[W]here the parties have particularized the terms of a contract, an apparently inconsistent general statement to a different effect must yield."), and that contractual provisions should be read as much as possible to yield a harmonious meaning, *see Bank of N.Y. v. First Millennium, Inc.*, 598 F. Supp. 2d 550, 557 (S.D.N.Y. 2009) ("In interpreting contract terms, the entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency.") (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Accordingly, there is no real conflict between the two sentences.

Moreover, even the decision BNY Mellon relies upon to contend that "to redeem" is different than "notice," *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04CIV10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005), demonstrates that the words "to redeem" may encompass more than the act of payment. In that case Judge Leisure first determined that the phrase in the indenture "call for redemption" was intended to be equivalent to "to redeem," and having done that, he then determined that "redemption" is "a multi-step process" requiring "detailed notice, deposit of sufficient funds, and Board resolution." *Id.* at *5. The *Aristocrat* court then concluded that "[t]he *entire process constitutes calling the bonds*, culminating in payment on the redemption date." *Id.* (emphasis added). Accordingly,

Chesapeake's position that "may redeem" in the first sentence, when harmonized with the clear notice provision in the second sentence, refers to the start of the "entire process," does not create any real conflict between the two sentences.

    2. <u>BNY Mellon's Interpretation Suffers from an Irreconcilable Conflict.</u>  Under BNY Mellon's interpretation, the second sentence of Section 1.7(b) modifies the first by effectively changing "November 15, 2012" to mean "December 15, 2012."  Simply articulating this concept reveals its absurdity.  Even BNY Mellon's expert witness, Bruce Tuckman, acknowledged at trial that BNY Mellon's interpretation was "odd."  Tr. 401.  This reading "strains the language" of Section 1.7 "beyond its reasonable and ordinary meaning."  *Seiden Assoc., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 428 (2d Cir. 1992).  *See* Chesapeake's Pretrial Br. 26-29.

    Along these lines, if BNY Mellon's reading were correct, the drafters could have accomplished the shortening of Chesapeake's redemption window simply by shortening the definition of Special Early Redemption Period to read "from and including *December 15*, 2012 to and including March 15, 2013."  It strains the ordinary meaning of the second sentence to construe it as moving the first possible redemption date by a month, when that purpose could so easily have been achieved simply by changing the opening date in the first sentence and dispensing with the second sentence entirely.

    By contrast, Chesapeake's interpretation of the provision could not have been achieved merely by changing the definition of "Special Early Redemption Period" to read "December 15, 2012 through May 14, 2013" despite BNY Mellon's argument to that effect.  Def. Pretrial Br. 15, 23-24.  Such a change to the first sentence – accompanied by the omission of the second sentence – would have entitled Chesapeake to give notice as late as April 15, 2013.  But that was not the business agreement, which clearly limited Chesapeake's ability to exercise its par

redemption option to the four-month period of mid-November to mid-March. There is no compellingly simple alternative way to describe that agreement. Although alternative formulations can be devised to reflect Chesapeake's interpretation even more clearly, the phrasing in the Supplemental Indenture is hardly an irrational way to express the agreement; in contrast, if BNY Mellon's interpretation were correct, the current phrasing would be patently irrational.

3. <u>BNY Mellon's Interpretation Assumes that Redemption Dates Determine Notice Dates When in Fact the Reverse Is True</u>. By insisting that the first sentence of Section 1.7(b) invariably establishes a period for possible redemption dates, rather than a period of possible notice dates, BNY Mellon assumes that bond indentures are keyed entirely to redemption dates, with the notice date simply serving a ministerial function of the chosen redemption date. But that overstates the importance of the redemption date. Under Section 3.04(a)(1) of the Base Indenture, it is in fact the *notice of redemption* that specifies the *redemption date*. Thus, it is perfectly sensible for the Supplemental Indenture to set forth a period for notice, rather than a period for when the redemption must be completed.

4. <u>BNY Mellon's Interpretation Yields Commercially Unreasonable Results.</u> BNY Mellon – including its expert at trial, Bruce Tuckman – could not identify any reason for the construction of the notice language in the second sentence of Section 1.7(b) as merely a front-end cut-off date. *See* Tr. 399-400, 404-05. The Court should disfavor an interpretation that yields a commercially implausible result.

5. <u>Chesapeake's Interpretation Yields Commercially Reasonable Results.</u> Chesapeake's interpretation, by contrast, is not only reasonable, but is consistent with the canon of construction generally applicable to option contracts. If an option agreement specifies a time period for the

option – but does not specifically require the optionee to tender performance during that time period – the agreement granting the option is generally construed to require only notice, but not payment, during that period. *See* Pl. Pretrial Br. 25-26. This rule is plainly animated by the same purpose advanced by Chesapeake's reading of Section 1.7(b): that the option holder is naturally focused on the last day to exercise a valuable right. Thus, as a business matter, the drafters would naturally have been much more concerned with the last possible date for Chesapeake to exercise its option, rather than the first possible exercise date.

