UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CHESAPEAKE ENERGY CORPORATION,

                Plaintiff,

       v.

THE BANK OF NEW YORK MELLON
TRUST COMPANY, N.A.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Civil Action No. 13 cv 1582 (PAE)

ECF Case

 

 

**POST-TRIAL MEMORANDUM OF DEFENDANT**
<u>**THE BANK OF NEW YORK MELLON TRUST COMPANY, N.A.**</u>

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................................1

THE EVIDENCE AT TRIAL.....................................................................................8

    I.      THE PARTIES AND PARTICIPATING NON-PARTIES ...................................8

    II.     THE RECORD OF THE NEGOTIATION AND DOCUMENTATION
           OF THE 2019 NOTES TRANSACTION ...........................................10

    III.   CHESAPEAKE'S POST-CLOSING CONDUCT ..............................22

    IV.   DISCUSSIONS REGARDING REDEMPTION IN LATE 2012 AND
           EARLY 2013 ...............................................................................25

    V.     CHESAPEAKE SENDS NOTICE TO TRUSTEE AND TO
           NOTEHOLDERS .........................................................................28

ARGUMENT ...........................................................................................................28

    I.      THE SUPPLEMENTAL INDENTURE UNAMBIGUOUSLY PERMITS
           A REDEMPTION AT PAR ONLY UNTIL MARCH 15, 2013 ..........28

    II.     IN THE EVENT THAT THE COURT DETERMINES THAT THE
           SUPPLEMENTAL INDENTURE IS AMBIGUOUS, IT SHOULD
           CONSTRUE  THE DISPUTED LANGUAGE AGAINST CHESAPEAKE
           AS THE ISSUER .........................................................................40

    III.   THE EXTRINSIC EVIDENCE OVERWHELMINGLY SUPPORTS
           BNY MELLON'S INTERPRETATION ...........................................46

    IV.   OTHER ISSUES BARRING RELIEF ON CLAIM I .........................51

CONCLUSION.........................................................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Air Vectors Assocs. v. N.Y. State Dep't of Transp.*,
53 B.R. 668 (Bankr. S.D.N.Y. 1985) ........................................................................28

*Allaire Corp. v. Okumus*,
2004 WL 719178 (S.D.N.Y. 2004) ...........................................................................39

*Allendale Mutual Ins. Co. v. Excess Ins. Co.*,
992 F. Supp. 271 (S.D.N.Y. 1997) ...........................................................................31

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04-civ-10014 (PKL), 2005
WL 1950116 (S.D.N.Y. Aug. 12, 2005) ..................................................................33

*Bank of N.Y. v. First Millennium, Inc.*,
607 F.3d 905 (2d Cir. 2010) .....................................................................................36

*Bank of New York Mellon v. Commerzbank Cap. Funding Trust II*,
No. 372, 2012, 2013 WL 1136821 (Del. Mar. 19, 2013) .......................6, 41, 45, 46

*Caleb & Co. v. E.I. DuPont De Nemours & Co.*,
624 F. Supp. 747 (S.D.N.Y. 1985) ...........................................................................50

*CBS Corp. v. Northrup Grumman Corp.*,
53 F. Supp. 2d 629 (S.D.N.Y. 1999) ..................................................................49, 51

*Cruden v. Bank of New York*,
957 F.2d 961 (2d Cir. 1992) .....................................................................................28

*Cunningham v. Ins. Co.*,
No. CV04-2997, 2006 WL 1896354 (E.D.N.Y. June 19, 2006) .............................32

*Faulkner v. Nat'l Geographic Soc'y*,
452 F. Supp. 2d 369 (S.D.N.Y. 2006) ................................................................30, 48

*Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.LLC*,
371 F. Supp. 2d 571 (S.D.N.Y. 2005) .......................................................................37

*Howe v. Bank of N.Y. Mellon*,
783 F. Supp. 2d 466 (S.D.N.Y. 2011) .......................................................................39

*In re Bank of New England Corp.*,
404 B.R. 17 (Bankr. D. Mass. 2009) ........................................................................45

*In re Bank of New England Corp.*,
646 F.3d 90 (1st Cir. 2011) ................................................................43

*In re Complaint of The City of New York*,
534 F. Supp. 2d 370 (E.D.N.Y. 2008) ..................................................39

*In re Lehman Bros. Holdings Inc.*,
439 B.R. 811 (Bankr. S.D.N.Y. 2010) ..................................................48

*Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*,
1993 WL 464730 (S.D.N.Y. Nov. 8, 1993) ...........................................41

*Kaiser Aluminum Corp. v. Matheson*,
681 A.2d 392 (Del. 1996) .........................................................7, 44, 45

*Kasen v. Morrell,*
6 A.D.2d 816,817, 175 N.Y.S.2d 315 (2d Dep't 1958) ........................30

*Law Debenture Trust Co. v. Maverick Tube Co.*,
595 F.3d 458 (2d Cir. 2010) ..............................................................5, 29

*Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*,
716 F. Supp. 1504 (S.D.N.Y. 1989) ......................................................28

*Morgan Stanley & Co. v. Archer Daniels Midland Co.*,
570 F. Supp. 1529 (S.D.N.Y. 1983) ......................................................44

*Nycal Corp. v. Inoco PLC*,
988 F. Supp. 296 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1988) ........................30, 48

*Ocean Transp. Line, Inc. v. Am. Philippine Fiber Industrs., Inc.*,
743 F.2d 85 (2d Cir. 1984) ...................................................................49

*Penn Mutual Life Ins. Co. v. Oglesby*,
695 A.2d 1146 (Del. 1997) .............................................................36, 43

*Prescott, Ball & Turben v. LTV Corp.,*
531 F. Supp. 213 (S.D.N.Y. 1981) ....................................................6, 40

*Readco Inc. v. Marine Midland Bank*,
81 F.3d 295 (2d Cir.1996) ...............................................................29, 52

*Republic Nat'l Bank v. Delta Air Lines*,
263 F.3d 42 (2d Cir. 2001) ...................................................................29

*RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*,
No. 10 Civ. 0025(PGG), 2013 WL 1294515 (S.D.N.Y. Mar. 30, 2013) ................................28

*RJE Corp. v. Northville Industrs. Corp.*,
329 F.3d 310 (2d Cir. 2003) ......................................................28, 29, 37

*Roth v. Goldman Sachs Group*,
    873 F.Supp.2d 524 (S.D.N.Y. 2012)......................................................................39

*Sass v. New Yorker Towers, Ltd.*,
    23 A.D.2d 105 (1st Dep't 1965) ..................................................................40, 43

*SEC v. Wang*,
    944 F.2d 80 (2d Cir. 1991)............................................................................39

*Securities Industry Ass'n v. Board of Governors of Federal Reserve System*,
    468 U.S. 207 (1984).................................................................................7, 44

*U.S. Bank Nat'l Ass'n v. Barclays Bank PLC*,
    2013 WL 1180414 (S.D.N.Y. Mar. 12, 2013) ................................................28, 32

*Union Oil Co. of Cal. v. Mobil Pipeline Co.*,
    C.A. No. 19395, 2006 WL 3770834 (Del. Ch. Dec. 15, 2006) .............................36

*United States Trust Co. v. Executive Life Ins. Co.*,
    602 F. Supp. 930 (S.D.N.Y. 1984) .................................................................43

*Walk-In Medical Ctrs., Inc. v. Breuer Cap. Corp.*,
    651 F. Supp. 1009 (S.D.N.Y. 1986)................................................................41

## OTHER AUTHORITIES

BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS 587 (8th ed.) ..............................33

BLACK'S LAW DICTIONARY 1304 (8th ed. 1999).........................................................33

OXFORD ENGLISH DICTIONARY ............................................................................33

Defendant The Bank of New York Mellon Trust Company, N.A. ("BNY Mellon" or the Trustee) respectfully submits this post-trial memorandum to set forth the appropriate decision tree analysis to determine Claim I of the Complaint, including addressing the four questions that the Court posed at the conclusion of trial.

## PRELIMINARY STATEMENT

*"What we wish, we readily believe, and what we ourselves think,*
*we imagine others think also."* – Gaius Julius Caesar

After weeks of expedited discovery and an accelerated trial, the clear and unambiguous terms of the Supplemental Indenture remain dispositive of this dispute. The trial confirmed that BNY Mellon continues to offer the only reasonable interpretation of the redemption provisions that harmonizes the entire agreement while remaining consistent with the uniform customs, practices, and usages relating to redemption as invariably understood in the bond industry. By contrast, Chesapeake's unreasonable view of the Special Early Redemption Period as a notice period permitting Chesapeake to redeem at par in April or May 2013 is inconsistent with the language of the agreement as a whole, contrary to Chesapeake's practical construction and description of the terms internally and to the market after issuance, and unsupported by any common bond industry practice or understanding.

Unsurprisingly, the admissible evidence introduced at trial provides no support for Chesapeake's unorthodox interpretation. The vague and incomplete recollections of a few Chesapeake witnesses establish no definitive agreement that notice could be given by March 15, 2013 to redeem at par value, and none of those or any other Chesapeake witness ever conveyed such an understanding to the actual counterparty to the Supplemental Indenture—BNY Mellon. Those hazy recollections and uncommunicated subjective intentions cannot carry Chesapeake's burden of proof in a dispute regarding a $1.3 billion public securities offering, where the clear

terms of the Supplemental Indenture unambiguously provide that Chesapeake must actually redeem the Notes within the Special Early *Redemption* Period, *and* provide the requisite advance notice within the Special Early Redemption Period.

Even if the Court finds that the redemption provisions are ambiguous, the Supplemental Indenture must be construed as a matter of well-settled securities law against Chesapeake as the issuer, because Chesapeake—not BNY Mellon or investors—had the exclusive ability to draft the agreement to express its unorthodox concept of redemption as notice in unequivocal language, but manifestly failed to do so. The rationale is compelling: the rights of investors in public securities are governed by their public terms, not by the hazy recollections of late-night phone calls to which the Trustee and investors were not a party. In fact, the trial confirmed that Chesapeake initially understood and interpreted its redemption rights as written—a period in which to redeem that ended on March 15, 2013. Chesapeake disclosed that construction in public filings and internal reports to senior management tracking the dates by which it needed to issue notice and redeem. Those actions and admissions speak louder than post-hoc arguments and implausible stories.

***What Did The Parties Write Down?*** Section 1.7 of the Supplemental Indenture sets forth two optional redemption periods that run consecutively, any time from and including November 15, 2012 to and including March 15, 2013 at par value, and then any time after March 15, 2013, to the date of maturity at the make-whole price. The language that the parties used to define these two optional redemption periods requires, on its face and in accordance with industry practice, that Chesapeake redeem the Notes on or before March 15, 2013 if it wished to repurchase the Notes at par value. That is undisputed. Section 1.7 then sets forth certain conditions and limitations on Chesapeake's ability to redeem the Notes within these periods,

including that Chesapeake must give advance notice to noteholders and the Trustee. In particular, the second sentence of Section 1.7(b) provides that Chesapeake may redeem the Notes at par at any time during the Special Early Redemption Period only if it had given the requisite notice during the period November 15, 2012 to March 15, 2013. This is the only principled reading of Section 1.7, because it accords ordinary words their ordinary meaning, and harmonizes all of the provisions of Section 1.7.

Chesapeake urges an alternative reading—that the second sentence expands its option to redeem the Notes at par. Chesapeake's reading requires the Court: (i) to transform the plain meaning of the conjunction "so long as," from a restrictive phrase to an expansive phrase, and (ii) to redefine the optional redemption periods, each of which the parties agree is clear and unambiguous on its face and well understood in the industry. New York law does not permit such mischief in contractual construction.

***What Chesapeake May Have Thought, Yet Cannot Clearly Recall and Did Not Document, Does Not Matter.*** The Court should not consider the testimony of Dell'Osso, Telle, Maultsby and Burns. That testimony consisted almost entirely of uncommunicated subjective intent evidence, and in any case has no bearing on the Supplemental Indenture to which BNY Mellon, but not the underwriters, was a party. Even if the Court were to consider such testimony, however, it plainly does not demonstrate a meeting of the minds between them.

First, not one of these gentlemen has a clear recollection of any discussion where they affirmatively agreed that the Special Early *Redemption* Period would be a notice period, or that Chesapeake would have until May 14, 2013 to redeem the Notes at par. Mr. Dell'Osso and Mr. Maultsby, the clients, do not recall any discussion that a redemption could occur in April or May 2013, and indeed testified that they did not focus on the mechanics of notice. Mr. Telle and Mr.

Burns, the lawyers, vaguely remember a discussion of when notice must be given, but their hazy recollections do not align. This is patently insufficient to establish a meeting of the minds (putting aside that these minds are not those of the parties to the agreement at issue). Conversations that are seemingly recalled with clarity only after the dispute was raised cannot trump the Prospectus Supplement, the Supplemental Indenture, statements made to investors on investor calls, the Company's internal and external reports, financial news publications and common sense.

Second, not a single email or other document reflects any communication suggesting the alleged agreement, and no other individual who worked on the transaction has provided evidence of this purported understanding. From February 9, 2012 to January 2013, there is not a single reference to a "meeting of the minds" that the Special Early Redemption Period would be a notice period or that Chesapeake may redeem at par in April or May 2013.

