UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                       :

CHESAPEAKE ENERGY CORPORATION,         :

                                        :        13 Civ. 1582 (PAE)

                             Plaintiff,       :

                                        :        <u>OPINION & ORDER</u>

                  -v-                   :

                                        :

THE BANK OF NEW YORK MELLON TRUST    :
COMPANY, N.A.,                          :

                                        :

                            Defendant.    :

                                        :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      This case is about whether a corporation made, or missed, the deadline to exercise its

right to redeem its outstanding notes early, on highly favorable terms.  On March 15, 2013,

plaintiff Chesapeake Energy Corporation ("Chesapeake") issued a notice to redeem

approximately $1.3 billion in notes due in 2019 that it had issued in 2012.  Chesapeake's notice

stated that it was redeeming these "2019 Notes" at par value plus interest.  The notice called for

the notes to be redeemed on May 13, 2013 (<i>i.e.</i>, next Monday).  Chesapeake's view is that, under

the Supplemental Indenture governing the notes, it had until March 15, 2013, to issue a notice of

redemption on these terms.  However, defendant Bank of New York Mellon Trust Company,

N.A. ("BNY Mellon"), the indenture trustee of those notes, representing the interests of the

noteholders, takes a different view of the applicable deadline.  BNY Mellon contends that, under

the Supplemental Indenture, Chesapeake's deadline to issue a notice of early redemption was

February 13, 2013.  BNY Mellon therefore contends that Chesapeake's notice was untimely and

ineffective.

To resolve the dispute, Chesapeake brought this declaratory judgment action.  Between April 23 and 30, 2013, after expedited discovery, the Court held a bench trial.  Trial was held on those dates to permit the Court to render decision before May 13, 2013—the redemption date that Chesapeake had set.

The following is the Court's decision.  The Court holds, in favor of Chesapeake, that its March 15, 2013 notice of redemption was timely and effective to redeem the 2019 Notes at par value (*i.e.*, 100% of the principal amount) plus interest.  The Court enters a declaratory judgment to that effect.

## I.    Background[1]

### A.    Overview:  The 2019 Notes and § 1.7 of the Supplemental Indenture

Chesapeake is a publicly-traded Oklahoma corporation.  It produces oil and natural gas.

In February 2012, Chesapeake completed a public offering of $1.3 billion in senior notes due in 2019 (the "Notes" or "2019 Notes").  The Notes pay at a rate of 6.775%.  The 2019 Notes

---

[1] The facts set out in this section are either undisputed, or are non-dispositive background facts that the Court finds.  Chesapeake and BNY Mellon dispute other facts.  These mainly involve the events surrounding the negotiation in February 2012 of § 1.7(b) of the Supplemental Indenture governing the 2019 Notes, and the collective intent of the parties who drafted that provision. The Court addresses those factual disputes, and has resolved them to the extent necessary, *infra*, in Part IV.

As used herein, "Compl." refers to Chesapeake's Complaint (Dkt. 1); "Tr." refers to the trial transcript; "PX" refers to exhibits introduced at trial by Chesapeake; "DX" refers to exhibits introduced by BNY Mellon; "[Witness] Decl." refers to the sworn declaration admitted at trial containing the direct testimony of the witness identified; "[Name] Rep." refers to the report of the named expert witness submitted as an attachment to his declaration; and "[Date] Hr'g Tr." refers to the transcript of a pretrial court conference on the date indicated.  The parties also submitted legal memoranda in support of and in opposition to: Chesapeake's order to show cause (Dkt. 4, 16, 28); certain noteholders' motions to intervene and withdraw (Dkt. 14, 42); Chesapeake's motion for judgment on the pleadings as to Count Two (Dkt. 70, 83, 97); and BNY Mellon's motion *in limine* to exclude evidence of the negotiations in February 2012 between Chesapeake and its lead underwriter (Dkt. 95, 99).  The parties also submitted pretrial briefs (Dkt. 91, 93) and post-trial briefs (Dkt. 110, 111), and BNY Mellon submitted a motion to admit certain deposition designations (Dkt. 109).

were issued pursuant to two indentures.  The first is a Base Indenture, dated August 2, 2010.  PX 6 (the "Base Indenture").  It governs a series of notes issued by Chesapeake since that date. BNY Mellon is named in the Base Indenture as trustee.  *Id.*  BNY Mellon is a national banking association with its principal place of business in Los Angeles, California.

The second indenture is Chesapeake's Ninth Supplemental Indenture, dated February 16, 2012.  PX 4 (the "Supplemental Indenture").  The Supplemental Indenture applies solely to the 2019 Notes.  Both the Base Indenture and the Supplemental Indenture recite that they were entered into between Chesapeake as the issuer, certain Chesapeake subsidiaries as guarantors, and BNY Mellon as the indenture trustee.  *See* Base Indenture, at BNY24, BNY94–97; Supplemental Indenture, at CHK368, CHK373–75.

This dispute centers on § 1.7 of the Supplemental Indenture.  Entitled "Redemption," it provides in full:

> (a)  The Company shall have no obligation to redeem, purchase or repay the Notes pursuant to any mandatory redemption, sinking fund or analogous provisions or at the option of a Holder thereof.
>
> (b)  At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes remains outstanding.  The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period.  Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.
>
> (c)  At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

Supplemental Indenture § 1.7 (emphasis in original).

The critical issue in this case is what the deadline is under § 1.7(b) for Chesapeake to give notice of redemption of the 2019 Notes at par plus interest. Under a Base Indenture provision (§ 3.04) expressly incorporated by § 1.7(b), Chesapeake, after giving notice of a redemption, must wait between 30 and 60 days before redeeming the subject Notes. The period during which Chesapeake may give notice of a special early redemption is, therefore, not coextensive with the period during which the redemption can be effectuated. Rather, the start of the notice period must precede the start of the redemption period by at least 30 days.

Chesapeake's position, based on the second sentence of § 1.7(b), is that the Special Early Redemption Period defined in § 1.7(b)—*i.e.*, November 15, 2012, to and including March 15, 2013—is a notice period. Chesapeake argues, therefore, that, under § 1.7(b), a redemption at par plus interest can occur as late as May 14, 2013 (*i.e.*, 60 days after March 15, 2013). Accordingly, it argues, the notice of a special early redemption that it gave on March 15, 2013, was timely. BNY Mellon's position is that the Special Early Redemption Period instead bounds the period during which the actual redemption of bonds pursuant to § 1.7(b) may occur. Because a minimum of 30 days' notice is required before redemption, BNY Mellon argues that Chesapeake's deadline to give notice of a special early redemption was February 13, 2013 (*i.e.*, 30 days before March 15, 2013).

Lots of money turns on this dispute. Because the 2019 Notes bear an attractive interest rate of 6.775%, redeeming them at par plus interest is, in today's low-interest-rate environment, far more advantageous to Chesapeake than its other contractual options. These are (1) paying the 6.775% rate out to the 2019 maturity date, or (2) redeeming the bonds before the maturity date, but after the opportunity to redeem at par plus interest has lapsed, which, under § 1.7(c), would

4

oblige Chesapeake to pay the noteholders the "Make-Whole Price," *i.e.*, the present value of the 6.775% interest rate payments to maturity. *See* PX 5, at BG2869–70. Conversely, a redemption by Chesapeake today at par plus interest deprives the holders of the 2019 Notes of an income stream not readily achievable elsewhere.

### B.   The Events of Late February and Early March 2013[2]

On February 20, 2013, Chesapeake notified Sharon McGrath, a BNY Mellon vice president, that it planned, by March 15, 2013, to redeem the 2019 Notes at par plus interest, pursuant to the special early redemption provision. McGrath did not initially object to that course. However, later that day, McGrath was contacted by James P. Seery, Jr., a partner in River Birch Capital LLC, a hedge fund, which had recently purchased a large volume of 2019 Notes. Seery notified McGrath that, in his view, the time period during which Chesapeake could redeem the 2019 Notes pursuant to the special early redemption provision had expired.

On February 22, 2013, McGrath, joined by counsel for BNY Mellon, notified Chesapeake that, in BNY Mellon's view, the time for Chesapeake to issue a notice of redemption pursuant to the special early redemption provision had passed. Six days later, in a call with Chesapeake's counsel, counsel for BNY Mellon reiterated that position. BNY Mellon also stated that, if Chesapeake issued a notice of redemption and it was held untimely, BNY Mellon might treat that notice as functioning as a notice of redemption pursuant to § 1.7(c) of the Supplemental Indenture. A redemption pursuant to § 1.7(c) would require Chesapeake, within 30 to 60 days, to pay the noteholders the Make-Whole Price. That payment would exceed by approximately $400

---

[2] The facts set forth in this subsection are those proffered by Chesapeake, BNY Mellon, and 2019 noteholder James P. Seery, Jr., in connection with Chesapeake's March 8, 2013 application for emergency relief. *See* Dkt. 1–7, 13–16, 27–28.

million the amount required to redeem the 2019 Notes pursuant to the special early redemption provision.

In an attempt to resolve this problem, Chesapeake prepared a proposed notice of redemption. *See* Compl. Ex. D (the "Notice"). That Notice, entitled "Notice of Special Early Redemption," specified a redemption price, terms, and date (May 13, 2013) consistent with the special early redemption provision in § 1.7(b). Chesapeake's proposed Notice stated explicitly and prominently that, were a court to hold it untimely to effect a special early redemption, the Notice would be null and void. BNY Mellon objected to that approach. It notified Chesapeake that it viewed Chesapeake's proposed Notice as untimely; that such a "conditional notice" was improper; that Chesapeake's Notice, if issued, would be irrevocable; and that BNY Mellon would seek to have the Notice treated as a notice of an immediate Make-Whole Redemption pursuant to § 1.7(c).

### C. Chesapeake's March 8, 2013 Complaint and Motion for Emergency Relief

On Friday, March 8, 2013, Chesapeake filed this diversity action against BNY Mellon. Dkt. 1. In its first cause of action, Chesapeake sought a declaration that its Notice of Special Early Redemption, if mailed on or before March 15, 2013, would be timely and effective to redeem the 2019 Notes at par plus interest. Compl. ¶ 26. In its second cause of action, Chesapeake sought a declaration that, in the event its Notice were held untimely to effect such a redemption, the Notice would be null and void, and would not operate as a notice of redemption at the Make-Whole Price. *Id.* ¶ 28.

The same day, Chesapeake moved for a preliminary injunction. It sought two forms of emergency relief. First, Chesapeake sought an injunction prohibiting BNY Mellon from treating its Notice of Special Early Redemption as a notice of redemption requiring payment at the Make-

Whole Price.  Alternatively, Chesapeake sought an immediate declaration that, if the Notice were held untimely to achieve a redemption at par plus interest pursuant to § 1.7(b), then that Notice would be null and void, and ineffective to achieve *any* redemption.  Chesapeake explained that it wished to invoke its right under § 1.7(b) to make an early redemption at par, which would save it approximately $100 million over the present value of letting the 2019 Notes run to maturity. However, Chesapeake asserted, without relief from the Court, it would be deterred from pursuing this right by BNY Mellon's threat to treat its Notice, if held untimely, as an unwitting notice of Make-Whole redemption under § 1.7(c), requiring it to redeem the 2019 Notes nearly immediately at the much higher Make-Whole Price.

Recognizing the urgent timetable, the Court, late on March 8, 2013, issued an order to show cause.  The order (1) directed BNY Mellon to respond to Chesapeake's motion for a preliminary injunction by Tuesday morning, March 12, 2013; and (2) set a preliminary injunction hearing for that afternoon.  Dkt. 2.  On March 12, 2013, BNY Mellon filed its memorandum of law opposing Chesapeake's motion, and supporting materials.  Dkt. 10–11, 28– 29.  The same day, the Court received a motion to intervene and opposition papers from a group calling itself the "Intervenor Ad Hoc Noteholder Group" (the "Intervenor Noteholders" or "Noteholders").  Dkt. 13–16.

On the evening of March 12, 2013, the Court held a preliminary injunction hearing.  The Court granted the Intervenor Noteholders' motion to intervene as of right under Federal Rule of Civil Procedure 24(b).[3]  The Court also heard extended argument from counsel for Chesapeake, BNY Mellon, and Intervenor Noteholders.  Counsel for an individual noteholder, Whitebox Advisors LLC, entered an appearance, but did not argue.

---

[3] The Court later issued an order memorializing that decision.  Dkt. 26.

### D.     The Court's March 14, 2013 Ruling on the Preliminary Injunction Motion

On March 14, 2013, the Court issued a lengthy oral ruling from the bench.  It ultimately denied Chesapeake's motion for a preliminary injunction.  *See* 3/14/13 Hr'g Tr.

The Court first held that the dispute between two parties to the Supplemental Indenture over its proper construction presented a justiciable controversy ripe for review.  *Id.* at 10–12.

Turning to the merits of Chesapeake's motion for a preliminary injunction, the Court considered (1) the likelihood of success on the merits; (2) whether the balance of hardships tipped decidedly in Chesapeake's favor; and (3) whether Chesapeake would suffer irreparable harm.  *See id.* at 13–14; *see also Pogliani v. U.S. Army Corps of Eng'rs*, 306 F.3d 1235, 1238–39 (2d Cir. 2002) (quoting *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002)).

As to the likelihood of success, the Court addressed separately Chesapeake's two claims for declaratory relief.  As to the first, for a declaration that a notice on March 15, 2013 of a special early redemption would be timely, the Court's preliminary assessment was that the parties' competing textual arguments based on the text of § 1.7(b) as to the deadline for such a notice appeared in rough equipoise.  *See* 3/14/13 Hr'g Tr. 17–21; *id.* at 21 ("Neither party's interpretation accounts for or explains every feature of the short but difficult document that is the supplemental indenture.").  Because the Court's initial assessment was that § 1.7(b) was ambiguous, it stated that consideration of extrinsic evidence might be warranted to discern the parties' intentions.  *Id.* at 21.[4]  However, the Court emphasized, its initial assessment that

---

[4] The only extrinsic evidence proffered at the preliminary hearing—two emails attaching drafts from February 2012, when the text of the Supplemental Indenture was being negotiated between Chesapeake and the underwriters of the note offering—appeared, the Court stated, to favor BNY Mellon's construction.  3/14/13 Hr'g Tr. 22–23.  Those drafts indicated that 17 words proposed by Chesapeake's outside counsel that would have demonstrated conclusively that the Special Early Redemption Period was a notice period had been either deleted from § 1.7(b) or rejected.  However, the Court noted, it was possible that other extrinsic evidence would support the

§ 1.7(b) was ambiguous was preliminary, based on the limited time frame in which the parties had briefed and the Court had studied the issue. *Id.* Accordingly, the Court held, Chesapeake had not demonstrated a likelihood of success on the merits of its claim for a declaration as to the timeliness of its redemption notice. Chesapeake had, however, established a sufficiently serious question going to the merits to justify continued inquiry. *Id.* at 24.

As to Chesapeake's second claim, the Court stated that Chesapeake had an overwhelming likelihood of success. *Id.* at 25. There was no serious basis for treating, against Chesapeake's will, an untimely notice of a special early redemption pursuant to § 1.7(b) as instead a notice for a Make-Whole redemption under § 1.7(c). On the contrary, the Court noted, Chesapeake's Notice, if so treated, would fail various requirements for a valid notice under the Base Indenture, including that it accurately recite the date, price, and terms of the upcoming redemption. *Id.* at 25–27; *id.* at 29 (citing Base Indenture §§ 3.04–3.06). Chesapeake was, therefore, highly likely to prevail in seeking a declaration that its Notice, if held untimely, was null and void. *Id.* at 30–31.

Turning to the balance of hardships, the Court found that a preliminary injunction would not work cognizable harm on BNY Mellon or the Noteholders. *Id.* at 31–37. The Noteholders, the Court stated, did not have a protected right to deter Chesapeake from issuing a Notice by threatening to have that Notice, if held untimely, treated as a notice of Make-Whole redemption. *Id.* at 33. An injunction that declared that an untimely notice would be null and void would merely clarify the parties' rights with respect to such a Notice, and would not work any real prejudice on the Noteholders. And Noteholders such as River Birch, that had purchased Notes

---

opposite conclusion, *e.g.*, by showing that the 17 words excluded from the draft indenture had been viewed as cumulative and unnecessary. *Id.* The two emails in question were later admitted at trial as PX 41 and PX 43. They are discussed *infra*, at Parts IV.B–IV.C.

after February 13, 2013, had assumed the risk that a Court might hold a notice of redemption at par timely until March 15, 2013.  *Id.* at 35–37.  Chesapeake, on the other hand, faced a degree of harm without the protection of an injunction.  That was because BNY Mellon and the Noteholders were using the threat to treat an untimely notice as triggering a redemption at the Make-Whole Price to coerce Chesapeake not to issue any notice.  It was plausible that the risk of being forced imminently to pay out $400 million extra might deter Chesapeake from exercising its rights under § 1.7(b).  For these reasons, the balance of hardships tipped somewhat, but not heavily, in favor of Chesapeake.  *Id.* at 37–40.

For several reasons, however, the Court rejected Chesapeake's argument that, without an injunction, it would suffer irreparable harm.  First, Chesapeake retained the right to try to redeem its shares at the special early redemption price.  The risk to Chesapeake that a Court would treat an untimely notice as requiring a redemption at the Make-Whole Price was inherent in doing business.  And if Chesapeake were forced to pay out the money for a Make-Whole redemption on May 15, 2013, while it litigated whether its Notice had worked such a redemption, Chesapeake had a damages remedy:  If its position prevailed, it could sue the Noteholders to recoup that money.  *Id.* at 42–44.  Second, if the time for a redemption at par had passed, Chesapeake was obliged, in 2019, to pay out a sum whose present value, by definition, matched the Make-Whole payment that the Noteholders threatened to demand.  Thus, the dispute triggered by the Noteholders' Make-Whole demand involved only the timing, not the amount, of Chesapeake's payout.  *Id.* at 39.  And Chesapeake had not shown an inability to pay out the additional $400 million if required to do so.  *Id.*  Third, the assessment that the Court had given of Chesapeake's second claim for declaratory relief was relevant.  Because the Court had opined that it was highly likely to treat an untimely Notice of Special Early Redemption as null and

void, the Court stated that Chesapeake could issue the proposed Notice with little risk that it would be held to trigger a Make-Whole redemption. *Id.* at 39–40.

Because a showing of irreparable harm was necessary for Chesapeake to prevail, the Court denied the preliminary injunction. *Id.* at 45–46.[5]

The Court further stated that, if Chesapeake went ahead with its plan to issue a Notice of Special Early Redemption, the Court was prepared to hold an expedited trial to resolve Chesapeake's claims for declaratory relief. The Court stated that it would decide, before the May 13, 2013 redemption date, whether that Notice was timely. *Id.* at 46–47. The Court directed counsel that, if Chesapeake issued the Notice, they were to confer promptly to develop a proposed discovery and trial schedule. *Id.*

### E.    Chesapeake's Notice of Special Early Redemption, and Pretrial Proceedings

On March 15, 2013, Chesapeake issued a Notice of Special Early Redemption. It was identical to the proposed Notice appended to its Complaint. *See* Dkt. 30 Ex. A, at 14. On March 19, 2013, the Court met with counsel to set an expedited discovery and trial schedule.[6]

On March 22, 2013, the Court issued a case management plan. The plan provided for expedited discovery, ending April 19, 2013. Dkt. 34.[7] The Court scheduled a bench trial[8] for

---

[5] On March 14, 2013, the Court issued an order memorializing this decision and incorporating by reference its lengthy oral ruling. Dkt. 29.

[6] At the conference, the Court inquired whether diversity jurisdiction was proper, given that one of the Intervenor Noteholders, like Chesapeake, resided in Oklahoma. *See* Dkt. 31. However, the Court stated, intervention by the Oklahoma Noteholder did not appear to destroy diversity, given cases holding that a non-necessary intervenor does not destroy diversity where it otherwise exists. 3/19/13 Hr'g Tr. 11–12; *see In re Olympic Mills Corp.*, 477 F.3d 1, 12 (1st Cir. 2007); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 500 F.3d 171, 179 (2d Cir. 2007) (assuming *arguendo* that *Olympic Mills* rule applied). This issue was mooted soon thereafter, when the Intervenor Noteholders withdrew from the case. *See* Dkt. 41–42, 60. This withdrawal assured complete diversity.

April 23–25, 2013, with closing arguments on April 30, 2013. *Id.* The Court proposed, and the parties agreed, to forego intervening summary judgment motions. Instead, the Court stated, it would take up such contentions in the decision it would issue after trial. Finally, the Court requested pretrial briefing on Claim Two (the Make-Whole issue). *Id.*

On March 25, 2013, the Intervenor Noteholders moved to withdraw, and to permit their lead counsel, Sidley Austin LLP, to be retained by BNY Mellon as lead counsel in this matter. Dkt. 40–42. After letter briefing, *see* Dkt. 48, 55, the Court granted that motion. Dkt. 60. This left Chesapeake and BNY Mellon as the sole parties to the case.

On March 31, 2013, BNY Mellon notified the Court that it was abandoning its argument that Chesapeake's Notice, if held untimely, would work a redemption at the Make-Whole Price. *See* Dkt. 58, at 3 n.2; 4/1/13 Hr'g Tr. 40. On that basis, BNY Mellon asked the Court to dismiss Chesapeake's second claim for declaratory relief. The parties, however, could not agree on the terms on which Chesapeake's Claim Two should be resolved: Chesapeake sought entry of judgment in its favor on Claim Two; BNY Mellon sought dismissal of that claim as moot. The Court reserved decision on that issue. *See* 4/1/13 Hr'g Tr. 38–48.

