UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                         :

CHESAPEAKE ENERGY CORPORATION,       :

                                                     :          13 Civ. 1582 (PAE)

                            Plaintiff,       :

                                                     :         OPINION & ORDER

                    -v-               :

                                                     :

THE BANK OF NEW YORK MELLON TRUST  :
COMPANY, N.A.,                        :

                                                     :

                            Defendant.     :

                                                   :
------------------------------------------------------------------------X

PAUL A. ENGELMAYER, District Judge:

      Before the Court are post-trial motions pursuant to Federal Rule of Civil Procedure 54(d)

for payment of attorneys' fees and expenses, one by plaintiff Chesapeake Energy Corporation

("Chesapeake"), the other by defendant The Bank of New York Mellon Trust Company, N.A.

("BNY Mellon").  The underlying dispute in this case involved whether Chesapeake's notice of

redemption of outstanding notes (the "2019 Notes") pursuant to a "Special Early Redemption

Period" provided for by the indenture governing those notes was timely.  On May 8, 2013,

following a bench trial, the Court held that Chesapeake's notice of redemption had been timely

and effective, rejecting the contrary argument of BNY Mellon, the indenture trustee.  The parties

thereupon moved for attorneys' fees and expenses.

      For the reasons that follow, the Court denies Chesapeake's motion to shift the duty to pay

its attorneys' fees and expenses to BNY Mellon.  The Court holds that, under the standards set

out in Section 6.11 of the Base Indenture governing the 2019 Notes, Chesapeake is responsible

for paying its fees and expenses.  As for BNY Mellon's motion, the Court agrees with BNY

Mellon that, under Section 7.07 of the Base Indenture, BNY Mellon is indemnified by

Chesapeake for any reasonable fees and expenses BNY Mellon incurred in this matter. The Court rejects Chesapeake's objections to indemnifying BNY Mellon based on the exception in Section 7.07 for expenses caused by a trustee's "negligence or willful misconduct," and also rejects Chesapeake's attempts to obtain discovery on that subject. However, because the parties have yet to meet and confer as to whether the specific fees or expenses for which BNY Mellon seeks indemnification were reasonable, and because no concrete dispute of that nature has been presented to the Court, it is premature to approve BNY Mellon's motion with respect to the payment of such fees. The Court will take up that motion when, and if, any dispute between the parties regarding specific fees or expenses has crystallized.[1]

## I. Background

### A.   Facts[2]

The Court assumes familiarity with the facts of the underlying case, which are chronicled in detail in the Court's May 8, 2013 decision. The Court relates additional background facts here to the extent relevant to the respective motions for fees and costs. In particular, the Court recites

---

[1] BNY Mellon has argued that the proper means of pursuing any claim it has or will have of a breach by Chesapeake of its duty to indemnify BNY Mellon would be not a post-trial motion pursuant to Rule 54(d), but a separate breach of contract action based on Chesapeake's asserted breach of its duty to indemnify under the Base Indenture governing the parties' rights and obligations. However, to assure that its right to pursue indemnification was preserved, BNY Mellon filed a motion under Rule 54(d) for payment of such fees and expenses. The Court agrees with BNY Mellon that it is at liberty to pursue in a follow-on lawsuit any claims it may have of a breach by Chesapeake of its indemnification duty, and that it is not obliged to bring such claims as part of this litigation.

[2] The facts related herein are drawn from Chesapeake's Memorandum of Law in Opposition to Defendant's Motion for Indemnification and in Support of Plaintiff's Motion for Attorneys' Fees and Related Nontaxable Expenses ("Chesapeake Br.") (Dkt. 136), BNY Mellon's Memorandum of Law In Response To Plaintiff's Submission Regarding Fee Issues ("BNY Mellon Br.") (Dkt. 141), and this Court's Opinion & Order dated May 8, 2013 ("Op.") (Dkt. 115).

certain facts regarding the events leading to this lawsuit, because Chesapeake's positions on both fee applications rely heavily on those events.

The dispute between Chesapeake and indenture trustee BNY Mellon as to the redemption deadline for the 2019 Notes began to take shape on February 20, 2013.  That day, Chesapeake telephoned Sharon McGrath, a BNY Mellon vice president, to begin preparation for a Special Early Redemption.  Chesapeake believed that it had until March 15, 2013, to give notice of such a redemption.  McGrath's initial reaction is disputed:  She stated either that she was unsure whether Chesapeake could still timely exercise that right and needed to consult counsel, or that she believed that the time in which to do so had passed.  *See* Chesapeake Br. 5; McGrath Dep. 59.  However, after consulting with BNY Mellon's counsel at Emmett, Marvin & Martin, LLP ("Emmett Marvin") later that day, McGrath told Chesapeake that it *could* properly exercise its right to a Special Early Redemption as long as it gave notice by March 15, 2013.

At some point that day, James P. Seery, Jr. of River Birch Capital, LLC, a hedge fund holding a large volume of recently-purchased 2019 Notes, communicated to BNY Mellon, verbally and by letter, River Birch's opposing view: that the deadline for Chesapeake to redeem the 2019 Notes pursuant to the Special Early Redemption provision had passed.  That same day, in a third phone call with Chesapeake, BNY Mellon informed Chesapeake that because it was unclear whether that deadline has passed, it would not facilitate such a redemption (*i.e.*, at par).

