UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                            :

CHESAPEAKE ENERGY CORPORATION,    :     Case No. 1:13-cv-1582-PAE
                            :

               Plaintiff,     :
                            :     ECF Case

                v.            :
                            :

THE BANK OF NEW YORK MELLON TRUST  :
COMPANY, N.A.                       :
                            :

               Defendant.    :
                            :
-------------------------------------------------------------------X

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR FURTHER RELIEF UNDER 28 U.S.C. § 2202

Lawrence S. Robbins
Mark T. Stancil*
Jeremy C. Baron*
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street N.W. Suite 411-L
Washington, D.C. 20006

*Counsel for Defendant The Bank of New York Mellon Trust Company, N.A.*

*\*Motions for admission* pro hac vice *pending*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ........................................................................................................ 3

ARGUMENT .............................................................................................................. 9

    I.     THE TRUSTEE IS ENTITLED TO JUDGMENT ON CLAIM I .............................. 10

    II.    ANY QUESTION REGARDING THE EFFECT OF CHESAPEAKE'S
        *NOTICE* OF REDEMPTION REMAINS MOOT—CHESAPEAKE
        DID, IN FACT, *REDEEM* THE BONDS OUTSIDE THE SPECIAL
        EARLY REDEMPTION PERIOD .............................................................. 10

           A.     Claim II Involved Only The Effect Of The Notice If This Court
                  Did Not Render A Declaratory Judgment In Chesapeake's
                  Favor Before May 13 ....................................................................... 11

           B.     This Court Correctly Held That Claim II Was Moot ...................................... 13

           C.     In Any Event, Claim II Is Moot In Light Of Chesapeake's
                  Redemption Of The Notes ............................................................... 15

    III.   CHESAPEAKE REDEEMED THE BONDS AFTER MARCH 15,
        2013, AND THEREFORE WAS CONTRACTUALLY OBLIGATED
        TO PAY THE MAKE-WHOLE PRICE .................................................... 17

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Am. Dietaids Co. v. Celebrezze*,
  215 F. Supp. 252 (S.D.N.Y. 1963) ......................................................................... 16

*Amersi Enters., Inc. v. I.N.S.*,
  741 F. Supp. 37 (N.D.N.Y. 1990) .......................................................................... 14

*Barcher v. N.Y.U. Sch. of Law*,
  172 F.3d 37 (2d Cir. 1999) .................................................................................... 14

*Brady v. Wal-Mart Stores, Inc.*,
  No. 03-CV-3843 JO, 2010 WL 4392566 (E.D.N.Y. Oct. 29, 2010) ...................... 15

*Browning Debenture Holders' Comm. v. DASA Corp.*,
  524 F.2d 811 (2d Cir. 1975) .................................................................................. 13

*Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*,
  91 N.Y.2d 256, (N.Y. 1998) .................................................................................. 18

*Burgo v. Gen. Dynamics Corp.*,
  122 F.3d 140 (2d Cir. 1997) .................................................................................. 14

*Christopher P. ex rel. Norma P. v. Marcus*,
  915 F.2d 794 (2d Cir. 1990) .................................................................................. 13

*Comrie v. Enterasys Networks, Inc.*,
  837 A.2d 1 (Del. Ch. 2003) ................................................................................... 19

*E.C. ex rel. R.C. v. Cnty. of Suffolk*,
  514 F. App'x 28 (2d Cir. 2013) ............................................................................. 14

*Eagle Star Ins. Co. Ltd. v. Seneca Ins. Co.*,
  94 CIV. 9106 (JFK), 1995 WL 733642 (S.D.N.Y. Dec. 12, 1995) ...................... 19

*Herbert Rosenthal Jewelry Corp.* v. *St. Paul Fire & Marine Ins. Co.*,
  21 A.D.2d 160 (N.Y. App. 1st Dep't 1964) ........................................................... 18

*In re Allied Artists Pictures Corp.*,
  71 B.R. 445 (S.D.N.Y. 1987) ................................................................................. 16

*In re Enron Corp.*,
  297 B.R. 382 (Bankr. S.D.N.Y. 2003) ................................................................... 16

*Lewis v. Don King Prods., Inc.*,
  94 F. Supp. 2d 430 (S.D.N.Y. 2000) ..................................................................... 16

*Mailer v. Zolotow*,
   380 F. Supp. 894 (S.D.N.Y. 1974) ........................................................ 14

*MedImmune, Inc. v. Genentech, Inc.*,
   549 U.S. 118 (2007)............................................................................... 14

*Penguin Books USA Inc. v. Walsh*,
   929 F.2d 69 (2d Cir. 1991) .................................................................... 16

*S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*,
   24 F.3d 427 (2d Cir. 1994) .................................................................... 13

*Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*,
   691 F.2d 1039 (2d Cir. 1982) ................................................................ 18

*Soto v. City of Lackawanna*,
   No. CIV-83-319E, 1986 WL 185 (W.D.N.Y. Apr. 11, 1986)................... 13

*Starter Corp. v. Converse Inc.*,
   170 F.3d 286 (2d Cir. 1999) .................................................................... 9

*Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*,
   890 F. Supp. 2d 398 (S.D.N.Y. 2012) .................................................... 13

*Zigman v. Rosen*,
   133 A.D.2d 399 (N.Y. App. 2d Dep't 1987) .......................................... 19

**Statutes**

28 U.S.C. § 2202.................................................................................... 1, 9

**Rules**

N.Y. CPLR §§ 5001 .............................................................................. 17, 22

N.Y. CPLR §§ 5004 .............................................................................. 17, 22

## PRELIMINARY STATEMENT

This case is on remand from the Second Circuit, which reversed this Court's declaratory judgment in favor of Plaintiff Chesapeake Energy Corporation ("Chesapeake"). Defendant The Bank of New York Mellon Trust Company, N.A. ("the Trustee") brings this motion for further relief under 28 U.S.C. § 2202, which provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." The Trustee seeks the following relief, all of which follows directly from the Second Circuit's disposition of the declaratory judgment ruling:

- Entry of judgment in the Trustee's favor on Claim I of Chesapeake's complaint.

