UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X

CHESAPEAKE ENERGY CORPORATION,

                           Plaintiff,

             -v-

THE BANK OF NEW YORK MELLON TRUST
COMPANY, N.A.,

                           Defendant.

-------------------------------------------------------------------X

13 Civ. 1582 (PAE)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/10/2015

PAUL A. ENGELMAYER, District Judge:

      On May 8, 2013, this Court entered a declaratory judgment that plaintiff Chesapeake

Energy Corporation ("Chesapeake") had timely issued a notice of "Special Early Redemption,"

and was therefore entitled, under a Supplemental Indenture, to redeem at par a series of senior

notes it had issued in 2012, which were to mature in 2019.  On May 13, 2013, Chesapeake

redeemed those notes at par.  However, on November 25, 2014, the Second Circuit overturned

this Court's decision.  It held that Chesapeake had missed the deadline for a Special Early

Redemption, and thus could not lawfully redeem at par.

      This decision resolves issues that the parties agree are properly resolved on remand.

Most significant, the Court decides the compensation that the Noteholders are due.  Agreeing

with indenture trustee (and defendant) Bank of New York Mellon Trust Company, N.A. ("BNY

Mellon"), the Court holds that the Noteholders were entitled to be paid the "Make-Whole" Price

which, under the Supplemental Indenture as construed by the Second Circuit, was due upon

redemption of the notes if Chesapeake redeemed after March 15, 2013.  Accordingly,

Chesapeake must pay the Noteholders compensation consistent with their entitlement to the

Make-Whole Price.  The Court therefore grants BNY Mellon's motion for further relief, and

denies Chesapeake's cross-motion for an order of restitution.

## I.       Background

The Court assumes familiarity with the facts of this case.  These are chronicled in detail

in the Court's May 8, 2013 decision and the Second Circuit's decision.  *See Chesapeake Energy*

*Corp. v. Bank of N.Y. Mellon Trust Co.*, 957 F. Supp. 2d 316 (S.D.N.Y. 2013), *rev'd and*

*remanded*, 773 F.3d 110 (2d Cir. 2014).  The Court recites here only the most central facts.

### A.       Chesapeake's May 2013 Redemption

In February 2012, Chesapeake issued $1.3 billion in senior notes due on March 15, 2019,

bearing an interest rate of 6.775% ("the 2019 Notes" or "the Notes").  The 2019 Notes were

governed by a Base Indenture applicable to several series of notes, and a Supplemental Indenture

specific to the 2019 Notes.

Section 1.7 of the Supplemental Indenture set out the terms under which Chesapeake

could redeem the 2019 Notes before the due date.  Entitled "Redemption," Section 1.7 provided,

in its entirety:

> (a)  The Company shall have no obligation to redeem, purchase or repay the
> Notes pursuant to any mandatory redemption, sinking fund or analogous provisions
> or at the option of a Holder thereof.

> (b)  At any time from and including November 15, 2012 to and including
> March 15, 2013 (the "Special Early Redemption Period"), the Company, at its
> option, may redeem the Notes in whole or from time to time in part for a price equal
> to 100% of the principal amount of the Notes to be redeemed, plus accrued and
> unpaid interest on the Notes to be redeemed to the date of redemption; provided,
> however, that, immediately following any redemption of the Notes in part (and not
> in whole) pursuant to this Section 1.7(b), at least $250 million aggregate principal
> amount of the Notes remains outstanding.  The Company shall be permitted to
> exercise its option to redeem the Notes pursuant to this Section 1.7 so long as it
> gives the notice of redemption pursuant to Section 3.04 of the Base Indenture
> during the Special Early Redemption Period.  Any redemption pursuant to this

>   Section 1.7(b) shall be conducted, to the extent applicable, pursuant to the
>   provisions of Sections 3.02 through 3.07 of the Base Indenture.
>
>   (c)   At any time after March 15, 2013 to the Maturity Date, the Company, at
>   its option, may redeem the Notes in whole or from time to time in part for an amount
>   equal to the Make-Whole Price plus accrued and unpaid interest to the date of
>   redemption in accordance with the Form of Note.

Dkt. 1, Ex. B, at 6.  Section 1.7(b) thereby referenced § 3.04 of the Base Indenture, which

provided, *inter alia*, that a notice of redemption must be made between 30 and 60 days before the

redemption itself:

>   At least 30 days but not more than 60 days before a redemption date, [Chesapeake]
>   shall mail a notice of redemption by first-class mail to each Holder of Securities to
>   be redeemed at such Holder's registered address.

Dkt. 185 ("Baron Decl."), Ex. I.

Section 1.7(c), in referring to the "Make-Whole Price" applicable to redemptions after the

Special Early Redemption Period, referenced a term defined elsewhere in the Supplemental

Indenture as "the sum of the outstanding principal amount of the Notes to be redeemed plus the

Make-Whole Amount of such Notes."  *See* Dkt. 1, Ex. B (Supplemental Indenture, Form of Note

("Form of Note")) ¶ 5, at A-4.  The "'Make-Whole Amount' with respect to a Note" is, in turn,

defined as "an amount equal to the excess, if any, of (i) the present value of the remaining

principal, premium, if any, and interest payments due on such Note (excluding any portion of

such payments of interest accrued as of the redemption date) as if such Note were redeemed on

the Maturity Date, computed using a discount rate equal to the Treasury Rate plus 50 basis

points, over (ii) the outstanding principal amount of such Note."  *Id.*

On February 20, 2013, Chesapeake announced that it planned to redeem the 2019 Notes

at the Special Early Redemption price of 100% of the notes' principal amount (*i.e.*, par), plus

interest accrued to the date of redemption (the "Special Price").  In Chesapeake's view, under

§ 1.7(b), March 15, 2013 was the deadline to give a notice of a Special Early Redemption, not the deadline for such a redemption itself.

BNY Mellon, however, notified Chesapeake that, in its view, the time to give notice of a redemption at the Special Price had expired.  BNY Mellon's view, supported by various holders of the 2019 Notes ("the 2019 Noteholders" or "the Noteholders"), was that the deadline under § 1.7(b) for a Special Early Redemption was March 15, 2013; it was therefore no longer possible to meet that deadline while giving the required 30 days' notice.  Further, in an apparent effort to deter Chesapeake from attempting such a redemption, BNY Mellon warned Chesapeake that any such attempt could backfire:  If Chesapeake issued a notice of Special Early Redemption that a court held untimely such that no such redemption went forward, BNY Mellon stated that it might, as indenture trustee, seek to treat such a notice as triggering a redemption under § 1.7(c), requiring Chesapeake to pay the Make-Whole Price rather than holding the Notes to maturity.

On March 8, 2013, Chesapeake filed this action against BNY Mellon, bringing two claims. Dkt. 1 ("Compl.").  Claim One sought a declaratory judgment that a notice of Special Early Redemption at the Special Price, if issued on March 15, 2013 and providing for a redemption on May 13, 2013, would be timely.  Claim Two sought a declaratory judgment that such a notice, if held untimely by this Court to effect a Special Early Redemption such that no redemption occurred, would not trigger redemption at the Make-Whole Price under § 1.7(c), but rather would be void.  Chesapeake's Complaint appended the notice it proposed to issue on March 15, 2013 ("the Notice").  *See id.* Ex. D.  The Notice stated that (1) redemption at the Special Price would occur on May 13, 2013, if this Court by then had ruled the Notice timely to effect a Special Early Redemption, but (2) if the Court had not so ruled by that date, the Notice would be null and void and would not trigger a redemption at the Make-Whole Price.

Chesapeake contemporaneously moved for emergency relief along the lines of Claim Two.  It sought an order that, if Chesapeake issued the Notice for a Special Early Redemption but this Court held it untimely to effect such a redemption, the notice would not bring about a Make-Whole Redemption.  On March 14, 2013, the Court denied Chesapeake's motion, finding that the standards for emergency relief had not been met.  *See* Dkt. 43 ("3/14/13 Tr.").  But the Court stated in strong terms its initial view, agreeing with Chesapeake, that, were the Court to hold the Notice untimely to effect a Special Early Redemption such that no redemption went forward, the Notice would be void, and would not trigger a Make-Whole redemption under § 1.7(c).

On March 15, 2013, Chesapeake issued the Notice.

In late April 2013, after expedited discovery, the Court held a bench trial.

On May 8, 2013, the Court issued a decision finding the Notice timely, and thus finding for Chesapeake on Count One, on two grounds.  Dkt. 115.  First, the text of § 1.7(b) permitted a Special Early Redemption so long as the notice of such a redemption had issued during the Special Early Redemption Period (*i.e.*, by March 15, 2013).  Second, even if the indenture text was ambiguous, the extrinsic evidence demonstrated that the parties who negotiated the Supplemental Indenture had intended March 15, 2013 as the deadline for a notice of redemption, not for the redemption itself.  The Court therefore entered judgment for Chesapeake on Claim One.  Claim Two, the Court held, was moot.