Despite this sensible purpose, BNY Mellon has argued that Chesapeake's interpretation creates "absurd results." Most of BNY Mellon's characterizations of Chesapeake's position simply misstate it – for example, stating that Chesapeake equates "redemption" with "notice." Def. Pretrial Br. 18. Besides these mischaracterizations, BNY Mellon also claims Chesapeake's view makes no sense because it would lead to overlapping notice periods: *i.e.*, that Chesapeake could notice a Special Early Redemption as late as March 15 (and thereby completes a redemption at par as late as May 14), but also notice a Make-Whole Redemption as early as March 16 (and thereby complete a Make-Whole Redemption as early as April 16). But this brief overlap is merely a function of the 60 days in which Chesapeake is entitled to give notice in the hypothetical scenario BNY Mellon posits; BNY Mellon posits no reason why Chesapeake would provide 60 days notice of a Special Early Redemption, followed the next day by 30 days notice of a Make-Whole Redemption.

In any event, the premise of BNY Mellon's argument is mistaken. There is nothing unreasonable about Chesapeake having partially overlapping rights to redeem at different prices. Indentures often provide for partly simultaneous redemption options, even if one of these options is plainly preferable to the other. For example, under the AEP Indenture, between March 18,

2005 and March 15, 2008 the issuer could have redeemed up to 35% of the notes at a redemption price of 107.875% plus accrued interest out of the proceeds of an equity offering. Pl. Ex. 105D. Between March 18, 2005 and September 15, 2005, the issuer could also have redeemed up to $25 million of the notes at a redemption price of 101% plus accrued interest using proceeds from the sale of AEP's Asia/Pacific operations. *Id.* Thus, the indenture allows for redemption at two different redemption prices between March 18, 2005 until September 15, 2005.[6] Far from "absurd," overlapping redemption options are just different types of rights that issuers may exercise under an indenture.

      6. <u>The Second Sentence is Not Restrictive of the First</u>. Finally, BNY Mellon's claim that the second sentence is necessarily restrictive of Chesapeake's rights because of its use of the phrase "so long as" is incorrect as a matter of linguistics and logic. Def. Pretrial Br. 14. Whether the phrase "so long as" is restrictive or expansive turns on the context in which it is used. In Section 1.7(b), the first sentence describes the economic terms of Chesapeake's right – to redeem at par – and also describes a time period for the exercise of that right. The parties agree that but-for the second sentence, the first sentence would necessarily reflect the notice provisions of the Base Indenture, so that left on its own the first sentence would require Chesapeake to issue its notice between September 15, 2012 (60 days before the first redemption date) and February 13, 2013 (30 days before the last redemption date). But the first sentence

---

[6] *See also* McClatchy Co. Indenture dated December 18, 2012 (attached as Exhibit 4.3 to the 8-K filed by McClatchy Co. on Dec. 20, 2012, *available at* http://www.faqs.org/sec-filings/121220/MCCLATCHY-CO_8-K/a12-29753_1ex4d2.htm) (prior to December 15, 2015, the issuer may redeem the notes at 109% of par with the proceeds of a qualifying equity offering; prior to December 17, 2017, the issuer may redeem the notes at par plus an "Applicable Premium," equal to the remaining scheduled interest payments due on the notes); Maxcom Telecomms. Indenture dated Dec. 20, 2006 (attached as Ex. 2.6 to the Form 20-F filed June 22, 2007, *available at* http://www.sec.gov/Archives/edgar/data/1113306/000095012307009220/y36149exv2w6.txt) (prior to December 15, 2009, the issuer may redeem up to 35% of the aggregate principal amount of notes at 111% of par with net proceeds from a sale of equity interests; prior to December 15, 2010, the issuer may redeem some or all of the notes at par plus an "Applicable Premium," equal to the remaining scheduled interest payments due on the notes).

does not stand alone; instead the second sentence expressly and unquestionably modifies the notice period implicitly referenced in the first sentence.

The second sentence accomplishes that objective by reiterating the basic option conferred by the first sentence on Chesapeake – the "Company shall be permitted to exercise its option" to redeem the Notes at par – and then adding that it can do so on a different notice period than the one referenced in the first sentence: "so long as it gives the notice . . . during the Special Early Redemption Period." The portion of the second sentence following "so long as" explicitly modifies the notice period implicitly stated by the first sentence. Instead of a notice period of September 15 through February 13, the second sentence clearly states that the notice period shall be November 15 through March 15. In this context, the phrase "so long as" is clarifying and modifying but not restrictive.

## II. The Relevant Extrinsic Evidence Resolves Any Ambiguity in Chesapeake's Favor.

### A. To Determine the Drafters' Intent, the Court Should Consider Extrinsic Evidence of Chesapeake's and BAML's Intentions (Court's Question #2).

Question 2: "Do the legal principles applicable to admitting extrinsic evidence as to the meaning of an ambiguous provision negotiated at arm's length apply in the specific context of negotiations between an issuer and an underwriter in general, and should they apply under the particular circumstances surrounding the drafting of the supplemental indenture here?" Tr. 481-82.

Chesapeake's Response: In a typical underwriting, negotiations between an issuer and underwriter are sufficiently arm's length to reliably illuminate the drafters' intent and fairly bind the ultimate purchasers of the securities. Underwriters have strong economic incentives to protect the interests of note holders in the business terms of an offering, and the underwriters and the issuer share legal obligations to protect the interests of note holders in fair disclosure of those terms. This is the case even when the underwriting is undertaken partly on a "best efforts" basis. In negotiating the provision here, BAML repeatedly considered note holders' interests by rejecting Chesapeake's request for a year-long early redemption period, by limiting the amount of any partial early redemption to assure liquidity for the note holders' benefit, and by ensuring that the Supplemental Indenture used the same phrasing as the Prospectus Supplement. That BNY Mellon did not actively participate in the discussions of

the business terms does not permit BNY Mellon to exclude evidence of the drafters' intentions. Moreover, BNY Mellon had the opportunity to comment on the language of the Supplemental Indenture but chose not to do so.