***What Did Chesapeake Tell BNY Mellon and Investors?*** In February 2012, Chesapeake and BAML—including Mr. Dell'Osso and Mr. Maultsby—consistently told BNY Mellon and investors that the Notes were just like any other redeemable note offering with one exception: Chesapeake could redeem the Notes early at par. Chesapeake did not tell BNY Mellon or investors about its novel understanding of how Section 1.7 worked. Not once in all of the offering documents, investor calls, press releases, marketing materials or Chesapeake's subsequent public statements and filings, did Chesapeake tell investors that the Special Early *Redemption* Period was in fact a "notice period" or that Chesapeake had until May 14, 2013, to redeem the Notes at par.

As a matter of law, ambiguities in indenture terms must be construed against the issuer and in favor of the reasonable expectations of the investors in the securities. The rationale for

*contra proferentem* is that the investors who bear the economic risk of owning the securities typically have no involvement in the drafting process and should not bear the risk of ambiguous terms. Here, according to Chesapeake's rosiest view of the evidence, four men sort of "understood" and "believed," but do not in fact recall, that during a telephone call on the evening of Saturday, February 11, 2012 (or perhaps some other day), they discussed providing Chesapeake a highly beneficial right, which: (i) constituted a radical departure from the custom and practice of the industry, (ii) was not reflected in the negotiation record or shared with the rest of their respective deal teams, (iii) was not communicated in any way to investors, the marketplace or the Trustee, and (iv) was not clearly set forth in the contract. Even if the Court admits and credits Chesapeake's alleged evidence—which it should not—this case presents the precise situation for which *contra proferentem* protects investors.

***What Are The Standards?*** The step-by-step analysis that the Court must follow is clear, as further informed by responses to the questions that the Court posed at the end of trial summarized below and addressed more fully in the Argument section.

1. The Court first must determine whether Section 1.7 of the Supplemental Indenture, read in conjunction with the Base Indenture and the custom and practice of the bond industry, is unambiguous. A term is ambiguous only if it is capable of "more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Law Debenture Trust Co. v. Maverick Tube Co.,* 595 F.3d 458, 467 (2d Cir. 2010). The Court should consider evidence of bond industry custom and practice, such as the meaning of "redeem" and "redemption," in determining whether the provision at issue admits of more than one reasonable

reading that harmonizes the indenture provisions as a whole and avoids creating conflicts between, or rendering superfluous, any provisions. Extrinsic evidence of alleged departures from custom and practice should not be considered at this initial stage.[1]

2.      If the Court nevertheless finds that ambiguity exists, it should construe the Supplemental Indenture against Chesapeake and in a manner that protects the "reasonable expectations" of investors. New York law holds that any ambiguous term is to be construed against the issuer, which is responsible for the language it chose in the security and indenture. *See, e.g.*, *Prescott, Ball & Turben v. LTV Corp.,* 531 F. Supp. 213, 217 (S.D.N.Y. 1981) ("[E]ven some level of ambiguity[] will result in a construction of the Trust Indenture favoring [investors]."). The Delaware Supreme Court recently affirmed this rule in *Bank of New York Mellon v. Commerzbank Cap. Funding Trust II,* No. 372, 2012, 2013 WL 1136821 (Del. Mar. 19, 2013). In considering the public policy advanced by this rule, the Court may (but need not) consider the many public statements of the issuer and its agents, the underwriters, when they brought the Notes to market on February 13, 2012, and its many public statements and filings in the year since then–all of which describe the redemption periods as November 15, 2012 to March 15, 2013 at par, and after March 15, 2013 at make whole. By construing ambiguity against the issuer, the rule protects all investors, those who read the Supplemental Indenture and those who did not (including investors who purchased on February 13, 2012).[2]

3.      As noted above, the Court need not consider any extrinsic evidence to decide this case even if it finds the terms at issue ambiguous. If the Court does consider extrinsic evidence introduced at trial, however, it should exclude evidence of communications between the issuer

---

[1] This paragraph addresses issues raised by the Court's first and fourth questions posed at the conclusion of the trial. (Trial Tr. 481:7-481:21, 482:25-483:18.)

[2] This paragraph addresses issues in the Court's fourth question. (Trial Tr. 482:25-483:18.)

and the underwriters that were not shared with BNY Mellon as counterparty.  Under settled law, underwriters who market securities on a "best efforts" basis (as here) are acting as the agent of the issuer.  *See Securities Industry Ass'n v. Board of Governors of Federal Reserve System*, 468 U.S. 207, 217 n. 17 (1984).  In any event, with respect to the Supplemental Indenture, evidence of such negotiations would only "reveal information about the thoughts and positions of, at most, the issuer and the underwriter," and not about those of the other side to the contract.  *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 397 (Del. 1996).  Because BNY Mellon was not a party to those negotiations, evidence of issuer-underwriter discussions should be excluded.[3]

4.      If the Court decides that Sections 1.7(b) and (c) are ambiguous, admissible extrinsic evidence would include evidence showing Chesapeake's practical construction of its redemption rights in: (i) statements to investors in February 2012, including the description provided to initial investors during the audio/video call on the morning of February 13, 2012; (ii) subsequent public statements in 2012, including the description in its table of senior notes on its website; and (iii) public filings with the SEC, including 10-Q and 10-K filings.  These statements qualify as party admissions, as does the practical construction of the redemption rights by Chesapeake's Treasury Department, which was charged with managing the issuance and redemption of the Notes.[4]

---

[3] This paragraph addresses issues in the Court's second question.  (Trial Tr. 481:22-482:15.)

[4] This paragraph addresses issues in the Court's third and fourth questions.  (Trial Tr. 482:16-483:18.)

## THE EVIDENCE AT TRIAL

## I.     THE PARTIES AND PARTICIPATING NON-PARTIES

### A.     Parties to the Supplemental Indenture

1.     Chesapeake, certain affiliates thereof and BNY Mellon are the parties to the Supplemental Indenture at issue.  (PX 4; PX 5.)[5]  The Notes are one of a series of Senior Notes that Chesapeake issued pursuant to a Base Indenture.  (PX 6.)

2.     Members of Chesapeake's Treasury Department had responsibility for monitoring, managing, and reporting on Chesapeake's new and outstanding debt issuances. (Trial Tr. 247:4-17.)  The working group list for the Notes issuance included the following individuals from the Treasury Department (PX 27 at 2), who also were involved in negotiating and drafting the Supplemental Indenture and other offering documents for the Notes:

- Nick Dell'Osso, Executive Vice President and CFO (*id*.; *see also* PX 8, 9, 10);
- Jennifer Grigsby, Senior Vice President, Treasurer and Corporate Secretary (*id*.);
- Elliot Chambers, Vice President, Finance and Assistant Treasurer (*id*.; *see also* Trial Tr. 250:10-18);
- Susan Seymore, Manager, Corporate Finance (PX 10, 27).[6]

Michael Telle of Bracewell & Giuliani LLP ("Bracewell") was the lead attorney representing Chesapeake in connection with the Notes issuance.  (PX 27 at 9; Telle Decl. ¶ 6.)

3.     BNY Mellon acts as Indenture Trustee for the Notes, pursuant to the Supplemental and Base Indenture.  (PX 4,6.)  BNY Mellon's duties are set forth in the Supplemental Indenture and under the Trust Indenture Act.  (PX 4; PX 6 §§ 1.03, 7.01.)

---

[5] Defined terms herein have the same meaning as set forth in BNY Mellon's Pre-Trial Brief.

[6] In addition to the foregoing, Caleb Morgret, Ross McLaughlin and Conrad Holub had responsibilities after the issuance for internal reporting and hedging of the Notes, as well as interacting with the Trustee. (Morgret Dep. 18:4-20:6, 49:6-50:8; McLaughlin Dep. 13:6-14:15, 17:8-18:9; Holub Dep. 23:2-24:20.)

B.    **Certain Non-Parties**

1.    *The Underwriters*

4.    Bank of America Merrill Lynch ("BAML") served as the lead

manager/bookrunner for the Notes issuance.  Declaration of James Alexander ("Lex") Maultsby

¶ 4 ("Maultsby Decl.").  As the lead manager/bookrunner, BAML acted on behalf of a group of

24 different institutions each of which was responsible for selling various allocations of the

Notes.  (PX 1 at S-42; PX 3, Sched. A.)

5.    Maultsby was the lead banker for BAML.[7]  (Maultsby Decl. ¶¶ 3-4; *see also* PX

8-10.)  Chesapeake "engaged BofAML to lead a $1,000 million offering," and BAML

considered Chesapeake as the client.[8]  Cravath, Swaine & Moore LLP ("Cravath") represented

the underwriters in connection with the issuance of the Notes.  Stephen Burns was the lead

lawyer on the Cravath team that represented BAML.  (Trial Tr. 116:17-24; Burns Decl. ¶ 3.)

6.    The Notes transaction was a "best efforts" deal.  (Trial Tr. 267:17-24, 268:7-9.)

BAML obtained approval on February 12, 2012 from its Leveraged Finance Committee ("LFC")

to serve as joint book running manager "on a best efforts basis for Chesapeake Energy

Corporation on a $1,000 million Senior Unsecured Notes offering."  (DX 44 at

BAML_CHK_02772.)  In a "best efforts" transaction, the underwriters have no obligation to

provide funds to the issuer and take no underwriting risk.  (Trial Tr. 205:3-6, 205:15-21.)

Indeed, the underwriters had "no firm commitment until the purchase agreement was available to

be signed."  (Trial Tr. 237:3-4.)  The underwriters only entered into the Underwriting

---

[7] The BAML team also included John Rote, from the Capital Markets Group, Joe Pantalena, and several others.  (PX 27 at 4-6.)  Mr. Rote had significant involvement in both the structuring of the Notes (PX 8-10; DX 183, 184) and the marketing of the Notes to investors.

[8] (Maultsby Decl. ¶ 3; DX 44 at BAML_CHK_02770, 02775; DX 17 at BAML CHK_02125-26 (describing Chesapeake as "client").)

Agreement, dated February 13, 2012 (PX 3), *after* orders for the book had been taken and the Notes began trading actively on February 13, 2012. By contrast, in a "bought deal," there is no risk to the issuer because the underwriters will "buy the deal and bear the risks in issuing." (Trial Tr. 268:3-268:6; *see also* Chambers Dep. 40:12-41:12.)[9]

### 2. *The Investors in the Notes*

7. By the early afternoon of February 13, 2012, the underwriters sold over $1.6 billion of Notes – over $683 million more than the original anticipated $1 billion offering – to 166 different initial purchasers. (PX 39 at CHK00002193.) Trading in the Notes began later that evening. (PX 39 at CHK00002192.)

8. The offering was oversubscribed, meaning that the underwriters received more orders than there were bonds available. (Trial Tr. 157:15-17.) The substantial demand of the Notes meant that there was no underwriting risk and only "theoretical" counter-party risk if confirmed purchasers backed out (for which the bank would have a breach of contract claim and face such risk every day). (Trial Tr. 156:15-157:24.)

## II. THE RECORD OF THE NEGOTIATION AND DOCUMENTATION OF THE 2019 NOTES TRANSACTION

### A. The Written Record of Negotiations

9. The Notes offering took place before the drafting and execution of the Supplemental Indenture. (Burns Decl. ¶¶ 6-7.)

10. On February 9, 2012, Maultsby provided Dell'Osso and Grigsby a presentation entitled "Short Term Callable Bond Opportunity." (PX 8 at CHK00000701.) The "Indicative Senior Notes Terms" provided for $1.5-2.5 billion of notes, with a maturity of May 15, 2017,

---

[9] For example, Credit Suisse proposed a "bought deal" to Chesapeake on January 8, 2013 "whereby Credit Suisse would buy the new issue from CHK at pre-agreed upon level." (DX 108 at CHK00030856.)

which were "Non-Callable" any time prior to November 15, 2012, and "Callable at Par" from 11/15/2012 to 12/31/2012. (PX 8 at CHK00000704.)

11.     Later that day, after a conference call with Chesapeake, Maultsby sent Grigsby, Dell'Osso, and Chambers a new indicative term sheet, with "pricing for the following alternatives: 1) Fully callable 5 year senior notes (as discussed this morning; pricing indication was improved slightly); 2) Special year-end redemption for 5, 7 and 10 year senior notes maturities; 3) Regular bullet (make-whole call at T+50 bps) for 5, 7 and 10 year senior notes maturities." (PX 9 at CHK00003507.) These indicative terms set forth data for seven different scenarios, each providing $1.5-2.5 billion of notes and, as applicable, a "callable at par" period of November 15, 2012 to December 31, 2012. (PX 9 at CHK00003506.) In response, Chambers asked if there was "a market for a fully callable 7 or 10yr issuance." (DX 9 at CHK00000713.) Maultsby rejected this possibility. (*Id*.)