Between late March and April 21, 2013, the parties took extensive discovery, focused on the extrinsic evidence bearing on the intent of the drafters of § 1.7(b). At least 15 depositions were taken. These included of personnel from Chesapeake; Chesapeake's outside counsel (the law firm of Bracewell & Giuliani LLP ("Bracewell")) that assisted it in drafting the Supplemental Indenture; the 2019 Note offering's lead underwriter, Bank of America Merrill

---

[7] The Court later extended that deadline to April 21, 2013. *See* 4/11/13 Hr'g Tr. 55–56; Dkt. 72.

[8] Section 13.15 of the Base Indenture provides that both Chesapeake and BNY Mellon "irrevocably waive . . . any and all right to trial by jury in any legal proceeding arising out of or relating to this indenture, the securities or the transaction contemplated hereby." Base Indenture § 13.15 (emphasis omitted).

Lynch, Pierce, Fenner & Smith Inc. ("BAML"), which had negotiated with Chesapeake the language that ultimately appeared in § 1.7(b); and BAML's outside counsel in that process (the law firm of Cravath, Swaine & Moore LLP ("Cravath")).  Depositions were also taken of each side's experts.

During the discovery process, the Court held several conferences with counsel to resolve discovery disputes and to adjust the pretrial schedule.  *See* 3/19/13 Hr'g; 4/1/13 Hr'g; 4/11/13 Hr'g.  These disputes included a disagreement relating to the temporal scope of Chesapeake's court-approved written waiver of its attorney-client privilege.  That waiver was limited to Chesapeake's communications with counsel governing the drafting, meaning, interpretation, and application of § 1.7 of the Supplemental Indenture, between February 8, 2012 (when Chesapeake first began the process that led it to issue the 2019 Notes) and February 21, 2013 (which Chesapeake represented had been the last day before its dispute with BNY Mellon first began to materialize).  *See* Dkt. 51 (protective order concerning privilege waiver); *see also* 4/11/13 Hr'g Tr. 12–41.  BNY Mellon asked the Court to expand the scope of that waiver until March 8, 2013, the date that Chesapeake brought this suit.  On April 15, 2013, after a careful *in camera* review of privileged materials implicated by BNY Mellon's motion, the Court issued a written decision denying that motion.  *See* Dkt. 77.

### F.    Trial

Trial commenced on April 23, 2013.  The Court heard in-person testimony from 10 witnesses.  As to eight, direct testimony was submitted by means of sworn declarations and cross-examination was live; as to the other two, direct and cross-examination were live.[9]  With respect to six other witnesses, the Court received, in lieu of in-person testimony, deposition

---

[9] Four of the 10 trial witnesses were experts.

designations from each side.[10]   The Court also received numerous exhibits.  Each party

submitted a pretrial (Dkt. 91, 93) and post-trial (Dkt. 110, 111) memorandum of law.  Counsel's

post-trial memoranda addressed, among other subjects, legal issues which the Court, after the

close of evidence, asked counsel to address.  *See* Tr. 480–83.

Closing arguments were held April 30, 2013.  That day, the Court resolved various open

evidentiary issues.  *See* Tr. 487–91.  However, the Court reserved ruling on a motion *in limine*

BNY Mellon had submitted on the eve of trial.  It sought to exclude extrinsic evidence of

Chesapeake's negotiations with the offering's underwriters regarding § 1.7(b).  The Court stated

that it would resolve that motion in its decision.  *See* Tr. 479, 489.  The resolution of that motion

is addressed *infra* at Part IV.A.

## II.   The Legal Framework Governing the Interpretation of § 1.7(b)

The central issue in this case is this:  Under § 1.7(b), what is the deadline for giving

notice of a special early redemption at par plus interest?[11]   That issue turns on how § 1.7(b) of

the Supplemental Indenture is interpreted.  "Interpretation of indenture provisions is a matter of

basic contract law."  *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1049

(2d Cir. 1982); *see Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989);

*Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F. Supp. 2d 280, 291

---

[10] The Court admitted deposition designations of six non-testifying witnesses:  Susan Seymore, Jennifer Grigsby, Conrad Holub, Ross McLaughlin, Caleb Morgret, and Aubrey McClendon. The Court also admitted deposition designations as to three fact witnesses who did testify live: Elliot Chambers, Domenic Dell'Osso, and Michael S. Telle.  *See* Tr. 488–89.

[11] Depending on the resolution of that question, there are subsidiary questions presented.  BNY Mellon contends that, even if Chesapeake's Notice was timely, it is defective because it is "conditional" (*i.e.*, conditioned on a court's holding that it was timely).  BNY Mellon also asserts several affirmative defenses.  Chesapeake contends that, if its Notice is held untimely, the Court should reach its second claim and hold the Notice null and void, as opposed to operating as a notice of redemption at the Make-Whole Price.

(S.D.N.Y. 2009). Accordingly, the Court begins by reviewing the principles applicable to contract interpretation.[12]

### A.      The Language of the Parties' Agreement

"The primary objective of a court in interpreting a contract is to give effect to the intent of the parties as revealed by the language of their agreement." *Compagnie Financiere CIC L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000). "[T]he 'words and phrases [in a contract] should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions.'" *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012) (second alteration in original) (quoting *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005)). "A written agreement that is clear, complete and subject to only one reasonable interpretation must be enforced according to the plain meaning of the language chosen by the contracting parties." *In re Coudert Bros.*, 487 B.R. 375, 389 (S.D.N.Y. 2013) (quoting *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat'l Ins. Co.*, No. 09 Civ. 1796 (GBD), 2012 WL 3890128, at *5 (S.D.N.Y. Sept. 7, 2012)).

Judgment as a matter of law "is generally proper in a contract dispute only if the language of the contract is wholly unambiguous." *Compagnie Financiere*, 232 F.3d at 157; *see SR Int'l Bus. Ins. Co., Ltd. v. World Trade Ctr. Props., LLC* (*World Trade Ctr. Props.*), 467 F.3d 107, 138 (2d Cir. 2006). "The question of 'whether the language of a contract is clear or ambiguous' is one of law, and therefore must be decided by the court." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 568 (2d Cir. 2011) (quoting *Compagnie Financiere*, 232 F.3d at 158).

---

[12] Both the Base Indenture and the Supplemental Indenture are governed by New York law. *See* Base Indenture § 13.08; Supplemental Indenture § 22. The principles of interpretation reviewed by the Court are applied under New York law.

"Where the parties dispute the meaning of particular contract clauses, the task of the court 'is to determine whether such clauses are ambiguous when read in the context of the entire agreement.'" *Law Debenture Trust Co. of N.Y. v. Maverick Tube Co.*, 595 F.3d 458, 467 (2d Cir. 2010) (quoting *Sayers v. Rochester Tel. Corp. Supp. Mgmt. Pension Plan*, 7 F.3d 1091, 1095 (2d Cir. 1993)).

Ambiguity is "defined in terms of whether a reasonably intelligent person viewing the contract objectively could interpret the language in more than one way." *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008). "An ambiguity exists where the terms of the contract 'could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.'" *Law Debenture Trust*, 595 F.3d at 466 (quoting *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 83 (2d Cir. 2002)).

In contrast, "[n]o ambiguity exists where the contract language has 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" *Law Debenture Trust*, 595 F.3d at 467 (second alteration in original) (quoting *Hunt Ltd. v. Lifschultz Fast Freight*, 889 F.2d 1274, 1277 (2d Cir. 1989)). "The mere assertion of an ambiguity does not suffice to make an issue of fact." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 187 (2d Cir. 2006) (quoting *Thompson v. Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990)); *see Sayers*, 7 F.3d at 1095 ("Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement."). "Thus, the court should not find the contract ambiguous where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and

ordinary meaning.'"  *Law Debenture Trust*, 595 F.3d at 467 (quoting *Bethlehem Steel Co. v. Turner Constr. Co.*, 2 N.Y.2d 456, 459 (1957)).  As the Second Circuit has put the point:  "[N]o ambiguity exists where the alternative construction would be unreasonable."  *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 299 (2d Cir. 1996); *accord Mycak v. Honeywell, Inc.*, 953 F.2d 798, 802 (2d Cir. 1992) (no ambiguity exists unless "the contractual language is susceptible of at least two fairly reasonable meanings" (citation omitted)).

That a text is complex or imperfect does not mean it is ambiguous.  *See Aramony v. United Way of Am.*, 254 F.3d 403, 411 (2d Cir. 2001) (finding contract unambiguous and noting that "[t]he fact that we remanded to the district court for an initial determination of the meaning of this complex contract in no way implies that we found it ambiguous as a matter of law"); *Carolina First Bank v. Banque Paribas*, No. 99 Civ. 9002 (NRB), 2000 WL 1597845, at *6 (S.D.N.Y. Oct. 26, 2000) (that a contract is not a "portrait of clarity" does not prevent a finding that it is unambiguous where the court finds only one reasonable interpretation); *cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 535 (2004) ("The statute is awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue.").

### B.  Consideration of Extrinsic Evidence

Where the language of a contract is held ambiguous, the factfinder—here, the Court—may properly consider "extrinsic evidence as to the parties' intent."  *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009); *see also Collins v. Harrison-Bode*, 303 F.3d 429, 433–34 (2d Cir. 2002) ("[W]here . . . there are internal inconsistencies in a contract pointing to ambiguity, extrinsic evidence is admissible to determine the parties' intent." (citation omitted)).  "Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder."  *JA Apparel Corp.*, 568 F.3d at 397; *accord Compagnie Financiere*, 232

F.3d at 158; *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1048 (2d Cir. 1989) ("In determining the meaning of an ambiguous contract term, the finder of fact seeks to fathom the parties' intent.  That intent may be proven by extrinsic evidence.").

Analysis of extrinsic evidence may entail review of "negotiations . . . made prior to or contemporaneous with the execution of a written contract which may tend to vary or contradict its terms."  *U.S. Fire Ins. Co. v. Gen. Reinsurance Corp.*, 949 F.2d 569, 571 (2d Cir. 1991) (alteration omitted) (quoting *67 Wall St. Co. v. Franklin Nat'l Bank*, 37 N.Y.2d 245, 248–49 (1975)); *accord Shann v. Dunk*, 84 F.3d 73, 80 (2d Cir. 1996).  The review of the surrounding facts and circumstances may also include consideration of industry custom and practice, *see U.S. Naval Inst.*, 875 F.2d at 1048–49, and any relevant course of performance or course of dealing, *see Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006).

### C.     The Doctrine of *Contra Proferentem*

Finally, if unable to determine the parties' intent based either on the text of an agreement or after evaluating admissible extrinsic evidence, the Court may, in some circumstances, apply the doctrine of *contra proferentem* to construe any ambiguity against the drafter of the contract.[13] *See M. Fortunoff of Westbury Corp. v. Peerless Ins. Co.*, 432 F.3d 127, 142 (2d Cir. 2005).  This, however, is a matter of last resort.  *See id.* ("[C]ourts should not resort to *contra proferentum* [*sic*] until after consideration of extrinsic evidence to determine the parties' intent." (citation omitted)); *Albany Sav. Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997) (New York applies the rule of *contra proferentem* "only as a matter of last resort after all aids to construction have been employed without a satisfactory result" and "the rule does not preclude the admission

---

[13] This oft-misspelled doctrine derives from the Latin phrase meaning "against the one offering." The Court notes that the penultimate letter in "proferentem," often mistakenly written as a "u," is in fact an "e," because a present active participle takes on the endings of the third declension, and here "proferentem" must appear in its accusative singular form.

of parol evidence" (citation omitted)); *see also U.S. Fire Ins.*, 949 F.2d at 574 ("Where . . . the

justifications for applying [*contra proferentem*] seem to be lacking, and there exists ample

extrinsic evidence, which, properly considered, clarifies the . . . ambiguity, we find that the

district court erred in applying the doctrine of *contra proferentem*.").

## III.   Textual Analysis of Supplemental Indenture § 1.7(b)

Pursuant to this familiar analytic framework, the Court considers, first, the text of

§ 1.7(b)—viewed, of course, in conjunction with the surrounding language of the Supplemental

Indenture and the terms of the Base Indenture.  This Court has conducted this textual inquiry

without regard to the extrinsic evidence of the parties' intent that was admitted at trial.

With equal certitude, Chesapeake and BNY Mellon each insist that its construction of

§ 1.7(b) based on its text is patently and obviously correct.  A more detached assessment is that

§ 1.7(b) is a flawed and awkwardly drafted provision.  As the Court recognized at the time that it

addressed Chesapeake's motion for emergency relief, § 1.7 is a short but difficult document, and

its text presents challenges for the construction advocated by each party.

However, the fact that the text of § 1.7(b) is challenging and imperfectly drafted does not

necessarily mean that it is ambiguous.  The test of ambiguity, as explained above, is instead

whether there is a reasonable construction of the contract language that affords a definite and

precise meaning, and no other reasonable construction.  *See, e.g.*, *Law Debenture Trust*, 595 F.3d

at 467; *Readco*, 81 F.3d at 299; *Mycak*, 953 F.2d at 802.

At the time the Court first considered § 1.7(b), its preliminary assessment was that both

parties had offered reasonable alternative constructions as to the deadline for giving a notice of

special early redemption.  On that premise, the Court stated that its initial assessment was that

§ 1.7(b) was ambiguous as to that point.

Guided now by the parties' far more extensive briefing on the issue, and with the benefit now of time to apply thoughtfully the canons of contractual interpretation to § 1.7(b), the Court has assessed anew whether each party's construction of that provision is indeed reasonable. The Court's considered conclusion is that Chesapeake's construction is reasonable as to the operative deadline for giving notice, and that BNY Mellon's construction is not reasonable. Indeed, when evaluated in light of these canons, BNY Mellon's construction is tortured and incoherent. Accordingly, presented with a reasonable interpretation that affords a definite and precise meaning as to the notice deadline, and an alternative construction that is unreasonable, the Court holds that § 1.7(b) is not ambiguous. Chesapeake's construction is correct.

In conducting this review, the Court has been guided by the following tenets of contractual interpretation, used under New York law. These canons are commonly applied at this stage of the analysis:[14]

- *An agreement is to be considered as a whole*. "The rules of contract interpretation . . . do not contemplate considering any provision of the contract in isolation 'but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" *U.S. ex rel. Anti-Discrimination Ctr. of Metro N.Y., Inc. v. Westchester Cnty.*, No. 12-2047-cv, 2013 WL 1352537, at *3 (2d Cir. Apr. 5, 2013) (quoting *JA Apparel Corp.*, 568 F.3d at 397); *accord Kass v. Kass*, 91 N.Y.2d 554, 566 (1998).

- *Specific language controls general language*. "[C]ourts construing contracts must give specific terms and exact terms . . . greater weight than general language." *Cnty. of Suffolk v. Alcorn*, 266 F.3d 131, 139 (2d Cir. 2001) (citation omitted); *see also John*

---

[14] *See, e.g.*, *JA Apparel Corp.*, 568 F.3d at 405 (Sack, J., concurring) (explaining that "[a]t least some principles of interpretation . . . ordinarily guide the inquiry into whether a contract term is ambiguous," and listing several rules commonly applied by New York courts).

*Hancock Mut. Life Ins. Co. v. Carolina Power & Light Co.*, 717 F.2d 664, 669 n.8 (2d Cir. 1983) ("New York law recognizes that definitive, particularized contract language takes precedence over expressions of intent that are general, summary, or preliminary.").

- *Language is to be afforded its reasonable and ordinary meaning.* "[T]he 'words and phrases [in a contract] should be given their plain meaning.'" *Olin Corp.*, 704 F.3d at 99 (second alteration in original) (quoting *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206). No ambiguity exists "where the interpretation urged by one party would 'strain[] the contract language beyond its reasonable and ordinary meaning.'" *Law Debenture Trust*, 595 F.3d at 467 (quoting *Bethlehem Steel*, 2 N.Y.2d at 459).

- *A construction of a provision should not create internal inconsistencies.* In interpreting a contract, "[t]he entire contract must be considered, and all parts of it reconciled, if possible, in order to avoid an inconsistency." *Morse/Diesel, Inc. v. Trinity Indus., Inc.*, 67 F.3d 435, 439 (2d Cir. 1995) (citation omitted); *accord Nat'l Conversion Corp. v. Cedar Bldg. Corp.*, 23 N.Y.2d 621, 625 (1969) ("All parts of an agreement are to be reconciled, if possible, in order to avoid inconsistency.").

- *The construction should be commercially reasonable and not absurd.* "Unless otherwise indicated, words should be given the meanings ordinarily ascribed to them and absurd results should be avoided." *Mastrovincenzo v. New York*, 435 F.3d 78, 104 (2d Cir. 2006) (citation omitted); *accord Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278, 283 (2d Cir. 2005) ("absurd results" are "forbidden by canons of construction"). A court should not interpret a contract in a way that would be "commercially unreasonable, or contrary to the reasonable expectations of the parties." *Samba Enters., LLC v. iMesh, Inc.*, No. 06 Civ. 7660 (DLC), 2009 WL 705537, at *5 (S.D.N.Y. Mar. 19, 2009)

21

(quoting *Lipper Holdings, LLC v. Trident Holdings, LLC*, 1 A.D.3d 170, 171 (1st Dep't 2003)), *aff'd*, 390 F. App'x 55 (2d Cir. 2010) (summary order); *see also Newmont Mines Ltd. v. Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be examined "in light of the business purposes sought to be achieved by the parties" (citation omitted)).

- *Language should not be rendered superfluous.* "An interpretation of a contract that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206 (citation omitted); *accord Lawyers' Fund for Client Prot. of State of N.Y. v. Bank Leumi Trust Co. of N.Y.*, 94 N.Y.2d 398, 404 (2000) (interpretation that would render contractual provision superfluous is "unsupportable under standard principles of contract interpretation").

The Court's review of the text of § 1.7(b) in light of these principles properly begins with its second sentence. It is the one sentence specifically addressed to the issue in this case: the deadline for a notice of redemption. It reads:

> **The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period.**

Supplemental Indenture § 1.7(b) (emphasis added). That sentence is the only part of § 1.7 to address the subject of notice. The word "notice" does not otherwise appear in the Supplemental Indenture.

Viewed within its four corners, the second sentence of § 1.7(b) unequivocally supports Chesapeake's position that it had until March 15, 2013, to give a notice of special early redemption, with the actual redemption (pursuant to § 3.04 of the Base Indenture) occurring

between 30 and 60 days afterwards.  That is because the preceding sentence of § 1.7(b) defines the "Special Early Redemption Period" as "any time from and including November 15, 2012 to and including March 15, 2013."  Thus, the one sentence in § 1.7 that is specific to the central issue here—the deadline for giving notice of a special early redemption at par—when read in isolation is decisive as to that issue.

The cleanliness of this reading favoring Chesapeake is tarnished, however, when the focus broadens to consider other text within § 1.7(b) and § 1.7(c).  That is because the initial sentences of both § 1.7(b) and § 1.7(c) use the verb "redeem":  Section 1.7(b) states that at any time during the Special Early Redemption Period, Chesapeake, "at its option, *may redeem* the Notes [at par]"; and § 1.7(c) states that "[a]t any time after March 15, 2013 to the Maturity Date, [Chesapeake], at its option, *may redeem* the Notes [at the Make-Whole Price]."  Supplemental Indenture § 1.7 (emphases added).  Neither of these sentences is couched in terms of *notice* to redeem.  And, as BNY Mellon has persuasively shown, "to redeem," as defined in dictionaries,[15] and as customarily used in the securities industry,[16] refers to an *act*.  It ordinarily and customarily refers to the act of paying a noteholder in exchange for his or her note.  It does not ordinarily or customarily refer to the act of giving *notice* of a redemption or to the overall redemption process.

---

[15] *See, e.g.*, Black's Law Dictionary 1390 (9th ed. 2009) (defining "redemption" as "[t]he reacquisition of a security by the issuer"); Barron's Dictionary of Finance and Investment Terms 587 (8th ed. 2010) (defining "redemption" as "repayment of a debt security or preferred stock issue, at or before maturity").

[16] The evidence at trial, including testimony from industry participants, uniformly was to this effect, *see, e.g.*, Landau Rep. ¶¶ 11–12; Mullin Rep. ¶ 33; Tuckman Rep. 14–15; Tr. 183–84, and Chesapeake does not dispute this point, *see, e.g.*, Chesapeake Post-trial Br. 26 ("The parties do not dispute that the term 'redeem' would mean 'to repay' if standing alone . . . ."); Tr. 14–15 ("There is no dispute about what the first sentence would mean in isolation.").

Chesapeake's construction of § 1.7(b) thus necessarily requires one to construe the words "may redeem"—as used at the start of both § 1.7(b) and § 1.7(c)—to mean "may commence the redemption process."  Without this uncommon construction of that phrase, Chesapeake's overall interpretation would be unsustainable.  As to § 1.7(b), that is because, were "may redeem" assigned its customary meaning, the first sentence of § 1.7(b) would contemplate a redemption at par during the first 30 days of the Special Early Redemption Period, *i.e.*, November 15 through December 14, 2012.  That, however, is an impossible result given (1) the second sentence's mandate that notice of such a redemption first be given during the Special Early Redemption Period and (2) the requirement of Base Indenture § 3.04 that there be at least 30 days notice before a redemption.  Similarly, as to § 1.7(c), if "may redeem" were assigned its customary meaning, any redemption that occurred after March 15, 2013, pursuant to the terms of § 1.7(c), could not be at par.  It would have to be at the Make-Whole Price.  But that, in turn, would contravene the second sentence of § 1.7(b), which permits a notice of Special Early Redemption to be made up until March 15, 2013, with redemption on such terms to follow (pursuant to Base Indenture § 3.04) between 30 and 60 days later.