On February 22, 2013, BNY Mellon, in a call with Chesapeake and Chesapeake's outside counsel, expressed with greater certainty its conclusion that the supplemental indenture provision governing the deadline for notice of a Special Early Redemption was ambiguous and that any notice that Chesapeake might now give of such a redemption would be untimely.  Chesapeake claims that BNY Mellon representatives also stated on that call that "the trustee had some sort of

3

obligation to side with the noteholders," Chesapeake Br. 7; at his deposition, Bayard Chapin of

Emmett Marvin, who participated in that call on behalf of BNY Mellon, disputed this.  *See* Ross

Decl. (Dkt. 138) Ex. J ("Chapin Dep.") at 94–96.  On February 27, 2013, BNY Mellon again told

Chesapeake that it would not facilitate the proposed redemption.  According to Chesapeake,

BNY Mellon again attributed that position to the fact that it had "fiduciary duties" to the

noteholders.

On February 28, 2013, Chesapeake, its outside counsel, Michael Telle, Esq., and Stephen

Burns, Esq., counsel to the underwriters of the notes, participated in a conference call with BNY

Mellon's outside counsel, Richard Lasker, Esq., of Emmett Marvin.  BNY Mellon stated on that

call that, in its view, Section 1.7 was not ambiguous, and that that provision unambiguously set a

notice deadline (30 days before March 15, 2013) that had, by then, passed.  On that basis, BNY

Mellon stated, it would not facilitate a Special Early Redemption.

On March 7, 2013, Chesapeake again contacted BNY Mellon.  Chesapeake sought "an

assurance that [any] proposed notice of Special Early Redemption . . . , if ultimately found to be

untimely, would be treated as null and void, and not as an unintentional notice of a Make-Whole

Redemption."  Chesapeake Br. 9.  BNY Mellon refused to provide that assurance.

On March 8, 2013, Chesapeake filed this lawsuit against BNY Mellon.  It sought, *inter*

*alia*, a declaration that a Special Early Redemption notice, if filed on or before March 15, 2013,

would be timely to effect such a redemption.  The same day, Chesapeake moved for emergency

relief in the form of a preliminary injunction that would bar BNY Mellon from treating a notice

of Special Early Redemption, if held untimely, as a notice of a Make-Whole Redemption.

On March 12, 2013, a hearing on Chesapeake's application for such relief was held, at

which Chesapeake and BNY Mellon appeared.  In addition, Steven M. Bierman, Esq., of Sidley

Austin LLP, appeared, as counsel for a self-styled "*ad hoc* group of noteholders," including River Birch.  Bierman stated that these noteholders sought to intervene in the case; the Court granted the unopposed motion to intervene.  Dkt. 26.  Chesapeake took the position that an untimely notice of Special Early Redemption would be null and void; Bierman, the noteholders' counsel, took the position that such a notice would operate as a notice of a Make-Whole Redemption under the Ninth Supplemental Indenture; and counsel for BNY Mellon was non-committal on the point, stating that should the issue arise, BNY Mellon would "do its best to figure out what its duties are under the indenture," including examining the indenture text and consulting the noteholders.  3/12/13 Hg. Tr. 35–37.

In a decision from the bench read on March 14, 2013, the Court denied Chesapeake's motion for such an injunction, while stating that it regarded as dubious the noteholders' claim that an untimely notice of a Special Early Redemption would, *sub silentio*, effect a Make-Whole Redemption.  To resolve the underlying issue of the notice deadline, the Court set an expedited schedule for discovery, and set the case for trial beginning April 23, 2013.  The purpose of this expedited schedule was to permit the issue of timeliness to be resolved by May 13, 2013, the date that Chesapeake contended was its deadline for a redemption at par assuming notice on March 15, 2013.  The following day, March 15, 2013, Chesapeake gave notice, to BNY Mellon, of a Special Early Redemption.

On March 22, 2013, the intervenor noteholders informed the Court that they wished to withdraw from the case, and leave the defense of Chesapeake's claims to indenture trustee BNY Mellon, whom Chesapeake had sued.  *See* Dkt. 40–42.  The Court granted that motion.  Dkt. 60.  In addition, with the consent of BNY Mellon and the noteholders, and with the Court's approval, Sidley Austin LLP, which until then had represented the noteholders, joined the representation of

5

BNY Mellon.  Sidley Austin thereafter acted as BNY Mellon's lead counsel, including at trial, although at least two other law firms, one of which was Emmett Marvin, also represented BNY Mellon.

On March 31, 2013, BNY Mellon, abandoning the position the noteholders had earlier taken, represented to the Court that it would not treat an untimely notice of Special Early Redemption as a notice of Make-Whole Redemption.  *See* Dkt. 58 at 3 n.2; 4/1/13 Hg. Tr. 40. That left the timeliness of Chesapeake's notice as the only substantial contested issue in the case.[3]

Trial was held between April 23 and April 30, 2013.  On May 8, 2013, the Court issued its Opinion & Order, holding, in favor of Chesapeake, that its notice of redemption had been timely and effective to redeem the 2019 Notes at par.  The Court so ruled both on the basis of the text of the indenture and the extrinsic evidence of the parties' intentions.