- Entry of judgment in the Trustee's favor on Claim II of Chesapeake's complaint.

- An order directing Chesapeake to pay the Trustee the contractually specified Make-Whole Price (minus the par amount Chesapeake actually paid when it redeemed the bonds), plus statutory prejudgment interest.

In Claim I, Chesapeake sought a declaration that it was permitted to redeem certain notes at par as late as May 13, 2013. The Second Circuit held that the indentures did not permit par redemption after March 15, 2013. The Trustee is therefore entitled to judgment in its favor on Claim I to enforce the Second Circuit's mandate.

In Claim II, Chesapeake sought a declaratory judgment regarding the effect of Chesapeake's *notice* of redemption in the event that this Court had ruled against it or had failed to rule before May 13, 2013. As this Court recognized in denying Claim II as moot, neither condition came to pass, and Chesapeake did not appeal that dismissal. Although there was no appellate briefing on Claim II, the Second Circuit's decision remanded "for consideration of Chesapeake's second claim for declaratory judgment that the redemption notice given by

1

Chesapeake on March 15, 2013 should not be deemed to have noticed redemption at the Make-Whole Price."  Robbins Declaration Exhibit ("Ex.") A at 12.  With respect, there is nothing additional to consider.  Chesapeake's Claim II involved the possible effect of sending a *notice* of par redemption, but those concerns are academic now that Chesapeake *did in fact* redeem the bonds.  Chesapeake may contend that the Trustee *stipulated* never to seek payment of the Make-Whole Price if Chesapeake redeemed but the Trustee then prevailed on appeal.  That is demonstrably incorrect.  The Trustee stated only that Chesapeake would not be *forced* to redeem in the absence of a favorable ruling from this Court before May 13, 2013.  But the Trustee never did—and never *would*—abandon the right to seek relief to which noteholders are contractually entitled if Chesapeake redeemed the bonds outside the Special Early Redemption Period.

That is, in fact, what Chesapeake did:  It redeemed the bonds on May 13, 2013.  As the Second Circuit has now held, Chesapeake was not entitled to redeem at par on that date.  To the contrary, Section 1.7(c) of the Ninth Supplemental Indenture requires that redemption after March 15, 2013, may occur only at the contractually specified Make-Whole Price.  Accordingly, when Chesapeake redeemed on May 13, it was required by Section 1.7(c) to pay the Make-Whole Price.  By deciding to go forward with the redemption, Chesapeake gambled that this Court's decision would be affirmed on appeal, hoping to reap a huge financial windfall by paying only the par price.  But that gamble also carried with it the risk of appellate reversal, and nothing in Claim II or the Supplemental Indenture did (or could) insulate Chesapeake from the contractually prescribed remedy for redeeming outside the Special Early Redemption Period.  Chesapeake redeemed the bonds on a date when the contract required the Make-Whole Payment.  Respectfully, that is where this case must end.

# BACKGROUND

Chesapeake issued $1.3 billion of 6.775% Senior Notes Due 2019 (the "2019 Notes") in February 2012. The bonds provided for a 6.775% interest rate with a maturity date of March 15, 2019. The Bank of New York Mellon served as Indenture Trustee for these notes, which were issued under a 2010 Base Indenture and a Ninth Supplemental Indenture specific to this bond series.

## The Redemption Provisions

The Ninth Supplemental Indenture included two provisions specifying two mutually exclusive methods by which Chesapeake could redeem the 2019 Notes before maturity. The first provision, § 1.7(b), defined a "Special Early Redemption Period" that would allow Chesapeake to redeem the notes at par (*i.e.*, principal plus accrued interest) by March 15, 2013. The second provision, § 1.7(c), gave Chesapeake the right to redeem the bonds after March 15, 2013, but only at the "Make-Whole Price." As its name suggests, the Make-Whole Price was designed to establish the payment due to noteholders in exchange for the loss of their right to hold the bonds to maturity.

These provisions read in full as follows:

(b) At any time from and including November 15, 2012 to and including March 15, 2013 (the "Special Early Redemption Period"), the Company, at its option, may redeem the Notes in whole or from time to time in part for a price equal to 100% of the principal amount of the Notes to be redeemed, plus accrued and unpaid interest on the Notes to be redeemed to the date of redemption; provided, however, that, immediately following any redemption of the Notes in part (and not in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal amount of the Notes remains outstanding. The Company shall be permitted to exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it gives the notice of redemption pursuant to Section 3.04 of the Base Indenture during the Special Early Redemption Period. Any redemption pursuant to this Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the provisions of Sections 3.02 through 3.07 of the Base Indenture.

(c) At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

Ex. B (PX 4) § 1.7.

<u>Chesapeake's Declaratory Judgment Action</u>

In early 2013, Chesapeake took the position that, if it issued a *notice* of redemption by March 15, it could redeem at par as late as May 13. After the Trustee informed Chesapeake that it disagreed with this reading and that the deadline for noticing a par redemption had passed, Chesapeake filed a declaratory judgment action and sought a preliminary injunction. Its Complaint included two claims for relief. Claim I sought a declaration

that the Notice of Special Early Redemption, upon being mailed on or prior to March 15, 2013 in accordance with the Base Indenture and the Supplemental Indenture, is timely and effective to redeem the 2019 Notes at 100% of principal amount plus accrued and unpaid interest to, but not including, the redemption date of May 13, 2013.