On May 11, 2013, BNY Mellon filed a notice of appeal.  Dkt. 117.

On May 13, 2013, Chesapeake proceeded with the redemption, paying the Noteholders approximately $1.3 billion, calculated pursuant to the Special Early Redemption provision.  *See* Dkt. 178 ("2/24/15 Tr."), 26–27.

5

**B.     The Second Circuit's Ruling**

On November 25, 2014, the Second Circuit reversed.  It held that the Supplemental Indenture authorized Chesapeake to redeem the 2019 Notes at par only if the *redemption* occurred within the Special Early Redemption Period, *i.e.*, no later than March 15, 2013, with notice of 30 to 60 days also given during that period.  Judgment was therefore to be entered for BNY Mellon on Claim One.  In remanding, the Second Circuit directed the Court to consider Chesapeake's Claim Two.  *See Chesapeake Energy Corp. v. Bank of N.Y. Mellon Trust Co., N.A.*, 773 F.3d 110, 117 (2d Cir. 2014).

**C.     Proceedings on Remand**

On February 24, 2015, after the Second Circuit's mandate had issued, the Court held a conference to identify issues to be resolved on remand.  Discussion at the conference centered on the measure of compensation due to the Noteholders.  Chesapeake and BNY Mellon agreed that, given the Second Circuit's holding that Chesapeake's redemption did not qualify as a Special Early Redemption, the 2019 Noteholders are entitled to be paid additional money by Chesapeake beyond the Special Price that Chesapeake had paid.  However, they disagreed as to the amount of such payment.

BNY Mellon argued that under § 1.7(c) of the Supplemental Indenture, the Make-Whole Price applies to all redemptions after March 15, 2013.  Thus, it argued, the 2019 Noteholders are entitled to be paid the difference between (a) the Special Price and (b) the Make-Whole Price.

Chesapeake argued that compensation should be calculated on the premise that, but for this Court's ruling that Chesapeake's notice had been timely, Chesapeake would never have redeemed at all, and the 2019 Notes would have been held to maturity.  Therefore, Chesapeake argued, the Noteholders are entitled to the difference between (a) the Special Price and (b) the

present value of Chesapeake's payouts to maturity.  Chesapeake termed this the "restitutionary" measure of damages.  This measure, Chesapeake stated, yields a smaller payout than the Make-Whole Price because the Make-Whole Price is calculated using a defined formula—including a discount rate 50 basis points above the yield then offered on comparable securities—that awards the Noteholders a sum more than the present value of the payouts to maturity.[1]

Including this dispute over the measure of compensation, the Court identified four issues to be resolved on remand:  (1) What is the proper resolution of Claim Two:  Is that claim still moot in light of the appellate reversal?; (2) What is the procedural vehicle by which the Noteholders' claim for compensation is to be resolved:  Must they (or BNY Mellon on their behalf) file a separate lawsuit seeking damages, or is there a mechanism by which the Court, on remand, can resolve that claim?; (3) What is the proper measure of compensation due to the Noteholders?; and (4) What rate of prejudgment interest applies to such an award?  *See* 2/24/15 Tr.

The parties thereafter briefed these issues.  *See* Dkt. 182 ("BNY Br."), 184 ("Chesapeake Br."), 188 ("BNY Reply Br."), 189 ("Chesapeake Reply Br.").[2]  At the Court's request, the parties also attempted to quantify the compensation due under the two alternatives—the "Make Whole" measure advocated by BNY Mellon and the "restitutionary" measure urged by Chesapeake.[3]  On May 1, 2015, the Court heard argument.  Dkt. 190 ("5/1/15 Tr.").

---

[1] Chesapeake states that this formula was chosen to discourage Chesapeake from redeeming the Notes after the period for a Special Early Redemption had passed.

[2] The parties had previously addressed some of these issues in submissions made before the February 24, 2015 conference.  *See* Dkt. 160–62.

[3] The parties agree that, had they received the Make-Whole Amount, the Noteholders would have received an additional $379.65 million on May 13, 2013.  *See* BNY Br. 2; Chesapeake Br. 8 n.5.  The parties do not agree as to the calculation of restitutionary damages, and Chesapeake, the

## II.    Discussion

The major question before the Court is the measure of compensation due the 2019 Noteholders given the Second Circuit's ruling that Chesapeake redeemed too late to effectuate a Special Early Redemption.  The Court addresses that issue after resolving two related procedural questions—the proper disposition of Chesapeake's Claim Two and the proper procedural vehicle for deciding the issue of the Noteholders' damages.  Last, the Court addresses prejudgment interest.

### A.    Proper Resolution of Chesapeake's Claim Two

In dismissing Claim Two as moot, this Court reasoned:

> Chesapeake . . . seeks a declaratory judgment that "in the event that either (i) [the Notice of Special Early Redemption] is determined not to be timely for [a redemption at par], or (ii) this Court has not issued a decision with respect to the declaratory relief sought in Claim I . . . prior to the May 13, 2013 redemption date, then the Notice of Special Early Redemption shall be deemed null and void and shall not be effective to redeem the 2019 Notes."  Compl. ¶ 28.  BNY Mellon opposed that motion.  Dkt. 83–84.
>
> Neither contingency posited by Chesapeake's second claim has occurred.  The Court has held Chesapeake's Notice timely, and has issued its decision prior to the May 13, 2013 redemption date.  Accordingly, Claim Two is moot.  On that ground, the Court denies Chesapeake's request for a declaratory judgment on Claim Two.

*Chesapeake Energy Corp.*, 957 F. Supp. 2d at 372 (alterations in original).  The Second Circuit, after finding Chesapeake's Notice untimely, remanded "for consideration of Chesapeake's

---

proponent of this approach, states that additional fact-finding would be needed to determine a precise number.  *See, e.g.*, Chesapeake Br. 8; Chesapeake Reply Br. 18–21.  The Court would have to determine, *inter alia*, the interest rate on securities available to the Noteholders on May 13, 2013.  *See* Chesapeake Br. 1–2.  Inputting this variable, the Court would have to determine the difference between the present values of (1) investing the par proceeds that the Noteholders received on May 13, 2013 and (2) holding the bonds to maturity.  *Id.*  Chesapeake estimates that a restitutionary damages award would be approximately $100 million—about $280 million less than an award based on the Make-Whole amount.  *Id.* at 7–8.  BNY Mellon appears to estimate that a restitutionary damages award would be some $325 million—"not that far off the Make-Whole Price."  BNY Br. 28 n.8.  These figures are prior to prejudgment interest.

second claim for declaratory judgment that the redemption notice given by Chesapeake on March 15, 2013 should not be deemed to have noticed redemption at the Make-Whole Price." *Chesapeake Energy Corp.*, 773 F.3d at 117.

Claim Two remains moot.  Claim Two was directed solely to the effect of Chesapeake's *notice* of a Special Early Redemption in the event such a redemption did *not* go forward.  The purpose of Claim Two was to assure that, if this Court either held the notice untimely to effect such a redemption or had not ruled by the March 13, 2013 redemption date, the notice itself would not be treated as triggering a different sort of redemption altogether—a Make-Whole Redemption under § 1.7(c).  Claim Two thereby sought to defuse BNY Mellon's attempt in February and March 2013 to deter Chesapeake from even attempting an at-par redemption, by threatening to treat a notice that was held untimely as triggering a Make-Whole Redemption. *See* Compl. ¶ 5 ("[T]he proposed relief will preserve the status quo by permitting Chesapeake to begin the redemption process without prejudicing either BNY Mellon or the noteholders.").  In the end, of course, Chesapeake was undeterred.  It issued the notice, reassured, no doubt, by the Court's statement in addressing the application for emergency relief that if the Court held such a notice untimely and no redemption occurred, it would almost certainly then find the notice void, as opposed to triggering redemption on different terms.

And the redemption *did* go forward.  Therefore, neither contingency posited by Claim Two occurred:  This Court held Chesapeake's notice timely and so ruled before the May 13, 2013 redemption date.  Presumably appreciating this, neither side appealed (or cross-appealed)

Case 1:13-cv-01582-PAE   Document 192   Filed 07/10/15   Page 10 of 37

the Court's finding that, in light of the Court's ruling, Claim Two was moot.  Nor does either

side now seek to alter the Court's judgment on Claim Two.[4]

Moreover, Chesapeake's later act of redemption made Claim Two doubly moot.  That

consequential act made academic the issue of what the effect of an untimely notice alone—*i.e.*,

one *not* followed by a redemption—would have been.  *See Penguin Books USA Inc. v. Walsh*,

929 F.2d 69, 73 (2d Cir. 1991) (declaratory judgment action involving effect of publication of

book rendered moot by publication).