Courts routinely admit proof of the drafter's intent to resolve contractual ambiguity whenever it has been expressed to the opposing negotiator. BNY Mellon tries to avoid this straightforward rule by trying to invoke three narrow and inapplicable doctrines.

(a)    No Negotiation Doctrine

First, BNY Mellon invokes inapposite cases in which such proof has been disallowed because there simply was no negotiation – the drafter acted unilaterally. *See, e.g.*, *Bank of New York Mellon v. Commerzbank Capital Funding Trust*, – A.3d – 2013 WL 1136821, at *1 (Del. Ch. 2013); *Sass v. New Yorker Towers, Ltd.*, 23 A.D.2d 105, 107-08 (1st Dep't 1965); *Rothschild v. Rio Grande W. Ry. Co.*, 84 Hun 103, 65 N.Y. St. Rep 193 (N.Y. Gen. Term 1895). This "no negotiation" doctrine does not apply because Chesapeake and BAML plainly negotiated the very terms of the Supplemental Indenture at issue here.

As a matter of industry custom and practice, the underwriter and the issuer negotiate the business terms of the offering. *See Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1509 (S.D.N.Y. 1989); Robert I. Landau & Romano I. Peluso, *Corporate Trust Administration and Management* 117 (6th ed. 2008) (hereafter "Landau & Peluso"); Steven L. Schwarcz & Gregory M. Sergi, *Bond Defaults and the Dilemma of the Indenture Trustee*, 59 Ala. L. Rev. 1037, 1067 (2007). The indenture is then drafted by the underwriter and the issuer to memorialize the business terms of the deal. *In re Bank of New England Corp.*, 404 B.R. 17, 30 (Bankr. D. Mass. 2009) (noting that "the drafting of an indenture is generally undertaken by counsel for the issuer or the underwriter"). Given this background, the negotiation and drafting

history between the underwriter and the issuer is the best – and only – body of extrinsic evidence to assist the court in determining the intended meaning of an ambiguous indenture term.

As Mr. Burns of Cravath and Mr. Maultsby of BAML each explained, an underwriter in a bond offering faces significant liability, as well as reputational and economic risks, and has ample incentive to consider the interests of prospective note holders. In recognition of these commercial realities, New York courts have long recognized that issuers and underwriters have divergent interests and negotiate at arm's length. *See, e.g.*, *EBC I, Inc. v Goldman Sachs & Co.*, 91 A.D.3d 211, 216 n.1 (1st Dep't 2011) (reaffirming the principle that the underwriter-issuer relationship is adverse, arm's length, and nonfiduciary); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983).[7]

Here, the proof at trial establishes that both the business terms reflected in the Special Early Redemption provision and the drafting of that provision in the Supplemental Indenture were plainly the product of an arm's length negotiation between the underwriter and its counsel at Cravath, on the one hand, and the issuer and its counsel at Bracewell, on the other. Because this negotiation plainly was not unilateral, this narrow doctrine does not apply here.

(b)     Manifest Intent Doctrine

Second, in its *in limine* motion, BNY Mellon argues that the "manifest intent" doctrine precludes all proof of the actual negotiations between BAML and Chesapeake, however

---

[7] *See also Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973) (the underwriter is "relied upon to verify published materials because of his expertise . . . and because of his incentive to do so. . . . Since he often has a financial stake in the issue, he has a special motive," and underwriters know that "[p]rospective investors look to [them] . . . "to pass on the soundness of the security and the correctness of the registration statement and prospectus."); *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 581-82 (E.D.N.Y. 1971) (stating that the underwriters' role is adverse to the issuer because "[t]heir duty is to the investing public under Section 11 as well as to their own self-interest and that duty cannot be taken lightly" and that "[t]he underwriters must play devil's advocate"); *Escott v. BarChris Constr. Corp.*, 283 F. Supp. 643, 696-97 (S.D.N.Y. 1968) (holding that "the positions of the underwriter and the company's officers are adverse" and the underwriters must be just as responsible as the company if the prospectus is false "[i]n order to make the underwriters' participation in this enterprise of any value to the investors."); *In re WICAT Sec. Litig.*, 600 F. Supp. 1236, 1240 (D. Utah 1984) ("[M]ost modern underwriting of securities is done on an arm's length basis, with the issuers and underwriters each acting in their own interest rather than in concert.").

probative of what the words of the indenture were intended to mean simply because Chesapeake purportedly did not share that intent at the time with BNY Mellon. As shown in Chesapeake's brief in opposition to that motion, the "manifest intent" rule assures that a negotiator's subjective intent must be shared at a time that the opposing negotiator can act upon it and attempt to revise the draft phrasing at issue. This doctrine does not apply here because Chesapeake and BAML repeatedly expressed their intentions not only to one another, but also to BNY Mellon. *See* Pl. Opp. to Def. Motion *In Limine* (Dkt. No. 99).