12.     That evening, Dell'Osso told Maultsby and others from BAML that Chesapeake would "like to move forward with the bond offering." (PX 10.) Dell'Osso told BAML that Chesapeake was interested in issuing bonds with a 2019 maturity, and inquired "whether we can go to a 12 month callable at par period without changing any other terms." (PX 10; Burns Decl. ¶ 8.) Dell'Osso explained that he wanted to de-link the par redemption window from the assets sales, which were planned to conclude by year end 2012, so that Chesapeake would have more flexibility in how it used the proceeds from the planned asset sale. (PX 10.) Maultsby informed Dell'Osso that 12 months was too long of an early par call period for him to find interested investors at a reasonable price. (Dell'Osso Decl. ¶ 17.) After some additional email discussion

regarding the issue, BAML and the other underwriters ultimately determined that the early redemption period would end on March 15, 2013, based on marketability to investors.[10]

### B. Drafting the Prospectus Supplement

13.     On Saturday afternoon, February 11, 2012, Cravath sent Bracewell an email on behalf of the underwriters requesting that the prospectus supplement include a March 15, 2019 maturity date, and interest payment dates of March 15 and September 15.  (Burns Decl. ¶ 14.) The underwriters sought this term because it is customary for the maturity, interest payment and redemption dates to reference the same day of the same month.  (Burns Decl. ¶ 14.)

14.     Bracewell circulated a revised draft including the "so long as" sentence on page S-30 of the Prospectus Supplement in the Section entitled "Redemption—*Special Early Redemption*."  (Burns Decl. ¶ 17.)  Burns suggested adding the same language to page S-7 of the Prospectus Supplement, which was part of the Summary section.  (Burns Decl. ¶ 19.)

15.     Several other issues relating to the mechanics of the par redemption period arose during the drafting process, *each of which is reflected in written email communications* between the Chesapeake and BAML deal teams.  First, on February 11, 2012, Maultsby sought to limit the par call such that Chesapeake "can redeem any amount of new notes at [its] option, so long as if any portion of the notes remain, there must be at least $250 million outstanding."  (DX 20 at CHK00004266; Burns Decl. ¶ 15.)  Second, Bracewell proposed unilaterally the end date for the redemption period to March 31, 2013 (PX 13), but wanted to "confirm the redemption dates" with Chesapeake on February 11, 2012.  (DX 22.)  On the same day, Cravath indicated to Bracewell that "[a]s to the redemption date … the banks want it to go to March 15, 2013 instead of March 31, 2013."  (DX 25.)  Additionally, in deciding the name of the par redemption, Telle

---

[10] (DX 25 (banks wanting to move the last redemption date from March 31, 2013 to March 15, 2013); *see also* DX 184 (internal BAML discussion about the redemption structure).)

stated that he thought that "special early redemption," rather than "special redemption," should be used in the Prospectus Supplement. (DX 26.) The final Prospectus Supplement and Supplemental Indenture included each of these changes. (PX 1 at CHK00000252, 261; PX 4 § 1.7(b).)

16.     Chambers reviewed the Prospectus Supplement language regarding the redemption option to make sure that it reflected Chesapeake's understanding of how the feature would work. (Trial Tr. 254:5-18.) Seymore also believed that she would have reviewed the various changes to the redemption provisions in the normal course of her responsibilities. (Seymore Dep. 118:4-14.) Indeed, on February 11, 2012, Chambers asked Seymore to review the redemption dates to "make sure this structure works for us [Chesapeake]?" Ms. Seymore wrote back "Okay. Done!" without suggesting any changes. (DX 25.) Despite their central roles, Chesapeake did not call Grigsby, Chambers or Seymore to testify at trial.

17.     Chesapeake obtained Board approval of the Notes transaction on February 12, 2012. Before the conference call with the board of directors, Grigsby advised Dell'Osso to "spell out specifically what you are asking the BOD to approve – issuance of up to $1.5B of new senior notes, that are callable at par on or before March 15, 2013, with a maturity no longer than 10 years and an interest rate no greater than 7.25%. Feel free to change these parameters if you think they are too tight … want to keep them loose." (DX 32 at CHK00011251.)

18.     BAML finalized its Final Best Efforts Memorandum, dated Sunday, February 12, 2012, and forwarded it to the BAML Leveraged Finance Committee ("LFC") for approval to serve as joint book running manager on a best efforts basis for Chesapeake on a $1 billion unsecured notes offering (*i.e.*, the Notes). (DX 44 at BAML_CHK_02772.) The Final Best Efforts Memorandum described the redemption rights as follows: "The notes will be non callable

until November 15, 2012 upon which time the Company can exercise a Special Early Redemption at par until March 15, 2013. After March 15, 2013, a make-whole at T+50 will apply." (DX 44 at BAML_CHK_02769.) Maultsby stated that BAML's "understanding" of the optional redemption terms as of February 10, 2012 was reflected in an earlier draft of the memorandum circulated on February 11, 2012. (Trial Tr. 206:25-207:5, citing DX 17 at BAML_CHK_02134.) The optional redemption terms in this earlier draft memorandum were identical to the optional redemption terms in the memorandum circulated to the LFC. (*See* DX 17 at BAML_CHK_02134; DX 44 at BAML_CHK_02775.).

  **C.**   <u>**The Alleged Meeting of Some Minds**</u>

  19.   As set forth above, there are ample email communications from February 2012 discussing various aspects of the redemption provisions. (DX 20, DX 22, DX 25, DX 26.)

  20.   There are no email communications from February 2012 discussing the purported agreement to have March 15, 2013 as a notice date with actual redemption to occur as late as 60 days thereafter.

  21.   The testimony at trial reflects the following recollections regarding the notice concept from the four witnesses Chesapeake determined to call at trial: (i) Dell'Osso cannot remember a single specific conversation about the notice concept (Trial Tr. 63:23-64:1, 64:22-65:5); (ii) Dell'Osso is not sure that he ever looked at the Supplemental Indenture and did not discuss with anyone at Bracewell the drafting of the Supplemental Indenture (*id.* 65:19-66:5, Dell'Osso Dep. 145:24-146:11, 149:5-150:22), and never specifically told Telle "that it mattered to the company as between whether March 15th and a date in May was in fact the redemption date" (Trial Tr. 113:8-13); (iii) Dell'Osso does not recall specifically focusing on anything in the Prospectus Supplement (*id.* 67:6-67:15); (iv) Burns recalls being "on the line" on a Saturday night call in which the "notice concept" was discussed, is not sure whether anyone from

Bracewell was on the line, and while his recollection "is not crisp," he believes that the concept of providing notice by March 15, 2013 was raised, and after the call had the "*understanding* that the Company and the underwriters had agreed as a business matter that the Company would be permitted to give notice of an early redemption at par until March 15, 2013" (Burns Decl. ¶ 16) (emphasis added); (v) Maultsby does "not recall the specifics" of an alleged conversation with Dell'Osso regarding "the time period in which Chesapeake would be able to decide whether to exercise its option to redeem the Notes at par (Maultsby Decl. ¶ 7); (vi) Telle is "confident" that he discussed the notice concept of Dell'Osso on Saturday, February 11, but he "do[es] not recall the precise substance of our discussions" (Telle Decl. ¶ 20); (vii) Telle testified in response to the Court's questions that Dell'Osso never specifically told him that it mattered to Chesapeake as between whether March 15 and a date in May was in fact the redemption date (Tr. T. 113:8-13); and (viii) Telle does not recall discussing his proposed language for the Supplemental Indenture with anyone from Cravath before sending it, and discussed neither the substance of it with Cravath, nor Cravath's rejection of that proposal (Trial Tr. 106:23-25; Telle Dep. 178:6-181:7, 222:17-25).

22.     Other members of the core deal team – Grigsby, Chambers and Seymore – have no recollection of any such supposed understanding.  (Grigsby Dep. 47:22-48:6, 58:11-60:15, 101:7-17; Chambers Dep. 30:24-31:18, 32:10-17, 124:14-18; Seymore Dep. 83:2-84:8, 87:4-88:9.)

**D.     The Launch**

23.     The Notes offering was a "drive-by" transaction that yielded more than $1.6 billion in orders in one day – February 13, 2012 – and the Notes began trading that same afternoon.  (Trial Tr. 220:7-221:6.)  At 1:59 a.m. on February 13, 2012, Chesapeake issued a

press release announcing that it was commencing a public offering of $1.0 billion of the Notes. (DX 166, Ex. B.)

24.     At 2:58 a.m. on February 13, 2012, BAML internally distributed a Sales Force Memorandum (the "SFM"). (DX 45; *see also* DX 187.) The first page of the SFM contained the following description of "Opt. Redemption": "Any time prior to 11/15/2012 – Non-Callable; 11/15/2012 to 3/15/2013 – Callable at Par; 3/16/2013 and thereafter – MWC (T + 50)." (DX 45 at BAML_CHK_02891; *see also* DX 187 at BAML_CHK_02664.)[11]

25.     Maultsby expected that BAML's sales force would convey the optional redemption information to potential investors. (Trial Tr. 214:23-216:15.) In addition, one of the "key investment highlights" of the Notes that Chesapeake and BAML used to market the Notes was the "[h]igh probability of outsized IRR given potential investment duration."[12] As part of the marketing materials explaining the outsized internal rate of return ("IRR"), the SFM contained a table comparing the IRR of the new note issuance with an older note issuance. (DX 45 at BAML_CHK_02893; *see also* DX 187 at BAML_CHK_02667.) While Maultsby described the analysis in the SFM as "very fluid" and not very specific (Trial Tr. 234:4-234:23), with varying original issue discount prices and coupon interest rates, the analysis calculated yield to call for only three redemption dates – November 15, 2012, March 15, 2013 and March 15, 2019. (Trial Tr. 219:21-220:6.) That same morning, Chambers circulated the preliminary Prospectus Supplement to the underwriters, who in turn began to market the Notes to investors.

---

[11] Morgan Stanley, one of the other underwriters and joint bookrunners, also created a memo on the Notes. The memo describes the "Early Redemption" feature as "Redeemable at par from 11/15/2012 – 3/15/2013. NCL otherwise." (DX 200.)

[12] (DX 45 at BAML_CHK_02891; Trial Tr. 217:6-8; DX 62 (BAML pointing out that "[i]nvestors were keenly focused on the IRR to the call window.") BAML itself was keenly aware of the importance of IRR, as the senior members of its deal team – Messrs. Maultsby, John Rote and John Pantalena – were interested in the effect of par redemption on investor IRRs. (DX 183, 184.)

(DX 50; DX 166 ¶ 17.)  Among the documents available to investors were the preliminary

Prospectus Supplement and the pricing term sheet (PX 3 at CHK00000355-357; Maultsby Decl.

¶ 10).

26.     Additionally, on February 13, 2012, investors received information about the

Notes offering from Bloomberg – "the most widely used source for financial information." (DX

166 ¶ 18.)  This includes an article at 9:02 a.m., an article at 12:59 p.m. and a "Bloomberg blast"

in advance of the investor call at 11:00 a.m. (DX 166 ¶¶ 18-19.)  Each of these Bloomberg

updates provided substantially similar information regarding the optional redemption terms.  For

instance, the Bloomberg blast described the optional redemption provision as follows:  "At

anytime prior to 11/15/12: non-callable; 11/15/12 - 3/15/13: callable @ par; 3/16/13 and

thereafter: non-callable (MWC T + 50 bps)."  (DX 166, Ex. D; *see also* DX 166, Ex. C; DX 187

at BAML_CHK_02663.)

27.     BAML further marketed the Notes to investors through an internet-based "road

show" that occurred at around 11:00 a.m. on February 13, 2012, with Maultsby and Dell'Osso

leading the investor call.[13]  While displaying the Investor Call Senior Notes Offering Slide

presentation (PX 35) to investors logged in for the investor conference call on Net Road show,

BAML and Chesapeake first showed the cover page, and then the second page labeled

"Summary of Senior Notes Offering Terms," which prominently describes the "Optional

Redemption" of the Notes as follows:  "Any time prior to 11/15/2012 – Non-Callable;

11/15/2012 to 3/15/2013 – Callable at Par ("Special Early Redemption"); 3/16/2013 and

thereafter – Callable at Make-Whole Premium (T + 50)."  (PX 35 at CHK00000124.)

---

[13] (DX 49; Trial Tr. at 211:5-211:8 (Mr. Maultsby stating that the recorded road show presentation on
February 13, 2012 was a "fair and accurate audio recording of the statements [he] made"); *see also* DX
166, Ex. D (Bloomberg blast stating that investor call is at 11 a.m. EST.).)

28.     At the same time this information was displayed, Maultsby stated the following:

> "Good morning, thanks for joining the Chesapeake Energy Investor call.  I am Lex Maultsby of BofA Merrill ….  There's a slide deck on Net Road show.  Let me just walk you through the term sheet and the first couple of pages. The Issue is a seven-year structure due March 15, 2019.  **There's been some confusion around the call schedule.  It has a par call window this November 15th, 2012 through March 15th, 2013.  Callable at par, that's what we call the special early redemption period.  And thereafter it will have a make whole premium consistent with the rest of the Chesapeake senior notes.**"

(DX 49 (emphasis added).)  No mention was made of a notice "window" or of a redemption potentially occurring any time after March 15, 2013, or that the notice provision would be radically different than market expectations or otherwise Chesapeake notes.