Chesapeake's construction of "redeem" as used in § 1.7 is also inconsistent with the use of that term in the Base Indenture and the earlier supplemental indentures.  Those documents all use that term in its customary sense, albeit in the course of describing redemption mechanics in general (the Base Indenture) or timetables or terms different from those in the Supplemental Indenture.[17]  Thus, Chesapeake's construction requires assigning the term "redeem" as used

---

[17] *See, e.g.*, Base Indenture § 3.05; *see also* Tuckman Rep. 6–10 (canvassing redemption mechanics in three prior Chesapeake issuances).

within § 1.7(b) a meaning ("commence the process of redemption") that it does not carry in any context other than the Ninth Supplemental Indenture.[18]

This regrettable circumstance was of course readily preventable. Chesapeake could have replaced the phrase "may redeem" in § 1.7(b) and § 1.7(c) with "may give notice of a redemption" or "may commence the redemption process." Or it could have added clarifying language. Such language could have either specified that the last date for a redemption was May 14, 2013, or stated generally that redemptions after March 15, 2013 are permitted if noticed by or on that date.[19] Either of these correctives, at a single stroke, would have made Chesapeake's reading of § 1.7(b) ironclad and watertight.

But Chesapeake's failure to draft § 1.7(b) optimally or with perfect clarity does not make its construction unreasonable. A provision, even if clumsily drafted, may still be subject to a single reasonable interpretation. *See supra* p. 17. And Chesapeake's construction yields "a definite and precise meaning" in that March 15, 2013 marks a bright-line end to the notice period. *Law Debenture Trust*, 595 F.3d at 467 (citation omitted); *see also Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 199 (2001) ("An omission or mistake in a contract does not constitute an ambiguity."). Given the specific, explicit, and crystal-clear command of the second sentence of § 1.7(b)—and given the canons that specific language controls general language and that language is not to be rendered superfluous—it is reasonable to construe the clauses "may

---

[18] The word "redeem" does not appear in the Ninth Supplemental Indenture other than in § 1.7.

[19] Although not relevant to the Court's textual analysis, Chesapeake's outside counsel sought, unsuccessfully, to add just such clarifying language at the 11th hour of the drafting process. *See infra* pp. 55–56.

redeem" in § 1.7(b) and § 1.7(c), in the singular context in which they appear, to mean "may commence the redemption process."[20]   That construction brings all parts of § 1.7 into harmony.

Moreover, the two-word phrase "may redeem" is not a defined term carrying a fixed and determinate meaning.  It therefore may be fairly read to mean "may commence the redemption process," and this reading, although in tension with the customary meaning of "redeem," does not create an irreconcilable conflict with any other provision of the Supplemental Indenture.  *See Aramony*, 254 F.3d at 413–14 ("Even where there is no 'true conflict' between two provisions, specific words will limit the meaning of general words if it appears from the whole agreement that the parties' purpose was directed solely toward the matter to which the specific words or clause relate." (citation omitted)).  As the Second Circuit has emphasized, parties are free to use contractual terms in ways that differ from their ordinary meaning, and when they do, evidence of the customary meaning must yield to the terms of the contract.  *See Croce v. Kurnit*, 737 F.2d 229, 238 (2d Cir. 1984) ("[E]vidence of industry practice may not be used to vary the terms of a contract that clearly sets forth the rights and obligations of the parties." (citing *In re W. Union Tel. Co.*, 299 N.Y. 177, 184–85 (1949)); *cf. Sharon Steel*, 691 F.2d at 1048–49 (affirming exclusion of custom and usage evidence where contractual language at issue was unique).[21]

---

[20] *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, No. 04 Civ. 10014 (PKL), 2005 WL 1950116 (S.D.N.Y. Aug. 12, 2005), is not to the contrary.  There, the court interpreted the term "call" in an indenture to mean to "[t]o redeem (a bond) before maturity."  *Id.* at *5 (alteration in original).  It held that, viewed in context of that indenture, "call" must refer to the entire multi-step process of redemption, not simply giving notice of redemption, because "[t]his interpretation comports with other language in the Indenture."  *Id.*  But here the parties do not dispute the customary meaning of "redeem," so to the extent *Aristocrat Leisure* merely confirms that customary usage, it is of little moment.  And in the context of *this* particular indenture, the non-customary interpretation of the phrase "may redeem" accords with the other language of, and brings overall coherence to, the Supplemental Indenture.

[21] Although not necessary to its outcome, the Court received "custom and usage" evidence at trial that favors Chesapeake's construction.  Chesapeake's expert, Dr. John Finnerty, testified

If Chesapeake's construction of § 1.7(b) is flawed in this single respect, BNY Mellon's construction is veritably riddled with canonical and logical problems, and brings various provisions of the indenture into irreconcilable conflict with each other. BNY Mellon's thesis is that the first sentence of § 1.7(b) permits the at-par redemptions themselves to take place during the Special Early Redemption Period (*i.e.*, between November 15, 2012 and March 15, 2013). BNY Mellon accounts for the pivotal second sentence of § 1.7(b), setting out the notice period for such special early redemptions, as limiting Chesapeake's right, at the front end (the first 30 days) of this period, to make such redemptions. The second sentence, BNY Mellon explains, requires Chesapeake to give notice of such a redemption during that same Special Early Redemption Period. Read in conjunction with the 30-day notice requirement of Base Indenture § 3.04, BNY Mellon asserts, this sentence serves to bar Chesapeake from exercising its option to effect an at-par redemption until the first 30 days of the period have run (*i.e.*, until December 15, 2012).

BNY Mellon's construction is at war, however, with basic canons of construction. To begin with, it is just that—a construct. In contrast to Chesapeake's construction, there is no specific sentence or provision within § 1.7(b) that cleanly—or even closely—articulates the reading urged by BNY Mellon. BNY Mellon's construction is instead aptly described as a

---

that, in reviewing 10 years of bond redemption provisions, in every instance but one, the redemption provisions lacked any reference to a deadline for giving notice. Further, common to all those provisions was that a redemption by the issuer pursuant to the provision would not affect the present value of the note to the noteholder—it would merely convert an income stream into an immediate payout. Notably, the only contrary instance, in which a redemption deadline was couched in terms of notice, involved a "cliff" redemption like Chesapeake's, where an issuer's redemption would terminate a favorable income stream to the holder without providing a commensurate lump-sum payout. Finnerty Rep. ¶¶ 34, 45–46. Given the customary absence of language addressing notice dates in redemption provisions of indentures, it is fair to have expected a person "cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Law Debenture Trust*, 595 F.3d at 466 (citation omitted), to alert to the unusual notice provision here and to understand that it was consequential.

valiant attempt to rationalize various components of § 1.7(b) so as, indirectly, to lend support to the claim that March 15, 2013 is the end date for actual redemption.  The absence of an affirmative provision in § 1.7(b) that articulates the meaning that BNY Mellon assigns to § 1.7(b) is striking, particularly when contrasted to the clarity with which the second sentence of § 1.7(b) supports Chesapeake's reading.  *See Cnty. of Suffolk*, 266 F.3d at 139 (courts "must give specific terms and exact terms . . . greater weight than general language" (citation omitted)); *John Hancock Mut. Life Ins.*, 717 F.2d at 669 n.8 ("[W]here the parties have particularized the terms of a contract an apparently inconsistent general statement to a different effect must yield." (citation omitted)).

Further, BNY Mellon's construction renders several portions of § 1.7(b) incoherent or inaccurate.  The first sentence of § 1.7(b) states, unequivocally, that Chesapeake "may redeem" the 2019 Notes at par beginning on November 15, 2012.  Under BNY Mellon's construction, however, that statement is untrue:  Because the second sentence of § 1.7(b) permits notice of such a redemption to first issue on November 15, 2012, Chesapeake in fact may *not* redeem the 2019 Notes at par until December 15, 2012.  In effect, BNY Mellon reads the second sentence of § 1.7(b) to repudiate, *sub silentio*, the first sentence, as least insofar as the first sentence states (under BNY Mellon's construction of "may redeem") that redemptions themselves may occur during the first 30 days of the Special Early Redemption Period.  An interpretation that creates such an internal inconsistency is disfavored.  *See Morse/Diesel, Inc.*, 67 F.3d at 439; *Nat'l Conversion Corp.*, 23 N.Y.2d at 625.

Under BNY Mellon's reading, in fact, the second sentence of § 1.7(b) would not serve any other purpose than to partially repudiate the first sentence.  But if the drafters' goal were to make December 15, 2012 the start date for redemption, there was no need to add the second

sentence:  Replacing the word "November" with "December" in the first instance would do the deed.  A formulation such as that of the second sentence is a bizarrely backhanded, indirect way of conveying such a simple concept.  Indeed, the only way to read "may redeem" in the first sentence of § 1.7(b) to describe accurately the one action that BNY Mellon asserts may validly occur with respect to redemptions during the first 30 days of the Special Early Redemption Period would be to read it to refer to the act of giving notice of redemption.  But that reading does not assist BNY Mellon.  Quite the contrary:  That is *Chesapeake's* reading of the provision.

BNY Mellon's construction also does violence to the second sentence of § 1.7(b).  That sentence, within its four corners, squarely permits BNY Mellon to exercise its option to redeem the 2019 Notes at par so long as it gives notice during the Special Early Redemption Period.  But under BNY Mellon's construction, that statement, too, is rendered untrue:  A notice given during the last 30 days of that period (*i.e.*, after February 13, 2013) would be too late to achieve a redemption at par.

BNY Mellon's construction also gives a strained and impractical meaning to the term "Special Early Redemption Period," defined in § 1.7(b) as "November 15, 2012 to and including March 15, 2013."  Under BNY Mellon's reading of § 1.7(b), there is no four-month period for doing *anything*, including for giving notice or for a redemption.  Rather, there is, implicitly, a three-month period for a notice of at-par redemption (November 15, 2012 through February 13, 2013) and a separate, implicit, three-month period for redemption itself on such terms (December 15, 2012 through March 15, 2013), with the period for redemption overlapping by two months with the period for notice.  But the four-month period identified in § 1.7(b) would not define any process or act.  At most, under BNY Mellon's reading, the Special Early Redemption Period can be said to bookend the span during which all steps in the redemption

29

process (notice and redemption) must occur.  Yet, on BNY Mellon's reading, that is inconsistent

with how § 1.7(b) uses the term "Special Early Redemption Period":  In the first sentence, it is

used to describe the period for redemption (even though redemption cannot occur during the first

30 days of that period), and in the second sentence it is used to describe the period for notice

(even though such notice would be ineffective during the last 30 days of that period).

In various ways, BNY Mellon's construction thus contravenes the basic canons that an

interpretation of a provision of an agreement should not make other clauses meaningless,

superfluous, unreasonable, or inaccurate.  *See Morse-Diesel*, 67 F.3d at 439 (avoid

inconsistencies); *Nat'l Conversion Corp.*, 23 N.Y.2d at 625 (same); *LaSalle Bank Nat'l Ass'n*,

424 F.3d at 206 (do not render clauses superfluous); *Lawyers' Fund*, 94 N.Y.2d at 404 (same).

For much the same reasons, BNY Mellon's construction is commercially unreasonable.

Section 1.7(b) does not say anything about there being a three-month period for giving notice.

Nor does it say anything about a three-month period for effecting a redemption.  Yet those

deadlines presumably are highly consequential to holders and investors.  They are the dates that

sellers or potential buyers of the 2019 Notes would want to know, to guide their investment

decisions.[22]  That a market participant—the most important audience for the Supplemental

---

[22] To put the point acutely, the single fact that a potential buyer or seller of the 2019 Notes in
early 2013 would most want to know is whether Chesapeake retained the ability to redeem those
Notes at par—or whether it was instead obliged to either pay the Notes out until maturity at the
rate of 6.775% or pay holders the present value of doing so.  That is because a redemption at par
would dramatically reduce the 2019 Notes' present value.  And that fact turns on whether the
deadline had passed for Chesapeake to give notice of a special early redemption.  Chesapeake's
construction of § 1.7(b) serves that need:  It sets out explicitly the final date (March 15, 2013) for
Chesapeake to give such notice.  BNY Mellon's construction does not.  It requires the market to
disregard § 1.7(b)'s express March 15, 2013 deadline for notice; to intuit the end date for
redemption through a process of reasoning irreconcilable with basic canons of construction; and
only then to derive from Base Indenture § 3.04 (because this ostensible deadline nowhere
appears in § 1.7(b)) the last date (February 13, 2013) on which Chesapeake can give timely
notice.

Indenture—could arrive at the deadlines urged by BNY Mellon only by a process of excruciating contortion reinforces that BNY Mellon's construction is unreasonable. *See Samba Enters.*, 2009 WL 705537, at *5 (avoid commercially unreasonable interpretations); *Lipper Holdings*, 1 A.D.3d at 171 (same); *cf. Mastrovincenzo*, 435 F.3d at 104 (avoid absurd results); *Bank Julius Baer*, 424 F.3d at 283 (same).

The Court is, then, presented with a choice between two constructions offered of § 1.7(b). One (Chesapeake's) is imperfect but reasonable. The other (BNY Mellon's) is incoherent and unreasonable. There are no other reasonable constructions of § 1.7(b). Under the case law, where one construction is reasonable and affords a clear and definite meaning and all others are not reasonable, a contract is not ambiguous. *See Law Debenture Trust*, 595 F.3d at 467; *Readco*, 81 F.3d at 299; *see also Wards Co. v. Stamford Ridgeway Assocs.*, 761 F.2d 117, 120 (2d Cir. 1985) ("A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings. Contorted semanticism must not be permitted to create an issue where none exists." (citation omitted)).

Chesapeake's reading of the deadline for issuing a notice of special early redemption under § 1.7(b), therefore, carries the day. That deadline was March 15, 2013. Chesapeake's Notice of Special Early Redemption that day was, accordingly, timely.

## IV. Analysis of Extrinsic Evidence Bearing on § 1.7(b)

Although the Court has ruled based on the governing texts, it has also carefully evaluated the admissible extrinsic evidence of the February 2012 negotiations between Chesapeake and its underwriters that led to the text of § 1.7(b). The Court's determination is that this evidence convincingly shows that the parties intended—consistent with § 1.7(b)'s second sentence—that

March 15, 2013 be the deadline for giving notice of a special early redemption, not the deadline for effecting such a redemption itself.  Thus, even if the text of § 1.7(b) were held ambiguous, Chesapeake's position as to the notice deadline would still prevail.  In the interest of completeness, the Court sets out here its reasoning in so finding.

The extrinsic evidence received at trial consisted of (1) the testimony of participants in the negotiation and drafting of the "Prospectus Supplement" and the Supplemental Indenture governing the 2019 Notes (collectively, the "deal documents"); (2) drafts and executed versions of the deal documents; (3) emails exchanging comments upon and edits of the deal documents; and (4) expert testimony as to industry custom and usage, and investor expectations.  The Court also received testimony about post-negotiation statements by Chesapeake and industry participants and publications as to the deadlines governing redemption of the 2019 Notes.

This analysis proceeds in three parts.  First, the Court addresses and resolves BNY Mellon's motion *in limine* to exclude much of this evidence.  Second, the Court sets forth its findings, based on the extrinsic evidence, as to the events of February 2012, including, centrally, the discussions that gave rise to the text of § 1.7(b).  Third, the Court explains why the evidence demonstrates, and why the Court finds, that the negotiating parties uniformly intended and agreed that March 15, 2013 would be the deadline for a notice of special early redemption.

### A.  Admissibility of Extrinsic Evidence of the Chesapeake/BAML Negotiations

On April 22, 2013, the day before trial, BNY Mellon filed a motion *in limine* seeking to exclude evidence of the subjective intent of any witness from Chesapeake, BAML, Bracewell, or Cravath, as to the meaning of § 1.7(b), except to the extent that the witness's views had been communicated to BNY Mellon at the time of the drafting and negotiation of the Prospectus Supplement and Supplemental Indenture.  *See* Dkt. 95, at 9–11.  Because of the expedited nature

of this litigation, and because this was a bench trial, the Court reserved decision on the motion until after trial.[23]

BNY Mellon's motion is based on what the case law alternatively describes as the doctrine of "unmanifested intent" or "uncommunicated subjective intent."  As explained further below, that doctrine may serve to preclude a party from offering evidence of its unexpressed, subjective intent as to the meaning of a contract's terms.  Paradigmatically, the doctrine applies where the contracting parties disagree as to the meaning of the terms on which they agreed.  This case, however, arises in a different context.  Here, Chesapeake (as issuer) and BAML (as lead underwriter) indeed negotiated the terms of § 1.7(b) of the Supplemental Indenture, the operative agreement in this case.  And as detailed *infra* in Parts IV.B–IV.C, there is compelling evidence that, in doing so, Chesapeake and BAML reached a common understanding as to the meaning of the agreed language that became § 1.7(b) of the Supplemental Indenture.  BNY Mellon, the indenture trustee that stood to take on responsibilities under the Supplemental Indenture once complete, was not party to those negotiations (save that its agents were copied on a small number of communications).  However, the parties to the Supplemental Indenture are Chesapeake and BNY Mellon (as trustee), not Chesapeake and BAML.

BNY Mellon argues that the "unmanifested intent" doctrine applies here, because the relevant parties to the Supplemental Indenture are its *signatories*, not the parties who negotiated its terms and text.  It argues that any evidence of the subjective intent of Chesapeake and BAML to which BNY Mellon was not privy is inadmissible, because such a shared intention was not manifested to BNY Mellon.  Because the negotiations that resulted in § 1.7(b) were solely

---

[23] On April 24, 2013, Chesapeake filed a response to BNY Mellon's motion.  *See* Dkt. 99.  The parties also addressed the motion in their post-trial briefs.  *See* Dkt. 110, 111.

between Chesapeake and BAML, BNY Mellon's motion, if granted, would exclude virtually all evidence as to the evolution of § 1.7(b) and the meaning that the negotiators assigned to it.

Although BNY Mellon's argument is provocative, BNY Mellon does not point to any case law that squarely supports applying that doctrine in this context. The Court finds the doctrine inapplicable here. Principally, that is because the negotiations between Chesapeake and BAML were sufficiently adversarial and arm's-length to guard against the concerns about collusion and unfair surprise that animate the doctrine. In addition, in practice, BNY Mellon's argument would fundamentally reshape the way bond indentures are negotiated, by causing the issuer to actively involve a future indenture trustee in the process of negotiating the indenture's terms, lest the failure to do so hamstring the issuer in future litigation.

### 1.   The Doctrine of Unmanifested Intent

The doctrine of unmanifested intent reflects the principle that the parties' objective manifestations of their intent—*i.e.*, their words to each other and their deeds—are most probative in contract formation and interpretation. *See Law Debenture Trust*, 595 F.3d at 467 ("[T]he objective of contract interpretation is to give effect to the *expressed* intentions of the parties." (emphasis in original) (citation omitted)); *Hotchkiss v. Nat'l City Bank of N.Y.*, 200 F. 287, 293 (S.D.N.Y. 1911) (Hand, J.), *aff'd*, 201 F. 664 (2d Cir. 1912), *aff'd*, 231 U.S. 50 (1913). It seeks to prevent a party from concealing its understanding of the contract from a counterparty, only to reveal that understanding later or to invent a *post hoc* rationalization in aid of a litigation position. *See Mercury Partners LLC v. Pac. Med. Bldgs., LP*, No. 02 Civ. 6005 (HBP), 2007 WL 2197830, at *14 (S.D.N.Y. July 31, 2007) ("It is the parties' 'intention as it existed at the time the contract was executed which must control rather than any subsequent intention tailored to complement an individual's posture once an agreement has gone sour.'" (quoting *New*

*England Merchs. Nat'l Bank v. Iran Power Generation & Transmission Co.*, 502 F. Supp. 120, 127 (S.D.N.Y. 1980))).  In light of these concerns, when a party seeks to introduce statements of its subjective intent that it did not communicate to the other party at the time of the drafting and that concern the ultimate meaning of the contract, courts typically do not consider, or assign little weight to, such evidence.[24]

      That said, evidence of a party's uncommunicated subjective intent is not categorically inadmissible.  Where an agreement is ambiguous, "the court may and should look to the prior negotiations to determine what was intended."  *Rudman v. Cowles Commc'ns*, 30 N.Y.2d 1, 11 (1972); *accord U.S. Fire Ins.*, 949 F.2d at 571.  The Second Circuit has explained that "[a]lthough a party's uncommunicated subjective intent cannot supply the ultimate meaning of

---

[24] For instance, where a contract's terms are unambiguous, courts will not allow a party's unexpressed subjective intention to raise an ambiguity.  *See, e.g., Klos v. Lotnicze*, 133 F.3d 164, 168 (2d Cir. 1997); *Wells v. Shearson Lehman/Am. Express*, 72 N.Y.2d 11, 24 (1988); *First Montauk Sec. Corp. v. Menter*, 26 F. Supp. 2d 688, 689 (S.D.N.Y. 1998).  Similarly, where a contract is ambiguous and one or both parties to the contract seek to introduce their own unexpressed subjective intentions, courts will not rely on such evidence to resolve that ambiguity.  *See, e.g., Pan Am. World Airways, Inc. v. Aetna Cas. & Sur. Co.*, 505 F.2d 989, 1003 (2d Cir. 1974); *JA Apparel Corp. v. Abboud*, 682 F. Supp. 2d 294, 306 n.10 (S.D.N.Y. 2010); *Invista B.V. v. E.I. Du Pont De Nemours & Co.*, No. 07 Civ. 713 (WHP), 2008 WL 4865044, at *5 (S.D.N.Y. Nov. 5, 2008); *Faulkner v. Nat'l Geographic Soc'y*, 452 F. Supp. 2d 369, 378 (S.D.N.Y. 2006), *aff'd*, 284 F. App'x 822 (2d Cir. 2008) (summary order); *Westfield Family Physicians v. HealthNow N.Y., Inc.*, 59 A.D.3d 1014, 1017 (4th Dep't 2009); *Sally v. Sally*, 225 A.D.2d 816, 818 (3d Dep't 1996).  *But cf. Nycal Corp. v. Inoco PLC*, 166 F.3d 1201, at *4 (2d Cir. 1998) (summary order) ("We note that the proposition of law . . . regarding the admissibility of evidence concerning subjective as opposed to objective intent in interpreting contracts, may not be as clearly settled in New York as the district court indicates.").  By contrast, in the rare situation in which both parties in a contract dispute have a contemporaneous understanding that, although unexpressed, is harmonious, that understanding may inform the meaning of an ambiguous contract.  *See, e.g., In re Sept. 11 Litig.*, 640 F. Supp. 2d 323, 333 (S.D.N.Y. 2009), *aff'd in relevant part sub nom. Aegis Ins. Servs., Inc. v. Port Auth. of N.Y. & N.J.*, 435 F. App'x 18 (2d Cir. 2011) (summary order); *Baladevon, Inc. v. Abbott Labs., Inc.*, 871 F. Supp. 89, 98–99 (D. Mass. 1994) (applying Massachusetts law); *see also Pennzoil Co. v. FERC*, 645 F.2d 360, 392 (5th Cir. 1981); 2 E. Allan Farnsworth, Farnsworth on Contracts § 7.9 (3d ed. 2004) ("Though it is generally safe to say that a party's 'secret intention' will not carry the day, this is not a safe assertion if it happens that both parties shared the same 'secret intention.'").

an ambiguous contract, it is quite another thing to hold that such evidence is wholly irrelevant

and inadmissible for other purposes." *World Trade Ctr. Props.*, 467 F.3d at 125.  Because the

parties' reasonable expectations of a contract's meaning are determined based on an objective

understanding of the surrounding circumstances in which the agreement was made, "a party's

subjective understanding, while not controlling, may shed light on the state of th[e] negotiations

and could bear on that party's objective actions."  *Id.* at 126; *see XL Specialty Ins. Co. v.