## B.     Procedural History

On May 22, 2013—14 days after the entry of judgment, per Rule 54(d)(2)(B)—both Chesapeake and BNY Mellon filed motions for attorneys' fees, along with preliminary briefs in support of those motions.  Dkt. 129 ("Chesapeake Prelim. Br."), 132 ("BNY Mellon Prelim. Br.").

On May 30, 2013, the Court entertained discussion on these motions, both as to their substance and as to an orderly process for resolving them.  At the close of the hearing, the Court directed Chesapeake to submit, by June 21, 2013, a brief addressing: (1) Chesapeake's claim that the fees it had incurred should be shifted to BNY Mellon pursuant to § 6.11 of the parties' Base

---

[3] BNY Mellon's alternative argument, that the purported "conditional" nature of Chesapeake's notice rendered such notice defective under the terms of the Base Indenture, remained an issue in the case, and was addressed in the Court's Opinion & Order.  *See* Op. 84–87.

Indenture dated August 2, 2010 ("Base Indenture") (Dkt. 1 Ex. A); and (2) Chesapeake's argument that BNY Mellon was not entitled to indemnification of its fees and expenses pursuant to § 7.07 of the Base Indenture, because these fees and expenses had been "caused by the Trustee's own negligence or willful misconduct," and therefore were not indemnifiable. *See* Base Indenture § 7.07. The Court directed BNY Mellon to submit an opposition brief by July 16, 2013. The Court determined that it was premature to take up any objections as to the reasonableness of specific aspects of BNY Mellon's requested fees. The Court held that, in the event the Court rejected Chesapeake's argument based on the "negligence or willful misconduct" exception to Base Indenture § 7.07, the parties could then meet and confer to determine whether Chesapeake disputed, as unreasonable, specific requests for indemnification of fees or expenses by BNY Mellon.

Chesapeake's brief was filed June 21, 2013, and was accompanied by an expert affidavit of Steven L. Schwarcz. BNY Mellon's brief was filed on July 16, 2013.

## II. Analysis

### A.    Chesapeake's Fees and Expenses: Analysis Under Section 6.11

The Court begins by addressing Chesapeake's argument why the duty to pay all or some of the fees and expenses it incurred should be assessed to BNY Mellon. Chesapeake's fee-shifting application is governed by § 6.11 of the Base Indenture. That provision states:

> In any suit for the enforcement of any right or remedy under this Indenture or in any suit against the Trustee for any action taken or omitted by it as Trustee, . . . a court in its discretion may assess reasonable costs, including reasonable attorneys' fees and expenses, against any party litigant in the suit, *having due regard to the merits and good faith of the claims or defenses made by the party litigant*.

Base Indenture § 6.11 (emphasis added).

Initially, at the May 30, 2013 conference, Chesapeake made three distinct arguments as to why it was entitled to fee-shifting under § 6.11.  First, Chesapeake argued that BNY Mellon had taken, in bad faith, the position that Chesapeake, were its notice of redemption held untimely, "was at risk of triggering an inadvertent make-whole payment."  5/30/13 Hg. Tr. 8.  In the ensuing colloquy with counsel, the Court expressed substantial doubt about that argument as a basis for finding bad faith on BNY Mellon's part.  The Court noted, *inter alia*, that the Make-Whole argument had been made only by the intervenor noteholders, and that BNY Mellon had never adopted that argument as its own, and indeed had renounced it on March 31, 2013.  *Id.* at 11–12.  Second, Chesapeake took issue with BNY Mellon's legal position as to the deadline for Chesapeake to give notice of a Special Early Redemption.  Chesapeake argued that BNY Mellon should have done a more searching investigation into § 1.7 of the Ninth Supplemental Indenture (the disputed language at issue), after the controversy as to that deadline arose, before concluding that the deadline had passed.  *Id.* at 9–10.  The Court expressed skepticism, too, of that position as a basis for finding bad faith, stating, *inter alia*, that, from the Court's perspective, BNY Mellon had made responsible, good-faith—albeit ultimately unavailing—legal arguments as to the deadline.  *Id.* at 15–16.  Third, Chesapeake argued, it had been an act of bad faith for BNY Mellon to litigate the case on its own when it had no financial stake in doing so.  Instead, Chesapeake argued, BNY Mellon could have pursued an interpleader action, and left to the interested noteholders, who had an economic stake in establishing that the notice deadline had passed, the job of litigating against Chesapeake as to the operative deadline.  *Id.* at 7–8.  Had the noteholders and not BNY Mellon mounted the defense, Chesapeake noted, it would not have been subject to nearly as large a claim of indemnification.  *Id.* at 8.