Ex. C (Dkt. 1) ¶ 26. Claim II arose from Chesapeake's concern that the act of sending the notice of redemption would irrevocably obligate it to go forward with the redemption at the Make-Whole Price even if this Court ruled against it on Claim I or had not yet ruled by May 13. Accordingly, Claim II sought a declaration

that the Notice of Special Early Redemption is effective solely for a redemption of the 2019 Notes at 100% of principal amount plus accrued and unpaid interest to, but not including, the redemption date of May 13, 2013 pursuant to Section 1.7(b) of the Supplemental Indenture, and in the event that either (i) such notice is determined not to be timely for that purpose, or (ii) this Court has not issued a decision with respect to the declaratory relief sought in Claim I set forth above prior to the May 13, 2013 redemption date, then the Notice of Special Early Redemption shall be deemed null and void and shall not be effective to redeem the 2019 Notes.

*Id.* ¶ 28.

Chesapeake attached as Exhibit D to its Complaint a proposed "Notice of Special Early Redemption at Par," which Chesapeake planned to issue by March 15. Ex. D (Dkt. 1-5) at 1

4

(capitalization and emphasis omitted). The Notice stated that, "For the avoidance of doubt, notwithstanding anything in the Indenture to the contrary, this Notice of Special Early Redemption at Par will not be deemed to be made pursuant to Section 1.7(c) of the Supplemental Indenture or otherwise to *require* the Company to redeem the Notes at the Make-Whole Price." *Ibid*. (emphasis added).

<u>Chesapeake's Preliminary Injunction Request</u>

This Court ordered briefing on Chesapeake's request for a preliminary injunction. Chesapeake's brief focused on the relief requested in Claim II. To exercise its purported right to redeem at par, Chesapeake argued, it was required to send its notice of redemption by March 15. But what if, before the May 13 redemption deadline, the Court were to rule that the deadline for par redemption had passed? Or, what if the Court were to fail to rule at all by May 13? In those scenarios, Chesapeake said, it was concerned about its "notice being misconstrued" as irrevocably requiring Chesapeake to redeem the bonds on May 13. Ex. E (Dkt. 4) at 3. In other words, Chesapeake faced a risk that, by sending its proposed notice of redemption, the company would irrevocably "trigger a redemption" on May 13, even though Chesapeake said it intended to redeem the bonds only if it had a favorable ruling from the Court by that date. *Id.* at 18. Chesapeake wanted assurance that it could send the notice without committing itself to go forward with a make-whole redemption.

At the March 12 preliminary injunction hearing, the Court identified the dilemma Chesapeake faced if it did not receive a preliminary injunction and if the declaratory judgment sought in Claim I were not resolved by May 13. Chesapeake would either have to (1) pay the noteholders the Make-Whole Price, and, if later victorious on Claim I, sue the noteholders to recover the excess over par; or (2) pay the noteholders par and risk having the noteholders call a

default. In the Court's words, the company would "either have to choose whether to redeem while reserving your right to reclaim in follow-on litigation, or [Chesapeake has] to say we're not redeeming and then suffer" the debilitating effects of a default. Ex. F at 18. The Court then explained the problem Chesapeake faced if it did not receive a preliminary injunction and if it lost before May 13 on Claim I: "[I]f I then rule against you before May 13 you're nevertheless stuck having issued" the notice of redemption. *Id*. at 22.

Significantly, the Court and counsel for Chesapeake also discussed the possibility of appellate review:

> THE COURT: Assuming that the Court were to decide for you in May under your schedule on the timeliness issue and the defendant [Bank of] New York for appeal, even under an expedited appeal what then?
>
> MR. ZIEGLER: Well.
>
> THE COURT: There comes some point where the process of realistic litigation timetable works some harm because of the long term uncertainty.
>
> MR. ZIEGLER: There is no question that an appeal is a very interesting potential development. In our view whether -- if we prevail in this court, a key question will be whether a no fault to persuade your Honor or the Second Circuit to grant a stay of that ruling and if so under what terms because if it is stayed, and we are confident that any stay would be conditioned on there being no default. If Chesapeake does not on the redemption date pay the amount, if there is no stay then I don't think there would be that uncertainty. I think that the redemption will be paid.
>
> THE COURT: I guess the issue is if there is a final judicial ruling before the redemption date, then I take it your argument is this is enough risk factor for the market. There is a different order of problem created if the redemption date is overrun by the progress of litigation or appellate say or whatever the case might be, isn't there?
>
> MR. ZIEGLER: Yes. But I think we thought through those consequences.

*Id*. at 57-58. This much is clear from that exchange: The Court pointed out to counsel for Chesapeake the possibility that the Second Circuit would not resolve an appeal until after May 13, and counsel responded that the company had "thought through those consequences."

Chesapeake did not suggest that Claim II would have any effect in the event of appellate reversal.

The Court denied a preliminary injunction in an oral ruling issued March 14, 2013. Among other factors, the Court found that Chesapeake did not face irreparable harm in the absence of an injunction. Chesapeake could issue the notice, pay the noteholders the Make-Whole Price on May 13, and, if later victorious on its Claim I, sue the noteholders to reclaim the extra payment (even though such a suit might require multi-district litigation). Ex. G at 44-46. The harm of unnecessarily paying the Make-Whole Price would be redressable with damages and was therefore not irreparable. But the Court suggested that Chesapeake was likely to succeed on the merits of Claim II, observing that "[i]t would be reckless for any party or entity to condition its conduct or order its legal or business affairs on the assumption that the Court would rule otherwise." *Id*. at 30-31. The statement responded to Chesapeake's concern that, if the Court were to fail to rule by May 13, the Trustee would demand redemption and payment of the Make-Whole Price on May 13 under threat of calling a default.