In remanding with instructions to consider Claim Two, the Second Circuit—recognizing

that its decision meant that Chesapeake's par redemption left the 2019 Noteholders insufficiently

compensated—may have viewed Claim Two as a possible vehicle for resolving the measure of

compensation due to the Noteholders.  That issue indeed must be resolved, as all agree. But

Claim Two ill fits that task, as it was not addressed to the circumstance in which a finding of

timeliness by this Court was followed by a redemption and then an appellate reversal.  And, as

follows, a satisfactory alternative procedural vehicle *has* been identified that will allow the entry

of a declaration as to the compensation due to the Noteholders.  The Court, accordingly, leaves

undisturbed the judgment that Claim Two is moot.

---

[4] At the February 24, 2015 conference, Chesapeake briefly argued that Claim Two was not moot,
*see* 2/24/15 Tr., 21, but later appeared to retreat from that contention, *id.* at 23, recognizing that,
regardless how Claim Two was resolved, the Court would still need to decide the measure of
compensation due the 2019 Noteholders.  On that issue, Chesapeake stated, "the effect of the
redemption that occurred is integrally tied to th[e] notice" it issued on March 15, 2013, *id.*, so as
to favor the lesser measure of compensation that Chesapeake endorsed.  The Court addresses that
separate argument *infra*.  Notably, Chesapeake's briefs after the February 24, 2015 conference
did not address Claim Two or dispute that Claim Two was moot.  *See* Dkt. 184, 189.

**B.      Procedural Mechanism for Resolving the Noteholders' Compensation**

Before the February 24, 2015 conference, the Court solicited counsel's views as to the proper procedural vehicle by which to resolve the compensation due to the Noteholders as a result of the ruling that Chesapeake was not entitled to redeem at par.  Dkt. 175.  At that conference, and later in the briefs, the parties addressed that question.  Significantly, although the parties identify different mechanisms, they agree it is appropriate and within the power of this Court on remand to resolve this issue by means of a declaration, and that it is unnecessary for BNY Mellon or the Noteholders to institute a separate lawsuit.

BNY Mellon argues that the Declaratory Judgment Act, 28 U.S.C. § 2202, supplies the proper procedure.  *See* BNY Br. 7 ("Section 2202 provides the appropriate way to decide the legal remedy for Chesapeake's May 13, 2013, breach.").  Section 2202 provides that "[f]urther necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."  28 U.S.C. § 2202.  Section 2202 applies here, BNY Mellon argues, because the Second Circuit's mandate requires that declaratory judgment be entered in its favor on Claim One, because that judgment affects both parties' rights, and because BNY Mellon's motion for further relief seeks "necessary [and] proper relief based on" that declaratory judgment.[5]  BNY Br. 7–8.

Chesapeake, in contrast, urges the Court not to rely on § 2202, which it claims has not been used in this precise factual scenario.  Chesapeake instead situates the power to remedy the

---

[5] On February 13, 2015—the day the Second Circuit's mandate issued, Dkt. 151—BNY moved "for further relief pursuant to 28 U.S.C. § 2202, and for such other and further relief that the Court deems just and proper," Dkt. 160, and filed a supporting memorandum of law, Dkt. 161, as well as a declaration, Dkt. 162.

Noteholders' injury in a court's "inherent equitable power to fashion the appropriate relief." Chesapeake Br. 34; *see also id.* at 33 ("The Court's inherent authority is sufficient to order the requested relief.").  Chesapeake's argument accords with its broader application that the remedy that the Court fashion on remand is informed by equitable principles of restitution, not contractually by the terms of the Supplemental Indenture.[6]

The Court's judgment is that while both procedural mechanisms could properly be used as the basis for furnishing relief here, § 2202 is the more natural fit.  Second Circuit precedent solidly supports that § 2202 is an appropriate mechanism for resolving damages.  The Circuit has held that § 2202 permits a court to award relief to a defendant who prevails in a declaratory judgment action, as BNY Mellon has here.  *See Starter Corp. v. Converse, Inc.*, 170 F.3d 286, 298 (2d Cir. 1999) (courts have invoked § 2202 to award relief to parties "who have won a declaratory judgment from the court to enforce that judgment through injunction, damages and other relief") (citing *Vt. Structural Slate Co. v. Tatko Bros. Slate Co.*, 253 F.2d 29, 29–30 (2d Cir. 1958)).  Further, relief under § 2202 may take the form of equitable or legal relief, and may include monetary damages.  *See, e.g.*, *Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.*, 155 F.3d 17, 25 (2d Cir. 1998) ("A district court may grant further relief, including monetary damages, whether or not it 'ha[d] been demanded, or even proved, in the original action for declaratory relief.'") (quoting *Edward B. Marks Music Corp. v. Charles K. Harris Music Publ'g,*

---

[6] Chesapeake, however, explicitly acknowledged that it does not dispute the Court's power to resolve this dispute.  *See* 2/24/15 Tr., 36 ("**THE COURT**:  I want to make sure that before we figure out the math, and the right way to measure damages, that there isn't any dispute between the parties that the right people are convened here and that I have the power ultimately to issue what appears from your point of view to be a declaration that, regardless of the number blank that's filled in, gives noteholders monetary relief.  You [*i.e.*, counsel for Chesapeake] and Mr. Robbins [*i.e.*, counsel for BNY Mellon], through somewhat different routes, appear to be saying I have that power.  **MR. ZIEGLER**:  Yes.").

*Co.*, 255 F.2d 518, 522 (2d Cir. 1958)) (alteration in *Fred Ahlert Music*); *Beacon Constr. Co. v. Matco Elec. Co.*, 521 F.2d 392, 399–400 (2d Cir. 1975) ("further relief" under § 2202 includes damages). Other circuits agree that § 2202 may be used to award monetary damages. *See Ins. Servs. of Beaufort, Inc. v. Aetna Cas. & Sur. Co.*, 966 F.2d 847, 851–52 (4th Cir. 1992); *Horn & Hardart Co. v. Nat'l Rail Passenger Corp.*, 843 F.2d 546, 548–49 (D.C. Cir. 1988); *Alexander & Alexander, Inc. v. Van Impe*, 787 F.2d 163, 166 (3d Cir. 1986); *Sec. Ins. Co. of New Haven v. White*, 236 F.2d 215, 220 (10th Cir. 1956). Section 2202 is properly utilized here, and Chesapeake, while attempting to distinguish this case factually, has not pointed to any contrary authority.[7]

### C.     The Compensation Due to the 2019 Noteholders

The parties take different approaches to the compensation due to the Noteholders. BNY Mellon emphasizes that the Supplemental Indenture is a contract, and that it provides for only two types of redemptions: Special Early Redemptions at par, which must occur by March 15, 2013; and redemptions after that date, which require Chesapeake to pay at the Make-Whole Price. Because Chesapeake redeemed after March 15, 2013, BNY Mellon argues, it must pay the Make-Whole Amount. In contrast, Chesapeake contends that damages should be determined based on equitable principles, not based on the indenture's text or breach-of-contract principles. Emphasizing that it never intended to effect a Make-Whole redemption, Chesapeake argues that

---

[7] Were § 2202 unavailable, the Court could use its inherent authority to issue a declaration as to the compensation due. But § 2202 fits better here because this case is a declaratory judgment action, and the need to award monetary relief to the Noteholders arises from the overturning of a declaratory judgment. Contrary to Chesapeake's evident premise in opposing the use of § 2202, the choice of that procedural mechanism does not carry substantive implications as to damages because § 2202 empowers the Court to issue both equitable and legal relief. *See Fred Ahlert Music*, 155 F.3d at 25.

a restitutionary remedy—measuring damages by the present value of the payouts the Noteholders would have received had there been no redemption and they held the Notes to maturity—is just.

### i.     Applicable Legal Standards

The Second Circuit has addressed the circumstances in which, under New York law,[8] a party's recovery is to be set pursuant to a contract as opposed to under equitable principles. Where a valid, enforceable contract governs the relevant subject matter, the Circuit has stated, the contract ordinarily precludes recovery in quasi-contract (*i.e.*, restitution).  As the Second Circuit put the point in *MacDraw, Inc. v. CIT Group Equipment Financing, Inc.*:  "[W]ell-settled principles of New York law would ordinarily preclude [plaintiff] MacDraw from pursuing an unjust enrichment claim against [defendant] CIT under the circumstances presented here . . . . '[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract [*i.e.*, unjust enrichment] for events arising out of the same subject matter.'"  157 F.3d 956, 964 (2d Cir. 1998) (quoting *U.S. E. Telecomms., Inc. v. U.S. W. Comm'cns Servs., Inc.*, 38 F.3d 1289, 1296 (2d Cir. 1994)); *accord Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) ("It is impermissible, however, to seek damages in an action sounding in quasi contract where the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.") (quoting *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388–89 (1987)); *Reilly v. Natwest Mkts. Grp. Inc.*, 181 F.3d 253, 262–63 (2d Cir. 1999) ("Under New York law, the existence of an express

---

[8] The indenture is expressly governed by New York law.  *See* Base Indenture, § 13.08; Ninth Supplemental Indenture, § 2.2.

contract governing a particular subject matter ordinarily precludes recovery in *quantum meruit* for events arising out of the same subject matter.").[9]

This Second Circuit authority, in turn, draws upon a line of decisions by the New York courts to the same effect.  In the landmark case of *Clark–Fitzpatrick*, *supra*, the New York Court of Appeals explained:  "A 'quasi-contract' only applies in the absence of an express agreement . . . .  [A] quasi-contractual obligation is one imposed by law *where there has been no agreement or expression of assent, by word or act, on the part of either party involved.*  The law creates it, regardless of the intention of the parties, to assure a just and equitable result."  70 N.Y.2d at 388–89 (emphasis in original) (citations and internal quotation marks omitted).  The law of other states is in accord.[10]

---

[9] *Cf. US Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1546–47 (2013) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.") (quoting Restatement (Third) of Restitution and Unjust Enrichment § 2(2) (2010)).