Understanding the trustee's role in the process also explains why this doctrine is not applicable here. The trustee plays a largely administrative role and does not negotiate the business terms of the offering. *See* Landau & Peluso, at 119, 122 (the trustee "has no responsibility for the substantive provisions of the contract and, under normal circumstances, should never undertake to alter the terms of the basic contract"); Efrat Lev, *The Indenture Trustee: Does It Really Protect Bondholders?*, 8 U. Miami Bus. L. Rev. 47, 71 (1999) ("Since most of the financial conditions and definitions are discussed primarily with the underwriter, the only real interest of the trustee in the indenture is to minimize the administrative burden. In fact, the issuer and the underwriter probably conclude all the financial terms of the bonds before the trustee even enters the picture."); *United States Trust Co. v. Alpert*, 10 F. Supp. 2d 290, 308 n.12 (S.D.N.Y. 1997) (recognizing th*e "peculiar and limited role of the* indenture trustee") (emphasis added); Smith, Case & Morison, *The Trust Indenture Act of 1939 Needs No Conflict of Interest Revision*, 35 Bus. Law. 161, 170 (1979) ("It is axiomatic that the business terms of the indenture are negotiated at arm's length between the underwriter and the issuer. The trustee takes no sides in the business deal.").

Notably, however, the trustee can and should take steps to ensure that the indenture is as clear and unambiguous as possible. BNY Mellon's own expert, Robert Landau, recommends that because the trustee "is the party that will have to administer the agreement for the life of the debt securities issued," it is important for the trustee to "review [indenture] provisions carefully to make certain that they are clear and unambiguous and adequately set forth the intent of the parties." Landau & Peluso, at 119, 122. Mr. Landau explicitly notes that redemption provisions, in particular, "should receive careful attention by the trustee as it reviews the prospective contract." *Id.* at 218.

Here, BNY Mellon and its counsel had ample opportunity to comment on the Special Early Redemption Provision, but chose not to. *See* Tr. 108-11; Pl. Exs. 20, 22, 25. They were copied on multiple drafts of the Prospectus Supplement and Supplemental Indenture, including the first draft of the Supplemental Indenture that included Mr. Telle's "seventeen words," as well as the subsequent draft in which this language was removed. *See* Pl. Exs. 20, 22, 41, 43. Instead of commenting on them as Chesapeake invited it to do, BNY Mellon stayed silent.[8] The expressed intent of Chesapeake and BAML concerning the meaning of the Special Early Redemption provision (proved at trial as described in ¶¶ 25-29, 31, *supra*) is fully admissible to resolve any ambiguity in the Supplemental Indenture.

Finally, the contemporaneous understanding by Chesapeake's and BAML's principals would be admissible even if it had not been expressed at the time of the negotiation. In the unusual circumstances in which, notwithstanding a lawsuit, the negotiators concur about the

---

[8] Under the "forthright negotiator" doctrine, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party. *See United States v. Stuart*, 489 U.S. 353, 368 n.7 (1989) (quoting the Restatement (Second) of Contracts § 201(2)(b) (1981)) ("It is hornbook contract law that the proper construction of an agreement is that given by one of the parties when that party had no reason to know of any different meaning attached by the other, and the other had reason to know the meaning attached by the first party."); *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 835-36 (Del. Ch. 2007).

meaning of an ambiguous contract provision, that agreed-upon understanding controls the resolution of any ambiguity. *See* Restatement (Second) of Contracts § 201(1) ("Where the parties [to a contract] have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning."); *MBL Contr. Corp. v. King World Prods., Inc.*, 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000) (same); *Baladevon v. Abbott Laboratories*, 871 F. Supp. 89, 98-99 (D. Mass. 1994) ("[I]n the rare case where evidence shows the two parties to an agreement to have a common understanding of a disputed provision at the time of contracting . . . the contracting parties' subjective intent controls.").

(c)    <u>*Contra Proferentem* Does Not Apply</u>

As a third argument to avoid the impact of the uniform extrinsic evidence of the drafters' intent, BNY Mellon asserts that any ambiguity in the disputed language should be resolved against Chesapeake. This argument suffers from multiple fatal flaws.

First, under controlling New York law, *contra proferentem* is to be "used only as a matter of *last resort* after all aids to construction have been employed but have failed to resolve the ambiguities in the written instrument." *United States Fire Ins. Co. v. General Reinsurance Corp.*, 949 F.2d 569, 573 (2d Cir. 1991) (emphasis added); *see Schering Corp. v. Home Ins. Co.*, 712 F.2d 4, 10 fn.2 (2d Cir. 1983) (noting the common sense of the requirement that *contra proferentem* be used only as a matter of last resort, because "[t]o conclude otherwise would require every ambiguously drafted policy to be automatically construed against the insurer"); *In re Prudential Lines, Inc.,* 170 B.R. 222, 233 (Bankr. S.D.N.Y. 1994). BNY Mellon's argument that the Court should apply *contra proferentem* as a first resort defies basic New York law.