29.     Chambers, as "lead liaison," sent the preliminary Prospectus Supplement to the rating agencies.  (DX 58; DX 197; DX 198).)  Mr. Sprinzen of Standard & Poor's then circulated a draft release on the Notes to Grigsby, Chambers, and Seymore so they could address "any factual errors … in the draft."  (DX 201 at CHK00026121.)  The release stated that "the notes could be redeemed at par prior to mid-March, 2013."  (DX 201 at CHK00026123.)  Neither Grigsby nor Chambers revised the description of the redemption provisions.[14]

30.     In fact, the pricing of the Notes on February 13, 2012 at 98.75% of par with a coupon of 6.775% (itself unusual in the industry) was no coincidence.  (DX 166 ¶¶ 29-30, Ex. F.)  The IRR of the Notes was a key consideration for investors, as highlighted in the SFM that BAML used to market and sell the Notes.  The ultimate pricing provided specific yields to call of 8% if called on March 15, 2013 (*i.e.*, the last par redemption date), and 7% if "called" at

---

[14] (DX 201 at CHK00026121; Trial Tr. 265:15-17.)  Chambers also reviewed a draft release from Moody's, and had no comments to the release either.  (DX 56.)

maturity. (DX 166 ¶¶ 30-32.) This confirms BAML's focus in selling the Notes was on an "outsized" 8% IRR if the "investment duration" of the Notes was cut short by an early par call.[15]

31.     After pricing the Notes on February 13, 2012, BAML distributed a term sheet to Bloomberg outlining the key terms of the Notes and describing the optional redemption provisions in the identical manner as the Bloomberg blast set forth above. (DX 47.) Bloomberg used this information to create a description page for the Notes that users of its Bloomberg terminal could access. (DX 47; Trial Tr. 365:5-9.) The Bloomberg terminals, with over 300,000 subscribers, are widely used in the finance and investment community. (Trial Tr. 361:4-6.)

32.     BAML produced an internal Case Study on the Notes that could be used to "self promote" (DX 62 at BAML_CHK_02699), highlighting the "never-before-seen special redemption feature that gives the Company the ability to call the notes at par during a four month window between November 15, 2012 and March 15, 2013."[16]

33.     Financial news publishers gave similar reports. A Bloomberg article, which Maultsby circulated to the BAML and Chesapeake deal teams, quoted a key BAML deal team member, John Rote, as stating that "[i]f the bonds don't come out in that November to March time frame, you're still getting a much better return on a pure yield basis versus a bond of similar maturity… If it does come out, it's basically a one-year piece of paper with an 8-percent-plus IRR, and obviously a lot of investors found that to be attractive." (DX 190 (quotations omitted).) The article observed that the Notes "are callable at par for a four-month period from mid-November 2012 to mid-March 2013." (DX 190.) Other commentators and reporters provided

---

[15] (DX 45 at BAML_CHK02891.) Indeed, any par redemption after March 15, 2013 would yield odd numbers that are less than 8% IRR. (DX 166 at p. 12.) Dell'Osso stated that, "[t]o those who complained of lack of upside, I'm guessing they won't complain too much when the[y] get an approx 8% cash on cash return for a BB+ name in 1 year!" (DX 59.)

[16] (DX 62 at BAML_CHK_02701.) The Case Study also lists the Notes' optional redemption schedule, in a manner substantially similar to the marketing materials outlined above. (*Id.*)

substantially similar information on the optional redemption terms.[17]  No mention was made of a notice "window" or of a redemption potentially occurring any time after March 15, 2013.

## E.   The Disclosure Documents

34.     Maultsby advised colleagues that special early redemption was disclosed on the cover page of the Prospectus Supplement (*i.e.*, the "OM") (DX 38)) which stated as follows:

> At any time from and including November 15, 2012 to and including March 15, 2013, we may redeem some or all of the notes at a redemption price equal to 100% of the principal amount of the notes plus accrued and unpaid interest, if any, to the redemption date; provided that after any redemption of the notes in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal amount of the notes remains outstanding.   See "Description of Notes—Redemption—Special Early Redemption."
>
> At any time after March 15, 2013, we may redeem some or all of the notes at a redemption price equal to 100% of the principal amount of the notes plus a "make-whole" premium, plus accrued and unpaid interest, if any, to the date of redemption, described in this prospectus supplement under "Description of Notes—Redemption—Optional Redemption."[18]

35.     The Prospectus Supplement also described the redemption of the Notes on pages S-7 and S-30.  The disclosures were substantially identical to the cover page (providing the November 15, 2012 through March 15, 2013 par redemption option and any redemption after March 15, 2013 at the make whole price), with this addition:  "We may redeem the Notes pursuant to the special early redemption provision so long as the notice of redemption is given during the Early Redemption Period.  See '—Redemption Procedures.'" (PX 1 at S-7, S-30.)

---

[17] (DX 205, Ex. B (Covenant Review describing that the "Company can redeem the 2019s at par at any time from and including November 15, 2012 through and including March 25[*sic*], 2013."); DX 199 at MS_CHK00001522 (Standard & Poor's Leveraged Commentary & Data reporting that the "[n]otes are non-callable until Nov. 15 of this year, and will then be callable at par until March 15, 2013.  After that date there is only a make-whole call at T+50."); DX 166, Ex. I (DebtWire citing a source that called the Notes as "callable at par between November 2012 and March 2013.")

[18] (PX 1 at cover page.)

36.     Chesapeake also filed with the SEC a Pricing Term Sheet, dated February 13, 2012, as a supplement to the Prospectus Supplement.  (PX 2.)  The Pricing Term Sheet included information regarding redemption substantively identical to pages S-7 and S-30 of the Prospectus Supplement.  (PX 2 at CHK00000359-360.)

### F.     The Supplemental Indenture

37.     On February 13, 2012, BNY Mellon agreed to act as Trustee for the Notes.  The next day, Bracewell circulated a draft of the Supplemental Indenture.  (Burns Decl. ¶ 24.)

38.     At Chesapeake, Seymore was primarily responsible for interacting with BNY Mellon and its counsel regarding the Supplemental Indenture.  Chambers received drafts of the Supplemental Indenture (Trial Tr. 254:23-25), but recalls no discussion of proposed language addressing the redemption provision, nor any particular proposed edits.  (Trial Tr. 257:21-24.) Indeed, neither Chambers nor Seymore recalls any discussion with BNY Mellon or its counsel regarding the redemption provisions. (Seymore Dep. 170:5-17.)

39.     On February 14, 2012, Telle proposed language for Section 1.7(b) of the Supplemental Indenture in order to add "clarity" to the provision governing early par redemption.[19]  In particular, he proposed the following as the second sentence of 1.7(b):

> The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture prior to 5:00 p.m. (Central Time) on March 15, 2013, even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period.[20]

40.     Telle has no recollection of discussing why he added this language with anyone from Bracewell, Chesapeake, Cravath, or BNY Mellon, and had no conversations with anyone at

---

[19] (Trial Tr. 101:3–102:4; Telle Decl. ¶ 36; Telle Dep. 180:9-14, 185:14-186:10, 186:20-187:20.)

[20] (Burns Decl. at p. 12.)

Cravath or the underwriters about this language prior to adding it to Section 1.7(b). (Telle Dep. 178:6-181:7, 222:17-25.) Cravath rejected the proposed language. Burns explained that while he did not review the Supplemental Indenture, Telle's proposed language was likely rejected in order to conform the Supplemental Indenture to the applicable provision in the Prospectus Supplement. (Trial Tr. 136:7-12.)[21]

41.     At around the time Cravath rejected Telle's proposed language, Seymore proposed to Bracewell defining the par redemption period as the "Special Early Redemption Period," and Bracewell advised that they had received "some comments from Cravath regarding the description of the end of the redemption period, and my guess is that the time zone language will be removed altogether." (DX 68 at CHK00027627.)

42.     On February 16, 2012, the parties to the Supplemental Indenture – Chesapeake and BNY Mellon – executed the agreement.

### III.   CHESAPEAKE'S POST-CLOSING CONDUCT

43.     Chesapeake's Treasury Department, including Seymore, Chambers, Holub, Morgret, and McLaughlin, was responsible for monitoring and reporting on Chesapeake's outstanding senior notes issuances, including ongoing work with respect to the Notes.[22] Certain

---

[21] (Trial Tr. 136:13-18; *see also* Trial Tr. 154:19-22.) Although Telle claims he spoke to O'Shea at Cravath about the rejection of Telle's proposed language, Telle admitted that, at best, he did not tell O'Shea the reason for his proposed language, and that O'Shea only wanted to "marry up" the language in the Supplemental Indenture to that in the Prospectus Supplement. (Trial Tr. 106:11-22; Telle Decl. ¶ 38.) Burns offered contradicting testimony, stating that O'Shea did not "recall being involved in" commenting on Bracewell's draft of the Supplemental Indenture. (Trial Tr. 125:21-126:6.) Chesapeake ultimately dropped O'Shea from its initial trial witness list.

[22] (Chambers Dep. 13:14-14:5, 14:10-14:14, 26:6-26:15; Morgret Dep. 18:24-20:10; McLaughlin Dep. 13:9-14:15; Seymore Dep. 40:15-41:7; Holub Dep. 82:19-83:8.)

of these individuals and Dell'Osso and Grigsby had responsibility for reviewing Chesapeake's public disclosures relating to outstanding debt issuances for accuracy.[23]

## A.    <u>Public Disclosures Regarding the Notes</u>

44.    Shortly after the transaction closed on February 16, 2012, Seymore and Holub began updating Chesapeake's summary of its debt securities that was posted on the "Investors" section of Chesapeake's website. The data sheet they prepared described the "Optional Redemption Dates" for the Notes as "from and including 11/15/12 to and including 03/15/13 @ 100% of principal" and "make whole call @ T + 50bps at any time after 3/15/13 to maturity." (DX 75, 79.) The debt securities data sheet was updated several times since February 2012, but the description of the Notes never changed. No mention was made of a notice "window" or of a redemption potentially occurring any time after March 15, 2013.

45.    In May 2012, Chambers advised that he "wanted to make sure the 6.775 notes par call option from Nov 2012 to Mar 2013 [was] discussed" in Chesapeake's 10-Q for the quarter ending March 31, 2012. (DX 82; Chambers Dep. 157:22-158:2.) The filed Chesapeake 10-Q disclosed as follows concerning the Notes' par redemption option:

> At any time from and including November 15, 2012 to and including March 15, 2013, we may redeem some or all of the notes at a redemption price equal to 100% of the principal amount of the notes plus accrued and unpaid interest, if any, to the redemption date; provided that upon any redemption of the notes in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal amount of the notes remains outstanding.

---

[23] (*See, e.g.*, Dell'Osso Dep. 202:8-202:16; Chambers Dep. 158:10-158:17; Seymore Dep. 22:8-23:7, 23:20-24:20, 98:24-99:15; Morgret Dep. 25:21-25:24; Holub Dep. 82:19-83:8.) Holub and Morgret were responsible for monitoring the trading prices and spreads for Chesapeake's outstanding publicly-traded notes, and assessing potential hedging opportunities. (Morgret Dep. 18:8-20:10.) Mr. Holub reported to Ms. Seymore and/or Mr. Morgret in this regard, and Mr. Morgret reported to Ms. Seymore and/or Mr. Chambers in this regard. (Seymore Dep. 16:17-17:3; Holub Dep. 7:12-7:21; Morgret Dep. 13:15-13:24.)

(DX 83 at 10.)  *See also* DX 152 at 173-174 (10-K with same disclosure).  No mention was made of a notice "window" or of a redemption potentially occurring any time after March 15, 2013.

46.    On August 7, 2012, Chesapeake conducted a public earnings call for investors on Chesapeake's second quarter earnings results.  During the earnings call, Mr. Dell'Osso described the Notes as having a "favorable call feature . . . which allows [Chesapeake] to call the notes at par between November 15 of this year and March 15 of 2013."  (DX 85 at 6.)  No mention was made of a notice "window" or of a redemption potentially occurring any time after March 15, 2013.

## B.    Internal Chesapeake Communications Regarding the 2019 Notes

47.    Treasury Department members also created many internal reports in the normal course of business.  They also were responsible for creating and updating the Treasury Manual, which included descriptions of the various senior notes on which Chesapeake was currently obligated.  The Treasury Manual included the Debt Summary on Chesapeake's website, and consistently described "Optional Redemption" of the Notes as: "11/15/12-3/15/13 - 100.000%; After 3/15/13 - Make Whole T + 50bps."  (DX 84 at CHK00059012; *see also* DX 90 at CHK00010506.)

48.    The Treasury Department prepared Quarterly Reports for senior management, including a report for quarter ending December 31, 2012 containing a column entitled "Optional Redemption," describing the Notes as follows:  "from and including 11/15/12 to and including 03/15/13 @ 100% of principal; make whole call @ T + 50bps at any time after 3/15/13 to maturity."  (DX 102 at 9.)  Chesapeake keeps track of the dates by which it needs to provide notice through the Quarterly Reports and the information on the website.  (Trial Tr. 289:6-289:9.)