Agoglia*, No. 08 Civ. 3821 (GEL), 2009 WL 1227485, at *17 (S.D.N.Y. Apr. 30, 2009), *aff'd*,

370 F. App'x 193 (2d Cir. 2010) (summary order); *Constellation Power Source, Inc. v. Select

Energy, Inc.*, 467 F. Supp. 2d 187, 209 (D. Conn. 2006).

### 2.   Application of the Doctrine Here

BNY Mellon's motion *in limine* is aimed at excluding the communications between

Chesapeake and BAML when they negotiated the Prospectus Supplement, the pertinent text of

which was later imported into the Supplemental Indenture.  BNY Mellon argues that negotiations

between an issuer and an underwriter over the terms of an indenture—either in general or on the

facts of this case—are not conducted at arm's length.  BNY Mellon likens these to discussions

among persons within one side of a business negotiation that are not manifested to the

counterparty.  It argues that testimony by Chesapeake or BAML as to their communications is

irrelevant to the meaning of an indenture provision to which Chesapeake and BNY Mellon, but

not BAML, were signatories.

The Court disagrees.  BNY Mellon's premise is that the negotiations between an issuer

and underwriter are collusive, and that admitting testimony as to such negotiations invites them

to invent, after the fact, a different, unspoken understanding of their agreed terms that favors the

issuer.  Generally, however, courts have characterized the relationship between issuer and

36

underwriter as arm's-length.  *See, e.g.*, *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp.

1504, 1509 (S.D.N.Y. 1989) ("[I]ndentures are often not the product of face-to-face negotiations

between the ultimate holders and the issuing company.  What remains equally true, however, is

that underwriters ordinarily negotiate the terms of the indentures with the issuers.  Since the

underwriters must then sell or place the bonds, they necessarily negotiate in part with the

interests of the buyers in mind."); *Morgan Stanley & Co. v. Archer Daniels Midland Co.*, 570 F.

Supp. 1529, 1541 (S.D.N.Y. 1983) (declining to construe indenture against issuer where it was

"negotiated by sophisticated bond counsel" from issuer and underwriter and "[t]here is no

suggestion of disparate bargaining power in the drafting of the Indenture, nor could there be");

*EBC I, Inc. v. Goldman Sachs & Co.*, 91 A.D.3d 211, 214–16 (1st Dep't 2011) (examining

issuer/underwriter relationship and finding it to be adverse and arm's-length).[25]

     Consistent with this, the trial record in this case revealed that the Prospectus Supplement

in general, and the text of the provision that became § 1.7(b) in particular, were the subject of

vigorous arm's-length negotiations between Chesapeake and lead underwriter BAML.  This

evidence reflected meaningful give and take, in which BAML negotiated with its own interests

in mind.  It also reflected a demonstrated ability by BAML to get its way and to influence terms

of the 2019 Note offering.  The parties' actual dealings demonstrate, in sum, that there was no

disparity of bargaining power between the negotiating parties.  *See, e.g.*, Telle Decl. ¶ 14

(BAML originally proposes window from November 15 to December 31); PX 10 (Chesapeake

---

[25] *Cf. Chris-Craft Indus. v. Piper Aircraft Corp.*, 480 F.2d 341, 370 (2d Cir. 1973) (describing
the underwriter as the party "most heavily relied upon to verify published materials" because of
its "incentive to do so," *i.e.*, that it "often has a financial stake in the issue" which gives it
"special motive thoroughly to investigate the issuer's strengths and weaknesses").  *But see*
*Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 397 (Del. 1996) (noting that whether issuer
and underwriter "can legitimately be viewed as 'negotiating' indenture provisions is a subject of
some dispute").

requests one-year redemption window); Dell'Osso Decl. ¶ 17 (BAML rejects Chesapeake's request for one-year redemption window); PX 1 (redemption window ultimately becomes four months); PX 16 (bank changes redemption date from March 31 to March 15); Telle Decl. ¶ 16 (same); *see also* PX 42 (following completion of Prospectus Supplement and during drafting of Supplemental Indenture, BAML counsel Cravath rejects Chesapeake counsel Telle's proposed clarification to notice provision in § 1.7(b)); DX 20 (Chesapeake describing dissatisfaction with provision, which eventually was added, requiring that $250 million of Notes remain outstanding if any are redeemed).

BNY Mellon counters that even if there is no general ban on admitting evidence of issuer-underwriter negotiations, the negotiations here should nevertheless not be treated as at arm's length. That is because the 2019 Notes were purportedly offered on a "best efforts" basis, in which BAML never bore any economic risk in marketing the Notes.

BNY Mellon is correct that a typical "best efforts" offering, where the underwriter does not buy the notes but simply markets them as the issuer's agent, entails significantly less risk for the underwriter than a "bought" or "firm commitment" deal, where the underwriter commits upfront to purchase the notes being issued and then seeks to resell them. *See Sec. Indus. Ass'n v. Bd. of Governors of the Fed. Reserve Sys.*, 468 U.S. 207, 217 n.17 (1984); *Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co.*, 32 F.3d 697, 701 (2d Cir. 1994); *Walk-In Med. Ctrs., Inc. v. Breuer Capital Corp.*, 651 F. Supp. 1009, 1013 n.3 (S.D.N.Y. 1986), *aff'd*, 818 F.2d 260 (2d Cir. 1987); Louis Loss, Fundamentals of Securities Regulation 100, 110 & n.11 (6th ed. 2011); Mullin Rep. ¶ 16. However, the evidence here lends only partial support to BNY Mellon's claim that BAML's involvement with the 2019 Notes was riskless. It shows that BAML was exposed to at least *some* degree of economic risk. As James Alexander Maultsby, the BAML managing

director, testified, BAML made a firm written commitment to Chesapeake to buy the notes on

closing.  Tr. 225.  The Underwriting Agreement reflects such a commitment.  *See* PX 3, at

CHK338 (the "Underwriting Agreement").

To be sure, that written commitment was made at a point when BAML's exposure, in

practice, was limited:  As of February 13, 2012, when BAML signed the underwriting

agreement, the issuance was already oversubscribed with orders from investors seeking to

purchase the 2019 Notes.  *See* Tr. 226; PX 39.  Although this substantially reduced the risk that

BAML would be left holding onto the 2019 Notes, it did not eliminate that risk entirely.  There

remained at least the possibility that purchasers would back out, obliging BAML to acquire the

Notes earmarked for them.  *See* Tr. 156–57 (BAML counsel Burns); Tr. 226–27 (Maultsby).  In

addition, BAML had its reputational interest to protect in negotiations.  Its goals were to provide

adequate disclosure and to fashion terms that would be attractive to purchasers and that would

clear the market, thereby enhancing BAML's ability to secure underwriting roles on future

agreements.  *See* Tr. 152–57 (Burns); Tr. 227 (Maultsby).

Consistent with this, as noted, BAML succeeded in negotiating terms materially different

from those initially proposed by Chesapeake.  Because BAML exercised influence over the

terms of the deal documents based on its own interests, which diverged from Chesapeake's, the

Court comfortably concludes that the negotiations between these two parties were at arm's

length, not one-sided or collusive.

In an alternative argument, BNY Mellon notes that Chesapeake and BAML's

negotiations were directed towards the terms of the Prospectus Supplement, whereas the

document at issue here is the later-prepared Supplemental Indenture.  BAML is correct that the

primary subject of Chesapeake and BAML's negotiations was the Prospectus Supplement, not

the Supplemental Indenture.  But that does not materially change the analysis, because the

Supplemental Indenture is intended to conform to the Prospectus Supplement, *see* Burns Decl.

¶ 6; Tr. 136, such that parallel language regarding the Notes' material terms was, in short order,

carried forward from the Prospectus Supplement to the Supplemental Indenture.  *Compare* PX 1,

at CHK284, *and* PX 2, at CHK359, *with* Supplemental Indenture § 1.7(b), *and* PX 5, at BG2869.

Indeed, when counsel for Chesapeake proposed a clarifying change to the notice sentence of

what became § 1.7(b), that change was rejected by BAML counsel Cravath, whose policy was to

conform the indenture language to that of the Prospectus Supplement.  *See* Burns Decl. ¶ 26; PX

41–43; *see also* Telle Decl. ¶¶ 35–38.[26]

Finally, BNY Mellon relies heavily on a Delaware case in which the court declined to

consider extrinsic evidence of the subjective intent of the parties that negotiated an agreement,

where doing so "would yield information about the views and position of only one side of the

dispute," and would ignore the expectations of the holders of the securities governed by the

agreement, who were not involved in its drafting.  *Bank of N.Y. Mellon v. Commerzbank Capital*

*Funding Trust II* (*Commerzbank*), -- A.3d ---, 2013 WL 1136821, at *7 (Del. Mar. 19, 2013).

This case is a far cry from *Commerzbank*.  There, the agreement had been negotiated by

Commerzbank and two affiliated entities that it had created.  Thus, for all intents and purposes,

the agreement had been negotiated unilaterally, and the three negotiating entities were each

defendants in the litigation.  In no sense did the participation of any of those entities benefit the

---

[26] For the purpose of determining the contracting parties' intent, the Court has not admitted for
the truth of the matter asserted the out-of-court statement to this effect by Cravath attorney
Daniel O'Shea to Bracewell's Telle.  *See infra* p. 64 & n.43 (addressing Telle Decl. ¶ 38).
However, the Court is permitted to consider otherwise inadmissible hearsay for the purpose of
resolving a motion *in limine*, *see* Fed. R. Evid. 104(a), 1101(d)(1); *cf. Bourjaily v. United States*,
483 U.S. 171, 178 (1987); *United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003), and the
Court has done so here.  The Court's analysis and outcome would be the same, however, even
putting aside the statement in Telle's declaration attributed to O'Shea.

future holders.  The danger of collusion undergirding the unmanifested intent doctrine was, thus, very real.  *See id.* ("This case does not fit the conventional model of contracts 'negotiated' by and among all the interested parties."); *see also Prop. Asset Mgmt., Inc. v. Chi. Title Ins. Co.*, 173 F.3d 84, 87 (2d Cir. 1999) (declining to recognize assignment based on testimony about subjective intentions, where purported assignment between sister corporations was never memorialized in writing).[27]

Here, by contrast, BAML negotiated the Indenture's terms with its own interests in mind. Because the parties were adverse yet conveyed to each other a shared understanding of the meaning of the important and unusual provision (§ 1.7(b)) that they together fashioned, there is little danger that the party adverse to Chesapeake now, BNY Mellon, will be the victim of *post hoc* collusion.  In this vein, the Court found particularly valuable the testimony of BAML's representatives (Maultsby and outside counsel Burns) as to the parties' intentions in drafting the text that became § 1.7(b), because BAML's personnel have little meaningful incentive to collude with Chesapeake in aid of litigation to which BAML is not a party.  *See Baladevon*, 871 F. Supp. at 98 (finding testimony of original party to contract who had assigned its rights in the contract to be "highly credible" because it no longer had a stake in the outcome of the litigation); *see also*

---

[27] *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392 (Del. 1996), on which BNY Mellon also relies, is inapposite.  There, the court was faced with "a hopelessly ambiguous contract" and was "reluctan[t] to rely on extrinsic evidence" such as "the thoughts and positions of . . . the issuer and underwriter."  *Id.* at 397–98.  But the court's reluctance was motivated in part by the fact that the ambiguous provision was boilerplate, and a case-by-case evaluation of identical boilerplate terms, based on the parties' negotiations, would create "enduring uncertainties as to the meaning of boilerplate provisions [that] would decrease the value of all debenture issues and greatly impair the efficient working of capital markets."  *Kaiser*, 681 A.D.2d at 398 (quoting *Sharon Steel*, 691 F.2d at 1048).  That concern is not present here, because the all-important second sentence of § 1.7(b) is anything but boilerplate.  *See, e.g.*, Finnerty Rep. ¶¶ 14, 43; Burns Decl. ¶ 16 (describing the notice provision as "a unique term in my experience that I had never seen in a prior deal"); PX 19 (email from Maultsby expressing pride in the deal's "unique structure").

*BKCAP, LLC v. Captec Franchise Trust 2000-1*, No. 3:07-cv-637, 2011 WL 3022441, at *7

(N.D. Ind. July 21, 2011), *aff'd*, 688 F.3d 810 (7th Cir. 2012) (relying on testimony of parties

that had negotiated terms of notes that were later assigned to a third party); *cf. MBL Contracting

Corp. v. King World Prods., Inc.*, 98 F. Supp. 2d 492, 497 (S.D.N.Y. 2000) (holding that where

two contracting parties have a common understanding of what is meant by an agreement, the

understanding of a third-party beneficiary to that agreement does not control its meaning).

As a final observation, the Court notes the broad implications of BNY Mellon's bid to

exclude issuer-underwriter communications to which an indenture trustee is not privy.  That

Chesapeake and BAML did not include BNY Mellon on all of their communications is not

evidence of some neglect or collusion.  It is standard industry practice:  "[U]nderwriters

ordinarily negotiate the terms of the indentures with the issuers."  *Metro. Life Ins. Co.*, 716 F.

Supp. at 1509; *see also* Robert I. Landau & Romano I. Peluso, Corporate Trust Administration

and Management 117 (6th ed. 2008); Burns Decl. ¶ 5; Tr. 151–52.  A rule under which

communications during negotiations between an issuer and an underwriter to which the trustee

was not party are inadmissible in later litigation over ambiguous contract terms would upend this

practice and yield a needlessly inefficient outcome:  The issuer, in an abundance of caution,

might feel compelled to include the trustee on calls and emails with the underwriter as to deal

terms and text, even though the trustee has no stake in the economic terms of a note issuance and

may have little value to add to such negotiations.  Issuers and underwriters do not set out

together to draft ambiguous indentures, but ambiguity happens.  When it does, and the issuer and

underwriter negotiated the indenture at arm's length, it is the evidence of *their* collective

intentions, where accessible, that informs the indenture's meaning.

For these reasons, the Court holds that evidence of communications between Chesapeake and BAML bearing on their shared understanding of § 1.7(b) is admissible, regardless whether BNY Mellon was party to those communications.  BNY Mellon's motion *in limine* to preclude such evidence is, therefore, denied.[28]

### B.      Findings of Fact as to the Events of February 2012

At trial, Chesapeake called four fact witnesses, each of whom played a key role in the process by which the 2019 Notes were conceived and their terms negotiated and memorialized in the deal documents: (1) Domenic Dell'Osso, Chesapeake's chief financial officer ("CFO") and executive vice president, *see* Declaration of Domenic J. Dell'Osso ("Dell'Osso Decl.") ¶ 2; (2) Michael Telle, a partner at Bracewell, Chesapeake's outside counsel for equity and debt offerings since 2007, *see* Declaration of Michael S. Telle ("Telle Decl.") ¶¶ 2, 5; (3) James Alexander Maultsby, a managing director at BAML, which served as the lead underwriter for the Notes offering, *see* Declaration of James Alexander Maultsby ("Maultsby Decl.") ¶¶ 2, 4; and (4) Stephen Burns, a partner at Cravath, BAML's counsel for the Notes offering, *see* Declaration of Stephen L. Burns ("Burns Decl.") ¶¶ 1, 3.  The Court found all four credible.[29]

BNY Mellon called two fact witnesses.  Elliot Chambers, Chesapeake's assistant treasurer and vice president of finance, was part of Chesapeake's working group on the issuance of the 2019 Notes.  The 2019 Notes are part of Chambers's current portfolio for reporting purposes.  Tr. 248–49.  Kyle Bork, a data analyst in the corporate bond and preferred debt department at Bloomberg LP, helped create the Bloomberg page describing the 2019 Notes.  Tr.

---

[28] Notwithstanding the denial of this motion, the doctrine of unmanifested intent may nonetheless be relevant in this case where statements about a witness's private understanding of a provision, uncommunicated to the counterparty, are offered.  The Court addresses that situation *infra* at pp. 64 n.42, 65 n.44.

[29] The Court addresses the credibility of these witnesses in greater detail *infra* in Part IV.C.

358, 362.  The Court also credited Chambers's and Bork's testimony, although, for the reasons

that follow, found both of limited relevance to the issue at hand.[30]

The facts found by the Court are as follows:

The 2019 Notes were conceived of, negotiated, and ultimately issued during a nine-day

period in February 2012.  Between February 8, 2012, and February 16, 2012, Dell'Osso, Telle,

Maultsby, and Burns, and their respective deal teams, proposed, negotiated, and drafted the deal

documents relating to the Notes.  The compressed time frame in which these events transpired

was due, at least in part, to the fact that Chesapeake was closing the books on its 2011 fiscal year

and planned to issue an earnings release toward the end of February.  In the days before that

release issued, Chesapeake would be subject to a "blackout period" and unable to issue public

securities.  Dell'Osso Decl. ¶ 15.

### 1.  February 8–9, 2012:  The Concept Emerges

As of the start of 2012, Chesapeake was in search of additional sources of short-term

liquidity, after an unusually warm winter had caused a significant decline in the price of natural

gas.  Dell'Osso Decl. ¶ 9.  On or around February 8, 2012, Dell'Osso was approached by

---

[30] As noted, four expert witnesses also testified—one called by Chesapeake and three by BNY Mellon.  These witnesses offered testimony regarding industry custom and practice or opined on how a person in the industry might understand § 1.7(b).  Dr. John D. Finnerty, called by Chesapeake, testified that, based on his research, both the special early redemption option in the 2019 Notes and the second sentence of § 1.7(b) setting forth a deadline for notice rather than the completion of redemption are "unusual and almost unprecedented" in the bond industry.  Finnerty Rep. ¶¶ 13–14.  Robert I. Landau, called by BNY Mellon, testified that the language "may redeem" or the term "redemption" customarily refers in the securities industry to the endpoint of the process of redemption, not the date on which notice is given and the process of redemption is commenced.  Landau Rep. ¶¶ 11–16.  James A. Mullin, called by BNY Mellon, testified that BNY Mellon's interpretation of § 1.7(b), based on his knowledge of the market, accords with the expectation of a reasonable investor.  Mullin Rep. ¶¶ 11, 38, 40.  Finally, Dr. Bruce Tuckman, called by BNY Mellon, testified that the text of the Supplemental Indenture accords with custom and practice in the bond industry in that it provides a period during which redemption must occur; he opined that a redemption of the 2019 Notes after March 15, 2013 would be at the Make-Whole Price.  Tuckman Rep. 10–13.

Maultsby and Scott Van Bergh, both of BAML, with a proposal for a public debt offering.  *Id.*

¶ 10.  Maultsby and Van Bergh proposed that this offering contain an unusual feature:  It would

provide Chesapeake with the option to call the notes at par early in their lifetime.  *Id.*  Such a

feature would give Chesapeake the liquidity it needed in the short term.  However, it would also

allow Chesapeake to repay the notes after certain planned asset sales—then in the works—had

occurred, without paying a premium, unlike in the case of typical high-yield bonds.  Dell'Osso

expressed interest in the proposal.  His assessment was that "BAML had done an excellent job of

reading Chesapeake's financial situation."  *Id.*  Dell'Osso and Chambers contacted outside

counsel Telle.  They told Telle that Chesapeake was considering an offering in conjunction with

BAML.  Telle Decl. ¶ 7.

On February 9, 2012, at 10:31 a.m.,[31] Maultsby emailed Dell'Osso and others at

Chesapeake with a written proposal entitled "Short-Term Callable Bond Opportunity."

Dell'Osso Decl. ¶ 12; PX 8.  Shortly thereafter, around 11:30 a.m., Maultsby, Dell'Osso, and

various Chesapeake officers spoke by phone, presumably to discuss BAML's proposal.

Dell'Osso Decl. ¶ 12; PX 8.  BAML proposed that Chesapeake issue five-year notes that could

be called at par during a period that spanned the last six weeks of 2012.  Dell'Osso Decl. ¶ 12.

After that point, the bonds could only be called above par, at premiums that would first increase

and then "step[]-down" to par as the bonds approached maturity.  *Id.*

A few hours after that phone call, BAML sent another presentation to Dell'Osso.  It

contained several variations on the initial proposal, including a range of potential maturity dates.