In light of its colloquy with the Court, Chesapeake has now refined its argument for fee-shifting under § 6.11 to a variant of the second and third arguments.  Chesapeake asserts:  "BNY Mellon's refusal to effectuate the redemption may have been animated by factors that would satisfy the Section 6.11 standard, such as its inexplicable decision to favor a holder's interests with complete disregard for the issuer's and, perhaps, a desire to compensate for BNY Mellon's initial error in informing holders that the time to redeem at par had expired, without having consulted counsel."  Chesapeake Br. 22.  To determine whether BNY Mellon's legal positions were driven by such motives, Chesapeake urges the Court to permit it to take discovery into (1) whether any noteholders indemnified BNY Mellon, or "directed the litigation in any respect"; (2) the legal and factual investigation BNY Mellon conducted before deciding not to implement a redemption at par and to countenance the noteholders' position that an untimely redemption might serve as an involuntary redemption at Make-Whole price; and (3) whether BY Mellon departed from industry norm in the manner in which it litigated this matter.  *See* Chesapeake Prelim. Br. 4.

BNY Mellon, for its part, opposes this bid.  It characterizes Chesapeake's pursuit of additional discovery as a "fishing expedition."  BNY Mellon Br. 9.  BNY Mellon argues that Chesapeake, in challenging BNY Mellon's motives for defending Chesapeake's lawsuit, has not come close to meeting the standard for subjective bad faith required for fee-shifting under § 6.11.  *Id.* at 10.  It further argues that BNY Mellon's reading of the Ninth Supplemental Indenture was "more than colorable and entirely proper."  *Id.* at 9.

In considering Chesapeake's motion to shift responsibility for its fees to BNY Mellon, it is, important, at the outset, to identify the governing legal standard.  Under the text of § 6.11, as BNY Mellon notes, the Court must give due regard *both* to "the merits and [the] good faith of the

claims or defenses made by the party litigant."  Section 6.11 is thus consistent with the American

rule that parties to litigation are responsible for paying their own attorneys' fees, regardless of

whether they won or lost in the underlying lawsuit, except "when the losing party has acted

in bad faith, vexatiously, wantonly, or for oppressive reasons." *Alyeska Pipeline Serv. Co. v.

Wilderness Soc'y*, 421 U.S. 240, 258–59 (1975).  Under Second Circuit case law, fees should be

awarded for such bad faith where a court finds "clear evidence that the losing party's claims

were entirely without color and made for reasons of harassment or delay or for other improper

purposes." *Sierra Club. v. U.S. Army Corps of Eng'rs*, 776 F.2d 383, 390 (2d Cir. 1985)

(citations omitted).  Importantly, both of these prongs—one objective and focused on the merits

of the losing party's claims, the other subjective and focused on the losing party's motives—

must be satisfied for a Court to find bad faith. *Colombrito v. Kelly*, 764 F.2d 122, 133 (2d Cir.

1985).

    Neither prong is satisfied here.  As to the first, objective prong, "the merits of the claims

and defenses made by the party litigant," BNY Mellon's claims and defenses at and leading up to

trial were focused tightly on the issue of whether March 15, 2013 was a notice deadline (as

Chesapeake urged) or a redemption deadline (as BNY Mellon urged).  Both sides lawyered

energetically and with evident skill on this critical point.  Chesapeake ultimately prevailed,

decisively.  It persuaded the Court that both the Ninth Supplemental Indenture text and the

parties' negotiating history validated its position.

    That BNY Mellon's cause solidly lost, however, does not mean that the interpretation

that it advanced of the Ninth Supplemental Indenture was "entirely without color."  A claim is

"entirely without color" when it "lacks any legal or factual basis." *Sierra Club*, 776 F.2d at 390;

*see also Nemeroff v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) (per curiam).  BNY Mellon's

defense, viewed objectively, was a far cry from that.  BNY Mellon advanced a colorable interpretation of a provision that the Court held "flawed and awkwardly drafted."  Op. 19; *see also id.* ("§ 1.7 is a short but difficult document, and its text presents challenges for the construction advocated by each party.").  Evidence of the legitimacy of BNY Mellon's defense effort is that the Court's own assessment of the indenture text evolved over the course of the litigation.  In its bench ruling denying Chesapeake's application for emergency relief, the Court originally pronounced the indenture text ambiguous.  Only later did the Court conclude, with the benefit of closer review, that canons of construction favored Chesapeake's construction.  Even so, the Court acknowledged, as it had from the outset, that the indenture text presented problems for Chesapeake as well.  *See* Op. 17 ("That a text is complex or imperfect does not mean it is ambiguous.").

Chesapeake, tellingly, does not ever expressly articulate the argument necessary for it to prevail on the first, objective prong of the good-faith inquiry: that BNY Mellon's position as to the notice deadline was "entirely without color."  And for good reason:  Such an argument would be untenable.  It would be an abject exercise in hindsight, relying on the fact of Chesapeake's ultimate victory, ignoring the complex and hard-fought litigation journey that led to that outcome, and falling prey to the fallacy of the predetermined outcome.[4]  The Court attests here firsthand to the nuanced, vigorous, creative, and credible arguments made by estimable defense counsel.  The Court's lengthy (92-page) decision in fact repeatedly evidences the responsible legal and factual arguments made by BNY Mellon in support of its reading of the notice