Chesapeake issued the notice of redemption on March 15, and the Court set an expedited trial schedule. During the discovery process, the parties submitted a joint letter that included a statement that, "with respect to Claim II in the Complaint, BNY Mellon will not treat the March 15, 2013 notice from Plaintiff as requiring a make whole redemption in the event that the Court determines the March 15, 2013 notice to be untimely for a par redemption." Ex. H (Dkt. 58) at 3 n.2. The statement said that the Trustee "otherwise reserves all rights and defenses." *Ibid.* Chesapeake nonetheless filed for judgment on the pleadings on Claim II. The Court deferred decision until after trial.

<u>The Declaratory Judgment Ruling And Redemption</u>

The Court held a four-day bench trial between April 23 and 25 and heard closing statements on April 30. It issued its opinion and judgment on May 8. The Court granted Chesapeake a declaratory judgment on Claim I, holding that the Supplemental Indenture unambiguously permitted Chesapeake to redeem at par by sending a notice of redemption by March 15. The Court also held that, even were the Supplemental Indenture ambiguous, the extrinsic evidence surrounding the drafting of the document supported Chesapeake's construction.

The court dismissed Claim II as moot, explaining that the problem at which it was directed had not come to pass:

> Chesapeake . . . seeks a declaratory judgment that "in the event that either (i) [the Notice of Special Early Redemption] is determined not to be timely for [a redemption at par], or (ii) this Court has not issued a decision with respect to the declaratory relief sought in Claim I . . . prior to the May 13, 2013 redemption date, then the Notice of Special Early Redemption shall be deemed null and void and shall not be effective to redeem the 2019 Notes." Compl. ¶ 28. BNY Mellon opposed that motion. Dkt. 83–84.

> Neither contingency posited by Chesapeake's second claim has occurred. The Court has held Chesapeake's Notice timely, and has issued its decision prior to the May 13, 2013 redemption date. Accordingly, Claim Two is moot. On that ground, the Court denies Chesapeake's request for a declaratory judgment on Claim Two.

Ex. I (Dkt. 115) at 88.

<u>The Appeal</u>

The Trustee filed its notice of appeal on May 11, and explicitly warned Chesapeake that, "[i]n the event that [Chesapeake] nevertheless chooses to redeem the notes at issue in this matter, the Trustee reserves any and all rights, including but not limited to the right to seek damages and all other available relief if and when the [Second Circuit] reverses . . . the District Court's Judgment." Ex. J. Chesapeake did not appeal or cross-appeal denial of Claim II. Chesapeake redeemed the notes at par on May 13.

The Second Circuit issued an opinion on November 25, 2014, reversing this Court's judgment and remanding the case. The Second Circuit held that the Supplemental Indenture was unambiguous in setting March 15, 2013, as the deadline for Chesapeake to redeem the notes at par. The court of appeals remanded "for consideration of Chesapeake's second claim for declaratory judgment that the redemption notice given by Chesapeake on March 15, 2013 should not be deemed to have noticed redemption at the Make-Whole Price." Ex. A at 12. The Second Circuit denied rehearing on February 6, 2015, and the mandate issued on February 13, 2015.

## ARGUMENT

As noted above, 28 U.S.C. § 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." As the Second Circuit held in *Starter Corp. v. Converse Inc.*, the statute allows a court to award relief (even *sua sponte*) to a defendant who prevails in a declaratory judgment action. 170 F.3d 286, 299 (2d Cir. 1999).

We respectfully submit that three things follow from the Second Circuit's reversal: First, judgment must be entered in the Trustee's favor on Claim I of Chesapeake's complaint. That order is necessary to enforce the Second Circuit's mandate. Second, judgment must be entered in the Trustee's favor on Claim II of Chesapeake's complaint. That claim went only to whether Chesapeake's *notice* of redemption would require it to redeem in the absence of a favorable ruling from this Court, and it remains just as moot as when this Court first denied it on that ground. Third, Chesapeake is required to pay the Make-Whole Price (minus the par price it actually paid) plus statutory prejudgment interest. Chesapeake in fact redeemed the bonds on May 13, 2013. The Ninth Supplemental Indenture permits redemption on that date at one and

only one price: the Make-Whole Price. Chesapeake breached that obligation and now must be held to the express terms of its bargain.

## I.     THE TRUSTEE IS ENTITLED TO JUDGMENT ON CLAIM I

The Second Circuit's opinion requires judgment in the Trustee's favor on Claim I. The Court should therefore enter judgment that Chesapeake's March 15 notice was untimely and ineffective to trigger a par redemption. See L.R. 58.1 ("Any mandate, order, or judgment of an appellate court, when filed in the office of the Clerk of the District Court, shall automatically become the order or judgment of the District Court and be entered as such by the Clerk without further order, except if such mandate, order, or judgment of the appellate court requires further proceedings in the District Court other than a new trial, an order shall be entered making the order or judgment of the appellate court the order or judgment of the District Court.").