[10] *See, e.g.*, *Clapp v. Goffstown Sch. Dist.*, 159 N.H. 206, 210–11 (2009) ("[U]njust enrichment shall not supplant the terms of an agreement. . . .  It is a well-established principle that the court ordinarily cannot allow recovery under a theory of unjust enrichment where there is a valid, express contract covering the subject matter at hand."); *Tolliver v. Christina Sch. Dist.*, 564 F. Supp. 2d 312, 315 (D. Del. 2008) ("[T]he existence of an express, enforceable contract that controls the parties' relationship will defeat an unjust enrichment claim[].");  *Trs. ex rel. Teamsters Benefit Tr. v. Doctors Med. Ctr. of Modesto, Inc.*, 286 F. Supp. 2d 1234, 1239–40 (N.D. Cal. 2003) ("Plaintiff's alleged overpayment for medical services in this case was not simply the result of a clerical mistake, but arises from a dispute over the parties' interpretation of the contract.  Even under the broader view of equitable restitution to remedy unjust enrichment, a claim of unjust enrichment lies only where the defendant has no legal claim to the overpayment.") (footnote omitted); *Meaney v. Conn. Hosp. Ass'n, Inc.*, 250 Conn. 500, 517 (1999) ("[A]n express contract between the parties precludes recognition of an implied-in-law contract governing the same subject matter.") (quoting 1 E. Farnsworth, Contracts (2d ed. 1998) § 2.20); *accord DBSI/TRI V v. Bender*, 130 Idaho 796, 805 (1997); *Washa v. Miller*, 249 Neb. 941, 950 (1996); *Bright v. QSP, Inc.*, 20 F.3d 1300, 1306 (4th Cir. 1994) (applying West Virginia law); *Zuger v. N. Dakota Ins. Guar. Ass'n*, 494 N.W.2d 135, 138 (N.D. 1992); *Lord Jeff Knitting Co. v. Lacy*, 195 Ga. App. 287, 287 (Ga. Ct. App. 1990); *S & M Constructors, Inc. v. City of Columbus*, 70 Ohio St. 2d 69, 71 (1982); *Maxted v. Barrett*, 198 Mont. 81, 87 (1982); *Kramer v. Fallert*, 628 S.W.2d 671, 675 (Mo. Ct. App. 1981); *La Throp v. Bell Fed. Sav. & Loan*

The reason for deriving the measure of recovery from the parties' agreement is explained well in an oft-cited comment to the Restatement (Third) of Restitution and Unjust Enrichment:

> Contract is superior to restitution as a means of regulating voluntary transfers because it eliminates, or minimizes, the fundamental difficulty of valuation. Considerations of both justice and efficiency require that private transfers be made pursuant to contract whenever reasonably possible, and that the parties' own definition of their respective obligations—assuming the validity of their agreement by all pertinent tests—take precedence over the obligations that the law would impose in the absence of agreement. Restitution is accordingly subordinate to contract as an organizing principle of private relationships, and the terms of an enforceable agreement normally displace any claim of unjust enrichment within their reach.

Restatement (Third) of Restitution and Unjust Enrichment [hereinafter "Rest. (Third) of Restitution"], § 2, cmt. c; *see, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 831 F. Supp. 2d 787, 797 (S.D.N.Y. 2011) (citing this comment), *aff'd sub nom. Pujals v. Standard Chartered Bank*, 533 F. App'x 7 (2d Cir. 2013) (summary order). Put differently, the law favors contractual guideposts because a contract makes the parties the masters of their destiny. Where the parties have set out, *ex ante*, their respective rights and obligations, using contractual guideposts to allocate loss or damages will generally result in more voluntary, predictable, efficient, and fair outcomes than the *ex post* application of common-law principles of equity. *See* Rest. (Third) of Restitution § 2, cmt. c.

Significantly here, under this doctrine, for a written agreement to guide the terms of recovery, it is not necessary that the agreement speak to the precise factual circumstances of the dispute at hand. Instead, it is generally sufficient that the contract speak to the *subject matter* at issue. *See, e.g.*, *Reilly*, 181 F.3d at 262–63; *MacDraw*, 157 F.3d at 964; *U.S. E. Telecomms.*,

---

*Ass'n*, 68 Ill. 2d 375, 391 (1977); *Brooks v. Valley Nat'l Bank*, 113 Ariz. 169, 174 (1976); *Lowell Perkins Agency, Inc. v. Jacobs*, 250 Ark. 952, 959 (1971); *Paschall's, Inc. v. Dozier*, 219 Tenn. 45, 55 (1966).

*Inc.*, 38 F.3d at 1296; *Clark–Fitzpatrick, Inc.*, 70 N.Y.2d at 388; *cf. Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959).

A recent case usefully—indeed dramatically—illustrates this point.  In *Anwar v. Fairfield Greenwich Ltd.*, *supra*, investors brought suit against intermediary banks, seeking to recover the fees that the banks had charged them for managing investments in a hedge fund that had invested its assets with Bernard Madoff.  831 F. Supp. 2d at 789–90.  The plaintiffs brought claims for breach of contract and unjust enrichment.  *Id.*  The district court dismissed both claims because a form contract governed the service fees charged for managing investments, and that contract precluded recovery in restitution.  The court stated:  "[T]he silence of the Form Contract with regard to such an extreme contingency does not open the door for a quasi-contract remedy.  Although it is indeed unfair—and even unjust—that Plaintiffs paid fees on assets that were, in actuality, worthless, 'the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment.'"  *Id.* at 796–97 (quoting Rest. (Third) of Restitution § 1, cmt. b).  The Second Circuit summarily affirmed.  *See Pujals*, 533 F. App'x at 11 ("Plaintiffs' claims are thus covered by an express contract, and their unjust enrichment claim was properly dismissed.").[11]

Salient here, to both the district court and the Second Circuit in *Anwar*, it was of no consequence that the contracting parties had never contemplated, let alone specifically addressed, the "extreme contingency" that, improbably, had occurred—their contract still

---

[11] *Anwar* involved the application of Florida law, but that is of no consequence because Florida law is substantively identical to New York law as to whether contract law or restitution governs. *See, e.g.*, *In re Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337 (S.D. Fla. 2002) ("An unjust enrichment claim can exist only if the subject matter of that claim is not covered by a valid and enforceable contract."); *cf. Singer v. AT & T Corp.*, 185 F.R.D. 681, 692 (S.D. Fla. 1998) ("[B]reach of contract and unjust enrichment . . . are universally recognized causes of action that are materially the same throughout the United States.").

17

controlled.  *See, e.g.*, *Valley Juice Ltd., Inc. v. Evian Waters of France, Inc.*, 87 F.3d 604, 610

(2d Cir. 1996) (invalidating supplier's unjust enrichment claim against distributor where

relationship between these parties was governed by contract, despite fact that alleged misdeeds

by distributor either predated contract or involved conduct not specifically anticipated by

agreement); *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1053 (2d Cir.

1982) (overturning equitable award of interest earned on funds held in escrow during litigation to

aggrieved noteholders in dispute with issuer that had strategically defaulted, because no

"contractual provision" supported payment of interest to noteholders on such sums, and district

court's application of equitable principles was barred by existence of contract).

To be sure, principles of restitution can sometimes come into play in cases involving a

contract.  But as the Restatement (Third) of Restitution reflects, they are relevant only in unusual

and "margin[al]" circumstances—such as where "performance has been rendered under a

contract that is invalid, or subject to avoidance, or otherwise ineffective to regulate the parties'

obligations."  Rest. (Third) of Restitution § 2, cmt. c.  As the Restatement explains, "[r]estitution

is the law of nonconsensual and nonbargained benefits in the same way that torts is the law of

nonconsensual and nonlicensed harms.  Both subjects deal with the consequences of transactions

in which the parties have not specified for themselves what the consequences of their interaction

should be."  *Id.* § 1, cmt. d; *see also, e.g.*, *Porter v. Hu*, 116 Haw. 42, 55–56 (Haw. Ct. App.