Second, courts apply the doctrine of *contra proferentem* only where the bargaining power between the parties is so unequal that *one* party can be considered the *sole* drafter of the

document.  *U.S. Fire. Ins. Co.*, 949 F.2d at 574 ("[T]he touchstone for applying *contra proferentem* is the insured's lack of sophistication.").  This principle does not apply for the reasons articulated above – Chesapeake and BAML were represented by sophisticated counsel and actually negotiated the disputed terms, and the investors were themselves sophisticated institutions represented by counsel.  *See Metro Funding Corp. v. WestLB AG*, No. 10 Civ. 1382 (CM), 2010 WL 1050315, at *21 (S.D.N.Y. Mar, 19, 2010) (declining to apply *contra proferentem* where both sides were "sophisticated and . . . represented by competent counsel," and "the finished product was the result of negotiation"); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983).[9]

Third, BNY Mellon is not in position to invoke the *contra proferentem* doctrine because it had an opportunity to comment on the language and clarify any ambiguity, but chose to stay silent – contrary to its duties as articulated by its own expert, Mr. Landau.  *See Record Club of Am. v. United Artists Records, Inc.*, 72 Civ. 5234(WCC), 1991 WL 73838, at *7 (S.D.N.Y. Apr. 29, 1991) (refusing to apply *contra proferentem* where non-drafting party had "ample opportunity to clarify any ambiguity"); *Mercury Partners LLC v. Pac. Med. Bldgs., L.P.*, No. 02 Civ. 6005 (HBP), 2007 WL 2197830, at *9 (S.D.N.Y. July 31, 2007) (rejecting *contra proferentem* as applicable because the parties had "the opportunity to influence" the language).

Fourth, for the reasons already addressed above, BNY Mellon is wrong to assert that *contra proferentem* is warranted to protect the interest of eventual noteholders.  The interests of

---

[9] BNY Mellon's position that "issuers bear the risk of any ambiguity" in an indenture agreement is not reflected in holdings by New York courts.  Def. Pretrial Br. 13.  None of the New York cases cited in BNY Mellon's Pretrial Brief or its motion *in limine* actually applies this purported principle in the context of an indenture agreement for a public debt offering.  *See Rothschild v. Rio Grande W. Ry. Co.,* 84 Hun 103, 65 N.Y. St. Rep. 193 (N.Y. Gen. Term 1895) (bond provisions prevailed over trust deed); *Sass*, 23 A.D.2d at 107 (finding "no ambiguity in the language" of a debenture and mentioning rule of *Rothschild* in dictum); *Prescott, Ball & Turben v. LTV Corp.*, 531 F. Supp. 213, 217 (S.D.N.Y. 1981) (concluding that the terms of indenture were unambiguous); *Stockman v. Heartland Indus. Partners, L.P.*, Nos. 4227-VCS, 4427-VCS, 2009 WL 2096213, at *5 (Del. Ch. July 14, 2009) (interpreting a partnership agreement).

investors are protected by underwriters and their counsel who are the first purchasers of the notes. Indeed, "[s]ince the underwriters must then sell or place the bonds, they necessarily negotiate in part with the interests of the buyers in mind." *Metro. Life Ins. Co.*, 716 F. Supp. at 1509; *Archer Daniels Midland Co.*, 570 F. Supp. at 1541 (declining to construe indenture against issuer where sophisticated underwriter stood in for note holders' interests and negotiated the deal); *Broad v. Rockwell Int'l Corp.*, 642 F.2d 929, 947 n.20 (5th Cir. 1981) (en banc) (applying New York law and noting that even a noteholder who purchased the note indirectly from the underwriter, "stands in the shoes of the underwriter who originally purchased those Debentures"); *Geren v. Quantum Chemical Corp.*, 832 F. Supp. 728, 734 (S.D.N.Y. 1993) ("[A]lthough indentures are generally not the product of negotiations between the issuing company and the ultimate holders, 'underwriters ordinarily negotiate the terms of the indentures with the issuers.'") (internal quotation marks omitted); *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1509 (S.D.N.Y. 1989) (same).[10]

BNY Mellon's argument also ignores the fact that sophisticated institutional investors like those in the 2019 Notes Offering, Pl. Ex. 39, have ample resources and opportunity to look after their own interests. Indeed, BNY Mellon's expert, Mr. Landau, acknowledges that structural developments over the years have "substantially resolved th[e] problem" of lack of adequate representation of the note holders during the preparation of the indenture. Landau &

---

[10] There is no evidence in this case that purports to establish that any investor in the 2019 Notes – whether an initial purchaser or otherwise – would have preferred when they purchased their notes February 13, 2013 as a deadline for giving notice of redemption, rather than March 15. While BAML understood that note holders preferred a short notice period, the investors may also have preferred that the short period occur later in the life of the notes so they could receive the above-market coupon rate for a longer period prior to redemption.

Peluso, at 117-18.  The first such development that Landau identifies is "the significant influence of the institutional investor."  Landau & Peluso, at 117.[11]

Finally, the Court should reject BNY Mellon's reliance on two Delaware cases, *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 399 (Del. 1996) and *Bank of New York Mellon v. Commerzbank Capital Funding Trust II*, -- A.3d --, No. 372 2012, 2013 WL 1136821, at *1-3 (Del. Mar. 19, 2013).  The court in each of these out-of-state cases stressed that it was applying *contra proferentem* principles because the language at issue was not subject to bilateral arms-length negotiation and was "hopelessly ambiguous," neither of which is the case here.[12]

In sum, because Chesapeake and BAML had a genuine negotiation over the terms of the Special Early Redemption Provision, and BNY Mellon was invited to clarify the phrasing of that provision of the Supplemental Indenture, the relevant extrinsic evidence must include the intent of the negotiators and drafters of the provision documented in the Prospectus Supplement, the Pricing Term Sheet, and the Supplemental Indenture.