49. Several key footnotes in the Quarterly Report reference the Notes, including footnote No. 2: "The make-whole optional redemption terms for the 6.775% Senior Notes due 2019 take effect after 3/15/2013." (DX 102 at 9, n.2.) The report further explained that "[t]he yield on the 6.775% Senior Notes due 2019 is skewed by the call window as the market assumption is that these will be called at par sometime between 11/15/2012 and 3/15/2013." (DX 102 at 9, n.5.)

50. In numerous analyses and budgets, Chesapeake consistently assumed that it needed to actually redeem the Notes at par by March 15, 2013. In November 2012, Morgret prepared an exchange analysis for Chambers which assumed that Chesapeake would repurchase the Notes on March 15, 2013. (DX 94; Trial Tr. 305:5-307:4.)[24] Chambers conceded at trial that Chesapeake prepared budgets assuming a March 15, 2013 redemption. (Trial Tr. 295:7-295:9.) He also claimed at trial to be aware of budgets assuming a redemption after March 15, 2013, but was impeached by his deposition testimony in this regard. (Trial Tr. 295:10-296:5.)

51. On December 10, 2012, Chambers was asked by a fellow manager in the Treasury Department if "the March note repurchase has to be by 3/15 doesn't it to still be callable at par?" (DX 101 at CHK00018860.) Chambers responded "**Yes, 3/15**." (*Id*.) (emphasis added).

## IV.   DISCUSSIONS REGARDING REDEMPTION IN LATE 2012 AND EARLY 2013

52. In January 2013, Chambers again expressed the view to his colleagues that Chesapeake had to notice a redemption of the Notes by mid-February 2013. (DX 108 at CHK00030853.) While he later described his understanding as an "incorrect" one, Chambers

---

[24] Numerous other examples confirm that Chesapeake assumed that actual redemption had to occur within the Special Early Redemption Period. (*See, e.g.*, DX 80 at CHK00003197(describing Notes' call option as "from 11/15/12 to 3/15/13 at 100% of par"); DX 81 at CHK00014653 (outlining the call schedule of the Notes as "[f]rom and including 11/15/12 to and including 3/15/13 @ 100% of principal"); DX 94 at CHK00030891 (providing a notes exchange analysis including the assumption that repurchase or redemption would occur on or before March 15, 2013).)

testified that he had that incorrect understanding through January 9, 2013. (Chambers Dep. 160:8-19.) Chambers played an important role in the preparation and negotiation relating to the issuance of the Notes and bore responsibility for compliance with the terms of issuance through maturity. (Trial Tr. 249:4-14; Chambers Dep. 26:19-25.)

53.     On January 9, 2013, Caleb Morgret, Treasury Department employee who reported to Chambers—who, unlike Chambers, was not involved in the negotiation and drafting of the Supplemental Indenture—disagreed with Chambers' view of the redemption provisions. Chesapeake contacted Telle for his view. Telle delegated review of the Supplemental Indenture to a then-second year associate at Bracewell, Erica Hogan. She concluded that Chesapeake had until March 15, 2013 to issue a notice of redemption, and thus could redeem the Notes 30 to 60 days thereafter. (DX 108 at CHK00030859.)[25]

54.     The following Sunday, on January 13, 2013, Chambers gave "everyone a heads up on how the par call feature works" and stated the following:

> The call "window" is from Nov 12 to March, 15 2013. However, what might not be clear, is that the March 15 date is a notice date. In other words, we can provide notice of call up to March 15 this year. The length of time from notice to redemption can be up to 60 days after the notice has been given to the Trustee and Bondholders. This means that we can realistically assume that the notes can be called up to approximately May 14th of this year . . ..

(DX 110.) Dell'Osso did not disagree with Chambers' view that it "might not be clear" that March 15, 2013 was purportedly a notice date. (Dell'Osso Dep. 233:19-234:10.)

55.     On January 28, 2013, Seymore circulated a "revised indenture summary" that reflected – for the first time – the notion that the redemption period was in fact a notice period. (DX 115; *see also* DX 113.) The restated indenture summary described the "Optional

---

[25] Telle allegedly reviewed Hogan's brief analysis and spoke to Morgret about the issue separately. (Telle Decl. ¶ 40.)

Redemption" as a "Par call notification window 11/15/12 – 3/15/13." (DX 115 at CHK00054652; *see also* DX 118 at CHK00055732.) Similarly, Morgret drafted and revised a "liability management" slide in mid-February, 2013, which summarized the Notes as having a "Par call window" and provided that "Call notice can be given now through 3/15/13 with actual repayment 30 to 60 days afterwards." (PX 48 at CHK00006129.)

56. Throughout this period, some investors continued to understand that the par redemption period ended March 15, 2013. For example, an initial investor in the Notes, Bank Julius Baer (PX 39), asked Chesapeake's Investor Relations group on February 20, 2013 whether Chesapeake had given the requisite notice of par redemption, and if not, to confirm that the Notes would not be redeemed at par. (DX 129.)

57. Similarly, on February 5, 2013, Barclays, one of the underwriters, pitched a refinancing proposal to Chesapeake, and viewed the Special Early Redemption period as requiring the issuance of "a call notice by February 13, 2013 in order for the redemption to settle within the special call period." (DK 50; DX 119 at CHK00006114, n.1.)[26] Two weeks later, Barclays appeared to have changed its position: "The market is clearly assuming that the notice period for the par call of the bonds has passed (incorrectly) and that the notes will remain outstanding." (DX 139 at CHK00007047.) Remarkably, during these discussions in January and February of 2013, not one member of the deal team from Chesapeake or Bracewell referenced their purported understanding from February 2012 of the supposed intent relating to Section 1.7.

---

[26] Indeed, the individual who sent the proposal stating his understanding of the final day for redemption (March 15, 2013) – Bradley Hutchinson – was one of the underwriter contacts for Barclays at issuance. (*Compare* DX 119, *with* DX 50; Trial Tr. 318:18-322:1.)

## V.     CHESAPEAKE SENDS NOTICE TO TRUSTEE AND TO NOTEHOLDERS

58.     On March 15, 2013, Chesapeake sent purported notice of redemption to BNY Mellon under Section 3.02 of the Base Indenture and to noteholders under Section 3.04 of the Base Indenture.

## ARGUMENT[27]

## I.     THE SUPPLEMENTAL INDENTURE UNAMBIGUOUSLY PERMITS A REDEMPTION AT PAR ONLY UNTIL MARCH 15, 2013

The interpretation of indenture provisions by New York courts is a matter of basic contract law. *RJ Cap., S.A. v. Lexington Cap. Funding III, Ltd.*, No. 10 Civ. 0025(PGG), 2013 WL 1294515, at *8 (S.D.N.Y. Mar. 30, 2013). "Where a 'contract is clear and unambiguous on its face, the intent of the parties must be gleaned from within the four corners of the instrument, and not from extrinsic evidence.'" *RJE Corp. v. Northville Industrs. Corp.*, 329 F.3d 310, 314 (2d Cir. 2003) (citation omitted). Thus, an interpreting court "must be concerned with what the parties intended, but only to the extent that what they intended is evidenced by what is written in the indentures." *Metropolitan Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989). The "'words and phrases should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.'" *U.S. Bank Nat'l Ass'n v. Barclays Bank PLC*, 2013 WL 1180414, at *5 (S.D.N.Y. Mar. 12, 2013) (citation omitted). The "entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Cruden v. Bank of New York*, 957 F.2d 961, 976 (2d Cir. 1992).

---

[27] As plaintiff in this declaratory judgment action, Chesapeake "must sustain the burden of proof and thereby bear the risk of non-persuasion of [its] *prima facie* case." *Air Vectors Assocs. v. N.Y. State Dep't of Transp.*, 53 B.R. 668, 685 (Bankr. S.D.N.Y. 1985) (citing 6A Moore's Federal Practice ¶ 57.31[1] at 57-283) (1984); *see also* Trial Tr. at 478:25-479:2 (counsel acknowledging that "plaintiff has the burden of proof").

Under this standard, contract terms "are not ambiguous if they 'have a definite and precise meaning and are not reasonably susceptible to differing interpretations.'" *RJE Corp.*, 329 F.3d at 314 (citation omitted). A court "'may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.'" *Law Deb. Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (citations omitted). Where consideration of the contract as a whole will remove the ambiguity created by a particular clause, there is no ambiguity." *Readco Inc. v. Marine Midland Bank*, 81 F.3d 295, 300 (2d Cir.1996) (citation omitted). "'Language whose meaning is otherwise plain does not become ambiguous merely because the parties urge different interpretations in the litigation.'" *Law Deb. Trust Co.*, 595 F.3d at 467 (citations omitted). Accordingly, a court should not find ambiguity based on an "interpretation urged by one party" that would "'strain [] the contract language beyond its reasonable and ordinary language.'" *Id.*

It is therefore well settled that a contract is ambiguous only "where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Id.* at 466 (citation omitted). In this context, "the 'reasonable person' in question is one who is familiar (or who is made familiar) with the customs and practices of the [relevant] industry." *Republic Nat'l Bank v. Delta Air Lines*, 263 F.3d 42, 48 (2d Cir. 2001). "Evidence as to such custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized," and "consists of proof that the language in question is fixed and invariable in the industry in question." *Law Deb. Trust Co.,* 595 F.3d at 466 (quotation marks and citations omitted). Settled

custom and usage "is deemed to form a part of the contract" unless contradicted by its "express terms." *Kasen v. Morrell,* 6 A.D.2d 816,817, 175 N.Y.S.2d 315, 317 (2d Dep't 1958)

Finally, the primary "'objective of contract interpretation is to give effect to the *expressed* intentions of the parties.'" *Law Deb. Trust Co.,* 595 F.3d at 467 (citation omitted) (emphasis in original). Under New York law, "this is accomplished by examining the objective manifestations of the parties' intentions," which necessarily "renders evidence of uncommunicated subjective intent irrelevant . . ." *Nycal Corp. v. Inoco PLC*, 988 F. Supp. 296, 301 (S.D.N.Y. 1997), *aff'd*, 166 F.3d 1201 (2d Cir. 1988). For this reason, mere "statements of subjective intention uncommunicated *to the other contracting party* are immaterial in construing the terms of the contract." *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006) (citation omitted) (emphasis added).

A.      <u>**The Relevant Contractual Terms**</u>

Article 3 of the Base Indenture governs redemptions of any series of notes issued under the Indenture. As used in the Base Indenture and in the bond industry, a "redemption" means the exchange of cash for the surrender of the debt security, which extinguishes the debt. (DX 168 at 2; DX 167 ¶ 12). Section 3.06 of the Base Indenture describes precisely what must happen on the date that a redemption occurs. By 11 a.m. on the date redemption occurs, Chesapeake must transfer funds to the Trustee, as paying agent, sufficient to pay the redemption price, plus accrued and unpaid interest, for "the Securities **to be redeemed on that date**" (emphasis added). Sections 3.02 and 3.04 of the Base Indenture describe the notice that Chesapeake must give prior to the redemption date.

Section 1.7 of the Supplemental Indenture (DX 72) provides for two successive optional redemption periods for the Notes: an optional redemption at a par price during a "Special Early

Redemption Period" and an optional redemption at the Make-Whole price after the "Special

Early Redemption Period."  Section 1.7 provides as follows:

> (a) The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.

> (b)  At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; …. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

> (c)  At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

(PX 4).

### B. The Supplemental Indenture Unambiguously Prohibits Chesapeake From Redeeming The Notes At Par After March 15, 2013.

When "a contract is capable of being interpreted one of two ways, courts must choose the

meaning which gives effect to all the contract's clauses rather than one that renders part of the

contract meaningless." *Allendale Mutual Ins. Co. v. Excess Ins. Co.*, 992 F. Supp. 271, 276

(S.D.N.Y. 1997).  The redemption provisions of the Supplemental Indenture do not suggest more

than one meaning when viewed objectively and giving the words their meaning as understood in

the bond industry. *See Law Deb. Trust Co.*, 595 F.3d at 466-67.  BNY Mellon's construction of

the provisions, unlike Chesapeake's, employs the ordinary meaning of the words used and

harmonizes all of the related provisions in agreements.

### 1. **_Section 1.7 Is Unambiguous On Its Face_**

The first sentences of Section 1.7(b) and of Section 1.7(c) are unambiguous on their face and mirror language commonly used in indentures that include optional redemption periods. These two sentences define Chesapeake's "options" to redeem the Notes. The key components in the definition of Chesapeake's "options," as is customary, are the redemption periods and the prices that apply to each redemption period. (*See, e.g.*, DX 168 at 11.).

The first sentence of Section 1.7(b) provides that at "any time from and including November 15, 2012 to and including March 15, 2013 (the 'Special Early Redemption Period')" the Company "at its option, may *redeem* the Notes . . . ." (PX 4 § 1.7(b).) The price at which the Company "may redeem" the Notes during the Special Early Redemption Period is set at "a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption." (*Id.*) Correspondingly, Section 1.7(c) provides that Chesapeake "may redeem" – *i.e.*, repurchase – the Notes at a make whole price "[a]t any time after March 15, 2013 to the Maturity Date. . . ." (PX 4 § 1.7(c).) Together, the first sentence of Section 1.7(b) and Section 1.7(c) establish a right of Chesapeake to redeem the Notes during the period November 15, 2012 through March 15, 2013, at par, and after March 15, 2013, at the Make-Whole Price.