*Id.*; PX 9.  At some point thereafter, Chesapeake decided that it would work with BAML to issue

notes with the "early-call-at-par" feature and a seven-year maturity, which Chesapeake believed

---

[31] The times used in this section are all Eastern Standard Time.

would integrate well into the maturity schedule of Chesapeake's then-existing debt.  Dell'Osso

Decl. ¶¶ 15–16.  In an email sent on February 9, 2012, at 7:07 p.m., Dell'Osso confirmed that

plan to the BAML group.  PX 10.  In that email—also sent to Telle and various individuals at

Chesapeake—Dell'Osso expressed a desire to extend the "early-call-at-par" period to 12 months.

*Id.*; Dell'Osso Decl. ¶ 17.  Such a period would have given Chesapeake a year in which to decide

whether to call the bonds early, flexibility that served Chesapeake's business needs because its

planned asset sales were at that time not "close to completion."  Dell'Osso Decl. ¶ 17; *see also*

Dell'Osso Dep. 57.

BAML, however, responded that a 12-month period would be too long.  Dell'Osso Decl.

¶ 17.  Dell'Osso persisted, and at some point over the course of the weekend, indicated to

Maultsby a desire to make Chesapeake's optional redemption window as long as possible.  *Id.*;

*cf.* Maultsby Decl. ¶ 7.  The evening of February 9, Dell'Osso and Telle exchanged a series of

emails.  These indicate that Telle and his colleagues at Bracewell had begun work on the deal.

PX 12; *see* Dell'Osso Decl. ¶ 18; Telle Decl. ¶ 7.

Meanwhile, John Pantalena of BAML got in touch with Cravath's Burns, to inform him

of Chesapeake's and BAML's intentions.  Pantalena forwarded to Burns the email in which

Dell'Osso had indicated his plan to ask BAML to set the "early-call-at-par" period at 12 months.

PX 11; Burns Decl. ¶ 8.  Late that night and the next morning, Burns staffed the deal with

Cravath attorneys, including Daniel O'Shea, Brandon DeFrehn, Christopher Moore, and Casey

McDonald, in anticipation of the tight time frame contemplated.  Burns Decl. ¶ 9.

## 2.   February 10–12, 2012:  The Prospectus Supplement Takes Shape

On the morning of February 10, 2012, Burns and his team at Cravath began work on the project, including the required due diligence, and participated in both internal and external phone calls.  Burns Decl. ¶ 10.  Morgan Stanley also joined BAML as co-lead underwriter.  *Id.*

Before Telle began to draft the Prospectus Supplement, he spoke with Dell'Osso and others at Chesapeake.  Telle Decl. ¶ 14.  They communicated to Telle Chesapeake's desire to lengthen the November 15–December 31, 2012 redemption period that had been proposed by BAML.  *Id.*  Chesapeake and its outside counsel decided to propose March 31, 2013, as the end of the redemption period.  *Id.*  Telle and his colleagues at Bracewell then worked to draft the preliminary Prospectus Supplement for the deal.  During the weekend, they circulated several drafts to other Bracewell attorneys, Cravath attorneys, the Chesapeake team, the BAML team, and the Morgan Stanley team.  *Id.* ¶ 12; Dell'Osso Decl. ¶ 19.

Late Friday night, February 10, 2012, the first draft of the Prospectus Supplement was sent out, by Bracewell attorney Erica Hogan, to the teams at Chesapeake, Cravath, and BAML.  PX 13; Telle Decl. ¶ 15; Burns Decl. ¶ 11.  Hogan's draft contained a provision for a special early redemption that used the customary language for a conventional redemption time-period.  Telle Decl. ¶ 15.  The "Description of Notes" section of the draft stated:

> Special Redemption.  Between November 15, 2012 and March 31, 2013, the Notes will be redeemable at our option at any time in whole, or from time to time in part, at a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption.

PX 13, at CHK842.  Hogan also attached to her email a redline version of the draft Prospectus Supplement, reflecting edits to a Prospectus Supplement that had been used in a note offering of Chesapeake's in February 2011.  PX 13, at CHK906; Burns Decl. ¶ 11.  As of that point,

Chesapeake had not yet reviewed a draft of the Prospectus Supplement; Hogan's email indicated thus and also advised that further revisions needed to be made to the document.  PX 13.

    During the next day, Saturday, February 11, 2012, changes continued to be made to the draft of the Prospectus Supplement.  Dell'Osso sent out his comments with tracked changes.  PX 15; Dell'Osso Decl. ¶ 19.  Later that morning, Cravath's DeFrehn sent an email to Telle and the Bracewell team, advising them that the banks preferred March 15, 2013 to serve as the end of the call period, rather than March 31, 2013.  PX 16; Telle Decl. ¶ 16; *see* Burns Decl. ¶ 14.  That email also asked that interest payment dates be set for every March 15 and September 15.  PX 16; Burns Decl. ¶ 14.

    Over the course of Friday and Saturday, Telle had discussions with his clients at Chesapeake to the effect that Chesapeake wanted as long a time period as possible to decide whether to call the bonds.  Dell'Osso told Telle that he wanted as long a period as possible to redeem.  Tr. 111–13.[32]  Telle recognized that, with a March 15, 2013 redemption deadline, Chesapeake would have to give notice by February 13, 2013—30 days earlier.  Telle Decl. ¶ 18.  At that point, Telle developed the idea on which this lawsuit turns: to make the period of November 15, 2012, through March 15, 2013 the time frame within which Chesapeake merely had to give *notice* that it planned to exercise its call option, as opposed to the time frame within which redemptions would have to be completed.  *Id.* ¶ 19.  Telle realized that this change would move later in time the window within which Chesapeake had (1) to decide whether to exercise its

---

[32] Although Telle does not recall all the specifics of those conversations, he recalls this statement by Dell'Osso.  *See* Tr. 95–97, 99–100.

option to redeem early at par, and (2) to raise the funds necessary for such a redemption. *Id.* ¶ 19. On Saturday, Telle discussed this idea with Dell'Osso and others. *Id.* ¶ 20.[33]

That weekend, representatives of Chesapeake discussed with representatives of BAML both (1) the time period within which Chesapeake would have to make its decision whether to pursue an early redemption at par, and (2) the concept of revising the language of the Prospectus Supplement so as now to focus on the time period within which Chesapeake could give notice of such a redemption. Based on the trial record, the Court cannot confidently determine how many such separate conversations (*i.e.*, involving representatives of both Chesapeake and BAML) along these lines occurred during that weekend. These conversations were all telephonic, and the witnesses who participated in them have limited recollections both as to who participated in which conversation, and as to the times of these conversations. The Court believes it most likely that at least two or three such conversations took place, and that they occurred on Saturday, February 11, 2012, including that evening. However, whether contained in one conversation or spread across two, three, or more, the Court finds that conversation(s) between representatives of Chesapeake and BAML were held on Saturday, February 11, 2012, and perhaps early on Sunday, February 12, 2012, during which the following three colloquies occurred:

**1. *Dell'Osso/Maultsby***: In a call with at least Maultsby and apparently others from BAML, Dell'Osso discussed Chesapeake's deadline for making its decision as to redemption. Dell'Osso stated that Chesapeake desired as long a period as possible to decide whether to redeem early. Dell'Osso Decl. ¶ 17; Maultsby Decl. ¶ 7. Dell'Osso's focus in that conversation was "on the time the Company had to act, not on the date the payment would need to be made to the noteholders." Dell'Osso Decl. ¶ 17. Dell'Osso and Maultsby accordingly did not focus on

---

[33] Although Dell'Osso does not specifically recall such a conversation with Telle, he does not dispute that such a conversation occurred. Dell'Osso Dep. 74–75.

the date when the actual redemption would occur.  *Id.*; Maultsby Decl. ¶ 8.  In discussing the

date by which Chesapeake had to act, neither Dell'Osso nor Maultsby stated that that date was

February 13, 2013 (which would be the last date for giving notice if March 15, 2013, were the

outside date for a redemption).[34]  Based on this conversation, Maultsby "understood the final

language to mean that Chesapeake could issue a notice to redeem the notes at par" until March

15, 2013.  Maultsby Decl. ¶¶ 8–9.

    **2.  *Burns/Dell'Osso***:  Sometime after 7:52 p.m. on Saturday, February 11, 2012, a call

between Burns, Dell'Osso, and at least one banker from BAML took place.  Burns Decl. ¶ 16.

(This call can confidently be placed after that time, because Burns recollects that the call

occurred after a 7:52 p.m. email in which Cravath's DeFrehn circulated Cravath's and the

underwriters' comments on the Prospectus Supplement.  PX 18; Burns Decl. ¶ 15.  The

handwritten changes included a provision requiring that, in the case of partial early redemption at

par, at least $250 million aggregate principal amount of the notes remain outstanding.  PX 18, at

BG842, BG852, BG864; Burns Decl. ¶ 15.  During that call, the issue of the date when

Chesapeake would have to give notice of its intention to exercise its redemption rights arose and

was discussed.  Burns. Decl. ¶ 16.[35]  Dell'Osso raised the concept of March 15, 2013,

functioning as the deadline for Chesapeake to give notice rather than as the deadline to complete

the entire redemption process.  *Id.*  By the end of the call, Chesapeake and the underwriters had

agreed with each other that Chesapeake "would be permitted to give notice of an early

---

[34] Nor did any party to those discussions over that weekend, or afterwards, suggest that that date
(February 13, 2013) be the last date on which Chesapeake could act to effect a redemption.
Maultsby Decl. ¶¶ 8–9.

[35] Although Burns did not specifically remember details of the call, "[t]he fact of the call, and its
general substance, stuck in [Burns's] mind because . . . the topic[] was a somewhat unusual
subject matter."  *Id.*

redemption at par until March 15, 2013 and, as long as they gave such notice by such date, redeem the bonds on a redemption date thereafter." *Id.* The effect of the agreement "was to change what had otherwise been a customary redemption mechanic." *Id.* The notice term to which the parties had agreed "was a unique term in [Burns'] experience that [he] had never seen in a prior deal." *Id.* Burns left the call with the understanding that Bracewell would incorporate the March 15, 2013 notice deadline into the Prospectus Supplement. *Id.* ¶ 17. Following the call, at 11:55 p.m. that evening, Maultsby emailed Dell'Osso, writing that BAML was "proud of the unique structure" of the offering. PX 19. As of this point, the parties had agreed that March 15, 2013, would serve as the final date on which Chesapeake could give a notice of special early redemption.

**3. *Telle/Burns***: On a call at some point on Saturday, February 11, 2012, Telle mentioned the idea to Burns of "changing the date in the Prospectus Supplement to provide that notice for a par redemption could be provided at any time during the early redemption period." Telle Decl. ¶ 23. Telle did so to gauge Burns' reaction to the concept; Burns "acknowledged the proposal and did not reject it." *Id.*

Early the next morning, *i.e.*, on Sunday, February 12, 2012, at 12:31 a.m., Bracewell's Hogan, carbon copying her colleagues at Bracewell, sent a revised draft of the Prospectus Supplement to Chesapeake, the underwriters, Cravath, and, this time, Bayard Chapin, an attorney for BNY Mellon, and Linda Garcia from BNY Mellon.[36] PX 20. That version of the draft included, in the "Description of Notes" section, the following sentence inserted by Telle, *see* Telle Decl. ¶ 21: "We may redeem the notes pursuant to the special early redemption provisions so long as the notice of redemption if [*sic*] given during the Early Redemption Period." PX 20,

---

[36] Linda Garcia is the signatory of both the Base Indenture and the Supplemental Indenture for BNY Mellon. *See* PX 4, 6.

at CHK8305; Burns Decl. ¶ 17.  Burns read the draft.  He recognized it as implementing the

parties' agreement on the call with Dell'Osso and at least one BAML banker from the night

before.  Burns Decl. ¶ 18.

Also on Sunday, February 12, 2012, during a 10 a.m. call with his team at Cravath, Burns

stated that the new language regarding notice should also be included in the "box" summary that

appears early in the Prospectus Supplement.  *Id.* ¶ 19.  At 4:12 p.m. that afternoon, Cravath, via

DeFrehn, sent back to Bracewell and the underwriters a markup of the Prospectus Supplement

draft.  PX 23; Burns Decl. ¶ 19; Telle Decl. ¶ 23.  That version accepted the new language

regarding notice that Telle had proposed.  PX 23; Burns Decl. ¶ 19; Telle Decl. ¶ 23.  It made

only cosmetic or grammatical changes to the document; it also attached a rider indicating, as

Burns had proposed to his team, that the language regarding notice should be copied into the

"box" summary.  PX 23, at CSM14086, CSM14095; Burns Decl. ¶ 19; Telle Decl. ¶ 23.

On Sunday night, February 12, 2012, an approximately three-hour phone call was held,

beginning at 9:56 p.m. and concluding at 12:53 a.m. the next morning, Monday, February 13,

2012.  *See* PX 26.  The participants were various representatives of Chesapeake, BAML, Morgan

Stanley, and their attorneys—including Telle.  *See* PX 26; Telle Decl. ¶ 24.  During the call,

Telle and his colleagues were finalizing the Prospectus Supplement at the financial printer.  Telle

Decl. ¶ 24.  During the call, as the changes to the draft Prospectus Supplement were being

discussed, the issue of the notice period came up.  Dell'Osso asked "something along the lines of

'I can redeem by giving notice up to March 15th, right?'  *Id.*  "[O]ne of the banks respond[ed]

affirmatively," saying "'That's right, that's the deal.'"  *Id.*

At 10:20 p.m. on February 12, 2012, Bracewell sent a printer's proof of the Prospectus

Supplement to Chesapeake, the underwriters, Cravath, and BNY.  It incorporated the changes

that had been made throughout that day, including the language regarding notice. PX 25, at BG1414, BG1438; Burns Decl. ¶ 19. At least two more rounds of editing took place that night and into the early hours of the next morning, including one sent by email from Cravath at 1:08 a.m. on Monday, February 13, with minor changes, *see* PX 28; Burns Decl. ¶ 20, and at least two more versions sent out by Bracewell, one at 3:13 a.m., *see* PX 30, and another at 7:35 a.m., *see* PX 32. Dell'Osso reviewed the final form of the Prospectus Supplement and "believed at the time of the notes offering, as well as today, that it accurately reflected the business deal I negotiated with BAML that afforded Chesapeake a four-month option period. . . . I understood that Chesapeake was permitted to . . . issu[e] its notice to redeem on any day during the four-month period, including on March 15." Dell'Osso Decl. ¶ 20.[37]

This preliminary Prospectus Supplement was distributed to prospective investors and filed publicly with the SEC. Telle Decl. ¶ 26; Maultsby Decl. ¶ 10; PX 32.[38] In final form, the relevant language in the Prospectus Supplement reads:

> Special Early Redemption. At any time from and including November 15, 2012 to and including March 15, 2013 (the "Early Redemption Period"), the Notes will be redeemable at our option in whole, or from time to time in part, at a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided that after any redemption of the notes in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal amount of the notes remains outstanding. We may redeem the Notes pursuant to the special early redemption provisions so long as the notice of redemption is given during the Early Redemption Period.

PX 32, at CHK5267.

---

[37] Dell'Osso "at no time . . . consider[ed] or discuss[ed] the possibility of a three-month period for our option, or a final date for us to act of mid-February, 2013," Dell'Osso Decl. ¶ 20, which is the length of the option period if one adopted BNY Mellon's reading of the Supplemental Indenture.

[38] The final Prospectus Supplement was also later filed with the SEC. Telle Decl. ¶ 27.

### 3.  February 13–16, 2012: The Deal

#### a.  The Deal Launches

At 8:12 a.m. on Monday, February 13, 2012, the deal launched and marketing

commenced.  Burns Decl. ¶ 21.  That morning, Maultsby took part in a conference call with

investors that included a slide presentation (the "Net Roadshow").  Maultsby Decl. ¶ 10; Tr.

207–11; DX 49; *see also* PX 31.  After that call, the pricing terms were memorialized by

Chesapeake and the underwriters in a Rule 433 pricing term sheet, which contained a provision

stating:  "The issuer may redeem the notes pursuant to the special early redemption provisions so

long as the notice of redemption is given during the Early Redemption Period."  PX 37, at

CHK5912.  That document was provided to investors who purchased the notes directly from the

underwriters on February 13; it was also filed on EDGAR, the SEC's online document system.

PX 2, 36; Maultsby Decl. ¶ 10; Tr. 227–28.

Over the course of the day, BAML allocated the 2019 Notes to a group of 166

institutional investors, *see* PX 39, who had been given, in addition to the pricing term sheet, the

preliminary Prospectus Supplement, *see* Maultsby Decl. ¶ 10.  That preliminary version was

substantially identical to the final Prospectus Supplement.  *Compare* PX 32, at CHK5267, *with*

PX 1, at CHK284.  It included the March 15, 2013 notice language quoted above.  Maultsby

Decl. ¶ 10; *see* Dell'Osso Decl. ¶ 21.

The Underwriting Agreement, prepared in the first instance by the Cravath attorneys,

Telle Decl. ¶ 31; *see* Burns Decl. ¶¶ 22–23, was executed that afternoon.  Burns Decl. ¶ 22.  The

executed Underwriting Agreement also contained the pricing term sheet with the identical notice

language.  PX 3, at CHK355; Burns Decl. ¶ 22; Maultsby Decl. ¶ 7.  The signed, execution copy

of the Underwriting Agreement was sent to the underwriters and Chesapeake at 6:55 p.m. on

February 13.  PX 37.  The Notes had begun trading on the secondary market that afternoon.

### b.  The Ninth Supplemental Indenture Is Drafted and the Deal Closes

The next step was to draft the Supplemental Indenture that would govern the 2019 Notes.

Customarily, the process of drafting a supplemental indenture is largely a mechanical one, in

which the text is primarily drawn from the description of notes section of the Prospectus

Supplement.  Telle Decl. ¶ 33; Burns Decl. ¶ 26; Maultsby Decl. ¶ 11; Dell'Osso Decl. ¶ 21; Tr.

123–24, 136.  At the point at which a supplemental indenture is drafted, the substantive terms of

a transaction are customarily not changed.  Telle Decl. ¶¶ 33, 38; *see* Burns Decl. ¶ 23; Maultsby

Decl. ¶ 11; Dell'Osso Decl. ¶ 21.

On Tuesday, February 14, 2012, at 6:44 p.m., Clay Brett, a Bracewell attorney, sent a

draft of the Ninth Supplemental Indenture by email to Chesapeake, Cravath, BNY Mellon, and

BNY Mellon's counsel at Emmet, Marvin, & Martin, LLP ("Emmet Marvin") inviting

comments.  PX 41.  He attached a redline against Chesapeake's Fifth Supplemental Indenture,

which the Bracewell team had used as a starting point in drafting the Ninth.  Telle Decl. ¶ 34; PX

41; Burns Decl. ¶ 24.  This draft of the indenture contained the following sentence, the last

phrase of which had been inserted by Telle:  "The Company shall be permitted to exercise its

option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of

redemption pursuant to Section 3.04 of the Base Indenture *prior to 5:00 p.m. (Central Time) on

March 15, 2013, even if such notice is received by Holders, or such redemption occurs,

following the Early Redemption Period*."  PX 41, at CHK2208 (emphasis added); Telle Decl. ¶

35; Burns Decl. ¶ 24.  Telle proposed adding this to the Supplemental Indenture, because he

believed that the early redemption section of the Indenture "could benefit from some additional language" and "wanted to provide 'belt and suspenders' clarity." Telle Decl. ¶¶ 35–36.

On Wednesday, February 15, 2012, in a 3:24 p.m. email, Cravath's Casey McDonald responded to Bracewell, reporting Cravath's comments on the Supplemental Indenture. PX 42; Burns Decl. ¶ 25. In this version, Cravath excised the italicized phrase above, replacing it with the prepositional phrase "during the Early Redemption Period" and adding a new sentence that read, "Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture." PX 42, at BG2637; Burns Decl. ¶ 25; Telle Decl. ¶ 37. After receiving the redline deleting his proposed edit, Telle telephoned Daniel O'Shea, a Cravath senior attorney. Telle Decl. ¶ 38. O'Shea explained that Cravath had made the change to keep the language in the Supplemental Indenture consistent with the language of the Prospectus Supplement. *Id.* The existing language, O'Shea stated, was sufficiently clear, and therefore Telle's additional language was not necessary. *Id.* Telle acquiesced to the edit. *Id.*[39]

At 6:01 p.m., Bracewell sent the Supplemental Indenture in execution form to Chesapeake, Cravath, BNY Mellon, and BNY Mellon's counsel at Emmet Marvin, inviting comments. PX 43; Burns Decl. ¶ 27.

On Thursday, February 16, 2012, the initial purchases of the Notes from the underwriters settled, Dell'Osso Decl. ¶ 21, and the offering closed, Burns Decl. ¶ 28.

---

[39] Dell'Osso, for his part, does not believe he reviewed any drafts of the Supplemental Indenture; he does believe, however, that he reviewed it in final form. Dell'Osso Decl. ¶ 21.

### C. Finding as to the Negotiating Parties' Intent

####     1.        The Bases for the Court's Finding

Based on the trial evidence, the Court comfortably finds that the parties who negotiated

the language of the Supplemental Indenture intended March 15, 2013 to serve as the last date for

Chesapeake to give notice of redemption, not as the deadline for redemption itself.  In so finding,

the Court recognizes that the actual document before the parties at the time they negotiated was

the Prospectus Supplement.  Its terms, including as to the notice deadline, were the subject of

extensive negotiations, between February 8 and 13, 2012, between the principals of and counsel

for Chesapeake and lead underwriter BAML.  However, the evidence conclusively showed that

the terms and text of the Prospectus Supplement, including the language that became § 1.7(b),

were—and were intended to be—imported into the Supplemental Indenture, whose text was not

the subject of independent negotiations.[40]  The negotiations leading to the Prospectus

Supplement are thus properly considered in gauging the intent of the drafters of Supplemental

Indenture § 1.7(b).  *See also supra* pp. 39–40.