---

[4] That journey, of course, included extensive discovery into extrinsic evidence.  This included testimony and documentary proof (*e.g.*, drafts, emails) as to the negotiating process that resulted in the Ninth Supplemental Indenture.  Although the Court ultimately held that that evidence favored Chesapeake's interpretation, BNY Mellon, having entered the arena after completion of the drafting process, cannot properly be charged, at least until the close of discovery days before trial, with knowledge of the materials unearthed in discovery.

deadline. It thus cannot plausibly be said that BNY Mellon's conclusion as to that deadline lacked a legal or factual basis. The first prong of the test for bad faith, relating to the objective merits of BNY Mellon's claims and defense, is therefore not, even remotely, met here. *Cf. Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 421–22 (1978) (in context of assessing attorneys' fees in Title VII cases, "it is important that a district court resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation"); *Tancredi v. Metro. Life Ins. Co.*, 378 F.3d 220, 230 (2d Cir. 2004) (reversing district court's attorneys' fees award on basis that action was frivolous, because "[h]indsight proves that plaintiffs' allegation . . . was very weak, but it was not completely without foundation").

The second prong of the good faith inquiry turns on whether BNY Mellon's subjective reasons for asserting its position involved harassment, delay, or another improper purpose. As to this point, Chesapeake focuses less on the substance of BNY Mellon's legal position that the notice deadline had lapsed. Instead, it focuses on the fact that BNY Mellon elected to itself adopt and defend that position, rather than leaving it to the non-indemnified noteholders (such as River Birch) to do so. Chesapeake posits that BNY Mellon could have facilitated its redemption notice and left it to the noteholders to challenge that notice as untimely. Alternatively, Chesapeake urges, after being sued, BNY Mellon could have interpleaded the noteholders as the real parties in interest, and thereafter stayed on the sidelines. Chesapeake paints BNY Mellon's decision to litigate for itself as mysterious. It seeks discovery, including into the legal advice given to BNY Mellon and into BNY Mellon's dealings with the noteholders, which, it urges, might explain that decision. Chesapeake posits that such discovery might reveal, for example,

that BNY Mellon adopted its position to compensate for an initial error in informing some noteholders that the Special Early Redemption Period had expired.

The Court is unpersuaded. Notably, Chesapeake all but concedes that the facts now known to it do not support relieving it of the duty to pay its own legal fees. *See* Chesapeake Br. 4–5 (acknowledging that Chesapeake's claim for fee-shifting "will likely turn to a significant extent on additional facts that [Chesapeake] expects to establish in targeted additional discovery proceedings"). There is not nearly a sufficient factual predicate to justify authorizing discovery into BNY Mellon's motivations for participating in this lawsuit, let alone probing into its privileged communications. To be sure, BNY Mellon was not required by law to defend against Chesapeake's claims on the merits. But, as explained further below in connection with Chesapeake's arguments under § 7.07, BNY Mellon was nowhere precluded from doing so, either. BNY Mellon was not obliged to foist responsibility for defending against Chesapeake's redemption bid onto the decentralized group of 100 or more noteholders. And the circumstances reveal eminently sensible reasons for BNY Mellon to take on that defense itself. Doing so assured that BNY Mellon's position that Chesapeake's notice deadline had lapsed was capably litigated and defended during the extremely telescoped time period during which this controversy emerged and was tried. It also assured that BNY Mellon would not be forced, absent a court order arising from a case in which it had meaningfully participated, to participate in a process of effectuating a redemption on terms that it had concluded were unlawful. *See also infra* pp. 19–21.

Significantly, too, BNY Mellon was represented by its own outside counsel (Emmett Marvin) at all critical points: when it (1) developed its view that Chesapeake had missed the Special Early Redemption deadline, (2) communicated with Chesapeake about that view,

13

(3) resolved not to facilitate issuance of a notice that it had concluded was untimely, and

(4) elected to defend against Chesapeake's ensuing lawsuit.  Chesapeake offers no reason to

assume that BNY Mellon flouted outside counsel's advice as to any of these matters, that outside

counsel acted in other than good faith, or that BNY Mellon's independence and objectivity were

corrupted by River Birch's self-interested advocacy.[5]  Further, the inquiry that Chesapeake

proposes would almost unavoidably entail some intrusion into BNY Mellon's communications

with counsel.  At a minimum, it would intrude into BNY Mellon's thought processes as derived

from those privileged communications.  There is no good charter for undertaking that invasive

inquiry.   To be sure, BNY Mellon's interpretation of the indenture proved wrong.  And

conceivably in its internal deliberations, BNY Mellon may have given more weight to its

perceived responsibilities to the noteholders than other trustees, in similar circumstances, would

have.  But these circumstances do not suggest improper motives or anything close to it.

    The Court therefore denies Chesapeake's application for fee-shifting under § 6.11 of the

Base Indenture.  Chesapeake, not BNY Mellon, is responsible for paying its own attorneys' fees

and costs.

### B.    BNY Mellon's Indemnification by Chesapeake:  Analysis Under Section 7.07

    BNY Mellon's claim that it is entitled to indemnification of its fees and expenses is based

on § 7.07 of the Base Indenture.  Section 7.07 broadly provides for such indemnification.