## II.    ANY QUESTION REGARDING THE EFFECT OF CHESAPEAKE'S *NOTICE* OF REDEMPTION REMAINS MOOT—CHESAPEAKE DID, IN FACT, *REDEEM* THE BONDS OUTSIDE THE SPECIAL EARLY REDEMPTION PERIOD

Claim II remains moot. By its terms, Claim II sought a declaration regarding whether Chesapeake would have been required to go through with the redemption in the event it had not obtained a favorable ruling from this Court before May 13. The claim no longer had any bearing on this case once this Court ruled in Chesapeake's favor on May 8. This Court therefore properly denied the claim as moot, and Chesapeake did not appeal that ruling. Moreover, Claim II certainly ceased to be relevant when Chesapeake elected to redeem the bonds on May 13. The bonds have been redeemed, and the only remaining question is to determine the proper remedy under the contract. In any event, a notice of redemption—however phrased—cannot give Chesapeake rights it does not have under the contract. The Court should deny Claim II.

<u>Claim II Involved Only The Effect Of The Notice If This Court Did Not Render A Declaratory Judgment In Chesapeake's Favor Before May 13</u>

By its plain terms, Claim II addressed only the effect of Chesapeake's notice of redemption; it did not request relief in the event that Chesapeake chose to redeem the bonds. It asked for a determination that "*the Notice* . . . is effective solely for a redemption" at par, and that, if this Court had not ruled in its favor by May 13, that "*the Notice* . . . shall be deemed null and void and shall not be effective to redeem the 2019 Notes." Ex. C (Dkt. 1) ¶ 28 (emphasis added). Claim II did not seek a ruling on the effect of any actual redemption, much less purport to do the impossible—that is, ask for an order anticipatorily invalidating a future consummated redemption.

Moreover, Claim II was included (and the notice was drafted) in response to Chesapeake's concern that redemption would be mandatory no matter how (or whether) the district court ruled before redemption. Chesapeake's memorandum in support of a preliminary injunction on Claim II explained that it was worried that sending a notice of redemption would "trigger a redemption," Ex. E (Dkt. 4) at 18, even if the Court had not ruled in favor of Chesapeake by May 13. In the event that the Court did not timely rule in its favor, Chesapeake explained, it did not plan to redeem the notes, and "the noteholders [would] be entitled to continue receiving interest as if no notice had ever been sent." *Id.* at 4.

At the preliminary injunction hearing, the Court noted that the Second Circuit's role in resolving the dispute could complicate matters. Although the transcript is muddled, the Court asked counsel for Chesapeake what would happen if "the Court were to decide for you in May" but the Trustee appealed. Ex. F at 57. Counsel called that "a very interesting potential development." *Ibid.* The Court again emphasized how there would be "a different order of problem created if the redemption date is overrun by the . . . appellate" process. *Id.* at 58.

Counsel for Chesapeake agreed and said his client had "thought through those consequences." *Ibid*. Counsel in no way suggested that Claim II would somehow protect against the possibility of appellate reversal.

Nor would such a suggestion have made any sense. A party cannot unilaterally reserve to itself the right to obtain final appellate confirmation of a declaratory judgment action. If Chesapeake wanted the certainty of appellate review before deciding whether to redeem, it should have commenced its declaratory judgment action in time to obtain expedited review. It did not do so. Rather, it was content to gamble that this Court's declaratory judgment would be affirmed. The gamble was understandable—by redeeming the bonds at par, Chesapeake profited by hundreds of millions of dollars—but it was a gamble all the same.

Nor is it true, as Chesapeake may argue, that the Trustee *stipulated* that Chesapeake would not have to make the Make-Whole Payment, even if Chesapeake redeemed the notes but the Trustee ultimately prevailed on appeal. Here is what the statement by the Trustee's counsel actually said:

> [F]or the Court's information, we have notified Plaintiff's counsel that BNY Mellon has instructed that, *with respect to Claim II* in the Complaint, BNY Mellon will not treat the March 15, 2013 *notice* from Plaintiff as requiring a make whole redemption in the event that the Court determines the March 15, 2013 notice to be untimely for a par redemption. *BNY Mellon otherwise reserves all rights and defenses*.

Ex. H (Dkt. 58) at 3 n.2 (emphasis added). The Trustee thus stated only that, as Chesapeake requested in Claim II, the Trustee would not argue that the "notice" Chesapeake had issued would itself "requir[e] a make whole redemption" if this Court did not first rule in Chesapeake's favor. The statement says nothing about what relief the Trustee would seek if Chesapeake, in fact, redeemed in the face of an appeal and the appeal was ultimately successful. And far from eschewing the contract remedy to which it was expressly entitled if Chesapeake redeemed

outside the Special Early Redemption Period, the Trustee "otherwise reserve[d] all rights and defenses." As we explain below (*infra* Part III), there is no disputing the fact that Chesapeake redeemed the bonds on a date that contractually required the Make Whole Payment. Nothing in this statement purports to relieve Chesapeake of that contractual obligation.

B.      This Court Correctly Held That Claim II Was Moot

Declaratory judgment suits, like any other actions in federal court, are subject to Article III's justiciability requirements. *S. Jackson & Son, Inc. v. Coffee, Sugar & Cocoa Exch. Inc.*, 24 F.3d 427, 431 (2d Cir. 1994). "[C]ourts may not entertain actions for declaratory judgment . . . when the question sought to be adjudicated has been mooted by subsequent developments." *Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.*, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (quotations marks omitted); *see also Christopher P. ex rel. Norma P. v. Marcus*, 915 F.2d 794, 802 (2d Cir. 1990) ("A litigant may not use the declaratory judgment statute to secure judicial relief of moot questions.") If "the remedy sought is a mere declaration of law without implications for practical enforcement upon the parties, the case is properly dismissed." *Browning Debenture Holders' Comm. v. DASA Corp.*, 524 F.2d 811, 817 (2d Cir. 1975). Claim II seeks exactly such a hypothetical remedy.