2007) (permitting unjust enrichment claim where contract between insurance agency and

independent agent simply did not address at all scenario in which agency fired agent and

subverted their contractual relationship in order to retain independent agent's books of business).

The equitable principle of restitution, championed by Chesapeake, is far more commonly

utilized in circumstances where the parties' relationship is not defined by contract.  For example,

18

a party disadvantaged by a lower court's ruling (*e.g.*, an order to pay damages, or to refrain from certain conduct) is typically entitled to be restored to its previous position after a higher court has reversed that ruling.  A court thus may issue a restitutionary award to protect the losing party below which, against its will, was obliged to heed that court's order before it was overturned on appeal.  *See, e.g.*, *Atl. Coast Line R.R. Co. v. Florida*, 295 U.S. 301, 309 (1935) ("Decisions of this court have given recognition to the rule as one of general application that what has been lost to a litigant under the compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants opposed to him, the beneficiaries of the error."); *Baltimore & Ohio R.R. Co. v. United States*, 279 U.S. 781, 786 (1929) ("The right to recover what one has lost by the enforcement of a judgment subsequently reversed is well established."); *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145 (1919) ("[A] party against whom an erroneous judgment or decree has been carried into effect is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby."); *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219–20 (1891) (higher court's reversal of lower court's judgment, due to lower court's lack of jurisdiction, did not deprive lower court of right, on remand, to order restitution to the successful appellants in the amount collected on the judgment pending the appeal).

Even when restitution might be awarded, however, it "is not of mere right"; it is a discretionary remedy.  *LiButti v. United States*, 178 F.3d 114, 120 (2d Cir. 1999) (quoting *Atl. Coast*, 295 U.S. at 310).  As the Second Circuit has explained:  "'[A] court will not order [a restitutionary remedy] where the justice of the case does not call for it.' . . . '[T]he simple but comprehensive question is whether the circumstances are such that equitably the defendant should restore to the plaintiff what he has received.'  The essence of equity jurisdiction has been

its flexibility to tailor each decree to the necessities of the specific case." *Id.* at 120–21 (quoting *Atl. Coast*, 295 U.S. at 310).

ii.     **Application**

Both parties have ably litigated the remedy issue presented by the unusual series of events here.  However, when viewed in light of the above principles, BNY Mellon's argument for recovery measured by Make-Whole damages as defined by § 1.7(c) of the Supplemental Indenture is substantially the more persuasive.  For four reasons, each ultimately relating to the law's preference for contract-based remedies where a valid contract governs the parties' relationship, Chesapeake's approach, under which § 1.7(c) is irrelevant to damages, is problematic.

1.  ***The indenture covers the relevant subject matter***:  As reviewed above, where a valid contract governs a particular subject matter, the contract ordinarily precludes recovery in quasi-contract (*i.e.*, restitution) for disputes concerning that subject matter, and courts have looked to the contract to provide the measure of recovery.  Such is the case here.  The subject matter of § 1.7 is the early redemption of the 2019 Notes, including the precise money due to the Noteholders depending on the date of that redemption.  This case thus naturally invites the application of the principle that where the parties have set out their respective rights and obligations as to a particular subject matter in a valid, enforceable agreement, a court setting remedies will be guided by that agreement.

Although it may be appropriate to fix remedies with reference to equitable principles in non-contract cases or in rare contract cases where the injury giving rise to a need for remediation is wholly unaddressed by the parties' agreement, such is not the case here, at all.  Rather, as in *Anwar*, the parties' agreement is capacious enough to cover the events at hand.  (Indeed, the

20

unexpected circumstance in *Anwar*—that the assets on which bank fees were being charged were phantom, as a result of the Madoff Ponzi scheme—was far harder to anticipate than that at issue here.)  The Supplemental Indenture is *comprehensive* as to the two types of redemptions that may occur with respect to the 2019 Notes.  And it defines them by date:  Redemptions on or before March 15, 2013 are Special Early Redemptions, *see* § 1.7(b); redemptions after that date are Make-Whole Redemptions, *see* § 1.7(c).  These provisions together cover the universe of dates on which a redemption can occur.

Chesapeake's approach, however, asks the Court effectively to recognize a third type of redemption, unmentioned in the Supplemental Indenture.  This redemption would be defined not by its date, but by Chesapeake's state of mind at the time of the redemption.  For Chesapeake's argument is that, because it acted in good faith when it attempted a Special Early Redemption on May 13, 2013 believing such still to be timely, it is entitled to pay its Noteholders less than had it otherwise redeemed (*i.e.*, under § 1.7(c)) the same day.

An indenture, however, is a form of contract.  *See, e.g.*, *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 559 (2014) ("A trust indenture is a contract, and under New York law '[i]nterpretation of indenture provisions is a matter of basic contract law.'") (quoting *Sharon Steel*, 691 F.2d at 1049, and collecting cases); *Bank of N.Y. Tr. Co., N.A. v. Franklin Advisers, Inc.*, 726 F.3d 269, 276 (2d Cir. 2013) ("It is a well-established rule in this Circuit that the 'interpretation of Indenture provisions is a matter of basic contract law.'") (quoting *Jamie Sec. Co. v. The Ltd., Inc.*, 880 F.2d 1572, 1576 (2d Cir. 1989)).  And it would be at odds with basic principles of contract law to effectively impute a new type of redemption into a contract that, by its terms, listed two and only two types of redemptions and them by date.  *See, e.g.*, *Vertin*, 23 N.Y.3d at 559–60 ("In construing a contract we look to its language, for 'a written agreement

that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.'") (quoting *Greenfield v. Philles Records*, 98 N.Y.2d 562, 569 (2002)); *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (applying New York law) ("[C]ourts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing.") (quoting *Bailey v. Fish & Neave*, 8 N.Y.3d 523, 528 (2007)); *id.* ("[I]f the agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity.") (quoting *Greenfield*, 98 N.Y.2d at 569–70); *Fiore v. Fiore*, 46 N.Y.2d 971, 973 (1979) ("The courts may not rewrite a term of a contract by 'interpretation' when it is clear and unambiguous on its face.").  Because the contract here covers the subject matter at issue—the payouts due for redemptions on particular dates—it is appropriate to award the Noteholders the recovery due under the indenture for redemptions after March 15, 2013.

2.  ***Implications of the holding that § 1.7 is unambiguous***:  Chesapeake's proposal is also in tension with the Second Circuit's holding that § 1.7 is textually unambiguous.  At argument on remand, the Court asked counsel whether Chesapeake believed that restitutionary damages would be appropriate if (1) Chesapeake had issued a notice of a Special Early Redemption on March *16*, 2013, and redeemed 30–60 days thereafter, but (2) an appellate court later held the notice untimely to effect such a redemption.  Chesapeake's counsel conceded that Chesapeake would then have to pay Make-Whole damages because § 1.7 clearly cannot reasonably be read to permit notice of a Special Early Redemption after March 15, 2013.

In light of the Second Circuit's ruling that the indenture text was clear, that logic applies as well to a notice of redemption issued on March 15, 2013.  For the Second Circuit held that

22

§ 1.7(b) *unambiguously* made March 15, 2013 the deadline for a Special Early Redemption itself, and therefore made February 13, 2013 the deadline for noticing such a redemption. *See Chesapeake Energy Corp.*, 773 F.3d at 116–17.  To be sure, this Court at all times took a different view—it initially viewed that provision as ambiguous, and later, in granting declaratory relief, held for Chesapeake that March 15, 2013 was the deadline for notice.  But the Second Circuit's decision, not this Court's overturned ruling, is authoritative as to the construction of the indenture.  And so is the Circuit's basis for reaching that construction—a finding that the indenture text was clear (as opposed to, for example, a finding of textual ambiguity, construed to favor the Noteholders).  *See Chesapeake Energy Corp.*, 773 F.3d at 116–17.  With the Second Circuit having held that February 13, 2013 was at all times *unambiguously* the deadline for giving notice of a Special Early Redemption, Chesapeake's March 15, 2013 redemption notice is not nearly as comfortably distinguished from the hypothetical of an unreasonable March 16, 2013 redemption notice as once might have appeared.

　　　**3.  *Respect due for investors' expectations*:**  For the Court to fashion what amounts to a new type of redemption, with its pricing terms to be set *post hoc* by a Court with reference to equitable principles, would confound investors' valid expectations.  Based on the Supplemental Indenture's text as construed by the Second Circuit, an investor who bought—or held—2019 Notes would have believed, after March 15, 2013, that there were only two possible dispositions for his investment:  (1) If Chesapeake did not redeem early such that Noteholders held to maturity, Noteholders would receive a 6.775% annual income stream until March 15, 2019, and recoup their principal.  Or (2) if Chesapeake redeemed, Noteholders would be paid, in a lump sum, the Make-Whole Amount, pursuant to § 1.7(c).