### B.     Statements Made by Chesapeake Are Not Probative Extrinsic Evidence (Court's Question #3).

Question 3:  "The Court has received evidence offered by BNY Mellon that may be taken to suggest that Chesapeake and/or its personnel, either in public filings or in communications to rating agencies, made statements to the effect that March 15, 2013, was the outside date for a special early redemption as opposed to being the outside date for giving notice of such a redemption.  What, if any, relevance

---

[11] Landau identifies other positive pro-investor structural developments, including securities law disclosure, the authority of the SEC, and the influence of experienced trustees and their counsel.  *See* Landau & Peluso, at 117-18.

[12] The *Kaiser* case has nothing to do with the circumstances here.  In *Kaiser*, a well-known "corporate raider" who had acquired a super-majority of Kaiser's common stock was at risk of losing that level of control once the then-outstanding shares of Kaiser's preferred stock were converted into additional common shares, as Kaiser's certificate of incorporation provided would occur automatically a year later.  To avoid that outcome, the raider spurred Kaiser to issue two new classes of stock, with  the preferred holders to receive mostly the class of new stock with only 1/10 the voting power.  Whether the raider's plan could work under the Certificate of Incorporation was subject to an anti-dilution provision that the Court held "was hopelessly unclear on the very point at issue."  681 A.2d at 397.  The court concluded that extrinsic evidence of the "thoughts and positions" of the issuer and underwriter would not be helpful, in part because the provision  did "not depend upon particularized intentions of the parties…" and was boilerplate.  *Id.* at 397-98.  In the absence of meaningful extrinsic evidence, the court applied the *contra proferentem* principle "only as a last resort."  *Id.* at 399.

do those statements have for the issue before the Court in this case, which is the proper construction of 1.7(b)?"  Tr. 482.

> Chesapeake's Response:  Whatever the theoretical significance of a party's statements, in this case such statements have essentially no probative value because the statements in question do not expressly state that March 15 was the last possible special early redemption date, but instead were simply shorthand summaries of the Special Early Redemption Provision.  As a result, these statements are not inconsistent with Chesapeake's actual understanding of the provision.  These statements are also not meaningfully probative of Chesapeake's intent because BNY Mellon did not establish that the individuals who were responsible for them had reviewed the relevant terms of the Prospectus Supplement and Supplemental Indenture or were aware of their meaning.

Statements to the ratings agencies and in Chesapeake's securities filings could be relevant if they actually provided after-the-fact evidence of the contemporaneous intentions of the negotiators and drafters of the Special Early Redemption Provision (*i.e.*, Messrs. Dell'Osso, Maultsby, Telle and Burns).  *See Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*, 853 F. Supp. 791, 798 (S.D.N.Y. 1994) (requiring "personal knowledge of the contracts negotiations" to determine intent).

But none of these statements expressly states that March 15, 2013 was the final date on which the Company could complete a Special Early Redemption of the 2019 Notes.  Rather, all the statements in the record reflect, at most, an incomplete recitation of the four-month window for redeeming early at par.  *See* Def. Exs. 56, 83, 197, 198.

For example, Chesapeake's communication with Moody's does not purport to address the meaning of Section 1.7(b).  The ratings agencies are focused on evaluating a company's creditworthiness and not reviewing the covenants and terms of specific bond offerings.  Def. Ex. 56.  The remaining communications with ratings agencies merely forwarded the Prospectus Supplement.  *See* Def. Exs. 58, 197, 198.

Similarly, the statements in the Company's 2012 1st Quarter 10-Q do not purport to reflect the full details of the redemption provisions of the 2019 Notes.  Significantly, a public

company's filing on the SEC's quarterly Form 10-Q or annual Form 10-K is not intended to describe every provision of the company's outstanding securities; the disclosures about the 2019 Notes were intended to describe new developments with respect to the Company's capital structure and indebtedness. The material features of the 2019 Notes for that purpose were fully disclosed – the amount, the coupon, the maturity date and the attractive feature, from the standpoint of Chesapeake's ability to manage its leverage, that the Company had the right to redeem those securities at par early in their life. There is no proof in the trial record – and there could be none – that the specific dates on which the Company could pay the redemption price was material for the purposes of those public filings. Chesapeake provides a prospectus to acquaint potential investors with that information.

The same is true with respect to the Company's website, which did not purport to be a complete description of the securities it described. The schedule describing multiple Chesapeake bond offerings posted on its website utilized a format with headings that did not work well for the unusual feature of the 2019 Notes (the "optional redemption dates" category). Chesapeake might have added a footnote for the entry concerning the 2019 Notes to clarify that the dates for the early par redemption period applied to notice and not payment, but there is no evidence in the trial record that the absence of that clarification resulted from a knowing choice by someone at Chesapeake who understood the "mechanics" of the redemption feature, or that the absence of that footnote actually affected any investor.[13] The same analysis applies to the purely internal descriptions of the 2019 Notes within Chesapeake's Treasury function.

---

[13] These statements also could not constitute a waiver of Chesapeake's right to issue a notice for Special Early Redemption on March 15, 2013 nor could they estop Chesapeake from exercising this right. Chesapeake did not clearly or voluntarily waive its rights, *see Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F. Supp. 2d 507, 517-19 (S.D.N.Y. 2009), and it cannot be estopped from asserting its rights with no evidence of detrimental reliance in the record, *see Richie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 163-64 (S.D.N.Y. 2012).