Given the plain language of the indenture and the established definitions of "redeem" and "redemption,"[28] Section 1.7(b) plainly creates a "Special Early *Redemption* Period" in which the

---

[28] *See, e.g., Law Deb. Trust Co.*, 595 F.3d at 466 (where contract uses specialized terms commonly used in particular industry, court may rely on "dictionaries" and applicable custom and practice evidence to become "'informed of the meaning of the language as generally understood in that business, in light of the customers and practices of the business'" (citation omitted)); *Barclays Bank PLC*, 2013 WL 1180414, at *5 (using "common practice" of courts to "refer to the dictionary" in "ascertaining the plain meaning of contract terms" that were not defined in the indenture); *Cunningham v. Ins. Co.*, No. CV04-2997, 2006 WL 1896354, at * (E.D.N.Y. June 19, 2006).

bonds may be redeemed – that is, actually repurchased for cash, and not a period in which notice

may be given with actual redemption after the Special Early Redemption Period.

The decision in *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, No. 04-civ-

10014 (PKL), 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005), is directly on point.  There the court

determined that the term "call" in an indenture meant "redeem" and not simply to give notice.

Citing indenture provisions that mirror those in the Base Indenture (particularly Section 3.06),

the court further found that "redemption occurs only when the Bonds are surrendered and paid."

*Id.* at *5.  As a result, the giving of notice did not constitute "redemption," but was merely one of

the prerequisites to redemption.  *See id.* at *6 ("Thus, Aristocrat has not called the bonds for

redemption.  It has merely attempted to complete some of the steps required to call the bonds.").

Dictionary definitions further confirm that the words "redeem" and "redemption" involve

actual reacquisition and payment.[29]  The "custom and usage" expert opinions of Robert I.

Landau, Bruce Tuckman, and James A. Mullin confirm these standard industry definitions.  (DX

166-168.)  As explained by Mr. Landau, the phrase "may redeem" has for "decades been

understood in the securities industry to mean an '*act of redemption*' *i.e.*, the act occurring on a

stated date when the issuer/obligor buys back outstanding securities."  (DX 167 ¶ 12).

With these accepted definitions in mind, the right of Chesapeake to "redeem" the Notes

"[a]t any time from and including November 15, 2012 to and including March 15, 2013 (the

"Special Early Redemption Period")," means that Chesapeake must actually repurchase the

Notes during the period November 15, 2012 to and including March 15, 2013, and not just

---

[29] For example, BLACK'S LAW DICTIONARY defines "redemption" as the "reacquisition of a security by the issuer."  BLACK'S LAW DICTIONARY 1304 (8th ed. 1999).  BARRON'S DICTIONARY OF FINANCE AND INVESTMENT TERMS 587 (8th ed.) similarly defines redemption as the "repayment of a debt security or preferred stock issue, at or before maturity, at Par or at a premium price."  *See also* OXFORD ENGLISH DICTIONARY (same).

provide notice of an intent to do so. Correspondingly, Section 1.7(c) provides that Chesapeake "may redeem" – *i.e.*, repurchase – the Notes at a make whole price "[a]t any time after March 15, 2013 to the Maturity Date. . . ." (PX 4, § 1.7(c).) Together, Sections 1.7(b) and 1.7(c) establish a right of Chesapeake to redeem the Notes during the period November 15, 2012 through March 15, 2013, at par, and after March 15, 2013, at the Make Whole Price.

After defining Chesapeake's par redemption "option," Section 1.7 provides that the option to redeem the Notes at par was limited in certain ways. In particular, Chesapeake could only exercise its option to redeem at par between November 15, 2012 and March 15, 2013 so long as: (i) Chesapeake gave notice to holders of the Notes at least 30 days but not more than 60 days before the date on which redemption occurs; (ii) Chesapeake provided the notice any time from and including November 15, 2012, to and including March 15, 2013; and (iii) in the case of a partial redemption, at least $250 million aggregate principal of the Notes remained outstanding following the redemption.

First, the sentence expressly refers to the "option" that was defined in the first sentence of the provision.[30] As a result, the meaning of the sentence must be cabined by that previously defined term, and construed as a pre-condition to the exercise of the previously defined "option." It is a useful exercise to insert into the sentence the definition of the Company's option that is set forth in the first sentence of Section 1.7(b). After doing so, the sentence reads: "The Company shall be permitted to **redeem the Notes at par at any time from and including November 15, 2012 to and including March 15, 2013** so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period." The only way

---

[30] One of Chesapeake's strategies has been to omit with ellipsis the words "pursuant to this Section 1.7" after the words "its option to redeem the Notes," in an apparent effort to suggest that the second sentence is a source of the option, rather than a notice provision for the option stated in the first sentence.

to interpret the actual second sentence of Section 1.7(b) differently is to ignore entirely the first sentence of the provision, which the Court may not do under clear New York law.

Second, the second sentence of 1.7(b) provides that "The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 **so long as** it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period." (emphasis added). The dictionary definitions of the conjunction "so long as" (and its synonymous conjunction "as long as") are limiting and restrictive, not expansive. "So long as" means "provided that" or "on the condition that," serving limit rather than expand any phrase that precedes it. *See, e.g.*, OXFORD ENGLISH DICTIONARY. The phrase "The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7" stands on its own as an independent sentence.

The dictionary definitions of "so long as" compel the conclusion that the parties sought to restrict Chesapeake's ability to exercise its option, not to expand it. Indeed, even the search terms of Chesapeake's expert, John Finnerty, acknowledge this. In an effort to find language similar to that in the second sentence, he replaced "so long" as with "provided that," "on the condition that," "if," "in the event that," and "unless." (PX 105 Appendix C ¶ 5.)

### 2.      *Chesapeake's Flawed Reading of Section 1.7(b)*

Chesapeake's contrary interpretation of the second sentence of Section 1.7(b) would require the Court to interpret Section 1.7(b) in a way that implicitly transforms a period of *redemption* – the "Special Early *Redemption* Period" – into a Special Early *Notice* Period. As in *Aristocrat*, this Court should reject Chesapeake's effort to conflate the act of redemption with a notice of redemption. *See* 116, at *6.

35

As the acknowledged drafter of the Supplemental Indenture, Chesapeake could have included express language to accomplish what it now seeks, but it failed to do so. *See generally Penn Mutual Life Ins. Co. v. Oglesby*, 695 A.2d 1146, 1149 (Del. 1997) ("It is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document"). Most simply, Chesapeake could have drafted the first sentence of Section 1.7(b) to provide that the Company "may redeem" at par at any time from and including November 15, 2012, to and including *May 14, 2013*, and drafted 1.7(c) to provide that the Company "may redeem" at the Make-Whole price at any time *after* May 14, 2013.[31] Chesapeake failed to include such language in Section 1.7, and therefore the Court should not create such rights by inserting such language.[32]

Critically, only BNY Mellon's interpretation gives effect to all of the language of Section 1.7. This interpretation gives meaning to each sentence of Section 1.7(b), properly treats the first sentence as a redemption provision and the second sentence as a notice provision, and does not lead to any result in conflict with the separate and different redemption option in Section 1.7(c), which states that after March 15, 2013, a redemption is at make whole. On the other hand, Chesapeake would have the Court believe that the Special Early Redemption Period is a notice

---

[31] If Chesapeake preferred to create an exception to the two stated redemption periods, it could have drafted the provision differently. In this regard, courts have long recognized that drafters may use "notwithstanding" language to resolve potentially conflicting terms. *See, e.g., Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 917 (2d Cir. 2010) ("This Court has recognized many times that under New York law, clauses similar to the phrase 'notwithstanding any other provision' trump conflicting contract terms."). (Internal citations omitted.)

[32] *See Union Oil Co. of Cal. v. Mobil Pipeline Co.*, C.A. No. 19395, 2006 WL 3770834, at *12 (Del. Ch. Dec. 15, 2006) ("[Courts] will not create contract rights and obligations that were not part of the original bargain, especially where, as here, the contract could easily have been drafted to expressly provide for them.").

period and only notice of a redemption needs to be given by March 15, 2013.[33]  Chesapeake's

contorted reading however, is inconsistent with the first sentence of Section 1.7(b), which

explicitly provides that Chesapeake may redeem at par only to and including March 15, 2013.  In

addition, Chesapeake's unreasonable interpretation also conflicts with the express terms of

Section 1.7(c) and would negate Section 1.7(c) because there would never be a make-whole

redemption before May 15, 2013.  The Court should therefore reject Chesapeake's unreasonable

interpretation in favor of BNY Mellon's, which alone harmonizes the provisions.[34]

BNY Mellon's interpretation also conforms with relevant custom and usage in the bond

industry.  *See Law Deb. Trust Co.*, 595 F.3d at 466.  In the bond industry, "redemption" means

the exchange of cash for securities and such redemption occurs on the redemption date.  (*See* DX

168 at p. 2; *see also* DX 166 ¶ 33.)  The optional redemption provisions in the Note, Base

Indenture, and Supplemental Indenture follow this custom and usage in specifying a single

redemption price for each redemption period.  Under established custom and practice, it is the

date of redemption – not the notice of redemption – that fixes the applicable redemption price.

---

[33] Contrary to Chesapeake's claim, Section 1.7(b) does not present a conflict between general and specific words.  The redemption rights are precisely stated in the first sentence of Section 1.7(b), specifying the exact dates and price, and the sentence is not less specific than the second sentence.  Moreover, resort to the doctrine of *ejusdem generis* is "inappropriate where it renders words or phrases meaningless…." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt.LLC*, 371 F. Supp. 2d. 571, 576 (S.D.N.Y. 2005).

[34] *See, e.g.*, *RJE Corp.*, 329 F.3d at 314-15; *Law Deb. Trust Co.*, 595 F.3d at 467 (finding no ambiguity where "interpretation urged by one party would 'strain [] the contract language beyond its reasonable and ordinary meaning.'"); *Capital Ventures*, 2011 WL 70227, at *5 (finding that plain language in definition of "Closing Date" in securities purchase agreement clearly meant "February 22," and that second phrase of definition did "not negate February 22 as the Closing Date" nor "create an ambiguity in the contract": "It is not a reasonable interpretation of the provision to read the language as first clearly defining the Closing Date as the date of the agreement, and then to read the second portion to create a shifting, uncertain closing date.  Such a reading would render the first portion meaningless, which violates well[-]settled principles of contract interpretation.").

(*Id.* at 8.)[35]  If Chesapeake wanted to deviate from this well established custom and practice, it fell well short of drafting language that would have such effect.

Chesapeake argues that BNY Mellon's interpretation is in conflict with the first sentence of Section 1.7(b) because the notice requirement in the second sentence of Section 1.7(b) prevents Chesapeake from redeeming the Notes until December 15, 2012 (after the requisite 30 day notice period has run).  But that is the result of the parties' use of the conjunction "so long as," which (as noted above) is a limiting conjunction that means "only if" or "provided that." Moreover, it is not unusual that a certain number of days within redemption periods must be used for notice.  Indeed, Exhibit A of the Finnerty Report describes the redemption provisions of three such series of Chesapeake's notes issued April 1, 2013.  (PX 105, Ex. A)  All are correctly said to be redeemable from the date of issuance, though none can be redeemed for 30-60 days after giving notice of redemption.  Immediately redeemable bonds subject to 30-60 days notice are common in the bond market and bank debt.  (DX 166 ¶ 33.)

Thus, that notice is required during the Special Early Redemption Period is not a purported flaw in drafting.  It is simply a part of the notice requirement prepared by Chesapeake that it must honor.  Further, by Chesapeake's own admission, the original purpose in mid-February 2012 of the special early redemption feature was to allow the Notes to act as a 12-month bridge loan.  (PX 9 (explaining need for "12 month callable at par period"); Dell'Osso Decl. ¶ 9 (explaining need to "raise[] short-term liquidity to 'bridge' [Chesapeake's] need for cash until the asset sales" closed).)  Allowing Chesapeake to redeem the Notes at par by March 15, 2013 (with notice therefore by February 13, 2013) accomplished just that.  Suggesting that

---

[35]As detailed below, *see infra*, Chesapeake's own disclosures and reporting – all of which fix the redemption price based on the redemption date – mirror and confirm this custom and practice.  (DX 3; DX 168 at pp. 6-10.)

there is no "business reason" to "restrict the period in which Chesapeake could issue its notice to the three months starting November 15," Pl. Pre-Trial Brief at 6, only obfuscates the original purpose for including the early at-par redemption provision.