The core basis for the Court's finding is simple:  As recapped immediately below, all four

participants in the negotiations as to the operative deadlines governing the 2019 Notes who

testified at trial (Burns, Dell'Osso, Telle, and Maultsby) testified that Chesapeake and the

underwriters openly communicated, and agreed, with each other that the language that became

§ 1.7(b) set March 15, 2013 as the deadline for Chesapeake to give notice of redemption.  And

---

[40] *See, e.g.*, Burns Decl. ¶ 6 ("The contractual terms of the supplemental indenture are intended to conform to those described in the prospectus supplement and pricing term sheet" and "are not viewed as subject to any further negotiation."); Maultsby Decl. ¶ 11; Tr. 136; *compare* PX 1, at CHK284 (Prospectus Supplement), *and* PX 2, at CHK359 (pricing term sheet), *with* PX 4, at CHK372 (Supplemental Indenture), *and* PX 5, at BG2869 (2019 Note).

the documentary evidence received at trial, and the attendant circumstances, both addressed

immediately following this recap, corroborate this testimony.

Burns, the Cravath lawyer representing BAML, testified that this subject was addressed

on the February 11, 2012 call, on which he, Chesapeake CFO Dell'Osso, and others, including at

least one underwriter, participated.  Burns Decl. ¶ 16.  Burns testified that Dell'Osso "raised the

concept of being able to redeem the notes so long as notice was given by March 15."  *Id.*  He

added:

> When I got off the call, it was my understanding that the Company and the
> underwriters had agreed as a business matter that the Company would be
> permitted to give notice of an early redemption date at par until March 15, 2013
> and, as long as they gave notice by such date, redeem the bonds on a redemption
> date thereafter.  The effect of adding the notice concept was to change what had
> been a customary redemption mechanic.

*Id.*  The following morning, Burns testified, he awoke to receive the draft Prospectus Supplement

as Bracewell had revised it overnight.  It included a sentence permitting redemption "pursuant to

the special early redemption provisions so long as the notice of redemption if [*sic*] given during

the Special Early Redemption Period."  *Id.* ¶ 17; *see also* PX 20, at CHK8305.  And, Burns

testified:  "In light of the telephone discussion that I had heard the night before," this language

did not surprise him, because it "reflect[ed] what I understood was agreed and what Chesapeake

wanted to include."  *Id.* ¶ 18.  The sentence added by Bracewell is functionally identical to the

critical second sentence of § 1.7(b).

Dell'Osso, for his part, recalled participating in a phone call the same weekend, involving

representatives of BAML.  Dell'Osso Decl. ¶ 17.  The call focused on "the time period in which

Chesapeake could act to exercise its option," which, Dell'Osso testified, was what was important

to him at the time.  *Id.*  Although Dell'Osso did not "recall a specific conversation on that call

about the notice concept," he did recall that his focus was "on the time that the Company had to

act, not on the date the payment would need to be made to the noteholders." *Id.* That concept is consistent with setting out, in the deal documents, a deadline for Chesapeake to give notice. It less naturally describes a deadline for the completion of the redemption process. Consistent with this, Dell'Osso testified, when he reviewed the final form of the Prospectus Supplement, he believed that it "accurately reflected the business deal I negotiated with BAML that afforded Chesapeake a four-month option period" ending on March 15, 2013 to give notice to retire the notes at par. *Id.* ¶ 20.

Telle, in turn, testified that, to effectuate Chesapeake's goals, in the early morning hours of Sunday, February 12, 2012, he personally modified the draft Prospectus Supplement "to convert what would typically have been a period for completing any redemption into a period for giving notice of redemption." Telle Decl. ¶¶ 20–21. The sentence he added is the one which Burns testified accurately reflected the parties' agreement on the late evening phone call on February 11. *Compare id.* ¶ 21, *with* Burns Decl. ¶ 17. Consistent with this, Telle testified he recalled at least two conversations over the weekend of February 11 and 12, 2012, and exchanged drafts with Cravath, in a series of events that together signified the underwriters' agreement to the change. Telle Decl. ¶ 22. One conversation was with Cravath's Burns on Saturday, February 11, in which Burns acknowledged the proposal. *Id.* ¶ 23. The following day, Cravath sent comments on the Prospectus Supplement back to Chesapeake, accepting the notice sentence that Telle had added. Cravath had added a rider copying the sentence into the Prospectus Supplement's prominent summary "box." PX 23. Telle understood these changes to reflect the underwriters' assent to the notice provision. Telle Decl. ¶ 23. Telle also recalled a conversation that evening, while at the printer, among BAML, another underwriter (Morgan Stanley), Chesapeake, and their lawyers, at which "the notice concept was specifically discussed

as the group worked through various changes to the draft prospectus supplement." *Id.* ¶ 24. As noted above, Telle recalled Dell'Osso stating, in effect, "I can redeem by giving notice up to March 15th, correct?" and that one of the underwriters "respond[ed] affirmatively and sa[id], 'That's right, that's the deal.'" *Id.*

Finally, Maultsby, of BAML, testified that he spoke to Dell'Osso "about the time period in which Chesapeake would be able to decide whether to exercise its option to redeem the bonds at par." Maultsby Decl. ¶ 7. Although Maultsby did not recall the specifics of that conversation, he did recall they had agreed on the terms of the provision that became the second sentence of § 1.7(b). And, he testified that, at that time, he understood "that sentence to mean that Chesapeake could issue a notice to redeem the 2019 Notes at par as late as March 15, 2013." *Id.* ¶ 8.

This assembled testimony convincingly establishes that Chesapeake, BAML, and their respective counsel communicated to each other, and mutually understood, that the second sentence that they inserted during the weekend of February 11–12 was a notice provision, with the deadline for Chesapeake to give notice of redemption being March 15, 2013. The Court has carefully considered whether there is a basis for discrediting any, let alone all, of these witnesses. There is none. Each projected as credible. Each supplied testimony, in writing and in person, that was nuanced and thoughtful. Each candidly acknowledged the limits to his recollections.

To be sure, none of Messrs. Burns, Dell'Osso, Telle, and Maultsby recalled the events of that weekend in precisely the same way, and BNY Mellon seeks to discredit their testimony on the grounds that the witnesses' recollections were vague and dissonant as to particulars. But the witnesses' deviations were as to collateral points, unlikely to be remembered more than a year after the fact—for example, which persons participated in which phone call during a corporate

deal that unfolded quickly over a weekend. Such dissonances are natural and to be expected. If anything, they are hallmarks of credibility, in that they tend to refute that the witnesses coordinated their stories. It is, further, unsurprising that these witnesses would recall the substance of their negotiated agreement more acutely than logistical niceties. The Court accepts the thrust of each witness's testimony as truthful and accurate.[41]

The documentary evidence received at trial is consistent with these witnesses' testimony. It confirms that, in the early morning hours of Sunday, February 12, 2012, beginning with the draft circulated by Telle, drafts of the Prospectus Supplement began to be exchanged which, for the first time, included a sentence addressing Chesapeake's issuing notices of redemption. *See* PX 20. Even in its first incarnation, that sentence is an easily recognizable precursor to the eventual second sentence of § 1.7(b). And the undisputed testimony at trial, from lay and expert witnesses alike, was that it is quite unusual for a bond indenture to link a redemption window to the notice date. *See* Burns Decl. ¶ 16 ("This was a unique term in my experience that I had never seen in a prior deal."); Telle Decl. ¶ 20 ("unique conditions for redemption"); Finnerty Rep. ¶ 14 (indenture with "defined time period for the issuer to give notice" is "virtually unprecedented"); Tuckman Rep. 13 (concluding that § 1.7(b) "serves only to disallow notice of a par redemption before . . . November 15, 2012"); Tr. 397–98 (Tuckman describing § 1.7(b)'s inclusion of "during the Special Early Redemption Period" as "much less common" and testifying that he had not seen a similar provision before).

The question therefore naturally arises: For what reason was the idiosyncratic language that became that second sentence added that weekend to the future § 1.7(b)? Only one party,

---

[41] The Court recognizes that each of these witnesses, to varying degrees, had a reputational and/or business interest in validating Chesapeake's position in this litigation. The Court has considered whether these interests compromise the credibility of any of these witnesses. The Court, emphatically, concludes not.

Chesapeake, offered evidence that credibly explained this noteworthy addition.  Taken together, the testimony of the above four witnesses, and the surrounding documents, were convincing as to Chesapeake's motivation for inserting such an unusual provision that weekend.  This circumstantial evidence strongly supports Chesapeake's thesis that the second sentence of § 1.7(b) was added with the intention of pushing until later in time the four-month window within which Chesapeake could decide to act to trigger a redemption.

By contrast, the record is devoid of extrinsic evidence as to why any party at the table in February 2012 would have wanted to add language with the effect posited by BNY Mellon.  BNY Mellon's claim, as noted, is that the second sentence of § 1.7(b) serves to limit the time span during which redemptions at par could occur by shortening, at the front end, what would otherwise be a four-month period for actual redemption, to the period between December 15, 2012 and March 15, 2013.  Were this the case, one would expect to see some evidence in support: for example, testimony of a participant as to a business or legal reason that was articulated during the February negotiations for truncating the redemption period so as to bar redemptions between November 15, 2012 and December 14, 2012.  Or, perhaps, emails or other contemporaneous records reflecting or suggesting a business or other motive to defer the start of the period for actual redemption.  But no such evidence, of any kind, was offered, despite the ample documentary and deposition discovery taken in the case.

BNY Mellon's proposed construction of § 1.7(b) is, thus, completely ahistorical.  Indeed, far from there being evidence that any person at the table during February 11–12, 2012 had any desire to trim the redemption period further, the evidence at trial showed that Chesapeake CFO Dell'Osso had preferred a *longer* redemption period, of up to 12 months, *see* PX 10, but had, by February 10, at the underwriters' behest, agreed to scale that period back to four months.

Dell'Osso Decl. ¶ 17; *see also* PX 13, at CHK811, CHK820.  There was no evidence of any push afterwards to trim the redemption period at the front end.  *See* Tr. 151 (Burns does not recall any conversation that weekend about the front end of the period).

Finally, although not necessary to the Court's determination as to the intent of the drafters of § 1.7(b), the extrinsic evidence surrounding Bracewell's attempt on February 14, 2012, to add a clause to § 1.7(b) tends to corroborate, and it certainly does not undermine, Chesapeake's claim as to the understanding of the negotiating parties.  By that day, the Prospectus Supplement was complete and the 2019 Notes had been sold pursuant to it. Bracewell was drafting the Supplemental Indenture.  Bracewell proposed to Cravath, as relevant here, that a clause be added to the text being imported from the Prospectus Supplement.  That clause, in italics below, would clarify that March 15, 2013 was the deadline for notice, not for redemption:

> The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture prior to 5:00 p.m. (Central Time) on March 15, 2013, *even if such notice is received by Holders, or such redemption occurs, following the Early Redemption Period.*

PX 41, at CHK2199 (emphasis added).  The following day, however, Cravath deleted the clause proposed by Bracewell, *see* PX 42, at BG2637, with the result that the second sentence of § 1.7(b) in the Supplemental Indenture is almost unchanged from the text of the final Prospectus Supplement.  *Compare* PX 43, at CHK2249, *with* PX 1, at CHK261.

As the Court recognized at the time it denied Chesapeake's application for emergency relief, one possible inference is that the rejection of that language reflected that the parties did not intend to permit a redemption at par after March 15, 2013.  *See* 3/14/13 Hr'g Tr. 22–23.

BNY Mellon so argues here.  However, as the Court noted, the clause proposed by Bracewell could have been excised for a reason other than a party's substantive disagreement with it.  *Id.*

The evidence received at trial is consistent with the latter thesis.  Telle testified that Bracewell was not seeking to change the terms of the Notes, but instead saw them as clarifying changes "consistent with converting the disclosure terms of the prospectus into contractual language."  Telle Decl. ¶¶ 35–36.[42]  After Cravath rejected this language, Telle testified, Cravath's O'Shea explained to him that the changes had been intended to keep the Indenture language consistent with the language in the earlier disclosure documents and to conform the § 1.7(b) language to that in the Prospectus Supplement.  *Id.* ¶ 38.  Telle also testified that O'Shea explained to him that the language in the Prospectus Supplement already made it sufficiently clear that March 15, 2013 was the deadline for giving notice, and that additional language to that effect would be superfluous.  *Id.*  Even if not taken for the truth of the matters asserted,[43] this statement during negotiations to Telle by a counterparty regarding the meaning of the unamended text of § 1.7(b) bears on the parties' common understanding of that provision.

In any event, even if the exchange between Telle and O'Shea were not taken as assisting Chesapeake's cause, ample extrinsic evidence at trial undermines BNY Mellon's claim that the

---

[42] Because Telle did not communicate this view to the underwriters or their counsel, the Court does not consider this statement by Telle as bearing on the collective intent of the negotiating parties, but solely to explain Telle's conduct.  *See World Trade Ctr. Props.*, 467 F.3d at 125.

[43] O'Shea's statement is admissible because it was made to Telle during negotiations between Chesapeake and BAML, and Telle was a firsthand witness to O'Shea's statement.  (O'Shea did not testify at trial, and in deposition, a Rule 30(b)(6) witness testifying on behalf of Cravath stated that O'Shea, a former associate, does not recall offering comments on the Bracewell draft of the Supplemental Indenture.  Tr. 125–26.)  The Court, however, does not consider O'Shea's statement as related by Telle for the truth of the matters asserted by O'Shea, who is not a party opponent of Chesapeake's at trial.  The Court instead considers O'Shea's statement for the limited fact that it was stated during contract negotiations and for its bearing on the state of mind, intent, and contract understanding of counterparty Telle.

rejection of that language by Cravath was a repudiation of its substance.  Consistent with the explanation articulated to Telle, Cravath partner Burns testified at trial that the language of the Supplemental Indenture essentially imported the language of the Prospectus Supplement, and that associates who work for him "are under standing instructions in such situations to conform, closely if not exactly, the draft indenture to the applicable provision in the description of notes of the prospectus supplement."  Burns Decl. ¶ 26; *see* Tr. 136.  Telle, too, testified that he understood at the time that "[b]ecause the Prospectus Supplement sets forth the terms of the 2019 Notes, as agreed between the issuer and the underwriters, drafting the Supplemental Indenture is essentially a mechanical task."  Telle Decl. ¶ 33.  Maultsby's testimony was of a piece.  *See* Maultsby Decl. ¶ 11 ("My understanding is that the Supplemental Indenture should reflect the business terms set out in the pricing term sheet and the Prospectus Supplement which disclosed the basis on which the 2019 Notes were sold to the initial investors . . . .").  Further, as of February 14, 2012, the Prospectus Supplement was final and the 2019 Notes were already trading in the market.  *See* Telle Decl. ¶¶ 26–27; Burns Decl. ¶¶ 21, 23; Dell'Osso Decl. ¶ 21. On the basis of this testimony, the Court concludes that Cravath's rejection of the language proposed by Bracewell was not a substantive repudiation.

The Court, therefore, finds that—even if § 1.7(b) were held textually ambiguous—the extrinsic evidence convincingly establishes a meeting of the minds among the negotiating parties as to the deadlines governing redemption at par of the 2019 Notes.  The Court finds that these parties intended and agreed that March 15, 2013 would serve as the deadline for Chesapeake to give notice of redemption.[44]

---

[44] In light of the ample evidence of bilateral communications between Chesapeake and the underwriters reflecting this shared intent, the Court need not rely on the testimony of the principals as to their personal understandings in February 2012 of the meaning of § 1.7(b).  A

### 2.      The Extrinsic Evidence on Which BNY Mellon Relies

On the basis of evidence of how Chesapeake and others have characterized the terms

governing the 2019 Notes, BNY Mellon argues that the extrinsic evidence supports its

construction.  This evidence falls into three categories.  The Court discusses them in turn.

### a.      Chesapeake's Post-Negotiation Statements

Most significantly, BNY Mellon argues, various statements made by Chesapeake after

the 2019 Notes were issued support that March 15, 2013 was the deadline for redemption, not

notice.  BNY Mellon argues that, during the period between mid-February 2012 and early 2013,

"Chesapeake consistently described the dates November 15, 2012 through March 15, 2013 as

'redemption dates' and otherwise understood and represented the Special Early Redemption

Period as just that—a period in which to redeem the Notes if it wished to do so at par."  BNY

Pretrial Br. 32.  BNY Mellon argues that these statements reflect Chesapeake's "practical

interpretation of [the] contract," which in turn merits "great, if not controlling, influence," *id.* at

35 (quoting *Sanchez v. Maher*, 560 F.2d 1105, 1108 (2d Cir. 1977) (quoting *Old Colony Trust

Co. v. City of Omaha*, 230 U.S. 100, 118 (1913))), over how § 1.7(b) is to be construed.

**1.  *The Debt Summary Schedule***:  As BNY Mellon notes, shortly after the 2019 Notes

were issued, Chesapeake posted on its website a "Debt Summary Schedule" reporting the

Notes' key terms.  DX 75, 79.  The schedule's initial draft was prepared by Conrad Holub, a

---

party's private state of mind is generally not admissible to prove the negotiating parties' intent,
*see World Trade Ctr. Props.*, 467 F.3d at 125, although where, as here, both parties to a
negotiation have testified to a common, although unexpressed, subjective intent, such testimony
has sometimes been admitted, *see supra* p. 35 n.24 (collecting cases).  Were that testimony
considered, it would reinforce Chesapeake's position:  All four principals who testified at trial
stated that they understood at the time of the negotiations that Chesapeake could exercise its
right to redeem at par by issuing its notice to redeem up to March 15, 2013.  Dell'Osso Decl.
¶ 20; Burns Decl. ¶ 29; Telle Decl. ¶¶ 21–22; Maultsby Decl. ¶¶ 8–9.  No participant in the
negotiations over the language of § 1.7(b) testified otherwise.

financial analyst in the Treasury Department, *see* Holub Dep. 48; later drafts were reviewed by Susan Seymore and Elliot Chambers, both of whom were members of Chesapeake's deal team for the 2019 Notes.  *See* DX 75, 79; Chambers Dep. 62; Holub Dep. 65–66; Tr. 248–49.  In a row reporting the 2019 Notes' "Optional Redemption Dates," the schedule states: "from and including 11/15/12 to and including 3/15/13 @ 100% of principal," and "make whole call @ T+50bps at any time after 3/15/13 to maturity."  DX 79.  At his deposition, Chambers testified that he believed that the information on the schedule as to the Notes' optional redemption dates was "correct."  Chambers Dep. 63.  At trial, however, Chambers testified that he does not believe that the information on the website was "complete."  Tr. 273.

BNY Mellon is fair to fault Chesapeake's website schedule.  Unhelpfully, it says nothing about the possibility of a redemption at par after March 15, 2013.  The schedule also does not state that Chesapeake regards the four-month period to which it refers as the period for giving *notice* of redemption.  An objective reader of the schedule could easily conclude that that four-month period ending March 15, 2013 reflects instead the period for redemptions at par.

However, neither the schedule, nor Chambers's testimony that he regarded it as "correct," illuminates the intent of the parties (Dell'Osso and Telle) who on Chesapeake's behalf actively negotiated § 1.7(b) with the underwriters.  There is no evidence that either played any role in preparing or approving the schedule, let alone that either reviewed it attentively.  And Holub, who drafted the schedule, testified:  "I didn't fully understand the notes when I was doing it.  I kind of did it—I wouldn't say hastily, but I didn't review all of the prospectus.  So I just found that part of the special redemption features and drafted it up at that time without fully understanding it."  Holub Dep. 65.  Further, by its nature, the schedule is a sparse shorthand summary comprised of pre-set categories (*e.g.*, "optional redemption date") in which there is

67

limited room for explication.  It does not purport to explain the terms of the 2019 Notes.  And the schedule equally undermines BNY Mellon's construction of § 1.7(b):  Under BNY Mellon's construction, redemption—contrary to the schedule's implication—cannot occur between November 15 and December 14, 2012.  Instead, BNY Mellon claims, it can occur only in the ensuing three months.

In sum, the schedule may fairly be viewed as incomplete or misleading, but this regrettable lapse—whether attributed to Chambers, Seymore, and/or Holub—does not shed light on the intent of the drafters of that provision.[45]

**2. *The Form 10-Q***:  BNY Mellon next cites the Form 10-Q that Chesapeake publicly filed in May 2012, three months after it issued the 2019 Notes.  *See* DX 83.  Drafts of the 10-Q were reviewed or commented on by, among others, Chambers, Seymore, Grigsby, and CFO Dell'Osso.  DX 82; Tr. 275–76; Dell'Osso Dep. 202.[46]  The final 10-Q that resulted states, in pertinent part:

> At any time from and including November 15, 2012, to and including March 15, 2013, we may redeem some or all of the notes at a redemption price equal to 100 percent of the principal amount of the notes plus accrued and unpaid interest, if

---

[45] As discussed in greater detail *infra* at pp. 72–74, Chambers participated in the drafting of the Prospectus Supplement for the 2019 Notes.  Chambers Dep. 26, 30–31; Tr. 248–50.  However, there is no affirmative evidence that Chambers participated in the pivotal calls between representatives of Chesapeake and BAML on which the notice and deadline issues were discussed and resolved.  It is possible that in February 2012, Chambers did not clearly understand what the March 15, 2013 deadline represented; it is possible that he understood it then but lost sight of it later; and it is possible that he was careless afterwards in his review of Chesapeake documents describing the 2019 Notes.  Chambers's state of mind, and his characterizations of the terms of the 2019 Notes, reveal little or nothing about the drafters' shared intent at the time of the negotiations.