Chesapeake counters that BNY Mellon is not entitled to such indemnification, given the

exception in § 7.07 of the Base Indenture for expenses "caused by the Trustee's own negligence

or willful misconduct."  Specifically, § 7.07 provides, in relevant part:

---

[5] River Birch, of course, had a substantial financial interest in BNY Mellon's taking the lead in defending the lawsuit.  Chesapeake relies heavily on this point.  But River Birch's motivations are beside the point.  The salient issue as to this prong concerns *BNY Mellon's* purposes. Chesapeake fails entirely to effectively impugn them.

The Company agrees to indemnify the Trustee against any loss, liability, claim, damage or expenses incurred by it arising out of or in connection with the acceptance and administration of the trust and its duties hereunder as Trustee, Registrar and/or Paying Agent, including the costs and expenses of enforcing this Indenture against the Company (including with respect to this <u>Section 7.07</u>) and of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties hereunder. . . . The Trustee may retain separate counsel and the Company shall reimburse the Trustee for the reasonable fees and expenses of such counsel. . . .

*The Company shall not be obligated to reimburse any expense or indemnify against any loss, liability, claim or damage incurred by the Trustee determined to have been caused by the Trustee's own negligence or willful misconduct.*

Base Indenture § 7.07 (emphasis added) (underline in original).

Chesapeake argues that BNY Mellon acted negligently or with willful misconduct by taking "staunchly anti-issuer positions." These included refusing to facilitate a redemption at par and subsequently choosing to litigate this dispute in its own name. Chesapeake Br. 1. In support, Chesapeake notes that "[f]ailing to execute required duties under an indenture can constitute negligence or willful misconduct under the indenture, depending on the reasons for the trustee's actions." *Id.* at 14. Chesapeake cites to cases holding a trustee liable for failure to perform administrative, non-discretionary tasks. *Id.*; *see, e.g.*, *LNC Inv., Inc. v. First Fid. Bank, N.A.*, 935 F. Supp. 1333, 1347 (S.D.N.Y. 1996) ("[A]n indenture trustee may be liable in tort for failure to perform basic non-discretionary ministerial tasks."); *Dresner Co. Profit Sharing Plan v. First Fid. Bank, N.A., N.J.*, No. 95 Civ. 1924 (MBM), 1996 WL 694345, at *4–5 (S.D.N.Y. Dec. 4, 1996) (same); *N.Y. State Medical Care Facilities Fin. Agency v. Bank of Tokyo Trust Co.*, 621 N.Y.S.2d 466, 472 (Sup. Ct. N.Y. Cty. 1994) ("[A] trustee will be liable for negligence" where it fails to "perform basic administrative chores with regard to the bonds."). Chesapeake argues that BNY Mellon's refusal to execute the redemption is akin to the lapses at issue in those cases.

This line of authority, however, is inapposite.  BNY Mellon's decision not to execute the redemption was not an oversight or a failure to meet a non-discretionary obligation.  Rather, as the undisputed record makes clear, BNY Mellon reached a considered judgment, at a time when it was represented by counsel, as to the deadline under § 1.7 for notice of a Special Early Redemption.  Based on its reading of the Supplemental Indenture's sub-optimal text, it determined that a redemption at par, if first noticed on March 15, 2013, would be unauthorized and therefore unlawful.  On that basis, not based on a refusal to attend to its duties, BNY Mellon refused to participate in the redemption process, thereby triggering this lawsuit.  Although BNY Mellon's understanding of § 1.7 was later held incorrect, its refusal to assist in Chesapeake's redemption at par arose from its attempt as trustee to *abide* by the terms of the Ninth Supplemental Indenture as it understood them.  It was not a deliberate attempt to flout a known legal duty or a negligent disregard of one.  Chesapeake cites no authority, and the Court is aware of none, requiring an indenture trustee to passively participate, as if a bump on a log, in a process of redemption that it regards, even incorrectly, as unlawful.

Attempting to substantiate its claim of negligence or willful misconduct, Chesapeake next argues that BNY Mellon could have taken steps short of litigating against Chesapeake that would have minimized its expenses and fees.  The Schwarcz Affidavit (Dkt. 137) chronicles such steps.  Chesapeake and Professor Schwarcz suggest that BNY Mellon could have: (1) sought an opinion of counsel; (2) sought direction of all of the noteholders, pursuant to Sections 7.01(c)(3) and 6.05 of the Base Indenture, as to the proper course; (3) facilitated the Special Early Redemption but left it to the noteholders to challenge the redemption as unlawful; and/or (4) filed an interpleader action, bringing the noteholders (and specifically River Birch) into the lawsuit to contest Chesapeake's construction of § 1.7.  *See* Chesapeake Br. 2–3, 10–11.  Chesapeake argues that

16

BNY Mellon's failure to take these steps departed from standard industry practice so as to constitute negligence or willful misconduct.  On this ground, too, Chesapeake seeks discovery into BNY Mellon's decision to itself litigate the issue of the notice deadline.