As this Court held, its May 8 judgment turned that request for relief into a purely academic question. As explained above, Claim II was premised on a scenario in which Chesapeake did not have a judgment in its favor on Claim I by May 13. Once this Court ruled for Chesapeake on Claim I, it was clear that "[n]either contingency posited by Chesapeake's second claim has occurred." Ex. I (Dkt. 115) at 88. Thus, the claim became moot. *See Soto v. City of Lackawanna*, No. CIV-83-319E, 1986 WL 185, at *2 (W.D.N.Y. Apr. 11, 1986) (finding request for declaratory judgment moot because event at issue already occurred); *Mailer v.*

*Zolotow*, 380 F. Supp. 894, 896 (S.D.N.Y. 1974) (finding "contingent" request for declaratory judgment to be nonjusticiable); *Amersi Enters., Inc. v. I.N.S.*, 741 F. Supp. 37, 39 (N.D.N.Y. 1990) (finding declaratory judgment action moot because it "presents the court with a hypothetical situation"); *see also MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (federal courts may not "advis[e] what the law would be upon a hypothetical state of facts") (quotation marks omitted).

If Chesapeake believed that Claim II had any relevance beyond the district court's May 8 ruling, it should have challenged that portion of the district court's ruling. If Claim II somehow sought (despite its terms) to protect Chesapeake from paying the Make-Whole Price in the event this Court were reversed on appeal, then it was not *moot*. If that were the case, this Court perhaps could have declined to *reach* the claim on the ground that it would be premature to decide it unless the Second Circuit reversed. But the explicit rationale of the Court's mootness holding was that Claim II sought relief for a state of facts—no ruling by the district court in Chesapeake's favor before May 13—that had not come to pass.

Chesapeake declined to appeal or cross-appeal the mootness holding, and it cannot challenge that ruling now. *See Burgo v. Gen. Dynamics Corp.*, 122 F.3d 140, 145 (2d Cir. 1997) ("What a party may not do, absent a cross-appeal, is attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary . . . ."); *Barcher v. N.Y.U. Sch. of Law*, 172 F.3d 37, at *1 (2d Cir. 1999) (summary order) (party that fails to file a cross-appeal is "not entitled to relief that was denied them by the district court"); *E.C. ex rel. R.C. v. Cnty. of Suffolk*, 514 F. App'x 28, 29 n.1 (2d Cir. 2013) (summary order) (ignoring arguments that dismissal should have been with prejudice because defendant did not cross-appeal); *Brady v. Wal-Mart Stores, Inc.*, No. 03-CV-3843 JO, 2010 WL 4392566, at *10

(E.D.N.Y. Oct. 29, 2010) (plaintiff "forfeited his right to challenge" the district court's failure to award post-judgment interest by "failing to cross-appeal"). Chesapeake's failure to appeal or cross-appeal reaffirms Chesapeake's statements in its pleadings, its papers, and its representations to the court about Claim II—that the claim sought to protect Chesapeake only from an *involuntary* redemption in the absence of a favorable ruling from this Court before May 13.

C.    In Any Event, Claim II Is Moot In Light Of Chesapeake's Redemption Of The Notes

In any event, even if Claim II could be read to have anything to do with appellate reversal, Chesapeake's decision to redeem the notes on May 13 makes Claim II entirely beside the point. That is, if Claim II *had* sought a declaration that Chesapeake's notice of redemption would be "null and void" if the Second Circuit reversed this Court's initial ruling in Chesapeake's favor, that does not change the fact that Chesapeake actually redeemed the notes on May 13. In light of that act of redemption, all that Chesapeake could hope to obtain by Claim II is a ruling that it redeemed the notes without valid notice under the Base Indenture and Ninth Supplemental Indenture. Even this atextual reading of Claim II would thereby serve only to establish that Chesapeake had failed to give proper notice of the redemption *and* had failed to pay the Make-Whole Price as required by Section 1.7(c). Claim II thus could prove only that Chesapeake had breached the contract *twice*; it could do nothing to eliminate Chesapeake's failure to pay the Make-Whole Price when it did, in fact, redeem the notes on May 13.

Claim II is therefore moot twice over. Once Chesapeake redeemed on May 13, it no longer mattered whether the notice of redemption *required* Chesapeake to redeem the bonds because Chesapeake *chose* to redeem the bonds. "An action becomes moot, and thus not a proper subject for declaratory judgment or any other form of adjudication, when the judgment

15

sought, even if granted, could have no practical effect upon the alleged controversy." *In re Allied Artists Pictures Corp.*, 71 B.R. 445, 448-49 (S.D.N.Y. 1987). Chesapeake's act of redemption ensured that any questions about the validity of its notice could have no practical effect on anything. Whatever optionality Chesapeake may have intended to preserve in its notice of redemption, subsequent events—both this Court's ruling and the redemption itself—have overtaken Claim II. *See id.* at 449 (refusing to grant declaratory judgment regarding "property [the debtor] no longer owns"); *see also Penguin Books USA Inc. v. Walsh*, 929 F.2d 69, 73 (2d Cir. 1991) (declaratory judgment action involving effect of publication of book rendered moot by publication). Granting Chesapeake such relief would serve no purpose. *See Lewis v. Don King Prods., Inc.*, 94 F. Supp. 2d 430, 438-39 (S.D.N.Y. 2000).