It is reasonable to assume that some investors decided to buy or hold the Notes because they believed that, after March 15, 2013, only these two outcomes were possible.  An investor could realistically not have anticipated the third scenario in which—if Chesapeake missed the deadline for a Special Early Redemption but redeemed in a good faith belief that it had met that deadline—Noteholders would receive an early-redemption lump-sum payout materially smaller than the Make-Whole Amount.  That is not to say that Chesapeake's notion of a "restitutionary" payout is normatively unreasonable.  It is not:  As Chesapeake explains, it is anchored in familiar equitable principles that calculate restitutionary damages as a present value (here, of payments to maturity).  But the investors who decided to buy (or hold) the 2019 Notes were beneficiaries of a contract.  It can safely be said that they did not have a restitutionary scenario in mind.  They presumably chose to buy or hold based on the comprehensive text of the indenture, which presented binomial outcomes.  Such investors may have chosen the Notes because they preferred a steady payout over time to a lump sum, unless the lump-sum formula was defined (like the Make-Whole Amount under § 1.7(c) to include a premium over the present value of that payout.

The interest in respecting investors' legitimate expectations therefore supports a payout keyed to the indenture's treatment of redemptions after March 15, 2013.  *See, e.g.*, *Metro. Life Ins. Co. v. RJR Nabisco, Inc.*, 716 F. Supp. 1504, 1520 (S.D.N.Y. 1989) (applying New York law) ("The sort of unbounded and one-sided elasticity urged by plaintiffs would interfere with and destabilize the market.  And this Court, like the parties to these contracts, cannot ignore or disavow the marketplace in which the contract is performed.  Nor can it ignore the expectations of that market—expectations, for instance, that the terms of an indenture will be upheld, and that a court will not, *sua sponte*, add new substantive terms to that indenture as it sees fit.") (citing, *inter alia*, *Sharon Steel*, 691 F.2d at 1048 ("[U]niformity in interpretation is important to the

24

efficiency of capital markets. . . .  [T]he creation of enduring uncertainties as to the meaning of

boilerplate provisions would decrease the value of all debenture issues and greatly impair the

efficient working of capital markets.")).  There is also a prospective dimension to this point.  A

judicial ruling supervening an indenture's comprehensive terms so as to excuse an issuer (based

on a good-faith misapplication) from a duty it would otherwise have would introduce uncertainty

into, and unhelpfully complicate, future indentures.

    **4.  *Chesapeake's awareness that its redemption might be held to trigger a § 1.7(c)***

***payout***:  Chesapeake was on notice at all relevant times that the present scenario, involving the

need on remand to resolve damages arising from a Special Early Redemption held untimely,

might arise.  From early on, Chesapeake knew that (1) the timeliness of its proposed Special

Early Redemption was hotly contested, and (2) if held untimely on appeal, its redemption might

be held to trigger a duty to pay the Make-Whole payment.

    As to the first point, beginning February 20, 2013, BNY Mellon notified Chesapeake that

it believed that the deadline for noticing a Special Early Redemption had passed on February 13,

2013.  And beginning March 8, 2013, this deadline was a principal subject of Chesapeake's

litigation in this Court, including its application for emergency relief.  Indeed, in denying that

relief, this Court stated that the indenture's notice deadline appeared ambiguous, meaning

Chesapeake's construction might ultimately be rejected.  *See* 3/14/13 Tr., 17 ("As counsel have

ably demonstrated, both of the competing positions find textual support within the indentures.").

The next day, Chesapeake gave notice of the redemption, binding itself to redeem if this Court

held its notice timely.

    As to the latter point, BNY Mellon and the Noteholders took the position, in

communications with Chesapeake and before this Court, that a Special Early Redemption notice

alone, if held untimely by this Court such that no redemption occurred, could trigger a redemption under § 1.7(c).  Although this Court disdained that position, it explicitly reminded Chesapeake, as all parties assuredly appreciated, that if Chesapeake redeemed the notes in reliance on a decision that its notice had been timely, and the Second Circuit reversed, Chesapeake could then be ordered to pay the Noteholders in a lump sum measured by the Make-Whole Amount, even though Chesapeake had never intended to trigger a § 1.7(c) redemption. *See* 3/19/13 Tr., 52–59.[12]  All parties further appreciated that, were Chesapeake to prevail at trial,

---

[12] At the March 19, 2013 hearing, the Court addressed the various outcomes of the upcoming trial with counsel, and engaged in the following colloquy with Chesapeake's counsel (Richard Ziegler, Esq.):

> **THE COURT**:  . . .  [N]ow hypothetically you win but there's an immediate appeal. . . .  Is [BNY Mellon] right that basically the remedy at that point was not . . . to seek the reinstatement of the notices on the 2019 agreement schedule but in effect to claim Judge Engelmayer got it wrong and the only way to make my clients whole is to in effect pay them what amounts to the present value -- the 2019 value -- in effect giving him the make-whole value through the backdoor?
>
> **MR. ZIEGLER**:  And certainly I don't think the Court will give the noteholders the make-whole value through the backdoor.
>
> **THE COURT**:  Well, you don't think that.  But I'm asking you to assume that the Court of Appeals disagrees with a ruling I make in your favor on timeliness and now wants to fashion a remedy.  What is that remedy?
>
> * * *
>
> **THE COURT**:  The notion would be that, in effect, on appeal the victorious noteholder would either get, as you say, the resuscitated new note, or, if you had to monetize it into a chunk of money to pay now, it winds up looking very much like the make-whole remedy.
>
> **MR. ZIEGLER**:  I just think the make-whole remedies in either case are sufficiently unusual that the equitable mootness doctrine may apply.
>
> **THE COURT**:  You're a creative lawyer, but it feels to me like there are money damages available on th[at] scenario. . . .

3/19/13 Tr., 56–59.

BNY Mellon and the Noteholders would appeal, but an appeal could not realistically be completed until long after the deadline for Chesapeake to redeem (60 days after its notice) had passed. *See id.* at 48–59. Chesapeake thus knew that in committing to redeem based on a finding of timeliness by a lower court only, it ran the risk of appellate reversal. *See, e.g.*, *Edgar v. MITE Corp.*, 457 U.S. 624, 651 (1982) (Stevens, J., concurring) ("[E]very litigant is painfully aware of the possibility that a favorable judgment of a trial court may be reversed on appeal.").

The unhappy situation in which Chesapeake finds itself was thus a front-and-center, and real, possibility at all times. All parties, and the Court, recognized this. In waiting until after February 13, 2013 to issue its notice of Special Early Redemption, and in committing to redeem if this Court held that notice timely, Chesapeake ran the known risk that this worst-case scenario would come to pass. It went forward in the face of this "known unknown." Chesapeake assuredly hoped for a better outcome—ideally, that all courts would sustain its Special Early Redemption; alternatively, that this Court would hold its notice untimely and thereby abort its bid pre-redemption. But in identifying potential branches of the decision tree, Chesapeake had to know that in one, it would redeem based on a ruling of timeliness which was later reversed, giving the Noteholders, under the indenture, a substantial claim for Make-Whole damages based on the date of the redemption.

For these reasons, the Court rejects Chesapeake's suggestion that its characterization of the redemption as other than a Make-Whole Redemption must be given significant weight. Section 1.7(c) indeed states, as Chesapeake notes, that Chesapeake "*at its option*" may bring about a Make-Whole Redemption; on that basis, Chesapeake argues that it never "opt[ed]" to bring such a redemption about. But Chesapeake gains little mileage from that clause. That clause makes the decision Chesapeake's alone whether or not to redeem the Notes after March

15, 2013.  But that clause did not permit Chesapeake, by labeling a redemption a "Special Early

Redemption," to decide the payout required under such a redemption if held later to have

occurred within the period when only Make-Whole redemptions were authorized.

Nor, under the present circumstances, can Chesapeake carry the day by noting that it

consistently characterized the May 13, 2013 redemption as other than a Make-Whole

redemption—including in the March 15, 2013 Notice of redemption itself.  *See, e.g.*, 2/24/15 Tr.,

23 (argument of Chesapeake's counsel that "the effect of the redemption that occurred is

integrally tied to th[e] notice" Chesapeake issued).  Lewis Carroll notwithstanding, what

Chesapeake has said repeatedly is not necessarily so.  *See* Lewis Carroll, The Hunting of the

Snark 3 (1876) ("I have said it thrice: What I tell you three times is true.") (quoted in *Parhat v.

Gates*, 532 F.3d 834, 848–49 (D.C. Cir. 2008)).  Chesapeake's characterization of the

redemption as a Special Early Redemption, although an accurate reflection of its intentions,

cannot preempt the Court from applying the principles above to determine the proper remedy due

to the Noteholders given the Second Circuit's contrary holding.