Chesapeake's public disclosures also cannot be considered to be a "course of dealing" or "course of performance," as BNY Mellon has contended. That concept requires the showing of a "well established custom" established over numerous transactions between the same parties over a period of time. *New Moon Shipping Co. v. Man B & W Diesel*, 121 F.3d 24, 31 (2d Cir. 1997). Mere descriptions of the provision are not performances.

The evidence of Chesapeake's public statements also lacks probative value because BNY Mellon has not established that the statements were made or reviewed by any individual who understood the "notice" mechanics of that provision. As noted above, the provision in question was drafted entirely by Chesapeake's outside counsel Mr. Telle, who had the greatest understanding of the provision on the Chesapeake side. But there is no evidence that Mr. Telle reviewed this portion of Chesapeake's securities disclosures or its submissions to the ratings agencies.[14]

As a result, the only import of Chesapeake's incomplete public statements is that an investor might assert a claim that such statements were misleading under the securities laws – but of course any such claim would be frivolous since a sophisticated investor cannot reasonably rely on shorthand statements rather than the full language of the Prospectus Supplement and Supplemental Indenture themselves. *Cf. Starr ex rel. Estate of Sampson v. Georgeson Shareholder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (dismissing securities fraud claim because only "a superficial or careless reading" of documents might have led investors to believe that they omitted a material fact); *Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir. 1993) (reliance was unreasonable where investors ignored "full and objective disclosure of non-

---

[14] BNY Mellon has apparently conceded, as it must, that Mr. Telle's intent is relevant here. *See* Pl. Pretrial Br. 30-31 (citing authority for considering intention of attorneys).

misleading factual material" in prospectus).  Note holders should not be able to obtain through

misapplication of contract law relief that they could not obtain through the securities laws.

### C.   The Views of Market Participants Are Not Probative Extrinsic Evidence (Court's Question #4).

Question 4:  "[T]he Court has received evidence that one or more persons within Chesapeake and also certain persons in the market and/or the investment community drew the conclusion that March 15, 2013, was the outside date for a special early redemption as opposed to being the outside date for giving notice of such a redemption.  Under Second Circuit law the Court is to inquire as to the meaning of an agreement 'when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade and business' (citation omitted).  My question to you is, under that standard what, if any, relevance do the views of those persons have for how section 1.7(b) is to be construed and, relatedly, can the views of any such person be considered absent evidence that, before reaching the conclusion they did, they had read section 1.7(b) itself?"  Tr. 482-83.

Chesapeake's Response:  The answer is a straightforward "no."  The views of persons within the market or investment community would not be relevant evidence even if those persons had reviewed Section 1.7(b) itself, because, as the Court has noted, the determination of a contract's meaning is not based on a plebiscite.  Without evidence that those persons had reviewed the contract, the determination would be entirely unmoored to the language of the contract or to the principles of contract law.

In *Law Debenture Trust Company of New York v. Maverick Tube Company*, 595 F.3d

458, 467 (2d Cir. 2010), the Court of Appeals for the Second Circuit held that in determining the

meaning of a contractual provision as a matter of law, the Court should determine how the

provision would be understood by a "reasonably intelligent person who has examined the context

of the entire agreement and who is cognizant of the customs, practices, usages, and terminology

as generally understood in the particular trade and business."

As should be apparent from this formulation, this determination is not simply a tally of

the views of investors who may or may not have even reviewed the relevant language in the first

place.  To the contrary, evidence of the individual and "subjective" expectations of individual

bondholders should not be used to determine the "objective" meaning of the plain language of the contract. *See Archer Daniels Midland Co.*, 570 F. Supp. at 1535-36. We are aware of no case where a court considers such evidence in the course of construing the meaning of a contract.

Nor should the Court consider the view of a single Chesapeake employee who had a mistaken view of the meaning of the provision – particularly since he corrected his view after reading the indenture. Tr. 326; *cf. Adasar Grp., Inc. v. NetCom Solutions Int'l, Inc*, No. 01 Civ. 0279 (WHP), 2003 WL 1107670, at *7-8 (S.D.N.Y. Mar. 13, 2003) (disregarding testimony from "officers and employees who did not participate in the negotiation . . . and had no first-hand knowledge of either"); *Alt. Thinking Sys., Inc. v. Simon & Schuster, Inc.*, 853 F. Supp. 791, 798 (S.D.N.Y. 1994) (requiring "personal knowledge of the contracts negotiations").

Even if the individual views of market participants were somehow relevant to the Court's determination of the contract's meaning, BNY Mellon has failed to offer evidence that those views were informed or reasonable. There is no evidence in the record that any investor with a contrary view read the Supplemental Indenture or even the full Prospectus Supplement. Notably, all the note holders who originally intervened in this matter withdrew, and BNY Mellon even successfully prevented Chesapeake from taking discovery from the most relevant note holder River Birch, maintaining that its beliefs were not "relevant." *See* Apr. 11, 2013 Tr. 8.

Even more damning, BNY Mellon's expert Mr. Mullin opined that most investors make their investment decisions after reviewing only the cover of the prospectus, without reviewing its contents, let alone the contents of the indenture. Tr. 374-76. Under these circumstances, an investor's understanding of Chesapeake's Special Early Redemption Option is plainly unreasonable and thus irrelevant.