Finally, the option cases cited by Chesapeake bear no relevance to optional redemption provisions. Indeed, they do not even address financial options having a specified price on the date of exercise. *See, e.g.*, *Allaire Corp. v. Okumus*, 2004 WL 719178 (S.D.N.Y. 2004) (court explained that "call options give the buyer of the option the ability to purchase the underlying stock at a specified price until the expiration date"); *SEC v. Wang*, 944 F.2d 80 (2d Cir. 1991) ("A call option on a certain stock gives its holder the right to buy that stock at an agreed price within a specified time; a put option gives its holder the same rights to sell stock.); *Roth v. Goldman Sachs Group*, 873 F.Supp.2d 524, 531 (S.D.N.Y. 2012) (call options had to be exercised by a specific date, with no mention of notice).

### 2. *Chesapeake's Interpretation Creates Absurd Results and Would Contradict Well-Established Principles in the Bond Industry*

Chesapeake's interpretation is completely inconsistent with well-established definitions and principles that are the custom and practice in the bond industry. If Chesapeake's interpretation that "notice" means "redemption" were given effect,[36] then several sections of the Base Indenture that use the term "redeem" or "redemption" would have absurd interpretations. For example, Section 3.06 of the Base Indenture provides that Chesapeake shall deposit with the

---

[36] When a word has a commonly-understood meaning, a court will not expand the word's meaning unless the parties to the indenture evidenced such an intent by creating a defined term. *See Howe v. Bank of N.Y. Mellon*, 783 F. Supp. 2d 466, 480 (S.D.N.Y. 2011) ("If the parties had intended 'defaulted' to mean something as broad as 'imminently about to default' they would have specified such an understanding …."); *In re Complaint of The City of New York*, 534 F. Supp. 2d 370, 380 (E.D.N.Y. 2008) ("The city does not offer any evidence that the parties intended the word 'stranded' to encompass a broader definition wholly at odds with the understanding of the term in maritime context. In the absence of such evidence, it is appropriate to apply the maritime definition of 'stranded' to the term as it appears in the contract.").

Paying Agent "funds available on the redemption date sufficient to pay the redemption price of, and accrued and unpaid interest to, but not including, the redemption date on, the Securities to be redeemed on that date."  Under Chesapeake's interpretation, funds would be required to be deposited with the Paying Agent on the date notice of the redemption was given.  Moreover, under Section 3.06, the redemption price is the price that is required to be paid on the Securities to be redeemed on that date (*i.e.*, when the securities are repurchased, not the date notice of redemption is given).  In addition, interest accrues up to the date on which the Securities are redeemed, when value is exchanged for the bond, and therefore it cannot be the date of the notice of redemption.  (*See* DX 4 § 3.06.)  Similarly, absurd results would occur with various other sections of the Base Indenture including Sections 2.11, 3.03 and 3.04, unsettling well-established custom and practice and creating uncertainty and chaos in the bond market. S*ee also* DX 166 ¶¶ 34-35.

## II.    IN THE EVENT THAT THE COURT DETERMINES THAT THE SUPPLEMENTAL INDENTURE IS AMBIGUOUS, IT SHOULD CONSTRUE THE DISPUTED LANGUAGE AGAINST CHESAPEAKE AS THE ISSUER

In the event of an ambiguity in an indenture or other securities trust agreement, the language is to be "construed against the issuing corporation . . . which created or bears responsibility for such ambiguity" without resort to extrinsic evidence that was never expressed to BNY Mellon or to the noteholders whose interests it represents.  *Sass v. New Yorker Towers, Ltd.*, 23 A.D.2d 105 (1st Dep't 1965); *Prescott Ball,* 531 F. Supp. at 217.  Thus, "the only way in which [issuers] may prevail" under such an indenture is if the indenture is unambiguous: "Anything less, even some level of ambiguity, will result in a construction of the Trust Indenture favoring plaintiffs [investors]."  *Prescott Ball,* 531 F. Supp. at 217.  The same result should obtain here:  the Supplemental Indenture should be interpreted against Chesapeake as issuer with respect to any ambiguity in the redemption provisions.

## A. The Sale and Marketing of the 2019 Notes

Chesapeake, as one of the largest and regular issuers of bonds in the high yield market, issued and sold the Notes with tremendous speed through a "drive-by" transaction. There is no dispute here that the underwriters acted on a "best efforts" basis and bore no underwriting risk, as Maultsby, Burns and Chambers conceded. *See infra* ¶¶ 6-8; *see also Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc.*, 1993 WL 464730, at *5 & n. 5 (S.D.N.Y. Nov. 8, 1993); *Walk-In Medical Ctrs., Inc. v. Breuer Cap. Corp.*, 651 F. Supp. 1009, 1014 & n. 3 (S.D.N.Y. 1986) (Firm commitment underwriting "shifts the risk of the market ... to the investment bankers" while in "best efforts" underwriting, the investment banker sells for the company as agent and its compensation takes the form of an agent's commission).[37]

## B. Ambiguous Terms Must be Construed Against Chesapeake to Give Effect to the Reasonable Expectations of Investors

As noted herein, Chesapeake could have used language to express its purported intent to have a longer par redemption window. This could have very easily been accomplished by the simple change of defining the Special Early Redemption Period to end on May 14, 2013 rather than March 15, 2013, and defining the Make Whole Redemption Period to begin on May 15, 2013, rather than March 16, 2013. Had Chesapeake made that extremely simple change, it would have been crystal clear to all that May 14, 2013 was the last date on which Chesapeake could redeem at par the Notes. It is clear Chesapeake was "better able to clarify unclear … contract terms in advance so as to avoid future disputes and therefore should bear the drafting burden that the contra proferentem principle would impose upon it." *See Commerzbank,* 2013

---

[37] Under Chesapeake's interpretation, the market could no longer price "drive by" "best efforts" deals because investors can not rely on the preliminary prospectus but must see all documents finalized to assure that no off market terms or ambiguities are included.

WL 1136821, at *9.  Accordingly, to the extent the Court finds Section 1.7(b) to be ambiguous, it should interpret the provision against Chesapeake.

Here, the reasonable expectations of an original purchaser of the Notes can be gleaned by reviewing the information that was disclosed to them and the manner in which Chesapeake and the underwriters described the redemption provisions.  The issuer and its agent-underwriters communicated to the market repeatedly on February 13, 2012, at the time the Notes were first offered and fully sold, that the Notes were redeemable at par from November 15, 2012 through March 15, 2013, and redeemable at a make whole premium from March 16, 2013.  This was communicated on February 13, 2012, by numerous means:

- The preliminary prospectus supplement, including on the cover (the most important space on the prospectus) (*see infra* at ¶ 34);

- The "Bloomberg blast message" to prospective purchases announcing the sales presentation at 11 a.m. (*id.* at ¶ 26);

- The words of Maultsby at that presentation (as proven by the audio of the conference call presented at trial) (*id.* at ¶ 28);

- The slides accompanying the presentation by Maultsby and Dell'Osso (*id.* at ¶ 27);

- Sales calls to prospective purchasers made pursuant to a "Sales Force Memo" that not only described the redemption periods in that way, but calculated the yield to March 15, 2013 as the yield to the last redemption date (and therefore the "yield to worst," a key measure for investors) (*id.* at ¶¶ 24-25);

- Releases from ratings agencies (previously reviewed by Chesapeake), which communicated the terms to the market (*id.* at ¶ 29);

- The entry of the redemption terms into the Bloomberg system, as presented by the underwriters to Bloomberg.  These terms thereupon became the basis for analysis of the Notes for investors worldwide, for at least a year from February 13, 2012 (*id.* at ¶ 31); and

- The trade press reported the redemption provisions as described in all the communications stated above (*id.* at ¶ 33).

As Mr. Mullin has opined, an initial purchaser of the notes or a subsequent purchaser, provided with such publicly available information without any correction from Chesapeake or the underwriters, would have reasonably expected that Chesapeake could redeem the Notes at par so long as such redemption occurred by March 15, 2013; otherwise, the Notes would remain outstanding to maturity or Chesapeake could call them at the make whole price after March 15, 2013. (*See* DX 166 ¶ 40.) Thus, "[w]here, as here, the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines her rights, the reasonable expectations of the purchaser of the securities must be given effect." *Kaiser*, 681 A.2d at 395; s*ee also Sass,* 23 A.D. at 105; *Penn Mutual Life Ins. Co.*, 695 A.2d at 1149 ("It is the obligation of the issuer of securities to make the terms of the operative document understandable to a reasonable investor whose rights are affected by the document").

### C. Evidence of Underwriter-Issuer Negotiations is Irrelevant

Ordinarily, upon a finding of ambiguity, a court may look to the negotiations ***between the parties to the contract*** to ascertain the meaning of the language in the contract itself. The "key issue is the intent of the parties to the indenture agreement and the  manner in which that intent is reflected in the language of the indenture." *United States Trust Co. v. Executive Life Ins. Co.*, 602 F. Supp. 930, 939 (S.D.N.Y. 1984); *Law Deb. Trust Co.*, 595 F.3d at 467 (courts should "give effect to the expressed intentions of the parties" at the time the contract was formed) (citation omitted). As the underwriters here are not a party to the Supplemental Indenture, evidence of their subjective intent or of their negotiations with the issuer is irrelevant.

The court's decision in *In re Bank of New England Corp.*, 646 F.3d 90 (1st Cir. 2011), is instructive. There the First Circuit, applying New York law, addressed a series of indentures in which the meaning of the phrase "interest due or to become due" was disputed. The only

relevant fact witness was the trust officer for the original indenture trustee, a party to the contract. *Id*. at 94. The First Circuit also credited testimony from two indenture experts[38] as well as "scholarly articles," both of which explained the customary understanding of the terms in the provision in question. *Id*. at 97-98. This evidence allowed the court to determine "that the parties to the indenture did not intend" the interpretation advanced by the plaintiff. *Id*. at 99.

Chesapeake has indicated that the underwriters in some sense were representing the noteholders, based on *dicta* in one case suggesting that holders of debentures may in some circumstances "stand in the shoes of the underwriters who originally negotiated and drafted" the debentures. [39] However, that *dicta* is inapplicable here, because the underwriters prepared the prospectus supplement and marketed the Notes on a "best efforts" basis. [40] As the Supreme Court noted in *Securities Industry Ass'n v. Board of Governors of Federal Reserve System,* 468 U.S. 207, 217 n. 17 (1984), when an underwriter acts on a "best efforts" basis, it offers the issuer's securities to the public "as agent for the issuer."

Counsel for the underwriters, Mr. Burns, candidly acknowledged that underwriters are interested in (a) avoiding liability caused by inadequate disclosure, and (b) crafting financial terms that will "clear the market." (Trial Tr. 152:24 – 153:13.) As underwriter's counsel, Mr. Burns "definitely" did "not [represent] the noteholders." (Trial Tr. 156:8-10.) Even

---

[38] The First Circuit agreed with the district court's decision not to credit competing expert testimony from an "investment and banking" specialist who "analyzed forty-six indentures culled from 1984, 1987, and 1989" and attempted to draw conclusions about the indenture in question based on these results.

[39] *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F. Supp. 1529, 1541 (S.D.N.Y. 1983). It is noteworthy that this decision preceded the Supreme Court's decision in *Securities Industry Ass'n v. Board of Governors of Federal Reserve System,* 468 U.S. 207 (1984).

[40] As courts have recognized, issuers should bear the burden of any ambiguity because "'they are in a much better position to clarify the meaning of . . . contract terms in advance of disputes than are investors generally.'" *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 398 (Del. 1996) (quoting Dale B. Tauke, *Should Bonds Have More Fun? A Reexamination of the Debate over Corporate Bondholder Rights*, 1989 Colum. Bus. L. Rev. 1, 87 (1989)).

Chesapeake's cited case law acknowledges that the underwriters do not represent investors when negotiating the terms of an indenture. *See In re Bank of New England Corp.*, 404 B.R. 17, 30 (Bankr. D. Mass. 2009) ("function [of the underwriters] is to work with the issuer to structure the transaction, prepare a prospectus and obtain necessary regulatory approvals, and offer the securities for sale," while the trustee "acts on behalf of the holders of the securities").

In *Commerzbank,* 2013 WL 1136821, at *9, the Delaware Supreme Court found that the securities trust agreement at issue was ambiguous as to the matter in dispute and noted that, under such circumstances, "a court normally will consider extrinsic evidence of the parties' contractual intent," but observed further that "[o]ccasions arise, however, – and this is one of them – where it is unhelpful to rely upon extrinsic evidence to determine the parties' intent in drafting the contract." By way of explanation, the court cited *Kaiser*, 681 A.2d at 397, which likewise barred extrinsic evidence because "such an investigation would reveal information about the thoughts and positions of, at most, the issuer and the underwriter." The *Kaiser* court noted that "[w]here, as here, the ultimate purchaser of the securities is not a party to the drafting of the instrument which determines her rights, the reasonable expectations of the purchaser of the securities must be given effect."

In *Commerzbank,* the court further concluded that the case before it did "not fit the conventional model of contracts 'negotiated' by and among all the interested parties. Here, important parties in interest – the holders of the securities – were neither consulted about, nor involved in the drafting of, the LLC Agreement, the Trust II Agreement, or the Support Undertaking." The court thus concluded that a special application of the *contra proferentem* principle "requires that a contract which creates rights in public securities investors be interpreted to give effect to those investors' reasonable expectations."