[46] In a May 5, 2012 email sent to Seymore and Mary Ann Sanders, an accounting manager at Chesapeake, Chambers stated, "I wanted to make sure the 6.775 notes par call option for Nov 2012 to Mar 2013 is discussed.  Didn't recall seeing that, but maybe I overlooked it."  DX 82; Tr. 276–77.

any, to the redemption date, provided that upon any redemption of the notes in part (and not in whole) pursuant to this redemption provision, at least $250 million aggregate principal of the notes remains outstanding.

DX 83, at 13; *see* Tr. 279.

Like the debt summary schedule, the description of the 2019 Notes used in the 10-Q leaves much to be desired.  The 10-Q says nothing about a possible redemption of the 2019 Notes at par after March 15, 2013.[47]  At best, its statement as to the redemption dates is imprecise; at worst, it may be seen as contradicting Chesapeake's position that § 1.7(b) makes March 15, 2013 the deadline for notice, not redemption.  As the Court has noted earlier, the phrase used in the 10-Q, "may redeem" ordinarily refers to the act of redemption.  *See supra* pp. 23–25.  Because the 10-Q is silent about notice, it could easily lead an investor, reading it in isolation, to assume that March 15, 2013 was the deadline for special early redemption.

But the 10-Q does not assist BNY Mellon on the issue of contract interpretation before the Court.  There was no evidence that the process of generating the 10-Q's description of the 2019 Notes involved any concerted focus on their redemption date.  And although CFO Dell'Osso signed the 10-Q, *see* DX 83, at 102; Dell'Osso Dep. 202, there was no evidence that he focused on its one-sentence synopsis of the 2019 Notes, let alone the characterization of the at-par redemption period.  That was an easy-to-overlook point in the context of the 102-page 10-Q.  The 10-Q's description of the 2019 Notes is also high-level and very general.  It omits several key features of the 2019 Notes, including the precise maturity date, the interest payment dates, and the make-whole provision itself, *see generally* DX 83, presumably because such terms, although material to a purchaser, may not be material for the purposes of a 10-Q.  There is, therefore, no basis to conclude that the 10-Q's synopsis reflected anything other than

---

[47] At trial, Chambers testified that he believed the 10-Q "summarized the [2019 Notes] transaction sufficiently for this document."  Tr. 279.

inattention or sloppiness.  And a party's errant *post hoc* description of an agreement does not unilaterally modify its terms or disturb the intent of the negotiating parties, who also included the underwriters.

Finally, the 10-Q equally defeats BNY Mellon's construction of § 1.7(b).  Like the website schedule, the 10-Q posits a period for actual redemption (November 15, 2012 through March 15, 2013) that both parties agree cannot possibly be correct given the second sentence of § 1.7(b).  The 10-Q thus may be inaccurate, but it says nothing about the intent of the drafters of § 1.7(b) or how to resolve the contractual ambiguity that the Court (for present purposes) assumes.

**3.  *The Quarterly Treasury Report*:**  In December 2012, Chesapeake prepared a quarterly treasury report, DX 102, a 38-page internal document intended to "summarize . . . transactions and activity" and to "inform about the company's capital structure."  Tr. 281.  The report contains a chart resembling the one on the website schedule.  In a column entitled "Optional Redemption," it lists the following information as to the 2019 Notes: "from and including 11/15/12 to and including 03/15/13 at 100 %  principal" and then, in a box immediately below, "make whole call @ T+50bps at any time after 3/15/13 to maturity."  DX 102, at CHK14869.

BNY Mellon is right to claim that this internal report, too, sits uneasily alongside Chesapeake's construction.  It says nothing about a potential redemption at par after March 15, 2013.  It is silent as to the deadline for Chesapeake to give notice of redemption.  And the report contains a footnote that states, "[t]he make-whole optional redemption terms for the 6.775% Senior Notes due 2019 take effect after 3/15/2013," *id.*, at CHK14869 n.2, implying that a redemption after March 15, 2013, would be at the Make-Whole Price, not par.

The report does not, however, bear on the proper construction of § 1.7(b).  There was no evidence at trial that traced authorship—or considered review—of the report to a primary drafter of § 1.7(b).  And, like the website schedule, the chart used in the report consists of cramped, pre-fabricated categories that leave little space for amplification and elaboration.  Whether errant or merely inartfully phrased, the report does not shed light on the drafters' intent.  And, like the debt summary schedule and the 10-Q, the report's range of "11/15/12 to and including 3/15/13" is inconsistent with BNY Mellon's construction of § 1.7(b), because BNY Mellon posits a three-month, not a four-month period for redemption.

**4.  *The Treasury Manual*:**  BNY Mellon argues that another internal document, Chesapeake's Treasury Manual (the "Manual"), DX 90, reveals that March 15, 2013 was the deadline for a redemption at par.  Tr. 290–94.  The 61-page Manual includes a column entitled "Optional Redemption."  It identifies as the date range for 100% (par) redemptions November 15, 2012, through March 15, 2013.  DX 90, at CHK10506; Tr. 294.  Unlike the preceding three documents, the Manual addresses the concept of notice.  In a section entitled "Redemption and Prepayment," it states:

> Redemption Notice to Holders:  At least 30 but no more than 60 days before redemption date directly to Holders or at least 45 days before redemption date to the Trustee.

DX 90, at CHK10506.

The Manual seems inconsistent with Chesapeake's position as to the operative deadlines.[48]  The Manual states that notice to the 2019 Noteholders must be given 30 to 60 days before the "redemption date."  To make that provision sensible, the "redemption date" must

---

[48] In questioning Chambers at trial and at his deposition about the Manual, BNY Mellon focused on another provision in it, entitled "Security Redemption Notice to Trustee."  Tr. 293–94; Chambers Dep. 73–74.  Both provisions use the term "redemption" inconsistently.  The analysis here therefore applies equally to both.

mean the date cash changes hands—as Chambers acknowledged.  Tr. 294; Chambers Dep. 73–

74.  But if so, then the redemption deadline of March 15, 2013 that the Manual lists presumably

has the same meaning.  Yet that is inconsistent with Chesapeake's construction of § 1.7(b).

That said, the Manual, however construed, is unrevealing as to the intent of the drafters of

§ 1.7(b).  First, there is no evidence that Dell'Osso (or outside counsel Telle) had a hand in

creating it or closely reviewed it.  Second, although Chambers and Chesapeake treasurer Jennifer

Grigsby received and may have reviewed the Manual, *see* Tr. 290; DX 90; *cf.* Chambers Dep. 72

(stating that Chambers "d[oes] not recall" if he reviewed the document), there is no evidence that

either had participated in negotiating the terms or language of § 1.7(b).  Any failure on their part

to correct or augment the language of the Manual says little, if anything, about how the drafters

understood § 1.7(b).  Third, the evidence at trial did not establish how the language in the

Manual came to be there.  There is no basis to conclude that the language reflected a concerted

judgment by Chesapeake that the dates set forth therein reflected the intent of the drafters of

§ 1.7(b).  It may instead have been the result of inattention, or of carelessly replicating the

language used to describe Chesapeake's conventionally-structured bond indentures without

considering the unique redemption terms of the 2019 Notes.  Fourth, the Manual, not unlike the

website schedule and the Treasury Report, presents data about the 2019 Notes in a restrictive

columnar schedule that permits but does not invite elaboration.  Fifth, even treating the date

range recited in the Manual as the dates for redemption would not assist BNY Mellon, because

that range (November 15, 2012, through March 15, 2013) is flatly inconsistent with BNY

Mellon's construction of § 1.7(b).

**5.** ***Chambers's*** **Post Hoc** ***Understanding***:  Noting that Chambers was an active member

of the deal team, BNY Mellon emphasizes his personal understanding during part of 2012 and

early 2013 of the early redemption features of the 2019 Notes.  Specifically, Chambers testified

that, during "the latter part of 2012" leading up to midday on January 9, 2013, he had believed

that March 15, 2013 was the deadline for completion of the redemption process, not notice.  *See*

DX 108, at CHK30853 (January 9, 2013, email to Caleb Morgret:  "Are you sure about that?  I

thought we had to provide notice by Feb[.] 15th and the window closes on March 15th.");  DX

101, at CHK18860; Chambers Dep. 87–90, 93, 248–49; Tr. 308, 311.

However, Chambers's post-negotiation perspective, notwithstanding his role on the deal

team that developed the 2019 Notes, *see* Chambers Dep. 26, 30–31; Tr. 248–50, says little about

the collective intent of the drafters of § 1.7(b).  Chambers testified generically that he recalled

that "there were conversations" during the drafting of the Prospectus Supplement about potential

redemption provisions.  Chambers Dep. 30–31.  He could not, however, recall "specific

conversations," nor did he mention the issue of notice, in particular, as having arisen in them.  *Id.*

And, despite extensive discovery, there was no evidence that Chambers had participated in the

critical conversations, chronicled above, in which the decision was made to insert the

consequential second sentence into what became § 1.7(b).  Further, as of the time on January 9,

2013 when Chambers emailed his direct report Morgret, a supervisor in the corporate finance

department, and stated that he understood that the redemption "window closes on March 15th,"

DX 108, Chambers had not recently reviewed the deal documents.  Chambers Dep. 249; Tr. 326.

Notably, the emails received at trial showed that, shortly after Chambers sent that January

9, 2013 email, Morgret responded.  DX 108; Tr. 327; Chambers Dep. 92.  Reporting that he had

"[c]hecked with Paul [Ingram, Chesapeake's internal counsel]," Morgret corrected Chambers,

explaining that Chesapeake had until March 15, 2013, to give notice.  DX 108.  Later that day,

Morgret informed Chambers that the attorneys at Bracewell agreed that March 15, 2013 was the

deadline for notice, not redemption at par.  DX 108, at CHK30859; Tr. 328; Morgret Dep. 100.

From that point forward, Chambers testified, his view, heeding the guidance of Chesapeake's

counsel, was that March 15, 2013 was a notice, not a redemption, deadline.  Chambers Dep.

107–08; Tr. 333–34.  Chambers's change of perspective predated, by more than a month, the

onset of the dispute that spawned this lawsuit.  From this episode, it appears that there had been,

until January 9, 2013, differing views between Chambers and Morgret as to what the March 15,

2013 date represented.  That several employees took opposite views about a deadline establishes

confusion among mid-level employees as to that point.  It does not disturb the uniform testimony

of the persons who drafted and adopted § 1.7(b), as to what the March 15, 2013 deadline

represented.

In sum, Chambers' post-negotiation perceptions as to the meaning of a contract term,

during one stretch of time, do not, on the record before the Court, shed light on the intent of

those who negotiated that term.

**6.**  ***Communications with Rating Agencies***:  Finally, BNY Mellon relies on

communications between Chambers and various rating agencies.  Acting as lead liaison between

Chesapeake and the rating agencies with respect to the company's bonds, *see* Tr. 258, Chambers

sent the Prospectus Supplement to rating agencies, including Fitch, Moody's, and Standard &

Poor's ("S&P").  Tr. 258–59; *see* DX 58 (Fitch), 197 (Moody's), 198 (S&P).  S&P responded by

sending a draft release to Chambers, with copies to Dell'Osso, Grigsby, and Seymore, and

soliciting comments on the draft.  DX 51; Tr. 261–64.  S&P's draft release said nothing about a

notice deadline or that Chesapeake could redeem at par after March 15, 2013.  Instead, S&P

stated, in the pertinent bullet-point, that "some of the notes could be redeemed at par prior to

mid-March, 2013."  DX 51, at CHK2068.  None of the Chesapeake recipients acted to revise

74

S&P's release.  Tr. 265–67; *see* DX 201.  For its part, Moody's draft release ignored the early

redemption at par provision altogether.  *See* DX 56.  It, too, went uncorrected by Chesapeake,

despite a request by Moody's to Chambers to review the release for "factual errors."  *Id.* at

CHK6785.  (The trial record does not reflect what, if anything, Fitch eventually published.)

 BNY Mellon urges that a negative implication be drawn as to the meaning of § 1.7(b)

from Chesapeake's failure to correct S&P's and Moody's inaccurate releases.  But no such

implication is merited.  Whatever the causes may be of the fact that Chesapeake did not ask

either rating agency to revise its representations as to the 2019 Notes, there was no evidence at

trial on which the Court could find that the company's inaction reflected agreement by its

negotiators and the underwriters, as of mid-February 2012, that March 15, 2013 was the deadline

for redemption at par.[49]  And to the extent that Chesapeake dropped the ball in not responding to

S&P's and Moody's requests for comments, those lapses may have been attributable to

Chambers (the rating agencies' point of contact) and/or his staff.  Further, Seymore's statement

to Jeff Mobley, who headed Chesapeake's investor relations group at the time, that there was

"[n]ot much to the release so in the interest of time J[ennifer Grigsby] went ahead and approved

it," DX 201, indicates, plausibly, that the releases received only cursory attention within

Chesapeake.

 In sum, the record lacks solid, non-speculative evidence favoring BNY Mellon's thesis

that Chesapeake's negotiators and their BAML counterparts privately rejected Chesapeake's

construction of § 1.7(b) and instead shared BNY Mellon's.  The Court is left, therefore, to

conclude that the various inaccurate, or incomplete, statements that BNY Mellon has unearthed

---

[49] Notably, Chesapeake furnished the rating agencies with a copy of the Prospectus Supplement, which included the language that became § 1.7(b).  Tr. 258; *see* DX 197, 198.  The record is silent whether the rating agencies read, let alone thoroughly analyzed, that provision.

reflected, at worst for Chesapeake, a misconception that took root within Chesapeake, particularly via Chambers, about the deadlines governing the 2019 Notes.  Having taken root, this misperception appears to have replicated itself in the internal and external communications on which BNY Mellon seizes.  If Chambers or his co-workers were incorrect or untutored as to the operation of the Supplemental Indenture's unusual redemption provision, it is easy to see how such a misconception could have taken root and spread.

It further appears that Chesapeake failed to appreciate the need to adapt its conventional structures for reporting redemption dates to the novel notice-based redemption terms of § 1.7(b).  That § 1.7(b) did not set out a final redemption date, but set out only the final date for notice and left the reader to compute the final redemption date (May 14, 2013) by consulting Base Indenture § 3.04, also may have contributed to an internal misconception that the redemption date was March 15, 2013.  That was, after all, the last date identified in the Supplemental Indenture.  And because the redemption deadline was presumably relatively unimportant to investors until early 2013 when the notice and redemption deadlines began to loom, it is easy to see how this error could long go unspotted while it was reproduced in various Chesapeake communications.

But the job of the Court in this case is to interpret an indenture provision.  It is to discern the intent of the drafters.  It is not to tally the number of times that Chesapeake personnel characterized March 15, 2013 as a redemption deadline and contrast it to the number of times it was described as a notice deadline.  It is not to trace the genealogy or viral spread of a post-agreement misconception within Chesapeake, except insofar as that conception can be reliably traced back to the drafters of § 1.7(b).

The Court, accordingly, rejects BNY Mellon's claim that Chesapeake's various errant statements rise to the level of representing the company's "practical application" of § 1.7(b).

Rather, the evidence shows at worst that company officers or employees not involved in negotiating § 1.7(b), particularly Chambers, misunderstood and misstated the operative deadline for actual redemption.  There is, however, no indication that Chesapeake engaged in *conduct* demonstrating its intention to treat February 13, 2013 as the final deadline for notice and March 15, 2013 as the final deadline for redemption.  Such conduct would be required before Chesapeake's post-negotiation actions could be treated as revealing its "practical application" of § 1.7(b) so as to bear on the construction of that provision.  *See Dar El-Bina Eng'g & Contracting Co., Ltd. v. Republic of Iraq*, 79 F. Supp. 2d 374, 384–85 (S.D.N.Y. 2000) ("There is a long line of New York case law endorsing the doctrine of practical construction and allowing courts to look to the parties' practical interpretations of a contract, *as demonstrated by their conduct*, in determining their intentions with regard to ambiguous contractual language." (emphasis added)); *Nationwide Auction Co. v. Lynn*, No. 90 Civ. 7643 (AGS)(THK), 1996 WL 148489, at *7 (S.D.N.Y. Apr. 1, 1996) (collecting cases, each of which deals with *actions* of the contracting parties); *CT Chems. (U.S.A.), Inc. v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993) (doctrine applies "[w]here a contract involves *repeated occasions for performance* and opportunity for objection" (emphasis added)); *see also New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 31 (2d Cir. 1997) ("Typically, a course of dealings analysis focuses on the *actions* of the parties with respect to a specific issue that the parties may have encountered before." (emphasis added)).

On the trial record, Chesapeake's errors in reporting the redemption deadline, however regrettable, do not signify that the personnel at Chesapeake, BAML, Bracewell, and Cravath who together negotiated the provision containing that deadline had a different understanding of it than

was reflected in the unusual sentence that they added to § 1.7(b) in February 2012, or in their credible, and corroborated, trial testimony.

### b.    BAML's Investor Call

BNY Mellon also relies on an informational conference call which Chesapeake and BAML held with investors on the morning of February 13, 2012.  The call included a slide presentation that investors could access by computer during the call.  Maultsby Decl. ¶ 10; DX 49; *see* PX 31.  The bulk of the call focused on Chesapeake's financial situation.  At the beginning of that call, however, Maultsby referred to the 2019 Notes, stating:

> There's been some confusion around the call schedule.  It has a par call window this November 15th, 2012 through March 15th, 2013.  Callable at par, that's what we call the special early redemption period.  And thereafter, it will have a make whole premium consistent with the rest of the Chesapeake senior notes.

DX 49-T, at 2.  As BNY Mellon notes, Maultsby said nothing, explicitly, about a notice window.

Properly understood, however, Maultsby's remarks do not undermine Chesapeake's construction or suggest that he, Maultsby, viewed March 15, 2013 as the redemption deadline.  To the contrary, Maultsby squarely testified that he understood March 15, 2013 to be the *notice* deadline.  Tr. 231.  Maultsby testified, credibly, that, when he used the word "confusion" on the investor call, he was referring to a separate issue: a misconception by some investors that the Notes would be callable at par immediately.  He credibly testified he was not addressing whether the period between November 15, 2012 and March 15, 2013 was a notice period or a redemption period.  Tr. 223–25.

Further, the language Maultsby used on the call ("a par call window this November 15th, 2012 through March 15th, 2013") does not necessarily describe the window for redemption.  It can equally be said to describe the window in which Chesapeake could act to give notice of redemption.  The word "callable," used on the investor call, does not have a rigid meaning.

Although BNY Mellon adduced expert testimony that "callable" has the same meaning as "redeemable," *see* Mullin Rep. ¶ 33; Tuckman Rep. 14–15, the Base Indenture itself uses "called" to refer to the act of *notice*.  *See* Base Indenture § 3.05 ("[o]nce notice of redemption is mailed in accordance with Section 3.04, Securities called for redemption become due and payable on the redemption date at the redemption price."); *id.* § 3.06 (describing default when "any Security called for redemption shall not be so paid upon redemption").[50]  Maultsby's statement on the investor call does not, therefore, undermine Chesapeake's reading of § 1.7(b).

### c.      The Market's Misconceptions

BNY Mellon has also impressively catalogued evidence that various market participants and the financial media regarded March 15, 2013 as the deadline for redemption at par.  This evidence indicates that the marketplace widely failed to identify March 15, 2013 as a notice deadline.  It further reflects that, until this controversy arose in February 2013, Chesapeake's contrary view that it could issue a notice to redeem the 2019 Notes as late as March 15, 2013 was little recognized.  BNY Mellon argues:

> If the "window" from November to March was in fact a "notice" window and Chesapeake therefore had until May 14, 2013, to redeem the Notes, surely someone—Chesapeake, the underwriters, Bloomberg, Standard & Poor's, Moody's, Fitch, Debtwire, Covenant Review—would have publicly touted that during the marketing and sale process (or in any subsequent disclosures).  No one did.

BNY Pretrial Br. 23.

---

[50] Black's Law Dictionary provides alternative definitions for "call" as used in the bond context, depending on whether it is used as a noun, verb, or adjective.  *Compare* call, n. ("4. A demand for the presentation of a security (esp. a bond) for redemption before the maturity date."), *with* call, vb. ("3. To redeem (a bond) before maturity."), *with* callable, adj. ("redeemable by the issuing corporation before maturity").  Black's Law Dictionary 232 (9th ed. 2009).  *Cf. Aristocrat Leisure*, 2005 WL 1950116, at *5 (discussing different dictionary definitions of "call" and finding that that indenture used "call" as a verb).

In identifying a number of statements by market players stating or suggesting that the 2019 Notes were redeemable at par only until March 15, 2013, BNY Mellon makes two arguments.  First, it argues, the Chesapeake and BAML negotiators could not have intended to impose deadlines contrary to those reflected in those statements.  Second, it argues, Chesapeake failed to correct these misunderstandings, and the absence of a correction by Chesapeake or the underwriters reveals that they shared the market's view that February 13, 2013 was the final date on which Chesapeake could give notice of redemption at par.  The Court reviews this evidence in turn.

**1.  *BAML's Sales Force Memo***:  This memo, DX 187, circulated within BAML on February 13, 2012, at 1:57 p.m., after the Prospectus Supplement was in place but before the Supplemental Indenture was complete.  In a section entitled "Summary of Terms," the memo states that "Opt. Redemption" is "11/15/2012 to 3/15/2013 – Callable at Par," and adds: "3/16/2013 and thereafter – MWC (T+50)."  DX 187, at CHK2664.  In the "Transaction Overview" section, BAML's memo states that "[t]he Notes will be non callable until November 15, 2012 upon which time the Company can exercise a Special Redemption at par until March 15, 2013.  After March 15, 2013, a make-whole at T+50 will apply."  *Id.*  The memo does not expressly refer to notice.  It does, however, use throughout the ambiguous phrase "callable," a phrase which, as noted, can plausibly be read in the context of the Supplemental Indenture to refer to notice.  *See supra* pp. 78–79 & n.50.