The Court disagrees.  As to the first option, obtaining an opinion of counsel, by both parties' accounts, BNY Mellon was represented by Emmett Marvin in late February and early March 2013, when it formulated its view as to the operative deadline for a redemption at par, as well as its determination to press that position in court.  Indeed, an Emmett Marvin lawyer, Richard Lasker, participated in the February 28, 2013 phone call with Chesapeake and its outside counsel in which BNY Mellon took the position that the deadline for such a redemption had passed.  Chesapeake does not offer any credible reason to doubt that BNY Mellon's posture reflected its counsel's advice.  Further, BNY Mellon represents, as it did on the privilege log that it produced to Chesapeake during discovery, that it obtained a February 26, 2013 memorandum from Emmett Marvin as to these matters.  *See* Ross Decl. Ex. B.  Under these circumstances, Chesapeake's argument that BNY Mellon was somehow negligent in not obtaining a written opinion of counsel does not logically follow.  First, it appears that BNY Mellon did obtain such a written opinion.  Second, more fundamentally, the circumstances clearly reveal that BNY Mellon sought and received outside counsel's advice.[6]

As for the other courses of action that Chesapeake suggests BNY Mellon could have pursued in lieu of litigating the redemption deadline itself, Chesapeake is correct that BNY Mellon had such alternatives.  It could have participated in the redemption process and left it to the noteholders to challenge Chesapeake's redemption notice in a lawsuit of their own.  Or, once

---

[6] BNY Mellon has offered to make this written opinion available to the Court for an *in camera* review.  *See* BNY Mellon Br. 19 n.10.  However, with Chesapeake's having supplied no factual basis to believe that BNY Mellon acted contrary to Emmett Marvin's advice, there is no reason for the Court to undertake such a review.

suit was filed against it, BNY Mellon could have interpleaded the noteholders and left them to defend the case.  Either approach had advantages.  And, by shifting the cost of legal action to the noteholders, either would have reduced Chesapeake's indemnification exposure.  But although those options were viable, Chesapeake has not persuaded the Court that they were required, such that BNY Mellon's decision instead to defend this lawsuit and its conclusion that the deadline for a redemption at par had passed was an act of negligence or willful misconduct.  That BNY Mellon in other contexts has filed interpleader actions, *see, e.g.*, *Bank of N.Y. v. First Millenium, Inc.*, 607 F.3d 905 (2d Cir. 2010); *Bank of N.Y. Trust, N.A. v. Franklin Advisers, Inc.*, 674 F. Supp. 2d 458 (S.D.N.Y. 2009), does not mean that that course was mandated here.

Further, that BNY Mellon could have sought direction of the noteholders, as it was empowered to do under the Base Indenture, did not require it to do so.  And, under the circumstances here, such a survey would have added little if any productive information.  All noteholders who had surfaced as of the March 12 preliminary injunction conference uniformly supported BNY Mellon's position as to the deadline.  *See* Dkt. 14 (memorandum of law by 10 intervenor-holders in support of motion to intervene); Dkt 16 (memorandum of law of same 10 noteholders, opposing Chesapeake's motion for preliminary injunction); 3/12/13 Hg. Tr. 38–42 (counsel for same noteholders, expressing view that Ninth Supplemental Indenture unambiguously set March 15, 2013, as redemption, not notice, deadline).  And, realistically, there was no reason to expect any noteholder, informed of the controversy, to take a different view.  Regardless of the date on which its 2019 Note had been purchased, each noteholder had a clear financial interest in a finding that the deadline to redeem the notes at par had passed, so as to lock in the favorable interest rates that otherwise extended until 2019.  The formality of a survey of the noteholders was unnecessary to reveal their interest.

18

In assessing Chesapeake's claim of negligence or willful misconduct, it is, finally, important to keep in mind the extraordinary circumstances and tight time frame under which BNY Mellon's decision as to how to proceed was necessarily reached.  Chesapeake had drafted an unusual, and imperfectly drafted, supplemental indenture provision.  It was unusual in that it had a "cliff" structure under which the value of the note to the noteholder dramatically increased once the date for a Special Early Redemption had passed.  It was imperfectly drafted for the reasons reviewed in the Court's May 8, 2013 decision.  With no advance notice, Chesapeake came to BNY Mellon on February 20, 2013, some three weeks before the notice deadline as understood by Chesapeake.

BNY Mellon, for its part, reached a different conclusion from Chesapeake as to the notice deadline.  It concluded that that deadline had passed.  It reached this conclusion after conferring not only with its own counsel but also with others.  On February 28, 2013, BNY Mellon heard from counsel for Chesapeake and counsel for the underwriters of the 2019 Notes.  BNY Mellon also heard from at least one noteholder, Seery, of River Birch.  Importantly, BNY Mellon had no stake in reaching either conclusion as to the notice deadline.  Its interests were those of a neutral.  Chesapeake implies that BNY Mellon was somehow improper, and did River Birch's bidding, in embracing the views River Birch held that the notice deadline had passed.  But Chesapeake fails to explain, let alone substantiate, what conceivable motive BNY Mellon had to advance a legal position which it privately disdained.  Indeed, had BNY Mellon instead taken the opposite view, *i.e.*, that the redemption notice was timely, River Birch could have made the reciprocal allegation, of improper co-optation of the trustee by an equally interested party, the issuer.  There would be no more merit to that insinuation than there is to Chesapeake's here.