Moreover, "declaratory relief is intended to operate prospectively. There is no basis for declaratory relief where only past acts are involved." *In re Enron Corp.*, 297 B.R. 382, 387 (Bankr. S.D.N.Y. 2003); *see also Am. Dietaids Co. v. Celebrezze*, 215 F. Supp. 252, 254 (S.D.N.Y.) (in the absence of a "present actual controversy," a request for declaratory judgment regarding "something done in the past" was inappropriate), *aff'd*, 317 F.2d 658 (2d Cir. 1963). Chesapeake's notice of redemption is in the past, as is the act of redemption itself. As a result, there is no basis upon which to issue a new declaratory judgment with respect to Chesapeake's prior notice or prior act of redemption. The Court should deny Chesapeake's Claim II and should focus on the only remaining issue of significance—Chesapeake's liability for its May 13 redemption.

### III. CHESAPEAKE REDEEMED THE BONDS AFTER MARCH 15, 2013, AND THEREFORE WAS CONTRACTUALLY OBLIGATED TO PAY THE MAKE-WHOLE PRICE

The Ninth Supplemental Indenture allows Chesapeake to redeem the bonds in two—and only two—ways: at par *on or before* March 15, 2013, or at the Make-Whole Price *after* March 15, 2013. Chesapeake did, in fact, redeem the bonds after March 15, 2013, and therefore must pay the Make-Whole Price (plus statutory prejudgment interest of nine percent, *see* N.Y. CPLR §§ 5001, 5004). The contract contemplates no other result.

As the Second Circuit recognized, the Ninth Supplemental Indenture "allowed Chesapeake two elective options for early redemption. Pursuant to § 1.7(b), Chesapeake could elect early redemption of Notes at [par] during the Special Early Redemption Period." Ex. A at 4. Or, "[p]ursuant to § 1.7(c), Chesapeake could elect early redemption of Notes after the Special Early Redemption Period at a substantially higher 'Make-Whole Price.'" *Ibid.* The Second Circuit held that the last day on which Chesapeake could have redeemed at par was March 15, 2013. Chesapeake in fact redeemed the bonds on May 13, 2013. Section 1.7(c) authorized redemption on that date, but only at the Make-Whole Price:

> At any time after March 15, 2013 to the Maturity Date, the Company, at its option, may redeem the Notes in whole or from time to time in part for an amount equal to the Make-Whole Price plus accrued and unpaid interest to the date of redemption in accordance with the Form of Note.

Ex. B (PX 4) § 1.7(c). The contract thus leaves no doubt as to what Chesapeake is required to pay for redeeming the bonds on May 13, 2013. In other words, Section 1.7(c) is the only provision under which Chesapeake was permitted to redeem the bonds on May 13, and Section 1.7(c) likewise supplies the only price at which Chesapeake may effect such a redemption.

Enforcing Chesapeake's obligation to pay the Make-Whole Price is in full accord with settled principles of contract law. "[T]he theory underlying damages is to make good or replace

the loss caused by the breach of contract." *Brushton-Moira Cent. Sch. Dist. v. Fred H. Thomas Assocs., P.C.*, 91 N.Y.2d 256, 261, 692 N.E.2d 551, 553 (N.Y. 1998). When Chesapeake redeemed the bonds but paid only the par price, the noteholders lost their bargained-for right to receive the Make-Whole Price in the event of a redemption outside the Special Early Redemption Period. Moreover, "in interpreting or construing a contract[,] the principal purpose of the parties is given great weight." *Herbert Rosenthal Jewelry Corp. v. St. Paul Fire & Marine Ins. Co.*, 21 A.D.2d 160, 167 (N.Y. App. 1st Dep't 1964) (citing Restatement (First) of Contracts § 236(b); 3 Corbin on Contracts § 545; 10 N.Y. Jur. Contracts § 194), *aff'd*, 218 N.E.2d 327 (N.Y. 1966). The evident purpose of Section 1.7 was that redemptions on or before March 15 could (subject to other conditions) occur at par, while redemptions afterward could occur only at the Make-Whole Price. It would defy the parties' intent to allow Chesapeake to redeem the bonds after March 15 at anything other than the Make-Whole Price. Indeed, it would effectively declare that the make-whole provision in the bonds is unenforceable, but that is not the law. *Accord*, *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir. 1982) (enforcing a redemption premium according to the terms of an indenture, notwithstanding a contention that debtor mistakenly believed that its actions did not constitute a breach). With respect, that ought to be the end of the matter.

It is no answer, as Chesapeake may claim, that its *notice* of redemption states that it "will not be deemed to be made pursuant to Section 1.7(c) of the [Ninth] Supplemental Indenture or otherwise to require the Company to redeem the Notes at the Make-Whole Price." Ex. D (Dkt. 1-5) at 1. As explained above, the optionality Chesapeake claimed in its notice addressed only whether Chesapeake would be *required* to redeem in the event this Court ruled against it or did not rule either way before May 13. It did not purport to reserve to Chesapeake the right to

"undo" a consummated redemption, and this Court therefore properly dismissed Claim II as moot when it ruled before May 13.

In any event, the terms of the notice are beside the point. Whatever conditionality Chesapeake may have attempted to preserve in its notice of redemption, it crossed the Rubicon when it redeemed on May 13. The question is not whether Chesapeake's *notice* is defective, or that *redemption* on May 13 was, by itself, improper. Rather, the sole remaining issue is whether Chesapeake breached its obligation to pay the Make-Whole Price as required by Section 1.7(c). It unquestionably did. It redeemed but did not pay the contractually specified price.