### iii.    Cases relied on by Chesapeake

The Court has carefully considered the cases on which Chesapeake relies in advocating

for a non-contractual remedy.  This authority is inapposite for the reasons that follow.

Chesapeake first relies on Supreme Court cases awarding restitution on remand after an

appellate reversal.  These cases apply the principle that "what has been lost to a litigant under the

compulsion of a judgment shall be restored thereafter, in the event of a reversal, by the litigants

opposed to him, the beneficiaries of the error."  *Atl. Coast*, 295 U.S. at 309; *see also Baltimore

& Ohio R.R.*, 279 U.S. at 786 ("The right to recover what one has lost by the enforcement of a

judgment subsequently reversed is well established."); *Arkadelphia*, 249 U.S. at 145 ("[A] party

against whom an erroneous judgment or decree has been carried into effect is entitled, in the

event of a reversal, to be restored by his adversary to that which he has lost thereby.").

       This principle does not assist Chesapeake.  In the cases which it cites, the Court applied

this principle to award damages to (1) a losing-defendant-turned-victorious-appellant who

(2) *lost* something under *compulsion* of a court order.  The rationale is that "[o]bedience was

owing" to the lower court's order (or the Interstate Commerce Commission's order) "while th[at]

order was in effect."  *Atl. Coast*, 295 U.S. at 309.  In *Baltimore & Ohio Railroad*, for example,

the "west side" railroads sought, and obtained from the Interstate Commerce Commission

("ICC"), an order that the "east side" railroads should bear the cost of trans–Mississippi River

travel.  The east side railroads then brought suit in federal court, seeking to set aside the ICC's

order; after the district court dismissed the suit for want of equity, the Supreme Court reversed.

On remand, the district court set aside the ICC's order, but, while holding that the east side

railroads had complied with the ICC's order while in effect, denied their bid for restitution.  On

appeal, the Supreme Court again reversed.  279 U.S. at 783–84.  It held that the east side

railroads were entitled to restitution because they had made payments "in compliance with the

[ICC's] invalid order," and those payments "inured to the benefit of the west side roads just as if

made directly to them."  *Id.* at 785–86.

       For a number of reasons, this case is a far cry from that scenario.  Chesapeake is not a

losing-defendant-turned-victorious-appellant; it is a winning-plaintiff-turned-unsuccessful-

appellee.  And Chesapeake was not *compelled* by a court to do (or refrain from doing) anything;

it affirmatively *chose* to pursue a course leading to a redemption knowing that timeliness was

contested and that it might be held on appeal to have missed the deadline for Special Early

Redemption.  Unlike the east side railroads, Chesapeake controlled its choices and ran a known risk.

Significantly, too, the relationship among the parties in the railroad-rate cases like *Baltimore & Ohio Railroad*, *Arkadelphia Milling*, and *Atlantic Coast* was not governed by contract; the litigation challenged regulatory rate-setting and court injunctions.  These cases thus do not displace the principle, reviewed above, that where the parties' relationship is defined by contract, courts should look to the contract in setting remedies.

Finally, these decisions do not limit the right of a party on remand to a restitutionary remedy.  Later decisions have held that, in the situation where a contractual provision initially has been misinterpreted, the losing-defendant-turned-successful-appellant may, on remand, seek *either* a contractual or a restitutionary remedy.[13]  Contrary to Chesapeake's claim, restitution on

---

[13] *Munoz v. MacMillan*, 195 Cal. App. 4th 648, 651 (Cal. Ct. App. 2011), supplies a good illustration.  There, landlord MacMillan sued tenant Munoz for unlawful detainer.  MacMillan prevailed in the trial court, and evicted Munoz.  Munoz won on appeal.  Munoz then sued for damages under the lease.  MacMillan argued that he had evicted Munoz in reliance on the trial court and that restitution therefore was Munoz's only remedy.  The appellate court disagreed:

> If Munoz has suffered damages as a result of the alleged breach, she can pursue applicable remedies for breach of contract.  Were this not the rule, it would be difficult to explain doctrinally what happened to Munoz's contract rights.  Munoz did not at any time voluntarily relinquish her right to possession under the lease for the term prescribed, either during the pendency of the unlawful detainer action or following the initial judgment. . . . MacMillan now contends the existence of a restitution remedy precludes a contract remedy. . . .  But we are unaware of any authority for the proposition that the existence of a remedy in restitution precludes a plaintiff from suing on an express contract.  It would be odd to say Munoz is required to seek restitution for the loss of her rights, but cannot seek recovery for breach of contract.  It is the *lease* (an actual contract, not one implied by law) that entitled Munoz to possession of the premises.  It is the *lease* that defines the rights Munoz lost when the initial judgment was enforced (the time period she was entitled to possess the premises).  There is no need in this case for Munoz to plead quasi-contract or quantum meruit—she has an actual contract.

*Id.* at 659–61 (footnote omitted).

remand is neither mandatory nor exclusive, *see* Chesapeake Br. 14, and the cases Chesapeake cites do not support that proposition.[14]

Second, Chesapeake relies on a section (§ 18) of the Restatement (Third) of Restitution derived, in part, from the foregoing Supreme Court cases. It states that "[a] transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment." But § 18 does not avail Chesapeake. Chesapeake relies on the broadly worded clause, "in compliance with *or otherwise in consequence of a judgment* that is subsequently reversed or avoided," but it puts more weight on that clause than it fairly bears. There is no authority for viewing this clause as displacing the scores of cases (reviewed earlier), or for that matter § 2 of the Restatement, that give primacy to contractual remedies where available. *See* pp. 14–20, *supra*. The comments to § 18 confirm Chesapeake's overreach:

---

[14] Some of these cases involved the calculation of a restitution award sought by a successful appellant; they do not speak to the situation where such an appellant seeks a different form of recovery. *See, e.g.*, *U.S. Indus., Inc. v. Gregg*, 457 F. Supp. 1293 (D. Del. 1978), *aff'd*, 605 F.2d 1199 (3d Cir. 1979); *see also In re Popkin & Stern*, 263 B.R. 885, 889 (8th Cir. B.A.P. 2001). Other cases examined the *motive* for a breach of contract only because a statute made it relevant whether the breach had been "wrongful" or "unjustified." *See, e.g.*, *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Seagate Tech., Inc.*, No. 04 Civ. 01593 (WHA), 2013 WL 1282971, at *3 (N.D. Cal. Mar. 27, 2013), (addressing whether insurer's refusal to defend insured had been "wrongful" under California statute, and noting that insured was "entitled to the benefit of its own bargain"); *Auto-Owners Ins. Co. v. Potter*, 242 F. App'x 94, 97–98 (4th Cir. 2007) (unpublished) (addressing whether insurer's withdrawal of defense of insured had been "unjustified" under North Carolina statute). Finally, several cases are sufficiently far afield as to have no bearing here. *See, e.g.*, *Chafin v. Chafin*, 133 S. Ct. 1017, 1028 (2013) (in Hague Convention child custody dispute, district court ordered child repatriated to Scotland, appeals court held the appeal moot, and Supreme Court found the appeal *not* moot because district court could order the child to return to the U.S.); *In re Cathedral of Incarnation in Diocese of Long Island*, 90 F.3d 28, 35–36 (2d Cir. 1996) (holding that bankruptcy court should wait to see if later events confirmed that restitution was available); *Am. Gen. Ins. Co. v. Equitable Gen. Corp.*, 493 F. Supp. 721 (E.D. Va. 1980) (at plaintiff's request, court granted rescission of a contract and awarded rescissory damages rather than return to the status quo).

> This section addresses the restitution issues that arise when a transfer of the claimant's property results, directly or indirectly, from an *adverse* judgment in a judicial or administrative proceeding to which the claimant is a party, and that judgment is subsequently reversed or otherwise set aside.  It is often possible to postpone *compliance* with an *adverse* judgment, by a bonding procedure or otherwise, pending a challenge by direct appeal or in collateral proceedings.  If there has been no transfer in consequence of the judgment that is later set aside, there is naturally no issue of restitution.  But a party is under no obligation to postpone *compliance* with a judgment that he seeks to *overturn*[], and postponement is not always feasible.

Rest. (Third) of Restitution § 18, cmt. a (emphases added).  Section 18 is thus aimed at ensuring recovery by the originally losing party that had acted (or refrained from acting) in "compliance" with an "adverse" judgment.  As noted, this case does not fit that paradigm.