In fact, the only evidence in the record of the views of individuals who *have* read the disputed language indicates that those market participants – including two sophisticated bond market publications – have agreed with Chesapeake's interpretation. *See* Pl. Exs. 105-B, 105-C.

Declining to consider this evidence would not lead to "chaotic results," as BNY Mellon argues. Def. Pretrial Br. 19. To the contrary, if there is any threat of chaos it would arise from courts ignoring extrinsic evidence of what the actual drafters actually intended, and instead attempting to make an after-the-fact determination of the "views of the market." The Court must determine the meaning of the Special Early Redemption Provision using the traditional tools of contractual interpretation and, if necessary, extrinsic evidence of the drafters' intent.

## III.    BNY Mellon Has Not Proven Its Affirmative Defenses.

BNY Mellon has no legal basis and has not proven any facts to support its defenses based on the purported conditionality of Chesapeake's March 15, 2013 Notice and Chesapeake's purported laches in initiating this suit.[15]

### A.    Conditional Notice

At trial, BNY Mellon produced no evidence to support its defense that Chesapeake's March 15 notice is somehow ineffective even if timely to effect a redemption at par. To the contrary, BNY Mellon's expert on trust administration testified at trial that there was nothing actually stated in the Base or Supplemental Indenture that prohibits conditional notice. Tr. 354-55.

In its Pretrial Brief, BNY Mellon cited a single decision in support of its "conditionality" defense, but that ruling is not on point. *See* BNY Mellon Trial Mem. at 37-38 (citing *Aristocrat*

---

[15] Although BNY Mellon pleaded other defenses in conclusory form in its Answer, BNY Mellon addressed only the "conditional notice" defense in its pretrial memorandum. Chesapeake therefore addresses that defense here and also discusses the laches defense because some proof relevant to it was admitted at trial. Chesapeake submits that BNY Mellon has waived its other affirmative defenses but seeks to preserve the right to respond in the event the Court determines otherwise.

*Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04CIV10014PKL, 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005)). The court in *Aristocrat* found a redemption notice defective – not because the notice contained a condition – but because the notice did not contain a key term that the indenture expressly required: a firm redemption date. *Id.* at *6-7. As discussed in Chesapeake's Pretrial Memorandum at pages 42-43, Chesapeake's March 15 notice supplies all the information required by the Base Indenture's Section 3.04, and is supported by the decision in *BKCAP, LLC v. Captec Franchise Trust 2000-1*, No. 07-cv-637, 2011 WL 3022441, at *12 (N.D. Ind. July 21, 2011).

## B.      Laches

To the extent BNY Mellon continues to assert this defense, the rebuttal evidence admitted at trial demonstrates that Chesapeake initiated this litigation promptly after learning that BNY Mellon would decline to treat a notice issued after mid-February as timely for redemption at par. In mid-January 2013, executives at Chesapeake began considering the process and timetable which it could redeem the 2019 Notes at par.

To the extent BNY Mellon continues to assert this defense, the rebuttal evidence admitted at trial demonstrates that Chesapeake initiated this litigation promptly after learning that BNY Mellon would decline to treat a notice issued after mid-February as timely for redemption at par. In mid-January 2013, executives at Chesapeake began considering the process and timetable which it could redeem the 2019 Notes at par. Chesapeake at that time confirmed with inside and outside counsel that it had the right to redeem at par if it issued notice by March 15, 2013. *See* Ct. Ex. 1 ¶¶ 24-25; Pl. Exs. 48-49; Def. Ex. 127.

Chesapeake had no reason to doubt these conclusions, and certainly no reason to believe BNY Mellon, a trustee performing ministerial functions, would disagree. Indeed, BNY Mellon agreed with Chesapeake's position on February 20, 2013, even after consulting about the

deadline issue with its outside counsel, Mr. Chapin.  Pl. Ex. 49.  Until February 20, 2013, therefore, Chesapeake had no knowledge of its claim against BNY Mellon.

The trial record also suggests that if Chesapeake had contacted BNY Mellon in January, 2013 (or any prior time) it would have received the identical response it received on February 20 after BNY Mellon had consulted with Mr. Chapin.  BNY Mellon's own proof at trial shows that although Mr. Chapin began to change his view later on February 20, that occurred only in the context of a hedge fund pressing the trustee to adopt its viewpoint that the notice deadline had expired on February 13.  Def. Ex. 127.  Chesapeake filed suit promptly thereafter on March 8, 2013, about two weeks later.  Any laches defense is without merit.

## CONCLUSION

The governing agreements unambiguously permit Chesapeake to provide notice of Special Early Redemption on March 15, 2013, and Chesapeake has proven at trial that all the pertinent extrinsic evidence corroborates this result.  BNY Mellon has proven none of its defenses, and Chesapeake is entitled to entry of judgment on Claim One in the Complaint, and to such other relief that the Court deems just and proper.

**Dated:** April 28, 2013
New York, New York

CHESAPEAKE ENERGY CORPORATION

___/s/ Richard F. Ziegler_____
Richard F. Ziegler (RZ0872)
Stephen L. Ascher (SA7820)
Michael W. Ross (MR4490)
Ali M. Arain (AA2008)
Prashant Yerramalli (PY7225)
JENNER & BLOCK LLP
919 Third Avenue, 37th Floor
New York, New York 10022-3908
*Counsel for Plaintiff*