Accordingly, any extrinsic evidence regarding the intent of Chesapeake or the underwriters should be excluded as it cannot be probative of the reasonable expectations of investors as to their rights under the Supplemental Indenture or the Notes themselves. *See Commerzbank,* 2013 WL 1136821, at *9 ("Here, an inquiry into what the parties intended would serve no useful purpose, because it would yield information about the views and positions of only one side of the dispute . . .," and finding that "a contract which creates rights in public securities investors be interpreted to give effect to those investors' reasonable expectation"); *see also* Defendant's Motion in Limine.

## III. THE EXTRINSIC EVIDENCE OVERWHELMINGLY SUPPORTS BNY MELLON'S INTERPRETATION

The admissible extrinsic evidence does not support Chesapeake's claim that the par redemption period extends until May 14, 2013. Instead, the public statements of Chesapeake and the underwriters, as communicated to the rating agencies and the broader market, show that it was understood that Chesapeake could redeem at par only until March 15, 2013.

### A. Chesapeake Did Not Have an Understanding of the Meaning of Section 1.7 During the February 2012 Negotiations and Expressed No Intent on the Subject to BNY Mellon

The so-called Chesapeake "deal team"—its then-Chief Executive Officer (Aubrey McClendon), its Chief Financial Officer (Nick Dell'Osso), its Treasurer (Jennifer Grigsby), and Vice-President and Assistant Treasurer (Elliot Chambers)— did not negotiate, or even discuss, the redemption provisions (Section 1.7) with anyone from BNY Mellon. (Trial Tr. 66:25-67:5; McClendon Dep. 49:20-23; Grigsby Dep. 18:24-19:3; Chambers Dep. 27:2-28:3, 29:3-21.) The only communications BNY Mellon received from Chesapeake or Bracewell about the redemption provisions in 2012 were transmittal emails with attached drafts of the Supplemental Indenture. (Trial Tr. 91:12-25; PX 41, 43.)

Moreover, the hazy and vague recollections of a few individuals do not reflect any meeting of the minds, even between the issuer and its underwriter (as a non-party to the Supplemental Indenture). In summary, under Chesapeake's version of the facts, (i) Dell'Osso cannot remember a single specific conversation about the notice concept (Tr. T. 63:23-64:1); (ii) Dello'Osso isn't sure that he ever looked at the Supplemental Indenture and didn't discuss with anyone at Bracewell the drafting of the Supplemental Indenture (*id.* 65:19-66:5); (iii) Dell'Osso doesn't recall specifically focusing on anything in the Prospectus Supplement (*id.* 67:6-67:15); (iv) Burns recalls being "on the line" on a Saturday night call in which the "notice concept" was discussed, isn't sure whether anyone from Bracewell was on the line, his recollection "is not crisp," he believes that the concept of providing notice by March 15, 2013, was raised, and after the call had the "understanding that the Company and the underwriters had agreed as a business matter that the Company would be permitted to give notice of an early redemption at par until March 15, 2013" (Burns Decl. ¶ 16); (v) Maultsby does "not recall the specifics" of an alleged conversation with Dell'Osso regarding "the time period in which Chesapeake would be able to decide whether to exercise its option to redeem the bonds at par (Maultsby Decl. ¶ 7); (vi) Telle is "confident" that he discussed the notice concept of Dell'Osso on Saturday, February 11, although he "do[es] not recall the precise substance of our discussions" (Telle Decl. ¶ 20); ); (vii) Telle testified in response to the Court's questions that Dell'Osso never specifically told him that it mattered to Chesapeake as between whether March 15 and a date in May was in fact the redemption date (Tr. T. 113:8-13); and (viii) Telle did not discuss his proposed language for the Supplemental Indenture with anyone from Cravath before sending it, and discussed neither the substance of it with Cravath, nor Cravath's rejection of that proposal. (Trial Tr. 106:23-25; Telle Dep. 178:6-181:7, 222:17-25).

Even assuming that Chesapeake has picked the right minds – they have not – there certainly was no meeting of these cherry-picked and legally irrelevant minds on any issue.  *See Faulkner*, 452 F. Supp. 2d at 378 ("[S]tatements of subjective intention uncommunicated *to the other contracting party* are immaterial in construing the terms of the contract.")  (emphasis added); *Nycal Corp.*, 988 F. Supp. at 301 (court must examine "objective manifestations of the parties' intentions," which necessarily "renders evidence of uncommunicated subjective intent irrelevant").  The Court also should look askance at this purported "meeting of the minds" in light of the myriad redemption topics reflected in the written email exchanges (*see, e.g., infra* ¶¶ 15, 19), and the noticeable absence of a single reference in any emails to the notion of a redemption after March 15, 2013.

### B.  Michael Telle Tried – But Failed – to Insert Language into the Supplemental Indenture to Allow an at Par Redemption After March 15, 2013

On February 14, 2012, Bracewell, on behalf of Chesapeake, proposed language for Section 1.7(b) in "blackline" format as follows:

> The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture prior to 5:00 p.m. (Central Time) on March 15, 2013, even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period.

(PX 41).

That proposed language does not appear in the final version of the Supplemental Indenture or the Note.  (PX 4; PX 5.)  To the contrary, the underwriters' counsel (Cravath) rejected it without any discussion of the substance of the proposed change, either before or after Telle sent it along.  (PX 42; Telle Dep. 178:6-181:7, 222:17-25.)  Under established interpretative principles, the Court should infer from the rejection of the proposed language that the expressed intent of the parties was not to permit a redemption at par after March 15, 2013.  *See, e.g.*, *In re Lehman Bros. Holdings Inc.*, 439 B.R. 811, 830 (Bankr. S.D.N.Y. 2010) (where

broad language concerning a contractual definition was rejected and replaced with a more narrowly tailored definition by the drafting parties, the court held that "this process of revision reflected the negotiations and effectuated the agreement of the parties"). Further, Chesapeake's claim that the Supplemental Indenture could not be changed to add "additional clarity" (to use Telle's turn of phrase) does not hold up. The indenture may contain additional but consistent language. Telle's proposal was rejected, and therefore the proper inference is that the language was inconsistent with the language of the Prospectus. Changing the language in the Supplemental Indenture to make Telle's change would have created a disclosure issue and investors no doubt would have balked at the changed terms of the deal.

### C. Chesapeake's Practical Understanding of its Redemption Rights under the Supplemental Indenture

Chesapeake's every day, practical interpretation of its redemption rights confirms that a redemption at par must occur during the Special Early Redemption Period (*i.e.*, on or before March 15, 2013) for the redemption to be priced at par. It is well settled that the "'practical interpretation of the contract by one party, evidenced by his words or acts, can be used against him on behalf of the other party, even though that other party had no knowledge of those words or acts when they occurred.'" *CBS Corp. v. Northrup Grumman Corp.*, 53 F. Supp. 2d 629, 631 n.1 (S.D.N.Y. 1999) (citing CORBIN ON CONTRACTS § 558 (1960)). As explained by the Second Circuit, the doctrine of practical construction provides that the "parties' interpretation of the contract in practice, prior to litigation, is compelling evidence of the parties' intent." *Ocean Transp. Line, Inc. v. Am. Philippine Fiber Industrs., Inc.*, 743 F.2d 85, 91 (2d Cir. 1984) (*citing Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913)).

This rule reflects the fact that such interpretations against a party's interests constitute admissions of a party-opponent under Fed. R. Evid. 801(d)(2). *See generally CBS Corp.*, 53 F.

Supp. 2d at 630-31 & n.1 (rejecting hearsay challenge to admissibility of extrinsic evidence of plaintiff's fax to outside accountant "clearly indicat[ing] that prepayment credits were among assets transferred" to defendant under ambiguous asset purchase agreement, as admission of party opponent reflecting a "practical interpretation of the contract" that directly contradicted plaintiff's litigation view); *Caleb & Co. v. E.I. DuPont De Nemours & Co.*, 624 F. Supp. 747, 749-50 (S.D.N.Y. 1985) (finding that press releases issued by plaintiff constituted "most significant" extrinsic evidence for interpreting ambiguous "prompt payment" requirement against plaintiff and in favor of defendant, where the admissions reflected plaintiff's "contemporaneous interpretation" of its obligation, contradicting its subsequent interpretation of contract in litigation).

The evidence at trial showed that Chesapeake consistently described the dates November 15, 2012 through March 15, 2013, as "redemption dates" and otherwise understood and represented the Special Early Redemption Period as just that – a period in which to redeem the Notes if it wished to do so at par. For example, in the days following the issuance of the Notes, Chesapeake uploaded to its website a revised and updated "Debt Summary" schedule reflecting the terms of the Notes. (DX 75, 79.) The schedule provides with respect to "Optional Redemption Dates" for the Notes: "from and including 11/15/12 to and including 3/15/13 @ 100% of principal; make whole call at T+50 bps at any time after 3/15/13 to maturity." (DX 75, 79.) Before the web posting, drafts of the amended Debt Summary were distributed for review within Chesapeake, including to Susan Seymore and Elliot Chambers, as well as to internal counsel. (DX 74, 75).

On May 21, 2012, Chesapeake described the Notes in its 10-Q Statement:

> *At any time from and including November 15, 2012 to and including March 15, 2013, we may redeem some or all of the [Notes] at a redemption price equal to 100% of the principal amount of the [Notes] plus accrued and unpaid interest, if any, to the redemption date; provided that upon any redemption of the [Notes] in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal amount of the [Notes] remains outstanding.*

(DX 83 at p. 13 of 102) (emphasis added).  The 10-Q does not mention a notice window or any purported right to redeem at par after March 15, 2013.

Chesapeake also prepared formal documents to brief senior management and others within the company, including a "Quarterly Report" and a "Treasury Manual."  None of these reports even suggest that the November 15, 2012 through March 15, 2013, constituted a notice period rather a redemption period.  (DX 84, 90, 102.)  Further, they provide the same information posted as Chesapeake's website.  (DX 79, 80.)  Chambers explained at trial that Chesapeake keeps track of the dates by which it needs to provide notice through the Quarterly Reports and the information posted to the website.  (Trial Tr. 289:6-9.).  This and other evidence adduced at trial establishes Chesapeake's "practical interpretation of the contract," and constitutes extrinsic evidence that refutes Chesapeake's proffered interpretation of the Supplemental Indenture.  *See, e.g.*, *CBS Corp.*, 53 F. Supp. 2d at 631 & n.1.

## IV.    OTHER ISSUES BARRING RELIEF ON CLAIM I

Apart from its untimeliness, the notice of redemption that Chesapeake sent to noteholders is defective.  Though purportedly sent pursuant to Section 3.04 of the Base Indenture, the notice expressly states that it will not be effective to cause an at par redemption "notwithstanding anything to the contrary in the Indenture."[41]  Further, Section 3.04 authorizes only two conditional statements, in subparts (6) and (7), neither of which is applicable here.  The last

---

[41] *See* Letter from Stephen L. Ascher to Judge Engelmayer, Ex. A. (March 19, 2013) [Dkt. No. 30].

subpart, (9), provides that the notice shall state "any other information required by such Securities or supplemental indenture relating to such Securities." Neither the Supplemental Indenture nor the Notes require or permit any conditions to be stated in the notice in addition to those in subparts (6) and (7). Accordingly, Chesapeake's notice of redemption is invalid on its face, without regard to whether this Court also finds it untimely.

Chesapeake's claim is further barred by the doctrines of estoppel, unclean hands, waiver, acquiescence and laches. Each of these defenses applies here. Since February 13, 2012, Chesapeake has repeatedly stated – in its road show presentation, sales force memorandum, investor call (PX 35; DX 45; DX 49); 10-Q and 10-K (DX 83 at 10; DX 152 at 173-74); and investor website (DX 75) – that it could redeem the Notes at par only until March 15, 2013, but has now taken a completely different position. *See Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 301-03 (2d Cir. 1996).

## CONCLUSION

For all the reasons set forth above, The Bank of New York Mellon Trust Company, N.A. respectfully requests that the Court enter an order of judgment in its favor.

Dated: New York, New York
April 28, 2013

Respectfully Submitted,

SIDLEY AUSTIN LLP

By: /s/ Steven M. Bierman
Steven M. Bierman
sbierman@sidley.com
Benjamin R. Nagin
bnagin@sidley.com
Alex R. Rovira
arovira@sidley.com
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Fax: (212) 839-5599

EMMET, MARVIN & MARTIN, LLP

By:  /s/ Paul T. Weinstein
       Paul T. Weinstein
       pweinstein@emmetmarvin.com
       Tyler J. Kandel
       Mordecai Geisler
       120 Broadway, 32nd Floor
       New York, New York 10271
       Telephone: (212) 238-3000
       Facsimile: (212) 238-3100

DUVAL & STACHENFELD LLP

By:  /s/ Allan N. Taffet
       Allan N. Taffet
       ataffet@dsllp.com
       555 Madison Avenue, 6th Floor
       New York, New York 10022
       Telephone: (212) 883-1700
       Facsimile: (212) 883-8883

*Attorneys for the Defendant The Bank of New York Mellon Trust Company, N.A.*