Importantly, there was no evidence that the sales force memo was created by anyone within BAML (*e.g.*, Maultsby) who actually negotiated the Prospectus Supplement.  The sales force memo therefore does not speak to the contemporaneous perceptions of the drafters of § 1.7(b).  By contrast, the pricing term sheet as to the 2019 Notes, *see* PX 37, at CHK 5912,

which Maultsby and the drafters of the Prospectus Supplement *were* involved in preparing, and

which was disseminated to potential investors, does reproduce the first two sentences of §

1.7(b)'s notice provision.

**2.** ***Bloomberg's Description Sheet for the Notes***:  Bork, the Bloomberg analyst whom

BNY Mellon called at trial, testified that he created Bloomberg's description sheet for the Notes

based on a term sheet received from BAML, DX 47, not the pricing term sheet which Maultsby

helped prepare.  Tr. 362–63.  Consistent with that term sheet, Bork added the 2019 Notes to

Bloomberg's database with the redemption terms as follows:

> At any time prior to 11/15/12: non-callable
> 11/15/12 – 3/15/13: callable @ par
> 3/16/13 and thereafter: non-callable (MWC T+50 bps)

DX 47, at BB62.  Bloomberg's summary of these terms was accessible on the more than 300,000

subscription-only Bloomberg terminals.  Tr. 361.

Bork, however, did not testify that he had ever read any of the deal documents.  And the

term sheet on which he relied is not traceable to any person who participated in negotiating the

terms or text of § 1.7(b).  Further, as noted, the term "callable," does not unequivocally refer to a

redemption date.  *See supra* pp. 78–79 & n.50.  Bloomberg's recap of the Notes thus does not

avail BNY Mellon in pursuing its construction of the indenture.[51]

**3.** ***Rating Agencies***:  As noted, Chambers sent the Prospectus Supplement to rating

agencies, including Fitch, Moody's, and S&P.  Tr. 258–59; *see* DX 58 (Fitch), 197 (Moody's),

198 (S&P).  S&P and Moody's published releases describing and rating the deal.  DX 51, 56.

The releases both provide an incomplete picture of the Notes.  As noted, S&P's stated that the

---

[51] The date range used by Bloomberg (11/15/12 to 3/15/13) is also inconsistent with BNY
Mellon's alternative construction of § 1.7(b).  *See supra* pp. 28–29, 68, 70–72.

Notes "could be redeemed at par prior to mid-March, 2013."  *See* DX 51, at CHK2068.
Moody's, for its part, ignored the early redemption at par provision altogether.  *See* DX 56.

These releases, however, do not shed light on the intentions of § 1.7(b)'s drafters.  Nor do they cast meaningful doubt on how a discriminating, conscientious reader would understand § 1.7(b).  As the evidence showed, the language of § 1.7(b) appears in full twice in the Prospectus Supplement (both in the summary "box" and in the "description of notes" section).  *See* PX 32, at CHK5244, CHK5267.  However, the cover page summary of the Prospectus Supplement uses only a shorthand description of the terms governing the 2019 Notes and does not refer to notice.  *See* PX 32, at CHK5235 (referring to early redemption at par up to March 15, 2013, but not mentioning notice).  Conceivably, the rating agencies, or other readers, who failed to read beyond the cover page may have construed the dates listed there (November 15, 2012 through March 15, 2013) as governing redemption, not notice.  But that failure of third parties to conduct a diligent review of the deal documents cannot fairly be said to reflect upon the intentions of the framers of that provision.

**4.  *Emails From Banks*:**  Finally, Chesapeake received several emails from banks stating their views about the Notes' redemption deadline, usually in the context of refinancing proposals.  For example, on January 8, 2013, Credit Suisse (an underwriter for the 2019 Notes) submitted a refinancing proposal to Chesapeake, via Dell'Osso, Grigsby, and Chambers.  It stated:  "We understand the special call provision in your 2019 notes is set to expire on March 15, 2013."  *See* Tuckman Rep. Ex. F, at CHK7534.  Similarly, on February 5, 2013, Barclays (another underwriter) submitted a refinancing proposal, via Dell'Osso and Chambers, that included a statement that "the end of the special redemption period for the 2019 Notes is fast approaching (ends March 15, 2013)."  DX 119, at CHK6114.  In a footnote, the proposal stated:

"*CHK will need to issue a call notice by February 13, 2013, in order for the redemption to settle within the special call period.*"  *Id.* n.2 (italics in original); *see also* Tr. 319–22.  Barclays subsequently revised that assessment to reflect a March 15, 2013 notice deadline.  *See* PX 50, at CHK7047.[52]

BNY Mellon's reliance on such market perceptions misses the mark.  The issue before the Court is not how many market participants may have shared BNY Mellon's view that March 15, 2013 was the deadline for a redemption at par.  The issue is instead one of contract interpretation.  It is "to fathom the *parties'* intent."  *U.S. Naval Inst.*, 875 F.2d at 1048 (emphasis added).  Absent evidence that the market's understanding of the operative deadlines reflected the shared intent of the parties who actually negotiated § 1.7(b), the market's perceptions, however widespread, are not probative of the parties' intent.  *Cf. Portside Growth & Opportunity Fund v. Gigabeam Corp., Inc.*, 557 F. Supp. 2d 427, 431 n.16 (S.D.N.Y. 2008).  The parties' testimony as to their communications, however, is probative, and it uniformly favors Chesapeake's interpretation.

Further, there was no evidence at trial that any market participant whom BNY Mellon cites as having recited March 15, 2013 as the deadline for redemption had ever read § 1.7(b) or the nearly identical language in the Prospectus Supplement.  Still less was there evidence that any such person had ever focused on the second sentence in § 1.7(b) that expressly stated that Chesapeake could give notice of redemption until March 15, 2013.  Absent evidence that the market participants who opined on the deadlines governing redemption of the 2019 Notes had ever read the deal documents, the spare expressions by these persons as to their views of the operative deadlines cannot be fairly considered in construing § 1.7(b).

---

[52] Others in the market, in or around February 2013, also articulated Chesapeake's interpretation. *See* PX 105-B, 105-C.

In finding the perceptions of market participants unrevealing as to the negotiating parties'
shared intent, the Court does not express a view whether, or to what extent, Chesapeake, by
virtue of its actions or inaction after mid-February 2012, bears responsibility for the market's
misconceptions as to Chesapeake's deadlines to give a notice of redemption at par.  Given the
Court's limited charge in this case of determining the notice deadline set by § 1.7(b), the Court
also has no occasion to consider whether a purchaser of 2019 Notes after February 13, 2013
could plausibly claim to have reasonably relied on Chesapeake's statements regarding those
deadlines, or whether the language in the second sentence of § 1.7(b) effectively precludes such
a claim.  Such issues are beyond the scope of this action.

For the foregoing reasons, the Court finds that, even if the text of § 1.7(b) were held
ambiguous as to the deadline to give a notice of redemption, the admissible extrinsic evidence
convincingly establishes that the parties who negotiated that text intended March 15, 2013 to be
a deadline for notice, not for redemption.[53]

## V.      Other Issues

### A.      BNY Mellon's Argument Based on "Conditional Notice"

In an alternative argument, BNY Mellon contends that, even if Chesapeake's Notice is
held timely, it is defective because it was conditional.

In pertinent part, Chesapeake's Notice stated, in bold capitalized letters, that Chesapeake
was calling the notes for redemption "solely at a price equal to 100% of the principal amount of

---

[53] The parties have vigorously disputed whether the doctrine of *contra proferentem* applies,
either as a general matter to negotiations between an issuer and an underwriter as to the terms of
an indenture, or based on facts specific to this case.  In light of the Court's resolution of this
dispute in Chesapeake's favor both on the basis of the text of § 1.7(b) and on the extrinsic
evidence bearing on that provision, the Court has no occasion to reach the issue whether *contra
proferentem* would apply in the context of the negotiations here.  *See M. Fortunoff*, 432 F.3d at
142; *Albany Sav. Bank*, 117 F.3d at 674; *U.S. Fire Ins.*, 949 F.2d at 571; *see also supra* pp. 18–
19.

the notes plus accrued and unpaid interest" pursuant to § 1.7(b).  Dkt. 30 Ex. A.  The Notice then

stated that (1) Chesapeake and BNY Mellon "have a disagreement concerning whether this

Notice is timely to effect a special early redemption at par," and (2) Chesapeake is seeking

declarations in this lawsuit that the Notice was timely for that purpose and that, if it is untimely,

it is null and void.  *Id.*  The Notice then stated:

> For the avoidance of doubt, notwithstanding anything in the Indenture to the
> contrary, this Notice of Special Early Redemption at Par will not be deemed to be
> made pursuant to Section 1.7(c) of the Supplemental Indenture or otherwise to
> require the Company to redeem the Notes at the Make-Whole Price.

*Id.*  Accordingly, the Notice stated, if this Court were to hold the Notice timely by the

redemption date, then the payment of par plus interest would be due.  *Id.*

BNY Mellon argues that this language renders the Notice defective, because Base

Indenture § 3.04, which sets out the requirements for a valid notice of redemption, does not

provide for a conditional notice of redemption.

The Court disagrees.  At the outset, BNY Mellon has not conclusively shown that a

conditional notice of redemption is inherently impermissible.  The Base Indenture appears to

make a notice of redemption *irrevocable*.  *See* Base Indenture § 3.05 ("Once notice of

redemption is mailed in accordance with <u>Section 3.04</u>, Securities called for redemption become

due and payable on the redemption date at the redemption price." (emphasis in original)).

Therefore, after issuing a notice of redemption, Chesapeake could not change its mind and

attempt to retract that notice.  But there is no comparable provision of the Base Indenture that as

clearly precludes Chesapeake from stating, in the notice itself, that a redemption will occur only

upon the occurrence of a given event or circumstance before the redemption date (*e.g.*, that

Chesapeake's stock price be above a certain level as of an intervening date).  BNY Mellon

instead relies on § 3.04 of the Base Indenture, which identifies the information that must be

included in a notice of redemption (*e.g.*, the redemption price, the redemption date, the aggregate principal amount of Notes being redeemed, and the name and address of the "Paying Agent" with whom Chesapeake is to deposit the funds available to pay the redemption price). BNY Mellon correctly notes that § 3.04 does not state that the notice must identify any condition precedent to redemption. It fairly argues that, from that omission, some negative implication may arise that a conditional notice of redemption was not contemplated by the parties who negotiated the Base Indenture. However, absent more substantial briefing than the parties have devoted to this point, the Court is not to prepared to hold that a conditional notice of redemption is necessarily prohibited under the Base Indenture.[54] The Court instead assumes the point *arguendo*.

Even on that assumption, however, there was nothing defective about Chesapeake's Notice here. Chesapeake did not condition its Notice on an intervening circumstance or event. Chesapeake's Notice merely acknowledged the authority of this Court, given the pending lawsuit, to determine whether the Notice had been timely issued. And, given the noteholders' pending threat to treat the Notice, if held untimely, as a notice of Make-Whole redemption, the Notice reasonably stated that it was not intended to and would not operate as such, and that an untimely notice would be null and void. The Notice is thus not fairly described as a conditional notice. The words in the Notice on which BNY Mellon seizes in so arguing were words of

---

[54] BNY Mellon argues that § 3.04(a)(6) and § 3.04(a)(7) of the Base Indenture permit conditional notices in discrete contexts, and therefore give rise to a negative implication that other conditions may not be attached to a notice of redemption. But that argument fails, because those two subsections do not describe conditional notices. Section 3.04(a)(6) provides that the notice of redemption must state that, except in the event of a default by Chesapeake in paying the redemption price plus interest (presumably to the Paying Agent), the Holder's sole right upon surrendering the Notes is to receive the redemption price plus interest. And Section 3.04(a)(7) provides that the notice must state that, where only a partial redemption is made, following that redemption, a new security will issue to a holder whose notes were only redeemed in part.

clarification.  They did not impose a condition.  With or without those words, the legal effect of

the Notice would have been the same.[55]

The decision in *Aristocrat Leisure*, on which BNY Mellon relies, is not at all to the

contrary.  The Court there held a notice issued by Aristocrat invalid because Aristocrat had

failed, despite a requirement of the governing indenture, to "specif[y] the appropriate date on

which the conversion right terminated."  *Aristocrat Leisure*, 2005 WL 1950116, at *7.  In other

words, the notice there failed to state the redemption date, and had identified only the  notice

date.  *Id.*  Chesapeake's notice, however, had no such deficiency.  It contained all of the

information that § 3.04 of the Base Indenture requires be set forth.  *See* Base Indenture § 3.04.

Finally, the Court notes, the Notice in this case, to the extent it adverted to the lawsuit

pending in this Court, served a constructive purpose.  It helpfully explained to holders of the

2019 Notes that Chesapeake and the BNY Mellon disagreed about whether the Notice was

timely.  And it explained to those holders what the implications would be for them in the event

the Court held, or did not hold, the Notice timely.  As the Court stated when it ruled on

Chesapeake's application for emergency relief:  "There is nothing in the indenture that bars

Chesapeake . . . from candidly acknowledging the good-faith disagreement that exists with

regard to timeliness and making clear that the notice will be void if held untimely."  3/14/13 Hr'g

Tr. 28; *see also id.* (describing Chesapeake's Notice as "a rational and permissible approach to

dealing with the problem" with which it was confronted).

The Court therefore holds that Chesapeake's Notice was effective, not defective.

---

[55] In his report, BNY Mellon's expert, Robert Landau, opines that Chesapeake's Notice is
defective because it is "conditionally effective."  Landau Rep. ¶¶ 17-18.  For the reasons set out
above, and because Landau's report as to this point is conclusory, the Court does not credit
Landau's testimony that the Notice is defective.

### B.      Chesapeake's Second Claim

On April 10, 2013, before trial, Chesapeake moved for judgment on the pleadings on its second claim.  Dkt. 69–71.  Chesapeake there seeks a declaratory judgment that "in the event that either (i) [the Notice of Special Early Redemption] is determined not to be timely for [a redemption at par], or (ii) this Court has not issued a decision with respect to the declaratory relief sought in Claim I . . . prior to the May 13, 2013 redemption date, then the Notice of Special Early Redemption shall be deemed null and void and shall not be effective to redeem the 2019 Notes."  Compl. ¶ 28.  BNY Mellon opposed that motion.  Dkt. 83–84.

Neither contingency posited by Chesapeake's second claim has occurred.  The Court has held Chesapeake's Notice timely, and has issued its decision prior to the May 13, 2013 redemption date.  Accordingly, Claim Two is moot.  On that ground, the Court denies Chesapeake's request for a declaratory judgment on Claim Two.[56]

### C.      BNY Mellon's Affirmative Defenses

In its Answer, BNY Mellon raised several additional affirmative defenses.  Dkt. 39.  It was BNY Mellon's burden to establish such defenses.  *See* Fed. R. Civ. P. 8(c); *Veltri v. Bldg. Serv. 32B-J Pension Fund*, 393 F.3d 318, 326 (2d Cir. 2004).  Although BNY Mellon did not vigorously pursue these defenses at trial and referred to them in only one paragraph of its post-trial brief, *see* BNY Post-trial Br. 52, the Court addresses here the affirmative defenses of laches, estoppel, and waiver, as to which some evidence was received.

Laches is "an equitable defense based on the . . . maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights)."  *Ivani*

---

[56] As the Court stated in its ruling on Chesapeake's application for emergency relief, its view was that, were the Court to reach the merits, Chesapeake was overwhelmingly likely to prevail on its second claim.  *See* 3/14/13 Hr'g Tr. 24–31.  Nothing has occurred since to alter that view.

*Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 259 (2d Cir. 1997) (quoting *Stone v. Williams*,

873 F.2d 620, 623 (2d Cir. 1989)).  It "bars an equitable claim where the plaintiff has

unreasonably and inexcusably delayed, resulting in prejudice to the defendant."  *Allens*

*Creek/Corbetts Glen Pres. Grp., Inc. v. West*, 2 F. App'x 162, 164 (2d Cir. 2001) (citations

omitted).  To prevail on a laches defense, BNY Mellon must show that Chesapeake "inexcusably

delayed in taking action," and that BNY Mellon "was prejudiced by the delay."  *Id.*

　　　　In considering a laches defense, the Court also considers the equities, because, "[w]here

there has been no inexcusable delay in seeking a remedy and where no prejudice to the defendant

has ensued from the mere passage of time, there should be no bar to relief."  *Gardner v. Panama*

*R. Co.*, 342 U.S. 29, 30–31 (1951).  "Prejudice results when a delay 'makes it difficult to garner

evidence,' or where a 'change in position' makes it inequitable to allow plaintiff's claim to

proceed."  *United States v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of*

*Am., AFL–CIO*, 829 F. Supp. 608, 615 (S.D.N.Y. 1993) (quoting *Robins Island Pres. Fund, Inc.*

*v. Southold Dev. Corp.*, 959 F.2d 409, 424 (2d Cir. 1992)).

　　　　Measured against these familiar standards, BNY Mellon's claim of laches fails.  BNY

Mellon has not identified any prejudice to it, or for that matter to the noteholders, that resulted

from the passage of time.  Further, there is no basis to argue that Chesapeake inexcusably slept

on its rights.  The trial record reflects that, in January 2013, Chesapeake confirmed with both its

in-house and outside counsel that March 15, 2013 was the deadline for it to give notice of a

special early redemption.  *See* PX 46.  It further reflects that, on February 20, 2013, BNY Mellon

informed Morgret at Chesapeake that it *concurred* with Chesapeake's analysis that notice on

March 15, 2013 was timely for that purpose.  *See* PX 49.  There was no reason up until this point

for Chesapeake to file this lawsuit; BNY Mellon had never indicated disagreement with

Chesapeake as to the notice deadline.  Two days later, however, on February 22, 2013, BNY

Mellon alerted Chesapeake that it had changed its position and now regarded the notice deadline

as having passed.  *See* Chambers Dep. 195–99.  Chesapeake filed this lawsuit just 14 days later.

There is no basis to conclude that Chesapeake slept on its rights during that period.  BNY

Mellon's affirmative defense of laches, accordingly, lacks merit.

       BNY Mellon also argues that Chesapeake's claims are barred under the doctrine of

equitable estoppel.  "Under New York law, the party asserting estoppel must show that the party

alleged to be estopped (1) [engaged in] conduct which amounts to a false representation or

concealment of material facts; (2) inten[ded] that such conduct [would] be acted upon by the

other party; and (3) [knew] the real facts."  *Readco*, 81 F.3d at 301 (alterations in original)

(citation omitted).  In addition, "the party alleging estoppel must also show with respect to

himself: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party

estopped; and (3) a prejudicial change in his position."  *Id.* at 301–02 (citation omitted).

       Under these standards, BNY Mellon fails to establish estoppel, for several independent

reasons.  First, Chesapeake did not conceal any material facts from BNY Mellon.  Quite the

contrary:  The Supplemental Indenture was available to the trustee and to the noteholders.

Second, although some statements by Chesapeake bearing on the operative deadlines governing

the 2019 Notes left much to be desired, the evidence did not establish that Chesapeake made

false representations about the 2019 Notes, and there was no evidence that the statements by

Chesapeake on which BNY Mellon has relied were made with the intent that they be acted upon

by BNY Mellon or the noteholders.  Third, there was no evidence adduced that BNY Mellon, or

for that matter the noteholders, relied to their detriment on any such statement by Chesapeake, let

alone that reliance was reasonable given the text of the Supplemental Indenture. BNY Mellon therefore fails to establish estoppel.

Finally, BNY Mellon argues that Chesapeake's claims are barred under the doctrine of waiver. Unlike the defense of estoppel, the defense of waiver does not require prejudice to the defendant and focuses instead on the actions of the plaintiff. *See Ventura Assocs., Inc. v. Int'l Outsourcing Servs., Inc.*, No. 04 Civ. 5962 (PKL), 2008 WL 2073628, at *5 (S.D.N.Y. May 14, 2008) (citing *Nassau Trust Co. v. Montrose Concrete Prods. Corp.*, 56 N.Y.2d 175, 184 (1982)). Under New York law, contractual rights may be waived only if they are "knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006).

The evidence, however, fails to establish this affirmative defense, too. There was no evidence that at the time Chesapeake personnel approved any of the unhelpful or arguably misleading statements on which BNY Mellon has seized, it was voluntarily and intentionally relinquishing a known right. Absent proof of such abandonment, there is simply no waiver. *See Readco*, 81 F.3d at 303.

The Court has considered BNY Mellon's remaining affirmative defenses. They, too, lack merit.

## CONCLUSION

For the reasons stated in the foregoing, the Court enters judgment in favor of Chesapeake on Claim One. The Court issues a declaratory judgment that Chesapeake's Notice of Special Early Redemption, issued on March 15, 2013, was timely and effective to redeem the 2019 Notes under the special early redemption terms set forth in § 1.7(b) of the Supplemental Indenture. The Court dismisses Claim Two as moot.

91

The Clerk of Court is directed to terminate the motions pending at docket numbers 69 and 94.

The Court directs counsel for Chesapeake and for BNY Mellon to meet and confer by Friday, May 17, 2013, as to whether there are any remaining issues in the case to be resolved. The Court directs counsel to submit, by Wednesday, May 22, 2013, a joint letter addressing that question.[57]

SO ORDERED.

Paul A. Engelmayer
United States District Judge

Dated: May 8, 2013
       New York, New York

---

[57] The Court wishes to commend the lawyers—and the entire legal teams—for both sides in this hard-fought case for their professionalism, crisp organization, and all-around excellence.  The caliber of advocacy was simply superb.