Under the circumstances, with BNY Mellon having concluded that Chesapeake's attempt to redeem at par and thereby save itself the interest payments it otherwise owed on the 2019 Notes was improper and unlawful, BNY Mellon had good reasons itself to defend its conclusion in court, in its capacity as indenture trustee.   BNY Mellon had an interest, as trustee, in assuring that the correct outcome as to the indenture deadline was reached, through vigorous, high-quality, litigation.   But there was no assurance that the noteholders could or would fund, or give satisfactory client direction to, such litigation.   The coming expedited litigation promised to be costly, potentially very costly, but given the pace at which events had unfolded and the uncertain future course of the litigation, the cost could not be known in advance.[7]   Further, the noteholders were decentralized.   There was no ready organizing or coordinating mechanism among them. There was an obvious risk of free-riding among them.   And time was short:  On March 19, 2013, four days after Chesapeake issued its notice of redemption, the Court set trial for late April and put in place a highly accelerated discovery schedule, to begin immediately.   To assure a capably litigated trial of the complex questions presented on the schedule set, BNY Mellon could reasonably conclude that its participation was necessary.

BNY Mellon's decision to take on the defense of the lawsuit that Chesapeake had brought against it, far from reflecting negligence or willful misconduct, was thus defensible. And although Chesapeake speculates as to malignant motives on its trustee's part, its suppositions are far too speculative to entertain, let alone to trigger discovery.   Chesapeake labels as mysterious the retention by BNY Mellon of the noteholders' former counsel, Sidley Austin, after the noteholders withdrew in favor of BNY Mellon.   But with Sidley's Bierman having skillfully argued before the Court as to the central issue in the case (the notice deadline) in

---

[7] BNY Mellon represents that it spent approximately $4.983 million on the litigation during the period between February 20, 2013 and April 30, 2013.  *See* Winke Decl. (Dkt. 133) ¶ 3.

connection with Chesapeake's preliminary injunction motion, and with BNY Mellon in agreement with the noteholders on that key point, BNY Mellon had every reason to retain Sidley once the noteholders withdrew and Sidley became available.  An independent counsel for BNY Mellon was also advisable given the possibility that Emmett Marvin's earlier involvement with the indenture made its personnel potential fact witnesses who could be noticed to testify.  This possibility was later realized:  Bayard Chapin, an Emmett Marvin partner, was subpoenaed to give deposition testimony in the case, and did so.  Chesapeake also surmises that BNY Mellon might have earlier advised a noteholder that the redemption deadline had passed, and that it felt obliged to adhere to that position going forward.  There is, however, no factual basis before the Court sufficient to justify discovery into that speculative theory.

The Court, accordingly, rejects Chesapeake's claim that BNY Mellon is disentitled to indemnification on account of negligence or willful misconduct.  *Cf. Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co.*, 631 F. Supp. 2d 308, 312 (S.D.N.Y. 2009) (additional costs incurred by trustee, after principal and interest were paid and after bondholders intervened and were represented by competent counsel, were potentially subject to indemnification).  BNY Mellon is entitled to indemnification for "reasonable fees and expenses of . . . counsel," as provided for by § 7.07 of the Base Indenture.

## CONCLUSION

For the reasons stated above, the Court holds that Chesapeake is responsible for paying its own legal fees and expenses.  The Court further holds that BNY Mellon is entitled, under Base Indenture § 7.07, to indemnification from Chesapeake for its counsel's reasonable fees and expenses, that the exception in § 7.07 for expenses caused by negligence or willful misconduct does not apply, and that discovery into the applicability of that exception is not justified.  The

21

Clerk of Court is respectfully directed to terminate the motion, by Chesapeake, at docket number 128.

The Court leaves open, for the time being, BNY Mellon's motion for fees and expenses, at docket number 131. Whether the individual fees and expenses incurred by BNY Mellon were reasonable, as opposed to unreasonable or excessive, is not presently before the Court. The Court strongly urges counsel to attempt to reach a resolution of that issue, and to avoid triggering a new round of litigation, this time into fees. The Court directs that counsel meet and confer about that issue promptly, and report back to the Court in the form of a joint status letter, due by October 18, 2013, as to that issue. To the extent the parties are unable to resolve any differences about specific fees or expenses, counsel should report whether these disputes are better resolved in the context of BNY Mellon's pending motion pursuant to Rule 54(d) or of a separate action brought by BNY Mellon.

The Court recognizes that whether fees and expenses incurred in connection with BNY Mellon's pending appeal are indemnifiable, and if so to what extent, presents a separate inquiry which the parties may conclude is better addressed at a later date. If the parties so conclude, the Court encourages counsel to attempt to resolve now any differences as to fees and expenses with regard to the trial phase of this litigation, with BNY Mellon reserving its right at a later date to seek, and Chesapeake its right to oppose, indemnification of appellate fees and expenses.


SO ORDERED.

*Paul A. Engelmayer*

Paul A. Engelmayer
United States District Judge


Dated: October 1, 2013
     New York, New York