The fact that that decision will prove more costly to Chesapeake than it had hoped does not relieve the company of the contractual obligations that follow from a post-March 15 redemption. Courts routinely enforce the consequences of such choices. Where a contract contains two alternative methods of performance, a party's choice as to which method of performance to select is irrevocable under New York law. "Once an election has been made, the contract ceases to be an alternative contract and the electing party is obligated to perform in accordance with the method of performance elected by him," even if a different method of performance is later revealed to be advantageous to him. *Zigman v. Rosen*, 133 A.D.2d 399, 401 (N.Y. App. 2d Dep't 1987). The party's choice of performance binds that party to its selected course, and the choice may not be unilaterally altered. *Eagle Star Ins. Co. Ltd. v. Seneca Ins. Co.*, 94 CIV. 9106 (JFK), 1995 WL 733642, at *4 (S.D.N.Y. Dec. 12, 1995). The rule ensures that a party "cannot [] obtain an award under the rejected alternative form of performance . . . simply because they may be better off now as a result of . . . performance under that clause." *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 19 (Del. Ch. 2003) (citing *Eagle Star*, 1995 WL

733642 at *3).    Having selected redemption on May 13 as its method of performance, Chesapeake must now live with the consequences of that choice.

Chesapeake will likely claim that it never would have redeemed the bonds if it had known that it would lose the appeal.  That is no answer.  Any party who takes action in the hope that a district court's determination will survive appeal would offer the same excuse.  The district court's ruling is not final unless and until it is affirmed on appeal.  Nor can Chesapeake be heard to complain that it had no other options.  It could, of course, have redeemed the bonds at par by March 15, 2013, as required by the contract.  Or, as noted above, it could have sought a declaratory judgment from this Court in sufficient time to allow for expedited review from the Second Circuit.  Or it could have chosen *not* to redeem the bonds in the face of the Trustee's appeal.  But Chesapeake elected instead to go ahead with the redemption in the hope that it would save hundreds of millions of dollars if the par redemption were held to be timely.  That was a calculated risk, but the fact that Chesapeake has ended up on the losing end is no reason to ignore the contract's plain terms.

Chesapeake may also protest that the Make-Whole Price represents a windfall to bondholders.  Not so.  It is an expressly bargained-for term of the parties' contract, and a central economic term of the bonds' value (and one on which bonds are marketed).  And the Make-Whole Price *benefited* Chesapeake by allowing it to issue the bonds at a lower price and/or coupon rate by promising bondholders that they would be paid an agreed-upon amount if the bonds were redeemed after March 15.  What is more, make-whole provisions are essential to the bond market's functioning and are widely used.  They establish a predetermined formula for determining the price of redemption within a certain range of dates.  In the absence of such a provision, the parties are left to debate complicated (and potentially unanswerable) questions

about alternative returns bondholders could have generated on other investments if the bonds are redeemed and the principal is returned before maturity. The parties to a bond contract agree to a specified redemption price—such as par or the make-whole—precisely to avoid the uncertainty of damages in the event of a redemption. Such uncertainty is anathema to the market's functioning. Indeed, the Make-Whole Price here—discounting future interest payments by the Treasury Rate plus 50 basis points (in bond parlance, "T+50")—is an industry-standard term.[1]

Last but not least, refusing to enforce Section 1.7(c) would actually yield something of a windfall *to Chesapeake*. Chesapeake sold these bonds to the market with a par redemption date that ended on March 15, 2013.[2] If Chesapeake wanted the right to redeem at par as late as May 13, 2013, it would have had to offer the market additional consideration for that privilege. Indeed, Chesapeake's CFO, Dominic Dell'Osso, testified that he asked the lead underwriter (Bank of America Merrill Lynch (BAML)) for a par-redemption period of *12 months*. BAML explained that a 12-month period would be "too long" for the offering. Ex. K (PX 101) ¶ 17; Ex. I (Dkt. 115) at 44. That is because the market would have demanded concessions (in the bond's offering price, coupon rate, or some combination of the two) in exchange for that additional right. The date on which the Make-Whole Price is triggered was no trivial matter to investors, and Chesapeake bargained for (and paid for) the right to redeem on May 13, 2013, *only* at the Make-Whole Price.

---

[1] Make-whole provisions customarily use either a T+50 or T+25 rate. The former is slightly more favorable to issuers because it discounts future payments by a higher rate.

[2] Although there was a dispute at trial over the significance of conversations between Chesapeake and BAML, there was no dispute that Chesapeake (and BAML) repeatedly stated to the market that these bonds were redeemable at par only as late as March 15, 2013, and sold the bonds by highlighting the specific yield that the bonds would have generated if redeemed at par on that date. See Ex. I (Dkt. 115) at 79 (noting that the Trustee has "impressively catalogued evidence that various market participants and the financial media regarded March 15, 2013 as the deadline for redemption at par"); *id.* at 80-82 (identifying some of this evidence).

All that remains is to calculate the Make-Whole Price as defined in the agreements, deduct the par amount Chesapeake actually paid on May 13, 2013, and then add 9% statutory prejudgment interest from that date to the date of judgment. *See* N.Y. CPLR §§ 5001, 5004. This should be a matter of simple arithmetic. In the unlikely event that the parties are unable to agree on those calculations, the parties could submit such disputes to the Court for resolution.

## CONCLUSION

This Court should enter judgment in the Trustee's favor on both claims in Chesapeake's Complaint and order Chesapeake to pay the Make-Whole Price, minus the par amount paid on May 13, 2013, plus statutory prejudgment interest to the date of judgment.

February 13, 2015

Respectfully submitted,

_/s/ Lawrence S. Robbins_____
Lawrence S. Robbins
Mark T. Stancil*
Jeremy C. Baron*
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street N.W. Suite 411-L
Washington, D.C. 20006
Phone: (202) 775-4500
Fax: (202) 775-4510
lrobbins@robbinsrussell.com

*Counsel for Defendant The Bank of New York Mellon Trust Company, N.A.*

*\*Motions for admission pro hac vice pending*