Third, Chesapeake argues that awarding Noteholders the § 1.7(c) Make-Whole remedy would award a windfall that is barred by the case law.  But Chesapeake does not identify any case inconsistent with using, to determine the amount of relief, a contractual provision that sets out the monies due the appellate victors upon the very action (a redemption on a given day) for which they seek recompense.  The cases involving TIAA entities, on which Chesapeake relies, do not aid its cause.  *See Teachers Ins. & Annuity Ass'n of Am. v. Coaxial Commc'ns of Cent. Ohio, Inc.*, 799 F. Supp. 16 (S.D.N.Y. 1992); *Teachers Ins. & Annuity Ass'n v. Ormesa Geothermal*, 791 F. Supp. 401 (S.D.N.Y. 1991).  Chesapeake notes that that those cases rejected make-whole provisions and instead awarded damages equal to the discounted present value of the incremental interest income that the investors lost due to the breach.  *See Coaxial Commc'ns*, 799 F. Supp. at 19; *Ormesa Geothermal*, 791 F. Supp. at 415–16.  But the *TIAA* cases concerned a different type of agreement (a private term loan, not a registered corporate bond), which had not yet been funded, *see Coaxial Commc'ns*, 799 F. Supp. at 18; *Ormesa Geothermal*, 791 F. Supp. at 416; thus, the make-whole provision was not yet in force when the breach occurred.  The *TIAA* cases therefore did not reject an applicable make-whole provision in favor of

restitution, so much as they declined to transport a make-whole provision to govern a time period

with respect to which the parties had agreed it would not apply.  And the court in *Coaxial*

*Communications* emphasized the primacy of contractual remedies when available, stating that

"absent a clear violation of public policy it is important to preserve the freedom of parties to

contract.  It is not for a fact-finder to second-guess the wisdom of their choices.  Both parties

elected to sign the commitment letter as written despite the risks, and defendant cannot now be

heard to seek to avoid its contract because of regrets on its side about a strategic business

decision."  799 F. Supp. at 18.  These decisions thus accord with the Second Circuit's emphasis

on upholding the "particularized intentions of the parties," so as to promote predictability and

market efficiency.  *Sharon Steel*, 691 F.2d at 1048.

 The Court therefore agrees with BNY Mellon:  With respect to the redemption on May

13, 2013 of the 2019 Notes, Chesapeake must pay compensation to the Noteholders consistent

with their entitlement to Make-Whole relief for such a redemption under §1.7(c).

 **D.** **Prejudgment Interest**

 The parties next dispute the appropriate measure of the prejudgment interest due to the

2019 Noteholders.

 The principles governing prejudgment interest under New York law are supplied by New

York CPLR § 5001 *et seq*.  Section 5001(a) provides that "[i]nterest shall be recovered upon a

sum awarded because of a breach of performance of a contract, or because of an act or omission

depriving or otherwise interfering with title to, or possession or enjoyment of, property, except

that in an action of an equitable nature, interest and the rate and date from which it shall be

computed shall be in the court's discretion."  Under § 5001(a), in a breach of contract action, the

prevailing party is entitled to prejudgment interest on its damages "as a matter of right."  *See*

*U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 936 F.2d 692, 698 (2d Cir. 1991).  In a breach of contract action, CPLR § 5004 establishes a default prejudgment interest rate of 9% per year, subject to the right of the parties to agree, by contract, to a different rate.  Thus, the "applicable rate of prejudgment interest [may] var[y] depending on the nature and terms of the contract." *NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 258 (2011); *see also id.* (explaining that CPLR § 5004 applies "[i]f the parties failed to include a provision in the contract addressing the interest rate that governs . . . in the event of a breach").  By contrast, in an equitable action, § 5001(a) gives the Court discretion to select a fair prejudgment interest rate.  *See, e.g.*, *Franklin Advisers*, 726 F.3d at 282; *United States v. Con. Edison Co.*, 452 F. Supp. 638, 658–59 (S.D.N.Y. 1977), *aff'd*, 580 F.2d 1122 (2d Cir. 1978) (court has "broad discretion in fashioning an award of interest[,] if any," when "recovery is based upon equitable principles").  In either circumstance—an action based in contract or in equity—prejudgment interest runs from "the earliest ascertainable date the cause of action existed, except that interest upon damages incurred thereafter shall be computed from the date incurred."  N.Y. CPLR § 5001(b).

The parties' positions as to prejudgment interest echo their arguments as to the amount of money due.  Chesapeake casts the issue as equitable, not contractual, and therefore argues that the prejudgment interest rate is left to the Court's discretion under § 5001.  Chesapeake proposes an interest rate of 2.3% per year, which, it states, was its "borrowing rate for short-term loans" on May 13, 2013 and therefore the interest that a 2019 Noteholder could have obtained had it invested redemption proceeds that day.  Chesapeake Reply Br. 24–25; *see also* Chesapeake Br. 33.  By contrast, BNY Mellon argues that this damages inquiry in substance, if not form, sounds in breach of contract.  Indeed, BNY Mellon notes, the 2019 Noteholders, rather than pursuing relief on remand in this litigation under § 2202, could have brought a breach of contract action,

claiming that Chesapeake breached its indenture-based duty to them to pay the Make-Whole

Amount upon the May 13, 2013 redemption.  BNY Mellon therefore argues that prejudgment

interest is as of right, not discretionary, and that the Court should set the prejudgment interest

rate using the 6.775% annual rate applicable to the 2019 Notes under the Supplemental

Indenture; consistent with this argument, BNY Mellon argues that this rate displaces the 9%

default rate in contract cases under New York law.  *See* BNY Br. 33–34.  The parties agree that

prejudgment interest runs from the redemption date (May 13, 2013).  *See* Chesapeake Br. 33;

BNY Br. 33–34.  BNY Mellon urges that this interest be calculated semi-annually, on March 15

and September 15, again, consistent with the Supplemental Indenture.[15]

The Court again agrees with BNY Mellon.  That the prejudgment interest rate is to be

determined contractually by reference to the indenture, if the indenture speaks to that point,

logically follows from the Court's holding that the Noteholders' damages are contractual in

nature, based on Chesapeake's breach of its duties upon redemption under the indenture.  To be

sure, the Supplemental Indenture does not set, *in haec verba*, a prejudgment interest rate.  The

6.775% rate that appears in the indenture instead is used to measure the interest on the 2019

Notes to their maturity (*i.e.*, assuming no redemption).  But although these contexts are distinct,

there is good logic to binding Chesapeake to that same rate in the context of setting the interest

rate upon breach.  After all, Chesapeake, the driving force behind, and a drafter of, the indenture,

agreed to pay such an interest rate on the Notes, over a seven-year period (2012 through 2019),

to the same class of Noteholders.  And § 3.06 of the Base Indenture appears to signal an intent

---

[15] *See* Dkt. 1, Ex. B, at 12 (Ninth Supplemental Indenture, Reverse Side of Note, ¶ 1)
("Chesapeake Energy Corporation . . . promises to pay interest on the principal amount of this
Note at the rate per annum shown above [6.775%].  The Company will pay interest semiannually
on March 15 and September 15 of each year . . . .").

that the 6.775% rate would apply to overdue redemption payments, a characterization that is fair as to the sums due here.  It states:  "If any Security called for redemption shall not be so paid upon redemption because of the failure of the Company to [deposit the required redemption price], interest will continue to be payable on the unpaid principal and any premium including from the redemption date until such principal and any premium is paid, and, to the extent lawful, on any interest not paid on such unpaid principal, in each case at the rate provided in the Securities and in Section 4.01 hereof."  Baron Decl., Ex. I (Base Indenture, § 3.06).  Moreover, given the Court's holding that the Noteholders' monetary entitlement is contractual in nature, a conclusion that that the 6.775% interest rate set in the indenture did not apply in the context of prejudgment interest would not benefit Chesapeake.  The Court would then, pursuant to § 5004, impose the default prejudgment interest of 9% that applies in contract cases.[16]

The Court, accordingly, holds that the prejudgment interest rate here is 6.775%; that it runs from May 13, 2013; and that interest is to be calculated semi-annually (on March 15 and September 15).

## CONCLUSION

For the foregoing reasons, the Court grants BNY Mellon's motion for further relief, and denies Chesapeake's cross-motion for an order of restitution.  Chesapeake shall pay the 2019 Noteholders $379,650,133.21, consistent with their entitlement to be paid the Make-Whole Amount for a redemption on May 13, 2013.  Further, the Court holds that the prejudgment

---

[16] For avoidance of doubt, were the prejudgment interest rate left to the Court's discretion, as Chesapeake posits, the Court would still choose the 6.775% rate on which the parties to the indenture agreed.  The Court finds this rate more appropriate under the circumstances than either the 2.3% borrowing rate for short-term loans available to Chesapeake on May 13, 2013, or the 9% default rate in breach of contract cases.

interest rate is 6.775%, that it runs from May 13, 2013, and that it is to be calculated semi-annually (on March 15 and September 15).

The Clerk of Court is respectfully directed to terminate the motions pending at 160, 169, and 183, and to close this case.


SO ORDERED.

*Paul A. Engelmayer*

PAUL A. ENGELMAYER
United States District Judge

Dated: July 10, 2015
      New York, New York